IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

NIKE, INC and CONVERSE, INC.,

Plaintiffs,

v.

Maria WU et al.

Defendants.

Case No. 13 Civ. 8012

**DECLARATION OF GUO LI**

I, GUO Li, declare as follows:

1.     I am a Professor of Law and Vice Dean at Peking University Law School, People's Republic of China, where I have been employed since 2005. My academic specializations are banking law, securities regulation, corporate and commercial law, and comparative studies. I have in recent years served as an advisor to a number of Chinese financial regulatory agencies and legislative organs. I have published a variety of monographs, journal articles, and commentaries on the above-mentioned areas of law.

2.     I have been asked to provide an expert opinion in NIKE, Inc. v. Wu, 13 Civ. 8012 (S.D.N.Y.), a United States (U.S.) federal court action brought by trademark holders ("Plaintiffs") against persons ("Defendants") accused of selling counterfeit goods by using Plaintiffs' trademarks without authorization. I understand that the U.S. federal court has entered a Final Order against the Defendants that imposes customer account disclosure and restraint requirements on nonparty banks organized under the laws of the People's Republic of China ("PRC") with branches in New York. Those banks include Agricultural Bank of China ("ABoC"), Bank of Communications ("BOCOM"), China Merchants Bank ("CMB"),

1

China Construction Bank ("CCB"), and Industrial and Commercial Bank of China Limited ("ICBC") (collectively, the "Banks").  I further understand that Plaintiff has issued subpoenas to the Banks seeking the disclosure of information about accounts, if any, that the Defendants have maintained at the Chinese branches of such banks (the "Subpoenas").  I understand that this declaration is being submitted to the Court in support of the position of those Banks that the disclosure and asset restraint provisions in the Final Order and disclosure demands in the Subpoenas should not extend to accounts in China.

3.      I have been asked to provide my opinions on the following questions:

•       Whether Chinese law prohibits Chinese commercial banks from complying with an order of a court in the U.S. or other jurisdictions outside of China to disclose information about customer accounts in China or to freeze the assets in such accounts;

•       The consequences that are likely to befall Chinese commercial banks or their officers and employees were they to comply with such an order of a U.S. court in contravention of Chinese law;

•       Whether there are alternative means (other than a discovery order issued by this or another U.S court) available for a litigant in a U.S. proceeding to obtain evidence in China in connection with the pending U.S. proceeding.

## BACKGROUND

4.      I commenced my study of law in the early 1990s, and graduated from Peking University Law School in 1997 with an LL.B. degree (with honors), and then in 2003 with an LL.D. degree (with honors). I also earned two LL.M. degrees in the U.S. from Southern Methodist University School of Law (International & Comparative Law, 2000) and Harvard Law School (International Finance Concentration, 2004). I passed the Chinese and New York Bar Exams in 1997 and 2004 respectively.

2

5.      I have been teaching subjects related to financial and corporate laws at Peking University and have also held positions in several foreign universities, such as Visiting Professor at Cornell Law School (2008-09) and University of Sydney Law School (Aug. 2017), Visiting Scholar at Vanderbilt Law School (Feb. 2012), Adjunct Professor at Case Western Reserve University School of Law (Aug. 2012), and Humboldt Foundation Research Fellow (Freiburg, Germany, 2010, 2011).   I am the Vice Chairman of China Banking Law Society.  I am affiliated with several academic associations, research institutions, and arbitration commissions both within and outside of China and serve on the editorial board of renowned law and finance journals, such as Asian Journal of Comparative Law and Securities Market Herald.

6.      In my research areas, I have published a number of papers in English in the Banking Law Journal, Cornell International Law Journal, European Business Organization Law Review, Journal of International Banking Law, Hong Kong Law Journal, Korean Law Journal, International Business Lawyer, etc., and co-authored two books such as Chinese Business Law (C. H. Beck & Hart) and Mergers and Acquisitions and Takeovers in China (Wolters Kluwer).  I am now serving as the editor-in-chief of PKU Journal of Legal Studies, the Peking University law journal in English. In Chinese, I have published several books and dozens of leading journal articles. One of the monographs, A Legal Reflection on the Innovation and Development of Chinese Banking Industry, published by Peking University Press, won the book awards of both Beijing Municipality and the nationwide competition organized by the Ministry of Justice.

7.      Attached as Exhibit A is a true and correct copy of my curriculum vitae, which provides a more complete statement of my credentials, including a list of publications.

3

**MATERIALS REVIEWED**

8.      In preparing this declaration, I have examined the following documents supplied to me by counsel to the Banks:

a.      The First Amended Complaint Filed in this Action on December 5, 2014.

b.      The Default Judgment Entered in this action on August 20, 2015.

c.      The Final Order entered in this action on October 20, 2017.

d.      The subpoenas issued to ABoC, BOCOM, CCB, CMB, and ICBC in connection with this action.

9.      I have also conducted independent research, as necessary, in the course of preparing this declaration. Attached as Exhibit B is a list of Chinese laws, regulations and cases referred to in this declaration, as well as the Chinese version of such laws and regulations accompanied by an unofficial English translation.

