UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
                                      :

NIKE, INC. and CONVERSE INC.,          :

                        Plaintiffs,         :

              -against-            :    No. 2013 Civ. 8012

MARIA WU d/b/a                       :
WWW.SHOECAPSXYZ.COM, et al.,     :

                  Defendants.      :

---------------------------------------------------------x

## DECLARATION OF DONALD CLARKE

I, Donald Clarke, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.       I am a professor of law at the George Washington University Law School, where I have been employed since 2005.  My academic specialization is the law of the People's Republic of China in general and the legal regime of Chinese economic reform in particular.   I speak and read Chinese fluently.

## STATEMENT OF QUALIFICATIONS

2.       From 1988 through 2004, I was on the faculty of the University of Washington School of Law ("UWLS"), and I have been a visiting professor at New York University Law School, University of California at Los Angeles School of Law, and Duke Law School.  From 1995 to 1998, I was on a leave of absence from the UWLS and worked as an attorney at Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"), a large United States law firm with a substantial China business practice.  During that period, I visited China and Hong Kong approximately twice a year in the course of my work, a substantial amount of which was related

to China.  From 1998 through 2003, I regularly worked with Paul, Weiss as a consultant on

Chinese law matters.  Since that time I have maintained an independent consulting practice.

      3.      I have published widely in the field of Chinese law; a full copy of my curriculum

vitae and list of publications is set forth in my curriculum vitae, attached hereto as Exhibit 1.

      4.      I graduated *cum laude* from Harvard Law School in 1987, where my studies

focused on East Asian legal systems and I served as an editor of the *Harvard Law Review*.  I

earned a graduate degree (M.Sc. with Honors) in the Government and Politics of China from the

School of Oriental and African Studies at the University of London in 1983.  I also studied

Chinese history for two years at Beijing University and Nanjing University in China from 1977

to 1979.  I earned my undergraduate degree from Princeton University in 1977.

      5.      I have served as adviser or consultant on Chinese law matters to a number of

bodies, including the Asian Development Bank, the Agency for International Development, and

the World Bank's Financial Sector Reform and Strengthening Initiative.  I have testified on

aspects of the Chinese legal system before the Congressional-Executive Commission on China

and the United States-China Economic and Security Review Commission.  I have been appointed

to the Academic Advisory Group to the US-China Working Group of the United States

Congress.  I am admitted to practice in the State of New York (1988) and am a member of the

Council on Foreign Relations.

### NATURE AND BASIS FOR THIS DECLARATION

      6.      I have been asked by Next Investments, LLC ("Next"), Assignee to the Judgment

awarded to Plaintiffs Nike, Inc. and Converse, Inc., to comment on certain issues raised by the

motion of nonparties Agricultural Bank of China ("ABC"), Bank of Communications Limited

("BOCOM"), China Construction Bank ("CCB"), China Merchants Bank ("CMB"), and

Industrial and Commercial Bank of China ("ICBC") (the "Moving Banks") to quash subpoenas and to modify the October 20, 2017 Final Order (the "Final Order") and Next's cross motion for an order compelling the Moving Banks and the Bank of China ("BOC") (together, the "Banks") to produce the records and account documents called for in the November 30, 2017 Subpoenas (the "Subpoenas").

7.     My opinion herein is based upon my academic and professional legal studies, research, teaching and publishing over the course of many years as a professor of law, my personal experience and familiarity with the Chinese legal system and court, and the statute, case law and authorities cited therein:

8.     In preparing this declaration, I have examined each of the documents cited in this declaration, among other documents:

   a. The filings made by the Moving Banks in support of their Motion to Quash, including the Declaration of Guo Li, dated February 13, 2018, and certain exhibits thereto.

   b. My prior declarations and the exhibits thereto provided in *Gucci America, Inc. v. Weixing Li*, 2010 Civ. 4974 (RJS) (S.D.N.Y.) dated January 3, 2010, December 1, 2014, and February 5, 2015.  True and correct copies of my January 3, 2010, December 1, 2014, and February 5, 2015 declarations are attached hereto as Exhibits 2, 3, and 4, respectively, with my curriculum vitae and duplicate copies of my prior declarations removed to avoid duplication.

   c. My prior declaration and the exhibits thereto provided in *Gucci America, Inc. et al. v. MyReplicaHandbag.com et al.*, No. 07 Civ 2438 (JGK) (S.D.N.Y.), dated June 27, 2008.  A true and correct copy of my June 27, 2008 declaration is attached hereto as Exhibit 5 with my curriculum vitae removed to avoid duplication.

   d. The Declaration of William P. Alford submitted in *Tiffany v. Qi Andrew*, 2010 Civ. 9471 (WHP) (HBP) dated May 24, 2011, which is attached hereto as Exhibit 6.

   e. *Response from the Ministry of Justice, People's Republic of China*, received by Judge Buchwald May 1, 2013, *Tiffany (NJ) LLC v. Forbse*, No. 11 Civ. 4976 (S.D.N.Y. May 23, 2012), which is attached hereto as Exhibit 7.

f.  *Gucci Am., Inc. v. Li*, 2010 Civ. 4974 (RJS), ECF 194 (S.D.N.Y. filed Jan. 20, 2016) (letter from BOC's counsel to Judge Sullivan).

g.  *Gucci Am., Inc. v. Li, 2010 Civ. 4974 (RJS),* ECF 195 (S.D.N.Y. filed Jan. 20, 2016) (letter from Gucci's counsel to Judge Sullivan).

h.  *Gucci Am., Inc. v. Li*, 2010 Civ. 4974 (RJS), ECF 196 (S.D.N.Y. filed Jan. 20, 2016) (Order by Judge Sullivan imposing a daily fine of $50,000 for each day the BOC did not comply with Court's order).

i.  *Gucci Am., Inc. v. Li*, 2010 Civ. 4974 (RJS), ECF 201 (S.D.N.Y. filed Feb. 2, 2016) (letter from Gucci's counsel to Judge Sullivan).

