# EXHIBIT 2

Robert Weigel (RW 0163)
Howard S. Hogan (HH 7995)
Jennifer C. Halter (JH 7032)
Anne M. Coyle (AC 3158)
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                                                                    :
GUCCI AMERICA, INC., BALENCIAGA                                     :
AMERICA, INC., BALENCIAGA S.A., BOTTEGA                             :
VENETA INTERNATIONAL S.A.R.L.,                                      :
BOTTEGA VENETA INC., LUXURY GOODS                                   :
INTERNATIONAL (L.G.I.) S.A. and YVES SAINT                          :
LAURENT AMERICA, INC.                                               :
                                                                    :
                                  Plaintiffs,                       :
                                                                    :   2010 Civ. 4974 (RJS)
-against-                                                           :
                                                                    :   **DECLARATION OF**
WEIXING LI, LIJUN XU and TING XU a/k/a JACK                         :   **DONALD CLARKE**
LONDON, all doing business as REDTAGPARTY,                          :
MYLUXURYBAGS.COM, KUELALA.COM,                                      :
XPRESSDESIGNERS.COM,                                                :
XPRESSDESIGNER.NET, and DESIGNER                                    :
HANDBAGS; ABC COMPANIES;                                            :
and JOHN DOES,                                                      :
                                                                    :
                                  Defendants.                       :
                                                                    :
------------------------------------------------------------------- X

I, DONALD CLARKE, declare as follows:

1. I am a professor of law at the George Washington University Law School ("GWULS"), where I have been employed since 2005. My academic specialization is the law of the People's Republic of China in general and the legal regime of economic reform in particular,

1

and I speak and read Chinese fluently. Attached as Exhibit A is a true and correct copy of my curriculum vitae, which provides a statement of my credentials, including a list of publications.

2. In 2008, I was asked to provide an expert opinion in the case *Gucci America, Inc., et al. v. MyReplicaHandbag.com et al.*, No. 07 Civ. 2438 (JGK) (S.D.N.Y.) concerning: (1) the extent to which the judgment of a United States court may be enforced in China; (2) the extent to which Chinese law prohibits the Bank of China from complying with the order of a United States court to disclose information about customer accounts, to freeze such accounts, and ultimately to transfer funds from such accounts to a judgment creditor; and (3) the repercussions that might be experienced by the Bank of China were it to do any of the preceding acts in violation of Chinese law. My opinion was set forth in a declaration dated June 27, 2008 (my "June 2008 Declaration"). A true and correct copy of my declaration is attached hereto as Exhibit B, without the version of my curriculum vitae that was attached as an exhibit.

**STATEMENT OF QUALIFICATIONS**

3. From 1988 through 2004, I was on the faculty of the University of Washington School of Law ("UWLS"), and have been a visiting professor at New York University Law School and University of California at Los Angeles School of Law. From 1995 to 1998, I was on a leave of absence from the UWLS and worked as an attorney at Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"), a large United States law firm with a substantial China business practice. During that period, I visited China and Hong Kong approximately twice a year in the course of my work, a substantial amount of which was related to China. From 1998 through 2003, I regularly worked with Paul, Weiss as a consultant on Chinese law matters. Since that time I have maintained an independent consulting practice.

4. I have published widely in the field of Chinese law; a list of publications is set forth in my curriculum vitae, attached hereto as Exhibit A.

5. I graduated cum laude from Harvard Law School in 1987, where my studies focused on East Asian legal systems and I served as an editor of the *Harvard Law Review*. I earned a graduate degree (M.Sc. with Honors) in the Government and Politics of China from the School of Oriental and African Studies at the University of London in 1983. I also studied Chinese history for two years at Beijing University and Nanjing University in China from 1977 to 1979. I earned my undergraduate degree from Princeton University in 1977.

6. I have served as adviser or consultant on Chinese law matters to a number of bodies, including the Asian Development Bank, the Agency for International Development, and the World Bank's Financial Sector Reform and Strengthening Initiative. I have testified on aspects of the Chinese legal system before the Congressional-Executive Commission on China and the United States-China Economic and Security Review Commission. I have been appointed to the Academic Advisory Group to the US-China Working Group of the United States Congress. I am admitted to practice in the state of New York (1988) and am a member of the Council on Foreign Relations.

NATURE OF AND BASIS FOR THIS DECLARATION

7. I have been asked by counsel for the plaintiff in the above-captioned action to provide my professional opinion as to the critique of my June 2008 Declaration proffered by the Bank of China ("BOC") in the above-captioned litigation and, in particular, the Declaration of Zhipan Wu, dated December 22, 2010 and submitted to the Court as Docket Entry 37.

