# EXHIBIT 3

Robert L. Weigel
Howard S. Hogan
Anne M. Coyle
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

GUCCI AMERICA, INC., BALENCIAGA
AMERICA INC., BALENCIAGA S.A., BOTTEGA
VENETA INTERNATIONAL S.A.R.L.,
BOTTEGA VENETA INC., LUXURY GOODS
INTERNATIONAL (L.G.I.) S.A. and YVES SAINT
LAURENT AMERICA, INC.

       Plaintiffs,

-against-

WEIXING LI a/k/a XIN LI, LIJUN XU a/k/a JACK
LONDON and TING XU a/k/a JACK LONDON
a/k/a XU TING a/k/a REBECCA XU, WENYING
GUO, XIAOCHAO SHANG, LEI XU, FENGYUAN
ZHAO, LIQUN ZHAO, MING ZHAO, and
PEIYUAN ZHAO, all doing business as
REDTAGPARTY, MYLUXURYBAGS.COM,
KUELALA.COM, XPRESSDESIGNERS.COM,
XPRESSDESIGNER.NET, and DESIGNER
HANDBAGS; ABC COMPANIES;
and JOHN DOES,

       Defendants.

------------------------------------------------------------------ X

2010 Civ. 4974 (RJS)

**SECOND DECLARATION
OF DONALD CLARKE**

I, DONALD CLARKE, declare as follows:

1. I am a professor of law at the George Washington University Law School ("GWULS"), where I have been employed since 2005. My academic specialization is the law of the People's Republic of China in general and the legal regime of economic reform in particular, and I speak and read Chinese fluently. Attached as Exhibit A is a true and correct copy of my curriculum vitae, which provides a statement of my credentials, including a list of publications.

2. In 2008, I was asked to provide an expert opinion in the case *Gucci America, Inc., et al. v. MyReplicaHandbag.com et al.*, No. 07 Civ. 2438 (JGK) (S.D.N.Y.) concerning: (1) the extent to which the judgment of a United States court may be enforced in China; (2) the extent to which Chinese law prohibits the Bank of China from complying with the order of a United States court to disclose information about customer accounts, to freeze such accounts, and ultimately to transfer funds from such accounts to a judgment creditor; and (3) the repercussions that might be experienced by the Bank of China were it to do any of the preceding acts in violation of Chinese law. My opinion was set forth in a declaration dated June 27, 2008 (my "June 2008 Declaration"). A true and correct copy of my declaration is attached hereto as Exhibit B, without the version of my curriculum vitae that was attached as an exhibit.

3. In 2010, I was asked to provide expert opinion in this case responding to a critique proffered by the Bank of China ("BOC") of the June 2008 Declaration. My opinion was set forth in a declaration dated Jan. 3, 2010 (the "January 2010 Declaration"). A true and correct copy of my declaration is attached hereto as Exhibit C, without the version of my curriculum vitae that was attached as an exhibit.

2

**STATEMENT OF QUALIFICATIONS**

4. From 1988 through 2004, I was on the faculty of the University of Washington School of Law ("UWLS"), and have been a visiting professor at New York University Law School and University of California at Los Angeles School of Law. From 1995 to 1998, I was on a leave of absence from the UWLS and worked as an attorney at Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss"), a large United States law firm with a substantial China business practice. During that period, I visited China and Hong Kong approximately twice a year in the course of my work, a substantial amount of which was related to China. From 1998 through 2003, I regularly worked with Paul Weiss as a consultant on Chinese law matters. Since that time I have maintained an independent consulting practice.

5. I have published widely in the field of Chinese law; a list of publications is set forth in my curriculum vitae.

6. I graduated cum laude from Harvard Law School in 1987, where my studies focused on East Asian legal systems and I served as an editor of the *Harvard Law Review*. I earned a graduate degree (M.Sc. with Honors) in the Government and Politics of China from the School of Oriental and African Studies at the University of London in 1983. I also studied Chinese history for two years at Beijing University and Nanjing University in China from 1977 to 1979. I earned my undergraduate degree from Princeton University in 1977.

7. I have served as adviser or consultant on Chinese law matters to a number of bodies, including the Asian Development Bank, the Agency for International Development, and the World Bank's Financial Sector Reform and Strengthening Initiative. I have testified on aspects of the Chinese legal system before the Congressional-Executive Commission on China and the United States-China Economic and Security Review Commission. I have been appointed to the Academic Advisory Group to the US-China Working Group of the United States Congress. I am

admitted to practice in the state of New York (1988) and am a member of the Council on Foreign Relations.

## NATURE OF AND BASIS FOR THIS DECLARATION

8. I have been asked by counsel for the plaintiffs in this action to provide my professional opinion as to (a) the extent to which certain court proceedings in China affect the opinions I offered in the June 2008 Declaration and the January 2010 Declaration, and (b) the application of the comity factors of § 403 of the Restatement (Third) of Foreign Relations Law (the "Restatement") to this case.

