# EXHIBIT 4

Robert L. Weigel
Howard S. Hogan
Anne M. Coyle
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                   :

GUCCI AMERICA, INC., BALENCIAGA
AMERICA INC., BALENCIAGA S.A., BOTTEGA
VENETA INTERNATIONAL S.A.R.L.,
BOTTEGA VENETA INC., LUXURY GOODS
INTERNATIONAL (L.G.I.) S.A. and YVES SAINT
LAURENT AMERICA, INC.

                         Plaintiffs,

   -against-

WEIXING LI a/k/a XIN LI, LIJUN XU a/k/a JACK
LONDON and TING XU a/k/a JACK LONDON
a/k/a XU TING a/k/a REBECCA XU, WENYING
GUO, XIAOCHAO SHANG, LEI XU, FENGYUAN
ZHAO, LIQUN ZHAO, MING ZHAO, and
PEIYUAN ZHAO, all doing business as
REDTAGPARTY, MYLUXURYBAGS.COM,
KUELALA.COM, XPRESSDESIGNERS.COM,
XPRESSDESIGNER.NET, and DESIGNER
HANDBAGS; ABC COMPANIES;
and JOHN DOES,

                        Defendants.

-------------------------------------------------------------------X

2010 Civ. 4974 (RJS)

**THIRD DECLARATION
OF DONALD CLARKE**

I, DONALD CLARKE, declare as follows:

1.  I was asked to provide a response to the Declaration of Yuqing Zhang submitted by the Bank of China ("BOC") in the above-captioned action.

2.  My opinion herein is based upon my academic and professional legal studies, research, teaching and publishing over the course of many years as a professor of law, my personal experience and familiarity with the Chinese legal system and courts, and the documents cited herein. In addition to the documents described in my Declaration dated December 1, 2014, I have reviewed the Declaration of Yuqing Zhang (the "Zhang Declaration") and exhibits thereto, as well as the Civil Judgment of the People's Court of Chaoyang District, Beijing Municipality, (2014) Chao Min Chu Zi No. 25377 ("Chaoyang Judgment"), a copy of which was provided by counsel for BOC and attached hereto, together with a certified translation, as Exhibits 1-2.

3.  Where appropriate, I have also conducted independent research and have cited the relevant sources in the text of my declaration.

4.  The conclusions set forth in my prior declarations remain the same: (1) I continue to believe that there is no state policy affording a high degree of protection to clients of Chinese banks, and those clients can be under no illusions as to the security of their bank information; and (2) I maintain the position that BOC and its officers are unlikely to be prosecuted for complying with the Court's orders in this case.

**BOC'S FAILURE TO SHOW ANY MEANINGFUL RISK OF SANCTIONS**

5.  The Zhang Declaration cites a number of Chinese court decisions he contends show that "Chinese courts do impose liability on banks for breaches of their duty to keep customers' account information confidential and to refrain from freezing customer accounts." Zhang Declaration ¶¶ 25-29. None of the cases cited show a Chinese bank or its executives suffering

criminal sanctions for doing what is being asked of BOC in this case. While I agree with the Zhang Declaration's statement that not all relevant cases may be published due to unsystematic reporting of cases in China, the fact is that BOC, with every incentive and years of time to find a case imposing criminal liability on a bank or its executives under similar circumstances, has failed to do so. No criminal liability has been imposed on BOC even though BOC froze certain defendants' accounts and produced partial banking records to Plaintiffs in this action.

6.   There is no assertion that the Chinese government has imposed any penalties on BOC—criminal or civil—in connection with its production of the defendants' bank account records. Indeed, although the Zhang Declaration states that the 2011 letter from the Chinese banking regulators "indicates that PBOC and CBRC will not hesitate to impose liability on a Chinese bank simply because that bank is partially owned by another governmental entity," (Zhang Declaration ¶ 39), the letter indicated only that BOC had received a warning and stated that the two authorities were in the process of evaluating the matter and determining sanctions (it made no mention of ownership issues). Today, *more than three years later*, the BOC has not asserted that any sanctions have been imposed.

**CHINESE GOVERNMENTAL CONTROL OF BOC**

7.   Although the Zhang Declaration contends that BOC operates "independently" from the Chinese government and that ownership of BOC's majority shareholder Central Huijin Investment Company ("Huijin") by the Chinese government therefore does not alleviate risk to the Bank for any alleged violation of Chinese laws, I believe this assertion to be contradicted by all available evidence. As set forth in detail in my January 2010 Declaration, governmental control of BOC is extensive. *See* Declaration of Donald Clarke dated January 3, 2010 (ECF 41) ¶ 19(a)-(k). BOC's own IPO prospectus states that Huijin's role as shareholder is "to represent

3

the PRC government in exercising its investor rights and obligations" and to "implement and execute PRC government policy arrangements in relation to the reform of state-owned financial institutions." *See id.* ¶ 19(i).

## THE BEIJING COURT JUDGMENT DOES NOT ALTER THE ANALYSIS

8.  As set forth in my Declaration of December 1, 2014, I cannot find in the Beijing High Court Judgment grounds for believing there is a strong state policy in favor of bank secrecy. It is a simple contract case. The court found nothing unlawful about the contract, which gave BOC very broad rights over its customers' information in certain circumstances. The case turned simply on matters of evidence; it would have been decided in BOC's favor had the court found BOC's evidence of breach adequate.

9.  The Zhang Declaration purports to address the argument that "the inclusion in the Beijing Judgment of information concerning the plaintiffs' bank accounts shows that China does not have a strong policy against the disclosure of bank client information." Zhang Declaration ¶ 32. The purported refutation, however, is simply the bare opinion that the conclusion does not follow from the premise, without any reasoning offered in support. It may well be that the inclusion of such information in the opinion does not relieve BOC of its confidentiality obligations (Zhang Declaration ¶ 32); the Plaintiffs have not argued to the contrary. The point is that the inclusion of such information in the opinion contradicts the general claim that the Chinese government takes bank confidentiality extremely seriously.

10.  The Zhang Declaration fails to provide any legal explanation for the inclusion of such supposedly confidential information in a public judgment or to explain why, if a Chinese customer's account information is meant to be closely guarded, such records would not be sealed or redacted as is typical of materials that contain highly confidential information in U.S. courts.

4

11. An important issue in this case is how to understand and interpret the concept of "suspected of (*shexian*) [involvement in illegal activity]" as that term is used in the banking services agreement between BOC and the defendants. The Zhang Declaration states that "under Chinese law, the concept of an individual being suspected of involvement in illegal activity is very narrow, and requires the issuance of criminal process against the accountholder." Zhang Declaration ¶ 33. Unfortunately, the Zhang Declaration cites no legal, academic, or other authority for this statement. The statement seems to be inconsistent with the plain language of the agreement, which provides that "[i]f the Applicant violates any provision of this Agreement . . . or is suspected of engaging in money laundering, financing of terrorism or other illegal or criminal activities, *based on any reason or factor (including risk control) as deemed justifiable by the Bank . . . .*" Beijing High Court Judgment at 4 (Zhang Declaration Exhibit 11) (emphasis added). The Beijing High Court did not state that the arrest or conviction of the Chinese Plaintiffs would have been required to support BOC's suspension of their bank accounts; it stated only that that BOC failed to produce sufficient evidence of the Chinese Plaintiffs engaging in criminal activities. The lower court whose judgment the Beijing High Court affirmed did note the lack of any judgment against the Chinese Plaintiffs, but again did not state that this was a *sine qua non* of being "suspected of" illegal activities under the agreement.

12. I note also that the Zhang Declaration's statement is contradicted by the position of the Bank itself as set forth in the December 30, 2014 Chaoyang Judgment dismissing BOC's lawsuit against the counterfeiters. The Chaoyang Judgment includes the court's presentation of the relevant part of BOC's argument, almost certainly verbatim. *See* p. 2, paragraph 5 of the English translation. If one looks at the Chinese original of the Chaoyang Judgment, the language used by BOC in its argument to the court was "in our opinion, the Defendants *were suspected of*

5

illegal acts . . ." (The English translation with which I was provided is misleading in that section

as it does not signal the use of the critical term *shexian*, "to be suspected of.") The term for

"were suspected of," *shexian*, is exactly the term used in the banking services agreement between

the defendants and BOC, and exactly the term that the Zhang Declaration opines can mean only

"were subject to an official criminal proceeding by reason of." Zhang Declaration ¶ 33.

### CHINA'S INADEQUATE ENFORCEMENT OF INTELLECTUAL PROPERTY RIGHTS

13. The Zhang Declaration opines on the "robustness of the remedies available for

trademark infringement under Chinese law." Zhang Declaration ¶ 55.

14. In 2014, the U.S. Trade Representative included China on its "Priority Watch List"

in its "Special 301 Report" reviewing the global state of intellectual property rights protection

and enforcement and reported that the United States will continue to monitor China under

Section 306 of the Trade Act of 1974.[1] The Report noted that "a wide range of U.S. stakeholders

in China continues to report serious obstacles to effective protection of IPR in all forms,

including . . . trademarks"[2] and that "foreign rights holders in China continue to face a complex

and challenging IPR environment."[3] Notably, although trademark enforcement activities in

China have increased, albeit mostly on behalf of local brands, "enforcement efforts have yet to

slow the sale of counterfeit products online" and measures to address the online sale of

counterfeit goods "have not significantly deterred repeat and large-scale offenders who, after

postings are removed, quickly place new postings offering the same infringing goods."[4]

15. The US-China Business Council ("USCBC"), a private, nonpartisan, nonprofit

organization comprising approximately 220 U.S. companies that do business in China, surveyed

---

[1] U.S. Trade Representative, 2014 Special 301 Report, attached hereto as Exhibit 3, at 30.
[2] *Id.*
[3] *Id.* at 31.
[4] *Id.* at 34.

its members in 2014 on the Chinese business environment and found that intellectual property rights enforcement ranked as the second biggest challenge.[5] It reported that "almost 50 percent of companies hold back on investment and research and development (R&D) in China because of IP concerns"[6] and that U.S. companies give all of China's enforcement channels, including its civil and criminal courts and administrative agencies, mixed reviews.[7]

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 5, 2015 in Washington, D.C.

_____
DONALD CLARKE

---

[5] The US-China Business Council, USCBC 2014 China Business Environment Survey Results: Growth Continues Amidst Rising Competition, Policy Uncertainty, attached hereto as Exhibit 4, at 11.
[6] *Id.* at 12.
[7] *Id.*

# EXHIBIT 1

## THE PEOPLE'S COURT OF CHAOYANG DISTRICT, BEIJING MUNICIPALITY

### CIVIL JUDGMENT

(2014) Chao Min Chu Zi No. 25377

**Plaintiff:**

Beijing Chaoyang Sub-Branch of Bank of China Limited, domiciled at No. 18 Xiaguangli, Dongsanhuan Beilu, Chaoyang District, Beijing.

