# EXHIBIT 5

Robert Weigel (RW 0163)
Howard S. Hogan (HH 7995)
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiffs Gucci America, Inc.,*
*Chloé SAS, and Alfred Dunhill Limited*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------- ------- X
                                     :

GUCCI AMERICA, INC.; CHLOÉ SAS; and
ALFRED DUNHILL LIMITED,

              Plaintiffs,

        -against-

MYREPLICAHANDBAG.COM; WHOLESALE-
REPLICA.COM; REPLICA-WATCH-
TOWN.COM; TRADERINASIA CONSULTING
LLC; KELVIN CHO a/k/a KELVIN CHO YAW
COON a/k/a "CHO YAW KOON"; ABC
COMPANIES; and JOHN DOES,

              Defendants.

--------------------------------------------------------------- X

07 Civ. 2438 (JGK)

**DECLARATION OF**
**DONALD CLARKE**

I, DONALD CLARKE, declare as follows:

1.  I am a professor of law at the George Washington University Law School, where I have been employed since 2005.  My academic specialization is the law of the People's Republic of China (the "PRC" or "China") in general and the legal regime of economic reform in particular, and I speak and read Chinese fluently.  I have published a number of articles, comments, and book reviews pertaining to Chinese law.

1

2.   I have been asked to provide my opinion on the following matters: (1) the extent to which the judgment of a United States court may be enforced in China; (2) the extent to which Chinese law prohibits the Bank of China from complying with the order of a United States court to disclose information about customer accounts, to freeze such accounts, and ultimately to transfer funds from such accounts to a judgment creditor; and (3) the repercussions that might be experienced by the Bank of China were it to do any of the preceding acts in violation of Chinese law.

## BACKGROUND

3.   I graduated *cum laude* from Harvard Law School in 1987, where my studies focused on East Asian legal systems and I served as an editor of the *Harvard Law Review*.  I earned a graduate degree (M.Sc. with Honors) in the Government and Politics of China from the School of Oriental and African Studies at the University of London in 1983.  I also studied Chinese history for two years at Beijing University and Nanjing University in China from 1977 to 1979.

4.   From 1988 through 2004, I was on the faculty of the University of Washington School of Law ("UWLS").  From 1995 to 1998, I was on a leave of absence from the UWLS and worked as an attorney at Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"), a large United States law firm with a substantial China business practice.  During that period, I visited China and Hong Kong approximately twice a year in the course of my work, a substantial amount of which was related to China.  From 1998 through 2003, I regularly worked with Paul, Weiss as a consultant on Chinese law matters.  Since that time I have maintained an independent consulting practice.

5.   I spent the calendar year 2003 in China conducting research on corporate governance issues as a Fulbright Fellow and Visiting Scholar at Tsinghua University Faculty of Law

("Tsinghua").  I also spent the fall of 2004 as a Visiting Scholar at Tsinghua.  I visit China
frequently and, since 2004, have spent at least three months a year there.

6.  I have served as adviser or consultant on Chinese law matters to a number of bodies,
including the Asian Development Bank, the Agency for International Development, and the
World Bank's Financial Sector Reform and Strengthening Initiative.  I have testified on aspects
of the Chinese legal system before the Congressional-Executive Commission on China and the
United States-China Economic and Security Review Commission.  I have been appointed to the
Academic Advisory Group to the US-China Working Group of the United States Congress.  I am
admitted to the practice of law in the state of New York and am a member of the Council on
Foreign Relations.

7.  I have served as an expert witness on Chinese law matters in over a dozen cases, most
of them involving issues of the Chinese legal system or Chinese commercial law.  In *In the
Matter of the Arbitration Between Trans Chemical Limited and China National Machinery
Import and Export Corporation*, 978 F. Supp. 266 (S.D. Tex. 1997), for example, my testimony
was cited extensively by the court in its decision.

