# EXHIBIT 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TIFFANY (NJ) LLC and TIFFANY AND
COMPANY,

                Plaintiffs,

          v.

QI ANDREW, GU GONG, SLIVER DENG, and
KENT DENG, all d/b/a TIFFANYSTORES.ORG,
FASHION STYLE and STORESORG; ABC
COMPANIES; and JOHN DOES,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF
WILLIAM P. ALFORD**

No. 10 Civ. 9471 (WHP) (HBP)

I, WILLIAM P. ALFORD, declare as follows:

1.      I am the Henry L. Stimson Professor of Law, Vice Dean for the Graduate

Program and International Legal Studies, and Director of East Asian Legal Studies at Harvard

Law School.  I have taught and conducted research on Chinese law for more than 30 years,

including the past 21 as a member of the Harvard Law School faculty.

2.      I have been asked to review the materials submitted by Bank of China ("**BOC**"),

the Industrial and Commercial Bank of China ("**ICBC**"), and the China Merchants Bank

("**CMB**") in the above-captioned case and to provide my opinion on the following matters:

•     The extent to which the law of the People's Republic of China ("**PRC**")

prohibits the BOC, ICBC, and CMB from complying with the order of a United States court to

disclose information about customer accounts and to freeze such accounts.

- The likelihood that the BOC, ICBC, CMB or their officers might suffer adverse legal consequences were compliance with an order of a United States court deemed to be in violation of Chinese law.

- The likelihood of obtaining evidence from China pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters ("**the Hague Convention**").

## QUALIFICATIONS

3.      My pertinent education, training and experience are as follows.  I commenced my study of China in the 1960s and of Chinese language in 1971 (at the intensive language program of Middlebury College).  Subsequently, I spent three years as a graduate student at Yale University,  earning  Master's degrees both in Chinese Studies (1974) and in History, focused on China, (1975) before entering Harvard Law School, where I did extensive course work and independent study in Chinese legal studies (including a period of study in Taiwan) before graduating in 1977.  After graduating from law school, I practiced law in the Washington, D.C. law office of Fried, Frank, Harris, Shriver & Kampelman where I, inter alia, represented American, European and Chinese clients in a variety of matters concerning Chinese law, and legal interaction between the U.S. and the People's Republic of China (PRC).

4.      I co-taught the first course on Chinese law offered at Georgetown University Law Center in 1980 and 1981 while still in law practice at Fried Frank.  In 1982, I joined the faculty of the UCLA School of Law, where I taught until moving to Harvard, first as a visiting professor (1988-89) and then as a chaired professor and Director of East Asian Legal Studies (1990 to the present).

5.    I have had extensive direct experience with Chinese legal and political institutions from 1978 onward through scores of trips to and periods of residence in the PRC to teach, conduct research, work with Chinese authorities on issues of law reform, and carry out pro bono work.  In the early 1980s, I was a co-founder of the Committee on Legal Education Exchange with China (CLEEC) and in the mid-1980s, I served for several years as the U.S. Executive Director of CLEEC's in-country summer institute on law which was the first program of its kind in the history of the PRC.  I am an Honorary Professor of two of China's leading law schools -- Renmin University of China and the Guanghua Law School at Zhejiang University -- and have been an honorary professor of the National College of Administration and  a fellow of the Institute of Law  (American Law Research Center) of the Chinese Academy of Social Science.

6.    I am the author or editor of four books and dozens of articles dealing with Chinese law and institutions, and serve on the editorial board of learned journals concerning China here and in the Chinese world.  I have testified about China and Chinese law before governmental bodies, including the Congressional-Executive Commission on China and a U.S. Senate sub-committee, and have advised senior officials in the U.S. government over several administrations, multilateral organizations, law firms, companies, foundations, and not for profit entities about China and Chinese law.  I am a member of the Council on Foreign Relations and the National Committee on U.S.-China Relations.  I speak and read Chinese.  I have been selected by several institutions of higher learning around the world to give endowed lectures and have received numerous awards, fellowships and grants in recognition of my work on China, including the Kluwer/*International Lawyers Newsletter* China Prize, the inaugural O'Melveny & Myers Centennial Award, an Abe Fellowship, a fellowship from the Committee on Scholarly Communication with China, and an honorary doctorate from the University of Geneva, among

others.  Attached as Exhibit A is a true and correct copy of my curriculum vitae, which provides a statement of credentials.

