# EXHIBIT 8

U.S.-China Economic and Security Review Commission

Staff Research Report



May 05, 2015

# China's Great Legal Firewall: Extraterritoriality of Chinese Firms in the United States

Kevin Rosier, Policy Analyst, Economics and Trade

**Disclaimer**: This paper is the product of professional research performed by staff of the U.S.-China Economic and Security Review Commission, and was prepared at the request of the Commission to support its deliberations. Posting of the report to the Commission's website is intended to promote greater public understanding of the issues addressed by the Commission in its ongoing assessment of U.S.-China economic relations and their implications for U.S. security, as mandated by Public Law 106-398 and Public Law 108-7. However, the public release of this document does not necessarily imply an endorsement by the Commission, any individual Commissioner, or the Commission's other professional staff, of the views or conclusions expressed in this staff research report.

# Abstract

Chinese businesses participating in the U.S. financial services sector can effectively operate behind a firewall that keeps them largely immune from the jurisdiction of U.S. courts and regulatory agencies, leaving U.S. partners, competitors, and investors vulnerable. Multiple examples already exist of China-based banks and financial services firms using a complex multinational corporate structure of their own design and the shroud of Chinese law, including official secrecy laws, to remove themselves from U.S. legal and regulatory jurisdiction. Although the Hague Service and Evidence Conventions provide the legal framework for serving papers and obtaining evidence in legal disputes between U.S.- and China-based entities, China's interpretation of its obligations under these conventions differs from that of the United States and has resulted in many service of process and discovery requests being denied or significantly delayed. As such, pursuing legal recourse through the Hague Conventions is not a viable course of action for many U.S. plaintiffs. Greater legal protections for U.S. entities, including requiring Chinese firms in the United States to assign a domestic agent to receive legal papers such as subpoenas and court notifications, are a possible solution to this dilemma of jurisdiction.

# Introduction

Chinese banks, financial services firms, and publicly traded companies are increasingly benefiting from U.S. financial markets. Chinese state-owned banks have branches throughout the United States, and privately owned Chinese asset managers are increasingly using U.S. capital markets as a platform to trade China-based securities. In addition, the initial public offering (IPO) of the China-based e-commerce firm Alibaba marked the largest IPO in U.S. history, adding to a growing list of China-based companies and financial instruments that are traded on U.S. exchanges.[1] As long as Chinese firms continue to thirst for foreign capital, the presence of Chinese entities seeking financing in U.S. capital markets is expected to grow.

Some analysts have long argued that the increased presence of Chinese commercial entities in the United States and other developed markets would have positive spillover effects on the behavior of Chinese firms and rule of law in China. For example, Rhodium Group experts Daniel Rosen and Thilo Hanemann predicted the following outcome of Chinese firms' exposure to Western markets and legal standards:

> *Going abroad changes the situation [for Chinese businesses] fundamentally. Chinese firms operating in the United States and Europe will have to comply with local laws and regulations, and they are subject to U.S. courts and litigation, giving their competitors a greater arsenal of legal options in the case of improper behavior. Exposure to foreign regulators should also create a positive feedback loop back into China, pushing the government to realize that its own legal system is diminishing the chances for these firms to successfully compete overseas.[2]*

In other words, Rosen and Hanemann claim the jurisdiction of U.S. laws and courts over Chinese firms in the United States not only would provide greater legal protections to U.S. competitors, but also would indirectly improve the rule of law in China. Intuitively, this theory would also extend to Chinese firms listed on U.S. stock exchanges due to their required compliance with U.S. Securities and Exchange Commission (SEC) regulations, the Sarbanes-Oxley Act, and other financial laws and regulations.

However, the experience of Chinese firms participating in or listing on U.S. capital markets has yet to validate this theory. On the contrary, Chinese financial institutions can effectively operate behind a firewall that keeps them largely immune from the jurisdiction of U.S. courts and regulatory agencies, leaving U.S. partners, competitors, and investors vulnerable. The experiences of U.S. firms that have sought legal recourse for alleged violations of law by Chinese firms illustrate the challenges U.S. courts face in determining the jurisdiction of Chinese businesses. The standard international protocols for service of process and obtaining evidence against foreign firms are the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents[3] (hereafter the Hague Service Convention) and the Hague Convention on the Taking of Evidence Abroad (hereafter the Hague Evidence Convention), to which China and the United States are both signatories; however, China interprets its obligations under these treaties in a manner that effectively protects Chinese firms from U.S. litigation. Therefore, this procedural safeguard does not present a viable course of action for many U.S. plaintiffs.[4]

Multiple examples already exist of China-based financial institutions arguing that their complex multinational corporate structures and the need to comply with Chinese law, especially state and banking secrecy laws, makes them immune to U.S. jurisdiction. Given the growing trend of Chinese firms seeking financing from the United States, China's legal firewall may become an increasingly important shield for Chinese financial institutions participating in the United States, and a mounting vulnerability for U.S. plaintiffs that file grievances against them.

# Service and Discovery with Chinese Characteristics

The American Bar Association (ABA) describes service of process as "one of the most basic and fundamental elements of litigation."[5] The delivery of a court summons or a complaint filed by a plaintiff to the defendant is the crucial first step that opens a new case for litigation in a given jurisdiction and allows for court-approved discovery requests of relevant evidence. Although service of process is a routine task within the United States, international service of process is more complicated. And in the case of U.S. litigation against China-based firms, this critical first step is an almost impossible one.[6]

If a U.S. plaintiff files a complaint against a China-based firm, the typical first response from the Chinese firm is that it is not subject to U.S. jurisdiction.[7] A representative of the China-based company typically does not exist within the United States. Unable to pursue domestic service of process, the plaintiff must then navigate the more complicated and time-consuming international procedure. The Hague Service Convention—to which the United States and China are signatories—serves as the standard method for international service of process for U.S. litigants against China-based entities.[8] In most cases, when Chinese firms operating within the United States argue immunity from U.S. jurisdiction and reject a U.S. court summons or complaint, they direct the U.S. plaintiff to use the Hague Service Convention. Although in theory this is a valid course of action, China's interpretation of its Hague Service Convention obligations means this avenue is effectively denied to U.S. litigants.[9]

