UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                   :

NIKE, INC. and CONVERSE INC.,        :

                        Plaintiffs,     :

            -against-         :  No. 2013 Civ. 8012

                              :

MARIA WU d/b/a               :  ORAL ARGUMENT REQUESTED
WWW.SHOECAPSXYZ.COM, et al.,  :

                    Defendants.   :

-----------------------------------------------------------x

**MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO QUASH FILED BY THIRD-PARTY CHINESE BANKS AND IN SUPPORT OF CROSS-MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

GIBSON, DUNN & CRUTCHER LLP
Robert Weigel
Howard S. Hogan
Lauren M.L. Nagin
Alexandra L. Grossbaum
200 Park Avenue
New York, NY  10166-0193
Telephone:  212.351.4000

Attorneys for NEXT INVESTMENTS, LLC

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 5

ARGUMENT ........................................................................................................... 8

    **A.**     The Final Order Should Not Be Modified. ......................................... 8

        **1.**     The Moving Banks Improperly Attempt to Re-Litigate An Issue Previously Decided Against Them In This Action. ................................... 8

        **2.**     The Moving Banks Offer No Substantive Reason to Revisit the Final Order. ....................................................................................... 9

    **B.**     The Banks' Contacts with New York Give Rise to Specific Jurisdiction. .......... 11

        **1.**     The Banks' Use of New York Correspondent Accounts Gives Rise to Specific Personal Jurisdiction To Enforce the Subpoenas................... 12

        **2.**     There Is Ample Additional Evidence That The Banks Purposefully Availed Themselves of The Benefits Of Conducting Business in New York. ............................................................................................. 14

        **3.**     The Banks' New York Contacts Relate Directly to this Litigation. ........ 16

        **4.**     Exercising Personal Jurisdiction Comports with Due Process. ............... 17

        **5.**     Any Doubt Should Be Resolved through Jurisdictional Discovery......... 18

    **C.**     An International Comity Analysis Favors Enforcement of the Subpoenas. ........ 19

        **1.**     The Importance of the Documents to the Litigation. ............................... 20

        **2.**     The Degree of Specificity of the Request. ............................................... 20

        **3.**     Origin of the Information Requested. ...................................................... 21

        **4.**     Availability of Alternative Means of Retrieving the Information. .......... 22

        **5.**     Balance of National Interests. ................................................................. 23

        **6.**     Hardship of Compliance. ........................................................................ 24

        **7.**     Good Faith of Party Resisting Discovery. .............................................. 25

**TABLE OF CONTENTS**
(continued)

Page

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*EM Ltd. v. Republic of Argentina*,
    695 F.3d 201 (2d Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML
    Capital, Ltd.*, 134 S. Ct. 2250 (2014)...............................................................................2, 21

*First Nat'l City Bank of N.Y. v. IRS*,
    271 F.2d 616 (2d Cir. 1959)..................................................................................21, 24

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011)...............................................................................................16

*Gucci Am., Inc. v. Curveal Fashion*,
    2010 WL 808639 (S.D.N.Y. Mar. 8, 2010) ........................................19, 21, 23, 25

*Gucci Am., Inc. v. Li*,
    2015 WL 7758872 (S.D.N.Y. Nov. 11, 2015) .................................................12, 25

*Gucci Am., Inc v. Weixing Li*,
    135 F. Supp. 3d 87 (2015) ...........................................4, 11, 12, 13, 14, 17, 18, 20

*Gucci Am., Inc. v. Weixing Li*,
    2011 WL 6156936 (S.D.N.Y. Aug. 23, 2011), *aff'd in relevant part Gucci
    Am., Inc. v. Li*, 768 F.3d 122 (2d Cir. 2014)................................10, 17, 20, 21, 22, 23, 24, 25

*Gucci Am., Inc.. v. Bank of China*,
    768 F.3d 122 (2d Cir. 2014)..................................................1, 5, 8, 10, 11, 19, 20

*Int'l Diamond Importers, Inc. v. Oriental Gemco (N.Y.), Inc.*,
    64 F. Supp. 3d 494 (S.D.N.Y. 2014)......................................................................19

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)...............................................................................................12

*Johnson v. Holder*,
    564 F.3d 95 (2d Cir. 2009).......................................................................................8

*Koehler v. Bank of Bermuda, Ltd.*,
    12 N.Y.3d 533 (2009) ............................................................................................11

*Licci v. Lebanese Can. Bank, SAL*,
    20 N.Y.3d 327 (2012) .................................................................................3, 13, 16

*Licci ex rel. Licci v. Lebanese Can. Bank, SAL,*
732 F.3d 161 (2d. Cir. 2013)....................................................................4, 12, 16, 17

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,*
673 F.3d 50 (2d Cir. 2012).........................................................................................11

*Marc Rich & Co., A.G. v. U.S.,*
707 F.2d 663 (2d Cir. 1983).......................................................................................22

*Minpeco S.A. v. Conticommodity Servs., Inc.,*
116 F.R.D. 517 (S.D.N.Y. 1987) ...............................................................................23

*Motorola Credit Corp. v. Standard Chartered Bank,*
24 N.Y.3d 149 (2014) ...................................................................................8, 9, 10, 11

*NML Capital, Ltd. v. Republic of Argentina,*
727 F.3d 230 (2d Cir. 2013).................................................................................10, 11

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,*
322 F.3d 147 (2d Cir. 2003).........................................................................................9

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa,*
482 U.S. 522 (1987).....................................................................................................22

*Strauss v. Credit Lyonnais, S.A.,*
175 F. Supp. 3d 3 (E.D.N.Y. 2016) ...........................................................................17

*Texas Intern. Magnetics, Inc. v. BASF Aktiengesellschaft,*
31 Fed. App'x 738 (2d Cir. 2002)..............................................................................19

*Tiffany (NJ) LLC v. China Merchants Bank,*
589 Fed. App'x. 550 (2d Cir. 2014)...........................................................................10

*Tiffany (NJ) LLC v. Forbse,*
2012 WL 1918866 (S.D.N.Y. May 23, 2012) ............................3, 11, 15, 16, 21, 24

*U.S. v. Quintieri,*
306 F.3d 1217 (2d Cir. 2002)........................................................................................8

*Wultz v. Bank of China Ltd.,*
910 F. Supp. 2d 548 (S.D.N.Y. 2012)...........................................................20, 21, 22, 23

**TABLE OF AUTHORITIES**
(continued)

*Wultz v. Bank of China Ltd.*,
   942 F. Supp. 2d 452 (S.D.N.Y. 2013)..........................................................................18, 23, 24

**Statutes**

N.Y. Banking Law § 200 ...............................................................................................................15

**Other Authorities**

Restatement § 442(1)(c)................................................................................................................19

**Rules**

Fed. R. Civ. P. 69 .........................................................................................................................10

N.Y. C.P.L.R. § 302(a)(1).....................................................................................................3, 11, 16

N.Y. C.P.L.R. § 5222 ....................................................................................................................10

N.Y. C.P.L.R. § 5223 ....................................................................................................................21

S.D.N.Y. Local Civil Rule 6.3 .......................................................................................................9

Next Investments, LLC ("Next"), Assignee to the Judgment[1] awarded to Plaintiffs Nike, Inc. and Converse, Inc., respectfully submits this memorandum of law in opposition to nonparties' Agricultural Bank of China ("ABC"), Bank of Communications Limited ("BOCOM"), China Construction Bank ("CCB"), China Merchants Bank ("CMB"), and Industrial and Commercial Bank of China ("ICBC") (the "Moving Banks") motion to quash subpoenas and to modify the October 20, 2017 Final Order (the "Final Order") and in support of its motion for an order compelling the Moving Banks and the Bank of China ("BOC") (together, the "Banks") to produce the records and account documents related to Judgment Debtors as called for in the November 30, 2017 Subpoenas (the "Subpoenas").

