**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NIKE, INC and CONVERSE, INC., | Case No. 13 Civ. 8012 (CM) (DCF) |
| Plaintiffs, | |
| v. | **ORAL ARGUMENT REQUESTED** |
| Maria WU et al. | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF NONPARTY BANKS' REPLY IN
SUPPORT OF MOTION TO QUASH SUBPOENAS AND TO MODIFY THE FINAL
ORDER AND OPPOSITION TO ASSIGNEE'S CROSS-MOTION TO COMPEL
<u>PRODUCTION OF DOCUMENTS</u>**

David G. Hille
Paul B. Carberry
Jacqueline L. Chung
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: dhille@whitecase.com
        pcarberry@whitecase.com
        jacqueline.chung@whitecase.com

*Attorneys for Agricultural Bank of China,
Bank of China, Bank of Communications,
China Construction Bank, China Merchants
Bank, Industrial & Commercial Bank of
China Limited*

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................ 4

   I.   THE BANKS ARE NOT SUBJECT TO SPECIFIC PERSONAL JURISDICTION IN NEW
YORK ....................................................................................................................... 4

      A.   The Banks' New York Correspondent Accounts Do Not Give Rise to Specific Personal
Jurisdiction ........................................................................................................ 5

          1.   The Receipt of Wire Transfer Funds Into New York Correspondent Accounts Does Not
Constitute "Purposeful Availment" In New York ............................................. 6

          2.   Gucci v. Li Does Not Change The Analysis .................................................... 8

      B.   Bank of China's Role as an Intermediary Bank Does Not Give Rise to a Basis for Specific
Jurisdiction ...................................................................................................... 14

      C.   Agricultural Bank of China, Bank of China, and Bank of Communications' Role as Acquiring
Banks for Credit Card Transactions in China Does Not Give Rise to a Basis for Specific
Jurisdiction ...................................................................................................... 15

      D.   Assignee's Other Evidence of Purported "New York Ties" Is Irrelevant to a Specific
Jurisdiction Analysis ......................................................................................... 19

      E.   Assignee Fails to Show That The Exercise of Specific Jurisdiction on The Grounds Asserted
Here Would Be Reasonable ................................................................................ 20

   II.   THE GLOBAL ASSET RESTRAINT IN THE FINAL ORDER SHOULD BE MODIFIED ..... 24

  III.  AS A MATTER OF INTERNATIONAL COMITY, THE COURT SHOULD DECLINE TO
ENFORCE THE SUBPOENAS AND THE FINAL ORDER AGAINST THE BANKS IN
CHINA ................................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.,
    2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ...................................................................19, 20

Amigo Foods Corp. v. Marine Midland Bank, N.Y.,
    39 N.Y.2d 391 (N.Y. 1976) ...........................................................................................................8

Ariz. Premium Fin. Co. v. Emplrs Ins. of Wausau,
    586 Fed. Appx. 713 (2d Cir. 2014)...............................................................................................25

Bluewaters Communications Holding v. Ecclestone,
    2014 N.Y. Misc. LEXIS 208 (Sup. Ct. N.Y. Cnty. 2014) ...........................................................14

Bristol Myers Squibb Co. v. Superior Court of Calif., San Francisco Cty.,
    137 S. Ct. 1773 (2017)..................................................................................................................20

Burger King Corp. v. Rudzewicz,
    471 U.S. 462 (1985)........................................................................................................6, 15, 20

Camreta v. Greene,
    563 U.S. 692 (2011)......................................................................................................................13

Casio Comput. Co. v. Sayo,
    2000 WL 1877516 (S.D.N.Y. Oct. 13, 2000) ...............................................................................22

CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd. P'ship,
    2013 WL 2661037 (S.D.N.Y. June 11, 2013) (CM) (SN)...........................................................32

Chloe v. Queen Bee of Beverly Hills, LLC,
    616 F.3d 158 (2d Cir. 2010).........................................................................................................20

Daimler v. AG Bauman,
    134 S. Ct. 746 (2014)..............................................................................................................18, 19

Daventree Ltd. v. Republic of Azer.,
    349 F. Supp. 2d 736 (S.D.N.Y. 2004)..........................................................................................22

Fin. Inst. Track Litig. v. Heartland Bank,
    2011 WL 1232352 (S.D. Tex. Mar. 31, 2011)..............................................................................17

First Union Nat'l Bank v. Banque Paribas,
    135 F. Supp. 2d 443 (S.D.N.Y. 2001)..........................................................................................22

Gliklad v. Bank Hapoalim B.M.,
    2014 N.Y. Misc. LEXIS 3600 (Sup. Ct. N.Y. Cnty. 2014) ....................................14

Gucci Am. Inc. v. Bank of China,
    768 F.3d 122 (2d Cir. 2014)...............................................................18, 19, 20, 26

Gucci Am., Inc. v. Li,
    135 F. Supp. 3d 87 (S.D.N.Y. 2015)............................................................. passim

Gucci Am., Inc. v. Weixing Li,
    2011 WL 6156936 (S.D.N.Y. Aug. 23, 2011) ........................................................32

Gucci Am., Inc. v. Weixing Li,
    2012 WL 5992142 (S.D.N.Y. Nov. 15, 2012) ........................................................12

Hau Yin To v. HSBC Holdings, PLC,
    700 Fed. Appx. (2d Cir. 2017) .............................................................................13

Helicopteros Nacionales de Colombia, S.A. v. Hall,
    466 U.S. 408 (1984).............................................................................................16

In re Terrorist Attacks on Sept. 11, 2001,
    2018 WL 1631450 (S.D.N.Y. Mar. 28, 2018) ......................................................13

In re Vitamin C Antitrust Litig.,
    837 F.3d 175 (2d. Cir. 2016)................................................................................30

Lan Assocs. XVIII, L.P. v. Bank of N.S.,
    96 Civ. 1022 (JFK), 1997 WL 458753 (S.D.N.Y. Aug. 11, 1997).........................23

Licci v. Lebanese Canadian Bank,
    732 F.3d 161 (2d Cir. 2013).......................................................................8, 9, 10

Licci v. Lebanese Canadian Bank SAL,
    20 N.Y.3d 327 (N.Y. 2012) ...........................................................................9, 10

Licci v. Lebanese Canadian Bank, SAL,
    673 F. 3d 50 (2d Cir. 2012)......................................................................9, 10, 20

Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros., Co.,
    23 N.Y.3d 129 (N.Y. 2014) .................................................................................21

Monkton Ins. Servs. v. Ritter,
    768 F.3d 429 (5th Cir. 2014) .................................................................................8

Motorola Credit Corp. v. Standard Chartered Bank,
    771 F. 3d 160 (2d Cir. 2014)...........................................................................24, 26

Motorola v. Standard Bank,
    24 N.Y.3d 149 (N.Y. 2014) ...............................................................................23, 24

NML Capital, Ltd. v. Republic of Argentina,
    727 F.3d 230 (2d. Cir. 2013)....................................................................................26

Nursan Metalurji Endustrisi A.S. v. M/V "Torm Gertrud",
    2009 WL 536059 (S.D.N.Y. Feb. 27, 2009)............................................................15

Project Honey Pot v. John Does,
    2012 WL 1854184 (E.D. Va. May 21, 2012) ....................................................17, 23

Reebok Int'l v. McLaughlin,
    49 F.3d 1387 (9th Cir. 1995) ...................................................................................30

Rushaid v. Pictet,
    28 N.Y.3d 316 (N.Y. 2016) ...............................................................................11, 13

SAS Group, Inc. v. Worldwide Inventions, Inc.,
    245 F. Supp. 2d 543 (S.D.N.Y. 2013).......................................................................11

Shipping Corp. of India v. Jaldhi Overseas PTE Ltd.,
    585 F.3d 58 (2d Cir. 2009)................................................................................21, 23

SPV OSUS, Ltd. v. UBS AG,
    882 F.3d 333 (2d Cir. 2018)..............................................................................13, 20

Sullivan v. Barclays PLC,
    2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)............................................................19

Tamam v. Fransabank SAL,
    677 F. Supp.2d 720 (S.D.N.Y. 2010)..........................................................................8

Tiffany (NJ) LLC v. Forbse,
    2012 WL 1918866 (S.D.N.Y. May 23, 2012) ...................................15, 18, 28, 33

Tiffany (NJ) LLC v. Qi Andrew,
    10 Civ. 9471 (KPF) (HBP), 2015 WL 3701602 (S.D.N.Y. Jun. 15, 2015) ..........28

Tiffany (NJ) LLC v. Qi Andrew,
    2012 WL 5451259 (S.D.N.Y. June 15, 2015) ........................................................29

Tiffany (NJ) LLC v. Qi Andrew,
    276 F.R.D. 143 (S.D.N.Y. 2011) .............................................................................32

Tiffany v. Forbes,
    2011 Civ. 4976 (NRB) (S.D.N.Y. June 21, 2012) ..................................................27

Tiffany v. Qi Andrew,
    2010 Civ. 9471 (WHP) (HPB) (S.D.N.Y. Nov. 2, 2011) ......................................................27

