IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIKE, INC and CONVERSE, INC., <br><br>Plaintiffs,<br><br>v.<br><br>Maria WU et al.<br><br>Defendants. | Case No. 13 Civ. 8012 |

**SUPPLEMENTAL DECLARATION OF GUO LI**

I, GUO Li, declare as follows:

1. I am a Professor of Law and Vice Dean at Peking University Law School, People's Republic of China, where I have been employed since 2005. I previously submitted in connection with this action a Declaration, dated February 13, 2018 (the "Guo Declaration"), in support of the Banks' Motion to Quash and to Modify the Final Order (the "Banks' Motion"). In response to my Declaration, Plaintiff-Assignee, Next Investments, LLC ("Next"), submitted the Declaration of Donald Clarke ("Clarke Declaration"), dated March 16, 2018. I hereby submit this Supplemental Declaration in further support of the Banks' Motion and in opposition to the Motion to Compel filed by Next in the above-captioned action. Capitalized but undefined terms used herein shall have the same meaning as ascribed in my Declaration.

2. My opinion herein is based upon my academic and professional legal studies, research, teaching and publishing over the course of many years as a professor of law, my personal experience and familiarity with the Chinese legal system and courts, and the documents cited therein. I have been asked to provide my opinions in response to the Clarke Declaration on the following questions:

1

- Whether Chinese commercial banks are subject to banking regulations notwithstanding their connections to the Chinese government;

- Whether China has a strong interest in bank secrecy;

- Whether Professor Clarke's assertion that the Banks will not be subject to sanctions for the violation of bank secrecy laws is correct;

- Whether a request made in accordance with strictures of the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters (the "Hague Convention") is a viable option for U.S. litigants to obtain discovery of information located in China in connection with a pending U.S. legal proceeding;

- Whether alternative means exist and are available to Next in China to enforce its judgment against the Judgment Debtors and obtain discovery in connection with these efforts.

## MATERIALS REVIEWED

3. In addition to the documents described in the Guo Declaration, I have also reviewed the Clarke Declaration and exhibits thereto.

4. I have also conducted independent research, as necessary, in the course of preparing this supplemental declaration. Attached as Exhibits 1-9 is a list of materials I relied upon in forming my expert opinions detailed in this supplemental declaration.

## SUMMARY OF OPINIONS

5. The conclusions I draw from my consideration of the relevant documents and my own research are as follows: (i) Chinese commercial banks are subject to regulation by the Chinese banking regulatory authorities notwithstanding their connections to the Chinese Government; (ii) China has a strong and legitimate interest in enforcing bank secrecy laws; (iii) Professor Clarke's assertion that the banks will not face sanctions for violations of bank secrecy laws is incorrect; (iv) a request made through the Hague Convention is a viable

option under Chinese law for discovery in connection with foreign (i.e., non-Chinese) proceedings; (v) alternatively, Next can make an application to a Chinese court seeking recognition of the U.S. court's default judgment, and thereafter seek discovery pursuant to a Chinese legal proceeding.

I. **CHINESE BANKS ARE SUBJECT TO REGULATION NOTWITHSTANDING THEIR CONNECTIONS TO THE CHINESE GOVERNMENT**

6.      Professor Clarke goes to great lengths to document the state ownership of the Banks in order to conclude that their status as state-owned entities[1] means that they are not subject to government regulation or sanctions.[2]  Professor Clarke points to no unique legal feature(s) or principle of the Chinese legal system in support for this conclusion; rather, it appears his opinion is rooted in nothing more than the mere *fact* of [partial] governmental ownership of the Banks.  However, there is no basis to conclude that a commercial enterprise in China would be immune from governmental sanctions due solely to its connections with the government.[3]  The conclusion that the Banks are not subject to banking regulations is purely speculative, given the abundance of Chinese laws, regulations, cases and administrative decisions to the contrary.

---

[1] As Professor Clarke notes, the Chinese government's ownership interest in each of these financial institutions is more than 50% for the Agricultural Bank of China, Bank of China, China Construction Bank and Industrial and Commercial Bank of China and more than 30% but less than 50% for Bank of Communications and China Merchants Bank.  Clarke Decl. ¶¶ 21-26.

