UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                       :

NIKE, INC. and CONVERSE INC.,       :

                               :

             Plaintiffs,        :

                               :  No. 2013 Civ. 8012 (CM)(DF)

     -against-                  :

                               :  ORAL ARGUMENT REQUESTED

MARIA WU d/b/a                :
WWW.SHOECAPSXYZ.COM, et al.,  :

                               :

            Defendants.      :

                               :
---------------------------------------------------------x

## MEMORANDUM OF LAW IN FURTHER SUPPORT OF CROSS-MOTION TO COMPEL PRODUCTION OF DOCUMENTS

GIBSON, DUNN & CRUTCHER LLP
Robert Weigel
Howard S. Hogan
Kristen Lisk Mathews
Alexandra L. Grossbaum
200 Park Avenue
New York, NY 10166-0193
Telephone:  212.351.4000

*Attorneys for NEXT INVESTMENTS, LLC*

# TABLE OF CONTENTS

Page

ARGUMENT ...................................................................................................................... 3

    **A.**    The Banks Are Subject To Specific Personal Jurisdiction In New York ............. 3

        **1.**    The *Gucci* Court Correctly Applied *Licci*'s Holding That A Foreign Bank's "Repeated Use" Of Its New York-Based Correspondent Account Demonstrates Minimum Contacts And Purposeful Availment ............................................................... 3

        **2.**    The Acquiring Banks' Use Of New York-Based Settlement Accounts Also Demonstrates Minimum Contacts and Purposeful Availment.......................................................................................... 8

        **3.**    The Banks' Other New York Connections Further Satisfy The Minimum Contacts And Purposeful Availment Requirements ................ 9

        **4.**    The Banks Have Failed To Show That The Exercise Of Specific Personal Jurisdiction Would Be Unreasonable ....................................... 11

    **B.**    International Comity Weighs In Favor Of Enforcing The Subpoenas ................ 13

CONCLUSION................................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amigo Foods Corp. v. Marine Midland Bank-N.Y.*,
    39 N.Y.2d 391 (1976) ........................................................................................................7

*AroChem Int'l, Inc. v. Buirkle*,
    968 F.2d 266 (2d Cir. 1992) .........................................................................................17

*Beck v. Levering*,
    947 F.2d 639 (2d Cir. 1991) ...........................................................................................6

*Bluewaters Comm'cns Holding v. Ecclestone*,
    2014 WL 220779 (Sup. Ct. N.Y. Cnty. 2014) ...........................................................10

*Casio Computer Co. v. Sayo*,
    2000 WL 1877516 (S.D.N.Y. Oct. 13, 2000) .............................................................13

*Chloe v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010) .........................................................................................11

*Daventree Ltd. v. Republic of Azer.*,
    349 F. Supp. 2d 736 (S.D.N.Y. 2004) .........................................................................13

*Fin. Inst. Track Litig. v. Heartland Bank*,
    2011 WL 1232352 (S.D. Tex. Mar. 31, 2011) ...........................................................10

*Gliklad v. Bank Hapoalim B.M.*,
    2014 WL 3899209 (Sup. Ct. N.Y. Cnty. 2014) .........................................................10

*Gucci Am., Inc.. v. Bank of China*,
    768 F.3d 122 (2014) ........................................................................................7, 9, 14, 17

*Gucci Am., Inc. v. Li*,
    2015 WL 7758872 (S.D.N.Y. Nov. 11, 2015) ...........................................................16

*Gucci Am., Inc. v. Weixing Li*,
    2011 WL 6156936 (S.D.N.Y. Aug. 23, 2011) .................................................15, 18, 19

*Gucci Am., Inc v. Weixing Li*,
    135 F. Supp. 3d 87 (2015) ..................................................................................*passim*

*Hau Yin To v. HSBC Holdings, PLC*,
    700 F. App'x 66 (2d Cir. 2010) .....................................................................................7

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*,
219 F.3d 104 (2d Cir. 2000)...................................................17

*Lawsuit Funding LLC v. Lessoff*,
2013 WL 6409971 (N.Y. Sup. Ct. Dec. 4, 2013) ....................17

*Licci v. Lebanese Can. Bank, SAL*,
20 N.Y.3d 327 (2012) ............................................................5, 7

*Licci ex rel. Licci v. Lebanese Can. Bank, SAL*,
732 F.3d 161 (2d Cir. 2013)............................................5, 12, 13

*Monkton Ins. Servs. v. Ritter*,
768 F.3d 429 (5th Cir. 2014) .......................................................7

*In re New Haven Projects Ltd. Liab. Co.*,
225 F.3d 283 (2d Cir. 2000).......................................................17

*Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
549 B.R. 56 (S.D.N.Y. 2016)........................................................7

*Project Honey Pot v. John Does*,
2012 WL 1854184 (E.D. Va. May 21, 2012) .............................9

*Rushaid v. Pictet & Cie*,
28 N.Y.3d 316 (2016) .......................................................*passim*

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist.
Court for the S. Dist. Iowa*,
482 U.S. 522 (1987)...................................................................15

*SPV OSUS, Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018)........................................................7

*Strauss v. Credit Lyonnais, S.A.*,
175 F. Supp. 3d 3 (E.D.N.Y. 2016) ...........................................12

*Tamam v. Fransabank SAL*,
677 F. Supp. 2d 720 (S.D.N.Y. 2010)..........................................7

*In re Terrorist Attacks on Sept. 11, 2001*,
2018 WL 1631450 (S.D.N.Y. Mar. 28, 2018) .............................7

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Tiffany (NJ) LLC v. Forbse*,
    2012 WL 3686289 (S.D.N.Y. Aug. 23, 2012)....................................................................9, 15

*Tiffany (NJ) LLC v. Qi Andrew*,
    2012 WL 5451259 (S.D.N.Y. Nov. 7, 2012)...........................................................................15

*Weiss v. Nat'l Westminster Bank PLC*,
    176 F. Supp. 3d 264 (E.D.N.Y. 2016) ....................................................................................12

*Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548 (S.D.N.Y. 2012) .......................................14, 15

**Treatises**

Restatement (Third) of Foreign Relations Law § 442 .................................................................17

The Banks' April 27, 2018 Opposition and Reply Brief (ECF No. 110) confirms that there was no basis for the Banks' earlier representation to this Court that there was a "critical factual distinction" between this case and *Gucci II*.[1]  ECF No. 71 at 13.  As the Banks now concede, they have precisely the same types of connections to New York that Judge Richard Sullivan previously found to support an order compelling BOC to produce the banking records of its customers who, through BOC's use of its New York-based correspondent account, laundered the U.S. dollar denominated proceeds of their counterfeit sales in the United States into their accounts in China.  Because the Banks fail to establish—or even advocate the existence of—any material difference in the facts of this case, the Court should reject the Banks' invitation to create an intra-circuit split with Judge Sullivan.