**SUMMARY OF OPINION**

10.     The conclusions I draw from a consideration of the relevant documents and my own research are as follows:  (i) Chinese law prohibits a Chinese commercial bank from complying with the order of a court in the United States (or other jurisdictions outside of China) requiring it to disclose information about customer accounts or to restrain such accounts in China; (ii) if a Chinese commercial bank or an officer or employee of the bank were to disclose information about customer accounts or restrain these accounts in China in violation of Chinese law, it would expose itself and its officers and employees to punishment by China's banking regulatory agencies, to civil liabilities towards the applicable account holder, and to criminal liability; (iii) the People's Court has the power to investigate bank account information in relation to a party of a civil lawsuit in accordance with the procedure set forth under Civil Procedure Law; and (iv) China is a signatory to the Hague Convention

4

and would have no reason not to enforce a request for evidence made in accordance with the Hague Convention in connection with the pending proceeding.

I.   **WHETHER CHINESE LAW PROHIBITS CHINESE COMMERCIAL BANKS FROM COMPLYING WITH THE ORDER OF A UNITED STATES COURT TO DISCLOSE INFORMATION ABOUT CUSTOMER ACCOUNTS IN CHINA**

11.   Over the last 20 years China has adopted a comprehensive set of laws and regulations that are designed to govern banks and banking in China.   First of all, all commercial banks in China are required to carry out their business in accordance with the Law of the People's Republic of China on Commercial Banks (the "**Commercial Bank Law**"), which was enacted in July 1995 and amended in December 2003 and August 2015. The Commercial Bank Law applies generally to all Chinese banks and to all aspects of their businesses.   In addition, the savings business of commercial banks is subject to the Regulations on the Administration of Savings ("**Savings Regulations**") promulgated by China's State Council (the top executive branch of Chinese government) in December 1992 and amended in January 2011.   The major laws in relation to the supervision of commercial banks include the Law of the People's Bank of China which became effective in March 1995 and was amended in December 2003, and the Banking Supervision Law enacted in December 2003 and amended in October 2006.

12.   The Commercial Bank Law provides general principles governing Chinese commercial banks but leaves the implementation of many of such general principles to the regulations issued by executive agencies such as the People's Bank of China ("**PBOC**") and China Banking Regulatory Commission ("**CBRC**").[1]   This regulatory scheme is intended to foster the creation and sound operation of commercial banks in China by, among other things,

---

[1]   The regulation of Chinese commercial banks had primarily been the responsibility of PBOC until April 2003 when CBRC was established and the primary authority to regulate Chinese commercial banks was transferred from PBOC to CBRC, but PBOC has retained the authority to regulate the settlement, anti-money laundering and financial stability aspects of Chinese commercial banks, etc.

(1) assuring that banks operating in China are managed on a secure financial basis, and are able to meet their obligations; and (2) establishing rules that govern the relationship between banks and customers. The existence of such protections is necessary to encourage the regular and widespread use of banks by businesses and individuals in China.

13.     The Commercial Bank Law and subsequent regulations implementing this law set forth the fundamental principle that banks must safeguard the rights of customers from interference or incursion from any party unless authorized by Chinese law, and establish that information related to customer accounts may not be disclosed unless called for by a Chinese court or designated agency of the Chinese government.

14.     These provisions reflect a considered decision by the Chinese government that the assurance of confidentiality regarding customer information is essential to fostering a modern banking system in China that is in line with the banking systems in other nations. It also reflects sensitivity to history, given the traditional reluctance by many Chinese consumers to make use of banks. Chinese consumers would be hesitant to maintain bank accounts if information could be disclosed in response to directives from foreign courts or government agencies and without resort to any Chinese court or government agency.

15.     Key provisions of the Commercial Bank Law include the following:

        a.      Article 8 of the Commercial Bank Law provides that "[c]ommercial banks shall carry out business in accordance with the relevant provisions of laws and administrative regulations."

        b.      Article 6 of the Commercial Bank Law provides that "[c]ommercial banks shall safeguard the legal rights and interests of depositors against the encroachment of any entity or individual."

        c.      Article 29 of the Commercial Bank Law provides that "[c]ommercial banks shall follow the principles of . . . keeping secrecy for depositors in handling personal

6

savings deposits. Commercial banks have the right to refuse any unit or individual to inquire about, freeze or deduct individual savings accounts, unless it is otherwise prescribed by laws."

        d.      Article 30 of the Commercial Bank Law provides that "a commercial bank has the right to refuse any unit or individual's inquiry about the account of an entity, unless it is otherwise prescribed by laws and administrative regulations; it also has the right to refuse any entity or individual's request for freezing or deducting the account, unless otherwise as prescribed by laws."

        e.      Article 73 of the Commercial Bank Law provides that "[i]n any of the following circumstances, a commercial bank shall undertake to pay interests for the deferred payment and other civil legal liabilities to the property losses of depositors or other clients: . . . 3. Illegally inquiring about, freezing, or deducting personal savings deposit account or unit deposit account; and . . . In the circumstances as prescribed in the preceding paragraph, the banking regulatory organ of the State Council shall order the commercial bank to correct, and confiscate the illegal gains if any, or impose a fine of one time up to five times the illegal gains if the illegal gains are more than RMB 50,000 Yuan; if there are no illegal gains or the illegal gains are less than RMB 50,000 Yuan, a fine of RMB 50,000 Yuan up to RMB 500,000 Yuan shall be imposed." (Exhibit B-1).

        16.      Based on these provisions, when an individual or company opens a bank account with a Chinese commercial bank and deposits funds in a bank account, the individual or company has a lawful right and interest in having the bank account and the funds in the bank account not disclosed, restrained or seized because of a dispute the individual or company may have with another party, whether Chinese or foreign, unless and until certain procedures provided by Chinese law are followed.