j.  *Gucci Am., Inc. v. Li*, 2010 Civ. 4974 (RJS), ECF 204 (S.D.N.Y. filed Feb. 11, 2016) (joint letter to Judge Sullivan).

k.  *Gucci Am., Inc. v. Li*, 2010 Civ. 4974 (RJS), ECF 207 (S.D.N.Y. filed Mar. 2, 2016) (joint letter to Judge Sullivan).

l.  *Tiffany v. Qi Andrew*, 2010 Civ. 9471 (WHP) (HBP), ECF 60-15 (S.D.N.Y. filed Nov. 26, 2012) (Ministry of Justice response to the Court's request for the taking of evidence).

m.  *Tiffany v. Qi Andrew*, 2010 Civ. 9471 (WHP) (HBP), ECF 60-14 (S.D.N.Y. filed Nov. 26, 2012) (Ministry of Justice response to the Court's request for the taking of evidence).

n.  *Tiffany v. Qi Andrew*, 2010 Civ. 9471 (WHP) (HBP), ECF 59 (S.D.N.Y. filed Nov. 26, 2012) (Brief for Plaintiff's Objections to the November 8, 2012 Opinion and Order of Magistrate Judge Henry B. Pitman).

o.  Minning Yu, Benefit of the Doubt: Obstacles to Discovery in Claims Against Chinese Counterfeiters, 81 FORDHAM L. REV. 2987 (Apr. 2013).

p.  Kevin Rosier, *China's Great Legal Firewall:  Extraterritoriality of Chinese Firms in the United States*, U.S.-China Economics and Security Review Commission Staff Research Report (May 5, 2015), and attached hereto as Exhibit 8.

q.  *How to Conduct International Discovery,* 71 Am. Jur. Trials 1 (1999).

9.  I have also conducted independent research and have cited the relevant sources in the text of my declaration.

10.  My conclusions, as explained in further detail below, are as follows:

a. A number of Chinese banking regulations give banks the right to refuse to disclose information about customer bank accounts in various situations; to have a right does not, however, imply a duty.

b. It is not clear that the Cybersecurity Law applies to this case at all, or that it poses an insuperable obstacle if it does apply.

c. There are no strong reasons for believing that the Banks or their executives will suffer serious sanctions for complying with a U.S. court order of the kind requested. The Banks have close ties to the state, and have been unable to show evidence of banks or their officers suffering sanctions in China for revealing customer account information in circumstances deemed improper under Chinese law. At most, they have been required to pay compensatory civil damages and extremely modest court fees.

d. The Convention on the Taking of Evidence Abroad in Civil or Commercial Matters is not a viable alternative method of obtaining information. The Chinese authorities, as a matter of both official policy and actual practice, regularly refuse to provide information deemed relevant and necessary by U.S. courts.

e. In addition, the conclusions set forth in my prior declarations remain the same:  (1) I continue to believe that there is no state policy affording a high degree of protections to clients of Chinese banks, and those clients can be under no illusions as to the security of their bank information; and (2) I maintain the position that BOC and its officers are unlikely to be prosecuted for complying with the Court's orders in this case.

I.     **General Comments on Chinese Laws Regarding Disclosure of Information About Customer Bank Accounts**

11.     Part I of the Declaration of Guo Li[1] (the "Guo Declaration") cites a number of provisions of Chinese banking regulations.  It is important to note that a number of the cited regulations provide not that the banks *must* refrain from disclosing information, but that they *have a right* to refrain from disclosing information.[2]  A rightholder can of course decide not to exercise a right.

12.     The Guo Declaration also raises the issue of China's Cybersecurity Law.[3]  As this law came into effect only in 2017, it is too early to know with certainty what its impact is.  First, it is not even clear that the Cybersecurity Law applies to this case at all.  Articles 1 and 2 of the Cybersecurity Law make clear that it is about regulating the flow of information over the Internet.  If the Banks disclose information other than via the Internet, the Cybersecurity Law does not appear to be implicated.

13.     Second, assuming for the sake of argument that information about the Defendants' bank accounts does constitute the type of data regulated by the Cybersecurity Law (as it might, for example, were it to be transmitted via the Internet), the Cybersecurity Law does not prohibit its transfer outright.  Instead, it requires the information provider to undertake a security assessment.[4]  If the Cybersecurity Law is the problem, then the proper response of the Banks to a court order to provide customer data is to undertake a security assessment, not to refuse outright to provide the data.

---

[1]   Decl. of Guo Li at 5-13, *Nike v. Wu*, No. 13 Civ. 8012, ECF No. 73 (S.D.N.Y. filed Feb. 14, 2018) [hereinafter "Guo Declaration"].

[2]   *Id.* at ¶¶ 15(c)-(d), 18-9 (quoting regulations).

[3]   *See id.* at ¶¶ 23-24, Ex. B-7 (quoting the Chinese Cybersecurity Law).

[4]   *See id.* at ¶ 23 (quoting Cybersecurity Law art. 37).

14.     If it is the Banks' position that under any security assessment procedure called for by the Cybersecurity Law, the Chinese government would *prohibit* the release of information about the Defendants' bank accounts (on the somewhat implausible grounds that releasing the bank account information of a few individual counterfeiters would endanger national security), then they cannot at the same time argue—as they do, and strenuously—that the Chinese government would *permit* the release of such information were the Plaintiffs to seek it under the procedures of the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters[5] (the "Hague Convention" or the "Convention").

15.     Finally, I would note that China does not have a strong state policy in favor of protecting the secrecy of bank account information.

16.     Under the provisions of Chinese law cited by BOC's expert[6] in *Gucci America, Inc. v. Weixing Li*,[7] a wide variety of organizations ("competent organs") have the right to inquire into and freeze bank accounts.  These "competent organs" include, in the case of corporate entities, the following:  courts, tax authorities, customs, procuratorates (similar to state prosecutors), police, state security authorities, military security authorities, prisons, anti-smuggling investigators, supervisory authorities (including military supervisory authorities) (essentially anti-corruption investigators) (inquiry only), auditing authorities (inquiry only), industrial-commercial administration authorities (in charge of company registration and other aspects of commercial regulation) (limited freezing powers), and securities regulatory authorities (inquiry only).