8. My opinion herein is based upon my academic and professional legal studies, research, teaching and publishing over the course of many years as a professor of law, my

3

personal experience and familiarity with the Chinese legal system and courts, and the statutes, case law and authorities cited herein.

9. In preparing this declaration I have examined, among other documents:

   a. The documents listed at paragraph 9 to my June 2008 Declaration;

   b. Memorandum of Law in Support of Plaintiffs' Motion to Compel Third-Party Bank of China to Comply with this Court's Orders and Plaintiffs' Subpoena, dated December 6, 2010 (Docket Entry 27) ("Plaintiffs' Memorandum of Law" or the "Plaintiffs' Brief");

   c. Declaration of Robert L. Weigel dated December 6, 2010 and exhibits (Docket Entry 28) (the "Weigel Declaration");

   d. Memorandum of Law of Non Party Bank of China in Opposition to the Plaintiffs' Motion to Compel and in Support of its Alternative Cross Motion to Modify the Court's Orders, dated December 22, 2010 (Docket Entry 35) ("BOC's Memorandum of Law" or the "BOC Brief");

   e. Declaration of Dwight A. Healy dated December 22, 2010 and exhibits (Docket Entry 36);

   f. Declaration of Zhipan Wu dated December 22, 2010 and exhibits (Docket Entry 37) (the "Wu Declaration");

   g. Declaration of John Beauchemin dated December 21, 2010 (Docket Entry 38)

   h. Declaration of Robert L. Weigel dated July 11, 2008 in *Gucci America, Inc., et al. v. MyReplicaHandbag.com et al.*, No. 07 Civ. 2438 (JGK) (S.D.N.Y.) and exhibits (the "Weigel *MyReplicaHandbag* Declaration");

4

      i.   Certification of Facts for Contempt Proceeding dated May 13, 2010 in *Gucci America, Inc. v. Curveal Fashion*, 09 Civ. 8458 (RJS) (THK); and

      j.   Order on Certification of Facts for Contempt Proceeding dated May 27, 2010 in *Gucci America, Inc. v. Curveal Fashion*, 09 Civ. 8458 (RJS) (THK).

10. I have also conducted independent research and have cited the relevant sources in the text of my declaration.

11. The conclusions I draw from an examination of the relevant documents and my own research are as follows: (1) There is no state policy affording a high degree of protection to clients of Chinese banks, and those clients can be under no illusions as to the security of their bank information; (2) I maintain the position set forth in my June 2008 Declaration that BOC and its officers are unlikely to be prosecuted for complying with the Court's orders in this case; and (3) I believe the Wu Declaration is too optimistic in its assessment of the prospects for obtaining evidence from China pursuant to the Hague Convention; Indeed, it is well known among transnational litigators that it is in fact very difficult to obtain evidence through formal Chinese court process.

**Point 1: What Are the Obligations of the Bank of China (the "BOC") Under Chinese Law with Respect to Providing Information About or Freezing Customer Accounts?**

12. BOC does not appear certain itself of the nature and source of its obligations. In the *Myreplicahandbag.com* litigation discussed in BOC's Memorandum of Law, BOC argued that to comply with a U.S. court order to freeze and provide information about the defendant's bank account would cause it to violate Chinese law. It bore the burden of proving this assertion, and accordingly cited several provisions of Chinese law. In my June 2008 Declaration, I examined the provisions of Chinese law cited by BOC and concluded that they did not in fact impose the

duties that BOC said they did. As BOC acknowledges in its brief, my opinion was limited to the provisions cited by BOC.

13. Apparently BOC found my reasoning convincing, for it has now looked elsewhere in the corpus of Chinese law to find grounds for its assertion. Under the provisions of Chinese law cited by BOC,[1] a wide variety of organizations ("competent organs") have the right to inquire into and freeze bank accounts. These "competent organs" include, in the case of corporate entities, the following: courts, tax authorities, customs, procuratorates (similar to state prosecutors), police, state security authorities, military security authorities, prisons, anti-smuggling investigators, supervisory authorities (including military supervisory authorities) (essentially anti-corruption investigators) (inquiry only), auditing authorities (inquiry only), industrial-commercial administration authorities (in charge of company registration and other aspects of commercial regulation) (limited freezing powers), and securities regulatory authorities (inquiry only).