9. My opinion herein is based upon my academic and professional legal studies, research, teaching and publishing over the course of many years as a professor of law, my personal experience and familiarity with the Chinese legal system and courts, and the statutes, case law and authorities cited herein.

10. In preparing this declaration I have examined, among other documents:

    a. Declaration of William P. Alford, in support of Tiffany (NJ) LLC and Tiffany and Company's Motion to Compel the Production of Documents from Third-Parties Bank of China, China Merchants Bank, and Industrial and Commercial Bank of China, in *Tiffany (NJ) v. Qi Andrew*, No. 10 Civ. 9471 (S.D.N.Y.) (the "Alford declaration"), attached hereto without exhibits as Exhibit D;

    b. Civil Judgment, The Second Intermediate People's Court of Beijing Municipality, issued December 4, 2013 (the "Beijing Intermediate Court Judgment");

    c. Civil Judgment, The Higher People's Court of Beijing Municipality, issued June 20, 2014 (the "Beijing High Court Judgment");

4

    d. The Second Circuit's opinion in *Gucci America, Inc. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014) (the "Second Circuit Opinion");

    e. May 15, 2013 letter from the Embassy of the People's Republic of China to the U.S. Department of State;

    f. December 19, 2013 letter from Huai Peng Mu, Director-General of the Legal Affairs Department of the People's Bank of China, and Yi Huang, Director-General of the Supervisory Rules and Regulations Department of the China Banking Regulatory Commission, to the U.S. Court of Appeals for the Second Circuit;

    g. Plaintiffs' June 13, 2014 letter brief in response to the United States' *amicus curiae* brief in *Gucci America, Inc. v. Bank of China*, No. 11-3934 (2d Cir.);

    h. Bank of China's June 13, 2014 letter brief in response to the United States' *amicus curiae* brief in *Gucci America, Inc. v. Bank of China*, No. 11-3934 (2d Cir.);

    i. October 17, 2014 letter from Plaintiffs and Bank of China to the Honorable Richard J. Sullivan, United States District Court for the Southern District of New York, regarding *Gucci America, Inc. v. Weixing Li*, No. 10 Civ. 4974 (S.D.N.Y.);

    j. Bank of China's July 24, 2014 application to supplement the record in *Gucci America, Inc. v. Bank of China*, No. 11-3934 (2d Cir.).

11. Where appropriate, I have also conducted independent research and have cited the relevant sources in the text of my declaration.

12. The conclusions I draw from an examination of the relevant documents and my own research are as follows: (1) I continue to believe that there is no state policy affording a high

5

degree of protection to clients of Chinese banks, and those clients can be under no illusions as to the security of their bank information; and (2) I maintain the position set forth in my June 2008 Declaration and my January 2010 Declaration that BOC and its officers are unlikely to be prosecuted for complying with the Court's orders in this case. My conclusions as to each comity factor of § 403 of the Restatement are set forth below.

**Point 1: What Is the Effect of the Beijing High Court Judgment on my Opinions as Stated in the January 2010 Declaration?**

13. Chinese courts have issued two judgments that are relevant to this case: the Beijing Intermediate Court Judgment and the Beijing High Court Judgment. Because the Beijing High Court Judgment is (a) a final judgment after appeal, (b) from a higher court than the court that issued the Beijing Intermediate Court Judgment, and (c) under Chinese law, a review of the entire case *de novo* with no deference to the first-instance judgment, I shall focus on that judgment as a more authoritative representation of how the Chinese legal system views the relevant issues.

14. First, the Beijing High Court Judgment has no effect on my opinion that BOC and its officers are unlikely to be prosecuted for complying with the Court's orders in this case. It is a private lawsuit for breach of contract. The factors supporting my opinion that BOC and its officers are unlikely to be prosecuted remain unchanged.

15. Second, the Beijing High Court Judgment offers no reasons for changing my opinion that there is no strong state policy affording a high degree of protection to clients of Chinese banks. The factors supporting my opinion in that respect remain unchanged. As I noted in Paragraph 13 of my January 2010 Opinion, a wide variety of organizations in China have the right to inquire into and freeze bank accounts. Thus, there is clearly no strong state policy in

6

favor of bank secrecy, and clients have no legitimate grounds for believing that their account information will be highly protected.

16. It is important to clarify what the Beijing High Court Judgment does and does not say. According to the judgment:

  a. There was a contract between BOC and Zhou Peiyuan and Xu Ting (together, the "Chinese Plaintiffs") respecting the Chinese Plaintiffs' deposits at the BOC;

  b. Under that contract, the BOC had the right to suspend or terminate services to the Chinese Plaintiffs under certain conditions, including that there was suspicion that the Chinese Plaintiffs were engaging in illegal or criminal activities, based on reasons and factors, including risk control, as deemed justifiable by the BOC;

  c. The BOC failed to provide adequate evidence showing that such suspicion existed, the mere fact of litigation in the United States against the Chinese Plaintiffs apparently being deemed inadequate; and

  d. Because the BOC had not paid any fine imposed by a United States court, or paid any amount to Gucci, it therefore failed to show that it had justifiable reasons to cease to provide services to the Chinese Plaintiffs.