Represented by: Huang Xiaojuan, President

Attorneys:

Zheng Yuejie, attorney-at-law with Jun He Law Offices of Beijing; and

Fu Changyu, attorney-at-law with Jun He Law Offices of Beijing

**Defendant:**

Zhao Peiyuan, female, born on 25 September 1943, ethnic Manchu and retired employee of Beijing Piano Plant, domiciled at No. 16 Unit 1, Building 13, Section A Fangyuanli, Chaoyang District, Beijing, identification card No. 110105194309256129.

Attorney:

Chen Peng, attorney-at-law with Zhongdun Law Office of Beijing.

**Defendant:**

Xu Ting, female, born on 10 June 1970, ethic Manchu, unemployed, domiciled at the same place as Zhao Peiyuan, identification card No. 11010519700610616X.

Attorney:

Chen Peng, attorney-at-law with Zhongdun Law Office of Beijing.

**Defendant:**

Xu Lei, male, born on 25 March 1972, ethnic Manchu, unemployed, domiciled at the same place as Zhao Peiyuan, identification card No. 110105197203256132.

Attorney:

Chen Peng, attorney of Zhongdun Law Office of Beijing.

In connection with the case brought by Plaintiff Beijing Chaoyang Sub-Branch of Bank of China Limited (the "Plaintiff") against Defendants Zhao Peiyuan, Xu Ting and Xu Lei (the "Defendants") regarding a dispute over tortious liability, this Court duly forms a collegial panel and conducts a public hearing after accepting the case. Zheng Yuejie, the attorney acting for the Plaintiff, and Chen Peng, the attorney acting for the Defendants, appear before us. This case has now been concluded.

The Plaintiff argues that: Defendant Zhao Peiyuan is the mother of Defendants Xu Ting and Xu Lei, and Defendant Xu Ting is the elder sister of Defendant Xu Lei. From 2009 to 2011, Xu Ting opened a number of accounts with our bank.

In June 2010, Gucci and six other companies ("Gucci *et al*") commenced an action before the United States District Court for the Southern District of New York ("SDNY") against the Defendants on the grounds that the Defendants and their whole family were allegedly involved in producing and selling products bearing fake Gucci trademarks and other trademarks in the United States and remitting proceeds therefrom into China, requesting that the Defendants stop their tortious conduct and compensate for losses.

However, the Defendants refused to appear and defend their case after they were sued by Gucci *et al*. They neither submitted any document to SDNY, nor responded to the request for evidence from Gucci *et al* as ordered by SDNY. As a result, SDNY issued a preliminary injunction and an order, requiring BOC to freeze the funds in the accounts opened by the Defendants in China, and to provide all the account information of the Defendants and other documentation in accordance with the subpoena issued by Gucci.

In order to avoid to be ordered by the US court to disclose the account information of the Defendants and freeze the funds in the Defendants' accounts, BOC had to engage US attorneys and expert witnesses to oppose to the preliminary injunction and order issued by SDNY, and submitted a motion to modify it. In the end, however, SDNY held on 15 November 2012 that BOC failed to comply with its preliminary injunction and order, found BOC to be in civil contempt of the court, and imposed a mandatory fine on BOC. Throughout this process, BOC paid a large sum of attorneys' fees, expert fees and other expenses for handling the case. The above costs amount to date to the equivalent of RMB 5,534,595. Although BOC asked the Defendants to appear before the court, to authorise BOC to provide their account information, or otherwise to resolve the relevant disputes on several occasions, the Defendants always refused to do so. Ultimately, the above costs were borne by BOC because Defendants' accounts had been opened with our bank.

In our opinion, the Defendants were allegedly involved in illegal acts of manufacturing and selling products bearing counterfeit trademarks in the US, and remitted the proceeds therefrom into the accounts opened with us in China, leading to BOC's involvement in US proceedings. Moreover, the Defendants refused to respond to the case against them. This eventually resulted in the preliminary injunction and order issued by the US court against BOC, to which BOC had to respond and paid a large sum of costs for that purpose, and will very likely incur further losses. The Defendants should be held liable to compensate us for the huge losses incurred by their acts. Moreover, the acts of the Defendants are in essence to escape from legal liability by taking advantage of the conflicts between the PRC and USA jurisdictions, and should not be protected by law. Therefore, our bank requests in accordance with Article 6 of the Tort Liability Law and other relevant regulations that Defendants Zhao Peiyuan, Xu Ting, and Xu Lei be ordered to compensate for our losses of RMB 5,534,595 in total, and be jointly liable for compensating for our losses.

The Defendants argue that:

Firstly, the Defendants committed no tortious acts against the Plaintiff. Our opening of accounts with the Plaintiff was civil legal behavior conducted in accordance with the *Commercial Bank Law of the People's Republic of China*, and materials were submitted in full accordance with the bank's requirements during the course of opening accounts, without any concealment or omission. Therefore, the conduct of opening accounts is legal and valid, and cannot constitute a tort against the Plaintiff. As to our failure to appear before and submit documents to the US court as mentioned by the Plaintiff, we have the freedom to dispose of our civil action rights under US law. We would assume any legal consequences resulting from our disposal of such rights. Our own acts had nothing to do with BOC NY Branch or the Plaintiff, and BOC had no right to require us to change our legal exercise of our own rights in legal proceedings. In fact, the sanctions imposed by the US court against BOC are a result of the US court's "jurisdictional hegemony," which should not be assumed by us at all. This is a political risk faced by BOC's overseas investments, and should be resolved by US domestic law and even through diplomatic channels, as opposed to shifting the relevant liabilities to consumers, particular to the consumers in the country, in an irresponsible manner.

Secondly, the Plaintiff suffered no actual losses. The Plaintiff is BOC Chaoyang Sub-Branch, but sought to recover damages for BOC NY Branch. This is contrary to legal principles. The BOC Chaoyang Sub-Branch and BOC NY Branch are two different entities: one is a domestic one and the other is a foreign one. The practice that the domestic entity seeks direct recovery of losses suffered by the foreign entity complies with neither domestic law nor international law. Moreover, BOC NY Branch has to date not actually paid any fine to the US court, and its case is still under trial. Therefore, the Plaintiff incurs no actual loss.

Thirdly, the dispute between the Plaintiff and us has been finally decided by the Beijing High People's Court through the (2014) Gao Min Zhong Zi No. 585 Civil Judgment, whereby the Plaintiff was ordered to unconditionally release the freezing of our accounts. However, the Plaintiff disregarded the effective judgment, intentionally concocted a course of action regarding a dispute over tortious liability, abused its right to claim, and commenced the present proceedings. This behavior has violated the basic civil procedural principle of "*ne bis in idem*" under the PRC civil procedural law, and is a waste of the increasingly constrained judicial resources in China. In relation to such behaviour, we propose a sanction by the court.

In conclusion, we did not commit any tortious act, the Plaintiff suffered no actual loss, and our proper behavior had no direct causal relationship with the expenses of the Plaintiff's overseas branch. It is legally groundless for our tort against the Plaintiff. The Plaintiff should instead be sanctioned for its disregard of judicial authority, abuse of its right to claim, and waste of judicial resources. Therefore, we request that the Plaintiff's claims be dismissed.

It is found upon a hearing that:

Xu Ting as elder sister and Xu Lei as younger brother are both children of Zhao Peiyuan.

From 2009 to 2011, Zhao Peiyuan, Xu Ting, and Xu Lei opened multiple accounts with the Beijing Lido Hotel Sub-Branch of Bank of China Limited ( "BOC Lido Sub-Branch").

Zhao Peiyuan, Xu Ting, and Xu Lei were sued by Gucci *et al* for alleged infringement in the US. The competent US court issued a preliminary injunction and a writ of discovery during the course of the proceedings. BOC NY Branch was also involved in the proceedings before the US court.

During the proceedings, BOC Lido Sub-Branch froze the bank accounts of Zhao Peiyuan, Xu Ting, and Xu Lei. Zhao Peiyuan, Xu Ting, and Xu Lei brought an action before the competent PRC court, requesting that the BOC Lido Sub-Branch promptly release the freezing of all the deposits held by Zhao Peiyuan, Xu Ting, and Xu Lei with the BOC Lido Sub-Branch.

In relation to the above case, it was found in the (2013) Er Zhong Min Chu Zi No. 01275 Civil Judgment of Beijing No. 2 Intermediate People's Court:

From 1 August 2009 to 26 April 2011, Zhao Peiyuan concluded transactions with BOC Lido Sub-Branch evidenced by the following documents: 3 gift deposit certificates (representing a total amount of RMB 257,269.70), 8 fixed term deposits (representing a total amount of RMB 510,000), two demand deposit passbooks (representing a total amount of RMB 120,683.11), 1 treasury transaction (in an amount of RMB 440,000), and 4 wealth management products (in a total amount of RMB 373,000). The total amount for the above is RMB 1,700,961.64. From 11 June 2009 to 8 April 2011, Xu Ting concluded transactions with BOC Lido Sub-Branch evidenced by the following documents: 5 gift deposit certificates (representing a total amount of RMB 416,845.58), 1 VIP card (representing a total amount of RMB 2,013), two demand deposit certificates (representing a total amount of RMB3,358.81), 2 wealth management products (in a total amount of RMB 679,000). The total amount for the above is RMB 1,101,217.39. From 17 August 2010 to 8 April 2011, Xu Lei concluded transactions with BOC Lido Sub-Branch evidenced by the following documents: 2 gift deposit certificates representing a total amount of RMB 154,553.53.

The above-mentioned fixed term deposits, treasury bonds and wealth management products have all matured in accordance with their initial terms or durations of transaction. The parties have no dispute over the information relating to the accounts of Zhao Peiyuan, Xu Ting and Xu Lei with BOC Lido-Sub-

Branchbranch, including the account numbers, account names, transaction numbers, opening dates, relevant business, transaction dates, primary opening documents, principal amounts, initial maturity dates, carry forward status, carry forward maturity dates and other account information.

Zhao Peiyuan, Xu Ting and Xu Lei claimed that they have been unable to withdraw money from any of their accounts maintained with BOC Lido Sub-Branch branch since 10 June 2011. The bank staff merely informed them verbally or via telephone that Xu Ting has been involved in an intellectual property right dispute in the United States with Gucci and therefore all amounts have been frozen and incapable of being withdrawn, but refused providing any evidence in writing. BOC Lido Sub-Branch, while acknowledging the time of suspending transactions relating to the accounts of Zhao Peiyuan, Xu Ting and Xu Lei, asserted that, pursuant to the provisions on account cancellation or business termination of the *Agreement of Account Opening and Comprehensive Services for Individual Accounts* signed and accepted by Zhao Peiyuan, Xu Ting and Xu Lei at the time of entering into various business transactions with the bank, if BOC is involved in any litigation or suffers any loss as a result of any dispute between Zhao Peiyuan, Xu Ting or Xu Lei (as the case may be) and any third party, or if Zhao Peiyuan, Xu Ting or Xu Lei is suspected of engaging in money laundering, fraud, financing of terrorism or other illegal activities, or if any account of Zhao Peiyuan, Xu Ting or Xu Lei is suspected of being used for money laundering, fraud or other illegal activities, the bank shall have the right to suspend business dealings with Zhao Peiyuan, Xu Ting and Xu Lei and suspend transactions of the relevant accounts. In light of the fact that it is currently involved in a lawsuit and dispute in the US Court, BOC Lido Sub-Branch may conclude that Zhao Peiyuan, Xu Ting and Xu Lei are involved in the scenarios above and that it is entitled to suspend its banking dealings with them and suspend transaction services relating to the relevant accounts, and such suspension does not constitute an account freeze.