8.  Attached as Exhibit A is a true and correct copy of my curriculum vitae, which
provides a more complete statement of my credentials, including a list of publications.

## MATERIALS REVIEWED AND SUMMARY OF OPINION

9.  In the course of researching this declaration, I have examined the following
documents supplied to me by Plaintiffs' attorney:

    a.  A printout from the Chinese National People's Congress website at
    www.npc.gov.cn entitled "Law of the People's Republic of China on Commercial
    Banks";

b. Memorandum of Law in Support of Plaintiffs' Ex Parte Application for Temporary Restraining Order, Asset Restraining Order, Expedited Discovery Order, and Order to Show Cause for Preliminary Injunction in the above-captioned action;

c. Provisions on the Administration of Financial Institutions' Assistance in the Inquiry, Freeze or Deduction of Deposits, promulgated by the People's Bank of China ("PBOC") on January 15, 2002 (effective Feb. 1, 2002)

d. Provisions Governing the Enforcement by the People's Courts and the Assistance by Financial Institutions in Enforcement jointly issued by the Supreme People's Court and the PBOC in September 2000

e. Plaintiffs' Complaint in the above-captioned lawsuit;

f. Declaration of Yuliya P. Kuklina dated March 26, 2007 and accompanying exhibits in the above-captioned lawsuit;

g. Letter dated March 28, 2007 from Howard S. Hogan, counsel for Plaintiffs, to Bank of China, informing Bank of China of the Court's March 26 Order directing a freeze be placed on all assets held by or for the Defendants in the above-captioned lawsuit;

h. Letter dated April 19, 2007 from Robert L. Weigel, counsel for Plaintiffs, to Walter P. Loughlin, counsel for the Bank of China, regarding Defendant Cho's consent that his Bank of China accounts be treated in accordance with the Court's March 26 temporary restraining order;

i. Stipulation and Order dated April 19, 2007 extending temporary restraining order and schedule for order to show cause;

j.    Defendant Kelvin Cho's brief asserting a "lack of jurisdiction over foreign accounts" filed June 4, 2007 in the above-captioned lawsuit;

k.    A letter dated June 7, 2007 from Robert L. Weigel to the Honorable John G. Koeltl requesting the Court's permission to bring a motion for sanctions and contempt of Court, and addressing the Bank of China's failure to comply with the Court's orders;

l.    A letter dated June 21, 2007 from Walter P. Loughlin to the Honorable John G. Koeltl regarding Plaintiffs' request to seek sanctions;

m.    Plaintiffs' Memorandum of Law in Opposition to Defendants' June 4, 2007 "Motion";

n.    Declaration of Howard S. Hogan dated June 19, 2007 and accompanying exhibits in Support of Plaintiffs' Opposition to Defendants' June 4 Motion;

o.    Order dated June 22, 2007 granting Plaintiffs' motion for a preliminary injunctions and denying Defendant Cho's June 4 Motion and compelling him to provide consent to the Bank of China;

p.    Plaintiffs' Memorandum of Law in Support of an Entry of Default Judgment Against All Defendants;

q.    Declaration of Howard S. Hogan dated August 22, 2007 and accompanying exhibits in support of an entry of default judgment against all Defendants;

r.    The following e-mail correspondence to and about counsel for the Bank of China:

    i.    Emails between Robert L. Weigel and Walter P. Loughlin dated April 5 and April 6, 2007, concerning BOC's response to the Court's temporary restraining order;

5

    ii.   Emails dated May 15 and May 16, 2007, to and from Michael Bondi

        (former counsel for Defendants), Robert L. Weigel, Howard S. Hogan,

        and Walter P. Loughlin concerning a statement signed by Defendant Cho

        on May 15, 2007, related to his BOC account;

    iii.   Letter emailed from Howard S. Hogan to Oleg Rivkin and Michael Bondi

        on May 17, 2007, concerning Defendant Cho's inquiry regarding his BOC

        account;

    iv.   Email dated May 21, 2007, from Michael Bondi to Robert L. Weigel and

        Howard S. Hogan concerning Mr.'s Cho's inquiry regarding his BOC

        account; and

    v.   Email dated June 4, 2007, from Walter P. Loughlin to Robert L. Weigel

        regarding BOC's noncompliance with the Court's temporary restraining

        order.