## MATERIALS REVIEWED

7.     In the course of researching this declaration, I have examined the following documents supplied to me by Plaintiffs' attorney:

(a)     Memorandum of Law in Support of Plaintiffs' Motion to Compel the Production of Documents from Third-Parties Bank of China, China Merchants Bank, and Industrial and Commercial Bank of China, Ltd., dated May 3, 2011 ("**Motion to Compel**");

(b)     Declaration of Robert L. Weigel, dated May 3, 2011, and exhibits (**"Weigel Declaration"**);

(c)     Memorandum of Law in Opposition to Plaintiffs' Motion to Compel the Production of Documents from Non-Parties Bank of China and Industrial and Commercial Bank of China, Ltd., dated May 17, 2011 ("**BOC-ICBC Brief**");

(d)     Declaration of Xintao Luo, dated May 17, 2011 ("**Luo Declaration**");

(e)     Declaration of John Beauchemin, dated May 17, 2011 ("**Beauchemin Declaration**");

(f)     Declaration of Lanier Saperstein, dated May 17, 2011, and exhibits ("**Saperstein Declaration**");

(g)     Declaration of James Feinerman, dated May 17, 2011, and exhibits ("**Feinerman Declaration**");

(h)     Memorandum of Law of Third Party China Merchants Bank in Opposition to the Plaintiffs' Motion to Compel the Production of Documents, dated May 17, 2011 ("**CMB Brief**").

(i)        Declaration of Dwight Healy, dated May 17, 2011, and exhibits;

(j)        Declaration of Richard Pagnotta, dated May 17, 2011 ("**Pagnotta Declaration**");

(k)        Declaration of Zhipan Wu, dated May 17, 2011, and exhibits ("**Wu Declaration**");

(l)        Declaration of Donald Clarke in *Gucci America, Inc., et.al. v. Li, et. al.* 2010 Civ. 4974 (RJS) (SDNY), dated January 3, 2011, and exhibits ("**Clarke Declaration**").

8.      In addition, in preparing this declaration, I have also conducted independent research of my own, as necessary. I cite relevant sources in the text of this declaration.

## SUMMARY OF OPINION

9.      Based on my study of and work with Chinese law, my examination of the aforementioned documents, and my experience in China, I conclude

- Chinese law does not prohibit Chinese banks from complying with the order of a United States court to disclose information about customer accounts and to freeze such accounts.

- It is unlikely that the BOC, ICBC, CMB or their officers would suffer adverse legal consequences were compliance with an order of a United States court deemed to be in violation of Chinese law.

- There is not a strong likelihood of obtaining evidence from China pursuant to the Hague Convention.

## DOES CHINESE LAW PROHIBIT CHINESE BANKS FROM OBEYING THE ORDER OF A UNITED STATES COURT REGARDING A CUSTOMER ACCOUNT?

10.    The BOC, ICBC and CMB assert that, in the words of Professor Zhipan Wu, "[o]ver the last 20 years China has adopted a comprehensive set of laws and regulations that are

designed to govern banks and banking in China." In so doing, they intimate a comparability with measures of U.S. law such as the National Bank Act and the Bank Holding Company Act of the U.S.[1] China has, indeed, during this period promulgated extensive measures regarding banking, as it has in many other areas of endeavor, but the framework described by Professor Wu is best understood as aspirational. In the words of the most recent (2010) report of the highly authoritative U.S. Congressional-Executive Commission on China, "[t]he foreign business community has found increased problems in the Chinese government's regulatory system and its application to business operations in China. The AmCham-China's 2010 Business Climate Survey for the first time found 'inconsistent interpretation and implementation of laws' to be the top challenge for the 318 members that responded to the survey."[2] To understand whether the laws and regulations cited by BOC, ICBC and CMB might prohibit Chinese commercial banks from complying with the order of a United States court to freeze and provide information about customer bank accounts in China, it is necessary to examine the manner in which they have been implemented.