Service of process on a Chinese defendant via the Hague Service Convention is lengthy, bureaucratically burdensome, and generally unreliable. The ABA describes the process as an "indirect method" by which service papers are first presented to China's central government, which then disseminates them to the relevant local authorities who are supposed to transmit the papers to the defendant.[10] All paperwork must be translated into Chinese, and translations with any alleged inaccuracies are frequently rejected by the Chinese government. References to organizations "controlled by the Chinese government" or papers that name China's government as a defendant will not be served. According to the ABA, the process is unduly time consuming, and "cooperation cannot always be expected."[11] The processing time for achieving service via the Hague Service Convention is nearly twice as long in China as in other member countries.[12]

If a U.S. litigant is fortunate enough to achieve service of process to a Chinese defendant, it may still need to face the daunting task of obtaining evidence in China. The Hague Evidence Convention is the governing process by which transnational discovery requests are made.[13] According to China law expert Dan Harris, "Discovery in China can be difficult. Apart from the restrictions placed on discovery by the Chinese government, Chinese companies are not accustomed to U.S.-style discovery, and they often consider compliance to be optional."[14] Harris cites this State Department description of discovery in China under the Hague Evidence Convention:

> *While it is possible to request compulsion of evidence in China pursuant to a letter rogatory or letter of request (Hague Evidence Convention), such requests have not been particularly successful in the past. Requests may take more than a year to execute. It is not unusual for no reply to be received or after considerable time has elapsed, for Chinese authorities to request clarification from the American court with no indication that the request will eventually be executed.* [15],*

Some U.S. courts have recognized that China's interpretation of its obligations under the Hague Service and Evidence Conventions means these are not viable options for U.S. plaintiffs filing complaints against Chinese defendants. Such cases are typically left pending and unresolved indefinitely. However, without any legal

---

* At the time of this paper's publication, the State Department no longer includes this text in its description of China as a signatory to the Hague Evidence Convention. The current text simply notes that China is a party to the convention, and that the China Ministry of Justice is the designated agency to process discovery requests. See U.S. Department of State Bureau of Consulate Affairs, *Legal Considerations – China*, November 15, 2013. *http://travel.state.gov/content/travel/english/legal-considerations/judicial/country/china.html*.

alternative, U.S. judges continue to refer litigants to the Hague Conventions, as described in the cases presented below. Even if the U.S. plaintiff is able and willing to navigate the long legal process to serve papers in China via the Hague Service Convention, that plaintiff often achieves little since the Chinese defendant can still refuse to appear in a U.S. court or honor discovery requests under the Hague Evidence Convention. These cases are typically left in a legal limbo without resolution.

Thus, the extraterritoriality[*] of Chinese firms in the United States exists from the earliest stages of a civil dispute: the serving of a complaint (service of process) and the acquisition of evidence (discovery). Without any viable option for service of process and discovery, U.S. litigants are often powerless even to initiate a case against a China-based financial institution in the United States.

# The Question of Jurisdiction: A Dilemma for U.S. Courts

U.S. litigants are not the only actors in the United States that struggle with determining the jurisdiction of China-based financial institutions. Prior case law indicates U.S. courts are likewise uncertain about proper jurisdiction. As noted above, courts are usually left with few options except to leave cases unresolved. Although the history of U.S.-based litigation against Chinese entities is short, some examples already exist that illustrate the dilemma U.S. courts face when ruling on cases against Chinese defendants.

## U.S. Litigation of Chinese Counterfeit Payments

Given their relatively high volume, counterfeit cases are the most indicative of the challenges U.S. courts encounter in ruling on cases against Chinese defendants. Three different counterfeit cases against Chinese banks filed within the span of one year from a single U.S. district court, the Southern District of New York (SDNY), demonstrate the inconsistency of rulings. Chinese banks involved in all three cases rejected requests from the SDNY to provide account evidence related to payments involved in counterfeit transactions. Furthermore, the inability of SDNY judges to compel the banks to cooperate has prevented U.S. litigants from receiving any recourse.

### *Tiffany LLC v. Qi Andrew*[16]

In July 2011, the luxury jewelry manufacturer Tiffany LLC filed a trademark infringement suit against multiple Chinese counterfeiters. Tiffany accused the defendants of selling counterfeit products online and using a third party online payment platform to transfer payments to Chinese bank accounts belonging to the Bank of China (BOC), Industrial and Commercial Bank of China (ICBC), and China Merchants Bank (CMB). The SDNY District Court granted Tiffany's motion for a preliminary injunction, including discovery instructions directed at the New York branches of the Chinese banks to produce financial records in China related to the counterfeit sales. Despite being branch offices of Chinese financial institutions, each of the three banks objected to the subpoenas, stating they did not have "possession, custody or control" of any bank documents located outside the United States.[17] The U.S.-based affiliate banks argued that because the New York and China branches have separate computer systems, the New York branches could not compel the China branches to produce account information.

In addition, the Chinese banks rejected the discovery requests outright, arguing that compliance would violate Chinese domestic law. They cited China's Commercial Bank Law; the Provisions on the Administration of Financial Institutions' Assistance in the Inquiry into, Freeze or Deduction of Deposits; and China's Criminal Law. In short, the New York branches of the banks argued paradoxically that while the U.S. arms of the Chinese banks

---

[*] The term "extraterritoriality" in this paper refers to its general definition: the exemption from the application or jurisdiction of local law or tribunals.

are protected by Chinese laws prohibiting access to China-based account information, the U.S. and China branches are also sufficiently separate such that the U.S. branches cannot compel discovery of evidence out of China.