## PRELIMINARY STATEMENT

This dispute arises from efforts to enforce this Court's August 20, 2015 judgment (the "Judgment") against a ring of international counterfeiters who targeted U.S. consumers for sales of fake Nike and Converse Products and used U.S banking and credit card processing services to facilitate their illegal sales and hide the proceeds of their operations. All of the Banks now before the Court appeared in this action previously, when the case was supervised by the Honorable Shira Scheindlin, to oppose entry of the Judgment, arguing that this Court lacked the power to freeze the counterfeiters' assets anywhere in the world. *See* ECF No. 47. Citing to the Second Circuit decision in *Gucci v. Bank of China*, 768 F.3d 122 (2d Cir. 2014) ("*Gucci 2d Cir.*"), Judge Scheindlin rejected the Banks' arguments and entered the Judgment freezing the

---

[1] Plaintiffs assigned to Next, as Assignee, all of their "rights, obligations and interests in and to the Judgment" through an Assignment Agreement executed January 18, 2017 (the "Assignment"). Next filed the Assignment with this Court on January 31, 2017 (ECF No. 50). On February 6, 2017, February 9, 2017 and February 15, 2017, Next served Judgment Debtors with the Assignment in accordance with this Court's prior orders authorizing alternative service. (ECF Nos. 51 & 52).

counterfeiters' assets. Neither the Banks nor the counterfeiters appealed the entry of Judgment. Now, the Moving Banks seek to re-litigate the same issues that were previously decided by Judge Scheindlin and several other Courts in this District.

Regretfully, the entry of the Judgment was not the end of this matter. Many of the Judgment Debtors simply moved their illegal counterfeiting operations to new websites. On October 20, 2017 this Court held certain Judgment Debtors in contempt and enjoined 566 new websites from continuing to violate both the Lanham Act and the injunction contained in the Judgment, and authorized a new round of discovery.

In order to enforce the Court's orders, Plaintiffs and Next sought discovery from credit card companies, payment processors, and correspondent banks that participated in the movement of the illegal U.S. dollar proceeds. The Second Circuit has explicitly endorsed this tactic: "It is not uncommon to seek asset discovery from third parties, including banks, that possess information pertaining to the judgment debtor's assets." *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207 (2d Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250 (2014). Indeed, "broad post-judgment discovery . . . is the norm in federal and New York state courts." *Id*. These efforts led directly to the Banks now before the Court. Next served the Subpoenas only after receiving documentary evidence tying each of the Banks to the payment trail through which the counterfeiters operated and continued to operate their illegal business.

Instead of expressing their shock that the counterfeiters were using accounts at their institutions to operate an illegal business in the U.S. and offering to help root out the illegal money laundering, the Banks have stonewalled and refused to turn over any records of the counterfeiters' movement of funds, save for a handful of records that BOC designates as

maintained by one of its New York branches. The Banks have even refused to produce records of wire transfers to the counterfeiters' accounts through the numerous clearing accounts that each Bank maintains at major banks located in New York. *None* of the excuses offered by the Banks withstands scrutiny.

First, the Banks cling to the fiction that their New York branches are somehow distinct for the purposes of this analysis. *See* Chung Decl. Exs. 2, 6, 7, 9; Weigel Decl. Exs. 124-26. But there is no real dispute—and courts in this District have recognized—that these New York branches are not separately incorporated and do not have any independent legal status. *See Tiffany (NJ) LLC v. Forbse*, 2012 WL 1918866, at *11 (S.D.N.Y. May 23, 2012) ("the Banks' New York branches are not subsidiaries of a foreign parent company, but rather are branches of the same corporate entities as their counterparts in China"). The Subpoenas at issue were properly directed to each of the Banks themselves, not just their New York branches. As a result, there is no basis for the Banks' unilateral refusal to comply with the Subpoenas on the basis that they designate most of the relevant records as based at their branches in China.

Second, the Moving Banks incorrectly claim that they are not subject to specific personal jurisdiction in New York. The Moving Banks' papers, however, fail to disclose that they each transact business in New York as that term is used in CPLR 302(a)(1), not only through their physical presence here, but also through the use of numerous clearing accounts at major banks in New York to facilitate the wire transfers that are directly at issue. *See Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327, 339 (2012) ("*Licci III*") ("a foreign bank's repeated use of a correspondent account in New York on behalf of a client-—in effect, a 'course of dealing'— show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of

New York and the United States.").  Worse, the Banks have apparently attempted to hide from this Court the fact that literally hundreds of wire transfers were sent to the Judgment Debtors' accounts through the Banks' clearing accounts at other New York institutions, and that several of the Banks provided the very credit card processing services that allowed the Judgment Debtors to sell their illegal products to U.S. residents.  The Banks' deliberate and recurring use of New York's banking facilities and their purposeful ties to New York are more than sufficient to establish a statutory basis for personal jurisdiction over the Banks and to enforce the Subpoenas.  *See Gucci Am., Inc v. Weixing Li*, 135 F. Supp. 3d 87, 95 (2015) ("*Gucci II*") (the "frequent and deliberate use of a domestic correspondent account to execute international wire transfers [is] enough to constitute transacting business in New York"); *Licci ex rel. Licci v. Lebanese Can. Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013) ("*Licci IV*") (a foreign bank's "use of a correspondent account in New York to accomplish its dollar-denominated wire transfers" as an "instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress, constitutes purposeful availment of the privilege of doing business in New York").