United States v. Visa U.S.A., Inc.,
    344 F.3d 229 (2d Cir. 2003).................................................................................................15

Walden v. Fiore,
    134 S. Ct. 1115 (2014)....................................................................................................4, 19

## STATUTES AND RULES

N.Y. C.P.L.R. § 302(1) ...................................................................................................19

Agricultural Bank of China, Bank of China, Bank of Communications, China Construction Bank, China Merchants Bank, and Industrial and Commercial Bank of China Limited, nonparties to this action (collectively, the "Banks"), respectfully submit their Reply Memorandum of Law in Support of their Motion to Quash Subpoenas and Modify Final Order ("Motion to Quash") and Memorandum in Opposition to Plaintiff-Assignee, Next Investments, LLC's ("Next" or "Assignee") Cross-Motion to Compel Production of Documents ("Motion to Compel").[1]

## PRELIMINARY STATEMENT

The fundamental issue here is straightforward. The Banks cannot comply with the Subpoenas or the Final Order entered in this action without violating the Chinese laws under which they are organized and to which they are subject. The only way that the Banks can produce the information requested by Assignee without violating Chinese law is via a request made pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters (the "Hague Convention"). Indeed, the *Banks are ready and willing to provide information in response to a Hague Convention request*. Moreover, because China processes Hague Convention requests as quickly as—if not more quickly than—the United States does, and plaintiffs in similar cases have obtained favorable results via the Hague Convention process, proceeding via that route to obtain the discovery sought herein would be more efficient and expedient than the instant proceeding. Requiring Assignee to proceed via the Hague Convention would not only conserve judicial resources, it would allow Assignee to obtain the information it seeks, would solve the Banks' Chinese law dilemma, and would spare this Court the need to reach a decision that either denies Assignee *all* of the information it seeks on

---

[1]   This Court granted the Banks' request to file an enlarged 35-page brief in response to Assignee's Opposition to the Motion to Quash and Motion to Compel. ECF Nos. 79-80.

jurisdictional and comity grounds (which the Banks submit is the correct outcome), or results in an unnecessary affront to a sovereign nation.

Nothing in Assignee's opposition to the Banks' Motion to Quash or Cross-Motion to Compel alters the calculus here.[2]  Neither the Subpoenas, nor the Final Order, are enforceable because the Court cannot exercise personal jurisdiction over the Banks.  Assignee has submitted records purporting to demonstrate the Banks' connections with New York—including records of correspondent account transfers, credit card transactions, promotional materials, and property records.  These alleged connections are insufficient to establish jurisdiction because they either do not show "purposeful availment" in New York, or have no connection to the underlying dispute (or the subject matter of the discovery requests).

For example, Assignee has submitted hundreds of wire transfer records in support of its argument for specific jurisdiction.  These records show that third parties (outside of New York and generally outside of the U.S.) directed wire payments to Judgment Debtors' bank accounts, maintained at the Banks, *in China*.  Assignee claims that these wire transfers give rise to specific jurisdiction over the Banks because the wired funds were routed through the Banks' correspondent accounts, maintained at wholly separate U.S. banks in New York.  However, the mere receipt of funds into a foreign bank's correspondent account at a U.S. bank in New York (a routine business occurrence for foreign banks everyday) is not a basis for finding "purposeful availment" in New York.

The same is true with regard to the credit card transactions that Assignee has presented to the Court.  Although these records indicate that certain of the Banks acted as acquiring banks (i.e., processors of credit card payments) in the Visa and MasterCard network for the Judgment

---

[2]  ECF No. 87, Opposition to Motion to Quash and Cross-Motion to Compel, hereinafter "Opp."

Debtors, there is no indication that the Banks provided any of these services to the Judgment Debtors outside of China.  As such, those services cannot form the basis for the exercise of jurisdiction over the Banks.  The fact that MasterCard is based in New York is of no relevance to the jurisdictional analysis (and Visa is not based in New York), which must focus on the contacts that the Banks maintain with the forum and the relationship that those contacts have with the subject matter of the discovery requests at issue.

Enforcing the Subpoenas and Final Order would also violate principles of comity.  This is especially true given that the Hague Convention provides an alternative to U.S. discovery proceedings, particularly here where the Banks have agreed to cooperate with Assignee on such a request.  Assignee's complaints about the time necessary to process Hague Convention requests in China (even though the average processing time for such requests in China is no longer than the average processing time in the U.S.) do not justify an end-run around the Hague Convention.  Indeed, the timeframe for a Hague Convention request may well be shorter when one factors in the time spent on these Cross-Motions and any subsequent appeal thereof.

A comity analysis also compels the conclusion that China's interests here outweigh the U.S. policy interests at issue.  As regulated and state-owned financial institutions based in China, the Banks must abide by Chinese banking laws and regulations.  These laws and regulations permit the disclosure of account information or the restraint of such accounts only pursuant to a Chinese court order or authorization by the relevant Chinese authorities.  The fact that the Chinese Ministry of Justice has written to this Court to express its opposition to the Subpoenas and the Final Order underscores the significance of China's interests here.

The U.S.'s interests here are secondary.  Although the U.S. has an interest in enforcing the rights of trademark holders, that interest is substantially diluted by the time it reaches the

Banks.  The Banks did not violate any U.S. trademarks.  The Banks are innocent third parties who *may* have information that *may* lead to the recovery of certain funds belonging to the Judgment Debtors.  In addition, the original trademark holders in this action have transferred their rights to the judgment to the Assignee, who has *no interest in enforcing intellectual property rights*.  As an entity created by and associated with a third party litigation funder, Assignee's only interest is in obtaining a return on its investment.  At heart, what is at stake here are the commercial interests of a litigation funder seeking to recover a piece of a $1.8 billion default judgment entered against hundreds of defendants who have never appeared before the Court in this action.  These interests are simply insufficient to justify the issuance of a U.S. court order compelling six of China's largest banks to openly defy the laws of their home country.

In light of these considerations, Assignee's demands for the global discovery of Judgment Debtor bank accounts pursuant to the Subpoenas should be quashed and its Motion to Compel denied.  If Assignee wants the disclosure of customer account information in China, it should proceed under the Hague Convention.  Moreover, the Final Order should be modified to prevent its application to the Banks outside of New York.

## ARGUMENT

## I.    THE BANKS ARE NOT SUBJECT TO SPECIFIC PERSONAL JURISDICTION IN NEW YORK

The touchstone of any specific personal jurisdiction analysis is that "the defendant's suit-related conduct must create a *substantial connection* with the forum state" and that the relationship between the defendant and the forum "must arise out of contacts that *the defendant himself* creates with the forum. . . ."  Walden v. Fiore, 134 S. Ct. 1115, 1121 (2014) (emphasis added).  The New York contacts alleged by Assignee do not satisfy these requirements because they either (1) are not "substantial connections" with the forum state, or (2) do not arise from

4

purposeful actions taken *by the Banks*.  Accordingly, the exercise of specific jurisdiction based on these connections would violate the minimum contacts requirements under due process and, additionally, fail to comport with traditional notions of fair play and substantial justice.[3]

### A.  The Banks' New York Correspondent Accounts Do Not Give Rise to Specific Personal Jurisdiction

Assignee accuses the Banks of being "less than candid" with the Court because they did not disclose the existence of records showing that wire payments to the Judgment Debtors were routed through the Banks' correspondent accounts in New York.  Opp. at 12.  It is Assignee that is not being candid.  Any correspondent account transaction records are maintained by the Banks *in China,* or in the files of *completely separate U.S. banks* (e.g., Chase and Citi).  See Declaration of Robert Almanas ("Almanas Decl.") ¶¶ 34, 47, 49;[4] Chen Decl. ¶ 6.  None of these records is maintained by the Banks in New York, in their New York branches or otherwise.  That is why they were not discovered or disclosed when the New York branches of the Banks voluntarily undertook a search of their records for documents relating to Judgment Debtors.

Correspondent banking is an arrangement under which one bank (the correspondent bank) holds deposits owned by another bank (the respondent bank) and provides payment and other services to the respondent bank.  See Almanas Decl. ¶ 27.  It generally involves the "opening of accounts by respondent banks at the correspondent banks and the exchange of messages to settle transactions by crediting and debiting those accounts."  Id.  By opening a correspondent account at a U.S. financial institution, a non-U.S. respondent bank can make and receive payments in U.S. dollars.  Id.  ¶ 31, 33.  It is an arms' length account arrangement

---

[3]  Personal jurisdiction under the New York long arm statute also fails.  Motion to Quash at 9-10 (noting that the personal jurisdiction standards under N.Y. C.P.L.R. § 302(1) and minimum contacts under due process are similar).

[4]  The declarations filed herewith are cited by reference to the Declarant's surname and "Decl."

between the two banks.  Virtually every major bank in the world has a correspondent account with a U.S. bank.  Almanas Decl. ¶ 34, 51.