[2] Clarke Decl. ¶¶ 20-38.

[3] Professor Clarke's perfunctory conclusion that the Banks, as "state-owned entities," are not accountable to the Chinese government merely by virtue of the government's ownership interest therein, is akin to concluding that companies such as General Motors and Citibank were likewise placed above the law during the years when the U.S. government was a major shareholder of those entities.  *See* Chris Isidore, *GM to Head Into Bankruptcy*, CNN MONEY (Jun. 1, 2009), http://money.cnn.com/2009/05/31/news/companies/gm_bankruptcy_looms/index.htm?postversion=2009053112 (reporting that the U.S. government would get a 60% equity stake in GM in 2009.); *see also* Chris Isidore, *Feds Step Deeper Into Citi Bailout*, CNN MONEY (Feb. 27, 2009), http://money.cnn.com/2009/02/27/news/companies/citigroup/index.htm (reporting that the U.S. government would control 36% of Citigroup's common stock in 2009).

> A.  *The China Banking Regulatory Commission and People's Bank of China Have Law Making And Enforcement Authority Over All Chinese Commercial Banks.*

7.  As I explained in the Guo Declaration, all commercial banks in China are subject to the supervision of China Banking and Insurance Regulatory Commission ("**CBIRC**", previously "**CBRC**") and People's Bank of China ("**PBOC**").[4] Article 2 of the Law of the People's Republic of China on Banking Regulation and Supervision provides:

> The banking regulatory authority under the State Council shall be responsible for the regulation and supervision of the banking institutions in China and their business operations. For the purposes of this law, the term "banking institutions" means financial institutions established in the People's Republic of China that take deposits from the general public, including, among others, commercial banks, urban credit cooperatives and rural credit cooperatives, and policy banks. (Exhibit 1).

8.  Each of the Banks involved as nonparties in this action fall into the category of "banking institutions" and are, therefore, subject to the supervision of the CBIRC and the PBOC.

> B.  *CBIRC has a solid record of imposing sanctions on the non-party banks.*

9.  The head office of CBIRC issued thirty-five sanctions orders in 2017, of which seventeen were issued against state-owned entities (thirteen against China Cinda Asset Management Co., Ltd., an asset management company of which the Ministry of Finance holds more than 60% of the shares of the company; two against China Construction Bank; and one each against Bank of Communications and Industrial and Commercial Bank of China).[5]

10. The Beijing branch of the CBIRC issued thirty-one sanctions orders in 2017, of which eight were issued against state-owned entities (five against Agricultural Bank of China; two against China Construction Bank; one against Postal Savings Bank of China). (Exhibit 2).

---

[4] Guo Decl. ¶ 12, Nike v. Wu, No. 13 Civ. 8012, ECF No. 73 (S.D.N.Y. filed Feb. 14, 2018).

[5] List of Administrative Penalty Decisions 2017, CHINA BANKING REGULATORY COMMISSION, http://www.cbrc.gov.cn/chinese/home/docViewPage/110002.html (last visited April 20, 2018).

11. The most serious sanction issued against an individual (which was included in a sanctions order issued by the Beijing Branch of the CBIRC against Agricultural Bank of China) included a life-long prohibition on doing business in the banking industry. (Exhibit 3).

12. Such sanctions for breaches of CBIRC regulations are serious for the bank, the individuals directly involved in the violation, and the bank senior management. The sanctions further demonstrate that the Chinese government has vested law making and enforcement powers in the CBIRC and the PBOC over all Chinese financial institutions, including state-owned financial institutions. These sanctions indicate that the regulations apply to state-owned banks and are routinely enforced against state-owned banks.