In their opening brief, the Banks accused Next of "fail[ing] to provide the Banks (or the Court) with any records indicating that the Judgment Debtors routed their ill-gotten funds to China, or elsewhere, via correspondent accounts held by the Banks in New York."  *Id.*  In fact, the Banks went so far as to represent to this Court that there was not "any basis in fact" for Next's alleged "speculation" that "evidence of correspondent account transfers relating to the Banks in this action . . . exist[ed]."  *Id.*  Next's March 16, 2018 submission, however, included voluminous evidence proving that this representation was incorrect and that, in reality, the Banks facilitated *at least 600 wire transfers* for Judgment Debtors through correspondent accounts in New York.  *See* ECF No. 87 at 12–14; *see also* Grossbaum Decl. Ex. 2.[2]

When confronted with the evidence of the 600-plus transfers that they made through New York on behalf of Judgment Debtors, the Banks did not deny that the transfers were made

---

[1]  Capitalized terms have the same meanings set forth in Next's March 16, 2018 Memorandum of Law (ECF No. 87).

[2]  The declarations filed herewith are cited by reference to the Declarant's surname and "Decl."

1

through New York.  The Banks' only explanation for having misled the Court as to the absence of "any basis in fact" for the transfers is that they did not bother to check for records outside of their New York branches.  *See* ECF No. 110 at 5.  Under Rule 11 of the Federal Rules of Civil Procedure, the Banks and their counsel were obliged to ensure that the Banks' "factual contentions have evidentiary support" and "denials of factual contentions are warranted on the evidence" only following "an inquiry reasonable under the circumstances."  The Banks should not have represented that Next's position was "without any basis in fact" absent a search through *their own records*.  It is the *Banks' head offices in China* that are before the Court, not merely their New York branches.  And, leaving aside whether the Banks had any duty to affirmatively disclose the existence of wire-transfer records in their possession, the Banks, at the very least, had a duty to avoid representing that such records did *not* exist.

Critically, the Banks do not factually dispute their involvement in at least 600 wire transfers through New York.  ABC, BOC, and BOCOM used New York-based settlement accounts to process more than 7,000 credit card transactions on behalf of Judgment Debtors. The Banks do not factually dispute any of Next's other evidence showing the Banks' many substantial ties to New York.  Unable to maintain their argument that this case is "factual[ly] distinct[]" from *Gucci II*, the Banks now resort to arguing that Judge Sullivan actually got it wrong and that this Court should ignore the evidence of the Banks' wire transfers and the overwhelming record of their other ties to New York.  But BOC made this precise argument directly to the Second Circuit when it sought a stay of the contempt order that Judge Sullivan entered after BOC refused to produce documents in *Gucci II*.  *See* Hogan Decl. Ex. 2 at 7–11. The Second Circuit affirmatively denied the Bank's motion to stay, and BOC later withdrew its appeal.  Chung Decl. Ex. 24.  As in *Gucci II*, the Banks advertise their extensive New York

operations and establish New York correspondent and settlement accounts precisely to attract customers like Judgment Debtors.  Because it was the Banks' New York ties and presence that made it possible for the Banks to assist Judgment Debtors, all of their New York contacts are relevant and support the exercise of personal jurisdiction here.  *See* Hogan Decl. Ex. 1.

The Banks' papers also confirm that they have no basis to dispute Judge Sullivan's conclusion in *Gucci I* that the Hague Convention (the "Hague") fails to provide an "easily obtainable alternative" avenue to secure information about bank customers who sell counterfeits in the United States.  And, as explained by the same Chinese law expert that Judge Sullivan relied on in *Gucci II*, the Banks have not demonstrated that they will suffer hardship if forced to comply with the Subpoenas, nor have they shown that China's interests in preserving the secrecy of bank records is even close to absolute.  The United States' interests in deterring counterfeiters and affording judicial remedies clearly outweigh China's interests.  Moreover, the Banks' unsupported representation to the Court about the absence of wire-transfer records and their continued attempt to convince this Court to reverse Judge Scheindlin's determination that Judgment Debtors' accounts should be frozen "regardless of whether [they] are located in the United States or abroad," ECF No. 49 ¶ 10, demonstrate that they are not acting in good faith in resisting this Court's orders and Next's discovery requests.

For all the reasons set forth herein and in Next's opening brief, the Court should grant Next's motion to compel.

## ARGUMENT

**A.      The Banks Are Subject To Specific Personal Jurisdiction In New York**

**1.      The *Gucci* Court Correctly Applied *Licci*'s Holding That A Foreign Bank's "Repeated Use" Of Its New York-Based Correspondent Account Demonstrates Minimum Contacts And Purposeful Availment**

Judge Sullivan, in *Gucci II*, was right to apply the Second Circuit's and New York Court

of Appeals' holdings in the *Licci* cases that "repeated use" of a correspondent account in New York demonstrates transaction of business in New York and gives rise to specific personal jurisdiction. As the New York Court of Appeals recently confirmed in *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316 (2016), "use" within the meaning of *Licci* does not depend on whether the foreign bank initiated rather than received wire transfers through its New York-based correspondent account. There is thus no question that Judge Sullivan's application of *Licci* in *Gucci II* was correct where, as here, the foreign bank received wire transfers of illicit counterfeiting proceeds through its New York-based correspondent accounts.[3]