7

17.    In 1992, prior to the enactment of the Commercial Bank Law, the State Council of China promulgated the Regulations on the Administration of Savings (the **"Savings Regulations"**) to protect the rights and interest of individual depositors.   These regulations were further amended in 2011.

      a.    Article 32 of the Savings Regulations provides that:

> Savings institutions [which are defined to include a bank] and their personnel shall have an obligation to keep secret the depositors' savings and relevant information.  Savings institutions shall not inquire into, freeze or allocate savings deposits on behalf of any unit or individual, unless otherwise provided for by laws and administrative regulations of the state.

      b.    Article 34 of the Savings Regulations further provides that:

> If any unit or individual commits any of the following actions in violation of the provisions of these Regulations, the People's Bank of China or one of its branches shall order it or him to make corrections, and may impose a fine, order it or him to suspend business operations for rectification or revoke the Permit for Financial Business according to the seriousness of the circumstances.   If the circumstances are serious enough to constitute a crime, the offender shall be investigated for criminal liability. . . . (Exhibit B-3)

18.    Following the enactment of the Commercial Bank Law in 1995, the PBOC promulgated in November 1997 the Measures for the Administration of Renminbi Corporate Deposit (**"Corporate Deposit Regulations"**) to implement certain general principles enunciated by the Commercial Bank Law.[2]

      a.    Article 24 of the Corporate Deposit Regulations provides that:

> A financial institution[3] shall keep secret the deposits of corporate depositors, and have the right to refuse the inquiry by any entity or

---

[2]    Article 1 of the Corporate Deposit Regulations states that "[t]hese Measures are formulated according to the Law of the People's Republic of China on the People's Bank of China, the Law of the People's Republic of China on Commercial Banks and other relevant laws and administrative regulations for the purpose of strengthening the administration of corporate deposit and regulating the corporate deposit business of financial institutions." (Exhibit B-2).

[3]    Pursuant to Article 2 of the Corporate Deposit Regulations, any financial institution that handles the Renminbi (China's currency, the **"RMB"**) corporate deposit business within the territory of

individual in this regard unless it is otherwise prescribed by the laws or administrative regulations, and also have the right to refuse the freeze or deduction of deposit by any entity other than those prescribed by the laws. (Exhibit B-2).[4]

    b.    Article 28 of the Corporate Deposit Regulations further provides:

A commercial bank that *discloses information* about the deposit of a corporate depositor in violation of the provisions of Article 24 *or inquires into, freezes or deducts* the deposit of a corporate depositor on behalf of others without following the *procedure provided by law* shall be punished according to Article 73 of the Law of the People's Republic of China on Commercial Banks. (Exhibit B-2) (emphasis added).

    19.    In March 2000, the State Council also promulgated the Provisions Concerning the Real-Name Personal Savings Account System. Article 8 of these provisions provides that:

Financial institutions and their staff shall be responsible for keeping secret the information of a personal savings account. Financial institutions shall not provide any unit or individual with information of a personal savings account and shall have the right to refuse any inquiry, freezing, deducting or transferring of the individual's money in the financial institutions by any unit or individual, unless it is otherwise provided for by laws.

Article 8 does not provide financial institutions with discretion regarding whether to keep personal savings account information secret or provide the information upon a third party's inquiry, but rather prohibits financial institutions from cooperating with such requests unless otherwise prescribed by law. (Exhibit B-12).

    20.    In January 2002, the PBOC codified various provisions relating to the procedure for the disclosure, freezing and deduction of bank deposits into the Provisions on the Administration of Financial Institutions' Assistance in the Inquiry into, Freeze or

---

China and any entity that participates in RMB deposit shall abide by these Measures. (Exhibit B-2). Chinese commercial banks are, therefore, bound by the Corporate Deposit Regulations.

[4] This language parallels Article 32 of the Savings Regulations.

Deduction of Deposits ("**Financial Institution Assistance Regulations**").[5]   The Financial Institution Assistance Regulations are the "procedure provided by law" referenced in Article 28 of the Corporate Deposit Regulations and Article 32 of the Savings Regulations.   (Exhibits B-2, B-3).   To follow that procedure, Chinese Banks must ensure that at least two conditions are met:  first, the request for the disclosure, freezing and deduction of funds from the deposit account in China of the Defendants must be from a "competent organ"; second, the "competent organ" must have presented to the bank a "notice on the assistance with the inquiry into, or freeze or deduction of deposits issued by the competent organs at or above the level of county or regiment" (the "**Assistance Notice**").   (Exhibit B-4).

21.   The "competent organs" that may provide the Assistance Notice are defined in Article 4 of the Financial Institution Assistance Regulations as "the judicial organs, administrative organs, military organs and public institutions exercising administrative functions (for details, see the attached table [to the Financial Institution Assistance Regulations]) that have the right to inquire about, freeze and deduct the deposits of entities or individuals in financial institutions according to the clear prescriptions in the laws and administrative regulations."   (Exhibit B-4).   The "attached table" referred to in that quoted definition explicitly lists *all* the "competent organs" and the extent of their authority with respect to inquiry into, or freezing of or deduction of deposits.   **The "competent organs" are:  people's court, taxation authority, customs house, people's procuratorate, public security organ, state security organ, security department of the armed forces, prison, smuggling investigation organ, supervisory organ (including the supervisory organ of the armed forces), audit organ, industrial and commercial administrative organ, and**

---

[5]   Article 1 of the Financial Institution Assistance Regulations states that "[t]hese Provisions are formulated according to the Law of the People's Republic of China on Commercial Banks and other relevant laws and administrative regulations for the purpose of regulating financial institutions' assistance to competent organs in inquiring about, freezing and deducting the deposits of entities and individuals in financial institutions."   (Exhibit B-4).