---

[5]     Hague, CONVENTION ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS (Mar. 18, 1970).

[6]     *See* Guo Declaration, *supra* note 1, at Ex. B-4.

[7]     *Gucci Am., Inc. v. Weixing Li*, 2011 WL 6156936 (S.D.N.Y. 2011).

17.     This long list of "competent organs," while not including foreign courts, is relevant to resolving an important issue before this court:  that of the relative weight to be attached to China's interest in bank secrecy (as shown by its legislation) versus the interest of U.S. courts in seeing their judgments enforced.  The legislation cited by BOC shows that a wide variety of institutions have the legal authority to obtain information about, and freeze, bank accounts.  There is clearly no state policy affording a high degree of protection to clients of Chinese banks, and those clients can be under no illusions as to the security of their bank information.

18.     This was also the conclusion reached by the District Court in that case:  Professor Wu notes that the protections provided by China's bank secrecy laws can be waived by the account holder himself or by a "competent organ," a designation that includes public bodies such as the "people's court," "taxation authority," "public security organ," "industrial commercial administrative organ," and "securities regulation organ." (Wu Decl. ¶¶ 15–16.)  In total, Professor Wu cites no fewer than thirteen different "organs" that "have the power to inquire about, freeze and deduct the deposits of entities and individuals." (Wu Decl., Ex. B–4 at 5)  This strongly suggests that China's bank secrecy laws merely confer an individual privilege on customers rather than reflect a national policy entitled to substantial deference.[8]

## II.     Consequences of Compliance with a U.S. Court Order

19.     I have been asked to opine on whether, even if complying with the order of a U.S. court in this case constituted a violation of Chinese law, the non-party banks in this case or their relevant executives and officers would be subject to adverse repercussions were they to comply. In my opinion, neither the Banks nor their officers are likely to suffer serious consequences.

---

[8]     *Id.* at *10.

First, the Banks are closely tied to the state.  For the state to punish the Banks and their officers would be akin to the state punishing its own personnel.  Second, the plain fact of the matter is that the Banks have not been able to come up with any cases in which banks or their officers have been punished for doing what they are being asked to do in this case.

### A. The Banks Are Closely Tied to the State

20.    The Banks are closely tied to the Chinese state and are in many respects quasi-governmental entities.

21.    ABC was, until 2009, wholly owned and controlled by the Chinese state[9]—in short, a traditional state-owned enterprise.  In 2009, it changed its organizational form to that of joint stock company,[10] and was for a time wholly owned by China's Ministry of Finance and Central Huijin Investment Company Limited ("Huijin Entity"),[11] a company wholly owned and controlled by China's Ministry of Finance and established for the purpose of holding government shares in China's "big four" state-owned banks.[12]  In 2010, it listed a minority of its shares on the Shanghai stock exchange and the Hong Kong stock exchange.[13]  Currently, an overwhelming majority of its shares—over 79 percent—remain in the hands of the Huijin Entity and China's Ministry of Finance, and still more shares are in the hands of other entities wholly owned by the Chinese state either directly or indirectly.[14]

---

[9]    COMPANY OVERVIEW, AGRICULTURAL BANK OF CHINA, http://www.abchina.com/en/about-abc/overview/ (last visited Mar. 9, 2018).

[10]    *Id.*

[11]    AGRICULTURAL BANK OF CHINA, 2009 ANNUAL REPORT 80 (2009).

[12]    The "big four" state-owned banks are the Bank of China, the Agricultural Bank of China, the Industrial and Commercial Bank of China, and the China Construction Bank.

[13]    AGRICULTURAL BANK OF CHINA, 2010 ANNUAL REPORT 2 (2010).

[14]    *See* AGRICULTURAL BANK OF CHINA LIMITED, THE THIRD QUARTERLY REPORT OF 2017, at 4 (2017) *available at* http://www.hkexnews.hk/listedco/listconews/SEHK/2017/1030/LTN20171030969.pdf.  In this and the following paragraphs describing the ownership of each of the Banks, the cited sources list only the top ten

*(Cont'd on next page)*

22.     BOC was, until 2004, wholly owned and controlled by the Chinese state—in short, a traditional state-owned enterprise.  In 2004, it changed its organizational form to that of joint stock company and was for a time wholly owned by the Huijin Entity.  In 2006, it listed a minority of its shares on the Shanghai and Hong Kong stock exchanges.[15]  Currently, a majority of its shares—over 64 percent—remain in the hands of the Huijin Entity.[16]

23.     CCB was, until 2004, wholly owned and controlled by the Chinese state[17]—also a traditional state-owned enterprise.  In 2004, it changed its organizational form to that of joint stock company,[18] and, for a time, 85 percent of the shares were owned by the Huijin Entity.[19]  In 2005, it listed a minority of its shares on the Hong Kong stock exchange,[20] and, in 2007, it was also listed on the Shanghai stock exchange.[21]  Currently, a majority of its shares—at least 60.28 percent—remain in the hands of the Huijin Entity (over 57%) and other shareholders wholly owned by the Chinese state either directly or indirectly.[22]

24.     ICBC was, until 2005, wholly owned and controlled by the Chinese state[23]—also a traditional state-owned enterprise.  In 2005, it changed its organizational form to that of joint

---

shareholders.  Thus, the total percentages cited for shares held directly or indirectly by the Chinese state are all *minimums*; any state-owned shares not held by the top ten shareholders are not included.

[15]     *See* BANK OF CHINA, 2006 ANNUAL REPORT 2006 107 (Apr. 25, 2007).

[16]     *See* BANK OF CHINA LTD., REPORT FOR THE THIRD QUARTER OF 2017, at 3 (2017), *available at* http://www.hkexnews.hk/listedco/listconews/SEHK/2017/1030/LTN20171030315.pdf.