14. This long list of "competent organs," while not including foreign courts, is relevant to resolving an important issue before this court: that of the relative weight to be attached to China's interest in bank secrecy (as shown by its legislation) versus the interest of U.S. courts in seeing their judgments enforced. The legislation cited by BOC shows that a wide variety of institutions have the legal authority to obtain information about, and freeze, bank accounts. There is clearly no state policy affording a high degree of protection to clients of Chinese banks, and those clients can be under no illusions as to the security of their bank information.

---

[1] *See* Wu Declaration, Exhibit B-4.

**Point 2: Will BOC or Its Officers Be Punished for Compliance?**

15. On the question of whether BOC or its officers will be punished for compliance with this court's order, I must respectfully disagree with the Wu Declaration's assessment of the probabilities and maintain the position I took in my June 2008 Declaration (my expert opinion in the *Myreplicahandbag.com* litigation).

16. First, I would note as a preliminary matter that under Chinese law, the New York branch of BOC is not a distinct corporate entity separate from BOC itself.

17. Second, BOC has already complied with an earlier freezing order without, apparently, any negative repercussions. Professor Wu states that it is his understanding that the customer in that case had consented to the freezing, and that there was therefore no violation of Chinese law.[2] The lack of violation would then explain the absence of punishment. My own understanding, expressed in Para. 38 of my June 2008 Declaration, was and is that the customer did *not* consent. This was in fact the position taken by the BOC itself in that case. In a letter dated June 21, 2007 from BOC's counsel, Walter Loughlin, to the Honorable John G. Koeltl, the judge in the *Myreplicahandbag.com* case, Mr. Loughlin specifically stated that written consent from the account holder, Kelvin Cho, was necessary to avoid a violation of Chinese law, but had not been forthcoming.[3] I can only conclude that Professor Wu has received inaccurate or incomplete information on the issue of consent and would change his assessment of the probabilities of punishment if aware of the facts as they are.

18. Third, as noted in the Plaintiffs' Memorandum of Law, BOC has not produced any cases showing Chinese banks or their officials punished for compliance with a U.S. court order. I agree with Professor Wu when he notes that there is no systematic reporting of judicial or

---

[2] *See* Wu Declaration, Para. 29.
[3] *See* Weigel *MyReplicaHandbag* Declaration, Ex. 11.

prosecutorial actions in China, and I agree as a matter of logic that in the Chinese system the inability to find reported decisions on a matter is not conclusive evidence that there are no such decisions. But it is evidence nonetheless. There exist extensive full-text databases of Chinese cases that are easily searchable by subject matter and by words and phrases appearing in the text.[4] Moreover, a case such as this would likely be reported, given its importance for the system as a whole. If such a case existed, therefore, I believe that a reasonably diligent search could find it.

19. Finally, there is the question of BOC's links to the Chinese government. In my June 2008 Declaration in the *Myreplicahandbag.com* litigation, I pointed to BOC's extensive ties to the government and stated that "the BOC does not have sufficient distance from the government for it to be a credible object of government sanctions."[5] Professor Wu, in his opinion, calls this view "simply wrong," and states that BOC operates "independently of the government" and is not controlled by it, and that BOC's 67% shareholder,[6] Central Huijin Investment Company Limited ("Huijin"), itself wholly state-owned, operates "entirely independently of the government." With respect, I must insist that it is the view of the Wu Declaration that is wrong. Relevant primary and secondary sources, both Chinese and foreign, official and unofficial, make it clear that BOC and Huijin are inextricably intertwined with the government of China.

    a. First, Huijin is a corporate entity that exists to serve as a holding company for assets on behalf of the Chinese government. Huijin is 100% owned by the China Investment Corporation ("CIC"), which itself is directly and wholly owned by the Ministry of Finance. The Wu Declaration admits that "some" ownership of the

---

[4] See, for example, the databases at www.chinalawinfo.com and www.lawyee.com.
[5] June 2008 Declaration, Para. 42.
[6] BANK OF CHINA LIMITED, 2009 ANNUAL REPORT, at 83, *available at* http://bit.ly/fm1NBY [hereinafter BOC ANNUAL REPORT 2009].