17. According to the Beijing High Court Judgment, therefore:

  a. A contractual provision of the kind that existed between the BOC and the Chinese Plaintiffs is permissible;

  b. Had BOC produced adequate evidence that there were grounds for suspecting that the Chinese Plaintiffs were engaged in illegal or criminal activities, its actions would have been upheld; and

7

    c. Had BOC already been sanctioned by a court in the United States for acts or failures to act causally related to the Chinese Plaintiffs' use of BOC's banking facilities, the Beijing High Court would have considered that a factor in favor of finding that BOC had justifiable grounds under its contract for suspending services to the Chinese Plaintiffs in the way complained of.

18. I cannot find in the Beijing High Court Judgment grounds for believing there is a strong state policy in favor of bank secrecy. It is a simple contract case. The court found nothing unlawful about the contract, which gave BOC very broad rights over its customers' information in certain circumstances. The case turned simply on matters of evidence; it would have been decided in BOC's favor had the court found BOC's evidence of breach adequate.

19. I note that the Alford Opinion takes the same position on both of the above issues, and I endorse it here.

20. I also note that the Beijing High Court Judgment, which contains significant information about the bank accounts of the defendants in this case, has been made publicly available by the Beijing High Court and can be found in a popular legal database.[1] This fact supports the conclusion that there is no strong state policy affording a high degree of protection to bank client information.

**Point 2: The Comity Factors of § 403 of the Restatement**

21. The Second Circuit Opinion provided that the district court on remand should, in the context of ordering compliance with an asset freeze, conduct a comity analysis using the factors

---

[1] http://www.pkulaw.cn/fulltext_form.aspx?Db=pfnl&Gid=121037305.

set forth in § 403 of the Restatement,[2] and not merely the factors set forth in § 442 of the Restatement.[3]

22. The relevant provisions of Section 403 of the Restatement are set forth in footnote 19 of the Second Circuit Opinion; I shall review them below.

    a. *"[T]he link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory"*: A freezing of bank accounts in China obviously has a link to the territory of China. It is also linked to the territory of the United States inasmuch as the BOC has chosen to business in the United States.

    b. *"[T]he connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect"*: The BOC has connections with both China and, through its establishment of a branch in New York, the United States. The asset freeze is designed to protect parties in the position of Plaintiffs in this case. To the extent Chinese law conflicts with an asset freeze, conflicting Chinese law exists to protect bank customers, not the banks themselves.

---

[2] The relevant provisions of § 403 of the Restatement are set forth in footnote 19 of the Second Circuit Opinion.

[3] Section 442(1)(c) of the Restatement provides:

    In deciding whether to issue an order directing production of information located abroad, and in framing such an order, a court or agency in the United States should take into account the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

9

c.  *"[T]he character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted"*: The activity to be regulated in this case is the freezing of bank accounts by banks. As discussed below in subparagraph (g), the Chinese state has not demonstrated that this activity is of great importance to it. As noted in my January 2010 Declaration and ¶ 12 of the Alford Declaration, a wide swath of government agencies have the right to inquire into and freeze bank accounts.

d.  *"[T]he existence of justified expectations that might be protected or hurt by the regulation"*: Also as discussed in my January 2010 Declaration and in the Alford Declaration, customers of Chinese banks do not have a justified expectation that their bank information will be generally well protected against disclosure and the bank accounts protected against freezes. A wide range of government agencies have access to this information and may order a freeze. With respect to whether BOC had a justifiable expectation that it would not be subject to an order from a United States court to freeze a customer's bank account in China, I offer no opinion as to matters related to the practices of United States courts and the degree to which foreign entities doing business in the United States should in general be expected to be familiar with those practices. I do offer the opinion that a bank doing business in China would be accustomed to a business environment in which governmental entities, including courts, had substantial authority to obtain customer information and order the freezing of bank accounts.

10

e. *"[T]he importance of the regulation to the international political, legal, or economic system"*: I offer no opinion on this factor.

f. *"[T]he extent to which the regulation is consistent with the traditions of the international system"*: I offer no opinion on this factor.

g. *"[T]he extent to which another state may have an interest in regulating the activity"*: Undeniably the Chinese government has at least a potential interest in regulating the freezing of bank accounts held in China. To date, however, I have not observed a strong manifestation of this interest. As noted above, the Beijing High Court Judgment is a simple contract case between two private parties and does not involve the Chinese state. There is no evidence of any state regulatory action that has been taken against BOC or its executives as a result of BOC's freezing of the defendants' bank accounts.

h. *"[T]he likelihood of conflict with regulation by another state"*: I do not believe that there is a significant likelihood of conflict. In reviewing the various documents submitted in this case, I find that the most that can be said is that the BOC's obligations are contractual.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on Dec. 1, 2014 in Washington, D.C.

_____
DONALD CLARKE

11