Upon court hearing, it has been found that all business transactions that Zhao Peiyuan, Xu Ting and Xu Lei have had with BOC Lido Sub-Branch, namely opening accounts, making demand deposits and fixed term deposits, treasury bonds sales and purchases, purchasing wealth management products, bank card related transactions, and electronic-banking transactions, etc., occurred between June 2009 and May 2011. When making fixed term deposits before October 2009, each of them completed an *Account Opening Application* at the request of BOC's staff. With respect of all subsequent fixed term or demand deposits and application for wealth management VIP card, each of them completed an *Application Form for Account Opening and Comprehensive Services for Individual Accounts*, on the back of which is the *Agreement of Account Opening and Comprehensive Services for Individual Accounts*. For their purchase of treasury bond products, each of them completed an *Application for Account Opening / Comprehensive Services for Individual Accounts*, on the back of which are notes to clients, BOC personal settlement account management agreement, and articles of association for BOC Great Wall debit card. For their purchase of wealth management products, each of them completed an *Information Confirmation Sheet for Personal Wealth Management Product Transactions*.

Below the client information blocks of the *Application Form for Account Opening and Comprehensive Services for Individual Accounts*, it contains the following language: I have read and understood the relevant provisions of the "Agreement for Applying for Account Opening and Comprehensive Services for Individual Accounts of Bank of China Limited", and undertake to carry on business transactions in compliance with the relevant provisions of the agreement, notes to the clients, the service agreement and the bank's current business articles of association, and business transaction rules and requirements. Zhao Peiyuan, Xu Ting and Xu Lei have signed their names in places marked with "applicant's signature".

According to paragraph (3) of the clause in relation to account closing or business termination in the *Agreement of Account Opening and Comprehensive Services for Individual Accounts*, which was formulated by Bank of China Limited and effective from June 2009 to May 2011, "*[i]f the Applicant violates any provision of this Agreement or any other rules and regulations of the Bank, or makes any operation with malicious intent, or defames or damages the reputation of the Bank, or maliciously attacks the electronic banking system of the Bank, or is suspected of engaging in money laundering, financing of terrorism or other illegal or criminal activities, based on any reason or factor (including risk control) as deemed justifiable by the Bank, the Bank has the right to suspend or terminate this Agreement and provision of the services hereunder, and reserves the right to hold the Applicant liable for such activities. Termination of this*

*Agreement shall not be deemed as cancellation of any outstanding transaction instructions given prior to such termination, or discharge or release of any legal consequence of any transaction incurred prior to such termination.*"

From 1 July 2011, Bank of China Limited started to use a new version of the *Agreement of Account Opening and Comprehensive Services for Individual Accounts,* in which paragraph (3) of the clause in relation to account closing or business termination reads as follows: "*[i]f the Applicant is suspected of engaging in money laundering, fraud, financing of terrorism or other illegal activities, or violates any provision of applicable laws, regulations, regulatory rules, government policies, this Agreement, or other by-laws, business rules or regulations of the Bank, or makes any operation with malicious intent, or defames or damages the reputation of the Bank, or maliciously attacks the electronic banking system of the Bank, or the Bank is involved in any litigation or incurs any loss due to any dispute between the Applicant and any third party, or the Applicant's account is suspected of being used for money laundering, fraud or other illegal purposes, the Bank has the right to suspend or terminate this Agreement and provision of the services hereunder, and reserves the right to hold the Applicant liable for such activities, and the Applicant shall be liable for any and all losses incurred by the Bank due to such activities. If any fund of the Bank is deducted by any court or other judicial or governmental authority that intends to deduct the Applicant's fund, the Bank has the right to deduct the Applicant's fund to cover the loss incurred by the Bank due to the abovementioned deduction. Termination of this Agreement shall not be deemed as cancellation of any outstanding transaction instructions given prior to such termination, or discharge or release of any legal consequence of any transaction incurred prior to such termination.*" Zhao Peiyuan, Xu Ting and Xu Lei claim that the clause above is a standard term. When they went through relevant formalities in relation to account opening and making deposits with BOC Lido Sub-Branch, they signed all the forms as instructed and required by the counter staff of the bank, and the bank failed to give any explanation on any clause of the agreements. They had no way to find out when a new version was adopted or what amendments were made to the *Agreement of Account Opening and Comprehensive Services for Individual Accounts.* Therefore, they claim that the clause above is illegal and invalid. BOC Lido Sub-Branch asserts that all applicable business by-laws, rules and regulations issued and updated from time to time by Bank of China Limited shall be part of the *Agreement of Account Opening and Comprehensive Services for Individual Accounts.* Therefore, the provisions of clauses adopted and incorporated into the *Agreement of Account Opening and Comprehensive Services for Individual Accounts* from time to time shall be automatically applicable to the legal relationship concerned in this proceeding. The bank has published announcements in relation to the adoption of the new version of the agreement at its business locations. However, BOC Lido Sub-Branch fails to present evidence to prove how it notified Zhao Peiyuan, Xu Ting and Xu Lei of the adoption of the new version of the *Agreement of Account Opening and Comprehensive Services for Individual Accounts* from 1 July 2011.

It is also found that in June 2010, seven companies representing five brands (including Gucci) filed a complaint against Xu Ting and her husband Xu Lijun *et al* with a court in the US, and included Zhao Peiyuan and Xu Lei as additional defendants in the US proceeding on 10 March 2011, alleging that those people had been involved in the manufacture and sale of counterfeits bearing the trademarks of Gucci and other plaintiffs in the US proceeding, and remitted the proceeds from the manufacture and sale of such counterfeits into China. Except Xu Lijun's attorney, who was present at the trial of the US proceeding, no defendant in the US proceeding filed any response or defence, or made any submission to Gucci *et al* or the US Court as ordered by the US Court. On 12 July 2010, the US Court issued a preliminary injunction and a writ of discovery, which prohibited Zhao Peiyuan, Xu Ting and Xu Lei *et al* from continuing the alleged infringements, and ordered the persons on whom the injunction was served (including the agents, representatives, successors and bankers of the three individuals mentioned above) to refrain from transferring any assets including the funds held in the accounts opened by Zhao Peiyuan, Xu Ting and Xu Lei *et al* with BOC in the PRC. On 13 and 16 July 2010, Gucci *et al* served upon the BOC NY Branch the said injunction, the writ of discovery and the subpoena to produce documents, information, or objects or to permit inspection of premises in a civil action, under which BOC was commanded to take necessary steps to comply with the provisions of the preliminary injunction, and release information in relation to the accounts of Zhao Peiyuan, Xu Ting and Xu Lei. From 21 July 2010, BOC engaged its US counsel, and as an interested third party, filed with the US Court a motion to quash the motion of Gucci for enforcing the writ of discovery, and a motion for reconsideration. On 23 August 2011, the US Court issued an order to compel BOC to comply with the

subpoena and the preliminary injunction served by Gucci *et al*, and denied the motion of BOC for reconsideration, requesting BOC to release the information required under the subpoena within 14 days after the order was issued. On 22 September 2011, BOC appealed this order to the United States Court of Appeals for the Second Circuit. On 30 November 2011, BOC also filed a motion with the US Court, requesting that the US Court grant the motion of BOC for reconsideration and for exemption from the order dated 23 August 2011, and order Gucci *et al* to seek further information from BOC via the Hague Convention procedures, and rule that the accounts inside China are not subject to the preliminary injunction. On 18 May 2012, the US Court denied the motion of BOC for a new trial. On 15 November 2012, the US Court held BOC in malicious and intentional contempt of the court order dated 23 August 2011 and the discovery obligation under the injunction for 14 months, and imposed a fine of USD 75,000 on BOC; if BOC failed to comply with the order dated 23 August 2011 within 7 days, a fine of USD 10,000 per day would be imposed on it from the expiry of such 7-day period, until BOC complied with the order. The US Court also granted the motion of Gucci *et al* to require BOC to pay the reasonable attorney's fees and court fees incurred by Gucci *et al* for filing the motion for contempt. BOC then appealed the contempt citation to the United States Court of Appeals for the Second Circuit, and filed a motion for stay of the penalty until the appeal proceeding is concluded. The motion was granted and BOC did not make any payment. In this case, BOC Lido Sub-Branch has not made any claim against Zhao Peiyuan, Xu Ting or Xu Lei for such loss allegedly incurred by it.

Beijing No. 2 Intermediate People's Court holds the opinion as follows:

1.      Whether the proceedings shall be consolidated.

According to the *Commercial Bank Law of the People's Republic of China*, a commercial bank is permitted to engage in accepting deposits from the public, trading government bonds and financial bonds, conducting bank card business, and other business approved by the banking regulatory authority under the State Council. The court of first instance finds that, in addition to the saving deposit contracts between Zhao Peiyuan, Xu Ting or Xu Lei and BOC Lido Sub-Branch, the parties also entered into other contracts including treasury bond trading contracts and wealth management contracts. The claims of Zhao Peiyuan, Xu Ting and Xu Lei are consistent and related to the same subject matter, i.e. requesting the court to order BOC Lido Sub-Branch to remove the block on all the accounts opened by them with the bank. In order to improve litigation efficiency, simplify the legal proceedings and reduce the burden of the parties, the proceedings shall be consolidated.

2.      Whether BOC Lido Sub-Branch violated any contractual or statutory provision by stopping financial service and suspending usage of the accounts of Zhao Peiyuan, Xu Ting and Xu Lei.

The undertakings and agreements in relation to the business conducted by Zhao Peiyuan, Xu Ting and Xu Lei through their accounts opened with BOC Lido Sub-Branch (including current deposits, term deposits, treasury bond trading, wealth management products, bank cards, electronic banking business) were signed between June 2009 and May 2011. BOC Lido Sub-Branch notified Zhao Peiyuan, Xu Ting and Xu Lei of its decision to suspend services to them in June 2011. Therefore, the rights and obligations of the parties to this action shall be governed by the terms of the *Agreement of Account Opening and Comprehensive Services for Individual Accounts* which was formulated by BOC and effective prior to 1 July 2011.

The clause in relation to account closing or business termination in such applicable version of the *Agreement of Account Opening and Comprehensive Services for Individual Accounts* reads as follows: *[i]f the Applicant violates any provision of this Agreement or any other rules and regulations of the Bank, or makes any operation with malicious intent, or defames or damages the reputation of the Bank, or maliciously attacks the electronic banking system of the Bank, or is suspected of engaging in money laundering, financing of terrorism or other illegal or criminal activities, based on reason or factor (including risk control) as deemed justifiable by the Bank, the Bank has the right to suspend or terminate this Agreement and provision of the services hereunder, and reserves the right to hold the Applicant liable for such activities.*

According to the facts found during the trial, Zhao Peiyuan, Xu Ting and Xu Lei completed and signed the application forms as requested by the bank when conducting banking business with BOC Lido Sub-Branch.