10. I have also conducted independent research and have cited the relevant sources in the text of my declaration.

11. The conclusions I draw from an examination of the relevant documents and my own research are as follows: (1) it is extremely unlikely that a contested commercial judgment of a U.S. court could be enforced in China; (2) Chinese law, at least insofar as its provisions have been cited by the BOC, does not prohibit the BOC from complying with the order of a United States court to disclose information about customer accounts, to freeze such accounts, or ultimately to transfer funds from such accounts to a judgment creditor; and (3) the BOC would as a practical matter suffer few if any adverse repercussions as a result of complying with such a court order.

## CAN UNITED STATES COURT JUDGMENTS BE ENFORCED IN CHINA?

12. The judgments of United States courts are not, as a general matter, enforceable in China. I know of no case in which such a judgment has been enforced over the objections of a party; if there are any such cases, they are almost certainly confined to divorce judgments.

13. The basic rule of Chinese law on the enforcement of foreign judgments is set forth in Articles 267 and 268 of the Civil Procedure Law. These provide in full as follows:

Art. 267. Where it is necessary for the people's courts of the People's Republic of China to recognize and enforce legally effective judgments and rulings of foreign courts, a party may apply for recognition and enforcement directly to the Intermediate Level People's Court having jurisdiction; a foreign court may also, in accordance with the provisions of an international treaty which the state of the foreign court and the People's Republic of China have concluded or to which they are parties, or in accordance with the principles of mutual benefit [reciprocity], request the people's court to recognize and enforce the judgment.

Art. 268. The people's court shall, in accordance with the provisions of an international treaty which the state of the foreign court and the People's Republic of China have concluded or to which they are parties, or in accordance with the principles of mutual benefit [reciprocity], undertake a review of the legally effective foreign court judgment or ruling the recognition and enforcement of which is applied for or requested. If upon such review it concludes that such judgment does not violate the basic principles of the law of the People's Republic of China or state sovereignty, state security, or the public interest of society, it shall issue a ruling recognizing the judgment's validity; where enforcement is necessary, it shall issue an order for enforcement and enforce the judgment in accordance with the provisions of this Law. Where to do so would violate the basic principles of the law of the People's Republic of China or state sovereignty, state security, or the public interest of society, the court shall not grant recognition and enforcement.

14. In brief, Chinese law requires that there exist a treaty or reciprocity between the foreign state and China in order for a foreign judgment to be enforced.[1]

---

[1] There is a very minor exception to this rule in a document issued by China's Supreme People's Court in 1991. This document allows courts to recognize, in certain situations, divorces granted to Chinese nationals by foreign courts. Notably, however, such recognition applies to the fact of divorce only and does not extend to issues of property, support, or child custody. *See* Zuigao Renmin Fayuan guanyu Zhongguo gongmin shenqing chengren waiguo

15. At present there exists no treaty between the United States and China obligating China to enforce U.S. judgments, and I do not believe that a Chinese court would enforce a U.S. judgment on any other grounds, such as the existence of reciprocity.

16. First, reciprocity does not in fact appear to exist. My research has failed to uncover a single case in which U.S. courts have enforced Chinese court judgments without inquiring into the underlying merits of the dispute.

17. Second, Chinese courts do not believe that reciprocity exists sufficient to support the enforcement of a U.S. court judgment. Although New York State has enacted a version of the Uniform Foreign Country Money-Judgments Recognition Act,[2] which might appear to provide grounds for finding reciprocity at least in theory, my research has found no cases in which a U.S. court judgment has been enforced on any grounds.