      11.    In the transcript of an April 19, 2011 hearing before United States Magistrate Judge Henry Pitman, counsel for CMB spoke of providing a "full record" of cases involving violations of China's bank secrecy law via the submission of expert witnesses.[3] The declarations

---

[1] Wu Declaration, paragraph 9.

[2] Congressional-Executive Commission on China, Annual Report 2010, 111th Congress, Second Session, October 10, 2010, available at http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=111_cong_house_committee_prints&docid=f:61507.pdf (last visited May 23, 2011), at p. 178 (Attached as Exhibit B).

[3] Transcript of Civil Cause for Conference, Before the Honorable Henry B. Pitman, April 19, 2011, pp. 32-33 (Exhibit 15 to the Weigel Declaration).

filed in the current proceeding by BOC, ICBC, and CMB together reference three cases, all of which concern issues clearly quite different from that of complying with the order being sought in the current case. Yongsheng Wang v. Bank of China Nanjing Hexi Branch involved a bank's failure to guard adequately against the surreptitious installation by thieves of devices that enabled them to duplicate ATM cards and a PIN number which the thieves then used to "withdraw illegally" more than 400,000 yuan from Wang's bank account with the Bank of China.[4] In People's Prosecutor of Xiangzhou District, Zhuhai Municipality v. Shao Guosong, Zhou Jianping, the 2009 amendment to China's Criminal Law cited by BOC, ICBC and CMB was invoked not against any banking institution but against an individual perpetrating a telephone scam fraud having nothing to do with a bank– circumstances completely different than those of BOC, ICBC and CMB in the current matter.[5] And the case of Ruihua Li v. Agricultural Bank of China Jinggangshan Branch involved a third party (Zou Yuan), not an officer or employee of the bank, who misled the bank in an effort to unlawfully collect a personal debt. This case resulted in an order to that third party to provide reimbursement, with, to be sure, the bank, being held jointly liable because of its failure to verify the authorization to open the new account.[6]

---

[4] Yongsheng Wang v. Bank of China Nanjing Hexi Branch (People's Court of Gulou District, Nanjing City, Jiangsu Province, November 26, 2008). Gazette of the Supreme People's Court of the People's Republic of China, Issue No. 2 of 2009, pp. 44-48. Original and translation are Exhibit B-8 to the Wu Declaration.

[5] People's Prosecutor of Xiangzhou District, Zhuhai Municipality v. Shao Guosong, Zhou Jianping, Xiang Xing Chu Zi. No. 1337 (2009). Original and translation are Exhibit B-9 to the Wu Declaration.

[6] Ruihua Li v. Agricultural Bank of China Jinggangshan Branch (People's Court of Jinggangshan City, Jiangxi Province, November 10, 2008). Jing Min Chu Zi No. 220. Original and translation are Exhibit B-7 to the Wu Declaration.

12.     Although BOC and ICBC assert that a primary purpose of Chinese banking law has been to provide "the strongest possible assurances of confidentiality,"[7] the aforementioned "full record" of cases indicates that Chinese banking law cited by the BOC, ICBC, and CMB also has the aspiration of guarding against fraudulent behavior.  This objective is further illustrated by the language of the Provisions on the Administration of Financial Institutions Assistance in the Inquiry, Freeze or Deduction of Deposits.[8]  It provides that a wide swath of "competent organs" – united in the fact that they all are engaged in the effort to stem China's very considerable problems of corruption and illicit behavior[9] – have the right to inquire into and freeze bank accounts.  These include courts, tax authorities, the customs service, the procuracy, public security organs, state security organs, military security organs, prisons, smuggling investigations organs, supervisory organs (including those of the military), auditing authorities (inquiry power), industrial and commercial administrative organs (inquiry power), and security regulatory authorities (inquiry power).  While the list does not include foreign courts, the purpose of the order at issue in this case is in keeping with the aspiration of guarding against corruption and illicit behavior, especially in view of China's repeated assurances to its own

---

[7]  Feinerman Declaration, paragraph 24.