The SDNY judge who presided over this case recognized the inconsistency of the Chinese banks' arguments, but was still unable to issue a ruling that would force them to comply with U.S. law and cooperate with discovery requests. Specifically, the judge rejected the New York branches' claim that they did not have control over financial records in China. However, in doing so, the judge was also accepting the banks' secondary argument that bank records are protected by Chinese laws. He therefore had no alternative but to direct Tiffany to make its discovery request through the Hague Evidence Convention, despite China's history of rejecting or delaying discovery requests under the treaty.[18]

More than one year later, Tiffany had received only a small portion of the documents it requested from the banks, and so asked the SDNY District Court to reconsider its decision to direct discovery requests via the Hague Evidence Convention. The U.S. judge denied Tiffany's request again, leaving the Chinese banks effectively exempt from U.S. jurisdiction. Nearly four years since it was first filed, the case remains pending after multiple requests by Tiffany for a ruling—including relief in the form of an asset freeze of the bank accounts involved—were rejected by the SDNY District Court.

### *Gucci America v. Weixing Li*[19]

In a similar trademark infringement case, Gucci America, Inc. filed a suit in August 2011 in the SDNY District Court against multiple Chinese defendants who sold imitation handbags online. As in Tiffany LLC v. Qi Andrew, Gucci America sought evidence of Chinese bank records related to transactions involved in the counterfeit business, in this case only from the BOC. As it did in the Tiffany case, the BOC argued it only had control over records in its New York branch, and claimed that obtaining records in China would violate Chinese law. However, in this case, the judge ruled that China's poor compliance with the Hague Conventions meant resorting to this process would be "unduly time consuming and expensive, as well as less certain to produce the needed evidence than direct use of the Federal Rules of Civil Procedures."[20] In his ruling, the SDNY judge held that "Hague Convention requests in circumstances similar to those presented [in this case] are not a viable alternative method of securing the information Plaintiffs seek."[21] The BOC refused to comply with the ruling and was given a $75,000 financial sanction.

However, in December 2013, the BOC appealed the decision and the U.S. Court of Appeals for the Second Circuit overturned the original ruling on the basis that the SDNY did not have jurisdiction over the BOC. The Second Circuit Appeals Court ruled the SDNY District Court judge had abused his discretion in holding the BOC in contempt, and that the bank was not subject to general personal jurisdiction in New York. Subsequently, in December 2014, Gucci America filed a new motion to compel production of BOC account information, arguing that the BOC's New York branch has sufficient contact with its China headquarters to exercise jurisdiction. The BOC has yet to file its opposition; more than four years since the original filing, the case remains unresolved.

### *Tiffany LLC v. Forbse*[22]

In a third case also involving Tiffany, the SDNY court came to yet a third conclusion despite otherwise similar circumstances. In this case, the role of the BOC, the ICBC, and the CMB was generally the same as in Tiffany LLC v. Qi Andrew, with the exception that the BOC itself—rather than a third party—handled the online payments for the counterfeit retailers involved. The three banks made the same arguments as in the aforementioned two cases, but in this ruling the judge held that Tiffany should only follow the Hague Evidence Convention process for obtaining evidence from the ICBC and the CMB. Because the BOC was also the bank that administered the

counterfeit transactions, the judge ordered the bank to comply with Tiffany's domestic discovery requests. In her ruling, the judge expressed suspicion that the BOC was knowingly withholding crucial evidence.

As part of her final decision, the judge also acknowledged that significant state ownership of Chinese banks makes it highly unlikely they would face any punitive action in China for failure to comply with discovery requests. The judge referenced a letter to the SDNY from China's central bank, the People's Bank of China (PBOC), and the China Banking Regulatory Commission (CBRC), which promised that the two banking regulators would cooperate closely with the China Ministry of Justice (MOJ) to ensure the banks complied with Hague Evidence Convention requests in a timely manner. In her ruling, the judge was skeptical of the PBOC and CBRC pledges, stating:

> *Although we are reluctant to conclude with any certainty how a foreign nation will choose to implement its own laws, we cannot ignore the reality that the Chinese government holds large ownership interests in the Banks and that the Banks have not been sanctioned for complying with discovery orders issued by a U.S. court under similar circumstance....We conclude that the possibility of sanctions 'is speculative at best,'...and therefore the potential hardship of compliance is not a factor that weighs in favor of amending the discovery order.[23]*

In short, as a major shareholder of Chinese banks, the Chinese government has no incentive to punish the banks for failing to comply with Hague Evidence Convention discovery requests. Moreover, Chinese banks have no incentive to comply with transnational discovery requests.

On appeal, the U.S. Court of Appeals for the Second Circuit added to the ambiguity surrounding U.S. courts' jurisdiction over China-based entities. It ruled the lower court did not have general jurisdiction over the banks, including the BOC, because the banks' primary operations were based in China. However, it upheld the judge's authority to issue a prejudgment asset freeze on the accounts involved in the case, despite a lack of jurisdiction. The decision prompted a strong reaction from the Chinese government, whose embassy in Washington, DC, submitted a letter to the State Department on May 15, 2013, complaining about U.S. courts serving subpoenas and issuing asset freezes on U.S. branches of Chinese banks. In the letter, the Chinese government said it "firmly objects to such wrongful acts that disrespect China's sovereignty and laws, and reserves the right to take equivalent actions."[24] Following the appeal decision, the SDNY case remains pending more than three years after it was filed.

## Enforcing the U.S. Antiterrorism Act against Chinese Entities

In 2012, the U.S. Antiterrorism Act (ATA) and China's bank secrecy laws collided when the BOC again claimed immunity from U.S. jurisdiction in a case involving alleged terrorist financing and a suicide bombing in Israel. In Wultz v. Bank of China Ltd., relatives of a suicide bombing victim filed a suit against the BOC, claiming that the bank aided and abetted international terrorism in violation of the ATA.[25] Similar to the counterfeit cases described above, the plaintiffs filed a motion to compel the BOC to provide documents under its control. Consistent with its practice of avoiding litigation in the United States, the BOC rejected the motion, arguing it is not subject to U.S. jurisdiction, and that producing the requested evidence would violate Chinese bank secrecy laws. In addition, the BOC also argued that China has an interest in building confidence in its banking sector, which would imply the Chinese government would be prompt in honoring discovery requests.[26]

In this case, the SDNY District Court upheld the motion to compel the BOC to provide evidence, noting the Hague Evidence Convention discovery process is optional and "does not deprive the court of the jurisdiction it would otherwise possess to order a foreign national appearing before it to produce evidence physically located within a signatory nation."[27] As in earlier cases, the SDNY District Court noted that obtaining discovery materials in China via the Hague Evidence Convention was unduly difficult, and the plaintiffs lacked sufficient discovery alternatives.