Third, the Moving Banks are also incorrect that the principle of international comity allows them to evade their discovery obligations to this Court.  For the exact same reasons previously articulated by judges of this Court and affirmed by the Second Circuit, the required comity analysis strongly supports ordering direct discovery from banks that use their physical presence in the U.S. and access to the U.S. banking system to facilitate the transfer of assets tied to the proceeds of counterfeiting.  U.S. courts have a strong interest in enforcing their lawful judgments, as well as in protecting U.S. consumers and intellectual property owners by enforcing the Lanham Act.  Because Chinese counterfeiters can re-establish infringing websites with ease, the *only* way to meaningfully curb these counterfeiting operations is to shed light on the

mechanisms that counterfeiters use to hide their ill-gotten gains. The Banks here voluntarily chose to do business with the counterfeiters and maintained the accounts that the counterfeiters use to hold the U.S.-dollar proceeds of their illegal operations. Moreover, the Moving Banks are demonstrably wrong that they will face dire consequences in China if they comply with this Court's orders. The clear record shows that the Banks are heavily owned and controlled by the Chinese government and that Chinese banks have previously produced bank records in similar U.S.-court actions without any reports of serious consequences to the Banks. That is why the Second Circuit held that if specific personal jurisdiction could be obtained over the BOC it was appropriate to compel the BOC to produce documents just like those sought here. *Gucci 2d Cir.*, 768 F.3d at 141 ("We discern no abuse of discretion in this analysis and conclude that BOC's arguments to the contrary are without merit.").

For each of these reasons, Next respectfully requests that Court deny the Moving Banks pending motion and instead grant its cross motion to compel.

## BACKGROUND

The Judgment Debtors in this action are serial counterfeiters who engaged in a long-term, wide-reaching counterfeiting operation through which they willfully misappropriate the renowned Nike and Converse trademarks. The Judgment Debtors have used thousands of websites to sell products bearing exact copies of Plaintiffs' trademarks and have opened hundreds of bank accounts to harbor their ill-gotten proceeds. (ECF Nos. 7, 10). At every turn in this action, Judgment Debtors have failed to dispute Plaintiffs' allegations (ECF. No. 34), and they willfully continue to violate the Lanham Act and evade this Court's Orders to this day. (ECF Nos. 60, 61) (sealed documents submitted in support of Next's Order to Show Cause).

Plaintiffs previously moved this Court for a default judgment against all Judgment Debtors. (ECF Nos. 37-40). The Banks opposed the proposed Judgment arguing that Plaintiffs were "not entitled to the post-judgment extraterritorial asset-freezing injunction." (ECF No. 47). The Court rejected the Banks' arguments because "the Court needs only personal jurisdiction over the defendants, not the Banks" and the Banks' objections were not "ripe given that the Proposed Default Judgment [wa]s directed entirely at defendants and seeks no enforcement against the non-party Banks" (ECF No. 48), and granted the Judgment. (ECF No. 49).

The Judgment continued to restrain all of Judgment Debtors' assets and provided that "any other of [Judgment Debtors'] Assets that Plaintiffs identify in the future . . . shall be subject to the asset restraint provisions set forth herein, regardless of whether the Defendants' Assets are located in the United States or abroad." *Id.* ¶ 11. The Banks received notice of the Judgment. *See* Declaration of Robert Weigel, dated March 16, 2018 ("Weigel Decl.") Ex. 254.

Because Judgment Debtors continued to violate the terms of the Judgment, Next applied for an Order to Show Cause why Judgment Debtors should not be held in contempt of court and finding that Judgment Debtors' additional email addresses, websites and bank accounts were subject to the terms of the Judgment. Unlike the proposed Judgment, the Banks did not oppose the Order to Show Cause. On October 20, 2017, the Court granted Next's Order to Show Cause and entered into the Final Order. (ECF No. 62).

The Final Order provides that the Banks are "restrained and enjoined from transferring, withdrawing or disposing of any money or other assets into or out of any accounts held by, associated with, or utilized by Judgment Debtors . . . regardless of whether such money or assets are held in the U.S. or abroad." Final Order ¶ 4. The Final Order also provides that "Plaintiffs may continue to seek expedited discovery by providing actual notice of this order to any banks

[or by service of a subpoena] . . . . [and the Banks] must provide to Next's counsel all documents and records in their possession, custody or control, whether located in the U.S. or abroad, relating to any financial accounts" held by Judgment Debtors.  *Id.* ¶¶ 8–10.  Next served the Final Order on the Banks. *See* Chung Decl. Ex. 4; Weigel Decl. 103, 123.

In accordance with the orders issued by this Court throughout the course of this litigation, Plaintiffs and Next have sought discovery and served subpoenas on the credit card companies and payment processors that the Judgment Debtors used to consummate their contumacious transactions, and received productions in response. *See* ECF No. 3 ¶¶ 15–16; ECF No. 14 ¶¶ 8–10; ECF No. 49 ¶ 13; ECF No. 62 ¶¶ 8–10; Weigel Decl. Ex. 257.  Those productions confirmed that Judgment Debtors held assets at the Banks and were transferring their assets from U.S. processors to the Banks now before the Court and that certain of the Banks were actually responsible for processing—and thus enabling—the Judgment Debtors' sales of counterfeit goods.  *See* Weigel Decl. Exs. 245-47, 256; Nagin Decl. Exs. 1 & 2.

On November 30, 2017, Next served the Subpoenas at issue on the Banks at their New York branches requesting information related to Judgment Debtors' accounts and operations. *See e.g.*, Chung Decl. Ex. 11; Weigel Decl. Exs. 125-126.  The Banks served responses and objections to the Subpoenas and refused to produce any documents not located at their New York branches, despite the plain language of the Final Order and the Subpoenas.  *See* Weigel Decl. Exs. 3, 32, 48, 82, 102, 127-28.[2]

---

[2] Next met and conferred with the Banks' counsel but were unable to resolve the issue.  The Moving Banks claim they have searched their records in New York and have found no responsive documents.  *See* Chung Decl. Ex. 9.  However, the Moving Banks have not indicated why they cannot produce records relating to their own correspondent accounts located in New York.  *See id.*  These records are undoubtedly within the Moving Banks' possession, custody, and control and should have been produced. While BOC produced limited documents held in its New York branch, this production was limited to "responsive

## ARGUMENT

### A.	The Final Order Should Not Be Modified.

The Moving Banks ask this Court to modify the Final Order "insofar as it purports to apply outside of New York." ECF No. 71 at 25. This is nothing more than an improper attempt to re-litigate issues that have been previously decided by this Court and confirmed as settled law. As Judge Scheindlin found, once the Court has personal jurisdiction over the counterfeiters it can freeze the counterfeiters' assets anywhere in the world. (ECF No. 48) at 3-4 (citing *Gucci 2d Cir.*, 768 F.3d at 129).

#### 1.	The Moving Banks Improperly Attempt to Re-Litigate An Issue Previously Decided Against Them In This Action.

"The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'" *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *U.S. v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)). Here, the Banks previously argued to Judge Scheindlin that the Judgment should not contain an asset restraint provision. *See* ECF No. 47. Judge Scheindlin rejected those arguments in her August 20, 2015 Order granting Plaintiffs' Motion for Default Judgment. *See* ECF No. 48. In particular, Judge Scheindlin held that (1) the Court needed only personal jurisdiction over defendants, not the Banks, to issue the Judgment, (2) a comity analysis was premature because the Judgment was not directed at the Banks, and (3) that another case cited by the Banks, *Motorola Credit Corp. v. Standard Chartered Bank*, 24 N.Y.3d 149 (2014), had no effect on the Court's ability to grant the Judgment. The Banks did not appeal either the August 20, 2015 Order or the Judgment.