Assignee's reliance on the correspondent account records pertaining to all of the Banks (except Agricultural Bank of China) as a basis for specific jurisdiction is misguided.  These wire transfer records indicate only that payments to certain Judgment Debtors were received into the Bank's correspondent account at an unrelated bank in New York as part of the routine and automated processing of U.S. dollar transactions.  The correspondent banks then instructed the Banks to credit the payments to the Judgment Debtor accounts maintained in China.  The mere receipt of debit and credit instructions from an independent bank do not support jurisdiction here. The Banks, like all international banks, need to be able to clear transactions in U.S. dollars. Utilizing a third-party bank located in New York to process such transactions does not constitute purposely directing one's activities to this forum.  See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (The minimum contacts inquiry turns on whether the entity over whom jurisdiction is sought "'purposefully directed' [its] activities at … the forum.").

### 1. The Receipt of Wire Transfer Funds Into New York Correspondent Accounts Does Not Constitute "Purposeful Availment" In New York

The flaws in Assignee's position become clear when one considers the mechanics of the wire transfer process in the correspondent banking relationship.  These "transfers" do not involve the physical movement of funds from one location to another. Rather, funds "move" from one account to another through a series of discrete book entries.  The party initiating a wire transfer instructs its bank (the "Originating Bank") to pay a beneficiary, using payment instructions that identify the beneficiary's bank account and the amount to be paid.  Almanas Decl. ¶ 39.  If the beneficiary's bank is a non-U.S. bank, the Originating Bank will credit the funds into the U.S.

correspondent account of the non-U.S bank.[5]   Almanas Decl. ¶ 40, 41.   Thereafter, the funds

stay in the non-U.S. bank's U.S. correspondent account and the U.S. correspondent bank notifies

the non-U.S. bank that its correspondent account has been credited with the payment amount.  Id.

¶¶ 41, 42.  The non-U.S. bank then enters a corresponding credit entry in its books and records

relating to the beneficiary's account.  Id.  ¶ 42, 43.  The only affirmative action that the non-U.S.

bank takes with regard to its customer—the crediting of the customer's account—takes place

outside of New York.  Id. ¶¶ 42-43, 45.  As such, there is no purposeful conduct by the non-U.S.

beneficiary bank within New York.

The transaction described above is also highly automated.  Once a non-U.S. bank has

established a correspondent account in the U.S., it does little to maintain the account, which is

hardly more than a mailbox for U.S. dollar transactions.  Id. ¶ 18, 36.  Moreover, these are high

volume transactions.   Significant numbers of correspondent banking transactions take place

across a large score of U.S. correspondent accounts maintained at U.S. financial institutions

(most of which are located in New York) on any given business day.  Id.  ¶ 46.  These routine

transactions enable the flow of U.S. dollars across international borders and are crucial to the

global funds transfer system.  Id.  ¶ 30.

In light of the nature and context of these transactions, the wire transfer records submitted

by Assignee—no matter how voluminous—are red herrings in the jurisdictional analysis.  The

records reflect nothing more than routine wire transfers in which the Banks are passive actors;

the Banks themselves do not transfer funds, nor do they direct the transfer of funds to their

customer accounts overseas.  Assignee accuses the Banks of "effectuat[ing]" or "facilitat[ing]"

---

[5]  If the Originating Bank is not in the United States, it will credit the funds to its own U.S.
correspondent account, which in turn will credit the funds to the U.S. correspondent account of
the non-U.S. beneficiary bank.  Almanas Decl. ¶¶ 40-42.

wire transfers to the Judgment Debtors in New York. Opp. at 12-13. But everything that happens in New York is actually the result of choices and decisions made by the Originator or Originating Bank and is executed by the correspondent bank, which then simply informs the Banks in China that a payment has been made. Notably, *none* of this activity is carried out by the New York branches of the Banks, which underscores that the Banks engage in no conduct in New York in connection with these correspondent transactions. This limited activity cannot form the basis for finding that the Banks have engaged in purposeful conduct in New York.

Accordingly, courts in this jurisdiction have long held that the "mere maintenance" of correspondent accounts in New York cannot be a basis for specific jurisdiction. See Amigo Foods Corp. v. Marine Midland Bank, N.Y., 39 N.Y.2d 391, 396 (N.Y. 1976) ("Standing by itself, a correspondent bank relationship … may not form the basis for long–arm jurisdiction."); Tamam v. Fransabank SAL, 677 F. Supp.2d 720, 727 (S.D.N.Y. 2010) ("courts in this district have routinely held that merely maintaining a New York correspondent bank account is insufficient to subject a foreign bank to personal jurisdiction."); Licci v. Lebanese Canadian Bank, 732 F.3d 161, 171 (2d Cir. 2013) ("Licci III") ("[W]e by no means suggest that a foreign defendant's mere maintenance of a correspondent account in the United States is sufficient to support … personal jurisdiction … in connection with any controversy."); see also Monkton Ins. Servs. v. Ritter, 768 F.3d 429, 431, 433-34 (5th Cir. 2014) (holding that 20 wire transfers sent via an account maintained at third-party defendant bank—but not initiated by the third-party defendant bank itself—into the jurisdiction over a three year period formed an insufficient basis for exercising specific jurisdiction over the wiring bank).

### 2. Gucci v. Li Does Not Change The Analysis

Assignee would have this Court reject decades of this settled authority on the basis of

<u>Gucci Am., Inc.</u> v. <u>Li</u>, 135 F. Supp. 3d 87 (S.D.N.Y. 2015) ("<u>Gucci</u>").[6]  In <u>Gucci</u>, another court in this district found that there were grounds to assert specific jurisdiction over Bank of China, on the basis of several wire payments that were received into its correspondent account at JP Morgan in New York.  <u>Id.</u> at 104.  Respectfully, however, the <u>Gucci</u> court's finding was premised on a misapplication of the prevailing case law, mistaken assumptions about Bank of China's role in the payment process, and the improper conflation of other irrelevant New York contacts into its jurisdictional analysis.  No court in this district or any other federal district court has adopted <u>Gucci</u> in support of the conclusion that the routine receipt of wire payments into a correspondent bank account can serve as the basis for personal jurisdiction.

First, <u>Gucci</u> incorrectly concluded that the New York Court of Appeals and Second Circuit decisions in the <u>Licci</u> cases dictated a finding that Bank of China's use of its correspondent accounts gave rise to specific jurisdiction.  <u>Licci</u> v. <u>Lebanese Canadian Bank SAL</u>, 20 N.Y.3d 327, 338-39 (N.Y. 2012) ("<u>Licci II</u>"); <u>Licci III</u>, 732 F.3d 161, 166 (2d. Cir. 2013).  The correspondent account transactions at issue in <u>Licci</u>, and the facts surrounding them, however, differ significantly from the facts at issue in <u>Gucci</u> (and here).  In <u>Licci</u>, plaintiffs alleged that a non-U.S. bank, Lebanese Canadian Bank, SAL ("LCB"), had itself violated the Anti-Terrorism Act by knowingly assisting an affiliate of Hizbollah, a known terrorist organization, to commit acts of terror.  <u>Licci</u> v. <u>Lebanese Canadian Bank, SAL</u>, 673 F. 3d 50, 54-55 (2d Cir. 2012) ("<u>Licci I</u>").  The court held there was a basis to exercise specific jurisdiction over LCB because it had, allegedly, "deliberately used a New York [correspondent] account

---

[6]  In an attempt to suggest that this Court should be bound by <u>Gucci</u>, Assignee asserts that the Second Circuit "rejected" Bank of China's appeal of <u>Gucci</u>.  Opp. at 12, n.6.  This is incorrect. The Second Circuit denied Bank of China's motion to stay contempt sanctions pending appeal and ordered an expedited appeal.  Supplemental Declaration of Jacqueline L. Chung ("Chung Supp. Decl.") Ex. 24.  Thereafter, Bank of China *voluntarily* dismissed its appeal.  Chung Supp. Decl. Ex. 25.

again and again to effect its support of [the Hizbollah affiliate] and shared terrorist goals."[7] <u>Licci II</u>, 20 N.Y. 3d at 340.   The complaint also alleged that Hizbollah "made and received dozens of dollar wire transfers via . . . LCB."   Chung Supp. Decl. Ex. 26 at ¶ 53 (<u>Licci</u> First Amended Compl.).   LCB was therefore alleged to have *initiated* the illegal payments through its correspondent account in furtherance of *its* alleged support of a terrorist organization.   Thus, even though the <u>Licci</u> court acknowledged that the mere maintenance of a correspondent account does not give rise to specific jurisdiction, it found sufficient allegations of bad acts *by LCB itself* to warrant a departure from this well-established standard. <u>Licci III</u>, 732 F.3d at 171, 173-74.