## II. CHINA HAS A STRONG INTEREST IN BANK SECRECY

### A. Existing Laws and Regulations Reflect China's Strong Interest in Bank Secrecy

13. There is no basis for Professor Clarke's conclusion that "there is no state policy affording a high degree of protections to clients of Chinese banks."[6] This conclusion ignores the many laws and regulations restricting the disclosure of account information or the restraint and deduction of such accounts, as detailed in the Guo Declaration.[7]

14. I understand that the CBIRC and the PBOC previously submitted letters to this Court that further explain China's significant interest in ensuring the enforcement of bank secrecy laws.[8] I have reviewed the letters from the CBIRC and the PBOC which indicate that the principle of keeping depositors' private information confidential is a cornerstone for maintaining a reliable commercial banking system in China and should not be challenged by foreign judicial bodies.[9]

---

[6] Clarke Decl. ¶ 10e.

[7] Guo Decl. ¶¶ 11-22.

[8] Guo Decl. Exs. B-20 at 4-5, B-21 at 9.

[9] *Id.*

      B.      *Maintaining the Confidentiality of Customer Accounts is Not a Right, but an Obligation*

15.    Professor Clarke's assertion that the Chinese banking statutes and regulations confer merely a right, rather than imposing a duty, on Chinese banks to protect customer bank accounts and information relating to them is based on an incorrect reading of the applicable law. Article 29 of the Commercial Bank Law states principally that "Commercial banks shall follow the principles of voluntary deposit and free withdrawal, paying interest to depositors and keeping secret for depositors in handling individual savings deposits."[10] The subsequent statement that "[c]ommercial banks have the right to refuse any entity or individual to inquire about, freeze or deduct individual savings accounts, unless it is otherwise prescribed by laws,"[11] must therefore be understood in the context of the immediately preceding statement.

16.    The principle of maintaining the confidentiality of depository accounts was first established by PBOC in the Charter for Depository Savings (the "Charter") in 1980. (Exhibit 4). The purpose of this provision in the Charter was to encourage Chinese citizens to deposit their money into banks in order to foster the development of the commercial banking system in China.[12] This same principle of confidentiality has been re-emphasized each time new legislation in relation to commercial banks or savings businesses has been passed.[13] For example, when the Regulations on the Administration of Savings were issued in 1992, replacing the Charter for Depository Savings, Article 32 of the Regulation provided that "Savings institutions and their personnel shall have an obligation to keep secret the depositors' savings and relevant information. Savings institutions shall not inquire into,

---

[10] Article 29 of Commercial Bank Law (Guo Decl. Ex. B-1).

[11] *Id.*

[12] Article 2 of Charter for Depository Savings (Ex. 4).

[13] I provide an overview of the chronology of all relevant Chinese banking laws and regulations pertaining to the protection of customer accounts and information in my initial report. *See* Guo Decl. ¶¶ 11-22.

6

freeze or allocate savings deposits on behalf of any unit or individual, unless otherwise provided for by laws and administrative regulations of the state."[14]  This article remained valid when the Regulations on the Administration of Savings were amended in 2011.

17.  As set forth in the Guo Declaration, the Financial Institutions Assistance Regulations, as established by China's banking regulatory authorities, state that only "competent organs" of the Chinese government have the power to inquire about account information and restrain and deduct from bank accounts.[15]  There would be no purpose for a regulation that expressly authorizes only "competent organs" of the Chinese government to order the disclosure of account information, the restraint of accounts, or the deduction of these accounts if banks independently had the authority engage in these activities.  The bank would be able to disclose information and restrain or deduct customer accounts regardless of whether the "competent organs" of the Chinese government had authorized them to do so. That is not the case.

C.   *China's Bank Secrecy Laws Are Not "Blocking" Statutes*

18.  I understand that U.S. courts have generally refrained from granting deference to the laws of other countries that are promulgated specifically for the purpose of blocking the application of U.S. discovery procedures abroad.  China's bank secrecy laws, however, are not such so-called "blocking statutes."  Chinese banking laws, which have been codified since the mid-1990s[16], are enforced independently of U.S. litigation.  Notably, the judicial and administrative decisions cited in the Guo Declaration that demonstrate that Chinese banks have been sanctioned for the improper disclosure, restraint, or deduction of customer

---

[14] Guo Decl. Ex. B-3, at 7.