In an attempt to circumvent *Licci* by casting themselves as "passive" players who "merely maintain"—rather than "use"—correspondent accounts in New York, *see* ECF No. 110 at 6–8; *see also* Almanas Decl. ¶¶ 37–45, the Banks have presented the Court with a primer on the mechanics of the wire transfers that they receive through their correspondent accounts. The Banks' description actually serves to illustrate their repeated and deliberate *use* of their New York correspondent accounts to facilitate their customers', including Judgment Debtors', transfer of U.S. dollars from New York to China. As the Banks represent, the "party initiating a wire transfer instructs its bank (the 'Originating Bank') to pay a beneficiary [here, a Judgment Debtor], using payment instructions that identify the [Judgment Debtor's] bank account and the amount to be paid." ECF No. 110 at 6. The Originating Banks "will credit the funds into the U.S. correspondent account[s]" belonging to the Banks. *Id.* at 6–7. While "the funds stay in the [Banks'] U.S. correspondent account[s]," the Banks then "enter . . . corresponding credit entr[ies] in [their] books and records relating to" Judgment Debtors' accounts. *Id.* Importantly,

---

[3]   There is evidence that all of the Banks, with the exception of ABC, facilitated wire transfers through their New York-based correspondent accounts. *See* Hogan Decl. Ex. 1.

the Banks confirm that it was their *head offices in China* who consciously and deliberately set up these correspondent accounts in New York and who credit Chinese-based accounts based on the receipt of funds held in New York.  *See id.*  This establishes that the Banks themselves—not just their New York branches—are transacting business in New York.[4]

As Judge Sullivan concluded in *Gucci II*, the role that the Banks play in these wire transfers demonstrates the sort of "use" that the New York Court of Appeals found satisfies New York's long-arm statute and that the Second Circuit found "shows purposeful availment of New York's dependable and transparent banking system."  *Licci III*, 20 N.Y.3d 327, 340 (2012); *Licci IV*, 732 F.3d 161, 171 (2d Cir. 2013).  Indeed, Judge Sullivan rejected the very same passive-recipient argument that the Banks now make:

> BOC's efforts to distinguish *Licci* are unpersuasive.  BOC asserts that 'there is a vast difference between a bank's purposeful *use* of a correspondent account in the United States to *make* illegal payments for a client, as in *Licci*, and BOC's passive receipt of transfers that [D]efendants and Chase Bank initiated and routed to BOC.'  . . . .  But BOC mischaracterizes *Licci*.  The Second Circuit and New York Court of Appeals emphasized that frequent and deliberate *use* of a domestic correspondent account to execute international wire transfers was enough to constitute transacting business in New York; neither court said anything about the *Licci* foreign bank knowingly making illegal payments, much less that such knowing complicity was required to establish jurisdiction pursuant to § 302(a)(1).

*See Gucci II*, 135 F. Supp. 3d 87, 94–95 (S.D.N.Y. 2015) (emphasis in original); *see also* Hogan Decl. Ex. 4 at 13–15.  Judge Sullivan's rejection of BOC's passive-recipient argument shows that, despite the Banks' arguments to the contrary, he both understood the mechanics of the transactions at issue and appreciated the contours of *Licci*.[5]

---

[4] In *Licci*, the Second Circuit expressly rejected the argument that foreign banks are not subject to personal jurisdiction where only the receipt of funds occurs in the U.S. and the banks' crediting of customer accounts takes effect elsewhere.  *See Licci IV*, 732 F.3d at 171–73; *see also Gucci II*, 135 F. Supp. 3d 87, 96 (S.D.N.Y. 2015).

[5] In *Gucci II*, BOC had a full and fair opportunity to litigate this issue, Judge Sullivan decided the issue against BOC, and BOC failed to pursue appeal.  BOC should be estopped from relitigating that argument here.  *See, e.g.*, *Beck v. Levering*, 947 F.2d 639, 642 (2d Cir. 1991).

5

The New York Court of Appeals' recent decision in *Rushaid* confirms that Judge Sullivan's application of *Licci* was right.  In *Rushaid*, the Court of Appeals expressly held that a foreign bank who *receives* transfers through its New York-based correspondent account may be subject to personal jurisdiction in New York based on that use.  *See* 28 N.Y.3d at 328 ("[o]ur cases do not require that the foreign bank itself direct the deposits, only that the bank affirmatively act on them").  The Court of Appeals held that *Licci* applies where "[a] foreign bank with a correspondent account . . . repeatedly approves deposits and the movement of funds through that account for the benefit of its customer."  *Id.*  And, like the *Gucci II* court, the Court of Appeals concluded that the "correspondent banking activity" in which a foreign bank engages when receiving transfers on behalf of its customers constitutes "use" within the meaning of *Licci*, is "sufficient to establish a purposeful course of dealing, constituting the transaction of business in New York under CPLR 302(a)(1)," and demonstrates minimum contacts and purposeful availment for federal due process purposes.[6]  *Rushaid*, 28 N.Y.3d at 329, 331.  Consistent with *Rushaid* and *Gucci II*, another court in this District recently exercised specific personal jurisdiction over foreign banks based on the receipt of transfers into New York-based correspondent accounts because the banks' "deliberate choice to utilize the New York correspondent bank accounts and, more generally, New York's and the United States banking systems, are United States contacts attributable to them."  *See Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 70 (S.D.N.Y. 2016).

The Banks' claim that "other courts in this circuit" have recently "decline[d] to follow" Judge Sullivan's analysis in *Gucci II*, ECF No. 110 at 13, is baseless.  The cases on which they

---

6  Consistent with *Gucci II*, the *Rushaid* court further concluded that the banks' use of their correspondent accounts was sufficiently related to the cause of action since the banks' use of their accounts played a critical role in the alleged schemes.  *See id.* at 329–30.

rely did not involve banks with a repeated course of conduct or physical presence in New York like here, and none of the cases even mentions *Gucci II*.[7]  And the pre-*Gucci II* (and pre-*Licci*) case on which the Banks rely, *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391 (1976), was expressly distinguished by the New York Court of Appeals in *Rushaid*.  28 N.Y.3d at 326–27 (distinguishing "[r]epeated, deliberate use" that is "approved by the foreign bank on behalf of and for the benefit of a customer" from "unintended and unapproved use").[8]