**securities regulatory organ.**  An entity **not** listed in that table, such as a foreign court, is not a "competent organ" under Chinese law.  Accordingly, the term "competent organs" as defined and used in the Financial Institution Assistance Regulations refers to specified authorities in China, and a U.S. court is not a "competent organ" as defined or used in the Financial Institution Assistance Regulations.  As such, Chinese law clearly prohibits Chinese commercial banks from complying with the order of a court in the U.S. or any other jurisdiction outside of China to disclose information about customer accounts.

22.    In 2011, the PBOC promulgated the "Notice of the People's Bank of China In Improving Work Related to the Protection of Personal Financial Information by Financial Institutions of the Banking Industry" (**"Financial Information Protection Notice"**).  The notice states in its preamble that "it is extremely necessary to raise the awareness of financial institutions of the banking industry regarding the protection of personal financial information as well as their legal awareness, and to urge banking financial institutions to collect, use and provide to external parties personal financial information in accordance with the law." (Exhibit B-8).

a.    Paragraph 6 of the Financial Information Protection Notice sets out the policy with regard to the protection of financial information held by Chinese commercial banks from disclosure abroad:

> Personal financial information collected within the territory of China shall be stored, handled and analysed within the territory of China.  Unless otherwise stipulated by laws, regulations and provisions of the People's Bank of China, financial institutions of the banking industry shall not provide domestic personal financial information to overseas countries.[6]

23.    In 2016, China passed the Cybersecurity Law (the **"Cybersecurity Law"**) which became effective on June 1, 2017. As the first legislation in the cyber security field,

_____

[6] The same prohibition on the banks against the provision of domestic personal financial information to overseas countries was reiterated in Article 33 of the People's Bank of China's Financial Consumer Protection Measures issued in 2016.

the Cybersecurity Law also explicitly requires that financial institutions and other critical information infrastructure operators[7] store personal information collected and generated during their operations within the PRC in China itself:

> Personal information and important data collected and produced by critical information infrastructure operators during their operations within the territory of the People's Republic of China shall be stored within China. If it is indeed necessary to provide such information and data to overseas parties due to business requirements, security assessment shall be conducted in accordance with the measures developed by the national cyberspace administration in conjunction with relevant departments of the State Council, unless it is otherwise prescribed by any law or administrative regulation. (Exhibit B-7).

24.     Article 66 of the Cybersecurity Law further provides that a failure to comply with this requirement may lead to the confiscation of illegal gains, fines, suspension of business or revocation of the entity's business license.[8]

25.     As demonstrated by the statutes, regulations, and notices discussed above, the Chinese government and the relevant regulatory authorities overseeing the banking industry have a clear interest in ensuring that laws and procedures are in place to protect the personal information of bank customers, including information on bank deposits. Although there are circumstances where banks may disclose customer account information or restrain such accounts without customer authorization, the banks may only do so where specific procedures, as established the Financial Institution Assistance Regulations are followed. These procedures do not permit the Banks to disclose customer account information or

---

[7] Under Article 31 of the Cybersecurity Law, financial institutions are among the critical information infrastructure operators. Critical information infrastructures "will result in serious damage to state security, the national economy and the people's livelihood and public interest if it is destroyed, loses functions or encounter data leakage" and therefore, must be closely protected under the rules made by the State Council. (Exhibit B-7).

[8] Article 66 of the Cybersecurity Law states that "[w]here a critical information infrastructure operator stores network data overseas, or provides network data to the overseas in violation of Article 37 of this Law, the competent department shall order it to take corrective action, give it a warning, confiscate its illegal income, and impose a fine of not less than 50,000 yuan but not more than 500,000 yuan on it, and may order it to suspend relevant business operation, cease business operation for rectification, or close down the website, or may revoke the relevant business permit or business license, and impose a fine of not less than 10,000 yuan but not more than 100,000 yuan on its directly responsible person in charge and other directly liable persons." (Exhibit B-7).

restrain customer accounts pursuant to a foreign court order.   Rather, the banks must receive a request through Chinese judicial authorities or another government department that is expressly authorized to order the disclosure or restraint of customer accounts.

26.     Chinese financial institutions, as third-party non-litigants, are not in a position to judge whether an account holder who becomes a defendant outside of China has been afforded procedural and substantive justice in the tribunal of the relevant foreign country. But if a foreign plaintiff were to apply to a Chinese court for a subpoena, the Chinese court will be better equipped than the Chinese financial institutions to make that determination and, if necessary, will issue an order to the applicable Chinese bank pursuant to the Financial Institution Assistance Regulations.

## II.   THE CONSEQUENCES FOR THE BANKS IF THEY COMPLY IN CHINA WITH THE ORDER OF A U.S. COURT OR ANY OTHER JURISDICTION OUTSIDE OF CHINA TO DISCLOSE INFORMATION ABOUT, RESTRAIN, OR DEDUCT CUSTOMER ACCOUNTS

27.     Article 73 of the Commercial Bank Law provides that if a commercial bank "illegally disclosed information about, froze, or deducted personal savings deposit account or entity deposit account", it "shall undertake to pay interests for the deferred payment" and "the banking regulatory organ of the State Council shall order the commercial bank to correct itself" [i.e. to cease such disclosures, unfreeze the account and restore deductions] and impose on it "a fine of not less than RMB 50,000 Yuan[9] and not more than RMB 500,000 Yuan." (Exhibit B-1).[10]

---

[9]     Chinese Yuan, also denoted as ¥, is the basic unit of the RMB, just as U.S. Dollar or $ is the basic unit of the U.S. currency. As of the date of this declaration, $1 is equal to about ¥6.28.