[17]     CHINA CONSTRUCTION BANK CORP., 2004 ANNUAL REPORT 7 (2004).

[18]     *Id.*

[19]     *Id.* at 15.

[20]     HISTORY, CHINA CONSTRUCTION BANK, http://www.ccb.com/en/investor/history.html (last visited Mar. 9, 2018).

[21]     *Id.*

[22]     *See* CHINA CONSTRUCTION BANK CORP., REPORT FOR THE THIRD QUARTER OF 2017, at 4 (2017), *available at* http://www.hkexnews.hk/listedco/listconews/SEHK/2017/1026/LTN20171026748.pdf.

[23]     INDUSTRIAL AND COMMERCIAL BANK OF CHINA LIMITED, 2005 ANNUAL REPORT 13 (2005).

*(Cont'd on next page)*

stock company,[24] and was for a time wholly owned by the Huijin Entity.  In 2006, it listed a minority of its shares on the Shanghai stock exchange and the Hong Kong stock exchange.[25] Currently, a large majority of its shares—at least 71.26 percent—remain in the hands of the Huijin Entity (34.71%), the Ministry of Finance (34.6%), and other shareholders wholly owned by the Chinese state either directly or indirectly.[26]

25.     BOCOM was, until 1987, wholly owned and controlled by the Chinese state[27]— also a traditional state-owned enterprise.  In 1987, it changed its organizational form to that of joint stock company.[28] In 2005, it listed a minority of its shares on the Hong Kong stock exchange,[29] and, in 2007, it was listed on the Shanghai stock exchange.[30]  Currently, 26.53% of its shares are owned directly by China's Ministry of Finance and another 14.7% of its shares are owned directly or indirectly by China's state-run Social Security Fund.  At least another 8.34% of the shares are owned by other Chinese state-owned entities.[31]  Thus, state shareholdings add up to at least 49.57%.

---

[24]   *Id.*

[25]   FAQs, INDUSTRIAL AND COMMERCIAL BANK OF CHINA LIMITED, http://www.icbc-ltd.com/ICBCLtd/Investor%20Relations/IR%20Contacts%20and%20Services/FAQs/ (last visited Mar. 9, 2018).

[26]   *See* INDUSTRIAL AND COMMERCIAL BANK OF CHINA LIMITED, THIRD QUARTERLY REPORT OF 2017, at 4 (2017), *available at* http://www.hkexnews.hk/listedco/listconews/SEHK/2017/1030/LTN20171030289.pdf.

[27]   OVERVIEW, BANK OF COMMUNICATIONS, http://www.bankcomm.com/BankCommSite/shtml/zonghang/en/3182/3204/16864/llist.shtml?channelID=3204 (last visited Mar. 9, 2018).

[28]   *Id.*

[29]   BANK PROFILE, BANK OF COMMUNICATIONS, https://www.bankcomm.com.hk/hk/shtml/bhk/en/2012886/2012947/list.shtml?channelId=2012886 (last visited Mar. 16, 2018).

[30]   *Id.*

[31]   *See* BANK OF COMMUNICATIONS CO., LTD., RESULTS ANNOUNCEMENT FOR THIRD QUARTER 2017, at 4-5 (2017) *available at* http://www.hkexnews.hk/listedco/listconews/SEHK/2017/1027/LTN20171027353.pdf.

*(Cont'd on next page)*

26.     CMB was established as a joint stock company in 1987.[32]  In 2002, it listed a minority of its shares on the Shanghai stock exchange,[33] and it was listed on the Hong Kong stock exchange in 2006.[34]  Currently, at least 37.1 percent of its shares remain in the hands of shareholders wholly owned by the Chinese state either directly or indirectly.[35]

27.     For the sake of convenience, I shall refer to the above banks as follows:

    a.   ABC, BOC, ICBC, and CCB:  the "Big Four Banks";

    b.   BOCOM and CMB:  the "Other Banks".

28.     To the best of my knowledge, the top executives at all the Banks are subject to the Chinese Communist Party's personnel control system.  This means that a Communist Party body has the ultimate say over who serves in a top position.[36]

29.     The Chinese government and Communist Party exercise control over the Banks either directly through ownership channels or more opaquely through the Communist Party's personnel control system.[37]  As the Huijin Entity is a major shareholder, it is important to understand more about it.

---

[32]  INTRODUCTION, CHINA MERCHANTS BANK, http://english.cmbchina.com/CmbInfo/About/DetailInfo.aspx?guid=ce1230c5-de69-441a-8861-d520fe3d287c (last visited Mar. 9, 2018).

[33]  FAQ, CHINA MERCHANTS BANK, http://english.cmbchina.com/CmbIR/ProductInfo.aspx?id=qa (last visited Mar. 9, 2018).

[34]  *Id.*

[35]  *See* CHINA MERCHANTS BANK CO., LTD., THIRD QUARTERLY REPORT OF 2017, at 6-7 (2017), *available at* http://www.hkexnews.hk/listedco/listconews/SEHK/2017/1027/LTN20171027644.pdf.

[36]  SOE refers to state-owned enterprises.  "SOE banks' core executives are appointed, removed and re-assigned by the Organization Department of the CCP."  Yongheng Deng, Randall Morck, Jing Wu & Bernard Yeung, MONETARY AND FISCAL STIMULI, OWNERSHIP STRUCTURE, AND CHINA'S HOUSING MARKET, NBER WORKING PAPER SERIES, No. 16871 (Mar. 2011), at 23.  The term "SOE banks" here includes BOC, ICBC, ABC, and CCB.  BOCOM and CMB are grouped together with the Big Four Banks by the authors in being described as "directly State controlled" by virtue of their shareholding structure.  *See id.* at n.17, 24.