  BOC can be traced back to the Ministry of Finance "through several layers." In fact, *71 percent* of the BOC shares are state-owned through these "several layers."[7]

b. Here is Huijin as described in BOC's own 2009 Annual Report:

> [Huijin] is a wholly state-owned company . . . . Wholly-owned by China Investment Corporation, Huijin makes equity investments in key state-owned financial institutions, as authorized by the State Council. On behalf of the state, Huijin exercises the rights and fulfils the obligations of an investor . . . .[8]

c. Here is Huijin as described in its own bond offering prospectus from September 2010:

> Huijin is a wholly state-owned company invested in by the state and established under the Company Law. . . . It represents the state in exercising the rights and duties of an investor in state-owned commercial banks and other key state-owned financial enterprises.[9]

d. In fact, the Articles of Association of CIC, Huijin's 100% owner, are quite clear:

> [Huijin] represents the state in exercising, according to law, the rights and duties of an investor in the Industrial-Commercial Bank of China, the Bank of China, China Construction Bank, and other key state-owned financial enterprises. *It manifests the controlling-shareholder position of the state in large financial institutions.*[10]

e. In my June 2008 Declaration, I cited additional evidence showing the extensive governmental ties of BOC and Huijin. Senior managers of both entities, for example, like the senior managers at other big commercial banks, are appointed through the Communist Party's Central Organization Department (its personnel

---

[7] *See* BOC ANNUAL REPORT 2009, *supra* note 6, at 83.
[8] BOC ANNUAL REPORT 2009, *supra* note 6, at 87.
[9] ZHONGYANG HUIJIN TOUZI YOUXIAN ZEREN GONGSI FAXING ZHAIQUAN MUJI SHUOMINGSHU (Central Huijin Investment Company, Limited Bond Offering Prospectus), September 2010, at 10 [hereinafter HUIJIN BOND PROSPECTUS].
[10] CHINA INVESTMENT CORPORATION ARTICLES OF ASSOCIATION, *excerpted at* http://www.china-inv.cn/governance/articles.html (China Investment Corporation's Web site) (in Chinese) (emphasis added).

9

    management system) and have official ranks.[11] The head of the BOC, for example, has an official rank equal to a vice minister and would not be appointed without the approval of the Communist Party's Central Organization Department.[12]

  f. Indeed, Huijin's own documents state that the members of Huijin's Board of Directors and Board of Supervisors are appointed by the State Council (the central executive branch of the Chinese government, similar to a cabinet), and all changes to Huijin's Articles of Association must be approved by the State Council.[13]

  g. As one news report described it, "China's banks operate like government departments, with senior managers appointed and removed by the ruling Communist party's Organisation Department, which is responsible for all senior personnel changes within the government."[14]

  h. A more academic discussion described it this way:

> Even in Reform-era China, all [state-owned enterprises] and state-controlled enterprises remain a part of (or subjects for) the Party

---

[11] *See* Sebastian Heilmann, *Regulatory Innovation by Leninist Means: Communist Party Supervision in China's Financial Industry*, CHINA QUARTERLY, no. 181 (2005), at 1, 17. The reach of the Party's Organization Department has been aptly described by journalist Richard MacGregor in his recent book, *The Party*:
> The department is accurately, if blandly, described as the human resources arm of the Party, but this does not do justice to its extraordinary brief and the way it is empowered to penetrate every state body, and even some nominally private ones, throughout the country. The best way to get a sense of the dimensions of the department's job is to conjure up an imaginary parallel body in Washington. A similar department in the US would oversee the appointment of the entire US Cabinet, state governors and their deputies, the mayors of major cities, the heads of all federal regulatory agencies, the chief executives of GE, Exxon-Mobile, Wal-Mart and about 50-odd of the remaining largest US companies, the justices on the Supreme Court, the editors of the New York Times, the Wall Street Journal and the Washington Post, the bosses of the TV networks and cable stations, the Presidents of Yale and Harvard and other big universities, and the heads of think-tanks like the Brookings Institution and the Heritage Foundation. Not only that, the vetting process would take place behind closed doors, and the appointments announced without any accompanying explanation about why they had been made. When the department knocks back candidates for promotion, it does so in private as well.

Richard MacGregor, THE PARTY 72 (2010).
[12] *See* Heilmann, *supra* note 11, at 9.
[13] HUIJIN BOND PROSPECTUS, *supra* note 9, at 15-16.
[14] Jamil Anderlini, *Chinese Officials to Run Three Banks*, FINANCIAL TIMES, June 21, 2007.