BOC Lido Sub-Branch failed to produce evidence to prove that Zhao Peiyuan, Xu Ting and Xu Lei had actually made any operation with malicious intent, or defamed or damaged the reputation of the bank, or maliciously attacked the electronic banking system of the bank. The US proceeding in which Zhao Peiyuan, Xu Ting and Xu Lei are involved is still on-going and pending. There is no judgment that has taken effect in China and finds Zhao Peiyuan, Xu Ting and Xu Lei guilty of being involved in money laundering, financing of terrorism or other illegal or criminal activities. BOC Lido Sub-Branch also failed to produce evidence sufficient to prove that it has justifiable reason or factor to cease to provide services to the Plaintiffs (sic). BOC has not paid any fine imposed by the US Court or any amount to Gucci.

According to the *Commercial Bank Law of the People's Republic of China*, the lawful business operation of a commercial bank is free from interference of any entity or individual; a commercial bank shall protect the lawful interest of depositors from being injured by any entity or individual; personal savings deposit business with commercial banks shall be based on the principles of voluntary deposit, free withdrawal, deposit bearing interest, and the confidentiality for the depositor. Therefore, BOC Lido Sub-Branch shall fully perform its obligations in accordance with the terms as agreed. There is no contractual or legal basis for BOC Lido Sub-Branch to unilaterally stop financial service and suspend usage of the accounts of by Zhao Peiyuan, Xu Ting and Xu Lei.

Therefore, it is decided that Beijing Lido Hotel Sub-Branch of Bank of China Limited be ordered to resume the provision of services for and dealing with all the bank accounts opened by Zhao Peiyuan, Xu Ting and Xu Lei, within seven days after this judgment takes effect.

The BOC Lido Sub-Branch was dissatisfied with the above judgment and appealed the case to the Beijing High People's Court, which is of the view as follows upon a hearing:

According to the *Commercial Bank Law of the People's Republic of China*, the lawful business operation of a commercial bank is free from interference of any entity or individual; a commercial bank shall protect the lawful interest of depositors from being damaged by any entity or individual; personal savings deposit business with commercial banks shall be based on the principles of voluntary deposit, free withdraw, deposit bearing interest, and the confidentiality for the depositor. During the period from June 2009 to May 2011, Zhao Peiyuan, Xu Ting and Xu Lei each opened accounts with BOC Lido Sub-branch for transactions including demand deposits and fixed term deposits, treasury bonds sales and purchases, wealth management products, bank cards, and electronic-banking transactions, etc., and at the time same entered into undertakings and relevant agreements, including the *Agreement of Account Opening and Comprehensive Services for Individual Accounts* which contains the following provisions in respect of account closing or business termination: *[i]f the Applicant violates any provision of this Agreement or any other rules and regulations of the Bank, or makes any operation with malicious intent, or defames or damages the reputation of the Bank, or maliciously attacks the electronic banking system of the Bank, or is suspected of engaging in money laundering, financing of terrorism or other illegal or criminal activities, based on any reason or factor (including any risk control) as deemed justifiable by the Bank, the Bank has the right to suspend or terminate this Agreement and the provision of services hereunder, and reserves the right to hold the Applicant liable for such activities.* BOC Lido Sub-Branch failed to produce evidence to prove that Zhao Peiyuan, Xu Ting and Xu Lei violated any contractually agreed terms, thus there is no contractual or legal basis for BOC Lido Sub-Branch to unilaterally stop financial services for and suspend usage of the accounts of Zhao Peijuan, Xu Ting and Xu Lei. In addition, the view of BOC Lido Sub-Branch that the terms and conditions of the *Agreement of Account Opening and Comprehensive Services for Individual Accounts* have taken effect since 1 July 2011 should be used as the contractual basis to govern the rights and obligations of the parties to the underlying case is not tenable and is not accepted by the court. The grounds for appeal provided by BOC Lido Sub-Branch are not tenable and are not upheld by the court. The first instance judgment has ascertained the facts clearly and applied the laws correctly, and shall be upheld by the court. It is decided on 20 June 2014 in the (2014) Gao Min Zhong Zi No. 585 Civil Judgment that the appeal be dismissed and the first instance judgment be upheld.

The Plaintiff argues that BOC Beijing Branch paid attorneys' fees and other expenses in a total amount of RMB 5,534,595 for the Plaintiff due to BOC's involvement in the above proceedings before the US court

and appointment of the US counsel for advice on the above proceedings; the relevant costs should be borne by the Plaintiff because Zhao Peiyuan, Xu Ting and Xu Lei were the customers of the Plaintiff. The Plaintiff submits the Notice of Payment of Legal Fees and Other Expenses Regarding the GUCCI Case provided by BOC Beijing Branch, and requests that Zhao Peiyuan, Xu Ting and Xu Lei compensate for the above costs.

Upon examination, the Plaintiff says that it was faultless for the Defendants to open the accounts, but they erred as follows: they allegedly produced and sold counterfeit products in the US after the opening of the accounts, and allegedly remitted the illicit income derived therefrom into the PRC through the accounts opened with BOC; they refused to respond to the proceedings initiated by the Gucci *et al*, refused to respond to Gucci *et al* as required by the US court, and still refused to appear and respond before the court, and refused to respond to the request for evidence of Gucci even when the US court required BOC to disclose relevant information, and the Defendants knew that BOC may be fined by the US court due to refusing to disclose information; the Plaintiff is of the opinion that the Defendants erred in refusing to participate in the proceedings after being requested by the Plaintiff to do so. The Plaintiff also argues that the above acts of the Defendant and those of the US court and Gucci constitute one single act, the result of which is that the Plaintiff had to be involved in the proceedings, and suffered losses. The acts of the Defendants are the ultimate cause, otherwise Gucci *et al* would not have commenced the proceedings and the US court would not have issued orders. Therefore, we request that the Defendants be liable to compensate for our losses.

Upon examination, the Defendants state that the Plaintiff has not consulted with them regarding disclosure of the relevant accounts before submitting a counter-motion to the US court. Both the Plaintiff and the Defendants say that none of them has received a judgment from the US court.

During the hearing of this case, the Plaintiff applied for property preservation to us. We ruled in the (2014) Chao Min Chu Zi No. 25377 Civil Ruling dated 24 June 2014 that the seizure and freezing of certain property in the name of defendants Zhao Peiyuan, Xu Ting and Xu Lei, in the amount of five million, five hundred and thirty four thousand, five hundred and ninety five yuan, be granted.

The above facts are substantiated by the (2014) Gao Min Zhong Zi No. 585 Civil Judgment submitted by the parties to this case, the submissions of the parties, and the hearing transcript.

This Court is of the opinion as follows:

A citizen or legal person shall assume civil liability for infringement upon the property of the State or the collective, or the property or body of other persons due to his, her or its own fault. In accordance with law, four elements are required to constitute a tort: (1) illegal act or acts; (2) fault on the part of the actor; (3) damage caused to the victim; and (4) causal relationship between the illegal act or acts and the damage. The Plaintiff holds that the Defendants are at fault, and requires the Defendants to compensate for its losses. However, the US proceedings in which the Defendants are involved are still on-going and pending. There is no effective judgment in China that finds Zhao Peiyuan, Xu Ting or Xu Lei guilty of being involved in money laundering, financing of terrorism or other illegal or criminal activities. And the Defendants' refusal to respond to the US proceedings is not an act directly against BOC.

The US court issued the preliminary injunction and the writ of discovery. BOC engaged US counsel to submit an opposition to the motion of Gucci *et al* to enforce the writ of discovery and a motion for reconsideration in the capacity of an interested third party. Then the US court ordered BOC to comply with the subpoena served by Gucci *et al* and the preliminary injunction, denied BOC's motion for reconsideration, required BOC to provide the information required under the subpoena within 14 days of the order, and imposed a fine on BOC, among other things. Although the Defendants were involved in the proceedings, and external factors such as the differences between the PRC and US judicial systems, and judicial sovereignty also have a bearing here, the above acts of the US court are judicial acts at its discretion, rather than the acts of the Defendants, and may not be deemed tortious acts of the Defendants. Moreover, the legal fees incurred by BOC for appointment of counsel to safeguard its legitimate rights are not losses directly caused by the acts of the Defendants. It is legally groundless for the Plaintiff to claim that the Defendants compensate for the above losses, and this claim is not upheld by this Court.

In conclusion, it is decided as follows in accordance with Article 64.1 of the *Civil Procedural Law of the People's Republic of China*:

The claims of Plaintiff Beijing Chaoyang Sub-Branch of Bank of China Limited be dismissed;

The RMB 5000 fee of application for property preservation be borne by Plaintiff Beijing Chaoyang Sub-Branch of Bank of China Limited (which has been paid); and

The court costs of RMB 50,542 be borne by Plaintiff Beijing Chaoyang Sub-Branch of Bank of China Limited (which have been paid).

A party who is not satisfied with this judgment may submit a petition for appeal to this Court and appeal this case to Beijing No. 3 Intermediate People's Court by submitting copy/copies of the petition consistent with the number of persons of the opposing party, within 15 days of service of this judgment.

Chief Judge: Lei Enqiang

Juror:   Li Lihua

Juror:   Huang Min

Date: 30 December 2014

Clerk: Yu Ting

Certified true copy of the original

## CERTIFICATION

I declare under penalty of perjury under the laws of the United States that I am a Partner employed by Allen & Overy LLP in Beijing, China, that I am proficient in the English and Chinese languages, and that this is an accurate translation of the original Chinese language document.