18. Third, the recognition and enforcement in China of foreign court judgments from any country—not just the United States—is extremely rare and occurs only in special circumstances. Below is a list of all such cases I have found from the post-Mao era (i.e., the era to which the current legal system may be said to belong).

19. Three cases involved foreign divorce proceedings between Chinese citizens, at least one of whom was living overseas. None of the three was contested; in each case, both parties requested the Chinese court to recognize the divorce. Finally, none of the cases actually required the courts to enforce anything. They were asked merely to confirm the validity in China of the

---

fayuan lihun panjue chengxu wenti de guiding [Supreme People's Court Rules on Procedural Issues When Chinese Nationals Apply for the Recognition of Divorce Judgments Issued by Foreign Courts], July 5, 1991.
[2] Art. 53, New York Civil Practice Law and Rules, §§ 5301-5309.

divorce decree, thus allowing the party resident in China to re-marry without having to initiate separate divorce proceedings in China.[3]

20. In another case, a court in Dongguan, Guangdong Province, recognized the American divorce decree of Zhang Yunwen, a prominent local businessman. Both parties to the marriage had been Dongguan residents. The report does not state whether recognition was contested or property and custody issues were involved.[4]

21. I have found only a single case that is not divorce-related. In January 2003, the Foshan Intermediate-Level People's Court, after approval by the Supreme People's Court, recognized the bankruptcy decree of an Italian court.[5] Like all the other enforcement cases canvassed, however, this one is special and did not involve an opposing party being required to pay money. In this case, "enforcing" the decree merely meant recognizing the claim of the petitioning Italian company to an equity interest in a Chinese-Italian joint venture that had previously belonged to another Italian company. Moreover, a treaty of judicial assistance existed at the time between Italy and China providing for mutual recognition and enforcement of court judgments in certain cases,[6] and the court stated that recognizing the decree was in accordance with the terms of the treaty. The report of the case states that it is the first case in which Chinese

---

[3] *See* Wang Lijian Case (No. 413), in 2 RENMIN FAYUAN ANLI XUAN—MINSHI JUAN [Selected Cases from the People's Courts—Civil Volume] 2027 (Zuigao Renmin Fayuan Zhongguo Yingyong Faxue Yanjiusuo [Supreme People's Court Institute for Practical Legal Research] ed., 2000) (U.S. divorce decree); Jiang Xiaomin Case (No. 416), in *id.*, at 2036 (New Zealand divorce decree); Li Geng Case (No. 216), in *id.*, at 2030; *also reported in* DU XINLI, GUOJI SIFA JIAOXUE ANLI [Cases for the Study of International Private Law] 350-51 (1999) (Japanese divorce decree).

[4] *See* Chen Si & Xiong Yijun, *Guanyu Dongguan Shi liangji fayuan shewai, she-Gang-Ao-Tai min shang shi shenpan de diaocha baogao* [Report of Investigation Into Adjudication by Dongguan Basic-Level and Intermediate Courts of Cases Involving Foreign, Hong Kong, Macao, and Taiwan Interests], April 18, 2004, available at http://www.gdcourts.gov.cn/dyzd/dcyj/t20040418_4133.htm.

[5] *See* B&T Ceramic Group Case, *discussed in* Hu Han, Zhongguo chengren yu zhixing waiguo fayuan panjue de falü zhidu ji shiwu yanjiu [A Study of the Legal System and Practical Issues Related to China's Recognition and Enforcement of Foreign Court Judgments], 2003, available at http://vip.chinalawinfo.com/newlaw2002/SLC/SLC.asp?Db=art&Gid=335568020.

[6] *See* Zhonghua Renmin Gongheguo he Yidali Gongheguo guanyu minshi sifa xiezhu de tiaoyue [Treaty on Judicial Assistance Between the People's Republic of China and the Republic of Italy], available at http://www.chinalawedu.com/news/21601/21713/21614/2004/12/zh88683293413214002104305_143429.htm.

courts recognized and enforced a foreign court judgment.  While this statement, as my discussion shows, is not strictly accurate, it is certainly evidence that recognition and enforcement are extremely rare.