[8]  Original and translation are Exhibit B-4 to the Wu Declaration.

[9]  The problem of corruption in China is addressed by Professor Minxin Pei of Claremont College in Corruption Threatens the Future of China Carnegie Endowment Policy Brief No. 55, October 2007.  Appended as Exhibit C and available at http://www.carnegieendowment.org/publications/index.cfm?fa=view&id=19628 (last visited May 22, 2011).

populace and to the United States government as recently as this year that it does not condone the theft of intellectual property.[10]

### ARE THE BANK OF CHINA, THE INDUSTRIAL AND COMMERCIAL BANK OF CHINA, OR THE CHINA MERCHANTS BANK OR THEIR OFFICERS LIKELY TO BE SUBJECT TO ADVERSE LEGAL CONSEQUENCES FOR COMPLIANCE WITH THE ORDER OF A UNITED STATES COURT IN THIS CASE?

13.     I have been asked to opine on whether, even if complying with the order of a United States court were to constitute a violation of Chinese law, the BOC, ICBC and CMB or their officers would be subject to adverse legal consequences, such as the loss of their banking licenses or punishment, if they complied with such an order.  In my opinion, it is unlikely that the BOC, ICBC, CMB or officers of any of these entities would be subject to adverse legal consequences for so complying.

14.     I base this opinion on the relationship of these three banks to the Chinese government as well as on the fact that the BOC appears to have experienced no adverse legal consequences from its compliance with an earlier freezing order.  Indeed, Professor Wu acknowledges in his Declaration of May 17, 2011 that there are no reported cases of Chinese

---

[10] Examples of China's statement of its policy may be found at 3,000 People Arrested for IPR Violations Since November, People's Daily, March 14, 2011.  Available at http://english.peopledaily.com.cn/90001/90776/90882/7318187.html (visited May 22, 2011 and attached as Exhibit D) and in Improved IPR Protection to Support Innovation,  People's Daily, March 14, 2011.  Available at http://english.peopledaily.com.cn/90001/90776/90882/7318677.html (visited May 22, 2011 and attached as Exhibit E).  The United States Trade Representative recognized the on-going seriousness of intellectual property infringement by placing China on its so-called "priority watch-list" earlier this month.  See http://www.ustr.gov/about-us/press-office/reports-and-publications/2011/2011-special-301-report (visited May 22, 2011 and excerpts attached as Exhibit F).

banks or their officers being punished for compliance with a United States court order.[11]   I

endorse and incorporate in this declaration Professor Donald Clarke's 2011 Declaration in *Gucci*

*America, Inc., et.al. v. Li, et. al.,* 2010 Civ. 4974 (RJS) (SDNY) (appended as Exhibit G), which

has thoroughly addressed the question of the possibility of adverse consequences for complying

with an order of this court.  I will not, therefore, in my declaration repeat the full range of

information he provided in that declaration.

       15.     The BOC, ICBC, and CMB each asserts that its New York branch does not have

the "ability" to secure information from its head office or branches in the PRC needed for

Plaintiffs to vindicate their rights.[12]   The three banks cite no authority in either the law of the

United States or of the PRC for this proposition, leading to the inference that it is a matter of

internal policy that was set by each bank and can be adjusted by each bank.  Indeed, Article 22 of

the Law of the People's Republic of China on Commercial Banks provides that "A commercial

bank shall adopt a financial system of unified accounting and fund disposition and hierarchical

management in respect of its branches.  The branches of a commercial bank have no

qualifications of a legal person, and shall carry out business according to law within the scope of

authorization by the parent bank, which shall bear civil liabilities thereof."[13]

       16.     Counsel for the BOC and ICBC resort to hyperbole in seeking to deflect attention

from the nature of the relationship between the banks and the PRC government, suggesting that

---

[11]   Wu Declaration, paragraphs 30-31.  Wu's precise words are "The fact that one cannot find
reported decisions in these circumstances therefore does not mean it has not occurred."  But,
surely, the fact that one cannot find reported decisions should not be taken to mean it has
occurred.