(That said, the SDNY District Court did write a letter to the MOJ requesting some documentation under the Hague Evidence Convention—a letter to which the MOJ responded nearly one year later.)[28]

The judge's decision to reject the Hague Evidence Convention discovery process was based on the following justifications:

- In prior similar cases, such as Tiffany LLC v. Qi Andrew, the MOJ denied valid Hague Convention discovery requests that were "of direct and close connection with the subject matter of the litigation." Assuming a similar standard in this case, the court expected the MOJ would likewise deny relevant discovery requests in the Wultz case.
- The elapsed time of nearly one year between the SDNY's letter to the MOJ and the hearing called into question whether evidence can be easily obtained through the Hague Evidence Convention process in China for this case.
- The BOC's argument that China's interest in building confidence in its banking sector "does not encompass an interest in protecting the confidentiality of those who participate in the funding of international terrorism."
- In response to its claim that producing evidence would violate Chinese banking secrecy laws, the BOC failed to produce evidence that the MOJ meaningfully sanctioned the bank in prior cases where the bank honored the U.S. courts' discovery orders.[29]

The SDNY District Court's decision reflects the most detailed justification thus far for requiring Chinese defendants to comply with discovery requests in U.S. courts without resorting to the ineffective Hague Evidence Convention option. However, the judge's ruling on this issue has been insufficient to fully remedy the question of Chinese firms' extraterritoriality claims. The BOC continues to file requests for reconsideration of the U.S. plaintiff's multiple pleas to compel discovery and the court's orders granting the requested discovery. In addition, in July 2014, three years after the court's original letter requesting discovery under the Hague Evidence Convention was sent, the MOJ finally responded, rejecting the request for evidence "on grounds of prejudice to China's national sovereignty and security." [30],* The case remains pending, with minimal progress on discovery.

# Chinese Litigation Risk and U.S. Capital Markets

The cases above illustrate how Chinese banks remain largely immune from U.S. jurisdiction, despite efforts by some district courts to rule otherwise. However, most of these cases do not necessarily have wider economic implications for the United States. Recently, however, China-based companies participating in or listing on domestic U.S. financial markets increasingly have come under scrutiny for their claims of immunity from U.S. law. The extraterritoriality claims of Chinese entities accused of investment-related fraud and other illegal financial market activity can affect not only U.S. competitors of Chinese firms, but also U.S. investors and the integrity of U.S. capital markets.

## Chinese Reverse Mergers

From 2010 to 2012, U.S. investors filed multiple shareholder class action lawsuits against Chinese companies that used reverse mergers as a means of listing on U.S. exchanges and fraudulently obtaining U.S. financing.† These

---

* This justification is based on Article 12 of the Hague Evidence Convention.
  *http://www.hcch.net/index_en.php?act=conventions.text&cid=82*
† A reverse merger is a way for a private company to go public, typically through a simpler, shorter, and less expensive process than a standard IPO. For a Chinese reverse merger in the United States, the owner of a private Chinese company initially buys enough shares to control a U.S. company that is already publicly traded. The shareholder then uses its shares in the private Chinese company to exchange

cases demonstrated the difficulty of achieving service of process to and discovery of evidence from Chinese defendants in investment-related cases. In 2011, nearly 20 percent of securities lawsuits in the United States involved U.S.-listed Chinese companies.[31] Over the full three-year period that saw a spike in Chinese reverse mergers, lawsuits against these companies accounted for about 10 percent of cases.[32] According to legal experts, one of the most worrisome aspects about Chinese reverse mergers was that U.S. shareholders would be unable to seek recourse if they had been defrauded.[33] In most cases, this was due to Chinese firms' extraterritoriality claims in the United States and the protection of nontransparent accounting procedures in China.

Despite the high-profile nature of the Chinese reverse merger phenomenon, shareholders faced significant procedural obstacles bringing Chinese reverse merger companies to court, including locating and serving defendants.[34] For example, in 2010, U.S. shareholders of the Chinese firm Duoyuan filed a suit in the SDNY District Court claiming the Chinese defendants made false and fraudulent statements in a prospectus for the company's U.S. IPO. The U.S. shareholders were initially unable to achieve service of process simply because they could not obtain addresses for the defendants. The plaintiffs requested that the court compel the company to provide the information, but the SDNY District Court denied the request, directing the plaintiffs to request the information via the Hague Evidence Convention.

In addition to procedural challenges, U.S. shareholders were also often unable to obtain sufficient information about reverse mergers' auditing procedures in China. They were therefore unable "to plead the fraudulent circumstances with sufficient particularity."[35] For example, in a case involving a Chinese reverse merger in the Central District of California, the court granted the Chinese defendant's request to dismiss the case "because plaintiffs failed to allege with sufficient specificity that the information filed with the SEC was false," even though there were obvious discrepancies between earnings reported to the SEC and the China State Administration for Industry and Commerce.[36]

## Investigating Chinese Compliance with U.S. Accounting Laws

Another example of how Chinese firms traded on U.S. markets have benefited from a clash between U.S. and Chinese law is in the case of SEC enforcement of the Sarbanes-Oxley Act. To enforce compliance with the law, the SEC sought the requisite audit paperwork of Chinese firms listed on U.S. stock exchanges from the Chinese affiliates of the Big Four U.S.-based accounting firms (Ernst & Young, KPMG, Deloitte Touche Tohmatsu, and PricewaterhouseCoopers). In this case, the SEC is both the prosecutor and enforcer of the Sarbanes-Oxley Act, and has been the chief U.S. government body involved; the Chinese affiliates of the Big Four U.S.-based accounting firms are the de facto defendants.[37]

Since the SEC first filed its suit in 2012, the Chinese arms of the Big Four accounting firms have argued they are legally prohibited by the China State Secrets Law, Archives Law, privacy laws, and China Securities Regulatory Commission (CSRC) regulations from sharing certain information belonging to their clients' businesses in China.[38] The Big Four firms initially claimed that if they violated these laws, they would be subject to regulatory sanctions, severe penalties, and possible prison sentences in China. In short, the Big Four firms faced a dilemma: in order to comply with Chinese law, they would have to violate U.S. law, namely the Sarbanes-Oxley Act.