---

wire transfer records" where BOC has acted "in its capacity as [an] intermediary bank." Weigel Decl. Ex 128. However, this production did not contain *any* documents related to Judgment Debtors' accounts.

The Banks now argue that this Court should modify the Final Order because New York's "separate entity rule" prevents the enforcement of an extraterritorial asset restraint. *See* ECF No. 71 at 17-18 (citing *Motorola*, 24 N.Y.3d at 158). This is precisely the argument that Judge Scheindlin rejected. *See* ECF No. 48 at 2, 4. The Banks appear to be arguing that the Court should revisit this issue because the Final Order is an "extraterritorial application of the post-judgment restraint" rather than the restraint itself. ECF No. 71 at 18. But that is not correct. The Final Order, same as the Judgment, is directed entirely at Judgment Debtors and seeks no enforcement against the Banks. *Compare* ECF No. 49 ¶¶ 10-11 *with* ECF No. 62 ¶ 4. Next is not currently seeking an order compelling the Banks to turn over their proceeds, simply discovery into the assets that the Banks currently hold for the Judgment Debtors. *See, e.g.*, Chung Decl. Ex. 11. As a result, the situation is no different than when Judge Scheindlin previously held that the Banks' arguments were premature. *See* ECF 48 at 2, 4.

As a result, the Banks' attempt to re-litigate these issues is improper. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) ("where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."). The time for a motion for reconsideration of this issue is long past.[3]

### 2. The Moving Banks Offer No Substantive Reason to Revisit the Final Order.

Even if the Moving Banks had brought a proper motion for reconsideration, there are no changed circumstances that would require a limitation on the current asset restraint. It is beyond reasonable dispute that New York law expressly permits this Court to issue a post-judgment asset

---

[3] *See* S.D.N.Y. Local Civil Rule 6.3 (setting a deadline of fourteen (14) days after the entry of an order or judgment).

restraint. *See* N.Y. C.P.L.R. § 5222; ECF No. 43 at 2.[4]  In fact, the Banks previously admitted

that courts have authority to issue post-judgment restraining orders with extraterritorial effect

against judgment debtors pursuant to New York law.  See ECF No. 43, at 2 ("restraining orders

under Section 5222 may apply extraterritorially as against judgment debtors").  The Second

Circuit and other courts have expressly held that a court need only "personal jurisdiction over the

*defendants*, not the Bank[s]," to issue an asset freeze injunction.  *Gucci 2d Cir.*, 768 F.3d at 129

(finding that Judge Sullivan did not abuse his discretion when he held that "[t]he fact that some

of the funds subject to the Injunction are located outside of the United States does not, contrary

to the Bank's arguments, deprive the Court of authority to issue the asset restraint." *Gucci v. Li*,

2011 WL 6156936, at * 4 (S.D.N.Y. Aug. 23, 2011) ("*Gucci I*")); *Tiffany (NJ) LLC v. China*

*Merchants Bank*, 589 Fed. App'x. 550, 552 (2d Cir. 2014) (same).

The Moving Banks' reliance on the New York Court of Appeals decision in *Motorola* is

substantively misplaced.  In *Motorola*, the Court of Appeals considered the "narrow question" of

whether the separate entity rule precludes a judgment creditor from obtaining "postjudgment

restraint of assets situated in foreign branch accounts" when jurisdiction over the bank is "based

solely on the service of a foreign bank's New York branch."  24 N.Y.3d at 162 & n.2.  *Motorola*

said nothing about a Federal Court's power to restrain a counterfeiter's assets pursuant to the

Court's equitable power under the Lanham Act.  Where, as here, there is no question that the

Court has jurisdiction over the Judgment Debtors, the well-settled rule remains that it is

"irrelevant whether the district court has personal jurisdiction over" the Banks or their foreign

branches when issuing an asset restraint.  *See NML Capital, Ltd. v. Republic of Argentina*, 727

---

[4]  *See also* Fed. R. Civ. P. 69 ("proceedings supplementary to and in aid of judgment execution
. . . must accord with the procedure of the state where the court is located").

F.3d 230, 243 (2d Cir. 2013); *see also Forbse*, 2012 WL 1918866, at *11 (finding the separate

entity rule to be "simply not relevant" when issuing an asset restraint).

      *Motorola* is also inapposite because of this Court's personal jurisdiction over the Banks

themselves. *See infra* Section B. In *Koehler v. Bank of Bermuda, Limited*, the Court of Appeals

established that a court *may* order a foreign garnishee bank branch to turn over or restrain a

judgment debtor's assets so long as it has personal jurisdiction over the bank. 12 N.Y.3d 533,

541 (2009) (A "New York court with personal jurisdiction over a defendant may order him to

turn over out-of-state property *regardless of whether the defendant is a judgment debtor or a*

*garnishee.*") (emphasis added). Nothing in *Motorola* purports to overrule this proposition and

the Court of Appeals expressly distinguished *Koehler* because there the "New York courts had

secured personal jurisdiction over" the garnishee bank. *Motorola*, 24 N.Y.3d at 159, 161-62.[5]

Moreover, in *Gucci* the Second Circuit expressly held that "the district court may be able to

require BOC's compliance with the Asset Freeze Injunction by exercising specific jurisdiction."

*Gucci 2d Cir.*, 768 F.3d at 136.

**B.    The Banks' Contacts with New York Give Rise to Specific Jurisdiction.**

      New York's long-arm statute provides that a court may exercise personal jurisdiction

over the Banks if (1) the Banks transacted any business within the state, satisfying the

"purposeful availment" prong, and (2) this cause of action arises from the Banks' business

transactions, satisfying the "nexus" prong. *See Gucci II*, 135 F. Supp. 3d at 93 (quoting *Licci ex*

*rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012) ("*Licci II*")); *see also*

N.Y. C.P.L.R. § 302(a)(1). In addition, the Banks must have "minimum contacts" with New

---

    [5] *Motorola* also is irrelevant to the enforcement of a subpoena. *Gucci II*, 135 F. Supp. 3d at 96
("[W]here the remedy sought is . . . subpoena, the separate entity rule had not barred
enforcement; rather only personal jurisdiction over the legal entity, the bank and its branches,
is necessary.").

York such that "the maintenance of the suit does not offend the traditional notions of fair play and substantial justice."  *Licci IV*, 732 F.3d at 169 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Here, all these elements are present.