In <u>Gucci</u>, as in this case, Bank of China did not initiate any payments through its correspondent account on behalf of the defendants, and Bank of China, like the Banks here, was not a defendant and was not accused of any wrongdoing.   <u>See</u> ECF No. 72, at 15-28, Declaration of Jacqueline L. Chung ("Chung Decl."), Ex. 14-1.   Unlike <u>Licci</u>, the passive transactions in <u>Gucci</u> did not warrant a departure from that baseline standard regarding the "mere maintenance" of correspondent accounts, and neither do the transactions here.   The Banks did not "use" their correspondent accounts to participate in or further the Judgment Debtors' counterfeiting scheme in the manner that LCB allegedly "used" its correspondent accounts to make payments to and for a terrorist organization.   The Banks did not provide any "financial support" to the counterfeiters, wittingly or unwittingly.   The Banks merely credited money to customer accounts in China based

---

[7]   The Second Circuit noted that the allegations against LCB were that "LCB had 'actual knowledge' that Hizbollah was a violent terrorist organization . . . and that Shahid [a Hizbollah affiliate] was 'part of Hizbollah's financial arm.'"  <u>Licci I</u>, 673 F. 3d at 57; <u>see also</u> Chung Supp. Decl. Ex. 26 ¶¶ 130, 135 (<u>Licci</u> First Amended Compl.).   Moreover, the plaintiffs alleged that the bank, as a matter of 'official LCB policy' 'continuously supports and supported Hizbollah and its anti-Israel program, goals and activities."  Id. ¶ 126.   In particular, the plaintiffs allege that LCB *carried out the wire transfers 'in order to assist and advance Hizbollah's goal of using terrorism to destroy the State of Israel.'*  Id. ¶ 129."  <u>Licci I</u>, 673 F. 3d at 57 (emphasis added).   These facts bear no relation to those present in this case.

on instructions given by their correspondent banks who happened to be located in New York. These correspondent accounts were simply repositories for funds directed to the Judgment Debtors by outside parties.[8]

Second, Gucci incorrectly concluded that in light of Licci, evidence of repeated correspondent account transactions is sufficient to show the kind of deliberate conduct that is required to establish specific jurisdiction. Gucci, 135 F. Supp. 3d at 95 ("[T]here can be no real dispute that BOC frequently and deliberately used its New York correspondent account with Chase to effectuate wire transfers for its U.S. clients, including, critically, Defendants in this action."). While there is no dispute that the transactions at issue are repetitive, it is simply incorrect to conclude that, because of that repetition, they are also deliberate or purposeful. This is especially true in the context of correspondent banking, which by its nature consists of the automated processing of large volumes of wire transfers that require no input from the non-U.S. bank receiving the transfer. Almanas Decl. ¶¶ 18, 36. There is no assertion of intentional or purposeful conduct here and no amount of repeated activity can make up for the absence of this essential element of the jurisdictional analysis. See SAS Group, Inc. v. Worldwide Inventions, Inc., 245 F. Supp. 2d 543, 548 (S.D.N.Y. 2013) ("It is the 'nature and quality' and not the amount of New York contacts that determine the purposeful activity.").

Third, Gucci incorrectly concluded that the opening of a correspondent account in New York is a sufficient basis upon which to establish specific jurisdiction because the account

---

[8]   More recently, in Rushaid v. Pictet, 28 N.Y.3d 316, 319, 328 (N.Y. 2016) the New York Court of Appeals held that there was a basis to assert specific jurisdiction over a foreign bank that plaintiff alleged had repeatedly and intentionally used a New York correspondent account as an "integral" part of a fraudulent scheme to wire bribes to the foreign bank's account. The foreign bank was alleged to have "orchestrated the money laundering." Id. at 328. Like Licci, Rushaid is therefore inapposite because there is no allegation (indeed no suggestion) that the Banks knowingly used their correspondent accounts to facilitate transfers on behalf of the counterfeiters, let alone that such transfers were an "integral" part of Judgment Debtors' scheme.

enables the non-U.S. bank to "transfer . . . money from its clients' bank accounts in the United States to their accounts abroad." Gucci, 135 F. Supp. 3d at 95; see also Opp. at 12 (noting that the Banks "open[ed] correspondent accounts with New York banks 'to repeatedly facilitate the transfer of money from' accounts held by counterfeiters like the Judgment Debtors." (quoting id. at 95)). The Banks entered into correspondent banking relationships, however, to receive U.S. dollar payments with respect to *any* and *all* transactions. Almanas Decl. ¶ 31. The Banks' correspondent accounts are omnibus accounts; they bear no relationship to any particular client. Id. ¶¶ 41-44. These accounts have no purposeful connection to the Judgment Debtors and certainly no purposeful connection to any counterfeiting transactions.

Fourth, Gucci incorrectly held that Bank of China's marketing activities relating to its correspondent banking services provided a basis for jurisdiction because "[s]uch marketing apparently captivated Defendants," who used BOC's correspondent banking account with J.P Morgan Chase to transfer money to China. Gucci, 135 F. Supp. 3d at 94.[9] Just as the opening and maintenance of a correspondent account are not a basis for specific jurisdiction, the advertising of correspondent account services does not give rise to jurisdiction either. While advertising activities might suffice to establish specific jurisdiction for claims relating to the advertising (e.g., a claim for false advertising or misrepresentation), such activities do not open the door for a U.S. court to exercise personal jurisdiction for all purposes. There is no suggestion that the Banks targeted counterfeiters to assist with their counterfeiting activities. The marketing

---

[9] The wire transfers in Gucci involved transfers of funds from the defendant counterfeiter's bank accounts at U.S. financial institutions into Bank of China's correspondent account in New York, before being transferred to the defendants' accounts at Bank of China in Beijing. Gucci Am., Inc. v. Weixing Li, 2012 WL 5992142, at n. 2 (S.D.N.Y. Nov. 15, 2012) ("Gucci II"). By contrast, none of the wire transfers here are transfers *between* the Judgment Debtors' accounts. Rather, they are wire payments from third parties *to* the Judgment Debtors' bank accounts in China that have been routed through the Banks' correspondent accounts in New York. See, e.g., Weigel Decl. Exs. 33, 49-62, 83-85, 104-108.

materials submitted by Assignee demonstrate that the Banks were simply marketing correspondent account activities and other banking services to the general public.  See Weigel Decl. Exs. 17-31, 41-47, 70-80, 92-101, 116-122, 233-244; see also Grossbaum Decl. Ex. 1.

At bottom, the Banks respectfully submit that Gucci was wrong to conclude that a non-U.S. bank "deliberately thrust[s] itself into the New York financial market" in such a way that it becomes subject to the personal jurisdiction of this court when it opens a correspondent account in New York and permits third parties to wire transfers through that account.  Gucci, 135 F. Supp. 3d at 95.  The decision ignores the differences between a non-U.S. bank's deliberate use of correspondent accounts to make payments in support of an illegal enterprise, and the routine receipt of wire payments into a non-U.S. banks' correspondent account at the direction of another party.  This Court is not bound by the Gucci analysis and it should decline to follow it, as other courts in this circuit have recently done.[10]  See Hau Yin To v. HSBC Holdings, PLC, 700 Fed. Appx. at 67 (2d Cir. 2017) (affirming dismissal of claims against non-U.S. bank because "[p]laintiffs have not alleged the kind of intentional and repeated use of correspondent accounts that amounts to a transaction of business") (citing Rushaid, 28 N.Y. 3d at 328-29, 339); SPV OSUS, Ltd. v. UBS AG, 882 F.3d 333, 345 (2d Cir. 2018) (declining to exercise specific jurisdiction on the basis of "a handful of communications and transfers of funds."); In re Terrorist Attacks on Sept. 11, 2001, 2018 WL 1631450, *7 (S.D.N.Y. Mar. 28, 2018) (no specific jurisdiction against non-U.S. bank where allegations were "only that *third parties* used the [non-U.S. bank] to transfer money to al Qaeda.") (emphasis in original).

---

[10]  See Camreta v. Greene, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.").

### B. Bank of China's Role as an Intermediary Bank Does Not Give Rise to a Basis for Specific Jurisdiction

Bank of China's New York branch ("BOC NY") has voluntarily produced records of wire transfers for which BOC NY served as an intermediary bank.  An intermediary bank serves as a payment conduit between an originator bank and a beneficiary's bank for wire transfers. Almanas Decl. ¶ 52.  BOC NY's involvement in these transactions is limited to receiving U.S. dollar payments from another U.S. bank, via both banks' membership in domestic U.S. payment channels such as CHIPS and Fedwire.  Id. ¶¶ 54-56.  BOC NY has no relationship with the ultimate beneficiary for whom the funds are intended and does not maintain an account on behalf of the beneficiary.  Id. ¶ 19, 52.

Thus, similar to the way in which funds are directed into a U.S. correspondent account by outside parties, BOC NY's receipt of funds as an intermediary is entirely passive and cannot be the basis for specific jurisdiction.  See Bluewaters Communications Holding v. Ecclestone, 2014 N.Y. Misc. LEXIS 208, *23 (Sup. Ct. N.Y. Cnty. 2014) (Chung Supp. Decl. Ex. 27) ("Even if the funds for these two payments cleared through a bank in New York, they did not end up here and the clearing process alone . . . would not be enough to support . . . [personal] jurisdiction over any of the defendants."); Gliklad v. Bank Hapoalim B.M., 2014 N.Y. Misc. LEXIS 3600, *8 (Sup. Ct. N.Y. Cnty. 2014) (Chung Supp. Decl. Ex. 28) (finding no basis for specific jurisdiction over a foreign bank whose New York branch served as an intermediary in a wire transfer because to exert jurisdiction over a "regularly available banking service would permit the extension of jurisdiction to a degree that would most certainly violate notions of 'fair play and substantial justice'").