[15] Guo Decl. Ex. B-4.  Such "competent organs" include the People's Court, Taxation Authority, Customs House, People's Procuratorate, Public Security Organ, State Security Organ, State Department of the Army, Prison Organ, Smuggling Investigation Organ, Supervisory Organ (including the Supervisory Organ of the Army), Audit Organ, Industrial and Commercial Administrative Organ, and Securities Regulatory Organ.

[16] *See supra* ¶ 16.

accounts are cases that involve domestic actors only.[17] This alone demonstrates that China's bank secrecy laws are not designed solely to block foreign litigation mechanisms, but are designed to further China's national interest in banking modernization and securing customer confidence in the banking system.

### III. PROFESSOR CLARKE'S ASSERTION THAT THE BANKS WILL NOT FACE <u>SANCTIONS FOR VIOLATING BANK SECRECY LAWS IS INCORRECT</u>

19. Professor Clarke's assertion that there is no evidence to show the banks will be subject to sanctions by complying with the U.S. court order is incorrect.[18] His conclusion is based on a misinterpretation of the administrative decisions and case law cited in the Guo Declaration.

   *A.   The Administrative Penalty Decision Announcements*

20. The administrative decisions cited in the Guo Declaration are evidence of China's robust governmental enforcement of the bank secrecy law.[19]

21. Administrative sanction decisions are published by the CBIRC and PBOC as public announcements. They generally do not include the same level of detailed information as Chinese court opinions. Nevertheless, the customary brevity of these administrative sanction announcements does not undercut the seriousness of the sanctions to which the banks are subject:

- The Ziyang City Bank decision issued a 310,000 yuan penalty against a bank for (1) failure to perform customer identification obligations in accordance with regulations; (2) inquiring about personal customer information without consent; (3) the false reporting and concealment of financial statistical data. (Exhibit 5). Contrary to Professor Clarke's conclusions, the fact that it is not possible to "determine how much of each fine was attributable to which offense" does not

---

[17] The judicial and administrative decisions cited in my original report that demonstrate that Chinese banks have been sanctioned for the improper disclosure, restraint, or deduction of customer accounts are cases that involve domestic actors only.  Guo Decl. ¶¶ 30-35.  That alone demonstrates that China's bank secrecy laws are not designed to evade foreign litigation mechanisms.

[18] Clarke Decl. ¶¶ 39-54.

[19] Guo Decl. ¶ 35.

      undermine the probative value of the decision, as all three violations are sanctionable offenses.

- The Qingxi Bank decision clearly imposed a 60,000 yuan fine on a bank for "unlawful sequestration and freezing of funds in customer bank account." (Exhibit 6).

- The CMB Nanjing Bank decision imposed a 200,000 yuan penalty on CMB for improperly deducting funds from customer accounts without consent. Professor Clarke focuses on the "blamelessness" of the customer to explain why the sanction was justified in this case (thereby suggesting that a sanction in the present case dealing with bank customers who are counterfeiters would not be justified), but the bank secrecy law makes no such distinctions regarding the customers to which its provisions should apply.[20] His additional conclusion that the customers in this case have consented to the Banks' actions in their customer contracts (unlike the customers in the Nanjing Bank decision) is also speculative an unsupported. (Exhibit 7).

    B.    *Chinese Legal Decisions*

        *1.*    *Zhao Peiyuan Litigation (involving Bank of China)*

22.    Professor Clarke misinterprets the meaning and significance of the Zhao Peiyuan litigation (the civil litigation initiated by customers of Bank of China as a result of the Bank's freezing of accounts in connection with the *Gucci* litigation in the U.S.).

23.    In the customer litigation brought against Bank of China for damages relating to the unauthorized freezing of customer accounts associated with the U.S. *Gucci* litigation, the Higher People's Court of Beijing Municipality affirmed a lower court ruling that required Bank of China to lift an asset restraint that it had placed on customer accounts connected with the *Gucci* litigation. Bank of China had argued that the asset restraint was permitted under the customer agreement executed by the customers, which provided in part that:

> [i]f the Applicant violates any provision of this Agreement or any other rules and regulations of the Bank, or makes any operation with malicious intent, or defames or damages the reputation of the Bank, or maliciously attacks the electronic banking system of the Bank, or is suspected of engaging in money laundering, financing of terrorism or other illegal or criminal activities, based on reason or factor (including risk control) as deemed justifiable by the Bank,

---

[20] Clarke Decl. ¶ 51.