Like the bank in *Rushaid* (and BOC in *Gucci II*), the Banks here deliberately and purposefully "credited the funds in [their] correspondent bank account[s] to" Judgment Debtors' accounts in China, which is an "essential step" in Judgment Debtors' counterfeiting scheme. *Rushaid*, 28 N.Y.3d at 327.[9]  There is no dispute that the Banks collectively received at least 600 wire transfers into their New York-based correspondent accounts on behalf of Judgment Debtors and then credited Judgment Debtors' accounts in China to reflect those transfers.  The Banks cannot seriously deny that they inserted themselves into the center of Judgment Debtors' counterfeiting scheme.  Indeed, Judgment Debtors could not have carried out their business of selling counterfeits to U.S. consumers without the Banks' having made it easy for them to move their profits outside the U.S. and into their accounts in China where they can compensate their

---

[7]  *See SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 344–45 (2d Cir. 2018); *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 67 (2d Cir. 2010); *In re Terrorist Attacks on Sept. 11, 2001*, 2018 WL 1631450, at *7 (S.D.N.Y. Mar. 28, 2018).

[8]  The other "mere maintenance" cases on which the Banks rely are similarly inapposite because they involved no allegations of actual use of forum state correspondent accounts. *See Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010); *Monkton Ins. Servs. v. Ritter*, 768 F.3d 429, 431, 433–34 (5th Cir. 2014).

[9]  Although the bank in *Rushaid*—which, like the bank in *Licci*, was a defendant rather than a non-party—was alleged to have "knowingly launder[ed] and conceal[ed]" bribes via the transfers at issue, as in *Licci*, the bank's actual knowledge of illegality was not the basis for the court's conclusion that it was subject to specific personal jurisdiction.  28 N.Y.3d at 320, 326–29; *see also Licci III*, 20 N.Y.3d at 338–39.

7

partners and suppliers with impunity.  Because the Banks' repeated and deliberate use of their

correspondent accounts made this counterfeiting activity possible, and because the information

sought in the Subpoenas is highly relevant to the underlying action, this Court, like the *Gucci II*

and *Rushaid* courts, should find that the Banks had the necessary minimum contacts and

purposefully availed themselves of the privilege of transacting business in New York.

### 2.    The Acquiring Banks' Use Of New York-Based Settlement Accounts Also Demonstrates Minimum Contacts and Purposeful Availment

ABC, BOC, and BOCOM (the "Acquiring Banks") have processed more than 7,000

credit card transactions, totaling more than $3 million, on behalf of Judgment Debtors.  *See*

Grossbaum Decl. Exs. 9–10, 16.[10]  The Acquiring Banks are especially well positioned to

provide key information regarding Judgment Debtors' counterfeiting scheme and illicit proceeds,

*see Tiffany (NJ) LLC v. Forbse*, 2012 WL 3686289, at *5–6 (S.D.N.Y. Aug. 23, 2012), and have

established and use New York-based settlement accounts.  *See* Nagin Decl. Ex. 1; Grossbaum

Decl. Exs. 11, 17–21; Hogan Decl. Ex. 1.  BOCOM concedes as much.  *See* ECF No. 110 at 17

n.16.  The volume of credit card transactions that the Acquiring Banks have facilitated through

their settlement accounts in New York demonstrates their minimum contacts with, and

---

[10]  In its opening submission, Next indicated that, although it already had obtained initial responses to a subpoena directed to Mastercard, a subpoena directed to Visa remained pending.  ECF No. 110 at 18 n.18.  On May 10 and May 21, 2018, Visa provided Next with initial responses containing information relating to ABC, BOC, BOC Credit Card, and BOCOM.  *See* Grossbaum Decl. Exs. 12–17.  And, on May 8, 2018, Next received a revised production of transaction data from Mastercard that identifies the merchants associated with each transaction but is otherwise substantively the same as the data produced in Exhibit 2 to the Nagin Declaration (ECF No. 86).  *See* Grossbaum Decl. Exs. 9–10.  Although the Banks "reserved the right to request permission to address any additional documents produced . . . that [Next] submits in conjunction with its reply," ECF No. 110 at 18 n.18, Next respectfully submits that this Court should deny any such request given that ABC, BOC, and BOCOM— in their capacity as acquiring banks—must be aware of these accounts and transactions and cannot dispute their existence.

purposeful availment of the privilege of transacting business in, New York.[11]

The Acquiring Banks argue that the Court cannot exercise specific personal jurisdiction over them by virtue only of their *status* as acquiring banks. But Next has presented evidence that the Acquiring Banks transact business in New York based on their *use* of settlement accounts in New York, among other contacts that are deliberately targeted at New York and directly related to the counterfeiters' operations. The out-of-state cases on which the Banks rely do not involve situations where the acquiring bank set up and repeatedly used a bank account in the jurisdiction to funnel the proceeds of illegal sales out of the country to the counterfeiters. *See Project Honey Pot v. John Does*, 2012 WL 1854184, at *7 (E.D. Va. May 21, 2012) (foreign bank not subject to personal jurisdiction merely because it served as acquiring bank for merchants who sold counterfeit products via credit card); *Fin. Inst. Track Litig. v. Heartland Bank*, 2011 WL 1232352, at *13 (S.D. Tex. Mar. 31, 2011) (bank not subject to personal jurisdiction merely because it participated in Visa and Mastercard networks as acquiring bank).[12]

### 3.   The Banks' Other New York Connections Further Satisfy The Minimum Contacts And Purposeful Availment Requirements

In addition to the correspondent- and settlement-account evidence that Next has amassed,

---

[11]   The Acquiring Banks also have subjected themselves to agreements governed by New York and California law and choice-of-forum provisions, *see* Nagin Decl. Ex. 1, Grossbaum Decl. Exs. 12–15, which also is relevant to the jurisdictional analysis. *See Gucci 2d Cir.*, 768 F.3d at 142 n.21 (circuit courts "have endorsed the position that, when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts . . . are contacts with the United States as a whole").