[10]     Article 73 parallels Article 34 of the Savings Regulations which provides that where "any unit or individual ... disclos[e]s information concerning a depositor's savings or inquir[es] into, freez[es] or allocate[s] savings deposits on others' behalf without completing legal procedures ..., the People's Bank of China or one of its branches shall order it or him to make corrections, and may impose a fine, or order it or him to suspend business operations for rectification, or revoke the Permit for Financial Business according to the seriousness of the circumstances. If the circumstances are serious enough to constitute a crime, the offender shall be investigated for criminal liability." (Exhibit B-3).

28.     Article 73 of the Commercial Bank Law further provides that a commercial bank that discloses, freezes or deducts funds from a customer account in China illegally must be responsible for "civil liabilities to depositors."[11] (Exhibit B-1).  Because, as discussed above, it is against Chinese law for a commercial bank to take such actions in response to an order from a foreign court, the Banks would expose themselves to lawsuits in Chinese courts by the Defendants if they were to comply in China with the U.S. subpoenas, unless customer consent has been granted for the provision of such information.  In such actions, a Chinese court will require the Banks to pay the Defendants the amount of any losses suffered by the Defendants from that order.

29.     There have been a number of Chinese cases where a commercial bank has been held liable to its customer because the bank turned over the deposits of a customer to a third party without following the procedure provided by the Chinese law or failed to keep confidential the information about the deposits of a depositor or safeguard the customer's lawful rights and interests.

30.     In Gucci Am., Inc. v. Li, No. 10 Civ. 4974 (RJS), 2011 WL 6156936 (S.D.N.Y. Aug. 23, 2011) ("Gucci v. Li"), Bank of China was ordered to produce documents concerning customer accounts located in China and also to restrain these accounts.  After Bank of China produced documents and restrained the customers' assets pursuant to the U.S. court's order in Gucci v. Li, the customers filed suit against Bank of China in the Second Intermediate People's Court of Beijing Municipality ("**Beijing People's Court**"), arguing that it was not proper for Bank of China to freeze customer assets in response to a U.S. court order.  The Beijing People's Court found in favor of the customers and held that there was no

---

[11]     See Article 73 of the Commercial Bank Law, which provides "[w]here a commercial bank . . . illegally inquires about, freezes or deducts personal savings deposit or entity deposit account . . . and causes losses to the depositor . . . shall be responsible for . . . civil liabilities to such depositor . . . ." (Exhibit B-1).

basis in law or contract for Bank of China to freeze assets pursuant to a U.S. court order.[12]
The trial court explicitly referenced Articles 4, 6 and 29 of the Commercial Bank Law in
support of its ruling, which, as noted above, require commercial banks to respect customers'
freedom to make deposits and withdrawals and to keep secret information relating to the
handling of individual savings deposits. The Beijing People's Court ordered that Bank of
China lift the asset freeze and required it to "bear all litigation costs associated with the case."
This judgment was affirmed on appeal.[13]  In 2014, Bank of China sued the aforementioned
customers for the loss that its New York branch had incurred during Gucci v. Li, the Court
ruled for the customers. The judgment was affirmed on appeal, based on the reasoning that
because no judicial ruling in China had found the customers guilty of illegal acts in
connection with their banking activities, Bank of China's loss resulting from Gucci v. Li was
not caused by the customers' alleged trademark infringements.[14]

   31. In Ruihua Li v. Agricultural Bank of China Jinggangshan Branch,[15] plaintiff
Ruihua Li had ¥40,000 in his bank accounts with defendant Jinggangshan Branch and owed
more than ¥39,684 to Yuan Zou, a payroll administrator at the institution where Ruihua Li
worked.  Yuan Zou notified Jinggangshan Branch that Ruihua Li owed her more than
¥39,684 and that Ruihua Li had stated that Yuan Zou could use the funds in Ruihua Li's bank
accounts to satisfy the debt Ruihua Li owed her. Jinggangshan Branch turned over a total of

---

[12] Zhao Peiyuan et al. v. Beijing Lido Hotel Sub-Branch of Bank of China Limited (Second
Intermediate People's Court of Beijing Municipality Dec. 4, 2013), Er Zhong Min Chu Zi No. 01275.
(Exhibit B-15).

[13] Beijing Lido Hotel Sub-Branch of Bank of China Limited v. Zhao Peiyuan et al. (Higher
People's Court of Beijing Municipality June 20, 2014), Gao Min Zhong Zi No. 585. The appellate
court's judgment became effective on July 1, 2014, and is final and not subject to further appeal.
(Exhibit B-16).

[14] Beijing Chaoyang Sub-Branch of Bank of China Limited v. Zhao Peiyuan et al. (Third Intermediate
People's Court of Beijing Municipality May. 20, 2015) San Zhong Min Zhong Zi No. 04894. (Exhibit
B-17).

[15] Ruihua Li v. Agricultural Bank of China Jinggangshan Branch (People's Court of
Jinggangshan City, Jiangxi Province, November 10, 2008). Jing Min Chu Zi No. 220 (2008) (Exhibit
B-13).