[37]  Personnel control is carried out via the Communist Party's Organization Department, whose reach has been aptly described by journalist Richard MacGregor in his book, *The Party*:

    The department is accurately, if blandly, described as the human resources arm of the Party, but this

*(Cont'd on next page)*

30.     The Huijin Entity is a corporate entity that exists to serve as a holding company for assets on behalf of the Chinese government.  The Huijin Entity is 100% owned by the China Investment Corporation ("CIC"), which itself is directly and wholly owned by the Ministry of Finance.

31.     Here is the Huijin Entity as described in its own bond offering prospectus from September 2010:

> Huijin is a wholly state-owned company invested in by the state and established under the Company Law. . . . It represents the state in exercising the rights and duties of an investor in state-owned commercial banks and other key state-owned financial enterprises.[38]

32.     The Articles of Association of CIC, Huijin Entity's 100% owner, are quite clear about the Huijin Entity's role:

> [Huijin] represents the state in exercising, according to law, the rights and duties of an investor in the Industrial-Commercial Bank of China, the Bank of China, China Construction Bank, and other key state-owned financial enterprises.  *It manifests the controlling-shareholder position of the state in large financial institutions.*[39]

---

does not do justice to its extraordinary brief and the way it is empowered to penetrate every state body, and even some nominally private ones, throughout the country.  The best way to get a sense of the dimensions of the department's job is to conjure up an imaginary parallel body in Washington.  A similar department in the US would oversee the appointment of the entire US Cabinet, state governors and their deputies, the mayors of major cities, the heads of all federal regulatory agencies, the chief executives of GE, Exxon-Mobile, Wal-Mart and about 50-odd of the remaining largest US companies, the justices on the Supreme Court, the editors of the New York Times, the Wall Street Journal and the Washington Post, the bosses of the TV networks and cable stations, the Presidents of Yale and Harvard and other big universities, and the heads of think-tanks like the Brookings Institution and the Heritage Foundation.  Not only that, the vetting process would take place behind closed doors, and the appointments announced without any accompanying explanation about why they had been made.  When the department knocks back candidates for promotion, it does so in private as well.

RICHARD MACGREGOR, THE PARTY 72 (2010).

[38]  ZHONGYANG HUIJIN TOUZI YOUXIAN ZEREN GONGSI FAXING ZHAIQUAN MUJI SHUOMINGSHU (Central Huijin Investment Company, Limited Bond Offering Prospectus), September 2010, at 10 [hereinafter HUIJIN BOND PROSPECTUS].

[39]  CHINA INVESTMENT CORPORATION ARTICLES OF ASSOCIATION, *excerpted at* http://www.china-inv.cn/governance/articles.html (China Investment Corporation's website) (in Chinese) (emphasis added).

*(Cont'd on next page)*

13

33.    The Huijin Entity's own documents state that the members of the Huijin Entity's Board of Directors and Board of Supervisors are appointed by the State Council (the central executive branch of the Chinese government, similar to a cabinet), and all changes to the Huijin Entity's Articles of Association must be approved by the State Council.[40]

34.    As one news report described it, "China's banks operate like government departments, with senior managers appointed and removed by the ruling Communist Party's Organisation Department, which is responsible for all senior personnel changes within the government."[41]

35.    A more academic discussion described it this way:

Even in Reform-era China, all [state-owned enterprises] and state-controlled enterprises remain a part of (or subjects for) the Party ranking system that embraces all public institutions.   Nomenklatura appointments [i.e., appointments made through the Party's personnel administration system] continue for public enterprises as they do for administrative units . . . . [T]he program [was always] to corporatize, recapitalize, and list (with the public issuance of shares acting primarily in the service of recapitalization), and yet to continue to allow state shareholders dominant ownership and absolute control in the banking firm.[42]

36.    Zhou Xiaochuan, formerly head of the China Construction Bank and now head of the People's Bank of China (China's central bank), has emphasized that:

[i]n order to preserve the state's full control power . . . , the state can maintain absolute control over a certain portion of the large-scale commercial banks; for

---

[40]   Huijin Bond Prospectus, *supra* note 38, at 15-16.

[41]   Jamil Anderlini, *Chinese Officials to Run Three Banks*, Financial Times, June 21, 2007.

[42]   Nicholas Calcina Howson, *China's Restructured Commercial Banks:* Nomenklatura *Accountability Serving Corporate Governance Reform?*, in China's Emerging Financial Markets: Challenges and Global Impact 123, 136, 144 (Zhu Min, Cai Jinqing & Martha Avery eds., 2009).  Professor Howson is a specialist in Chinese law at the University of Michigan Law School.  *See also* Hu Runfeng, Cheng Zhe, and Fu Tao, *Zhonghang Shenqiu zhihang zai bao piaoju an* (Another Bank of China Shenqiu Branch Receipts Case Explodes), Caijing (Finance and Economy), no. 161 (no. 13, June 12, 2006), at 40, *quoted in* Howson, *supra*, at 141 ("[A]s a controlling shareholder, [the Chinese government] has the power to propose strategic arrangements for the future development of the Bank[.]").

*(Cont'd on next page)*

instance, [the state] can keep a 75% equity interest [and still maintain effective control].[43]

37.     Although the Banks engage in commercial activities, they cannot be viewed simply as independent commercial entities that cannot afford to offend the government.  They are, on the contrary, vehicles by which the Chinese government at times carries out certain policy decisions.  This is particularly true for the Big Four Banks.  That is why the government maintains (directly or indirectly) commanding ownership positions in the Banks and why senior management appointments are subject to Communist Party control.[44]  The government is as likely to sanction the Banks or put them out of business as it is to sanction or put out of business the Ministry of Defense or the Ministry of Foreign Affairs.

38.     In conclusion, the Banks do not have sufficient distance from the government for them to be a credible object of government sanctions.