> ranking system that embraces all public institutions. Nomenklatura appointments continue for public enterprises as they do for administrative units . . . . [T]he program [was always] to corporatize, recapitalize, and list (with the public issuance of shares acting primarily in the service of recapitalization), and yet to continue to allow state shareholders dominant ownership and absolute control in the banking firm.[15]

   i. BOC's own IPO prospectus states that Huijin's function as a BOC shareholder is "to represent the PRC government in exercising its investor rights and obligations" and to "implement and execute PRC government policy arrangements in relation to the reform of state-owned financial institutions."[16]

   j. Zhou Xiaochuan, formerly head of the China Construction Bank and now head of the People's Bank of China (China's central bank), has emphasized that:

   > [i]n order to preserve the state's full control power . . . , the state can maintain absolute control over a certain portion of the large-scale commercial banks; for instance, [the state] can keep a 75% equity interest [and still maintain effective control].[17]

   k. Accordingly, the Wu Declaration's assertion that Huijin and BOC operate independently of the Chinese government is in my opinion contradicted by all the available evidence.

20. In summary, I maintain my original position that BOC and its officers are unlikely to be prosecuted for complying with the court order in this case.

---

[15] Nicholas Calcina Howson, *China's Restructured Commercial Banks:* Nomenklatura *Accountability Serving Corporate Governance Reform?*, in CHINA'S EMERGING FINANCIAL MARKETS: CHALLENGES AND GLOBAL IMPACT 123, 136, 144 (Zhu Min, Cai Jinqing & Martha Avery eds., 2009). Professor Howson is a specialist in Chinese law at the University of Michigan Law School. *See also* Hu Runfeng, Cheng Zhe, and Fu Tao, *Zhonghang Shenqiu zhihang zai bao piaoju an* (Another Bank of China Shenqiu Branch Receipts Case Explodes), CAIJING (Finance and Economy), no. 161 (no. 13, June 12, 2006), at 40, *quoted in* Howson, *supra*, at 141 ("as a controlling shareholder, [the Chinese government] has the power to propose strategic arrangements for the future development of the Bank").
[16] BANK OF CHINA HONG KONG OFFERING PROSPECTUS 197 (2006), *quoted in* Howson, *supra* note 15, at 132.
[17] Zhou Xiaochuan, *Guoyou shangye yinhang ruhe chongshi ziben* (How the State-Owned Commercial Banks Can Replenish Their Capital), RENMIN RIBAO (People's Daily), May 9, 2000, at 9.

11

**Point 3: Is There a Good Prospect of Obtaining Evidence from China Pursuant to the Hague Convention?**

21. I believe the Wu Declaration is too optimistic in its assessment of the prospects for obtaining evidence from China pursuant to the Hague Convention. It is well known among transnational litigators that it is in fact very difficult to obtain evidence from China in this way:

> Under the Hague Convention on Evidence, China has agreed to allow some limited discovery of documents. Articles 1 and 2 of that Convention provide for document discovery by means of a Letter of Request issued by the court where the action is pending and transmitted to the "Central Authority" of the jurisdiction where the discovery is located. The Central Authority is then responsible for transmitting the request to the appropriate judicial body for a response. However, Article 23 permits a signatory country to "declare that it will not execute Letters of Request issued for the purpose of obtaining pre trial discovery of documents as known in Common Law countries." China has executed such a declaration and, therefore, document discovery for trial purposes is permissible. The "fishing expedition" discovery for which the United States has become known, however, is not.
>
> Yet even for the document discovery authorized in China, it is unlikely that the Chinese Central Authority will instruct a Chinese court to compel production. The U.S. State Department made the following accurate summary of how China tends to respond to U.S. court document discovery requests:
>
>> While it is possible to request compulsion of evidence in China pursuant to a letter rogatory or letter of request (Hague Evidence Convention), such requests have not been particularly successful in the past. Requests may take more than a year to execute. It is not unusual for no reply to be received or after considerable time has elapsed, for Chinese authorities to request clarification from the American court with no indication that the request will eventually be executed.[18]

22. It is therefore my opinion that a Hague Convention request issued by a United States court is not a realistic or meaningful option for the Plaintiffs in this case to obtain the information that they seek or to effectively freeze the defendants' assets.

---

[18] Dan Harris, *How to Sue a Chinese Company. Part II. Discovery*, CHINA LAW BLOG, Nov. 9, 2010, http://bit.ly/if6ZOy. The State Department summary referred to can be found under the title "China Judicial Assistance" at http://travel.state.gov/law/judicial/judicial_694.html.

23. Moreover, for reasons set forth at Paragraphs 12 through 25 my June 2008 Declaration (and not disputed in the Wu Declaration), it is virtually inconceivable that a Chinese court would enforce the judgment of this Court in this action.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 3, 2010 in Washington, D.C.

_____
DONALD CLARKE