Executed on ⅔ January, 2015

Signed: _____

Print name: (Jane) Ying Jiang

# EXHIBIT 2

# 北京市朝阳区人民法院

# 民事判决书

（2014）朝民初字第 25377 号

原告中国银行股份有限公司北京朝阳支行，住所地北京市朝阳区东三环北路霞光里 18 号。

代表人黄晓娟，行长。

委托代理人郑跃杰，北京市君合律师事务所律师。

委托代理人傅长煜，北京市君合律师事务所律师。

被告赵培媛，女，1943 年 9 月 25 日出生，满族，北京钢琴厂退休职工，住北京市朝阳区芳园里甲 13 号楼 1 单元 16 号，公民身份号码 110105194309256129。

委托代理人陈鹏，北京市中盾律师事务所律师。

被告徐婷，女，1970 年 6 月 10 日出生，满族，无业，住同赵培媛，公民身份号码 11010519700610616X。

委托代理人陈鹏，北京市中盾律师事务所律师。

被告徐雷，男，1972 年 3 月 25 日出生，满族，无业，住同赵培媛，公民身份号码 110105197203256132。

委托代理人陈鹏，北京市中盾律师事务所律师。

原告中国银行股份有限公司北京朝阳支行（以下简称原告）与被告赵培媛、徐婷、徐雷（以下简称三被告）侵权责任纠纷一案，本院受理后，依法组成合议庭，公开开庭进行了审理。原告的委托代理人郑跃杰、被告的委托代理人陈鹏到庭参加了诉讼。本案现已审理终结。

原告诉称：被告赵培媛是被告徐婷及徐雷的母亲，被告徐婷是被告徐雷的姐姐，2009 年至 2011 年间，徐婷在我行开立了大量账户。

2010 年 6 月，因被告及其整个家族涉嫌在美国制造、销售假冒古驰美国公司等商标的产品，并将相关收益汇回中国国内，古驰美国公司等七家公司（以下称"古驰公司等"）向美国纽约南区地方法院（以下称"纽约南区法院"）提起了诉讼，要求被告停止侵权，赔偿损失。

但被古驰公司等起诉后，被告却拒绝出庭应诉，未向纽约南区法院提交任何文件，也未按纽约南区法院的裁决对古驰公司等的取证请求作出回应，导致美国纽约南区地方法院作出预先禁令及命令，要求中国银行冻结被告在中国境内开立的账户中的资金，并要求中国银行按照古驰公司传票的要求，提供被告的所有账户信息及其他文件。

为避免被美国法院强制要求披露被告账户信息、冻结被告账户资金，中国银行不得不聘请了美国律师及专家证人，对纽约南区法院的预先禁令及命令提出反对意见，并向其提出了动议。但最终，2012 年 11 月 15 日，纽约南区法院认为中国银行未遵守其预先禁令及命令，判令中国银行在民事上藐视法庭，并裁定对中国银行处以强制性罚款。在这一过程中，中国银行支付了大量的律师费用、专家费用与其他办案费用。截止目前，上述费用折合人民币已达 5 534 595 元。虽然中国银行曾多次要求被告通过出庭或授权中国银行提供其账户信息等方式解决相关纠纷，但被告却一直予以拒绝。最终，因被告系在我行处开立账户，上述费用均由我行承担。

　　我行认为，被告涉嫌在美国从事制造、销售假冒商标的商品的违法行为，并在我行处开立账户，将相关收益汇回国内，导致中国银行被卷入美国诉讼，同时，被告在被起诉后，拒绝应诉，最终导致美国法院对中国银行作出了强制禁令及命令，使中国银行不得不进行应对，导致我行为此支付了大量费用，并很可能承受进一步的损失。被告的行为致使我行遭受了巨额损失，应承担相应的赔偿责任，同时，被告行为的实质上是利用中美司法管辖的冲突，逃避法律责任，不应受到法律的保护。为此，特根据《侵权责任法》第6条等相关规定，请求判令：1、被告赵培媛、徐婷、徐雷向我行赔偿损失共计人民币 5 534 595 元，并对我行的损失承担连带赔偿责任。

　　三被告辩称：一、对原告无侵权行为。我们在原告处开立账户，是依据《中华人民共和国商业银行法》实施的民事法律行为，在开立账户的过程中完全按照银行的要求进行了提交资料，无任何隐瞒或遗漏。因此开立账户的行为合法有效，不可能构成对原告的侵权。至于原告提到的在美国法院不出庭，不向法院提交文件等行为，我们有在美国法下对自己的民事诉讼权利处分的自由。自行承担对该权利处分所带来的诉讼后果。我们自己的行为与中国银行纽约分行无关，与原告无关，中国银行无权要求我们改变自身对诉讼权利的合法行使。实际上，中国银行在美国法院受到制裁，是美国法院司法霸权主义的结果，这样的一个结果根本不应由我们来承担。这是中国银行的海外投资所遭遇的政治风险，应该通过美国国内法，甚至通过外交途径解决。而不是不负责任地将这些责任转嫁到消费者身上，尤其是国内消费者身上。二、原告无任何实际损失。原告

3

是中国银行北京朝阳支行，原告的诉求却是为中国银行纽约分行寻求弥补损失。这是不符合法理的。中国银行北京朝阳支行与中国银行纽约分行是两个不同的主体，一个是国内主体，一个是外国主体。外国主体的损失，却由国内主体直接追索，既不符合国内法，也不符合国际法。况且，中国银行纽约分行到目前为止，亦没有实际向美国法院缴纳罚款，中行纽约分行的案件仍在审理中。所以说原告无任何实际损失。三、原告与我们之间的纠纷已经由北京市高级法院（2014）高民终字第585号民事判决书作出了终审裁决，已经判决原告无条件解除对我们账户的冻结。而原告无视生效判决，故意捏造侵权责任纠纷的案由，滥用诉权，提起诉讼。这一行为已经违反了我国民事诉讼法一事不再理的民事诉讼基本原则，是对我国日益紧张的司法资源的浪费。对于这一行为，建议法院对原告予以制裁。综上所述，我们并没有任何侵权行为，原告也没有实际损失，我们的合法行为与原告境外联行支行的支出之间更没有直接的因果关系，我们对原告构成侵权，没有任何的法律依据。相反地，原告无视司法权威，滥用诉权，浪费司法资源，应当予以制裁。因此，请求驳回原告的起诉。

经审理查明：徐婷、徐雷姐弟系赵培媛之子女。

2009年至2011年期间，赵培媛、徐婷、徐雷在中国银行股份有限公司北京丽都饭店支行（以下简称中行丽都饭店支行）开立多个账户。

赵培媛、徐婷、徐雷因在美国涉嫌侵权，被古驰公司等起诉，在诉讼过程中，美国法院作出预先禁令及证据发现令，中国银行纽约分行亦参与到在美国法院进行的诉讼中。

期间，中行丽都饭店支行冻结了赵培嫒、徐婷、徐雷的银行帐户。赵培嫒、徐婷、徐雷诉至法院，要求中行丽都饭店支行立即解除对赵培嫒、徐婷、徐雷在中行丽都饭店支行的所有存款的冻结状态。

北京市第二中级人民法院作出（2013）二中民初字第 01275 号民事判决书，在该案，查明以下事实：赵培嫒自 2009 年 8 月 1 日至 2011 年 4 月 26 日在中行丽都饭店支行办理了 3 笔礼仪存单，金额 257 269.7 元；8 笔定期存单，金额 510 000 元；两个活期存折，金额 120 683.11 元；1 笔国债买卖，金额 440 000 元；4 笔理财产品，金额 373 000 元；共计 1 700 961.64 元。徐婷自 2009 年 6 月 11 日至 2011 年 4 月 8 日在中行丽都饭店支行办理了 5 笔礼仪存单，金额 416 845.58 元；1 张贵宾卡 2013 元；两个活期存折，金额 3358.81 元，2 笔理财产品，金额 679 000 元；共计 1 101 217.39 元。徐雷自 2010 年 8 月 17 日至 2011 年 4 月 8 日在中行丽都饭店支行办理了 2 笔礼仪存单，共计金额 154 553.53 元。

上述款项的定期存款、国债及理财产品按照首期的存期及交易期限均已到期。各方当事人对赵培嫒、徐婷、徐雷在中行丽都饭店支行涉案的包括账号数、客户名称、交易账号、开立日期、相关业务、交易日期、主要开立文件、本金、首期到期日、转存状态、转存到期日等账户信息均无异议。

赵培嫒、徐婷、徐雷称自 2011 年 6 月 10 日之后在中行丽都饭店支行开立的账户中的所有款项均不能支取，银行的工作人员只以口头及电话方式告知因徐婷在美国与古驰公司有知识产权纠纷，故所有款项予以冻结不能支取，但不给出具任何书

5

面证明材料。中行丽都饭店支行认可停止赵培媛、徐婷、徐雷账户交易的时间，但主张根据赵培媛、徐婷、徐雷在银行办理各种业务时所签字确认的《个人账户开户及综合服务协议书》中销户或业务终止条款的约定，在赵培媛、徐婷、徐雷与其他第三方发生纠纷而致中国银行被卷入诉讼或致中国银行遭受损失，赵培媛、徐婷、徐雷涉嫌从事洗钱、欺诈、恐怖融资等非法行为，赵培媛、徐婷、徐雷账户涉嫌被洗钱、欺诈等非法行为利用的情形下，银行有权中止与赵培媛、徐婷、徐雷的业务往来、暂停相关账户交易。中行丽都饭店支行可以根据目前在美国法院涉及诉讼纠纷的事实，判断赵培媛、徐婷、徐雷存在上述情形，并有权中止与赵培媛、徐婷、徐雷的银行业务往来，暂停相关账户的交易服务，并非是冻结的行为。

庭审中查明，赵培媛、徐婷、徐雷在中行丽都饭店支行开立账户办理活期存款、定期存款、国债买卖、理财产品、银行卡、电子银行等业务，均发生在 2009 年 6 月至 2011 年 5 月期间，在 2009 年 10 月之前办理定期存款时，按照银行工作人员的要求填写了《开户申请书》，之后办理的定期、活期存款、中银理财贵宾卡均填写了《个人账户开户及综合服务申请表》，其背面系《个人账户开户及综合服务协议书》。购买国债产品时填写的《个人开户/综合服务申请书》，背面附有客户须知、中国银行个人结算账户管理协议书、中国银行长城电子借记卡章程。购买理财产品时填写了《个人理财产品业务交易信息确认单》。

在《个人账户开户及综合服务申请表》客户资料一栏的下方载明有如下文字：本人已阅读并了解本申请表中"中国银行股份有限公司个人账户开户及综合服务申请协议书"的有关条

款，并保证遵照该协议的有关约定、客户须知、服务协议和银行最新业务章程、业务规则、业务规定办理相关业务。并由赵培媛、徐婷、徐雷在"申请人签字"处签名确认。

2009 年 6 月至 2011 年 5 月期间，由中国银行股份有限公司制定并实施的《个人账户开户及综合服务协议书》销户或业务终止条款第（三）项约定：申请人违反本协议或其他银行相关规章制度或存在恶意操作、诋毁、损害银行声誉、恶意攻击银行电子银行系统等行为，或者申请人涉嫌从事洗钱、恐怖融资或其他违法犯罪行为，银行有权依据其认定的正当理由或风险控制等相关因素，中止或终止本协议及提供相关服务，并保留追究申请人责任的权利。协议终止并不意味着终止前所发生的未完成交易指令的撤销，也不能消除因终止前所发生的交易所带来的任何法律后果。

2011 年 7 月 1 日，中国银行股份有限公司启用新版本《个人账户开户及综合服务协议书》。将销户或业务终止条款第（三）项补充修改为：申请人涉嫌从事洗钱、欺诈、恐怖融资等非法行为，或违反法律法规、监管规定及相关国家政策，违反本协议或其他银行相关章程、业务规则、业务规定，或存在恶意操作、诋毁和损害银行声誉、恶意攻击银行电子银行系统等行为，或因申请人与其他第三方发生纠纷而致银行被卷入诉讼或遭受损失的，或申请人账户涉嫌被洗钱、欺诈等非法行为利用的，银行有权中止或终止本协议及提供相关服务并保留追究申请人责任的权利，申请人应承担因此给银行造成的损失，对于相关法院、其他司法机关或政府机关因扣划申请人资金而致银行资金被扣划的，银行有权扣划申请人资金予以补偿银行因此所受