22. The only report of a case I have found where the enforcement of a foreign judgment might have been contested was one from the 1950s, when China and the U.S.S.R. had close and friendly relations. In that case, despite the absence of a treaty or a practice of reciprocity, China and the U.S.S.R. agreed through diplomatic channels that Chinese courts would enforce a U.S.S.R. judgment for child support against a Soviet citizen living in China.[7]  The same source also mentions, without any details, the enforcement of an East German judgment;[8] I do not know whether that was contested or not, or what the subject matter was. As these cases apparently had no impact on Chinese nationals, date from a completely different era in Chinese history, and involve political issues, they have little if any contemporary relevance.

23. By contrast, there is a modern case in which enforcement of a foreign judgment was refused. In 1994, the Dalian Intermediate Level People's Court considered the application of a Japanese national for the enforcement of a Japanese court judgment against another Japanese national.[9]  That judgment called for the defendant to transfer its equity interest in a Chinese company to the plaintiff in satisfaction of a debt.[10] The Dalian court rejected the application, finding that neither a treaty nor reciprocity existed between China and Japan.

---

[7] *See* YUAN CHENGDI, GUOJI SIFA YUANLI [Principles of International Private Law] 368 (2003).

[8] *See id.*

[9] *See* Riben gongmin Wuwei Huang shenqing Zhongguo fayuan chengren he zhixing Riben fayuan panjue an [The Case of the Application of Japanese Citizen Gomi Akira to a Chinese Court for the Recognition and Enforcement of a Japanese Court Judgment], *Zuigao Renmin Fayuan Gongbao* [Supreme People's Court Gazette], No. 1, Mar. 20, 1996, at 29.

[10] This is my best understanding of what the judgment called for. The case report states that the judgment named the Chinese company as a third party and instructed it to transfer to the plaintiff the defendant's investment in it of RMB 4.85 million *yuan*. This may mean that the judgment purported to order the Chinese company in effect to redeem some or all of the defendant's equity share at the stated price and to pay the money to the plaintiff; it may also mean

10

24. I have found only five cases in which the enforcement of a U.S. court judgment was sought in China. In four of them, including the single commercial case in the group, the applicant was unsuccessful. In 1967, the Yantai Municipal People's Court rejected an application to recognize and enforce a divorce judgment from a U.S. court.[11]  In 1985, the Supreme People's Court issued a directive to the Shanghai Higher-Level People's Court (one level below the Supreme People's Court) instructing it not to recognize a U.S. divorce judgment, but instead to consider the case anew.[12]  Also in 1985, the Supreme People's Court issued a directive to the Jiangsu Higher-Level People's Court instructing it to return unenforced a divorce judgment that had been sent to it by a California court.[13]  I have found one mention of a commercial case in which a plaintiff apparently requested, without success, the enforcement in China of a Tennessee court judgment, but the report provides few details.[14]  The one case in which the applicant was successful was the divorce case of Zhang Yunwen, discussed in Paragraph 19 above, but there is no evidence that this case was contested, and in any case Zhang appears to be a locally influential personage.

---

that the judgment purported to order the Chinese company to transfer to the plaintiff's name some or all of the defendant's equity share in the company represented by its original investment of RMB 4.85 million *yuan*.

[11] *See* LI WANG, GUOJI SUSONG JINGHE [Competition and Cooperation in International Litigation] 240 (2002). I do not believe that this case has any contemporary significance—it occurred at the height of the Cultural Revolution—and include it only for the sake of completeness.