[12]   Beauchemin Declaration; Luo Declaration; and Pagnotta Declaration.

[13]   Law of the People's Republic of China on Commercial Banks, Wu Declaration, Exhibit B-1.

that legitimate – indeed, necessary – inquiry "borders on offensive, and smacks of jingoism."[14]

But the fact is that, although the Chinese economy is much changed from Maoist days, it remains

quite different from that of the United States, with a far greater degree of state and Communist

Party involvement, including, very notably, in the financial services sector, as the highly

accomplished German scholar Sebastian Heilmann and the noted Australian journalist Richard

McGregor have each shown in important recent studies.[15]  As Professor Clarke documented in

detail in his 2011 Declaration, a majority of the BOC's A shares (67% as of the time of his

Declaration) are owned by the Central Huijin Investment Company Limited which, in turn, is

100% owned by the China Investment Corporation, which itself, is directly and wholly owned by

the Ministry of Finance of the PRC.[16]  Moreover, as Clarke further documented, "[s]enior

managers of both entities [BOC and Huijin] . . . are appointed through the Communist Party's

Central Organization Department (its personnel management system) and have official ranks."

As the BOC's own IPO prospectus stated, Huijin's function as a BOC shareholder is "to

represent the PRC government in exercising its investor rights and obligations and to implement

and execute PRC government policy arrangements in relation to the reform of state-owned

financial institutions."[17]

---

[14]  BOC-ICBC Brief, pp. 22-23.

[15]  Sebastian Heilmann, *Regulatory Innovation by Leninist Means: Communist Party Supervision in China's Financial Industry*, China Quarterly, no. 181 (2005), at 1, 17 (attached as Exhibit H).  Richard McGregor, The Party:  The Secret World of China's Communist Rulers (2010), at 34-69, 280-82.

[16]  Clarke Declaration, paragraph 19.

[17]  Id.

17.     The same logic applies to the ICBC and CMB.  The government of China owns more than 70% of the A shares of the ICBC, with Huijin and the Ministry of Finance itself each holding slightly more than 35%.  CMB's ownership is more widely dispersed but the top 10 holders of its A shares are all state owned enterprises and no private shareholder owns more than 1.2% of its A shares.  In the words of the Federal Reserve Board (United States), "CMB is indirectly controlled by the Government of China through a number of wholly owned companies."[18]

18.     In his Declaration of May 17, 2011, Professor Wu cites the example of the enforcement of non-Chinese arbitral awards against two state-owned companies (the Ningxia Huiye Magnesium Co., Ltd and the Wuhu Smeltery Company) for the proposition that China is not hesitant to "enforce Chinese laws against entities that are partially or fully owned by the government."[19]  These cases are inapposite.  The BOC, ICBC, and CMB are not relatively obscure industrial enterprises but leaders of the financial sector with several billions of dollars of assets that are pillars of the Chinese economy and absolutely central to the government's program of development.  As the Financial Times, one of the most respected business newspapers in the world has noted, "China's banks operate like government departments."[20]

---

[18]  The Federal Reserve Board, Federal Reserve Bulletin volume 94, 2008.  At www.federalreserve.gov/pubs/bulletin/2008/legal/q407/order7.htm (visited May 22, 2011 and excerpt attached as Exhibit I).

[19]  Wu Declaration, paragraph 32.