---

for shares in the public U.S. company. Through these transactions, the private Chinese company has effectively become a publicly traded U.S. company. Companies that go public via reverse mergers often use a publicly traded shell company or company that was formerly operable but became defunct. Reverse mergers are not illegal in the United States; however, between 2010 and 2012, about one-third of Chinese reverse mergers listed on U.S. exchanges were accused of fraud (http://www.investopedia.com/articles/stocks/09/introduction-reverse-mergers.asp; http://www.forbes.com/sites/martinzwilling/2014/05/02/is-a-reverse-merger-the-way-to-fund-your-startup; http://www.gsb.stanford.edu/insights/charles-lee-how-well-do-chinese-reverse-mergers-perform).

The SEC action prompted U.S. and Chinese regulators to accelerate on-going negotiations to resolve tensions between U.S. and Chinese banking and accounting laws. These diplomatic negotiations culminated in an announcement at the 2013 U.S.-China Strategic and Economic Dialogue (S&ED) in which China pledged that its central bank (the PBOC) and CSRC would begin providing required audit paperwork to the SEC and the Public Company Accounting Oversight Board (PCAOB). The S&ED pledge appeared initially to resolve the issue when reports became public that the CSRC had provided some audit paperwork to U.S. regulators in December 2013. The Big Four firms used the S&ED announcement as a justification to request a dismissal of the SEC's suit.[39]

However, despite diplomatic progress, the SEC Administrative Court denied the Big Four firms' request for dismissal and ruled in January 2014 that the Big Four firms' "willful refusal" to comply with the SEC's initial requests was a violation of law. The SEC then issued a suspension of the Chinese units of the Big Four firms from "appearing or practicing before the SEC for six months," an action that would have temporarily barred Chinese firms that sought to list on U.S. exchanges from hiring the Big Four accounting firms.[40] The Big Four firms immediately appealed the decision and shifted to a strategy of negotiating a settlement with the SEC.

In order to comply with the Sarbanes-Oxley Act, the Big Four accounting firms sought cooperation from the CSRC to provide many of the documents they originally refused to submit to the SEC out of concern for violating Chinese law. After extensive negotiations, the CSRC permitted the documents to be submitted to the SEC. In February 2015, the SEC and the Big Four firms' China units were thus able to reach a settlement agreement: the SEC sanctioned each of the firms with a $500,000 fine and required them to admit that they did not produce documents before the proceedings were instituted against them in 2012.[41] The SEC's statement regarding the settlement holds the Big Four firms accountable "for previously violating U.S. rules" and "makes clear that should production of documents cease, the SEC can restart the administrative proceeding."[42] The CSRC denied it was a party to the settlement and claimed it had no information on the matter.[43]

Although the dispute between the SEC and the Big Four firms appears to be resolved for now, observers are skeptical that the $500,000 sanction and admission of failure to produce required documents place sufficient pressure on Chinese firms to comply fully in future accounting investigations.[44] In short, the settlement failed to target the ultimate source of the problem: in order for Chinese firms to comply with the Sarbanes-Oxley Act, they inevitably violate China's state secrecy laws. Peking University Accounting Professor Paul Gillis says that U.S. regulators must be more "willing 'to just say no' to listing companies that are not willing or able to fully comply with U.S. laws."[45] Thus, Gillis argues that suspending such firms from listing on U.S. financial markets would be a far more effective tool at ensuring compliance with Sarbanes-Oxley.

## China-Based Financial Instruments

In addition to Chinese company stock, China-specific financial instruments are also proliferating on U.S. capital markets. China-specific mutual funds and exchange-traded funds (ETFs) traded in the United States are popular and convenient vehicles for U.S. investors to invest in a diverse basket of Chinese companies, bonds, and other domestic securities. Moreover, the trading of these instruments on U.S. markets gives U.S. investors the impression of a more secure investment under the protection of U.S. financial regulations and law.

However, as in the cases outlined above, the Chinese asset managers involved in establishing and listing China-specific mutual funds and ETFs in the United States can hide behind China's de facto firewall and the ambiguity of their jurisdiction. Although the popularity of such China-specific financial instruments is a recent phenomenon, at least one example of a failed attempt at U.S. litigation against a Chinese defendant demonstrates the high risk involved.

The Harvest Funds Intermediate Bond Fund was among the first China-specific mutual funds to be distributed in the United States.[46] The fund was established in New York, NY_by a U.S.-China joint venture between U.S.-based Krane Distribution (hereafter KD) and the Hong Kong subsidiary of Beijing-based asset manager Harvest Fund Management (HFM).[47] HFM marketed the mutual fund as "the first time an investment product actively managed by a Chinese asset manager is available in the United States."[48] According to the company, the added value of the mutual fund was HFM's ability to provide expert understanding from within China of the country's otherwise opaque bond market. The joint venture was established under an exclusive distribution agreement that temporarily restricted HFM from launching mutual funds in the United States with partners other than its U.S.-based partner, KD.[49]

In 2014, KD filed complaints against its Chinese joint venture partner for allegedly violating the terms of its exclusive distribution agreement, and for the alleged theft of intellectual property (IP). KD accused HFM's Hong Kong subsidiary of prematurely terminating the exclusive agreement and seeking to market unilaterally the Harvest Funds Intermediate Bond Fund and future prospective funds without cooperating with or compensating KD.[50] Moreover, KD accused HFM of IP theft and anticompetitive harm for allegedly stealing KD's plans for a prospective Harvest-KD ETF and launching it jointly with Deutsche Bank instead. KD filed the contract violation complaint in the Delaware Court of Chancery and the IP theft complaint in the SDNY District Court.[51]