1. **The Banks' Use of New York Correspondent Accounts Gives Rise to Specific Personal Jurisdiction To Enforce the Subpoenas.**

In *Gucci v. Li*, Judge Sullivan found that this Court has specific personal jurisdiction to order discovery from the Bank of China to produce records related to counterfeiters in China who made use of BOC accounts because BOC "deliberately thrust [] itself into the New York financial market" by opening correspondent accounts with New York banks "to repeatedly facilitate the transfer of money from" accounts held by counterfeiters like the Judgment Debtors here.  135 F. Supp. 3d at 95.[6]  The Moving Banks argue that Judge Sullivan's decision is not applicable here because Next's position that "the Judgment Debtors routed their ill-gotten funds to China . . . via correspondent accounts held by the Banks in New York" is only "wishful thinking."  ECF No. 71 at 13.  But the Banks have been less than candid with the Court.

Next has obtained irrefutable evidence, from the correspondent banks themselves, that BOC, BOCOM, CCB, CMB and ICBC have collectively facilitated *at least* 600 wire transfers through the Banks' New York–based correspondent accounts, and total *at least* $3.6 million.  *See* Weigel Decl. Exs. 33, 49-62, 83-85, 104-08, 129-219; *see also id.* Exs. 1, 249 (indicating the Banks maintain correspondent accounts in New York); Grossbaum Decl. Ex. 2.[7]  These transfers

---

[6] The Second Circuit rejected the Bank of China's appeal of Judge Sullivan's order.  No. 15-3850 (2d Cir. Jan. 12, 2016), *appeal withdrawn* (2d Cir. Feb 16, 2016).

[7] Although the bulk of these wire transfers went through BOC, the other listed Banks each have multiple transfers except for BOCOM which has a single identified transfer.  Grossbaum Decl. Ex. 2.  As discussed below, ABC, BOC and BOCOM are separately subject to personal jurisdiction because they provided credit card processing services to these counterfeiters.

were all routed to one of Judgment Debtors' accounts listed in the Judgment and the Final Order.

The New York Court of Appeals has held that "a foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'—show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci III*, 20 N.Y.3d at 339. In *Licci* the foreign bank conducted dozens of wire transfers through its New York-based correspondent account. *Id.* at 332. Here, the Banks have repeatedly used their correspondent accounts at JPMorgan Chase, Citibank, and elsewhere in New York to effectuate hundreds of Judgment Debtors' wire transfers between the U.S. and China. *See* Weigel Decl. Exs. 33, 49-62, 83-85, 104-08, 129-219. The Banks did not disclose the identified wire transfers and certainly do not represent that there are not others. Just as in *Gucci*, these wire transfers were crucial components of the counterfeiters' operations and were only made possible because of the use of these correspondent accounts; the correspondent accounts are "[c]ritical to serving" the Judgment Debtors, as they allow BOC, BOCOM, CCB, CMB and ICBC "to conduct secure, efficient, and quick wire transfers" of Defendants' ill-gotten profits. *Gucci II*, 135 F. Supp. 3d at 95. The Banks can offer no good faith reason why the counterfeiters in this case are differently situated to the counterfeiters in *Gucci*. Both collect money from U.S. consumers by processing orders through their websites, and then transfer the proceeds to the Banks' accounts, knowing their victims will be unable to readily pursue them.

The Banks, moreover, did not simply maintain their correspondent accounts but "encouraged [their] clients to rely on [their] relationships with [the Correspondent Banks] so that they could effectuate frequent wire transfers from the United States to China, which is exactly what [Judgment Debtors] did here." *Id.* For example, BOC boasts that "it ranks tenth in the

volume of U.S. dollar clearing transactions, making it the largest Chinese-funded financial institution in the United States," Weigel Decl. Ex. 234, and that since "New York is reliable, globally linked, and convenient" BOC can offer its customers "a wide network of correspondent banks around the word." *Id.* Ex. 236. ICBC similarly brags that it "has taken all necessary steps to set up a US dollar Clearing Center in New York in an effort to improve the standard of clearing services" by setting up "correspondent banking relationships." *Id.* Ex. 116. Additional examples are summarized in Exhibit 1 to the accompanying Declaration of Alexandra Grossbaum, dated March 16, 2018 ("Grossbaum Decl."), and examples can be found in the Weigel Declaration. *See* Weigel Decl. Exs. 17-31 (ABC's websites); 41-47 (BOCOM's websites); 70-80 (CMB's websites); 92-101 (CCB's websites); 116-22 (ICBC's websites); 233-44 (BOC's websites). As a result, there is an undeniable nexus between Next's Subpoenas and the conduct of BOC, BOCOM, CCB, CMB and ICBC.

### 2. There Is Ample Additional Evidence That The Banks Purposefully Availed Themselves of The Benefits Of Conducting Business in New York.

While the courts in *Licci* determined that the repeated use of a correspondent account is sufficient, by itself, to constitute transacting business in New York, there is ample additional evidence to support exercising personal jurisdiction over the Banks. Here, as in *Gucci*, the Banks' conduct "is, if anything, even more substantial, deliberate and recurring than that of the foreign bank in the *Licci* cases."[8] *Gucci II*, 135 F. Supp. 3d at 94. Given the voluminous evidentiary record of the Banks' connections to New York, it is only possible to provide the barest of summaries in this brief. A breakout of the connections relevant to each Bank is set forth as Exhibit 2 to the Grossbaum Declaration.

---

[8] While not all of the Banks have each piece of evidence described in this Section, the totality of evidence, as detailed in the Weigel and Grossbaum Declarations, indicate that each Bank has purposefully itself of the benefits of conducting business in New York.

**New York Ties**.  Critically, unlike the Lebanese Canadian Bank in *Licci*, the Banks all have branches in New York, *see* Weigel Decl. Exs. 8, 35, 68, 75, 81, 115, 222; *see also* ECF No. 71 at 5, own real property in New York, *id.* Exs. 4, 34, 63, 87, 109, 225, and are participants in the Clearing House Interbank Payments System ("CHIPS") based in New York, *id.* Exs 7-8, 38-39, 66, 89, 113, 228, as well as the Federal Reserve's Fedwire Funds Service, *id.* Exs. 11, 40, 67, 90, 114, 230.[9]  ABC, BOC, CMB and ICBC hold mortgages on properties in New York.  *Id.* Exs. 5, 36, 64, 112, 227.  ABC, BOC, CCB, CMB and ICBC are registered with the New York Department of Financial Services ("DFS") to do business in New York, as required by N.Y. Banking Law § 200 (requiring a foreign bank to register and obtain a license from the Superintendent of the DFS).  *See id.* Exs. 14, 68, 69, 115, 231; *see also id.* Exs. 15-16.  ABC, CCB, CMB and ICBC are chartered institutions with New York State, Weigel Decl. Ex. 2, and BOC and ICBC are insured by the FDIC, *id.* Exs. 110, 223-224.