### C.  Agricultural Bank of China, Bank of China, and Bank of Communications' Role as Acquiring Banks for Credit Card Transactions in China Does Not Give Rise to a Basis for Specific Jurisdiction[11]

Assignee argues that Agricultural Bank of China, Bank of China, and Bank of Communications, by virtue of acting as "acquiring banks" for the MasterCard and Visa networks, should be subject to personal jurisdiction here.[12]  Opp. at 15-16.  Assignee's argument suffers the same defect as its correspondent account argument: these three banks' roles as acquiring banks simply do not establish the requisite connection with New York to justify the exercise of personal jurisdiction.  Burger King Corp., 471 U.S. at 472 (under the minimum contacts inquiry, the litigation must "result[] from alleged injuries that 'arise out of or relate to'" activities within the forum) (citations omitted).

Assignee submits five exhibits as evidence of Agricultural Bank of China,[13] Bank of China,[14] and Bank of Communications acting as acquiring banks, Grossbaum Decl. Ex. 2, but

---

[11]  China Construction Bank, China Merchants Bank, and Industrial and Commercial Bank of China Limited are not alleged to have engaged in any transactions as acquiring banks relating to the Judgment Debtors.

[12]  An acquiring bank "acts as liaison between the network and those merchants accepting the network's payment cards."  United States v. Visa U.S.A., Inc., 344 F.3d 229, 235 (2d Cir. 2003); see also Almanas Decl. ¶¶ 65, 68.

[13]  The "evidence" of Agricultural Bank of China acting as an acquiring bank is scant: just four credit card transactions totaling $326.65 from 2013—that is, almost five years ago.  Weigel Decl. Ex. 245.  Given the passage of time, there is little support for Assignee's argument that it is "extremely likely that ABC" will "have valuable information on the identity, business activities, and even location of one or more [Judgment Debtors]."  Opp. at 16 (citing Tiffany (NJ) LLC v. Forbse, 2012 WL 1918866, *2, *5 (S.D.N.Y. May 23, 2012)).

[14]  Assignee submits records produced by MasterCard and Visa relating to BOC Credit Card (International) Limited ("BOC Credit Card").  BOC Credit Card, a wholly-owned subsidiary of BOC, Hong Kong, is a separate legal entity from BOC.  See Chung Supp. Decl. Ex. 29; Xue Decl. ¶ 21.  Accordingly, BOC Credit Card's alleged contacts with the forum cannot be imputed to BOC.  Nursan Metalurji Endustrisi A.S. v. M/V "Torm Gertrud", 2009 WL 536059, *3 (S.D.N.Y. Feb. 27, 2009) (holding that Defendant is not subject to personal jurisdiction in New York because Plaintiff failed, inter alia, to "allege any basis for treating the two separate entities"—the Defendant and its wholly owned subsidiary—as "one for the purposes of

*none* of these documents indicates transactions with any apparent connection to New York.  For example, Assignee points to a 57-page list of MasterCard transactions, see Nagin Decl. Ex. 2, yet nothing on this list shows a New York nexus.  Indeed, nothing on this list even shows a connection with the Judgment Debtors.  The document simply lists a series of credit card transactions where the issuing country for each transaction was the U.S. and the acquiring country (i.e. where acquiring bank services were actually performed) was China, but does not identify the merchants associated with any specific transaction.  Assignee's other exhibits are equally unavailing, and none demonstrate that the Banks provided any services to the Judgment Debtors outside of China.

Assignee cannot establish that specific jurisdiction is warranted simply because MasterCard is based in New York.  That would make every bank that participates as an acquiring bank for MasterCard subject to jurisdiction in New York for any dispute relating to a credit card transaction on that basis alone.  Such a finding would not comport with the requirements of due process, because the "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."  Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417 (1984).

The Banks have all confirmed that their acquiring bank activities are conducted only domestically in China.[15]  Although Assignee has not explained the connection between these acquiring bank activities and New York (other than the location of MasterCard's headquarters), there is simply no basis to conclude that these transactions constitute "purposeful availment" in

---

determining personal jurisdiction.").

[15]  Shang Decl. ¶¶ 5-10; Xue Decl. ¶ 20; Shi Decl. ¶¶ 5-11.

New York.[16]  See Project Honey Pot v. John Does, 2012 WL 1854184, *7 (E.D. Va. May 21, 2012) (no basis for specific jurisdiction over non-U.S. banks who provided acquiring bank services for online merchants of counterfeit drugs because there was no evidence the banks knew the merchants were targeting the forum and exercising jurisdiction "merely because … the banks are members of the global Visa system would essentially subject all acquiring banks to jurisdiction anywhere in the world."); Fin. Inst. Track Litig. v. Heartland Bank, 2011 WL 1232352, *13 (S.D. Tex. Mar. 31, 2011) (no basis for specific jurisdiction in Texas over Missouri-based acquiring bank participating in the Visa and MasterCard networks).

Assignee also cites license agreements that Bank of China and Bank of Communications entered into with MasterCard, along with MasterCard's and Visa's rules, as further evidence in support of jurisdiction on the basis that these agreements and rules are purportedly governed by New York law.  See Nagin Decl. Exs. 1, 2; Weigel Decl. Exs. 248, 255.  Assignee states that, pursuant to the licenses, "the Banks consent to personal jurisdiction in New York for all disputes arising out of those agreements," as though that fact should establish jurisdiction here.  Opp. at 16.  This is specious.  The dispute here does not "aris[e] out of" the licensing agreements, and those agreements are irrelevant to the instant jurisdiction analysis.  Moreover, each of the licensing agreements specifically restricts the Licensee's "permitted area of use" to China, further undercutting the argument that any credit card transactions provide a nexus with New

---

[16]  One of the banks, Bank of Communications, maintains a settlement account associated with its acquiring bank activities at JP Morgan-USA in New York.  This settlement account is an all-purpose account that is not specific to any merchant to whom it provides services.  Payments associated with all credit card transactions for which the bank serves as an acquirer (e.g., merchant payments, returns, and chargebacks) are credited and debited to this account. Thereafter, the bank will issue corresponding credits and debits to merchant accounts in China. For the same reason that correspondent and intermediary bank accounts do not give rise to specific jurisdiction, settlement accounts also cannot give rise to such jurisdiction given the absence of any meaningful connection between the bank and the forum in relation to the Judgment Debtors and their counterfeiting activities.

York.  See Nagin Decl. Ex. 1 at MC000011, 17, 21, 25.

Assignee's invocation of Visa and MasterCard's rules is similarly misplaced.  Section 2.4 of the MasterCard rules states that

> [a]ny action initiated by a Customer . . . must be brought, if at all, only in the United States District Court for the Southern District of New York or the New York Supreme Court for the County of Westchester, and any Customer involved in an action hereby submits to the jurisdiction of such courts and waives any claim of lack of personal jurisdiction . . . .

Weigel Decl. Ex. 255 at 53.  While the Banks arguably qualify as "Customer[s]" under the MasterCard rules,[17] this dispute is not an "action initiated by" the Banks, nor is it a case brought against MasterCard.  This jurisdictional provision is, of course, entirely irrelevant to the present dispute.  Assignee's reliance on the Visa rules is even more mystifying, as these rules make no reference to personal jurisdiction at all.  See Weigel Decl. Ex. 248.

Finally, Assignee relies on Forbse to argue for personal jurisdiction based on the acquiring bank activities of the three banks.  Opp. at 15.  Crucially, however, the court in Forbse did *not* find a sufficient basis upon which to exercise specific personal jurisdiction based on the banks' role as acquiring banks.  Rather, *general* jurisdiction was presumed because the case was decided prior to the Supreme Court's decision in Daimler, and at that time, the mere presence of a New York branch sufficed to establish general jurisdiction over a non-U.S. bank.  That is no longer the case.  See Daimler v. AG Bauman, 134 S. Ct. 746, 760-61 (2014); Gucci Am. Inc. v. Bank of China, 768 F.3d 122, 129 (2d Cir. 2014) ("Gucci III").  Forbse thus provides no support for extending personal jurisdiction in this case based on acquiring bank activities.[18]

---

[17]  Chung Supp. Decl. Ex. 30 at 282.

[18]  Assignee states that a subpoena to Visa remains pending.  Opp. at 16.  The Banks respectfully reserve the right request permission to address any additional documents produced by Visa in response to the subpoena that Assignee submits in conjunction with its reply memoranda of law in support of its Motion to Compel.

### D. Assignee's Other Evidence of Purported "New York Ties" Is Irrelevant to a Specific Jurisdiction Analysis

Assignee has produced a ream of exhibits purporting to show *any* connections that the Banks have with the forum, apparently operating under the assumption that if it bombards the Court with enough evidence of New York contacts—no matter how irrelevant to the underlying action and discovery sought—the Court is bound to find a basis for personal jurisdiction somewhere.  Opp. at 14 n. 8 and Grossbaum Decl. Exs. 1-2.  Assignee's attempt to persuade the Court to replace the traditional specific jurisdiction analysis with the now-discredited approach of "all purpose" or general jurisdiction (as rejected in Daimler, 134 S. Ct. at 760-62) should not be permitted here.