> the Bank has the right to suspend or terminate this Agreement and provision of the services hereunder, and reserves the right to hold the Applicant liable for such activities.[21]

24. The Higher People's Court held that Bank of China was required to lift the asset restraint because Bank of China had failed to show adequate cause for its unilateral suspension of the customer agreement, and thus there was no contractual or legal basis for Bank of China to cease the provision of services to the customers.[22] Notably, the lower court had concluded that there was no basis to terminate services against the customers because "*[t]here is no judgment that has taken effect in China [that] finds [the Bank of China] customers guilty of being involved in money laundering, financing of terrorism or other illegal or criminal activities*."[23] The absence of a Chinese court order was a critical factor in the court's conclusion that the restraint of the customer accounts was not warranted.

25. The Higher People's Court and the lower court also concluded that the asset restraint was not in compliance with Article 29 of the Commercial Bank Law, which states that "personal savings deposit business with commercial banks shall be based on the principles of voluntary deposit, free withdrawal, deposit bearing interest, and the confidentiality for the depositor."[24]

26. This court decision makes clear that while, as Professor Clarke states, "[a] contractual provision of the kind that existed between the BOC and the Chinese Plaintiffs is permissible," the Chinese courts will not interpret these contractual provisions in a way that conflicts with Chinese law. Thus, the parties cannot mutually agree to waive the requirements of bank secrecy in the Commercial Bank Law via a contract.

---

[21] Ex. 8, at 20.

[22] *See id.* at 21.

[23] *See* Guo Decl., Ex. B-15, at 21.

[24] *See* Guo Decl., Ex. B-15, at 21; *see also* Ex. 8, at 22.

27. Professor Clarke also states that "[h]ad BOC produced adequate evidence that there were grounds for suspecting that the Chinese Plaintiffs were engaged in illegal or criminal activities, its actions would have been upheld" and suggests that proof of the default judgment entered in this case by a U.S. court would constitute such "adequate evidence."[25] There is no support for this assumption, and indeed, it would contradict the terms of the Commercial Bank law to permit an asset restraint that has not been authorized by a Chinese court or the relevant Chinese authorities.

### 2. The Ruihua Li Case

28. Professor Clarke has similarly misinterpreted the Ruihua Li case. In this case, the bank turned over funds deposited in a bank customer's account without his consent to a payroll administrator at the customer's place of employment. The Court ordered the payroll administrator to return the funds turned over by the bank, and further ordered the bank to reimburse the customer in the event that the payroll administrator did not pay back the funds.[26] The bank was therefore penalized for deducting funds from a customer account without proper authorization. Professor Clarke attempts to minimize the bank's liability by concluding that the bank was only "secondarily" liable, but this observation does not alter the fact that the bank was bound by a court decision that subjected the bank to a risk of monetary loss due to its violation of the applicable laws. Further, Professor Clarke's conclusion that "if the bank ended up repaying the amount in question, it would have the right to then seek recovery from [the payroll administrator]," is mere speculation, but even if true, again, it would not alter the fact that the bank was found liable for violating Chinese law.

---

[25] Clarke Decl. ¶¶ 41-43.

[26] Contrary to Professor Clarke's assertion that I mischaracterized the Court's ruling, saying "The Court ordered the payroll administrator to pay back the money, or otherwise the bank would have to pay" is logically equivalent to saying "the Bank is ordered to pay, unless the payroll administrator has paid."

      C.    *The Yongsheng Wang Case*

29.    Professor Clarke incorrectly concludes that the Yongsheng Wang case is of "questionable relevance."[27] In this case, a Chinse bank was found liable for damages suffered by its customers when funds were withdrawn from their accounts using duplicated ATM cards and pin numbers. The case is relevant for the purposes of demonstrating that if the court was willing to sanction the bank for negligent conduct resulting in the disclosure of customer account information and the illegal withdrawal of funds, then it is almost certain that a court would sanction a bank for the *intentional* disclosure of customer information or the restraint or deduction of customer funds in violation of China's bank secrecy laws.