[12]   The same is true with respect to BOC's arguments regarding its admitted role as an intermediary bank. *See* ECF No. 110 at 14. Next has proffered evidence of many wire transfers through BOC's New York-based correspondent account, among many other New York ties, which distinguishes BOC from the parties in the cases on which it relies. *See Bluewaters Comm'cns Holding v. Ecclestone*, 2014 WL 220779, at *11, at *23 (Sup. Ct. N.Y. Cnty. 2014) (non-bank defendants not subject to personal jurisdiction merely because they made deposits through clearing accounts in New York); *Gliklad v. Bank Hapoalim B.M.*, 2014 WL 3899209 (Sup. Ct. N.Y. Cnty. 2014) (foreign bank not subject to jurisdiction merely because it was an intermediary bank for transfers unrelated to the cause of action).

the record also contains evidence of the Banks' many other New York contacts, including the

marketing of their New York-based clearing services, the operation of their New York branches,

the ownership of real property in New York, registration with the New York Department of

Financial Services, and participation in CHIPS and FEDWIRE.  *See* Hogan Decl. Ex. 1.  The

Banks do not and cannot factually dispute *any* of this evidence.  And all of these contacts with

New York relate to the central role that the Banks play in Judgment Debtors' counterfeiting

operations.  The Banks have attracted customers like Judgment Debtors, who, without the Banks'

New York presence, could not profit from the sale of counterfeit products in the U.S.  The Banks

have promoted their New York presence with statements including:

- BOC:  "Bank of China USA specializes in . . . US dollar clearing," Weigel Decl. Ex. 233;
- ICBC:  "Over the past few years, ICBC has taken all necessary steps to set up a US dollar Clearing Center in New York in an effort to improve the standard of clearing services, bringing robust increases in USD clearing volume," *id.* Ex. 116;
- ABC:  "New York Branch has its US dollar clearing business launch successfully. . . .  ABC thus becomes a tier-one global clearing bank for US dollars," *id.* Ex. 17;
- BOCOM:  "The New York Branch offers Cross-border RMB Clearing Services, including U.S. Dollar Clearing Services," *id.* Ex. 46;
- CCB:  "The NY branch specializes in . . . USD Clearing" and provides "[e]fficient, accurate and reliable USD Clearing Services," with "CCB teams (Beijing and New York) process[ing] a 21.5 hour non-stop USD Clearing service," *id.* Exs. 92, 93; and
- CMB:  "China Merchants Bank New York Branch . . . provide[s] integrated and professional cross-border financial services for Chinese and American customers" and "provides domestic and foreign customers with RMB, USD and other currencies' deposits . . . , as well as collection, payment and settlement services," *id.* Ex. 70.

Taken together, the Banks' New York connections leave no doubt that the Banks' conduct "is, if

anything, even more substantial, deliberate and recurring than that of the foreign bank in the

*Licci* cases" and that there "[c]learly . . . is more than 'an articulable nexus' between [the Banks']

New York business activity and [Next's] discovery requests."  *Gucci II*, 135 F. Supp. 3d at 94–

99 (considering BOC's use of correspondent bank accounts, ownership of real property,

operation of New York branches, and marketing materials, among other contacts).  The Banks,

therefore, have "sufficient minimum contacts with New York for the Court to have personal

jurisdiction over [Next's] motion to compel."  *Id.* at 99.

Once again, unable to dispute the facts or distinguish this case from *Gucci II*, the Banks

resort to arguing that Judge Sullivan was wrong to conclude that marketing materials and other

evidence of New York ties and connections were relevant to the analysis.  But, "[i]n determining

the strength of the contacts under both section 302(a)(1) and the Due Process Clause," courts

must "look to the totality of . . . contacts with the forum state."  *Chloe v. Queen Bee of Beverly

Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).  And the Court of Appeals in *Rushaid* expressly

found that evidence that the foreign bank had "marketed 'business relations in New York' on its

website" was relevant.[13]  *Rushaid*, 28 N.Y.3d at 327.  Here, the uncontroverted evidence of the

Banks' New York connections demonstrates the Banks' minimum contacts with, and purposeful

availment of the privilege of transacting business in, New York.[14]

### 4.    The Banks Have Failed To Show That The Exercise Of Specific Personal Jurisdiction Would Be Unreasonable

The Banks have failed to satisfy their burden of demonstrating that the Court's exercise

of specific personal jurisdiction would be unreasonable.  *See Licci IV*, 732 F.3d at 173.  For the

---

[13]  In other post-*Licci* contexts similar to these, other New York courts also have considered contacts aside from correspondent account use.  *See Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 19 (E.D.N.Y. 2016) (relevant that foreign bank operated New York branch, which acted as intermediary for wire transfers made on behalf of bank's clients); *Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 279 (E.D.N.Y. 2016) (same).

[14]  Next maintains that the evidence it has submitted is more than sufficient to support the exercise of specific personal jurisdiction over the Banks.  If, however, the Court determines otherwise, Next respectfully reiterates its request that the Court order jurisdictional discovery.  *See* ECF No. 87 at 18–19.  In their opening brief, the Banks argued that the Court should reject any request for discovery because Next had "provide[d] not a scintilla of support for" its position.  ECF No. 71 at 16–17.  Now that the Banks have been confronted with Next's "ream of exhibits," ECF No. 110 at 2—including "hundreds of wire transfer records," *id.* at 2, 19, they have abandoned that position.

reasons set forth in Next's opening brief, the factors to be considered all weigh in Next's favor. *See* ECF No. 87 at 18. The Banks do not rebut any of those arguments except with respect to New York's interests. Specifically, the Banks present the Court with a parade of horribles that supposedly will befall New York's status as an "international financial center" should the Court exercise jurisdiction. *See* ECF No. 110 at 21. The Banks' prediction is absurd.

As an initial matter, Next is not asking this Court to find that mere maintenance of correspondent accounts opens the door to personal jurisdiction. Here, the Banks purposefully and deliberately used New York-based correspondent accounts to facilitate hundreds of transfers of U.S. dollars beyond the reach of lawful process in the United States. Those transactions are the very subject of the underlying cause of action (and discovery requests).[15] That, of course, would not be true in "every international tort case." ECF No. 110 at 21. But here, the Banks have inserted themselves into the center of Judgment Debtors' counterfeiting operations and have used their New York-based correspondent and settlement accounts to facilitate those operations. Indeed, there is no reasonable dispute that the Banks have long been on notice that their correspondent accounts are being used to facilitate counterfeiting operations and yet they continue to protect their counterfeiting customers, including Judgment Debtors.