¥39,684 from Ruihua Li's bank accounts to Yuan Zou to satisfy the obligation Ruihua Li owed to Yuan Zou. Ruihua Li sued Jinggangshan Branch, demanding that the branch compensate him for the ¥39,684 that it had turned over to Yuan Zou. The court held that unless a financial institution, such as the branch, has acted in accordance with the procedure provided by law, it may not "disclose information about, freeze or turn over funds from the account of a depositor in favor of a third party." On that basis, the court ordered Jinggangshan Branch to pay the depositor, Ruihua Li, ¥39,684, the amount that was turned over from his bank accounts, unless Yuan Zou returned that amount to Ruihua Li.

32.    In another case, Yongsheng Wang v. Bank of China Nanjing Hexi Branch,[16] three men surreptitiously installed a recordable ATM card reader on the automatic door of Bank of China Nanjing Hexi Branch and a miniature video recording device above one of the ATMs on the premises of the branch and illegally obtained plaintiff Yongsheng Wang's ATM card information and PIN number. Using that information, the three men duplicated two ATM cards. They then used the two duplicated ATM cards and the PIN number to withdraw illegally more than ¥400,000 from Wang's bank account with Bank of China. The court found the branch liable to Wang for the deposit he lost through the theft because, among other reasons, (i) "it is the obligation of a commercial bank under the Commercial Bank Law to keep the information of the depositor confidential and to safeguard the legal rights and interests of the depositor against the encroachment of any entity or individual; (ii) the bank's confidentiality obligation encompasses not only the obligation to keep secret the depositor's personal information but also the obligation to provide a safe and secure transactional environment for its depositors; and (iii) the bank failed to provide a safe and secure transactional environmental to Wang, leading to his loss."

---

[16]    Yongsheng Wang v. Bank of China Nanjing Hexi Branch (People's Court of Gulou District, Nanjing City, Jiangsu Province, November 26, 2008). Gazette of the Supreme People's Court of the People's Republic of China, Issue No. 2 of 2009, pp 44 – 48 (Exhibit B-14).

33.     These cases show that Chinese courts take seriously commercial bank obligations to keep customer account information confidential, and not to freeze or turn over funds from customer's accounts unless the procedure provided by the Chinese law is followed, and to safeguard customers' rights and interests in their bank accounts. In the case Yongsheng Wang v. Bank of China Nanjing Hexi Branch, the bank was found liable even though it merely failed to fulfil, but did not intentionally take any action to breach, its obligations to keep customer account information confidential and safeguard customers' rights and interests in their bank accounts. These cases confirm that if the Banks were to *intentionally* disregard their confidentiality obligations and violate the prohibition under Chinese law by illegally disclosing customer account information to a plaintiff outside China, and subsequently were sued in China by the customer for damages, a Chinese court will have no qualms finding the Banks liable to the customer.

34.     Article 78 of the Commercial Bank Law further provides that "[i]n case a commercial bank has the circumstances as described in Article 73 [of the Commercial Bank Law], the directors or senior management personnel directly responsible and other persons directly liable shall be imposed disciplinary punishment . . . ."[17] (Exhibit B-1).

35.     In addition to civil liabilities owed to customers, banks in China also face administrative penalties from the banking regulatory agencies for inquiring into, freezing, and deducting customer accounts in violation of banking laws and regulations. In November 2017, Ziyang Branch of Suining Bank Co., Ltd. was given a warning and levied a fine of RMB 310,000 Yuan by Ziyang City Central Branch of PBOC as a consequence of, among others, inquiring about personal information without customer consent.[18]  In February 2017,

---

[17]     In China, disciplinary punishment can range from a recordation of major mistake in one's human resource file, which will ruin one's career prospects, to demotion or outright dismissal.

[18]     Administrative Penalty Decision of PBOC Ziyang City Central Branch, No. 3 [2017] (Exhibit B-18).

due to the illegal freeze and deduction of customer accounts, Qingxi Branch of the Nanchong City Commercial Bank was fined RMB 60,000 Yuan by Nanchong Branch of CBRC pursuant to, among others, Article 73 of Commercial Bank Law.[19]   In September 2015, China Merchants Bank ("CMB") Nanjing Branch was assessed an RMB 200,000 Yuan penalty by CBRC Jiangsu Branch for deducting corporate accounts without proper authorizations of its corporate customers in violation of Articles 5 and 6 of Commercial Bank Law.[20] These administrative decisions demonstrate the Chinese government's strong interest in protecting the rights of financial customers from illegal intervention. As a result, even without lawsuits initiated by private plaintiffs, banks still face rigorous enforcement measures taken by banking regulatory agencies for violations of banking laws and regulations.

36.     This concern with customer privacy was reemphasized in 2009, when Article 253(A) of China's Criminal Law was amended to include a provision safeguarding the personal information of individual Chinese citizens.[21]   This provision applies to bank accounts as well, and is intended to ensure that the financial and economic information of individuals is kept strictly confidential when in the hands of a Chinese bank.   In particular, because the deposits of individuals are involved in this matter, as opposed to the deposits of corporations, the Banks and their employees would be subject to increased fines and criminal

---

[19]     Administrative Penalty Decision of CBRC Nanchong Branch, No. 8 [2017] (Exhibit B-23).

[20]     Administrative Penalty Decision of CBRC Jiangsu Branch, No. 28 [2015] (Exhibit B-19).