**B.     The Banks Have Shown no Basis for a Concern for Adverse Consequences of Compliance**

39.     Over the course of litigation in this and related cases, the Banks, with every incentive and years of time to find cases in which banks or their officers have suffered punishment for doing what is being asked of the Banks in this case, have failed significantly to do so.  The Guo Declaration cites three cases in which banks were subject to administrative fines of a total of 570,000 yuan (about $90,000) for various violations of Chinese banking regulations.[45]  In only one case was a bank official sanctioned, and it is not clear for what

---

[43]   Zhou Xiaochuan, *Guoyou shangye yinhang ruhe chongshi ziben* (How the State-Owned Commercial Banks Can Replenish Their Capital), RENMIN RIBAO (People's Daily), May 9, 2000, at 9.

[44]   *See Chinese Officials to Run Three Banks*, FINANCIAL TIMES, June 21, 2007 ("China's banks operate like government departments, with senior managers appointed and removed by the ruling Communist party's Organisation Department, which is responsible for all senior personnel changes within the government.").

[45]   *See* Guo Declaration, *supra* note 1, para. 35.

*(Cont'd on next page)*

offense.[46]  It mentions three civil cases (discussed below), in which neither banks nor bank officials suffered punitive sanctions.[47]  And despite its warnings of imminent criminal liability, it cites *no criminal cases at all* in which liability was actually imposed on any person or entity.

40.     The first civil case discussed in the Guo Declaration is the Zhao Peiyuan litigation.[48]  This was a lawsuit filed in Chinese court against the Bank of China (the "BOC") by the defendants in the case of *Gucci America, Inc. v. Weixing Li*,[49] who were customers of the BOC and sought damages on the grounds that the BOC had improperly frozen their assets in response to a U.S. court order sought by Gucci America, Inc. ("Gucci"), the plaintiff in U.S. litigation.  This case does not support the argument that the Banks will be sanctioned under Chinese banking law if they comply with a U.S. court order in this case.

41.     The judgment of the Beijing High Court[50]—the final and authoritative judgment in this case—found the following:

- There was a contract between BOC and Zhao Peiyuan and Xu Ting (together, the "Chinese Plaintiffs") respecting the Chinese Plaintiffs' deposits at the BOC;

- Under that contract, the BOC had the right to suspend or terminate services to the Chinese Plaintiffs under certain conditions, including that there was suspicion that the Chinese Plaintiffs were engaging in illegal or criminal activities, based on reasons and factors, including risk control, as deemed justifiable by the BOC;

- The BOC failed to provide adequate evidence showing that such suspicion existed, the mere fact of litigation in the United States against the Chinese Plaintiffs apparently being deemed inadequate; and

---

[46]   This is the Ziyang Bank case; *see id.*, para. 35 & Exhibit B-18 thereto.  The fine was 10,000 yuan (approximately $1,582).

[47]   *See id.*, paras. 30-33.

[48]   *See id.*, para. 30 & Exhibit B-15 thereto (first-instance proceedings in the Beijing Second Intermediate Court), Exhibit B-16 thereto (proceedings on appeal in the Beijing High Court).

[49]   *Gucci v. Li*, *supra* note 7.

[50]   The text of the judgment is attached to the Guo Declaration, *supra* note 1, as Exhibit B-16.

*(Cont'd on next page)*

- Because the BOC had not paid any fine imposed by a United States court, or paid any amount to Gucci, it therefore failed to show that it had justifiable reasons to cease to provide services to the Chinese Plaintiffs.

- The BOC was not sanctioned in any way in this case. It was required to pay damages and court fees for the first- and second-instance proceedings of 140 yuan (approximately $22.14).[51]

42.     According to the Beijing High Court Judgment, therefore:

- A contractual provision of the kind that existed between the BOC and the Chinese Plaintiffs is permissible;

- Had BOC produced adequate evidence that there were grounds for suspecting that the Chinese Plaintiffs were engaged in illegal or criminal activities, its actions would have been upheld; and

- Had BOC already been sanctioned by a court in the United States for acts or failures to act causally related to the Chinese Plaintiffs' use of BOC's banking facilities, the Beijing High Court would have considered that a factor in favor of finding that BOC had justifiable grounds under its contract for suspending services to the Chinese Plaintiffs in the way complained of.

43.     In other words, under the standard contract entered into by its depositors, the

BOC had the right to freeze customer accounts if customers were engaged in illegal activities,

and it did not violate Chinese banking laws and regulations for it to do so. I believe it is likely

that the corresponding standard contracts of the Moving Banks in this case are similar. The Zhao

Peiyuan case turned on the sufficiency of evidence provided by the BOC that its customers were

engaged in illegal activities. I do not know what kind of evidence the BOC offered to show that

its customers had engaged in counterfeiting. The Beijing Intermediate Court, whose findings

were adopted by the Beijing High Court, noted that the U.S. litigation against the Chinese

Plaintiffs was still ongoing, suggesting that a verdict against the Chinese Plaintiffs might have

---

[51]   As the District Court noted in *Gucci America, Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 104 (2015), "[T]he Beijing judgments, which resulted in BOC paying the equivalent of $22.00 in court fees, do nothing to change the Court's prior conclusion that BOC's contention that compliance with the 2010 and 2011 Subpoenas would subject it to serious criminal and civil liability is unduly speculative."

*(Cont'd on next page)*

constituted stronger evidence in favor of the BOC.  Such a verdict exists in this case:[52]  were the

Defendants to initiate similar proceedings against the Banks in China, the Banks could offer in

evidence the judgment against the Defendants that Nike and Converse have already obtained.

44.     The Ruihua Li case cited in paragraph 31 of the Guo Declaration fails to support

the Banks' argument.[53]  In that case, a payroll administrator at the plaintiff's employer, Zou

Yuan, used her position to convince the defendant bank to turn over to her funds in the plaintiff's

bank account that Zou Yuan asserted were owed to her by the plaintiff.  The plaintiff sued the

bank on the grounds that he had neither been notified of, nor consented to, the withdrawal of

funds by Zou Yuan.  Zou Yuan was added to the lawsuit as a third party.  The court found that

the bank had violated the terms of its contract with the plaintiff, as well as relevant banking

regulations, by handing over the funds without his consent.