7

的资金损失。协议终止并不意味着终止前所发生的未完成交易指令的撤销，也不能消除因终止前的交易所带来的任何法律后果。赵培媛、徐婷、徐雷认为上述条款均是格式条款，在与中行丽都饭店支行办理开户、存款手续时，均是按照银行柜台工作人员的指点和要求，在各种表格上签字，银行从来没有对协议的任何条款进行过解说，个人更无从知道《个人账户开户及综合服务协议书》何时启用了新版本及哪些条款进行了修改。因此对上述条款的合法性、有效性均存在异议，不予认可。中行丽都饭店支行则主张中国银行股份有限公司发布并不时更新的相关业务章程、业务规则、业务规定均为《个人账户开户及综合服务协议书》的有效组成部分，因此各个时期启用的《个人账户开户及综合服务协议书》中的条款规定，均自动适用到本案涉及的法律关系中，银行在公开的营业网点公告启用新协议版本。但在本案中，中行丽都饭店支行没有提交证据证明如何向赵培媛、徐婷、徐雷告知 2011 年 7 月 1 日启用新版本的《个人账户开户及综合服务协议书》。

另查明，2010 年 6 月，古驰公司等七家公司五个品牌在美国法院起诉徐婷及其丈夫徐立军等人，后于 2011 年 3 月 10 日追加起诉赵培媛、徐雷，称以上人员制造、销售假冒古驰公司等商标的产品，并将相关收益汇回中国国内。除徐立军的律师到场，其他人均未应诉答辩，也未按照美国法院命令向古驰公司等或法院提交任何资料。2010 年 7 月 12 日，美国法院作出预先禁令及证据发现令，禁止赵培媛、徐婷、徐雷等继续侵权行为，并命令上述三人的代理人、代表、继承人、银行等受禁令送达者，不得转移包括赵培媛、徐婷、徐雷等在境内中国银行

开立的账户中的资金等财产。2010 年 7 月 13 日及 16 日，古驰公司等向中国银行纽约分行送达上述禁令、证据发现令及在民事诉讼中提供文件、信息或物品或允许对营业场所进行检查的传票，要求中国银行采取必要措施遵守预先禁令的条款，提供赵培媛、徐婷、徐雷的账户信息。自 2010 年 7 月 21 日起，中国银行聘请美国律师，以案外当事人的身份向美国法院提交请求驳回古驰公司等申请强制执行发现令的动议及申请复议的动议，2011 年 8 月 23 日，美国法院作出命令，指令中国银行遵守古驰公司等的传票及预先禁令的要求，并驳回中国银行申请复议的动议，要求中国银行应于该命令作出之日起 14 天提供传票要求提供的信息。2011 年 9 月 22 日，中国银行就该命令向美国第二巡回上诉法院提起上诉。2011 年 11 月 30 日，中国银行还向美国法院提出动议，请求该院批准中国银行申请重审和豁免适用 2011 年 8 月 23 日命令的动议，判令古驰公司等必须通过《海牙公约》程序从中国银行寻求进一步的文件，并判令预先禁令的范围不涉及位于中国境内的账户。2012 年 5 月 18 日美国法院驳回中国银行申请重审的动议。2012 年 11 月 15 日，美国法院认定由于中国银行长达十四个月恶意地和故意地藐视 2011 年 8 月 23 日命令和根据禁令承担的证据披露义务，故构成藐视法庭，对中国银行处以 75 000 美元的强制罚款，若 7 日内仍未能遵守 2011 年 8 月 23 日命令，将于随后每日处以 10000 美元的强制性罚款，直到遵守命令。同时批准古驰公司等申请由中国银行支付因提起该藐视法庭动议而产生的合理律师费和诉讼费的请求。随后，中国银行针对藐视法庭的裁定向美国第二巡回上诉法院提出上诉，并申请延缓处罚，等待上诉，并得到准

9

许，中国银行未支付任何款项。本案中，中行丽都饭店支行亦未就其所称的损失向赵培媛、徐婷、徐雷主张权利。

北京市第二中级人民法院认为，一、关于本案是否应合并审理的问题。根据《中华人民共和国商业银行法》的规定，商业银行可以经营的业务有吸收公众存款、买卖政府债券、金融债券，从事银行卡业务，经国务院银行业监督管理机构批准的其他业务等。一审法院庭审查明，赵培媛、徐婷、徐雷与中行丽都饭店支行之间除存在储蓄存款合同关系，同时还存在国债买卖、委托理财等合同关系。赵培媛、徐婷、徐雷是针对中行丽都饭店支行同时将三个人开立的所有账户中的款项不予支取的事实提出一致的诉讼请求，即判令解除该种状态，赵培媛、徐婷、徐雷起诉的诉讼标的相同。为提高诉讼效率、简化诉讼程序，减少当事人诉累，本案应当合并审理。

二、关于中行丽都饭店支行对赵培媛、徐婷、徐雷采取中止服务、暂停交易的措施是否符合合同或法律规定的问题。

赵培媛、徐婷、徐雷在中行丽都饭店支行开立账户办理活期存款、定期存款、国债买卖、理财产品、银行卡、电子银行等业务、签署承诺及协议书的时间，均发生在2009年6月至2011年5月期间，中行丽都饭店支行通知赵培媛、徐婷、徐雷中止提供服务的时间是2011年6月，因此应该以2011年7月1日之前由中国银行制定的《个人账户开户及综合服务协议书》的条款内容，作为本案确定双方当事人权利义务关系的合同依据。

该时期适用的《个人账户开户及综合服务协议书》销户或业务终止条款的规定为：申请人违反本协议或其他银行相关规章制度或存在恶意操作、诋毁、损害银行声誉、恶意攻击银行

10

电子银行系统等行为，或者申请人涉嫌从事洗钱、恐怖融资或其他违法犯罪行为，银行有权依据其认定的正当理由或风险控制等相关因素，中止或终止本协议及提供相关服务，并保留追究申请人责任的权利。

根据庭审查明的事实，赵培媛、徐婷、徐雷在中行丽都饭店支行办理各项业务时，按照银行的各项要求填写了申请表并在相关位置上签字，办理各项银行业务。中行丽都饭店支行未能举证证明赵培媛、徐婷、徐雷已实际实施了恶意操作、诋毁、损害银行声誉、恶意攻击银行电子银行系统等行为；赵培媛、徐婷、徐雷在美国涉及诉讼，案件正在审理之中，尚无结论，目前在中国境内尚未有生效的裁判文书认定赵培媛、徐婷、徐雷涉嫌从事洗钱、恐怖融资或其他违法犯罪行为；中行丽都饭店支行也未向一审法院提交足以认定其认为的正当理由或风险控制的证据。且目前中国银行也没有按照美国法院的命令支付罚款及向古驰公司支付费用。

《中华人民共和国商业银行法》规定：商业银行依法开展业务，不受任何单位和个人的干涉；商业银行应当保障存款人的合法权益不受任何单位和个人的侵犯；商业银行办理个人储蓄存款业务，应当遵循存款自愿、取款自由、存款有息、为存款人保密的原则，故中行丽都饭店支行应当按照约定全面履行自己的义务，现对赵培媛、徐婷、徐雷的银行账户自行采取中止服务、暂停交易的措施没有合同依据和法律依据。遂判决：中国银行股份有限公司北京丽都饭店支行于判决生效之日起七日内解除对赵培媛、徐婷、徐雷所有银行帐户中止服务、暂停交易的状态。

　　中行丽都饭店支行不服，上诉至北京市高级人民法院。北京市高级人民法院审理后认为：《中华人民共和国商业银行法》规定：商业银行依法开展业务，不受任何单位和个人的干涉；商业银行应当保障存款人的合法权益不受任何单位和个人的侵犯；商业银行办理个人储蓄存款业务，应当遵循存款自愿、取款自由、存款有息、为存款人保密的原则。2009 年 6 月至 2011 年 5 月期间，赵培媛、徐婷、徐雷分别在中行丽都饭店支行开立账户办理活期存款、定期存款、国债买卖、理财产品、银行卡、电子银行等业务，同时签署承诺及相关协议书，其中《个人账户开户及综合服务协议书》销户或业务终止条款的规定为：申请人违反本协议或其他银行相关规章制度或存在恶意操作、诋毁、损害银行声誉、恶意攻击银行电子银行系统等行为，或者申请人涉嫌从事洗钱、恐怖融资或其他违法犯罪行为，银行有权依据其认定的正当理由或风险控制等相关因素，中止或终止本协议及提供相关服务，并保留追究申请人责任的权利。中行丽都饭店支行未提出证据证明赵培媛、徐婷、徐雷违反合同相关约定，其对赵培媛、徐婷、徐雷的银行账户自行采取了中止服务、暂停交易的行为没有合同依据和法律依据。同时中行丽都饭店支行认为应当以 2011 年 7 月 1 日之后的《个人账户开户及综合服务协议书》的条款内容作为确定双方权利义务关系的合同依据不能成立，本院不予采信。中行丽都饭店支行的上诉理由不能成立，上诉请求本院不予支持。一审法院判决认定事实清楚，适用法律正确，本院予以维持。遂于 2014 年 6 月 20 日作出（2014）高民终字第 585 号民事判决书，判决：驳回上诉，维持原判。

原告称因中国银行在美国法院进行上述诉讼活动，聘请美国律师进行相关诉讼活动，中国银行股份有限公司北京市分行代原告支付律师费等费用 5 534 595 元，因赵培媛、徐婷、徐雷系原告的客户，相关费用应由原告负担，原告提交了中国银行股份有限公司北京市分行《关于"GUCCI"案律师费等费用支付事的通知》，现原告要求赵培媛、徐婷、徐雷赔偿上述费用。

经询，原告称被告开立账户的行为不存在过错，但存在如下过错：开立账户后，涉嫌在美国制造销售假冒伪劣产品，涉嫌将非法行为所得通过中国银行账户汇回国内，在美国古驰等公司提起诉讼后拒绝应诉，同时对美国法院要求其对古驰公司等作出回应的情况下，仍拒绝回应，在美国法院要求中国银行披露相应信息，被告在明知中国银行因拒绝相关信息可能被美国法院处罚的情况下，仍然未出庭应诉，仍拒绝对古驰公司的取证申请作出回应，在原告向被告提出要求的情况下，被告仍拒绝参与诉讼，这个整体我们认为被告存在过错。原告还称被告上述行为和美国法院、古驰公司共同构成一个行为，导致原告不得不参与诉讼，致使原告遭受损失，被告行为是根本性的，否则不会有古驰等公司起诉和美国法院作出命令等，所以要求被告承担赔偿责任。

经询，三被告称原告在向美国法院提出反动议前，就相关账户的披露没有征求过三被告的意见。原告和三被告均称尚未收到美国法院的判决。

本案审理过程中，原告申请财产保全，本院于 2014 年 6 月 24 日作出作出（2014）朝民初字第 25377 号民事裁定书，裁定：查封、冻结被告赵培媛、徐婷、徐雷名下价值五百五十三万四