[12] *See* Zuigao renmin fayuan guanyu lü-Mei huaqiao Zhang Xuefen xianhou xiang woguo fayuan he Meiguo fayuan qisu lihun Meiguo fayuan yi panjue lihun woguo fayuan shifou ke zai zuo panjue wenti de pifu [Reply of the Supreme People's Court on the Question of Whether Chinese Courts May Make an Additional Judgment Where Zhang Xuefen, an Overseas Chinese Resident in America, Has Successively Brought Divorce Actions in Chinese and American Courts and the American Court Has Already Made a Divorce Judgment], Sept. 19, 1985. This document is also discussed in LI WANG, *supra* note 11, at 240.

[13] *See* Zuigao renmin fayuan guanyu Meiguo fayuan wei tongguo waijiao tujing jingzhi jiang lihun panjeushu jigei wo renmin fayuan ruhe chuli de pifu [Reply of the Supreme People's Court on How to Handle the Direct Sending of a Divorce Judgment to a Chinese Court by an American Court Without Going Through Diplomatic Channels], Dec. 26, 1985.

[14] *See* Xianghu chengren, zhixing waiguo fayuan caipan he waiguo zhongcai caijue [The Mutual Recognition and Enforcement of Foreign Court Judgments and Foreign Arbitral Awards], n.d., available at http://www.hainu.edu.cn/zy_jingpinkecheng/asp_hainu_show.asp?id=3837&fuji_bbsid=.

25. To summarize the evidence set forth above, there is to date no evidence suggesting that a Chinese court would enforce the judgment of a United States court in a contested commercial matter, and considerable evidence suggesting it would not.

**TO WHAT EXTENT DOES CHINESE LAW PROHIBIT THE BANK OF CHINA FROM OBEYING THE ORDER OF A UNITED STATES COURT REGARDING A CUSTOMER ACCOUNT?**

26. Chinese law does not appear to contain a strict prohibition against the BOC's compliance with a United States court order to reveal information about, freeze, or transfer funds from a customer account.

27. The BOC's argument that Chinese law does contain such a prohibition appears to be based upon two sources. First, in a letter to the Hon. John G. Koeltl dated June 21, 2007 (the "Loughlin Letter"), Walter P. Loughlin states that BOC's Legal and Compliance Department has issued an opinion to BOCNY (the "BOC Opinion") stating that "the freezing of a customer's account under the order of a non-Chinese court, in the absence of the customer's consent," would violate Chinese law.

28. Second, the Loughlin Letter contains, as Exhibit F, an English translation of an opinion obtained by the BOC from the Ministry of Justice of the People's Republic of China (the "MOJ Opinion"). I shall address the MOJ Opinion first, noting, however, that I have not seen the Chinese-language original of this document and have no way of judging whether the translation accurately reflects the content of the original.

29. *The MOJ Opinion.* The MOJ Opinion does not provide strong support for the claim that Chinese law prohibits BOC compliance with a U.S. court order of the kind contemplated in this case. The MOJ Opinion addresses the issue of the taking of evidence and cites international law and treaties relevant to that issue. But that is not the central issue here. The plaintiffs here

12

seek or will seek three things: information, a freeze, and seizure. They seek information about the defendant's bank account not for purpose of taking evidence, but in order to freeze the defendant's assets more effectively. They seek to freeze and seize funds from the defendant's bank account in order to satisfy a judgment, not in order to obtain evidence. The MOJ Opinion makes a passing reference to the Banking Law, but provides no concrete analysis.

30. Moreover, the MOJ Opinion cannot be considered an objective analysis. The MOJ is an arm of the Chinese government. As explained in Paras. 40-42 below, the BOC has significant ties to the Chinese government. Thus, the MOJ is not a disinterested third party in this matter.

31. *The BOC Opinion.* According to the Loughlin Letter, the BOC Opinion asserts that Articles 29 and 30 of the Commercial Banking Law of the People's Republic of China[15] (the "Banking Law") and Articles 2 and 4 of the People's Bank of China Provisions for Financial Institutions Assistance[16] (the "PBOC Provisions") forbid compliance with a U.S. court order to freeze a customer account without the customer's consent.