[20]  Jamil Anderlini, *Chinese Officials to Run Three Banks*, Financial Times, June 21, 2007, cited in Clarke Declaration, paragraph 19 (attached as Exhibit J).

Indeed, as Professor Clarke indicates in his Declaration, "the head of the BOC, for example, has an official rank equal to a vice minister."[21]

19.      That the BOC, ICBC, and CMB, and their officers would not be likely to experience adverse legal consequences were they to comply with an order of this court is confirmed by the fact, as discussed in Professor Clarke's Declaration, that the "BOC has already complied with an earlier freezing order without, apparently, any negative repercussion."[22]  As Clarke indicates, in that instance, counsel for the BOC indicated in a letter to the Honorable John G. Koeltl (the judge in the Myreplicahandbag.com case) that there was not customer consent and hence, there was a violation of Chinese law – and yet, there is no indication that the bank or its officers suffered any adverse legal consequences.

20.      In conclusion, it does not seem likely that the BOC, ICBC, CMB or their officers would suffer adverse legal consequences were they to comply with the order of a United States court in this case.

## IS THERE A STRONG LIKELIHOOD OF OBTAINING EVIDENCE FROM CHINA PURSUANT TO THE HAGUE CONVENTION?

21.      The BOC and ICBC assert that " a properly tailored request" through the Hague Convention  should enable Plaintiffs to secure information only available in China that is needed to obtain effective  and timely redress for the infringement they have experienced.[23]  This view (which is also expressed by CMB) is overly optimistic, given China's experience with the Hague

---

[21]  Clarke Declaration, paragraph 19.

[22]  Id., paragraph 17.

[23]  Feinerman Declaration, paragraph 6.

Convention and ignores uncertainty as to what, if anything, would constitute "a properly tailored request" in the current PRC setting.

22.     Although China ratified the Hague Convention in 1997, effective 1998, "[a]t the April 19, 2011 hearing [in this case], the Banks [BOC, ICBC, and CMB] could not provide the Court with any examples of Chinese officials providing meaningful or timely information to a U.S. trademark owner in a counterfeiting case, or even provide an estimate as to how long the process would take."[24]  This is not surprising, given that it at the time of its ratification, China entered a reservation indicating that "for the purpose of obtaining pre-trial discovery of documents as known in common law countries, only the request for obtaining discovery of the documents clearly enumerated in the Letters of Request and of direct and close connection with the subject matter of the litigation will be executed."[25]  Crucially, neither at that time nor since, have the terms "of direct and close connection with the subject matter of the litigation" been spelt out.

23.     Contrary to the banks' suggestion that the Hague Convention provides a ready path to obtaining evidence from China, several informed observers have published articles confirming the difficulty of utilizing the Hague Convention to obtain evidence from China.  Fang Shen, a lawyer from China trained both in the PRC and the U.S., noted in 2003 that "China apparently retains much discretion in determining what constitutes a 'direct and close connection with the subject matter of the litigation' for purposes of enforcing requests sent to Chinese

---

[24]  Motion to Compel, p. 19 (citing Weigel Decl. Ex. 15 at 23:20-25:9, 26:21-27:25, 39:6-20).

[25]  Available at http://www.hcch.net/index_en.php?act=conventions.status&cid=82 (visited May 22, 2011 and attached as Exhibit K).

authorities."[26]  Joseph Tanner and Li Dan of Baker & Daniels (the latter of the firm's Beijing

office) observed in 2008 that "the Hague Convention is of limited utility in China in large part

because its implementation remains uncertain and unpredictable," and further observed that "few

litigants…successfully compel either documentary or testimonial discovery" and that the Beijing

High Court executive "approximately one such request per year."[27]  The China specialist Dan

Harris of Harris & Moure, observed in his well-regarded blog in 2010 that "even for the

document discovery authorized in China…it is unlikely that the Chinese Central Authority will

instruct a Chinese court to compel production."[28]  Professor Donald Clarke of George

Washington University, one of the United States' leading experts in Chinese law, declared in

2011 it was his "opinion that a Hague Convention request issued by a United States court is not a

realistic or meaningful option."[29]  And Stephanie Scharf, a specialist in complex litigation

recognized as one of the leaders in her field, and her co-authors observed in 2011 that "discovery

of documents and witnesses located in China may prove difficult" and "letters of request…may

also prove ineffective."[30]

---

[26]  Fang Shen, *Are You Prepared for this Legal Maze? How to Serve Legal Documents, Obtain Evidence, and Enforce Judgments in China*, 72 UMKC L. Rev. 215 (2003).