HFM moved to dismiss KD's claims on the basis that the court lacks jurisdiction over a Chinese entity. Similar to other cases of Chinese defendants in the United States, HFM used legal barriers and its multilayered corporate structure to protect itself from U.S. jurisdiction. In response to KD's complaints, HFM's U.S. distribution arm Harvest USA, Inc. argued that its Chinese parent company HFM and HFM's Hong Kong subsidiary were immaterial parties to the joint venture, and thus only Harvest USA, Inc. could be served. In a letter to the SDNY District Court, the defendant stated that the parent company in Beijing "would not participate as a shareholder in the Company or undertake any obligations relating to the Company's management, operations, or financing."[52] In doing so, HFM's U.S. shell could protect its parent company from having to accept service of process or provide evidence from China directly to the U.S. courts.[*]

HFM's argument appeared to directly contradict its own marketing strategy for the Harvest Funds Intermediate Bond Fund, which stated that active management by a domestic Chinese asset manager (the parent company HFM) was a defining characteristic of the fund. On the other hand, HFM's Hong Kong subsidiary and U.S. distribution arm are simply vehicles by which HFM can access overseas markets. In short, HFM's multilayered corporate structure appears designed to protect the company from just this kind of litigation. Fittingly, in a letter to the court, HFM's own legal representatives even described partnership with the Chinese company as a "risky business venture."[53]

Thus far, HFM's ability to hide behind its corporate structure has stalled these cases' progress in U.S. courts, and prevented the company from having to accept service of process. As a result, despite the fact the joint venture is U.S.-based and the mutual fund is traded on U.S. markets, KD will likely have few alternatives but to arbitrate the cases in Hong Kong with HFM's local subsidiary, or file a lawsuit directly against HFM in China. Furthermore, if U.S. investors or financial intermediaries that distribute the joint venture's mutual fund seek retribution for any

---

[*] In the SDNY District Court case, HFM's parent company in China has moved to dismiss the case for lack of jurisdiction. The parties are in the process of briefing this motion, and the court has not yet decided. The Delaware Chancery Court referred that case to arbitration, and those proceedings between KD, Harvest USA, Inc. (HMF's U.S. arm), and Harvest Global Investments Ltd. (HFM's Hong Kong subsidiary) are pending.

fraudulent activity or misuse of investment funds by HFM, they will likewise be unable to rely upon U.S. courts to mediate.

## Conclusions and Policy Options

The preceding discussion indicates Chinese companies participating in or listing on U.S. financial markets are often protected by a Chinese legal firewall and multilayered corporate structures that can keep them largely immune from U.S. jurisdiction, leaving U.S. partners, competitors, and investors vulnerable. The cases presented here of U.S. firms and investors that have sought legal recourse for alleged violations of law by Chinese entities in the United States illustrate the challenges U.S. courts face in determining the jurisdiction of Chinese businesses. Specifically, this paper draws the following key conclusions:

- Chinese financial institutions operating in the United States usually deny they are subject to U.S. jurisdiction, and reject service of process and discovery requests from U.S. courts. U.S. judges typically resort to ordering plaintiffs to conduct service of process under Hague Service Convention procedures.
- China's government has interpreted its obligations under the Hague Conventions in a manner that results in frequently rejecting or severely delaying service of process and discovery requests made under the treaty, as compared with the U.S. interpretation of the treaties. Without this option, U.S. plaintiffs often have no alternative processes by which to obtain evidence against Chinese defendants.
- Several civil and class action lawsuits filed by U.S. businesses remain unresolved because Chinese defendants claim they are not subject to U.S. jurisdiction, and discovery requests via the Hague Evidence Convention in China are not fully honored.
- As Chinese company shares and financial products traded on U.S. capital markets increase, U.S. courts will likely face a greater challenge in judging how to handle civil lawsuits against Chinese defendants. Likewise, U.S. businesses and investors will be increasingly vulnerable without the protection of the U.S. judicial system when engaging with Chinese affiliates and entities operating in the United States.

Policy options that would help U.S. courts' dilemma in determining jurisdiction over Chinese firms participating in U.S. financial markets include:

- U.S. government monitoring and reporting on rule of law in foreign countries and the nature of China's implementation of its Hague Convention obligations would raise awareness about the challenges of litigating against Chinese defendants in the United States, including service of process and discovery.
- Regulations could be issued that require foreign businesses from countries with poor domestic rule of law and inadequate implementation of the Hague Conventions, such as China, to assign an agent for service of process to be based in the United States as a prerequisite for access to U.S. financial markets. The presence in the United States of an agent for service of process from a Chinese parent company would help address U.S. judges' dilemma of determining personal jurisdiction.
- U.S. regulators could be more active in suspending foreign firms that are not willing or able to comply with U.S. laws, such as the Sarbanes-Oxley Act, from U.S. financial markets.[54] Moreover, increased pressure on China to fulfill its 2013 S&ED commitment to share audit paperwork with the SEC and PCAOB would help ease tensions between China's banking secrecy laws and the Sarbanes-Oxley Act.
- Legislation definitively declaring that China-based firms which list on or participate in U.S. financial markets are subject to the jurisdiction of U.S. courts would eliminate any ambiguities about this jurisdiction.