**Role as Acquiring Bank**.  In addition, ABC, BOC, BOC Credit Card (International) Limited ("BOC Credit Card"), a subsidiary of BOC, *see* Weigel Decl. Ex. 232, and BOCOM have also acted as acquiring banks for Judgment Debtors' infringing websites.  *See* Weigel Decl. Exs. 245-47; 256; Nagin Decl. Ex. 2.  "[A]n acquiring bank helps to process online purchases by serving as an intermediary between the online merchant and a credit card network such as Visa" and Mastercard.  *Forbse*, 2012 WL 1918866, at *2 (ordering BOC to comply with the discovery order because the "the bank's [] role as the acquiring bank for infringing websites tips the balance of the analysis in favor of" forcing compliance with Plaintiff's subpoenas).

---

[9] CHIPS is headquartered in New York and "selects New York Law as applicable to fund transfers involving a CHIP payment message."  Weigel Decl. Ex. 9*; see also id.* Ex. 10.  The Banks are deemed to be located in New York anytime they receive wire transfers via Fedwire.  *Id.* Ex. 13; *see also id.* Ex. 12.

At least one leading New York-based credit card company has already produced transaction data for some of the Judgment Debtors, proving that they have an expansive business in the United States. *See* Nagin Decl. Exs, 1 & 2. BOCOM and BOC Credit Card used the system established by that leading credit card company to process credit card transactions for Judgment Debtors, therefore transacting business in New York. *See* Weigel Decl. Ex. 256; *see also* Nagin Decl. Ex. 2. The agreement also provides that New York law governs those agreements and that the Banks consent to personal jurisdiction in New York for all disputes arising out of those agreements. *Id.* Ex. 1; *see also* Weigel Decl. Ex. 255; *see also id.* Ex. 248. A subpoena to another leading New York-based credit card company remains pending.

As another court in this District has noted, acquiring banks often are required to perform due diligence on the merchants with whom they do business, making it extremely likely that ABC, BOC, BOCOM and BOC Credit Card "have valuable information on the identity, business activities, and even location of one or more [Judgment Debtors]." *Forbse*, 2012 WL 1918866, at *2, *5. These banks "may very well possess information that will enable [Plaintiff] to discover defendants' identities or even recover a portion of defendants' illicit profits." *Id.* at *11.

### 3.     The Banks' New York Contacts Relate Directly to this Litigation.

Specific jurisdiction focuses on "affiliation between the forum and the underlying controversy" and the "issues deriving from, or connected with the very controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Contrary to the Moving Banks' assertions, the nexus prong of § 302(a)(1) "does *not* require a causal link between [the Banks'] New York business activity and a plaintiff's injury. Instead, it requires 'a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the merits of the claim.'" *Licci IV*, 732 F.3d at 168-69 (emphasis added) (citing *Licci III*, 20 N.Y.3d at 339). This "relatively permissive nexus is satisfied where

16

at least one element of the plaintiff's claim arises from the [Banks'] New York contacts."
*Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 18-19 (E.D.N.Y. 2016) (alteration omitted).

Here, the Subpoenas seek information that arises out of the Banks' New York contacts, described above. The Subpoenas relate to Judgment Debtors' transfer of counterfeiting proceeds denominated in U.S.-dollars to Judgment Debtors' accounts at the Banks in China. The Banks not only used their New York-based correspondent accounts to repeatedly process wire transfers in this forum, but also have long-established connections to New York and the United States. *See* Section B.1 & 2 *supra*. The Banks' ability to conduct business and effectuate wire transfers is completely dependent upon its extensive use of its contacts in New York and the subject of the information requested in the Subpoenas. *See Gucci II*, 135 F. Supp. 3d at 93-96.

### 4. Exercising Personal Jurisdiction Comports with Due Process.

#### a. The Banks Have the Necessary Minimum Contacts with New York.

For all the same reasons discussed above, the Banks' connections to New York also compel the conclusion that the Banks have "purposely chosen to do business in New York" and availed themselves "of the myriad benefits that come with establishing a presence in the United States' premier financial center." *See Gucci II*, 135 F. Supp. 3d at 97 (citing *Gucci I*, 2011 WL 6156936, at *10). "It should hardly be unforeseeable" that by making use of New York's banking system, they "might be subjected to the burden of a lawsuit in [New York] for wrongs related to, and arising from, that use." *Licci IV*, 732 F.3d at 171-72.

#### b. Exercising Jurisdiction Over The Banks is Reasonable and Consistent with Traditional Notions of Fair Play and Substantial Justice.

In determining whether the exercise of personal jurisdiction is reasonable, courts consider five factors. *See Gucci II*, 135 F. Supp. 3d at 99. As in *Gucci*, these factors clearly weigh in favor of exercising personal jurisdiction:

1. *Burden.* The Banks all have branches in New York, s*ee* Weigel Decl. Exs. 8, 35, 75, 86, 115, 222, and multiple New-York based correspondent accounts. *Id.* Exs., 1, 249. BOC and BOCOM have initiated lawsuits in this District, *see* Grossbaum Decl. Ex. 2, and have agreed, in other circumstances, to submit to personal jurisdiction in New York. *See* Nagin Decl. Ex. 1. Additionally, "the fact that the controversy at issue involves subpoena compliance, and not [the Banks'] own liability, gives [the Banks] even less cause to complain of outrage of fair play." *Gucci II*, 135 F. Supp. 3d at 99. Although the Moving Banks' argue that they are "burdened by potential violations of foreign law if they comply," ECF No. 71 at 14, no Court has considered such "argument in the context of assessing reasonableness of an exercise of personal jurisdiction." *Id.*

2. *Forum State Interests.* The counterfeiters deliberately and intentionally sold and shipped fake products into New York in order to deceive New York residents. *See* ECF Nos. 10 at ¶¶ 2, 5-12; 7 at ¶ 16. New York and this Court both have a strong interest in third parties complying with discovery obligations "to ensure an efficient and effective judicial process . . . and enforcing . . . the Lanham Act, [which is] designed to protect intellectual property rights and prevent customer confusion." *Id.* The Moving Banks' assertion that Assignee "cannot demonstrate that it has a particular interest in enforcing the judgment *in this forum*" simply misstates the law. It is not Assignee's interest that is relevant here but the forum's itself. *Id.*

3. *Plaintiff's Interests.* There can be no doubt that Next has a strong interest in the Banks complying with the Subpoenas because the Subpoenas are the "most fruitful avenue for discovering the identity of additional infringers and the most effective measure of the revenues generated by" Judgment Debtors. *Id.* As it is unlikely that Next will be able to recover absent the Banks' compliance with the Subpoenas, Next's interest "in obtaining its desired relief in its desired forum are even greater." *Id.*

4. *Most Efficient Resolution.* Exercising personal jurisdiction over the Banks would be, by far, the most practical, efficient, and fastest way to resolve this dispute. It was this Court that awarded the Judgment at issue. "Forcing [Plaintiffs] to initiate this process in China would be significantly less efficient, extremely time consuming, and potentially fruitless." *Id.*; *see also Wultz v. Bank of China Ltd.*, 942 F. Supp. 2d 452, 468 (S.D.N.Y. 2013) *("Wultz II")*.