To satisfy the requirements for specific jurisdiction, the Banks' New York contacts must be related to the underlying action (and in the context of third party discovery, the subject matter of the discovery order).  See ECF No. 70 (Motion to Quash) at 8-9; Walden, 134 S. Ct. at 1121; N.Y. C.P.L.R. § 302(1); Gucci III, 768 F.3d at 141 (noting that at least one circuit has applied the specific jurisdiction test to nonparty discovery requests "by focusing on the connection between the nonparty's contacts with the forum and the discovery order at issue.").  Critically, Assignee "must demonstrate that the Foreign Banks' suit-related conduct creates minimum contacts with New York . . . not simply that the Foreign Banks have a presence here *or conduct business activities here in general*."  7 W. 57th St. Realty Co., LLC v. Citigroup, Inc., 2015 WL 1514539, *10 (S.D.N.Y. Mar. 31, 2015) (citing Walden, 134 S. Ct. at 1121) (emphasis added); see also Sullivan v. Barclays PLC, 2017 WL 685570, *43 (S.D.N.Y. Feb. 21, 2017) ("In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.").

Here, Assignee's evidence of so-called "New York ties"—the Banks' New York

branches, real property ownership in New York, participation of the New York branches in the CHIPS and Fedwire payment systems, holding of mortgages on New York property, registration with the New York Department of Financial Services, advertising of financial services provided by the New York branches, charters in New York, and FDIC insurance—all amount to nothing more than evidence of "conduct[ing] business activities here in general." 7 W. 57th St. Realty Co., 2015 WL 1514539, at *10. Assignee does not show how these factors give rise to specific jurisdiction, nor could it, as none bears any relation at all to the underlying trademark action or to the subject matter of Assignee's discovery requests. See SPV OSUS, Ltd., F.3d 333 at 344 ("'[A] defendant's general connections with the forum are not enough' to support the exercise of specific jurisdiction.") (quoting Bristol Myers Squibb Co. v. Superior Court of Calif., San Francisco Cty., 137 S. Ct. 1773, 1781 (2017)).

### E. Assignee Fails to Show That The Exercise of Specific Jurisdiction on The Grounds Asserted Here Would Be Reasonable

Assignee also has not shown that the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. Licci I, 673 F.3d at 59-60; Gucci III, 768 F.3d. at 136 (quoting Burger King Corp., 471 U.S. at 472). Although Assignee marches through the five-factor "reasonableness" test associated with the due process analysis,[19] its arguments are unconvincing. It is *not* reasonable for this Court to exercise specific jurisdiction over non-U.S. banks on the basis of routine and automated correspondent account transactions that are processed daily in this jurisdiction in significant volumes, credit card processing transactions that

---

[19] The five factors to be considered are: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164-65 (2d Cir. 2010).

take place abroad, and a hash of other purported New York connections with no connection to the underlying dispute.  The Banks addressed the five-factor test fully in their Motion to Quash at pages 13-16.  The Banks respond further here solely to Assignee's position regarding the interests of the forum state.

Asserting personal jurisdiction here runs directly counter to New York's interests as an international financial center.  If this Court were to find that the passive receipt of funds into a U.S. correspondent account constituted a sufficient basis for personal jurisdiction in New York, New York courts would open themselves up to every international tort case where payment to or by a defendant is made in U.S. dollars and cleared through New York banks.  All that a plaintiff would be required to show to establish specific personal jurisdiction over a non-party bank is that (1) the bank maintains a correspondent account with a New York bank through which its customers' U.S. dollar-denominated payments are cleared and settled; and (2) any wire payment with any connection whatsoever to some civil suit has been received into the non-U.S. bank's New York correspondent account.  Were Assignee's overly broad interpretation of jurisdiction adopted, New York courts would find themselves flooded with suits "every time one foreign national, effecting what is alleged to be a fraudulent transaction, moves dollars through a bank in New York."  Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros., Co., 23 N.Y.3d 129, 137 (N.Y. 2014); see also Shipping Corp. of India v. Jaldhi Overseas PTE Ltd., 585 F.3d 58, 62 (2d Cir. 2009) (acknowledging the errors and "unforeseen consequences" of a prior holding that electronic funds transfers passing though intermediary banks were subject to maritime attachment in New York, which resulted in plaintiffs filing "962 lawsuits seeking to attach a total of $1.35 billion," within a four month period, totaling  "33% of all lawsuits filed in the Southern District . . .").

21

New York's interests would not be served by overburdening its courts in this manner, a fact that courts have repeatedly recognized in declining to extend jurisdiction based on wire transfers passing through New York.[20]  See, e.g., Daventree Ltd. v. Republic of Azer., 349 F. Supp. 2d 736, 764 (S.D.N.Y. 2004) (declining to exercise jurisdiction because "plaintiffs' factual allegations regarding [defendants'] wire transfers and cash transfer do not suffice to demonstrate the existence of 'minimum contacts'"); Casio Comput. Co. v. Sayo, 2000 WL 1877516, *26 (S.D.N.Y. Oct. 13, 2000) ("Although . . . the wire transfers reached bank accounts in the United States, such conduct by defendants does not satisfy the level of minimum contacts required to assert personal jurisdiction over them.").

Moreover, New York enjoys a status—long-recognized by this Court—"as a world financial capital."  First Union Nat'l Bank v. Banque Paribas, 135 F. Supp. 2d 443, 453 (S.D.N.Y. 2001).  Consistent with New York's interests in maintaining this status, the Court should encourage non-U.S. banks to rely upon correspondent banks in New York to clear U.S. dollar transactions, not discourage that practice by taking an expansive view of personal jurisdiction for civil suits and third party discovery.  Indeed, faced with the possibility of legal risk arising from tenuous forum connections such as the receipt of funds into a correspondent account, non-U.S. banks in need of legitimate correspondent banking services may very well be incentivized to direct their business to cities other than New York.  If non-U.S. banks were driven to other jurisdictions, or were motivated to use other non-U.S. dollar currencies in order to avoid being subjected to personal jurisdiction, New York banks could lose a significant business that generates employment for citizens of this forum.  Almanas ¶ 82.  As such, New York's

---

[20]  Given the very few distinctions between the operations of correspondent banks and New York branches of foreign banks acting as intermediary banks in the international funds transfer system, it would also be unreasonable for the Court to assert personal jurisdiction over Bank of China based on its New York branch's intermediary services.  See supra at 14.

critical interest in protecting the expectations of the international banking system and in maintaining its status as an international financial center provides another reason why jurisdiction would be unreasonable here.[21]

Forum interests also do not support the exercise of specific jurisdiction over non-U.S. banks that provide acquiring bank services for merchants in the Visa and MasterCard payment networks. Even if the Court were to find the existence of minimum contacts on the basis of the sparse New York contacts associated with these transactions (if any), the exercise of personal jurisdiction would be highly unreasonable and, indeed, border on irrational. The Court would essentially open itself (and other New York courts) to the exercise of jurisdiction over parties involved in processing any credit card transaction in the world that is processed through the MasterCard or Visa network. See Project Honey Pot, 2012 WL 1854184, *7 (E.D. Va. May 21, 2012) (finding personal jurisdiction based on Visa network participation would not be reasonable as it would implicate any bank around the world that processes Visa transactions).

---

[21]  See also Jaldhi, 585 F.3d at 62 ("Undermining the efficiency and certainty of fund transfers in New York could, if left uncorrected, discourage dollar-denominated transactions and damage New York's standing as an international financial center."); Lan Assocs. XVIII, L.P. v. Bank of N.S., 96 Civ. 1022 (JFK), 1997 WL 458753, *6 (S.D.N.Y. Aug. 11, 1997) ("Were such a minimal contact [alleged wire transfers] with New York to be deemed significant, this Court, located in one of the world's largest and busiest financial centers, would be burdened with countless international financial disputes having no real, substantive link to New York."); Motorola v. Standard Bank, 24 N.Y.3d 149, 162 (N.Y. 2014) (given "New York's status as the preeminent commercial and financial nerve center of the Nation and the world," construing jurisdiction too broadly could "result in serious consequences in the realm of international banking to the detriment of New York's preeminence in global financial affairs.").

## II.      THE GLOBAL ASSET RESTRAINT IN THE FINAL ORDER SHOULD BE MODIFIED

The Banks are entitled to a modification of the asset restraint in the Final Order on the basis of the separate entity rule in New York, the lack of personal jurisdiction (see supra at 4-23), and principles of international comity (see infra at 27-33).  Assignee's attempts to discredit the Banks' arguments as either "unripe" or precluded by the "law of the case" are based on a mischaracterization of the Final Order and this Court's prior rulings.  Opp. at 8-9.  Additionally, none of the authority cited by Assignee can overcome the clear holding in Motorola that the separate entity rule "prevents a judgment creditor from ordering a garnishee bank operating branches in New York to restrain a judgment debtor's assets held in foreign branches of the bank".  Motorola, 24 N.Y.3d at 158; see also Motorola Credit Corp. v. Standard Chartered Bank, 771 F. 3d 160, 161 (2d Cir. 2014).