30.    It would not be correct to conclude that the three cases discussed above are the only incidents where courts have sanctioned banks for a violation of China's bank secrecy laws. Not all judgments and sanction orders are published in China. Because China is not a common law country, courts are bound solely by the law codified in written statutes and regulations instead of by prior judicial judgments. Accordingly, the Chinese judiciary does not share the same rationale as judiciaries in common law countries for publishing judicial opinions. Neither is there any mandatory requirement for the CBIRC to publish all its administrative sanctions. Indeed, the head office of CBIRC only started publishing online sanction announcements in 2016.

---

[27] Clarke Decl. ¶ 47.

**IV. NEXT SHOULD PROCEED VIA THE HAGUE CONVENTION TO OBTAIN EVIDENCE IN CONNECTION WITH A U.S. LEGAL PROCEEDING**

*A.   The Chinese Civil Procedure Law Requires Discovery Conducted In China In Connection With Non-Chinese Civil Proceedings To Be Conducted Via Judicial Assistance Treaties Such as The Hague Convention*

31.   Article 276 of the Civil Procedure Law of the People's Republic of China provides that

> [i]n accordance with an international treaty concluded or acceded to by the People's Republic of China or under the principle of reciprocity, a people's court and a foreign court may request each other to provide judicial assistance in … collection of evidence.[28]

The Hague Convention, which China has acceded to since 1998, is one of the international treaties referred to in Article 276.

32.   Article 277 further specifies the proper channels through which judicial assistance can be requested and more importantly, states that

> [e]xcept for the circumstances in the preceding paragraph, no foreign authority or individual shall, without permission from the competent authorities of the People's Republic of China, serve process or conduct investigation and collection of evidence within the territory of the People's Republic of China.

Accordingly, a request made through the Hague Convention, which is prescribed in Articles 276 and 277, is the primary means for a litigant in a U.S. civil proceeding to obtain evidence in China in connection with the pending U.S. civil proceeding.  Any other method of discovery in China in connection with a foreign proceeding, except through a Hague Convention request, will be deemed in violation of the Civil Procedure Law.

33.   Moreover, in recent letters to the Court by the Chinese Ministry of Justice ("MOJ"), the MOJ reiterated that "[a]ny Bank records or other evidence possessed by these banks to be used by any individual or entity for the purpose of any law suit can only be collected by the Chinese Competent Authority through legal procedures" and that "the U.S.

---

[28] Guo Decl. Ex. B-5, at 11.

court or other competent authority shall forward civil MLA request to the Ministry of Justice of China, and the Ministry of Justice of China will execute the request according to the above-mentioned Convention and the Chinese laws."[29]

> B.  *Statistics on China's Execution of Hague Convention Requests Show A Solid Compliance Record*

34. Professor Clarke concludes that a request made through the Hague Convention would be ineffective,[30] but fails to acknowledge that the number of letters of request received annually by the Chinese Central Authority (in China, the MOJ) increased steadily from 27 in 2009 to 58 in 2013. Professor Clarke also fails to acknowledge that despite the steady increase of letters received by the Chinese Central Authority, China's rate of Hague Convention request executions actually surpasses that of the United States: whereas 33% requests were executed under 12 months in China in 2012, the rate for the United States in the same year is 23%.