Furthermore, BOC raised this same unpersuasive argument in *Gucci II* to no avail. *See* Hogan Decl. Ex. 4 at 21. Unsurprisingly, in the nearly three years since *Gucci II* was decided,

---

[15] The Banks cite two pre-*Licci* cases to support its claim that New York courts have declined to exercise jurisdiction based on wire transfers to avoid "overburdening its courts." ECF No. 110 at 22. Neither of these cases involves facts similar to this case. *See Daventree Ltd. v. Republic of Azer.*, 349 F. Supp. 2d 736, 762 (S.D.N.Y. 2004) (no personal jurisdiction over foreign bank where alleged transfers through correspondent account were not "'at the very root of the action'" and amounted only to "'mere maintenance'"); *Casio Computer Co. v. Sayo*, 2000 WL 1877516, at *26 (S.D.N.Y. Oct. 13, 2000) (no personal jurisdiction over non-bank defendants based merely on wire transfers that defendants made through New York).

this District has not been "flooded with suits," ECF No. 110 at 21, and the Banks do not even attempt to argue otherwise.  Nor do the Banks suggest that *Gucci II* caused "non-U.S. banks in need of legitimate correspondent banking services . . . to direct their business to cities other than New York."  *Id.* at 22.  There is no support in the record for the Banks' assertion that foreign banks will leave the New York market if this Court agrees with Judge Sullivan's decision in *Gucci II*.  And there is no reason for this Court to give credence to the Banks' supposed concerns when the New York Court of Appeals were not deterred by any such considerations in deciding *Licci* and *Rushaid*.  Indeed, contrary to the Banks' argument, it is in New York's interests, as well as federal interests, to exercise jurisdiction under these circumstances.  *See Licci IV*, 732 F.3d at 174 ("[W]eighed in the balance is the United States' and New York's interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of . . . nefarious ends.").[16]

## B.     International Comity Weighs In Favor Of Enforcing The Subpoenas

The Banks' effort to convince the Court to reject Judge Sullivan's (and Judge Scheindlin's) conclusions with respect to the efficacy of the Hague Convention and other comity factors is fatally flawed.  Importantly, the Second Circuit expressed its approval of Judge Sullivan's application of the comity factors—including his conclusion regarding the Hague—in *Gucci I*, *see Gucci 2d Cir.*, 768 F.3d at 122, 141 (2d Cir. 2014), and Judge Sullivan reaffirmed that conclusion in *Gucci II*.  *See Gucci II*, 135 F. Supp. 3d at 104; *see also Wultz*, 910 F. Supp. 2d at 557–58.  Here, principles of international comity weigh even more heavily in favor of

---

[16]   *See also Gucci II*, 135 F. Supp. 3d at 100 (New York has strong interest where "U.S. dollar-denominated transfers of allegedly ill-gotten gains were routed through New York," "in litigants' compliance with their discovery obligations," and "in enforcing the . . . Lanham Act," which is "designed to protect intellectual property rights and prevent customer confusion'"); *Rushaid*, 28 N.Y.3d at 331 (finding that "the fraudulent use of New York's banking system" is "an issue of great importance to the State"); *see also* ECF No. 87 at 18.

compelling the production of documents responsive to the Subpoenas.  The Banks do not present

any convincing reason to depart from these conclusions.

**Neither The Hague Convention Nor Enforcement in China Provides a Viable**

**Alternative**.  The Banks claim that the *Qi Andrew* and *Forbse* cases support their position that

the Hague provides a viable alternative for obtaining discovery.  But if the Court looks carefully

at the facts of those cases, as Judge Scheindlin and Judge Sullivan did in *Wultz* and *Gucci I*,

respectively, it will find that the record actually "validate[s] the concern . . . that the Hague

Convention requests in circumstances similar to those presented here are not a viable alternative

methods of securing the information Plaintiff seeks."  *Wultz*, 910 F. Supp. 2d 548, 557 (S.D.N.Y.

2012) (internal quotation omitted); *see also Gucci I*, 2011 WL 6156936, at *8 (S.D.N.Y. Aug.

23, 2011) (Hague "does not present an easily obtainable alternative"); *see also* Second Clarke

Decl. ¶¶ 6(d); 30–43.

- In *Tiffany (NJ) LLC v. Forbse*, Judge Naomi Reice Buchwald ordered the plaintiff to proceed
  through the Hague with respect to ICBC and CMB because "China ha[d] yet to have a
  meaningful opportunity to demonstrate whether it will comply with the Hague Convention
  request under these circumstances."  2012 WL 1918866, at *10 (S.D.N.Y. May 23, 2012).  It
  took China's Ministry of Justice ("MOJ") *more than nine months* to produce documents that
  were only *partially responsive* to the plaintiff's initial requests, *see* ECF No. 110 at 28, *see
  also* Second Clarke Decl. ¶¶ 36–37, 42, despite the MOJ's "stated intention to cooperate with
  [plaintiff's] request," *Forbse*, 2012 WL 1918866, at *10.  This is in sharp contrast to BOC's
  7,000-page production in *Gucci*, which happened a mere seven days after the Second Circuit
  denied BOC's motion to stay contempt sanctions.  *See* Chung Decl. Ex. 24; Grossbaum Decl.
  Ex. 8; *see also* Second Clarke Decl. ¶ 40.[17]

- In *Qi Andrew*, Judge Henry Pitman ordered the plaintiff to proceed through the Hague.  The
  MOJ's response consisted of a mere 30 pages provided *nine months* after the parties
  submitted their request.  *See* Second Clarke Decl. ¶¶ 36, 40, 42, Ex. 1.  And the MOJ
  "expressly noted that it was *not* producing all documents requested."  *Tiffany (NJ) LLC v. Qi*

---

[17]   Notably, Judge Buchwald granted the plaintiff's motion to compel with respect to BOC,
finding BOC's role as "acquiring bank for an infringing website . . . strengthen[ed] the
importance of the information sought" and "tip[ped] the balance of the analysis in favor of
[the plaintiff]."  *Forbse*, 2012 WL 1918866, at *11.  BOC produced the documents soon
after.  *See* Second Clarke Decl. ¶ 20, Ex. 7.  Here too, documents from the acquiring banks—
ABC, BOC, BOC Credit Card, and BOCOM—are especially important to the litigation.