[21]     Additionally, the Supreme People's Court and the Supreme People's Prosecutor General's Office's promulgated explanations regarding criminal cases involving misuse of citizens' private information in May 2017, in which they stated that a serious violation of the law against the misuse of personal data involves: (1) Illegally obtaining, selling, or providing more than 50 pieces of information on personal locations, communication contents, credit history, property history, or (2) Illegally obtaining, selling or providing more than 500 pieces of information on personal addresses, communication records, transactional information that might affect bodily or property safety of others. (Exhibit B-10).

penalties if they were to disclose information about accounts of the Defendants (should they

exist) in China.   Article 253(A) of China's Criminal Law provides:

> Where any staff member of a state organ or an entity in such a field *as finance*, telecommunications, transportation, education or medical treatment, in violation of the state provisions, sells or illegally provides personal information on citizens, which is obtained during the organ's or entity's performance of duties or provision of services, to others shall, if the circumstances are serious, be sentenced to fixed-term imprisonment not more than three years or criminal detention, and/or be fined.
>
> Where any entity commits either of the crimes as described in the preceding two paragraphs, it shall be fined, and the direct liable person in charge and other directly liable persons shall be punished under the applicable paragraph.[22]

(Exhibit B-6) (emphasis added).   Thus, not only would the Banks be subject to heavy fines,

but employees of the Banks could spend several years in jail for providing information about

customer accounts in China.   In my opinion, a Chinese court would take any disclosure of

information about an individual customer's account seriously, and would penalize the

employees of the Banks as provided by Article 253(A) of China's Criminal Law.   A Chinese

court would not treat an order of a United States court as an appropriate authorization for the

disclosure of customer information of a customer account in China.

   37.   I would also note that there is no recognized procedure for the banks to obtain

an exemption from, or exception to, the prohibitions outlined above.   Under Chinese law there

is no form of judicial action available to a party in the Banks' position to petition the court

for relief; and there is similarly no established administrative avenue to seek or receive such

relief from the Ministry of Justice, PBOC or any other governmental agency.

---

[22]   Of course, these restrictions apply in the absence of customer consent to disclosure of information about and restraint of assets.   Where a customer has consented to disclosure or restraint, a Chinese bank may disclose information about or restrain funds in the customer's account without violating Chinese law.

III.   **LEGAL PROCESS REQUIRED BY THE PEOPLE'S COURT TO OBTAIN INFORMATION ON CUSTOMER BANK ACCOUNTS**

38.    As discussed above, customer account information in China may be disclosed or restrained only upon customer consent or as provided by China's bank secrecy laws, which permit certain "competent organs" to inquire into and freeze customer accounts.   The People's Court in China constitutes one of the permissible "competent organs."

39.    The People's Courts must follow the procedure set forth in the Civil Procedure Law to inquire into customer accounts and/or restrain bank accounts.

40.    The People's Court has the power to investigate bank account information in a civil lawsuit for the purpose of collecting evidence.

a.     Article 64 of the Civil Procedure Law provides, "[a] people's court shall investigate and collect evidence which a party and its litigation representative are unable to collect for some objective reasons and evidence which the People's court deems necessary for trying a case." (Exhibit B-5).

b.     According to Interpretation of the Supreme People's Court on the Application of the Civil Procedure Law of the People's Republic of China, Article 94, "[t]he evidence which a party and its litigation representative are unable to collect for some objective reasons as mentioned in paragraph 2, Article 64 of the Civil Procedure Law includes: . . . (2) evidence concerning state secrets, trade secrets or personal privacy; . . ." (Exhibit B-9).

41.    Further, the People's Court also has the power to investigate and freeze bank accounts in order to prevent the account holder from transferring his assets or causing other damages.

a.     Article 100 of the Civil Procedure Law provides, "[f]or a case where, for the conduct of a party or for other reasons, it may be difficult to execute a judgment or any other damage may be caused to a party, a people's court may, upon application of the

20

opposing party, issue a ruling on preservation of the party's property, order certain conduct of the party or prohibit the party from certain conduct; and if no party applies, the people's court may, when necessary, issue a ruling to take a preservative measure." (Exhibit B-5).

        b.      According to Article 103 of the Civil Procedure Law, "[p]roperty shall be preserved by seizure, impoundment, freezing of account or any other means prescribed by law. After preserving any property, a people's court shall immediately notify the person whose property is preserved." (Exhibit B-5).

        c.      According to Interpretation of the Supreme People's Court on the Application of the Civil Procedure Law of the People's Republic of China, Article 156, "[a] people's court which takes property preservation methods and measures shall handle it in accordance with the relevant provisions of the enforcement procedure." (Exhibit B-9).

        d.      Article 242 of the Civil Procedure Law provides, "[w]here the party against whom enforcement is sought fails to perform obligations determined in a legal instrument as required by a notice of enforcement, the people's court shall have the right to inquire the relevant units about the deposits, bonds, stocks, fund shares and other property of the party against whom enforcement is sought. The aforesaid property inquiry and seizure, freezing, transfer and sale by the People's Court shall not exceed the extent of obligations that the party against whom enforcement is sought shall perform. The People's Court shall issue a ruling on seizure, freezing, transfer or sale of property, as well as a notice of enforcement assistance, and the relevant units must assist." (Exhibit B-5).

      42.      To balance the interests of the relevant parties, and to assist the People's Courts in identifying the banks where the investigated party has bank accounts, the PBOC and Supreme People's Court have issued a Joint Notice on the People's Court's Inquiry and the PBOC's Assistance in Such Inquiry about the Bank Names of the RMB Bank Settlement Account of a Judgment Debtor in July 2010 (**"Joint Notice"**). According to this Joint Notice,

when the People's Court inquires about the bank account of a judgment debtor through the RMB Bank Settlement Account Management System, the parties subject to inquiry by the People's Court shall be limited to the judgment debtors determined in effective legal documents. (Exhibit B-11).