45.     The court's final judgment, however, was not quite as the Guo Declaration

describes it.  The Guo Declaration states that the bank was ordered to repay the funds to the

plaintiff unless Zou Yuan did so.  I believe this statement could be misleading.  In fact, the court

*ordered Zou Yuan* to repay the funds.  Zou Yuan bore primary liability.  The court made the bank

only secondarily liable.  In other words, it is apparent from the judgment that if the bank ended

up repaying the amount in question, it would have the right then to seek recovery from Zou

Yuan.  In short, *neither the bank nor its officers were fined or otherwise punished in any way*.

Assuming Zou Yuan to be solvent, the only cost to the bank of its breach of contract and

violation of banking regulations was its attorney's fees and 400 yuan ($63) in court costs.

---

[52]     *See Nike v. Wu*, No. 2013 Civ. 8012 (CM), ECF 62 (Oct. 20, 2017).

[53]     *See* Guo Declaration, *supra* note 1, at ¶ 31, Ex. B-13.

46.     Moreover, in the Ruihua Li case, the breach of contract was undisputed.  In the current case, assuming the Banks' contracts with depositors to be similar to those of the BOC, freezing the Defendants' accounts would be permitted by contract and thus, because consensual, not a violation of China's banking regulations.

47.     The Yongsheng Wang case cited in paragraphs 32 and 33 of the Guo Declaration[54] is of questionable relevance.  In that case, as described in the Guo Declaration, criminals surreptitiously installed devices on the defendant bank's premises allowing them to harvest the plaintiff's ATM card information and PIN code.  They then used this information to withdraw funds from the plaintiff's account.  Not surprisingly, the court found the bank liable to the plaintiff for his losses.  This was not, however, really a bank secrecy case.  The bank never revealed information about the plaintiff to anyone.  Liability was based on the bank's negligence first in allowing the criminals to install the devices and then in failing to detect them.  To restate the summary of the Guo Declaration, "the bank failed to provide a safe and secure transactional environment to [the plaintiff] Wang, leading to his loss."[55]

48.     Like the Ruihua Li case, but unlike the case here, the Yongsheng Wang case involves a blameless plaintiff who has not violated the terms of his depositor's contract with the bank.  Moreover, as in the other civil cases discussed in the Guo Declaration, there was no punitive sanction imposed on the defendant bank or its officers.  Thus, the prospect of "disciplinary punishment" for directors and senior management raised in paragraph 34 of the Guo Declaration seems, given the Banks' apparent inability to find any examples, to be entirely speculative, if not actually fictional.

---

[54]   *See id.* at ¶¶ 32-33, Ex. B-14.

[55]   *Id.* at ¶ 32.

*(Cont'd on next page)*

49.     The cases of administrative punishments cited in the Guo Declaration are equally non-probative.  The details of the Ziyang City Bank case[56] are unclear; an administrative fine was levied on both the bank (310,000 yuan or approximately $49,000) and on a bank officer (10,000 yuan or a little over $1500), but three offenses are listed,[57] so it is not possible to determine how much of which fine was attributable to which offense.

50.     In the Qingxi Bank case,[58] the administrative punishment decision tells us nothing of the facts of the case; the reason for the fine is listed as "unlawful sequestration and freezing of funds in customer bank account."  The bank was fined 60,000 yuan:  less than $9,500 at current exchange rates.  And whatever the facts of the offense were, no bank officials were punished for it.

51.     In the CMB Nanjing Bank case,[59] a bank was fined 20,000 yuan (approximately $3,150) for improperly deducting funds from customer accounts without customer consent.  As in the other cases, the customers here appear blameless, and there appears to be no argument—as there is in this case—that they previously consented by contract to the bank's actions.

52.     In spite of the concerns expressed in the Guo Declaration, neither the Guo Declaration nor any of the submissions of the Banks of which I am aware have identified *even one case* in which bank officials were subject to criminal sanctions for doing what the Banks are being asked to do in this case.

53.     The Guo Declaration notes the existence of Article 253A of the Chinese Criminal Law.  The provision in question regarding the unlawful disclosure of citizens' personal

---

[56]   Discussed in *id.* at ¶ 35.

[57]   The offenses were (1) failing to verify customer status, (2) inquiring about personal information without consent, and (3) falsely reporting financial statistics.

[58]   *See* Guo Declaration, *supra* note 1 at ¶ 35, Ex. B-23.

[59]   *See id.* at ¶ 35, Ex. B-19.

information has been in effect since February 28, 2009, just 15 days short of a full *nine years* up to the date of the Guo Declaration.  Yet, the Guo Declaration does not cite a single case over that nine-year period where a bank or bank officer incurred liability for unlawful disclosure of information under Article 253A, let alone a case under circumstances such as those presented here.

54.     I personally conducted research on cases of unlawful *acquisition* of information under a separate section of Article 253A not quoted in the Guo Declaration,[60] and it is plausible to suppose that there have been prosecutions for unlawful *disclosure* as well.  But my research into unlawful acquisition cases leads me to believe that if there were any prosecutions of bank officials for unlawful disclosure of customer information in the last nine years—that is, prosecutions of the kind that the Moving Banks assert are likely to follow if they release customer information pursuant to a U.S. court order—they would not be difficult to find.  Had the Banks been able to find any such cases, surely they would have brought them to the court's attention in their filings or expert witness declarations.  That the Moving Banks have not done so strongly suggests that there are no such cases.  The Moving Banks have simply offered no grounds for believing that employees of the Moving Banks "could spend several years in jail for providing information about customer accounts in China."[61]

III.     **The Hague Convention Is Not a Viable Alternative Method of Obtaining Information**

55.     In my opinion, the Guo Declaration is too optimistic in its assessment of the Plaintiffs' prospects for obtaining satisfactory results through the use of the Hague Convention.

---

[60]     Donald Clarke, *Don't Ask, Don't Sell: The Criminalization of Business Intelligence in China and the Case of Peter Humphrey*, 33 UCLA Pac. Basin L.J. 109 (2016).

[61]     Guo Decl., *supra* note 1, at ¶ 36.