千五百九十五元的财产

上述事实，有当事人提交的（2014）高民终字第 585 号民事判决书、当事人陈述意见及庭审笔录在案佐证。

本院认为：公民、法人由于过错侵害国家的、集体的财产，侵害他人财产、人身的应当承担民事责任。依据法律规定，侵权行为构成要件有四：一、须有违法性之行为；二、行为人存在过错；三、受害人有损害事实；四、违法行为与损害后果之间有因果关系。原告认为三被告存在过错行为，并要求三被告赔偿原告的损失，三被告虽在美国涉及诉讼，但相关案件正在审理之中，尚无结论，目前在中国境内尚未有生效的裁判文书认定赵培媛、徐婷、徐雷涉嫌从事洗钱、恐怖融资或其他违法犯罪行为，三被告拒绝在美国应诉的行为亦非直接针对中国银行。

美国法院作出预先禁令及证据发现令，中国银行聘请美国律师，以案外当事人的身份向美国法院提交请求驳回古驰公司等申请强制执行发现令的动议及申请复议的动议后，美国法院作出命令，指令中国银行遵守古驰公司等的传票及预先禁令的要求，并驳回中国银行申请复议的动议，要求中国银行应于该命令作出之日起 14 天提供传票要求提供的信息、对中国银行作出罚款等，相关诉讼虽涉及三被告，且有中美司法制度差异、司法主权等外在因素，但美国法院的上述行为亦系美国法院自主做出的司法行为，不能等同于被告的行为，亦不能视为三被告的侵权行为。中国银行聘请律师维护自己的合法权利，相关律师费用亦非三被告的行为所直接导致的损失。现原告要求三被告赔偿上述损失，于法无据，本院不予支持。

综上，依照《中华人民共和国民事诉讼法》第六十四条第一款之规定，判决如下：

驳回原告中国银行股份有限公司北京朝阳支行的诉讼请求。

财产保全申请费 5000 元，由原告中国银行股份有限公司北京朝阳支行负担（已交纳）。

案件受理费 50 542 元，由原告中国银行股份有限公司北京朝阳支行负担（已交纳）。

如不服本判决，可在判决书送达之日起十五日内，向本院递交上诉状，并按对方当事人的人数提出副本，上诉于北京市第三中级人民法院。

审　判　长　　雷恩强

人民陪审员　　李丽华

人民陪审员　　黄　敏

二〇一四年十二月卅日

书　记　员　　于　婷

本件与原本核对无异

# EXHIBIT 3

# 2014 Special 301 Report



Ambassador Michael B.G. Froman
Office of the United States Trade Representative

## SECTION II. COUNTRY REPORTS

### Determination in Section 301 Investigation of Ukraine

Ukraine was designated a Priority Foreign Country in the 2013 Special Report due to the particular IPR acts, policies, and practices identified in the 2013 Special 301 Report. (*See* 2013 Special 301 Report; Identification of Ukraine as a Priority Foreign Country and Initiation of Section 301 Investigation, 78 FR 33886 (June 5, 2013)). Those acts, policies, and practices involved: (1) the administration of Ukraine's system for collecting societies, which are responsible for collecting and distributing copyright royalties to U.S. and other rights holders; (2) use of infringing software by Ukrainian government agencies; and (3) online infringement of copyright and related rights. On May 30, 2013, the United States Trade Representative initiated a Section 301 investigation of the acts, policies, and practices identified in the Special 301 Report.

Based on the information obtained during the investigation, on February 28, 2014, the U.S. Trade Representative determined that these acts, policies, and practices are unreasonable and burden or restrict United States commerce, but, due to the current political situation in Ukraine, no action would be taken at that time. (*See* Notice of Determination in Section 301 Investigation of Ukraine, 79 FR 14326 (March 13, 2014)).

USTR remains committed to addressing the problems that served as the basis for the designation of Ukraine as a PFC, and appreciates Ukraine's recent outreach and ongoing engagement in exploring how to ameliorate these problems and improve its overall IP regime. The United States looks forward to working with Ukraine on these three issues.

### PRIORITY WATCH LIST

### China

China remains on the Priority Watch List and subject to Section 306 monitoring.

China's leadership has acknowledged the critical role that intellectual property plays in spurring innovation and the need to improve China's protection and enforcement of IP rights, including at the Third Plenum of the 18th Central Committee of the Chinese Communist Party. Consistent with China's policy objectives, its judicial, legislative, administrative, and enforcement authorities are in the midst of wide-ranging legal reform efforts relating to the protection and enforcement of IPR in China. Certain rights holders report positive experiences, including in some cases a greater ability to obtain redress against infringers in civil court actions. The United States also notes increased cooperation between U.S. and Chinese law enforcement agencies in an effort to stem cross-border flows of infringing products. The United States looks forward to strengthened cooperation, building on the increasing and positive cooperation between U.S. customs and investigative agencies and their Chinese counterparts, including the General Administration of Customs and Ministry of Public Security.

At the same time, a wide range of U.S. stakeholders in China continues to report serious obstacles to effective protection of IPR in all forms, including patents, copyrights, trademarks,

trade secrets as well as protection against unfair commercial use or unauthorized disclosure of test and other data generated to obtain marketing approval for pharmaceutical products. As a result, sales of IPR-intensive goods and services in China remain disproportionately low when compared to sales in similar, or even less developed, markets that provide a stronger environment for IPR protection and market access. Despite laudable policy objectives and a welcome ongoing reform effort, foreign rights holders in China continue to face a complex and challenging IPR environment. Given the size of China's consumer marketplace and its global importance as a producer of a broad range of products, China's protection and enforcement of IPR will continue to be a focus of U.S. trade policy.

In particular, the theft of trade secrets remains a significant concern. Such thefts are occurring not only inside but also outside China for the competitive advantage of Chinese state-owned and private companies. Conditions are likely to deteriorate as long as those committing such thefts, and those benefitting, continue to operate with relative impunity, often taking advantage of the theft in order to enter into unfair competition or disadvantageous business relationships with their victims. The United States strongly urges the Chinese government to take serious steps to put an end to these activities and to deter further activity by rigorously investigating and prosecuting trade secret thefts conducted by both cyber and conventional means.

Of longstanding concern are Chinese central, provincial, and local government measures and actions that appear to require or pressure rights holders to transfer IPR from foreign to domestic entities. Sometimes guided by government measures or policy statements intended to promote indigenous innovation and the development of strategic industries, government authorities may deny or delay market access or otherwise condition government procurement, permissions, subsidies, tax treatment, and other actions on IPR being owned or developed in China, or licensed to a Chinese entity. The U.S. Government is also concerned by the increased number of stakeholders reporting that Chinese government entities are using regulatory pressure to compel the licensing of important technologies or to dissuade stakeholders from pursuing available legal avenues to enforce their IPR. China has made certain commitments to the United States on some of these matters; the United States will continue pressing China to follow through on those commitments.

### *Legal Reform*

The United States welcomes China's ongoing legal reform efforts despite serious reservations regarding certain measures. Since 2012, China has undertaken revisions to and invited comment on draft revisions to its existing laws on patents, copyrights, trademarks, drug administration, and scientific and technological achievements. Effective January 1, 2013, China's amended Civil Procedure Law includes provisions that may help U.S. rights holders to secure preliminary measures and otherwise enforce their rights in civil court actions. Currently before China's State Council Legislative Affairs Office (SCLAO) are draft amendments to the Copyright Law and Patent Law. In mid-2014, a revised Trademark Law and implementing regulations will go into effect. Amendment of the Anti-Unfair Competition Law (AUCL), unrevised since first entering into force in 1993, is proceeding at a slower pace. While applauding China's consideration of U.S. government and private sector perspectives and experiences as it amends its laws, the United States notes the need to move forward expeditiously with remaining revisions to its IP-related laws, and underscores the urgent need to update and amend the AUCL and related trade

secret laws, regulations, and judicial interpretations, including provisions regarding the protection and enforcement of trade secrets.

China also invited comment on draft rules and guidelines on proposed regulations for the remuneration of "service inventions" (i.e., inventions created by an employee as part of his or her employment), rules for anti-monopoly enforcement in the field of intellectual property rights, and patent examination guidelines for utility model and design patents. Several proposed measures raise serious concerns, while others represent a marked improvement over prior drafts. The United States applauds China's openness to receiving comments and looks forward to continuing engagement as future drafts are developed and evaluated, and as the drafts move through the SCLAO and the National People's Congress.

Additional legal reforms require action, including amending the Criminal Law and other relevant measures to address continuing deficiencies in China's criminal IPR enforcement.

### National Leading Group

Following the completion of China's 2010-11 Special IPR Campaign, the State Council established a permanent office of the national leading group on combating IPR infringement (Leading Group) to better coordinate and improve China's efforts to combat IPR infringement and the manufacture and sale of counterfeit and sub-standard goods. In 2013, the Leading Group continued to coordinate enforcement actions and undertake special campaigns, including concerning online markets and cross-border infringement cases. The United States encourages China to continue to work with foreign governments and rights holders to share information and demonstrate the constructive role the Leading Group can play to improve the protection and enforcement of IPR.

### Trade Secrets

As noted above, trade secret theft is a serious and growing problem in China. Thefts may arise in a variety of circumstances, including those involving departing employees, failed joint ventures, and cyber intrusion and hacking. In addition, thefts arising from the misuse of information submitted to government entities for purposes of complying with regulatory obligations are particularly troubling. The misappropriation of trade secrets and their use by a competing enterprise can have a devastating impact on a company's business, making recourse to adequate and effective legal remedies particularly important.

Under Chinese law, however, available remedies are difficult to obtain, given that civil, administrative, and criminal enforcement against trade secrets theft remains severely constrained. Enforcement obstacles include various deficiencies in China's AUCL; constraints on gathering evidence for use in litigation; difficulties in meeting the criteria for establishing that information constitutes a trade secret; and criminal penalties that do not provide adequate deterrents. Unlike other Chinese IP laws, the AUCL does not expressly authorize judges to issue certain provisional orders that are often critical to the successful pursuit of a civil enforcement action. While China's new Civil Procedure Law may address, or partially address, that problem, there has been insufficient time to ascertain whether this new law is facilitating access to civil remedies in practice. Additionally, the AUCL appears to apply primarily to "commercial undertakings" and not to impose liability on individual actors; the AUCL also requires that a trade secret have "practical applicability," which may limit the scope of protection for early stage research.

There are other important weaknesses in China's civil enforcement system that relate to mechanisms for gathering evidence; procedures for obtaining preliminary injunctions; and the relative weight afforded certain kinds of evidence, as reflected in the overreliance on original documentary evidence over oral testimony. Without changes to address these weaknesses, some of which are not specific to intellectual property but relate to China's civil process generally, effective enforcement against misappropriation of trade secrets in China will remain challenging.

The United States is encouraged by China's December 2013 Joint Commission on Commerce and Trade (JCCT) commitment to undertake an Action Program that will include concrete actions to address enforcement, enhance public awareness, and require strict legal compliance with respect to trade secrets. The United States will continue to engage with China as it develops this Action Program, and as it advances legal and regulatory reforms to better protect trade secrets.

### *Copyright and Piracy*

#### *Software legalization*

The United States will continue to urge that all levels of the Chinese government, as well as state-owned enterprises (SOEs), use only legitimate, licensed copies of software. In May 2011, China's government reported that software legalization in central government offices was complete. At the provincial level, China's government reported that a similar effort was completed as of June 30, 2012. In January, 2014, the Chinese government reported that all local government agencies at the city and county level had completed software legalization by the end of 2013. However, even with the significant work to legalize this number and range of government agencies, U.S. software companies have seen only a modest increase in sales to government agencies, and specific information about the procedures and tools used to ascertain budget or audit information remains unavailable.