32. I note first that the Loughlin Letter does not contain, nor have I seen, a copy of the BOC Opinion, so I am not in a position to judge its reasoning. My reading of the Banking Law and the PBOC Provisions, however, leads me to believe that the BOC Opinion does not accurately reflect what these regulations say.

33. The BOC Opinion cites Articles 29 and 30 of the Banking Law. These provisions read as follows:

---

[15] Zhonghua Renmin Gongheguo shangye yinhang fa [Commercial Banking Law of the People's Republic of China], effective Feb. 1, 2004.

[16] As the BOC has not supplied the Chinese title of this document, I cannot be sure to which regulation it is referring. I shall proceed on the assumption that it is referring to People's Bank of China, Jinrong jigou xiezhu chaxun, dongjie, kouhua gongzuo guanli guiding [Rules on the Administration of the Work of Financial Institutions When They Assist in Investigations, Freezes, or Forcible Transfers], effective Feb. 1, 2002, available at http://www.pbc.gov.cn/rhwg/020505f.htm.

Art. 29.  In handling savings deposits for individuals, commercial banks should (*yingdang*) adhere to the principles of voluntary deposit, liberty of withdrawal, interest on deposits, and confidentiality for depositors.

Commercial banks have the right to refuse [the request of] any unit[17] or individual to investigate, freeze, or forcibly transfer (*kouhua*) funds from an individual's savings deposits, except where otherwise provided for by law.[18]

Art. 30.  Commercial banks have the right to refuse [the request of] any unit or individual to investigate a unit's saving deposits, except where otherwise provided for by law or administrative regulations.[19]  They have the right to refuse [the request of] any unit or individual to freeze or forcibly transfer funds from such deposits, except where otherwise provided for by law.

34. It is impossible to find here any prohibition on complying with a foreign court order.  The law provides the bank with the *right* to refuse certain requests under certain circumstances should it wish to do so.  The law does not impose a *duty* to refuse.

35. The BOC Opinion also cites Articles 2 and 4 of the PBOC Provisions in support of its position.  These provisions are entirely definitional and contain no rights or obligations whatsoever.  They read in their entirety as follows:

Art. 2.  "Assisting in investigating, freezing, and forcibly transferring" in these Rules means the actions of a financial institution in assisting authorized organs, according to law, in investigating, freezing, or forcibly transferring [funds from] the deposits of units or individuals at that financial institution.

"Assisting in investigating" means the actions of a financial institution, in accordance with the provisions of relevant laws or administrative regulations and the request of an authorized organ, in providing the authorized organ with information about the amount, currency, and other matters relating to the deposits of units or individuals.

"Assisting in freezing" means the actions of a financial institution, in accordance with the provisions of relevant laws and the request of an

---

[17] The term "unit" (*danwei*) here essentially means any institutional entity—for example, a corporation, a government agency, or some other organization.
[18] "Law" here means a statute passed by the National People's Congress or the National People's Congress Standing Committee.
[19] "Administrative regulations" here means rules passed by the State Council, in effect China's executive branch.

authorized organ, in prohibiting, for a given period of time, units or
individuals from withdrawing all or part of the deposits held in their
accounts.

"Assisting in forcibly transferring" means the actions of a financial
institution, in accordance with the provisions of relevant laws and the
request of an authorized organ, in transferring to another designated
account all or part of the funds deposited in the account of a unit or
individual.

Art. 4.  "Authorized organ" in these Rules means a judicial organ, an
administrative organ, a military organ, or an institution with administrative
functions (see appended table), in each case having the right, under clear
provisions of laws or administrative regulations, to investigate, freeze, or
forcibly transfer [funds from] the deposits of units or individuals in
financial institutions.

36. In short, neither the provisions of the Banking Law nor the provisions of the PBOC

Opinion cited in the BOC Opinion and incorporated into the Loughlin Letter in fact support the

conclusion of the BOC Opinion and the Loughlin Letter.