[27]   Weigel Declaration, Exhibit 30.

[28]  China Law Blog – China Law for Business. Published by Harris & Moure, pllc,  How to Sue a Chinese Company, Part II. Discovery  (November 9, 2010), available at http://www.chinalawblog.com/2010/11/how_to_sue_a_chinese_company_part_ii_discovery. html (visited Mar 23, 2011 and attached as Exhibit L).

[29]  Clarke Declaration, paragraph 22.

[30]  Stephanie A. Scharf et al., Discovery of Documents and People Abroad, PLIREFPLL § 14.3 (2011).

24.     The BOC, ICBC and CMB point to a recent change in the wording of the U.S.
State Department's website notice regarding the Hague Convention in an effort to suggest that
Plaintiffs should rely on the Convention.[31]  While it is true that the State Department on May 13,
2011 deleted language indicating that the U.S. was "seeking clarification from China as to how
the Hague Convention would be applied" and suggesting that requests pursuant to the Hague
Convention had not been "particularly successful," the website now does no more than indicate
that China is a party to the Hague Convention and that China "has indicated that…obtaining
…evidence in China for use in foreign courts may, as a general matter, only be accomplished
through requests to its Central Authority under the Convention."[32]  In effect, the State
Department has received clarification from China as to its position and China's position is that
requests should be made under the Hague Convention.  This, in itself, is not an indication of the
likelihood of success of obtaining evidence from China under the Hague Convention.

25.     China, to be sure, by its own account, did in the first half of 2010, provide judicial
assistance in 37 cases (from throughout the whole world) involving obtaining evidence regarding
civil and commercial matters[33] but the first half of 2010 appears to have been a period of unique
intensity that would seem since to have abated.  This is demonstrated by the fact that a May 12,
2011 document from the Ministry of Justice center now charged with overseeing judicial
assistance requests observed that over each of the past five years "requests of execution of letters

---

[31]  BOC-ICBC Brief, pp. 10-11; CMB Brief, pp. 17-18.

[32]  See http://travel.state.gov/law/judicial/judicial_694.html (visited May 22, 2011).  Appended
as Exhibit D to Feinerman Declaration.

[33]  See http://www.moj.gov.cn/sfxzjlzx/content/2010-07/23/content_2206673.htm  (visited
May 22, 2011).  Original and translated version of this website appended as Exhibit C to
Feinerman Declaration.

rogatory or taking of evidence averaged 20 each year… [and] about 50% have been executed with timely transmittal to foreign requesting party."[34] This would suggest that over the past five years, China has only executed approximately 50 requests for judicial assistance in civil and commercial matters from throughout the whole world, meaning that with 37 having been executed in the first half of 2010, an average of approximately only 3 such requests appear to have been executed annually throughout the rest of the period. And, as the Ministry's center itself notes, these requests have taken "an average of six months to one year…to be executed." [35]

26.     In view of the foregoing, it does not seem likely that a Hague Convention request issued by a United States court would result in Plaintiffs in this case obtaining the information they seek in this case.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 24, 2011 in Cambridge, Massachusetts.

WILLIAM P. ALFORD

---

[34] See International Legal Cooperation Center of the Ministry of Justice [of the People's Republic of China], Reply Letter Concerning the Status of China's Civil and Commercial Judicial Assistance to Other Countries, paragraph 3, dated May 12, 2011. Original and translation appended as Exhibit S to the Saperstein Declaration.

[35] Id.