# Endnotes

[1] Prudence Ho, "Alibaba to Inspire U.S. Listings Among Chinese Internet Companies," Wall Street Journal, August 13, 2014. *http://www.wsj.com/articles/more-chinese-internet-companies-to-list-in-new-york-after-alibaba-1407932402.*

[2] Daniel Rosen and Thilo Hanemann, "The Rise of Chinese Overseas Investment and What It Means for American Businesses," *China Business Review*, July 1, 2012. *http://www.chinabusinessreview.com/the-rise-in-chinese-overseas-investment-and-what-it-means-for-american-businesses/.*

[3] Hague Conference on Private International Law, "Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters," November 1965. *http://www.hcch.net/index_en.php?act=conventions.pdf&cid=17.*

[4] Frederick Longer, "Service of Process in China," *American Bar Association*, April 2012. *http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/sac_2012/19-1_service_of_process_in_china.authcheckdam.pdf.*

[5] Frederick Longer, "Service of Process in China," *American Bar Association*, April 2012. *http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/sac_2012/19-1_service_of_process_in_china.authcheckdam.pdf*

[6] Frederick Longer, "Service of Process in China," *American Bar Association*, April 2012. *http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/sac_2012/19-1_service_of_process_in_china.authcheckdam.pdf*

[7] Frederick Longer, "Service of Process in China," *American Bar Association*, April 2012. *http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/sac_2012/19-1_service_of_process_in_china.authcheckdam.pdf*

[8] Hague Conference on Private International Law, "Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters," November 1965. *http://www.hcch.net/index_en.php?act=conventions.pdf&cid=17.*

[9] Frederick Longer, "Service of Process in China," *American Bar Association*, April 2012. *http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/sac_2012/19-1_service_of_process_in_china.authcheckdam.pdf*

[10] Frederick Longer, "Service of Process in China," *American Bar Association*, April 2012. *http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/sac_2012/19-1_service_of_process_in_china.authcheckdam.pdf*

[11] Frederick Longer, "Service of Process in China," *American Bar Association*, April 2012. *http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/sac_2012/19-1_service_of_process_in_china.authcheckdam.pdf*

[12] Frederick Longer, "Service of Process in China," *American Bar Association*, April 2012. *http://www.americanbar.org/content/dam/aba/administrative/litigation/materials/sac_2012/19-1_service_of_process_in_china.authcheckdam.pdf*

[13] Hague Conference on Private International Law, "Convention on the Taking of Evidence Abroad in Civil or Commercial Matters," March 1970. *http://www.hcch.net/index_en.php?act=conventions.text&cid=82.*

[14] Dan Harris, "How to Sue a Chinese Company. Part II: Discovery," *China Law Blog*, November 2010. *http://www.chinalawblog.com/2010/11/how_to_sue_a_chinese_company_part_ii_discovery.html.*

[15] Dan Harris, "How to Sue a Chinese Company. Part II: Discovery," *China Law Blog*, November 2010. *http://www.chinalawblog.com/2010/11/how_to_sue_a_chinese_company_part_ii_discovery.html.*

[16] Tiffany LLC v. Qi Andrew, 276 F.R.D. 143 (S.D. New York 2011).

[17] Tiffany LLC v. Qi Andrew, 276 F.R.D. 143 (S.D. New York 2011).

[18] Tiffany LLC v. Qi Andrew, 276 F.R.D. 143 (S.D. New York 2011).

[19] Gucci America, Inc. v. Weixing Li, WL 6156939 (S.D. New York 2011); Gucci America, Inc. v. Weixing Li, WL1883352 (S.D. New York 2012); Gucci America, Inc. v. Weixing Li, WL 5992142 (S.D. New York 2012); and Gucci America, Inc. v. Weixing Li, 768 F.3d 122 (2nd Cir. 2014).

[20] Gucci America, Inc. v. Weixing Li, WL 6156939 (S.D. New York 2011); Gucci America, Inc. v. Weixing Li, WL1883352 (S.D. New York 2012); Gucci America, Inc. v. Weixing Li, WL 5992142 (S.D. New York 2012); and Gucci America, Inc. v. Weixing Li, 768 F.3d 122 (2nd Cir. 2014).

[21] Gucci America, Inc. v. Weixing Li, WL 6156939 (S.D. New York 2011); Gucci America, Inc. v. Weixing Li, WL1883352 (S.D. New York 2012); Gucci America, Inc. v. Weixing Li, WL 5992142 (S.D. New York 2012); and Gucci America, Inc. v. Weixing Li, 768 F.3d 122 (2nd Cir. 2014).

[22] Tiffany LLC v. Forbse, WL 3686289 (S.D., New York 2012); Tiffany LLC v. China Merchants Bank, WL 4627662 (C.A.2 NY 2014); and Tiffany LLC v. Forbse, WL 191886 (S.D., New York 2012).

[23] Tiffany LLC v. Forbse, WL 3686289 (S.D., New York 2012); Tiffany LLC v. China Merchants Bank, WL 4627662 (C.A.2 NY 2014); and Tiffany LLC v. Forbse, WL 191886 (S.D., New York 2012).

[24] Tiffany LLC v. Forbse, WL 3686289 (S.D., New York 2012); Tiffany LLC v. China Merchants Bank, WL 4627662 (C.A.2 NY 2014); and Tiffany LLC v. Forbse, WL 191886 (S.D., New York 2012).

[25] Wultz v. Bank of China Limited, 910 F.Supp.2d 548 (S.D. New York 2012); Wultz v. Bank of China Limited, 942 F.Supp.2d 452 (S.D. New York 2013).

[26] Wultz v. Bank of China Limited, 910 F.Supp.2d 548 (S.D. New York 2012); Wultz v. Bank of China Limited, 942 F.Supp.2d 452 (S.D. New York 2013).

[27] Wultz v. Bank of China Limited, 910 F.Supp.2d 548 (S.D. New York 2012); Wultz v. Bank of China Limited, 942 F.Supp.2d 452 (S.D. New York 2013).

[28] Wultz v. Bank of China Limited, 910 F.Supp.2d 548 (S.D. New York 2012); Wultz v. Bank of China Limited, 942 F.Supp.2d 452 (S.D. New York 2013).

[29] Wultz v. Bank of China Limited, 910 F.Supp.2d 548 (S.D. New York 2012); Wultz v. Bank of China Limited, 942 F.Supp.2d 452 (S.D. New York 2013).

[30] Wultz v. Bank of China Limited, 910 F.Supp.2d 548 (S.D. New York 2012); Wultz v. Bank of China Limited, 942 F.Supp.2d 452 (S.D. New York 2013).

[31] Pamela Signorello, "The Rise (and Fall?) of Chinese Reverse Merger Litigation," *Bloomberg Law*, November 14, 2011. *http://www.bna.com/the-rise-and-fall/*.