5. *Social Interests.* New York, and the United States generally, have strong interests in protecting intellectual property as it is the "single greatest asset . . . of the American people." Weigel Decl. Ex 251; *see also id.* at Exs. 252 & 253.

**5.      Any Doubt Should Be Resolved through Jurisdictional Discovery.**

Should the Court find that Next has not presented enough evidence for it to exercise

personal jurisdiction over the Banks, Next requests that the Court order jurisdictional discovery

into the Banks' connections to New York. *See, e.g., Int'l Diamond Importers, Inc. v. Oriental Gemco (N.Y.), Inc.*, 64 F. Supp. 3d 494, 507 (S.D.N.Y. 2014). While Next believes that the evidence it has submitted is more than sufficient to establish specific personal jurisdiction over the Banks, the materials obtained from third party sources show, at a minimum, that Next has offered sufficiently specific allegations to obtain discovery from the Banks about their further connections to the wire transfers at issue. *Texas Intern. Magnetics, Inc. v. BASF Aktiengesellschaft*, 31 Fed. App'x 738, 739 (2d Cir. 2002).

**C.    An International Comity Analysis Favors Enforcement of the Subpoenas.**

Finally, the Banks argue that they should be allowed to escape their obligations under the Federal Rules of Civil Procedure because Chinese national policy does not allow them to convey information about the illegal proceeds that the counterfeiters have obtained from U.S. consumers. It is well settled, however, that "American courts are not required to adhere blindly to the directives of a foreign blocking statute." *Gucci Am., Inc. v. Curveal Fashion*, 2010 WL 808639, at *5 (S.D.N.Y. Mar. 8, 2010) ("*Curveal* ") (citation omitted).

In cases like this, where Chinese banks have resisted discovery orders from the Courts of this District, the Second Circuit has instructed that courts should employ the five-factor test set forth in Restatement § 442(1)(c). *See, e.g.*, *Gucci 2d Cir.*, 768 F.3d at 139. In addition, courts in the Second Circuit may also consider "the hardship of compliance on the party or witness from whom discovery is sought" and "the good faith of the party resisting discovery." *Gucci II*, 135 F. Supp. 3d at 101.

Here, these factors all weigh in favor of an order requiring production of the documents sought. Although the Moving Banks cite to a handful of cases where courts have required parties to resort to a formal request under the Hague Convention, the experience of the litigants in those cases demonstrate beyond all doubt that the Hague Convention process delayed the

matters significantly and allowed Chinese authorities to frustrate the pursuit of counterfeiters. Indeed, both Judge Scheindlin (in a separate case against BOC) and a leading professor of Chinese law have evaluated these productions and other evidence and concluded that The Hague Convention does not provide a reasonable alternative. *See Wultz v. Bank of China, Ltd.*, 910 F. Supp. 2d 548, 557-58 (S.D.N.Y. 2012) ("*Wultz I*"); Declaration of Donald Clarke, dated March 16, 2018 at ¶¶ 55-60 ("Clarke Decl."). The Second Circuit, moreover, evaluated cases where this Court did order production of counterfeiters' records directly from the BOC and found "no abuse of discretion" in ordering the production. *See Gucci 2d Cir.*, 768 F.3d at 141 ("BOC's arguments to the contrary are without merit").[10]

1. **The Importance of the Documents to the Litigation.**

The Subpoenas seek information related to Judgment Debtors' bank accounts. This information is crucial to establishing the true identities of Judgment Debtors and the location of Judgment Debtors' profits from their counterfeiting operation in order to satisfy the Judgment. As Judgment Debtors have never appeared in this action, there is no alternative source of evidence about Judgment Debtors' ongoing counterfeiting operations or the location of their assets, making this information essential. *See Gucci I*, 2011 WL 6156936, at *5-6.

2. **The Degree of Specificity of the Request.**

The Subpoenas seek production of information limited to Judgment Debtors' accounts at the Banks. The requests are modeled on similar requests that several courts in this District have previously found to be narrowly tailored to target information to enable Next to identify the true

---

[10] *See also Gucci I*, 2011 WL 6156936, at *8 (Professor Clarke, "a former practitioner of international law and current law professor specializing in the laws of China, credibly opines that a Hague Convention request issued by a United States court is not a realistic or meaningful option for the Plaintiffs . . . to obtain the information that they seek."), *aff'd in relevant part Gucci 2d Cir.*, 768 F.3d at 141; *Gucci II*, 135 F. Supp. 3d at 102-03.

identities of Judgment Debtors and to track the revenue from their illicit counterfeiting operation. *See Gucci I*, 2011 WL 6156936, at *6; Weigel Decl. Ex. 250; *Curveal*, 2010 WL 808639, at *3. And these requests are well within the scope of the broad post-judgment discovery that is the norm in both federal and New York state courts. *See Republic of Argentina*, 695 F.3d at 207; New York CPLR § 5223 ("a judgment creditor may compel disclosure of all matter relevant to the satisfaction of the judgment").

### 3. Origin of the Information Requested.

First, the evidence that each of the Banks maintain correspondent accounts in New York means that certain wire transfer information responsive to the Subpoenas originated in New York. Second, while certain information sought in the Subpoenas is currently located in China, the information concerns proceeds of Judgment Debtors' counterfeiting operations, which originated not in China, but in the U.S. *See* Weigel Decl. Exs. 33, 49-62, 83-85, 104-08, 129-219. Third, the Banks' assertions that they do not have access to records of accounts maintained outside New York do not withstand scrutiny. *See* ECF No. 71 at 2. Courts in this circuit have rejected the contention that the New York branches of Chinese banks do not have possession, custody or control of account records held at branches outside the U.S. *See, e.g., Forbse*, 2012 WL 191886, at *3; *Wultz I*, 910 F. Supp. 2d at 559.

Many of the Banks even brag of their ability to allow their customers to obtain these records from all around the world. *See, e.g.* Weigel Decl. Exs. 17, 70, 118, 236. Accordingly, the Banks' self-interested assertions that they do not have access to the records in China is not sufficient to overcome the presumption of custody and control. *First Nat'l City Bank of N.Y. v. IRS*, 271 F.2d 616, 618 (2d Cir. 1959) ("Clear proof of lack of possession and control is necessary to rebut the presumption."). Indeed, prior productions by BOC of documents located in China undermine any argument that the Banks do not have custody or control of documents

outside of New York. In *Gucci v. Li*, for example, after making the exact same argument (and being held in contempt for failing to honor the Court's order), BOC actually produced the bank records from China. *See* Grossbaum Decl. Exs. 3-8; *see also Wultz v. Bank of China Ltd.*, 2013 WL 11326630, at *1 (S.D.N.Y. Sept. 27, 2013). The Banks therefore can and should be compelled to produce the counterfeiters' records. *See e.g. Marc Rich & Co., A.G. v. U.S.*, 707 F.2d 663, 667 (2d Cir. 1983) (the "test for the production of documents is control, not location").