Assignee now states that it is "not currently seeking an order compelling the Banks to turn over their proceeds, simply discovery into the assets that the Banks currently hold for the Judgment Debtors."  Opp. at 9.  Of course, Assignee did in fact serve the Banks with notice of the Final Order and instruct the Banks "to make sure that [the Banks] take all necessary steps to comply with the terms of the Final Order, including *restraining the accounts* identified [in the letter]."  Chung Decl. Exs. 1, 3, 4; Chung Supp. Decl. Ex. 31.  If Assignee does not in fact intend to enforce the restraint against the Banks (as it suggests in its briefing), then this only further supports the Banks' contention that the Final Order should be modified to indicate that the asset restraint is not applicable against the Banks.

Contrary to what Assignee asserts, the Banks are not attempting to re-litigate an issue that has already been decided.  Although the Banks did object to the entry of the global asset restraint, Judge Scheindlin never ruled on the merits of these objections but simply held that they

were not "ripe" for adjudication at the time of the entry of the judgment.  August 2015 Order, ECF No. 48 at 2 (noting that "[t]he Banks raise three related objections to the asset freeze provisions of the Proposed Default Judgment, none of which are ripe given that the Proposed Default Judgment is directed entirely at Defendants and seeks no enforcement against the non-party Banks.").  The law of the case doctrine applies only where the court "decides upon a rule of law."  See Ariz. Premium Fin. Co. v. Emplrs Ins. of Wausau, 586 Fed. Appx. 713, 716-17 (2d Cir. 2014) (finding law of the case doctrine inapplicable because relevant order "did not 'decide upon a rule of law' in any relevant sense.").  Assignee does not explain how the Banks can be subject to the "law of the case" doctrine here, when Judge Scheindlin specifically stated that she was *not* ruling on the Banks' objections.

The Banks' concerns regarding the extraterritorial application of the asset restraint in the Final Order are thus ripe for resolution now.  Assignee attempts to sidestep the issue by applying Judge Scheindlin's characterization of the Default Judgment, which she described as "directed entirely at the Judgment Debtors and seek[ing] no enforcement against the Banks," to the Final Order.  Opp. at 9.  This description of the Final Order, however, is contradicted by its very terms, which state that

> *third party financial service providers*, receiving actual notice of this Order by personal service or otherwise, *are restrained and enjoined* from transferring, withdrawing or disposing of any money or other assets into or out of any accounts held by, associated with, or utilized by Judgment Debtors . . . regardless of whether such money or assets are *held in the U.S. or abroad*.

ECF No. 62 ¶ 4 (emphasis added).  Thus, the Final Order is not the "same as the Judgment," as Assignee incorrectly asserts, Opp. at 9, because unlike the default judgment,[22] it purports to

---

[22]   In contrast to the Final Order which expressly requires "third party financial service providers" to restrain Judgment Debtors' assets, the Default Judgment provides that "all

require the Banks to freeze judgment debtor assets no matter where they may be located, including in China.  The Final Order also provides that third parties affected by its terms shall have the opportunity to move for a modification of the order, or at the very least, a clarification of its terms.  ECF No. 62 ¶¶ 10, 14.  Such a provision would not be included in the order unless it was contemplated that the terms would be binding on third parties (not just the Judgment Debtors).  Thus, Assignee's attempt to discredit the Banks' dispute as unripe is incorrect.

Finally, Assignee misses the mark when it asserts that restraint provisions may apply extraterritorially against the Judgment Debtors as long as the Court has personal jurisdiction over them.  Opp. at 9-10 (citing Gucci III, 768 F.3d at 129).  The Banks do not dispute that the restraint may be enforced against the Judgment Debtors.  What they dispute is the enforcement of the restraint over the nonparty Banks for whom (1) there is no basis of personal jurisdiction and (2) the separate entity rule applies.  The Second Circuit held in Gucci that an asset restraint *cannot be enforced against a non-party bank* unless the Court has personal jurisdiction over that non-party.  Gucci III, 768 F.3d at 134 ("A district court can enforce an injunction against a nonparty . . . only if it has personal jurisdiction over that nonparty."  (citing NML Capital, Ltd. v. Republic of Argentina, 727 F.3d 230, 243 (2d. Cir. 2013)).  Motorola made it clear that even when the court has personal jurisdiction over a bank, the separate entity rule applies to prohibit an asset restraint served on one branch of a bank from having an effect on other branches.  Motorola, 771 F.3d 160, 161; Motion to Quash at 17-18.  Neither NML nor Kohler, as cited by Assignee, which do not address the separate entity rule, challenge this finding.  See Motorola, 771 F.3d at 161 (rejecting the argument that Kohler had abolished the separate entity rule).

---

Defendants' Assets that have been previously identified as frozen or that were otherwise required to be restrained in compliance with this Court's Orders, continue to be restrained regardless of whether the Defendants' Assets are located in the United States or abroad. . ."  ECF No. 49 ¶ 10.

26

III.   **AS A MATTER OF INTERNATIONAL COMITY, THE COURT SHOULD DECLINE TO ENFORCE THE SUBPOENAS AND THE FINAL ORDER AGAINST THE BANKS IN CHINA**

Even if this Court were to find a basis for specific jurisdiction over the Banks, principles of international comity should compel the Court to refrain from enforcing the Subpoenas and the Final Order against the Banks in China.  The Banks have already explained in detail why the comity factors require this outcome.  See Motion to Quash at 18-25.  While the Banks will not restate those arguments here, there are three factors that carry particular relevance for a comity analysis: (1) the availability of the Hague Convention as an alternative to U.S. discovery proceedings; (2) China's significant interests in ensuring compliance with its banking laws; and (3) the United States' minimal interests in supporting the private interests of a litigation funder.

**The Hague Convention.**  While the Banks maintain that there are no grounds for personal jurisdiction here, the Court need not even reach a decision on that issue, given that the Hague Convention provides a perfectly viable alternative means of obtaining the information Assignee seeks.  The Banks have made it clear that they are willing to work with Assignee to produce documents via the Hague Convention and, indeed, on prior occasions have assisted plaintiffs in trademark actions with their Hague Convention applications.  Chung Decl. Ex. 9 (January 8, 2018 Letter from White & Case to Gibson Dunn stating that "the Banks are open to cooperating with you on a Hague Convention request and are willing to discuss the provision of reasonable assistance with a request to the relevant Chinese authorities."); Chung Supp. Decl. Ex. 32 ¶ 20 (Hague Application in Tiffany v. Qi Andrew, 2010 Civ. 9471 (WHP) (HPB) (S.D.N.Y. Nov. 2, 2011) (stating that "[t]he Banks have cooperated with Plaintiffs in the submission of this Letter of Request, and have agreed not to object to it"); Ex. 33 ¶ 19 (Hague Application in Tiffany v. Forbes, 2011 Civ. 4976 (NRB) (S.D.N.Y. June 21, 2012) (same)).

Moreover, China's Ministry of Justice—the governmental body authorized to receive and respond to requests under the Hague Convention—has written to this Court with regard to the pending action to confirm that it will "execute a [Hague Convention request] according to the . . . Convention and Chinese laws" and "take [a Hague Convention request] seriously and offer necessary legal assistance."   Chung Supp. Decl. Exs. 34, 35 (Ltrs. from Chinese Ministry of Justice).  The willingness of the Banks and the Ministry of Justice to cooperate with Assignee on a Hague Convention request, in lieu of subjecting the Banks to the legal processes of a U.S. court, could not be more patent.

Despite Assignee's protests to the contrary, there is no evidence that a Hague Convention request would be unreliable or introduce significant delay.   In recent years, the rates at which Hague Convention requests have been processed in China have increased, and China's rate of processing such requests is now comparable to that of the United States.  See Guo Supp. Decl. ¶ 34.  In the two prior instances where plaintiffs (also represented by Assignee's counsel) were required to submit an application for discovery of customer account information through the Hague Convention, their requests were responded to within the standard time frame of nine months.  Tiffany (NJ) LLC v. Qi Andrew, 2015 WL 3701602 (S.D.N.Y. Jun. 15, 2015); Forbse, 2012 WL 1918866.  Given that the Ministry of Justice has indicated that it will "offer necessary legal assistance" with regard to a Hague Convention request issued in connection with this action, there is no reason to believe that the response time will be unduly protracted in this instance.[23]

---

[23]   In any event, Assignee's concerns regarding the potential for delay caused by a Hague Convention application should also be considered in the context of its own delays in seeking post-judgment discovery in this action.   The default judgment in this action was entered on August 20, 2015.  ECF No. 49.  Assignee did not begin its post-judgment discovery efforts against the Banks until October 2017, *more than two years* after the entry of the judgment.

Moreover, Assignee's dismissal of the productions made pursuant to the Hague Convention in Qi Andrew and Forbse is unpersuasive.  Opp. at 19-20; Clark Decl. ¶¶ 57-59. Notably, after following the Hague Convention process, the plaintiffs in Qi Andrew were able to identify new defendants, thus demonstrating the process's utility.  See Guo Supp. Decl. ¶ 35; Tiffany (NJ) LLC v. Qi Andrew, 2012 WL 5451259, *2 (S.D.N.Y. June 15, 2015).  Magistrate Judge Pittman rejected plaintiffs' challenge to the sufficiency of the Hague Convention production, deeming it "sufficient for plaintiffs to continue their investigation concerning the counterfeit goods at issue" and dismissing complaints about non-produced evidence as "at most, a small step that may or may not lead to the goal [of identifying the source of the counterfeit merchandise]."  Qi Andrew, 2012 WL 5451259, at *2, 3.  Plaintiffs did not even challenge the sufficiency of the Hague Convention production in Forbse.  See Guo Supp. Decl. ¶ 35.