> C.  *Documents produced through the Hague Convention in the Tiffany cases were deemed sufficient by presiding judges*

35. In addition, Professor Clarke's unsubstantiated assertions regarding the supposed insufficiency of the productions provided by the Banks through the Hague Convention in *Tiffany (NJ) LLC v. Qi Andrew* and *Tiffany (NJ) LLC v. Forbse* are not correct. In *Qi Andrew*, the Chinese banks' successful production resulted in a favorable outcome for Plaintiffs as "Tiffany received additional information regarding Defendants from the Non-Party Banks through the Hague Convention … [and as a result] on August 22, 2013, with leave of the Court, Tiffany amended the Complaint to add [the] new Defendants."). *See Tiffany (NJ) LLC v. Qi Andrew*, 2015 WL 3701602, at *1-2 (S.D.N.Y. 2015). Magistrate Judge Pitman, who presided over the discovery dispute in *Qi Andrew*, also commented

---

[29] Chung Supp. Decl. Ex. 36 at 1-2, Ex. 35 at 3-4.
[30] Clarke Decl. ¶¶ 55-56.

favorably on the efficacy of the Hague Convention and deemed the resulting production of evidence as "sufficient for plaintiffs to continue their investigation concerning the counterfeit goods at issue." *Tiffany (NJ) LLC v. Andrew*, 2012 WL 5451259, at *2-3 (S.D.N.Y. Nov. 7, 2012). Any information that plaintiffs failed to receive through their Hague Convention request was, in Judge Pitman's words, "at most, a small step that may or may not lead to that goal [of identifying the source of the counterfeit merchandise]." *Id.* at *2. With regard to *Forbse*, Professor Clarke concedes that plaintiffs in that action never challenged the sufficiency of the production. [31]

> D. *China's Reservation in the Hague Convention Against Broad Pre-Trial Discovery Is Reasonable And Not Unique*

36. Professor Clarke states that one of the most important reasons why a Hague Convention request will not be effective is that "China retains the right to decide that certain requested materials . . . have no 'direct and close connection' with the subject matter of the litigation and therefore will not be provided."[32] The reticence to which Professor Clarke refers is a reservation that China has included in the Hague Evidence Convention relating to *pre-trial discovery*. I understand that Next is currently involved post-judgment discovery, not pre-trial discovery.[33] In any event, the reservation is not unreasonable and more than 30 other countries have made the same reservation under the Hague Convention that China has made.[34]

---

[31] Clarke Decl. ¶ 59.

[32] Clarke Decl. ¶ 56.

[33] The reservation states that: "[I]n accordance with Article 23 of the Convention concerning the Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in common law countries, only the request for obtaining discovery of the documents clearly enumerated in the Letters of Request and of direct and close connection with the subject matter of the litigation will be executed. Reservation of China, Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters (Mar. 18, 1970), *available at* https://www.hcch.net/en/instruments/conventions/statustable/notifications/?csid=493&disp=resdn.

[34] Status Table, Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters (Mar. 18, 1970), *available at* https://www.hcch.net/en/instruments/conventions/status-table/?cid=82.

### V. ALTERNATIVELY, NEXT CAN APPLY TO A CHINESE COURT TO RECOGNIZE THE U.S. COURT'S DEFAULT JUDGMENT

37. I understand that Next has already obtained a judgment in a U.S. court. As such, Next can apply directly to a court in China for recognition and enforcement of its U.S. court judgment. According to Article 281 of the Civil Procedure Law:

> [w]here an effective judgment or ruling of a foreign court requires recognition and enforcement by a people's court of the People's Republic of China, a party may apply directly to the intermediate people's court of the People's Republic of China having jurisdiction for recognition and enforcement or apply to the foreign court for the foreign court to request recognition and enforcement by the people's court in accordance with the provisions of an international treaty concluded or acceded to by the People's Republic of China or under the principle of reciprocity.

The approach set forth in the civil procedure law would be a feasible solution for Next.

38. In 2015, a civil judgment by a Californian court was enforced by the intermediate people's court in Wuhan, Hubei Province. The court held that even though "the United States and China have not concluded or have jointly participated in international treaties that recognize and enforce civil judgments," it would recognize the California State Court default judgment because "there are precedents in the United States for the recognition and enforcement of civil judgments in China's courts" and "there is a mutually beneficial relationship between the two parties that recognize and enforce civil judgments."[35] I believe that Next can follow the same procedures under Article 281 of the Civil Procedure Law and bring a lawsuit in China to enforce the judgment against the defendant's assets.

---

[35] Ex. 9, at 10-11.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of April, 2018, Beijing, China.

_____
Guo Li