*Andrew*, 2012 WL 5451259, at *2 (S.D.N.Y. Nov. 7, 2012); *see also* Second Clarke Decl. ¶¶ 36, 40, 42, Ex. 1.

"If the [MOJ] applies a similar standard in the instant case," to that which it applied in *Forbse* and *Qi Andrew*, "it is likely that documents relevant to [Next's] claims . . . will be denied." *Wultz*, 910 F. Supp. 3d at 558; *see also* Second Clarke Decl. ¶¶ 6(d), 30–43.[18]

The Banks' expressed willingness to work with Next to produce documents through the Hague does not change the calculus.  The Banks made the same offer in *Qi Andrew* and *Forbse*, and, there, although the negotiated requests that the Banks insisted upon were more limited than plaintiff's initial subpoenas, *compare, e.g.*, Second Clarke Decl. Ex. 2 *with* Chung Supp. Decl. Ex. 32, the MOJ's responses *still* did not include all of the requested information.  *See* Second Clarke Decl. ¶¶ 36–37, 40, 42, Ex. 1.

The letters submitted by the MOJ in this case also do not alter the analysis.  *See* ECF No. 110 at 28.  These letters raise the same points that the People's Bank of China ("PBOC") and China Banking Regulatory Commission ("CBRC") raised in the *Gucci* case—and Judge Sullivan rejected those arguments.  *Compare* Chung Supp. Decl. Exs. 34, 35 *with* Hogan Decl. Ex. 6.[19] The U.S. Government also weighed in at the request of the Second Circuit during the initial *Gucci* appeal and wrote that "the Regulators' Letter," which made many of the same points as

[18]  Although Judge Pitman found in *Qi Andrew* that the Hague process "ha[d] not proven futile," 2012 WL 5451259, at *3, the Supreme Court has articulated the standard not as futility but rather whether the Hague "facilitate[d]" discovery by "produc[ing] needed evidence." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for the S. Dist. Iowa*, 482 U.S. 522, 541–42 (1987) (declining to adopt a rule requiring "first resort to the Convention procedures" because that "would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules"); *see also Gucci I*, 2011 WL 6156936, at *8 ("Bank's position that the Hague . . . must be futile before a court can forego its procedures is . . . plainly in tension with the Supreme Court[]").

[19]  The MOJ submitted a nearly identical letter in *Gucci* after Judge Sullivan ordered BOC to produce documents responsive to Gucci's subpoena.  *See* Hogan Decl. Ex. 6.  This letter had no effect on Judge Sullivan's decision to hold BOC in contempt for failing to produce.  *See generally Gucci Am., Inc. v. Li*, 2015 WL 7758872 (S.D.N.Y. Nov. 11, 2015).

the MOJ's letters here, "does not present information necessitating reversal of the order requiring compliance with the document subpoena in *Gucci*." Hogan Decl. Ex. 7 at 4, 27.

The Banks are also incorrect that Next should be required to go to China to seek to enforce its Judgment. *See* Guo Supp. Decl. ¶¶ 37–38; *see also* Second Clarke Decl. ¶¶ 6(e), 44–48. Critically, the Banks can cite only one case—which is the *only example in China's history* of a Chinese court enforcing a U.S. judgment—and it is very likely that the case will remain an outlier. *See* Second Clarke Decl. ¶¶ 45–47. The Office of the U.S. Trade Representative acknowledges that "China remains a hazardous and uncertain environment for U.S. right holders hoping to protect and enforce their IP rights," Hogan Decl. Ex. 8 at 38, making it even less certain that China would enforce a trademark judgment.

**The United States Has Stronger Interests.** Judge Sullivan, the Second Circuit, and the U.S. Government in the *Gucci* case all concluded that the United States' interests in cases like this one are substantial. *See Gucci 2d Cir.*, 768 F.3d at 141; *Gucci II*, 135 F. Supp. 3d at 103; Hogan Decl. Ex. 7 at 2–3, 9–10, 24–25. The Banks' only new response is to argue that these interests are somehow diminished because Next, or its parent company Tenor, is a so-called "litigation funder." That does not change the analysis. Litigation funders are important in cases such as these because they "allow[] . . . lawsuits to be decided on their merits, not based on which party has deeper pockets or stronger appetite for protracted litigation." *Lawsuit Funding LLC v. Lessoff*, 2013 WL 6409971, at *6 (N.Y. Sup. Ct. Dec. 4, 2013). As such, there is "no public policy against the funding of litigation by outsiders." *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 272 (2d Cir. 1992). And, regardless of the reasons underlying the assignment, Next, as assignee, "takes all of the rights of the assignor, no greater and no less." *In re New Haven Projects Ltd. Liab. Co.*, 225 F.3d 283, 290 n.4 (2d Cir. 2000). The Banks' attempt to put the

details of Plaintiffs' continuing interest in this litigation at issue is nothing more than an attempt to distract the Court.  Moreover, this factor of the comity analysis considers each *country's* interest, not each party's interest.  *See* Restatement (Third) of Foreign Relations Law § 442(1)(c).  The United States' interest in "enforcing . . . the Lanham Act," *Gucci II*, 135 F. Supp. 3d at 100, which is designed in large part to protect consumers, *see Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 108 (2d Cir. 2000), is no less powerful because an assignee, rather than the trademark holder, is the entity seeking to enforce the law.[20]