43.      Thus, pursuant to the Joint Notice, People's Courts are authorized to inquire about the bank account information of judgment debtors as provided in effective legal instruments. However, foreign courts are not referenced in the Joint Notice and are thus not similarly authorized.

44.      Foreign litigants may thus pursue legal action in the People's Court in order to obtain the necessary authority from the Chinese courts to seek discovery on customer bank accounts located in China and to restrain such accounts. Alternatively, foreign litigants may petition the courts in their home jurisdiction to submit a request to Chinese authorities through the Hague Convention on the Taking of Evidence in Civil and Commercial Actions (the "**Hague Convention**").[23]

## IV.   ACCESS TO THE INFORMATION SOUGHT SHOULD BE OBTAINED THROUGH THE HAGUE CONVENTION

45.      In prior actions before the Southern District of New York and the United States Court of Appeals for the Second Circuit, the PBOC and CBRC have also written to the courts to explain that the discovery provisions contained U.S. court orders violate Chinese banking laws and have encouraged the courts to direct plaintiff to submit a discovery request

---

[23] The latter approach comports with the requirements of the Civil Procedure Law. Article 276 provides that Article 276 of Civil Procedure Law provides that "[i]n accordance with an international treaty concluded or acceded to by the People's Republic of China or under the principle of reciprocity, a people's court and a foreign court may request each other to provide judicial assistance in service of process, investigation and collection of evidence and other litigation activities. If any matter requested by a foreign court for assistance is detrimental to the sovereignty, security or public interest of the People's Republic of China, the people's court shall not grant the request." Article 277 of the Civil Procedure Law, which provides that, aside from certain exceptions, "no foreign authority or individual shall, without permission from the competent authorities of the People's Republic of China, serve process or conduct investigation and collection of evidence within the territory of the People's Republic of China. (Exhibit B-5).

via the Hague Convention. (Exhibits B-20 and B-21). These letters submitted by key regulatory agencies in the Chinese government underscore the important national interest that China has in enforcing its banking laws and ensuring stability in the banking system.

46.     China has been a signatory to the Hague Convention since 1998. China takes its treaty commitments seriously, and has adopted laws expressly providing for enforcement of its Hague Convention obligations. For example, Articles 276 and 277 of the Civil Procedure Law (as quoted above) prescribe the procedure of judicial assistance between Chinese and foreign courts.

47.     Chinese courts have given effect to judicial assistance requests for the taking of evidence in China for use in other countries. I would expect that a Chinese court would give effect to a properly made Hague Convention request issued by a United States court.

48.     In China's response to the Hague Evidence Convention questionnaire of November 2013, the number of letters of request received annually by the Central Authority (i.e. the Ministry of Justice) increased steadily from 27 in 2009 to 58 in 2013. The country from which the largest number of letters of request originate is the United States. In 2012, 14 out 42 (33%) were executed under 12 months, and only 13 out of 42 (31%) were returned unexecuted. In comparison, the United States executed 106 out of 459 (23%) letters under 12 months, and 94 out of 459 (20%) were returned unexecuted.[24] Compared to the United States, China's compliance with the Hague Evidence Convention in 2012 does not pose a daunting picture for foreign litigants to seek discovery through the Hague Evidence Convention in China.

49.     I understand that a Hague Convention request issued in a similar case involving a Chinese bank as a non-party, Tiffany (NJ) LLC, et al v. Qi Andrew, et al, 10 civ.

---

[24] Synopsis of responses to the questionnaire of November 2013 relating to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (Evidence Convention), pp. 14-15, 18 (Exhibit B-22).

9471 (WHP) (HBP) ("Tiffany v. Andrew") was successfully executed.  Approximately nine months after the Hague Convention request was submitted to the Ministry of Justice by the court in Tiffany v. Andrew, the Ministry of Justice sent back to the court dozens of pages of information responsive to the request.  I further understand that although plaintiffs in that action attempted to challenge the sufficiency of the production made in response to the Hague Convention request, the court found that the production was sufficient and that plaintiffs were not entitled to further discovery.

50.     I further understand that in another case in the Southern District of New York, Tiffany (NJ) LLC v. Forbse, No. 11 Civ. 4976, 2012 WL 1918866, 1 (S.D.N.Y. May 23, 2012), the court also ordered the plaintiffs to proceed via the Hague Convention, and a Hague Convention request was submitted to the Ministry of Justice.  As in Tiffany v. Andrew, approximately nine months after the request was submitted, the Ministry of Justice produced documents responsive to the request to the court.  The plaintiffs in that action did not challenge the sufficiency of the production.

51.     As I noted above, China is going through rapid development, and in the last 20 years has overhauled its judicial and regulatory systems to become in line with international conventions. There is every reason to expect that Chinese courts will follow through on this development and will respond to a Hague Convention request issued by a U.S. court. In order to respond to such a request, however, a Chinese court must first receive one. As the Civil Procedure Law makes clear, a Hague Convention request is the only proper way for a court of a country other than China to seek evidence in China. By using the Hague Convention procedures, Plaintiffs would invoke the authority of a Chinese court in their attempts to obtain evidence, and, properly instructed by a Chinese court, the Banks would be in a position to comply with requests for evidence without violating Chinese law.

*[Balance of the page intentionally left blank and the signature page follows.]*

24

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _13th_ day of February, 2018, Beijing, China.

Guo Li