The overall experience of U.S. plaintiffs is summarized in a recent report issued by the United States Economic and Security Review Commission:

> Although the Hague Service and Evidence Conventions provide the legal framework for serving papers and obtaining evidence in legal disputes between U.S.- and China-based entities, China's interpretation of its obligations under these conventions differs from that of the United States and has resulted in many service of process and discovery requests being denied or significantly delayed.  As such, pursuing legal recourse through the Hague Conventions is not a viable course of action for many U.S. plaintiffs.[62]

56.     There are substantial reasons for doubting that use of the Hague Convention will be effective or a viable alternative to discovery pursuant to a court order under the Federal Rules of Civil Procedure.  Most importantly, China retains the right to decide that certain requested materials—materials that presumably have survived a party's request to exclude and thus have been deemed relevant and important by a U.S. court—have no "direct and close connection" with the subject matter of the litigation and therefore will not be provided.[63]  The history of U.S. cases in which brand owners have been required to use the Hague Convention to seek information about counterfeiters from Chinese banks shows that China has in fact regularly invoked this reservation when providing its delayed and inadequate responses to discovery requests.  The Guo Declaration offers no grounds for believing that things will be different this time.

---

[62]   Kevin Rosier, CHINA'S GREAT LEGAL FIREWALL: EXTRATERRITORIALITY OF CHINESE FIRMS IN THE UNITED STATES, U.S.-CHINA ECONOMIC AND SECURITY REVIEW COMMISSION STAFF RESEARCH REPORT (May 5, 2015) at 2.  The "Evidence Convention" in this quotation refers to the Hague Convention.

[63]   Reservation of China, Hague, CONVENTION ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS (Mar. 18, 1970) *available at* https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=493&disp=resdn.

*(Cont'd on next page)*

57.     In the case of *Tiffany (NJ) LLC v. Qi Andrew*,[64] discussed in paragraph 49 of the Guo Declaration, the Hague Convention request was *not* successfully executed, at least from the plaintiff's perspective.  The Chinese authorities, invoking China's reservation under the Convention, refused to produce a number of documents.[65]  Finding that resort to the Hague Convention had not been "futile," the Magistrate Judge declined to order further discovery.  But to find that a request has not been utterly futile is a far cry from finding that it has been "successful," and in any case, futility is not the proper standard.  In *Gucci America, Inc. v. Weixing Li*,[66]  Judge Sullivan of the District Court emphatically rejected the futility standard, and explicitly took issue with the views of the Magistrate Judge in *Tiffany*.[67]  On appeal, the Second Circuit left Judge Sullivan's analysis of this issue untouched.[68]  And in the case of *Wultz v. Bank of China*,[69] the District Court cited the *Qi Andrew* case precisely in order to make that point that the Hague Convention "would *definitively not* represent a reasonable alternative means for plaintiffs to obtain discovery."[70]

---

[64]   276 F.R.D. 143 (S.D.N.Y. 2011).

[65]   *See Tiffany (NJ) LLC v. Qi Andrew*, No. 10 Civ 9471, ECF 60-14 (S.D.N.Y. filed Nov. 26, 2012), ECF. Nos. 60-14, 60-15.

[66]   *Supra* note 7, at *7-8.

[67]   *See id.* at *7-9.

[68]   *See Gucci America, Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014).

[69]   910 F. Supp. 2d 548 (S.D.N.Y. 2012).

[70]   *Id.* at 558 (emphasis added).  As the District Court noted, China has both officially declared and put into practice a policy of denying requests for documents that it deems not "*directly and closely related* to the case." *See id.* at 558 (citing official communication from Chinese banking regulators) (emphasis in original).  *See also* ¶ *56 supra*.  Thus, "it is likely that documents relevant to the plaintiffs' claims—in particular, documents that may not themselves be admissible at trial, but are 'reasonably calculated to lead to the discovery of admissible evidence'—will be denied." *Wultz*, 910 F. Supp. 2d at 558 (internal footnotes omitted).

*(Cont'd on next page)*

58.     The plaintiff's request for documents in *Tiffany (NJ) LLC v. Forbse*[71] was similarly unsuccessful.  Once again, the Chinese government refused to produce all the requested documents.  The Chinese government itself stated that the request was only "partly executed," again invoking the language of its reservation under the Hague Convention.[72]

59.     The statement of the Guo Declaration[73] that the plaintiffs in *Forbse* did not challenge the sufficiency of the production does not reflect the full circumstances as I understand them.  First, that the production was insufficient seems clear; the letter from China's Ministry of Justice (the "Ministry") itself states that the request was only "partly executed."[74]  Second, I am informed by counsel for Plaintiffs that (a) by the time the Ministry's inadequate production was received, jurisdiction over the case had already been transferred to the Second Circuit, so further proceedings at the District Court level would have been pointless, and (b) it turned out that the most useful information was in the hands of the Bank of China, which *was* subject to a direct order under the Federal Rules, as opposed to two other defendant banks (the ICBC and the CMB) respecting which the plaintiffs were required to use the Hague Convention.

60.     In short, the history of similar cases so far shows that the Hague Convention has not been effective in obtaining discovery of important information, and that discovery orders under the Federal Rules, backed up by sanctions, *have* been effective.

61.     I understand that the proceedings in this action are continuing.  If called to do so, I would be willing to review additional materials and offer further opinions as appropriate.

---

[71]   No. 11 Civ. 4976, 2012 WL 1918866 (S.D.N.Y. May 23, 2012).

[72]   RESPONSE FROM MINISTRY OF JUSTICE, PEOPLE'S REPUBLIC OF CHINA, *received by Judge Buchwald May 1, 2013, Tiffany (NJ) LLC v. Forbse*, No. 11 Civ. 4976 (S.D.N.Y. May 23, 2012).

[73]   *See* Guo Declaration, *supra* note 1, at ¶ 50.

[74]   *See supra* 72.

Dated:  Washington, D.C.
        March 16, 2018

                                        Donald Clarke