Software legalization efforts more recently have extended to China's SOE sector. Losses by software companies due to piracy at SOEs and other enterprises remain very high. To the degree that Chinese firms do not pay for the software that runs many of their operations, they reap a cost advantage relative to competitors who pay for legally acquired software. The United States remains committed to working with China to continue to address these challenges.

#### *Online piracy*

Despite bilateral commitments to increase IPR enforcement, online piracy in China persists on a large scale. As of 2013, China had the largest Internet user base in the world, estimated at over 600 million users, including nearly 500 million mobile web users. Despite national campaigns and the leadership of the Leading Group, widespread piracy affects industries involved in the distribution of legitimate music, motion pictures, books and journals, video games, and software. For example, industry reports that in 2013 the revenues from digital music sales in China were $65.4 million, compared to $108.3 million in South Korea, and $32.0 million in Thailand – a country with less than five percent of China's population and a roughly equivalent per capita GDP. Similarly, over 90 percent of the revenue generated by U.S. films in China comes in the form of box office revenues, compared to 25-30 percent in the United States. This difference is partly due to widespread piracy of motion pictures over the Internet and on optical discs. Online piracy extends to scientific, technical, and medical publications as well.

Parties in China are also facilitating online infringement, in China and third countries, through media box piracy. Manufactured in China and exported abroad, media boxes can be preloaded with infringing content and plugged directly into televisions. They enable the user to stream and download infringing online audio and visual content. The vast majority of the infringing websites to which media box users connect are reportedly located in China. The United States urges China to continue efforts to improve IPR protection and enforcement in this area.

### Counterfeit Goods

Despite increased enforcement efforts, problems with counterfeiting in China remain widespread. A partial list of commonly counterfeited goods includes food and beverages; apparel, footwear, and accessories; consumer electronics, computers and networking equipment; entertainment and business software; batteries; chemicals; appliances; pharmaceuticals; and auto parts. Impacts are not limited to lost sales volumes and damage to the reputation of the trademark owner. For example, higher defect and failure rates among counterfeit semiconductors may cause malfunctions in the equipment in which they are incorporated, which may include medical devices, vehicle safety and braking systems, and other critical applications. As one measure of the scale of the problem, products from China (including Hong Kong) accounted for 93 percent of the value of the IPR infringing products seized by U.S. Customs and Border Protection in fiscal year 2013.

Although rights holders report increased enforcement activities, mostly but not exclusively on behalf of local brands, enforcement efforts have yet to slow the sale of counterfeit products online.  This is particularly concerning in light of the rapid growth of e-commerce both within China and between China and overseas markets. Rights holders report that local Administrations for Industry and Commerce (AICs) typically confine their efforts to physical markets. While both the State Administration for Industry and Commerce and local AICs have called on online trading websites to improve procedures to address online sales of counterfeit merchandise, these measures have not significantly deterred repeat and large-scale offenders who, after postings are removed, quickly place new postings offering the same infringing goods. It is reported that the Supreme People's Court may issue a judicial interpretation to address these concerns.

### IPR and Technology Transfer Requirements

The United States is concerned about Chinese measures, policies and practices at the national, provincial, and local levels that allegedly are intended to hasten China's development into an innovative economy, but that may disadvantage foreign rights holders.  Industry reports that many of China's innovation-related policies and other industrial policies, such as strategic emerging industry policies, may have a negative impact on U.S. exports or U.S. investors and their investments or IP rights.  Such Chinese measures frequently call for technology transfer and, in certain cases, appear to include criteria that could require IP rights to be developed in China, or to be owned by or licensed to a Chinese party.  Such government-imposed conditions or incentives may distort licensing and other private business arrangements, resulting in commercial outcomes that are not optimal for the firms involved or for promoting innovation. Such government intervention in the commercial decisions that enterprises make regarding the ownership, development, registration, or licensing of IP is not consistent with international practice, and may raise concerns relative to China's implementation of its WTO commitments.

# EXHIBIT 4



# THE US-CHINA BUSINESS COUNCIL
## 美 中 贸 易 全 国 委 员 会



USCBC 2014 China Business Environment Survey Results:

# Growth Continues Amidst Rising
# Competition, Policy Uncertainty

Case 1:13-cv-02013-VM-DCF Document 148-4 Filed 02/06/18 Page 44 of 46

**USCBC** / **THE US-CHINA BUSINESS COUNCIL** / 美 中 贸 易 全 国 委 员 会

# USCBC 2014 China Business Environment Survey Results
# Growth Continues Amidst Rising Competition, Policy Uncertainty

## Executive Summary

» The China market continues to deliver important revenue opportunities to American companies, even as GDP growth moderates. Nearly 50 percent of survey respondents report double-digit revenue expansion – fewer than in prior years, but still impressive compared to other markets around the globe.

» US companies remain overwhelmingly profitable in the China market, but increasing local competition and rising costs are combining to pressure profit margins.

» Policy uncertainty continues to temper executive optimism. Companies have seen little tangible impact from China's economic reforms and report little improvement in any of the top 10 issues over the past year.

» There has been a steady 30 percentage point shift over the past four years in how companies view prospects in China's market, from "optimistic" to "somewhat optimistic." However, few executives are pessimistic about their prospects in China, a view consistent with other surveys.

» Uncertainty over policy direction is moderating expansion plans. Fifty percent of companies plan to boost resources in China over the next 12 months, down from almost 75 percent just three years ago. On the other hand, only 2 percent of companies say they will reduce resources in China, with the remainder neither increasing nor decreasing resources.

» Differential treatment of domestic and foreign companies in China runs throughout the top 10 issues and beyond. Real progress in implementing the market-based reforms announced by China's new leadership and in concluding a US-China Bilateral Investment Treaty are necessary to put the commercial environment on a more positive trajectory.

» While American companies report that their primary competition is with other US and foreign companies in China, competition from domestic industry is growing. Some observers focus concern on preferential treatment received by Chinese state-owned enterprises, but survey data shows again that nationality may trump ownership – Chinese companies, whether state-owned or private, receive benefits that foreign companies do not.

» The lingering challenges of protecting intellectual property rights in China are well-known. While the enforcement environment continues to slowly improve, such

### Top 10 Issues

1. Competition with Chinese companies in China
2. IPR enforcement
3. Foreign investment restrictions
4. [Tie] Human resources: Talent recruitment and retention
4. [Tie] Cost increases
6. Uneven enforcement/implementation of Chinese laws
7. Licensing
8. Transparency
9. Nondiscrimination/national treatment
10. Overcapacity in the China market

improvements have been modest. American companies continue to limit their operations and IP exposure in China because of the lack of adequate protections.

» China's environmental pollution is starting to impact staffing. Forty percent of companies report that air pollution has made it difficult to retain or assign expatriate staff to China. Pollution has also increased the use of sick leave by expatriate and local staff in China.

» China's ramped-up enforcement of its relatively new antitrust and competition regime has garnered significant attention in recent months. While both foreign and domestic companies are being investigated, foreign companies appear to be facing increasing scrutiny. Eighty-six percent of respondents are concerned about the lack of transparency, due process, and other issues surrounding competition-related investigations.

» USCBC's annual survey continues to stand out for the quality and unique profile of its respondents. Half of its respondents are China-based and half are based in the United States, resulting in responses that blend the on-the-ground experience with the global perspective and context. Eighty-five percent of participating companies have been in the China market for more than 10 years, with the majority bringing more than 20 years of experience to the survey's results.

# Challenge #2
## IPR Enforcement

| Progress on Issue in Past Year: Unchanged |
|---|
| Rank in 2013: . . . . . . . . . . . . . . . . . . 5 |
| Rank in 2012: . . . . . . . . . . . . . . . . . . 5 |
| Rank in 2011: . . . . . . . . . . . . . . . . . . 5 |
| Rank in 2010: . . . . . . . . . . . . . . . . . . 4 |
| Rank in 2009: . . . . . . . . . . . . . . . . . . 8 |
| Rank in 2008: . . . . . . . . . . . . . . . . . . 6 |
| Rank in 2007: . . . . . . . . . . . . . . . . . . 3 |
| Rank in 2006: . . . . . . . . . . . . . . . . . . 3 |



Fig. 18 Level of Concern about IPR Enforcement

The lingering challenges of protecting intellectual property rights in China are well known, and this year's survey findings reinforce that more must be done to address the issue. IP protection is not just an issue for American companies doing business in China — it also affects Chinese companies. USCBC's annual membership surveys have consistently found that while some improvements have been made year to year, they are modest. As one survey respondent put it, "IPR enforcement is ever improving, but by far not enough (Fig. 18)."

The improvements that American companies have seen are varied, and they include more administrative actions, greater attention to the IPR legal framework, and the creation of IP-focused courts in Beijing, Shanghai, and other locations (Fig. 19).

However, challenges remain. Improved IP enforcement is not simply a matter of ensuring that IP owners are compensated for the fruits of their work — it is also an economic issue for China. The lost opportunities for job creation and innovation can be seen in the areas where American companies are limiting their operations in China because of the lack of



Fig. 19 Over the Past Year, China's Protection of IPR Has...

©2014, The US-China Business Council

full protection for IP rights. Notably, almost 50 percent of companies hold back on investment and research and development (R&D) in China because of IP concerns; less than 25 percent say the IP environment has no impact on investment decisions (Fig. 20). Increased foreign investment in R&D would help to create the kind of innovative, value-added jobs that China's government is actively seeking to develop. As a consequence, improving IP enforcement will be an important component of China's innovation drive.

China has several specific IP enforcement channels, all of which receive mixed reviews from American companies that have considered or used them. In general, China's civil courts and administrative agencies, such as the State Administration for Industry & Commerce (SAIC) and the Public Security Bureau, are viewed as being the most viable options for IP enforcement, though not in all cases (Fig. 21).

China's criminal courts are viewed most skeptically by companies, with nearly 50 percent of companies indicating that pursuing criminal cases is not a viable option. A similar percentage of companies said that they have not had cases that would be eligible for criminal enforcement. These results are a strong reminder of USCBC's longstanding recommendation that China impose criminal penalties for commercial-scale theft of IP and eliminate minimum value thresholds. If such a change were made, more criminal cases could be brought and enforced, and views on the viability of criminal courts would likely improve (Fig. 22).



**Fig. 20** **Impact of China's Level of IPR Enforcement on Types of Activities Companies Undertake in China***

- Limits R&D activities in China
- Limits products manufactured in China
- Limits products co-manufactured or licensed in China
- Limits products sold in China
- No impact

*Multiple responses allowed



**Fig. 21** **Viability of China's IPR Enforcement Channels**

- Criminal courts
- Civil courts
- Administrative agencies (e.g. SAIC, PSB)



**Fig. 22** **Success Rate of China's IPR Enforcement Channels**

- Criminal cases
- Civil cases
- Administrative cases

©2014, The US-China Business Council