37. That Chinese law is not in fact as strict as asserted by the BOC is clear from the

BOC's own actions.  Exhibit C to the Loughlin Letter is an e-mail from Walter Loughlin to

Robert Weigel and others dated May 11, 2007.  The e-mail states that "the Bank customer [i.e.,

Yaw Koon "Kelvin" Cho] came to the branch in China today and sought to make a withdrawal.

The Bank did not allow the withdrawal to be made."  Exhibit E to the Loughlin Letter is, on its

face, a translation of a document issued by the Guangdong Branch of the Bank of China dated

June 19, 2007.   It states that the Branch has taken "internal control" of Mr. Cho's account.

38. To the best of my knowledge, no Chinese government body (for example, an

"authorized organ" as defined in Article 4 of the PBOC Provisions) has requested or demanded

that Mr. Cho's account be frozen and that he be prohibited from withdrawing funds.  Nor, to the

best of my knowledge, has Mr. Cho consented to such a freezing.  And yet the account has in

effect been frozen.  This fact leads inescapably to the conclusion that the BOC may, if it wishes,

freeze the funds in the account—at least in these circumstances—without in its own opinion violating Chinese law. Moreover, I see no basis in these circumstances for distinguishing between investigations, freezes, and forcible transfers of funds.

## THE BANK OF CHINA WILL NOT FACE ADVERSE REPERCUSSIONS IF IT COMPLIES WITH THE ORDER OF A UNITED STATES COURT IN THIS CASE

39. I have been asked to opine on whether, even if complying with the order of a U.S. court constituted a violation of Chinese law, the Bank of China would be subject to adverse repercussions such as loss of its banking license were it to comply. In my opinion the BOC would suffer no such adverse consequences.

40. I base this opinion on the fact that the BOC is in many important respects a quasi-governmental entity. The BOC was, until 2004, wholly owned and controlled by the Chinese state—in short, a traditional state-owned enterprise. In 2004, it changed its organizational form to that of joint stock company and was for a time wholly owned by Central Huijin Investment Company Limited ("Huijin") (now sometimes known as Central SAFE Investment Company Limited), a company wholly owned and controlled by China's Ministry of Finance, and established for the purpose of holding government shares in China's "big four" state-owned banks. In 2006, it listed a minority of its shares on the Shanghai and Hong Kong stock exchanges.[20] But the majority of its shares—approximately 67 percent—remain in the hands of Huijin. Huijin is not a commercial investor; it is distinct from government in form only. Its role is described in the BOC's latest annual report:

> On behalf of the state, Huijin performs the rights and obligations as an investor in the Bank, and implements the equity investment subject to the approval of the State Council and policies and arrangement relating to the state's reform of state-owned financial institutions. Huijin does not engage in other business activities.[21]

---

[20] *See* BANK OF CHINA, ANNUAL REPORT 2006, at 107 (April 25, 2007).
[21] *See id.*

16

41. Thus, the BOC, while it engages in commercial activities, cannot be viewed as an independent commercial entity that relies on government favor in order to do business. It is, on the contrary, a vehicle by which the Chinese government at times carries out certain policy decisions. That is why the government maintains (albeit indirectly) overwhelming majority ownership in the BOC and why senior management appointments are subject to Communist Party control.[22] The government is as likely to sanction it or put it out of business as it is to sanction or put out of business the Ministry of Defense or the Ministry of Foreign Affairs.

42. In conclusion, the BOC does not have sufficient distance from the government for it to be a credible object of government sanctions.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 27, 2008 in Beijing, China.

_____
DONALD CLARKE

---

[22] *See Chinese Officials to Run Three Banks*, FINANCIAL TIMES, June 21, 2007 ("China's banks operate like government departments, with senior managers appointed and removed by the ruling Communist party's Organisation Department, which is responsible for all senior personnel changes within the government.").