[32] Katherine Zuber, "Breaking down a Great Wall: Chinese Reverse Mergers and Regulatory Efforts to Increase Accounting Transparency," *Georgetown Law Journal* 102:1307 (April 2014): 1308–1328. *http://georgetownlawjournal.org/files/2014/04/ZuberBreaking.pdf*.

[33] Katherine Zuber, "Breaking down a Great Wall: Chinese Reverse Mergers and Regulatory Efforts to Increase Accounting Transparency," *Georgetown Law Journal* 102:1307 (April 2014): 1308–1328. *http://georgetownlawjournal.org/files/2014/04/ZuberBreaking.pdf*.

[34] Katherine Zuber, "Breaking down a Great Wall: Chinese Reverse Mergers and Regulatory Efforts to Increase Accounting Transparency," *Georgetown Law Journal* 102:1307 (April 2014): 1308–1328. *http://georgetownlawjournal.org/files/2014/04/ZuberBreaking.pdf*.

[35] Katherine Zuber, "Breaking down a Great Wall: Chinese Reverse Mergers and Regulatory Efforts to Increase Accounting Transparency," *Georgetown Law Journal* 102:1307 (April 2014): 1308–1328. *http://georgetownlawjournal.org/files/2014/04/ZuberBreaking.pdf*.

[36] Katherine Zuber, "Breaking down a Great Wall: Chinese Reverse Mergers and Regulatory Efforts to Increase Accounting Transparency," *Georgetown Law Journal* 102:1307 (April 2014): 1308–1328. *http://georgetownlawjournal.org/files/2014/04/ZuberBreaking.pdf*.

[37] Kirkland & Ellis, "SEC Bars Chinese Units of Big Four Accounting Firms," January 2014. *http://www.kirkland.com/siteFiles/Publications/Alert_012914.pdf*.

[38] Kirkland & Ellis, "SEC Bars Chinese Units of Big Four Accounting Firms," January 2014. *http://www.kirkland.com/siteFiles/Publications/Alert_012914.pdf*.

[39] "U.S. Administrative Law Judge Suspends Chinese Affiliates of 'Big Four' Accounting Firms," Ropes & Gray LLP, January 24, 2014. *https://www.ropesgray.com/news-and-insights/Insights/2014/January/US-Administrative-Law-Judge-Suspends-Chinese-Affiliates-of-Big-Four-Accounting-Firms.aspx*.

[40] Kirkland & Ellis, "SEC Bars Chinese Units of Big Four Accounting Firms," January 2014. *http://www.kirkland.com/siteFiles/Publications/Alert_012914.pdf*.

[41] U.S. Securities and Exchange Commission, *SEC Imposes Sanctions against China-Based Members of Big Four Accounting Networks for Refusing to Produce Documents*, February 2015. *http://www.sec.gov/news/pressrelease/2015-25.html*.

[42] U.S. Securities and Exchange Commission, *SEC Imposes Sanctions against China-Based Members of Big Four Accounting Networks for Refusing to Produce Documents*, February 2015. *http://www.sec.gov/news/pressrelease/2015-25.html*.

[43] Michael Rapoport, "SEC, Big Four Accounting Firms in China Settle Dispute," Wall Street Journal, February 6, 2015. *http://www.wsj.com/articles/sec-big-four-accounting-firms-in-china-settle-dispute-1423237083*.

[44] Paul Gillis, "The SEC Caves on China," *China Accounting Blog*, February 2015. *http://www.chinaaccountingblog.com/weblog/the-sec-caves-on-china.html*.

[45] Paul Gillis, "The SEC Caves on China," *China Accounting Blog*, February 2015. *http://www.chinaaccountingblog.com/weblog/the-sec-caves-on-china.html*.

[46] Krane Distribution LLC v. Harvest Fund Management Co. LTD., Harvest Global Investments LTD, CV03589 (S.D. New York, 2014); Krane Distribution LLC v. Harvest USA, Inc., 9673-VCG (Delaware Chancery, 2014).

[47] Krane Distribution LLC v. Harvest Fund Management Co. LTD., Harvest Global Investments LTD, CV03589 (S.D. New York, 2014); Krane Distribution LLC v. Harvest USA, Inc., 9673-VCG (Delaware Chancery, 2014).

[48] Krane Distribution LLC v. Harvest Fund Management Co. LTD., Harvest Global Investments LTD, CV03589 (S.D. New York, 2014); Krane Distribution LLC v. Harvest USA, Inc., 9673-VCG (Delaware Chancery, 2014).

[49] Krane Distribution LLC v. Harvest Fund Management Co. LTD., Harvest Global Investments LTD, CV03589 (S.D. New York, 2014); Krane Distribution LLC v. Harvest USA, Inc., 9673-VCG (Delaware Chancery, 2014).

[50] Krane Distribution LLC v. Harvest Fund Management Co. LTD., Harvest Global Investments LTD, CV03589 (S.D. New York, 2014); Krane Distribution LLC v. Harvest USA, Inc., 9673-VCG (Delaware Chancery, 2014).

[51] Krane Distribution LLC v. Harvest Fund Management Co. LTD., Harvest Global Investments LTD, CV03589 (S.D. New York, 2014); Krane Distribution LLC v. Harvest USA, Inc., 9673-VCG (Delaware Chancery, 2014).

[52] Krane Distribution LLC v. Harvest Fund Management Co. LTD., Harvest Global Investments LTD, CV03589 (S.D. New York, 2014); Krane Distribution LLC v. Harvest USA, Inc., 9673-VCG (Delaware Chancery, 2014).

[53] Krane Distribution LLC v. Harvest Fund Management Co. LTD., Harvest Global Investments LTD, CV03589 (S.D. New York, 2014); Krane Distribution LLC v. Harvest USA, Inc., 9673-VCG (Delaware Chancery, 2014).

[54] Paul Gillis, "The SEC Caves on China," *China Accounting Blog*, February 2015. *http://www.chinaaccountingblog.com/weblog/the-sec-caves-on-china.html*.