## 4. Availability of Alternative Means of Retrieving the Information.

"[I]f the information cannot be *easily obtained* through alternative means, this factor . . . weighs in favor of disclosure." *Wultz I*, 910 F. Supp. 2d at 558 (emphasis in original). A Hague Convention request need not be "futile" for this factor to weigh in favor of the requesting party. *Gucci I*, 2011 WL 6156936, at *7. The Supreme Court has made clear that first resort to the Hague Convention is not required and that "[i]n many situations the Letter of Request procedure authorized by the Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa,* 482 U.S. 522, 542 (1987).

The Banks, moreover, are simply incorrect that a Hague Convention request would provide a reliable alternative to obtain the information requested by the Subpoenas. The best evidence from practitioners indicates that Hague Convention requests to Chinese authorities have not worked as intended. *See* Clark Decl. ¶¶ 55-60. While the Moving Banks cite to cases in which courts directed that discovery should be pursued through a Hague Convention request, those precedents actually confirm that the results introduced significant delay into the process and that the resulting productions did not allow the Plaintiffs to pursue the counterfeiters. *Wultz I*, 910 F. Supp. 2d at 557-558; Clark Decl. ¶¶ 57-59. In the meantime the counterfeiters can conceal their assets and continue to violate the Lanham Act.

5. **Balance of National Interests.**

While this Court must consider China's interests in its bank secrecy laws, the United States has "a substantial interest in fully and fairly adjudicating matters before its courts" that weighs in favor of ordering compliance with the Subpoenas. *Minpeco S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523-34 (S.D.N.Y. 1987). Moreover, it "need hardly be stated that the United States itself has a powerful interest in enforcing the acts of Congress, especially those, such as the Lanham Act, that are designed to protect intellectual property rights and prevent consumer confusion." *Gucci I*, 2011 WL 6156936, at *11; *see also* Weigel Decl. Exs. 251-53. Further, the trademark laws that Judgment Debtors violated are designed to protect the public. *Curveal*, 2010 WL 808639, at *5.

In contrast, the Banks overstate China's interest in maintaining absolute secrecy over bank records. *See* Clarke Decl. ¶¶ 10(e), 11-18. The ability of numerous Chinese governmental organs "to waive China's bank secrecy laws, 'strongly suggests' that China's bank secrecy laws do not 'reflect a national policy entitled to substantial deference.'" *Wultz II*, 942 F. Supp. 2d at 471 n.88 (quoting *Gucci I*, 2011 WL 6156936, at *10).

Furthermore, "China's limited national interest in this case is further highlighted by the fact that the Bank[s have] purposely chosen to do business in New York and [have] availed [themselves] of the myriad benefits that come with establishing a presence in the United States' premier financial center." *Gucci I*, 2011 WL 6156936, at *10. "Having made such a determination, and reaped the rewards that flow therefrom, the Bank can hardly hide behind Chinese bank secrecy laws as a shield against the requirements faced by other United States-based financial institutions." *Id.* "If the Bank cannot, as it were, serve two masters and comply with the lawful requirements both of the United States and [a foreign country], perhaps it should

surrender to one sovereign or the other the privileges received therefrom." *First Nat'l City Bank of N.Y. v. IRS*, 271 F.2d 616, 620 (2d Cir. 1959).

###### 6. Hardship of Compliance.

Although the Banks offer several conclusory assertions that they will face hardship from compliance with the Subpoenas, both logic and the record here dictate otherwise. The Banks are all substantially owned by the Chinese government, so the risk of serious punishment is low. *See* Clarke Decl. ¶¶ 20-38. Despite litigating these issues over and over, the Banks have *never* cited a specific instance in which a Chinese financial institution was punished for complying with a foreign court order. *See* Clarke Decl. ¶¶ 39-54. In the *Gucci v. Li* case, BOC boasted extensively of its production of thousands of pages of bank records. *See* Grossbaum Decl. Exs. 3-8 (describing BOC's document production). And in spite of this, BOC's public filings show no discernable adverse inference. *See* Weigel Decl. Exs. 220 & 221.

This is why courts in this District have repeatedly found no basis for the Banks' warnings of imminent harm. *See Wultz II*, 942 F. Supp. 2d at 468 ("Chinese authorities have apparently not yet actually sanctioned a bank for disclosing confidential information to a foreign court under threat of sanctions in violation of Chinese law"); *Forbse*, 2012 WL 1918866, at * 9 ("BOC has not actually been punished in any manner for complying with Judge Sullivan's order"). Although the Moving Banks' expert here cites a number of laws and regulations, they merely support the unremarkable proposition that there are protections in China for the secrecy of bank records. Clarke Decl. ¶¶ 11-15. The cases cited by the Moving Banks involve instances of fraud or incompetence, not compliance with a court order. *Id.* ¶¶ 39-54; *see also Gucci I*, 2011 WL 6156936, at *11 (rejecting BOC's reliance on two of the same cases relied on by the Moving Banks as evidence of hardship of compliance). As a result, this case is no different from the

previous case that have ordered foreign banks to produce counterfeiters' records.  *See Gucci I*, 2011 WL 6156936, at *11; *Curveal*, 2010 WL 808639, at *7-8.

### 7.  Good Faith of Party Resisting Discovery.

There is ample evidence that the Banks have not acted in good faith by failing to comply with the Subpoenas.  Despite having demonstrated that it has the power to produce documents from a Chinese branch in litigation before this Court, and having been held in contempt for failure to comply with prior orders compelling production, Bank of China continues to refuse to comply with the Subpoenas.  *See Gucci Am., Inc. v. Li*, 2015 WL 7758872 (S.D.N.Y. Nov. 11, 2015), *motion to stay denied*, No. 15-3850 (2d Cir. Jan. 12, 2016).  The Moving Banks are well aware of this prior litigation and offer no distinguishing justification for their current refusal to comply.  Moreover, the Moving Banks provide no justification for their refusal to produce documents responsive to the Subpoenas in connection with correspondent accounts in New York, which does not raise the same comity concerns.  Such baseless refusal is bad faith.

## CONCLUSION

For the foregoing reasons, Next respectfully asks that this Court enter an order:  (a) denying Moving Banks' motion to modify the Final Order as it applies extraterritorially; (b) denying Moving Banks' motion to quash the Subpoenas; (c) compelling the Banks to produce all documents called for in the Subpoenas; and (d) awarding such relief as the Court deems proper.

Dated: March 16, 2018
New York, New York

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Robert Weigel
Robert Weigel
Howard S. Hogan
Lauren M.L. Nagin
Alexandra Leigh Grossbaum

200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Fax: 212.351.4035
RWeigel@gibsondunn.com
HHogan@gibsondunn.com
LNagin@gibsondunn.com
AGrossbaum@gibsondunn.com

Attorneys for NEXT INVESTMENTS, LLC