**China's Interests.**  There can be no doubt China has a significant interest in ensuring that the Banks are not forced to disclose customer information in a manner that would violate China's bank secrecy laws.  Indeed, protecting the privacy of personal financial information promotes the integrity of and confidence in the banking system of China, which in turn promotes economic growth and China's national interests.  Two Chinese governmental ministries, the Ministry of Justice (the equivalent to the U.S. Department of Justice) and the China Banking Regulatory Commission ("CBRC"), and the central bank of China (the People's Bank of China, or "PBOC"), have written to this Court on various occasions to express strong opposition to any

---

Moreover, rather than commencing the Hague Convention request process immediately, Assignee chose to subpoena the Banks and subject them to a discovery dispute that has already lasted more than six months (and will last, at a minimum, several months more).  Had Assignee initiated a Hague Convention request six months ago, it would be well on its way to receiving the requested discovery, even assuming the typical nine-month processing time.  It should not now be able to invoke concerns regarding "delay" to overcome China's vital interest in maintaining its banking laws and regulations.

order that would compel a Chinese bank to violate Chinese privacy laws.  It would undoubtedly be a significant affront to the Chinese government if the Court were to compel state-owned financial institutions to violate Chinese law.  See Clarke Decl. ¶¶ 21-26 (detailing the Chinese government's ownership interest in the six banks).

In submissions to this Court, the Ministry of Justice has indicated that "[a]ny bank records or other evidence possessed by these banks . . . can only be collected by the Chinese Competent Authority through legal procedures."  See Chung Supp. Decl. Exs. 34, 35 (Ltr. from Chinese Ministry of Justice).  It has further stated that the proper channel for Assignee's requests is through a Hague Convention application.  Id. ¶ iii.  Statements from the Chinese government on the meaning and application of its own laws deserve deference and are a powerful factor in the comity analysis weighing against the enforcement of the Subpoenas and Final Order.  See In re Vitamin C Antitrust Litig., 837 F.3d 175, 189 (2d. Cir. 2016) ("official statements of the [Chinese] Ministry should be credited and accorded deference."); see also Reebok Int'l v. McLaughlin, 49 F.3d 1387, 1395 (9th Cir. 1995) ("We cannot arrogate to the federal courts the power to control the banking systems of other countries within their own territory.").

In addition to the Ministry of Justice's statements, the CBRC and PBOC often reiterated China's strong interest in ensuring compliance with banking laws and regulations, including the bank secrecy laws and regulations at issue here, in submissions to courts in this Circuit.  See Guo Decl. ¶¶ 13-14; Guo Decl. Exs. B-20, B-21 (ECF Nos. 73-21, 73-22); Guo Supp. Decl. ¶¶ 13-18.  For example, in a letter to the Second Circuit, the CBRC and PBOC stated:

> The Chinese government has material interests in strictly enforcing [bank secrecy statutes and related regulations] to effectively protect the information of bank clients. China's bank secrecy laws, like those of the United States, serve the important national interest of supporting stable growth in the banking sector.  A key aspect of stable growth is ensuring the confidence of depositors and other

> bank customers in the nation's banking systems.   All bank customers must be able to rely on the assurance that banks will not interfere with their deposits or disclose information relating to them unless permitted to do so by the customer, or unless required to do so under Chinese law.

Guo Decl. Ex. B-20, at 2; see also Ex. B-21, at 2.  The CBRC and PBOC have also noted that any bank that violates the prohibitions on the disclosure of information relating to customer accounts or the restraint of such accounts (absent authorization from the competent Chinese authorities) faces the prospect of civil and administrative penalties under the relevant laws, in addition to being subject to investigation by the CBRC and PBOC.  Guo Decl. Exs. B-20, at 2-3; Ex. B-21, at 3.  In light of the CBRC and PBOC's repeated assertions that enforcement measures like those sought here will jeopardize China's legal protections regarding bank secrecy, Assignee's attempt to dismiss these vital concerns as "not reflect[ing] a national policy entitled to substantial deference," Opp. at 23, and the similar conclusion of its Chinese law expert, Donald Clarke, that "there is no state policy affording a high degree of protections to clients of Chinese banks," are simply unfounded.  Clarke Decl. ¶ 10(e).

Assignee downplays China's interests here by claiming that the absence of proof of sanctions for violations of bank secrecy laws means that these are not real interests entitled to deference.  Opp. at 24.  Assignee further concludes, without any basis, that the Banks' state-ownership will render them immune from prosecution for violations of the relevant Chinese laws.  Id. at 24; Clarke Decl. ¶¶ 20-38; Guo Supp. Decl. ¶¶ 6-12.  Assignee puts the cart before the horse:  requiring the Banks to show that they have been punished (essentially requiring them to violate the applicable laws and meet the resultant consequences) in order prove that they will be punished in this instance.  There is no need to impose this unreasonable burden of proof on the Banks, especially in their capacity as non-parties here.  See CE Int'l Res. Holdings, LLC v.

31

S.A. Minerals Ltd. P'ship, 2013 WL 2661037, *15 (S.D.N.Y. June 11, 2013) (CM) (SN) ("The

requirement that an entity resisting disclosure must provide specific instances of enforcement is

relaxed, however, where that entity is a non-party to the action."); Tiffany (NJ) LLC v. Qi

Andrew, 276 F.R.D. 143, 158 (S.D.N.Y. 2011) (holding that banks' "status as non-parties weighs

against compelling production of documents in violation of Chinese law" and that banks "need

not prove that they will certainly be punished if forced to comply with plaintiffs' subpoenas. . .").

It is sufficient that China's laws plainly state that customer privacy must be protected, and that

the Ministry of Justice, CBRC, and PBOC have all weighed in to express their significant

concerns regarding the enforcement of discovery orders and asset restraints against the Banks in

China.

  **U.S. Interests.** In contrast to China's interests, the United States' interests in this

judgment enforcement dispute are minimal. Assignee repeatedly invokes the United States'

"powerful interest in enforcing the acts of Congress, especially those . . . that are designed to

protect intellectual property rights . . . ." Opp. at 23 (citing Gucci Am., Inc. v. Weixing Li, 2011

WL 6156936, *11 (S.D.N.Y. Aug. 23, 2011) ("Gucci I")), but this argument rings hollow given

that the trademark holders in this action long ago transferred their rights to Assignee, a litigation

funder with no interest in strengthening intellectual property rights.[24] Further, there is no

---

[24] The Assignment of Judgment to Assignee and the certificate of formation of Assignee were
both signed by Daniel Kochav, a Partner and Chief Operating Officer at Tenor.  ECF No. 50;
Chung Supp. Decl. Exs. 36 (Tenor's 2018 Form ADV); 37 (LinkedIn Profile of Daniel Kochav).
Tenor manages several investment funds dedicated to funding international and commercial
arbitration.  See Chung Supp. Decl. Ex. 38 at 8-9 (Tenor SEC Brochure dated March 30, 2018)
(noting that Tenor's investment "strategies include . . . litigation finance" and that certain of its
funds "invest in international & commercial arbitrations, a subset of litigation finance.").  For
example, Tenor has provided litigation funding to Chrystallex, a Canadian mining company
seeking to enforce a $1.4 billion arbitration award against the Bolivarian Republic of Venezuela,
in exchange for a share of any resulting judgment or settlement.  Chung Supp. Decl. Ex. 39.
Counsel for Chrystallex is also counsel for Assignee in this action.  Chung Supp. Decl. Ex. 40.

suggestion that the *Banks* had any role in any trademark infringement.  The attempt to reframe this dispute as one grounded in serious intellectual property concerns is nothing more than a fig leaf for Assignee's commercial interests.  In reality, this dispute concerns nothing more than collecting a judgment, and the issues in contention now would be the same regardless of the underlying claim.

Moreover, the Banks' status as non-parties "attenuate[s] the United States' interest in enforcing discovery obligations" on them.  Forbse, 2012 WL 1918866, at *6.  Accordingly, the United States' interests in this dispute are secondary and do not justify the issuance of an order that would require the Banks to violate the laws of their home country.

## CONCLUSION

For the foregoing reasons, the Court should quash the Subpoenas, modify the Final Order insofar as it purports to apply outside of New York, and deny the Motion to Compel.

Dated: April 27, 2018

/s/ David G. Hille
David G. Hille
Paul B. Carberry
Jacqueline L. Chung
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: dhille@whitcase.com
        pcarberry@whitecase.com
        jacqueline.chung@whitecase.com

*Attorneys for Agricultural Bank of China, Bank of China, Bank of Communications, China Construction Bank, China Merchants Bank, Industrial and Commercial Bank of China Limited*

33