The United States' "significant public interest in enforcing the Lanham Act" is not "outweighed by Chinese bank secrecy laws, the protections of which may be waived, especially where such laws are susceptible to use and exploitation by international counterfeiters."  *Gucci I*, 2011 WL 6156936, at *11 n.8.  BOC has now produced bank records in at least *four* known cases and, if BOC has been sanctioned for doing so, it would say so.  *See* Clarke Decl. ¶¶ 19–20. The Banks cannot point to a single instance where a bank has been sanctioned for complying with a court order.  The best the Banks do is cite to a handful of administrative decisions and cases, none of which are factually similar to the situation here or amount to severe sanctions. *See id.* ¶¶ 6(c), 10–13, 19–29.  The Banks claim that Next is "put[ting] the cart before the horse" by requiring the Banks to "violate applicable laws" in order to "show that they have been punished."  ECF No. 110 at 31.  But BOC already supposedly "violated the applicable laws" when it produced over 7,000 pages in response to the subpoena in the *Gucci* case, and when it produced documents pursuant to court orders in three other cases.  *See, e.g.*, Grossbaum Decl. Ex. 8; *see* Second Clarke Decl. ¶ 20.  BOC does not claim it was sanctioned or suffered any

---

[20]   *See also* Hogan Decl. Ex. 7 at 21, 25 (United States provides "robust remedies for private litigants" to help "keep[] counterfeit goods out of the domestic marketplace").

liability as a result of these productions.  *Id.*  Although the Banks refer to a civil suit brought against BOC by the counterfeiters in the *Gucci* case, BOC suffered no real consequences in that case.  *See* Second Clark Decl. ¶¶ 10–11.  It is nothing but unsupported speculation to suggest that the Banks will be sanctioned if the Court allows the discovery sought here.

Furthermore, despite the Banks' assertions to the contrary, China's banking regime does not place the utmost premium on the confidentiality of customer information.  Because China's bank secrecy regulations are trumped by other regulations that allow regular access to customer information, the counterfeiters here have no reasonable expectation that their bank records will remain confidential.  *See* Second Clarke Decl. ¶¶ 6(a), 7–13.  This is precisely why Judge Sullivan concluded that actual practice undermines state policy favoring a high degree of protection to the Banks' customers.  *See Gucci I*, 2011 WL 6156936, at *9–11.

**The Banks Are Not Acting In Good Faith.**  An order compelling disclosure is further supported by the fact that the Banks have not been forthright with this Court about their use of their New York-based correspondent accounts.  Despite claiming that there was no "basis in fact" for the proposition that "Judgment Debtors routed their ill-gotten funds to China . . . via correspondent accounts held by the Banks in New York," ECF No. 71 at 13, the Banks knew or, at minimum were reckless in denying, that they used their New York correspondent accounts to enable Judgment Debtors to wire the illegal proceeds of their counterfeiting schemes back to their accounts in China.  It is irrelevant that the Banks claim there were no records of these accounts or wires in New York, *see id.* at 10, as the Banks' head offices must have records of all the wire transfers that go through their New York correspondent accounts.  At best, the Banks knew that their representation to the Court that there was not "any basis in fact" for Next's assertions regarding the wire transfers was made without sufficient factual inquiry.  At worst, the

Banks' representation was an intentional misstatement to the Court.  Either way, the Banks demonstrated a lack of good faith.

The Banks' lack of good faith is further demonstrated by their continued attempt to circumvent Judge Scheindlin's previous asset restraint order, which they did not appeal.  The Banks' efforts to draw a material distinction between the Judgment and the Final Order—based on inconsequential stylistic differences in the language of the respective orders—strain credulity. The asset restraint provisions in the Judgment and Final Order are substantively the same as they both "order the Banks to comply with [the] asset freeze," ECF No. 48 at 3, and it would be illogical to treat them differently.

- Judgment: "[A]ll Defendants' Assets . . . continue to be restrained regardless of whether the Defendants' Assets are located in the United States or abroad . . . *includ[ing]*. . . *the accounts set forth in Exhibit 3*," which lists **Judgment Debtors' accounts at the Banks**. ECF No. 49 ¶ 10, Ex. 3.

- Final Order: "*[T]hird party financial service providers* . . . are restrained and enjoined from transferring, withdrawing or disposing of any [of Judgment Debtors'] money or other assets . . . regardless of whether such money or assets are held in the U.S. or abroad."  ECF No. 62 ¶ 4.

It is therefore the Banks who are "attempt[ing] to sidestep" Judge Scheindlin's order finding that the Banks' arguments were "premature" even though "the Proposed Default Judgment *would order the Banks to comply with an asset freeze*" because the Banks were not being compelled to turn over the funds in those accounts.  ECF No. 48 at 3 (emphasis added). The Banks point to no changed circumstances that would justify this Court revisiting Judge Scheindlin's order.[21]  The Banks' argument that this Court should modify the Final Order verges

---

[21]   Additionally, as set forth in Next's opening brief, ECF No. 87 at 8–11, *Motorola* remains inapposite.  "Nothing in *Motorola* supports extending its holding to the issuance of [an order] where no enforcement proceeding against any objecting Bank has been initiated."  ECF No. 48 at 4.  Next is not seeking turnover of assets held at the Banks, and Next's potential future enforcement proceeding is irrelevant to whether the Final Order should be modified.

on frivolous and further supports the notion that the Banks are not acting in good faith when resisting compliance with court orders or discovery requests in this case.[22]

## CONCLUSION

For the foregoing reasons and for the reasons set forth in its opening brief, Next respectfully asks that this Court enter an order: (a) denying the Banks' motion to modify the Final Order; (b) denying the Banks' motion to quash the Subpoenas; (c) compelling the Banks to produce all documents called for in the Subpoenas; and (d) awarding such other and further relief as the Court deems just and proper.

Dated: May 25, 2018
New York, New York

GIBSON, DUNN & CRUTCHER LLP

By:    *s/ Robert L. Weigel*
_____
Robert Weigel
Howard S. Hogan
Kristen Lisk Mathews
Alexandra L. Grossbaum

200 Park Avenue
New York, NY  10166-0193
Telephone:  212.351.4000
Fax:  212.351.4035
RWeigel@gibsondunn.com
HHogan@gibsondunn.com
KMathews@gibsondunn.com
AGrossbaum@gibsondunn.com

*Attorneys for NEXT INVESTMENTS, LLC*

---

[22]  In addition, although ABC was notified nearly five years ago that it was the acquiring bank for a website through which one Judgment Debtor sold counterfeits and was directed to freeze that account, *see* Hogan Decl. Ex. 3, ABC continued to allow the merchant to transact business.  *See* Grossbaum Decl. Ex. 16.  ABC's blatant disregard for the Court's orders further reveals its lack of good faith.