UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NIKE, INC. and CONVERSE INC.,

                              Plaintiffs,

                    -against-

MARIA WU d/b/a
WWW.SHOECAPSXYZ.COM, et al.,

                              Defendants.

13cv08012 (CM) (DF)

**AMENDED[1]
MEMORANDUM
AND ORDER**

**DEBRA FREEMAN, United States Magistrate Judge:**

After the Court granted a default judgment (the "Judgment" (Dkt. 49)) in favor of

plaintiffs Nike, Inc. and Converse Inc. (together, "Plaintiffs") in this trademark-infringement

action, Plaintiffs assigned their interest in the Judgment to Next Investments, LLC (the

"Assignee"), and the matter has recently been before the Court in connection with the Assignee's

efforts to enforce the Judgment against the defendant judgment debtors ("Defendants" or the

"Judgment Debtors") and disputes related to those efforts.  In particular, the Honorable

Colleen McMahon has referred the case to this Court to address a post-judgment motion by

six nonparty Chinese banks – Agricultural Bank of China ("ABC"), Bank of Communications

Limited ("BOCOM"), China Construction Bank ("CCB"), China Merchants Bank ("CMB"),

Industrial and Commercial Bank of China ("ICBC"), and the Bank of China ("BOC")

(collectively, the "Banks") – to quash certain subpoenas (the "Subpoenas") served on them by

the Assignee, and to modify an Order issued by Judge McMahon on October 20, 2017 (the

---

[1] The amendment of this Court's prior Memorandum and Order, dated September 11, 2018, corrects a typographical error in its concluding paragraph, so as to indicate that the docket number of the Assignee's cross-motion is Dkt. 82 (not Dkt. 80, as originally stated).  The addition of this footnote, explaining the amendment, also alters the footnote numbering that was used in this Court's prior Memorandum and Order.

"10/20/17 Order"), which imposed a global restraint on the assets of the Judgment Debtors.  (*See* Dkts. 70 (motion by five of the Banks), 107 (request by BOC for leave to join in the motion).[2]) Also before this Court is the Assignee's cross-motion to compel compliance with the Subpoenas. (Dkt. 82.)[3]

For the reasons discussed below, the Banks' motion is denied to the extent the Banks seek to quash the Subpoenas and deemed withdrawn without prejudice to the extent they seek to modify the 10/20/17 Order, and the Assignee's cross-motion to compel the production of documents pursuant to the Subpoenas is granted.

---

[2] For the reasons discussed below, BOC's request to join in the other banks' motion to quash (Dkt. 107) is granted, and this Court will proceed to consider the motion to quash as if made on behalf of all six of the Banks.

[3] Also before this Court is an application by the Assignee to seal portions of certain documents submitted to the Court in connection with the pending motions.  (*See* Dkt. 90; *see also* Dkts. 91, 123, 131.)  This Court will address that application by separate Order, but notes that, to the extent this Court has relied on any materials presumptively filed under seal, this Court now considers those materials to be "judicial documents," entitled to a presumption of public access.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-20 (2d Cir. 2006); *see also, e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, MDL No. 1358 (SAS), 2013 WL 3531600, at *3 (S.D.N.Y. July 12, 2013 (finding documents submitted in conjunction with a motion to be "judicial documents").  Certainly, to the extent this Court explicitly discusses any such materials, they should be considered integral to its analysis, and thus the presumption of public access to those materials should be accorded significant weight.  *See United States v. Amodeo*, 71 F.3d 1044, 1048-49 (2d Cir. 1995) (noting that the weight of the presumption will vary depending on where on the "continuum" the confidential information falls, with the greatest weight given when the information "directly affect[s] an adjudication").  For this reason, and because, with respect to the types of sealed information that this Court has cited herein – including the names of certain banks holding settlement accounts and general descriptions of credit-card transaction volumes – this Court finds that, on balance, any "competing considerations" to public access (such as the privacy interests of innocent third parties, *see, e.g.*, *Amodeo*, 71 F.3d at 1050-51) are either non-existent or weak, this Court is not placing any part of this Memorandum and Order under seal.

**BACKGROUND**

Plaintiffs commenced this action in November 2013, asserting federal and state

trademark claims against hundreds of alleged infringers, based on their unauthorized use of

Plaintiffs' trademarks in connection with the sale of counterfeit goods.  (Dkts. 1, 28.)  None of

the named Defendants appeared in this action, and, on June 29, 2015, Plaintiffs filed a motion for

a default judgment, seeking both injunctive and monetary relief.  (Dkt. 37.)  At that point, as

discussed further below, the nonparty Banks filed an objection (Dkt. 41), specifically challenging

the provision of the proposed default judgment that they described as an "asset-freezing

injunction that would purport to require the Banks to restrain customer accounts located outside

of the United States" (*id.*, at 1).  After receiving briefing regarding the Banks' objection (*see*

Dkts. 42, 43, 46, 47), the Honorable Shira A. Scheindlin, U.S.D.J., to whom the case was then

assigned, denied the objection on August 20, 2015 (Dkt. 48).  On that same day,

Judge Scheindlin entered the Judgment, which awarded Plaintiffs more than $1 billion in

equitable relief and which included the asset-restraint provision that had been challenged by the

Banks.  There was then no further activity in the case before the Court until Plaintiffs assigned

their interest in the Judgment to the Assignee on January 31, 2017 (Dkt. 50), and the Assignee

began efforts to seek enforcement (*see, e.g.*, Dkts. 53-58).

On October 6, 2017, the case was reassigned to Judge McMahon, and, on October 20,

2017, Judge McMahon issued an Order finding the Judgment Debtors to be in contempt of court.

(10/20/17 Order ¶ 1.)  Further, as relevant to the matters now before this Court, the 10/20/17

Order expressly restrained and enjoined not only Defendants, who were the only subjects of the

Judgment, but also third parties (including the Judgment Debtors' "financial service providers")

"from transferring, withdrawing, or disposing of any money or other assets into or out of any

accounts held by, associated with, or utilized by the Judgment Debtors, . . . regardless of whether such money or assets are held in the U.S. or abroad."  (*Id.* ¶ 4.)

On or about November 30, 2017, the Assignee issued the Subpoenas to the Banks, seeking information related to the Judgment Debtors' assets.  (*See* Declaration of Jacqueline L. Chung [in Support of Banks' Motion to Quash Subpoenas and Modify the 10/20/17 Order], dated Feb. 14, 2018 ("Chung Decl.") (Dkt. 72) ¶ 13 and Ex. 11 (example of Subpoenas).) According to the Banks, the Subpoenas to the different Banks are largely identical and may be considered collectively.  (*See id.*)[4]

On February 14, 2018, five of the Banks (all except for BOC) filed a motion to quash the Subpoenas, and to modify the global asset-restraint provision of the 10/20/17 Order.  (Dkt. 70 (Notice of Motion); *see also* Memorandum of Law of Nonparties ABC, BOCOM, CCB, CMB, and ICBC's Motion to Quash Subpoenas and to Modify the 10/20/17 Order, dated Feb. 14, 2018 ("Banks Mem.") (Dkt. 71).)  On March 16, 2018, the Assignee filed an opposition to that motion, together with a cross-motion to compel compliance with the Subpoenas.  (*See* Dkt. 82 (Notice of Cross-Motion); *see also* Memorandum of Law in Opposition to the Motion to Quash Filed by Third-Party Chinese Banks and in Support of Cross-Motion to Compel Production of Documents, dated Mar. 16, 2018 ("Assignee Mem.") (Dkt. 87).)  On April 27, 2018, BOC filed a motion for leave to join in the other banks' motion to quash (Dkt. 107), and, on the same day, the originally moving banks filed a joint reply on their motion and an opposition to the cross-motion. (*See* Memorandum of Law in Support of Nonparty Banks' Reply in Support of Motion to Quash Subpoenas and to Modify the 10/20/17 Order and Opposition to Assignee's Cross-Motion to

---

[4] While the Chung Declaration only notes the similarity of the Subpoenas served on ABC, BOCOM, CCB, CMB, and IBCB, this Court assumes that the Subpoena served on BOC was also largely identical to those served on the other banks.

Compel Production of Documents, dated Apr. 27, 2018, ("Banks Reply Mem.") (Dkt. 110).)  On May 25, 2018, the Assignee filed a reply on its cross-motion.  (Memorandum of Law in Further Support of Cross-Motion to Compel Production of Documents, dated May 25, 2018, ("Assignee Reply Mem.") (Dkt. 127).)

The Banks and the Assignee have also filed no fewer than 21 separate Declarations in support of their motions and cross-motions, (see Dkts. 72-78, 83-86, 108, 109, 111-15, 124-26), including Declarations from two experts in Chinese law (see Declaration of Guo Li ("Guo") [in Support of the Banks' Motion to Quash and to Modify the 10/20/17 Order], dated Feb 13, 2018, ("Guo Decl.") (Dkt. 73); Declaration of Donald Clarke ("Clarke") [in Support of the Assignee's Cross-Motion to Compel Production of Documents], dated Mar. 16, 2018 ("Clarke Decl.") (Dkt. 83)).  The Court has also received a letter from the Ministry of Justice of the People's Republic of China, in support of the Banks' motion.  (Letter to the United States Department of Justice and the Honorable Colleen McMahon, U.S.D.J., from the Ministry of Justice, People's Republic of China, dated Mar. 20, 2018 ("Chinese Ministry of Justice Letter") (Dkt. 103).)

Judge McMahon referred the disputes over the Subpoenas and the 10/20/17 Order to this Court for resolution.  (Dkts. 95, 116.)  As also discussed further below, this Court subsequently heard oral argument from counsel for the Assignee and the Banks (see Transcript of June 25, 2018 Oral Argument ("6/25/18 Tr.") (Dkt. 128)), and received post-argument submissions relating to an issue raised during the argument (Dkts. 130, 132, 133, 134).

## DISCUSSION

I.   **THE BANK'S MOTION TO QUASH THE SUBPOENAS AND
     THE ASSIGNEE'S CROSS-MOTION TO COMPEL COMPLIANCE**

    A.   **Timeliness of Motion To Quash and of BOC's Request To Join the Motion**

"In order to be timely, a motion to quash a subpoena generally must be filed before the return date of the subpoena." *Bouchard Transp. Co. v. Associated Elec. & Gas Ins. Servs. Ltd.*, No. 15cv6586 (PAC), 2015 WL 6741852, at *1 (S.D.N.Y. Nov. 4, 2015) (internal quotation marks and citations omitted). The representative Subpoena submitted by the Banks in conjunction with their motion to quash reflects a return date of January 2, 2018 (Chung Decl., Ex. 11, at 1) and, although the Court has not been provided copies of all of the Subpoenas, it assumes that the others were returnable on the same or a similar date. Five of the six Banks filed their motion to quash on February 14, 2018, a little over one month after the return date stated on the representative Subpoena (Dkt. 70), and BOC did not seek leave to join in the motion until April 27, 2018 (Dkt. 107). As such, it appears that all of the Banks' motions, with regard to the Subpoenas, are untimely.

Still, "district courts have broad discretion over the decision to quash a subpoena, and a number of courts in this Circuit have exercised their discretion to consider motions to quash that were not timely filed within the meaning of Rule 45 and applicable case law." *Bouchard Transp.*, 2015 WL 6741852, at *1 (internal quotation marks and citations omitted). Given the important interests articulated in the Banks' motion, this Court will exercise its discretion to consider the motion to quash, even if untimely. Also, as BOC's interests in this matter are virtually identical to those of the other nonparty banks, and as the Assignee has not objected to BOC's request for leave to join in the motion, this Court finds that permitting BOC to join in the motion would be reasonable and would aid the Court in efficiently resolving the matters at issue.

Accordingly, BOC's request for leave to join in the motion (Dkt. 107) is granted, and this Court will not *sua sponte* deny, as untimely, either the motion to quash or BOC's application to join in the motion.

### B.    Personal Jurisdiction Over the Banks

It is axiomatic that, before compelling a nonparty to comply with a subpoena pursuant to Federal Rule of Civil Procedure 45, a court must have personal jurisdiction over that nonparty. *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 141 (2d Cir. 2014) ("*Gucci II*"); *see also Gucci America, Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 93 (S.D.N.Y. 2015) ("*Gucci III*").[5]   On their motion, the Banks contend that the Court cannot compel them to comply with the Subpoenas because personal jurisdiction is lacking.   The Assignee, however, argues persuasively to the contrary.[6]

---

[5] In *Gucci Am., Inc. v. Weixing Li* ("*Gucci I*"), the Honorable Richard J. Sullivan, U.S.D.J., ordered BOC to produce documents located in China in response to certain subpoenas, based on a finding of general personal jurisdiction over the bank and a comity analysis. No. 10cv4974 (RJS), 2011 WL 6156936 (S.D.N.Y. Aug. 23, 2011).  On appeal, the Second Circuit "discern[ed] no abuse of discretion in [Judge Sullivan's comity] analysis and conclude[d] that BOC's arguments to the contrary [were] without merit."  *Gucci II*, 768 F.3d 122, 141.  In light of the Supreme Court's recent decision in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), however, the Second Circuit found that "BOC's contacts with the forum were insufficient to support the exercise of general personal jurisdiction," and vacated and remanded the decision on that basis.  *Id.*; *see also Daimler*, 571 U.S. at 126.  On remand, Judge Sullivan found that the court could exercise specific personal jurisdiction over BOC, and ordered BOC to comply with subpoenas on that basis.  *Gucci III*, 135 F. Supp. 3d 87.

[6] The Assignee alternatively argues that, should the Court find that an adequate showing of personal jurisdiction has not been made, then it should "order jurisdictional discovery into the Banks' connections to New York."  (Assignee Mem., at 18-19.)  As this Court finds, for the reasons discussed herein, that personal jurisdiction has been demonstrated, jurisdictional discovery is not needed.

1.      **General Personal Jurisdiction**

A court may have general or specific personal jurisdiction over a nonparty.  *See Gucci II*,

768 F.3d 134 (citing *Daimler*, 571 U.S. at 126).  "General, all-purpose jurisdiction permits a

court to hear any and all claims against an entity. . . .  Specific jurisdiction, on the other hand,

permits adjudicatory authority only over issues that arise out of or relate to the entity's contacts

with the forum."  *Gucci II*, 768 F.3d at 134 (internal quotation marks and citations omitted).  The

Second Circuit, applying the Supreme Court's decision in *Daimler*, addressed and foreclosed the

possibility of exercising general personal jurisdiction over a nonparty Chinese bank that has only

a minimal number of branches in the forum, and that is headquartered and incorporated abroad.

*Gucci II*, 768 F.3d at 135 (holding that BOC, which had only four branches in the United States

and conducted only a "small portion of its worldwide business" in New York, was not subject to

general jurisdiction in that forum).

Here, as none of the Banks are incorporated or headquartered in the United States, as all

of the Banks conduct only a small amount of business here relative to their operations abroad,

and as each has only a single branch in New York, the same analysis applies.  (*See* Declaration

of Du Binyu, dated Feb. 14, 2018 ("Du Decl.") (Dkt. 74) ¶ 2 (stating that ABC has only one New

York branch, its only branch in the United States, out of "23,686 outlets in 14 countries and

regions across the world"); Declaration of Fu Qingqing, dated Feb. 14, 2018 ("Fu Decl.")

(Dkt. 76) ¶ 2 (stating that CCB has only one New York branch, its only branch in the United

States, out of "14,960 operating outlets in 30 countries and regions across the world");

Declaration of Dong Jianjun, dated Feb. 14, 2018 ("Dong Decl.") (Dkt. 78) ¶ 2 (stating that

ICBC has only one New York branch, its only branch in the United States, out of "17,035

branches in 42 countries and regions across the world"); Declaration of Junjie Shi, dated Feb. 14,

2018 ("Junjie Decl.") (Dkt. 75) ¶ 2 (stating that BOCOM has only one New York branch, one of

two branches in the United States, and "over 2500 branches across Mainland China");

Declaration of Songliang Zhou, dated Feb. 14, 2018 ("Songliang Decl.") (Dkt. 77) ¶ 2 (stating

that CMB has only one New York branch, its only branch in the United States, and "137

branches and 1681 sub-branches in 6 countries across the world"); Declaration of Jing Xue

("Jing Decl.") (Dkt. 108) ¶ 2 (stating that BOC has only one New York branch, one of four

branches in the United States, out of "11,605 branches in 54 countries across the world,

including 10,674 branches in Mainland China").

    Consistent with the Second Circuit's reasoning in *Gucci II*, the Banks' operations here

are not "so continuous and systematic as to render [them] essentially at home in the forum

State." *Daimler*, 571 U.S. at 139 (internal quotation marks omitted; citing *Goodyear Dunlop

Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see also Gucci II*, 768 F.3d at 135.

Therefore, the Court has no basis for asserting general jurisdiction over the Banks, and may only

compel the Banks to comply with the Subpoenas if it can exercise specific personal jurisdiction

over them.

## 2.   <u>Specific Personal Jurisdiction</u>

    In order for a court to exercise specific personal jurisdiction over an entity for purposes

of a Rule 45 subpoena, three requirements must be satisfied:  (1) "the [entity] must have been

properly served," (2) "the [C]ourt must have a statutory basis for exercising personal

jurisdiction," and (3) "the exercise of personal jurisdiction must comport with constitutional due

process." *Gucci III*, 135 F. Supp. at 93 (citing *Licci ex rel. Licci v. Lebanese Canadian Bank,

SAL,* 673 F.3d 50, 59-60 (2d Cir. 2012) ("*Licci II*")).  The Banks are not contesting proper

service in this action.  (*See* Banks Mem., at 8 ("Proper service is not contested here.").)[7]  The

other two requirements will be addressed in turn.

a.    <u>New York Statutory Basis for Specific Jurisdiction</u>

In order to establish personal jurisdiction over a non-domiciliary, the requirements of the

forum state's long-arm statute must be satisfied.  *See Chloé v. Queen Bee of Beverly Hills, LLC*,

616 F.3d 158, 163, 169 (2d Cir. 2010) (citing *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22

(2d Cir. 2004)); *see also Daimler*, 571 U.S. at 125 ("Federal courts ordinarily follow state law in

determining the bounds of their jurisdiction over persons." (citing Fed. R. Civ. P. 4(k)(1)(A))).

Under New York's long-arm statute, courts may exercise personal jurisdiction over a

non-domiciliary, if the non-domiciliary (1) "transact[s] business within the state; and (2) the

claim asserted arises from that business activity."  *Licci by Licci v.  Lebanese Canadian Bank*,

*SAL*, 834 F.3d 201, 209 (2d Cir. 2016) ("*Licci V*") (internal quotation marks, alteration, and

citation omitted);[8] *see* N.Y. C.P.L.R. § 302(a)(1); *see also Rushaid v. Pictet & Cie*, 28 N.Y.3d

---

[7] BOC, which sought to join the other banks' motion to quash after it was filed, has not expressly stated that it is not contesting the propriety of service.  In the briefing it sought to join, however, no objection regarding service on any of the Banks was raised, and BOC made no such objection on its own behalf during oral argument on the motion.  Under the circumstances, this Court finds that BOC has waived its right to raise such an objection.  *See Datskow v. Teledyne, Inc., Cont'l Prod. Div.*, 899 F.2d 1298, 1303 (2d Cir. 1990) (defendant barred from complaining that service of process was defective after the defendant "attended [a] conference with [a] magistrate and participated in scheduling discovery and motion practice," without raising the argument).

[8] The procedural history of the *Licci* cases that is most relevant to the present action may be summarized as follows:  The district court declined to exercise personal jurisdiction over a defendant foreign bank based on the bank's use of a U.S. correspondent account to facilitate certain contested transactions.  *Licci v. Am. Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 408 (S.D.N.Y. 2010) ("*Licci I*"), *aff'd in part*, 672 F.3d 155 (2d Cir. 2012), and *vacated in part*, 732 F.3d 161 (2d Cir. 2013).  In reviewing the district court's decision on appeal, the Second Circuit determined that, to resolve the jurisdictional issue, it needed clarification of certain ambiguities in the New York Court of Appeals' statement "that a sufficient nexus exists where 'there is a substantial relationship between [a New York] transaction and the claim asserted.'"  *Licci II*, 673 F.3d 50, 70 (emphasis in original (*quoting Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467

10

316, 323 (2016) ("under the first prong[,] the defendant must have conducted sufficient activities to have transacted business in the state, and under the second prong, the claims must arise from the transactions").

Where the jurisdictional analysis concerns the question of whether a foreign nonparty should be required to comply with a Rule 45 subpoena, the Second Circuit has narrowed the second prong of the statutory inquiry to focus on "the connection between the nonparty's contacts with the forum and the discovery order at issue." *Gucci II*, 768 F.3d at 141-42 (citing *Application to Enforce Admin. Subpoenas Duces Tecum of the S.E.C. v. Knowles*, 87 F.3d 413, 418 (10th Cir. 1996) (finding specific jurisdiction where the "subpoena enforcement action" at issue "ar[ose] out of [the nonparty's] contacts" with the forum)).

---

(1988))).  The Second Circuit therefore certified two questions to the New York Court of Appeals:

> (1)    Does a foreign bank's maintenance of a correspondent bank account at a financial institution in New York, and use of that account to effect 'dozens' of wire transfers on behalf of a foreign client, constitute a 'transact[ion]' of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

> (2)    If so, do the plaintiffs' claims under the Anti-Terrorism Act, the ATS, or for negligence or breach of statutory duty in violation of [foreign] law, 'aris[e] from' [the defendant's] transaction of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)?

*Id.*, at 74-75.  The New York Court of Appeals answered both questions in the affirmative, *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327 (2012) ("*Licci III*"), and the Second Circuit utilized the New York Court of Appeals' analysis in its subsequent decisions in this case, *see, e.g.*, *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 732 F.3d 161 (2d Cir. 2013) ("*Licci IV*"); *Licci V*, 834 F.3d 201.

### i.      **Whether the Banks Transact Business in the Forum**

With respect to the question of whether the Banks transact business in New York, this Court first notes that each of the Banks owns real property in the state.  (*See generally*, Declaration of Robert L. Weigel, dated Mar. 16, 2018 ("Weigel Decl.") (Dkt. 84) ¶ 6 and Exs. 4-5 (indicating that ABC owns property in Manhattan); Weigel Decl. ¶¶ 37-39 and Exs. 34-36 (indicating that BOCOM owns property in Manhattan and Queens); Weigel Decl. ¶¶ 67-68 and Exs. 63-64 (indicating that CMB owns property in Queens); Weigel Decl. ¶ 92 and Ex. 87 (indicating that CCB owns property in Brooklyn); Weigel Decl. ¶¶ 115, 118 and Exs. 109, 112 (indicating that ICBC owns property in Manhattan); Weigel Decl. ¶¶ 232, 234 and Exs. 225, 227 (indicating that BOC owns property in Manhattan and Queens); *see also* Declaration of Howard Hogan, dated May 25, 2018 ("Hogan Decl.") (Dkt. 126), Ex. 1, at 2 (summarizing the foregoing).)

Second, and of particular importance here, all of the Banks have been shown by the Assignee to maintain multiple correspondent accounts with New York banks (*see* Weigel Decl. ¶¶ 3, 256 and Exs. 1 (copy of The Bank Directory of Worldwide Correspondents (indicating all of the correspondent accounts maintained by the Banks)), 249 (copy of list of Banks' correspondent accounts at Citibank); *see also* Hogan Decl., Ex. 1, at 2)), which are used to facilitate international wire transfers on behalf of the Banks' customers.  Focusing on the Judgment Debtors in this case, the Assignee has specifically shown that at least four of the Banks – BOC, CCB, CMB, and ICBC – have actually used New York-based correspondent accounts to facilitate numerous wire transfers on behalf of Judgment Debtors.[9]  (*See generally*

_____

[9] While both of the remaining two banks – BOCOM and ABC – have also been shown to maintain correspondent accounts at New York banks, the Assignee has only provided evidence that BOCOM facilitated one wire transfer through such an account on behalf of a Judgment

Weigel Decl. ¶¶ 135-225 and Exs. 129-219 (cataloging 564 wire transfers processed on behalf of

Judgment Debtors that passed through BOC correspondent accounts at Citibank in New York,

totaling over $3.2 million); *id.* ¶¶ 87-89 and Exs. 83-85 (cataloging four wire transfers processed

on behalf of Judgment Debtors that passed through CCB correspondent accounts at Citibank in

New York, totaling over $34,000); *id*. ¶¶ 52-65 and Exs. 49-62 (cataloging 15 wire transfers

processed on behalf of Judgment Debtors that passed through CMB correspondent accounts at

Citibank in New York, totaling over $81,000); *id*. ¶¶ 109-13 and Exs. 104-108 (cataloging 27

wire transfers processed on behalf of Judgment Debtors that passed through ICBC correspondent

accounts at Citibank in New York, totaling over $127,000); *see also* Hogan Decl., Ex. 1, at 1

(summarizing the foregoing).

     In determining whether the use of a correspondent account by a foreign bank is

sufficiently purposeful to constitute a transaction of business within the state, the New York

Court of Appeals has stated that the relevant distinction is between "unintended and unapproved

use of a correspondent bank account, where the nondomiciliary bank is a passive and unilateral

recipient" and "[r]epeated, deliberate use that is approved by the foreign bank on behalf and for

the benefit of a customer." *Rushaid*, 28 N.Y.3d at 326-27.  While the former is not enough to

constitute a repeated and purposeful transaction of business in the state, the latter "demonstrates

volitional activity constituting a transaction of business." *Id*.; *see also Licci v. Lebanese*

*Canadian Bank,* 20 N.Y.3d 327, 339 (2012) ("*Licci III*") ("[A] foreign bank's repeated use of a

correspondent account in New York on behalf of a client . . . show[s] purposeful availment of

New York's dependable and transparent banking system.").  Central to the inquiry is whether

---

Debtor (*see* Weigel Decl. ¶ 35 and Ex. 33), and has not offered evidence of any wire transfers
facilitated by ABC through any correspondent account on behalf of any Judgment Debtors (*see*
*id*. ¶¶ 3, 256 and Exs. 1, 249).

there are sufficient facts to demonstrate that a bank's maintenance and use of correspondent accounts was purposefully directed at the forum, as opposed to merely "coincidental." *Licci III*, 20 N.Y.3d at 338.

In this case, the type of evidence presented by the Assignee here – that the Banks deliberately established, and repeatedly used, correspondent accounts in New York in order to conduct business in the state – has been held by New York courts to satisfy the requirements of the first prong of New York's long-arm statute. *See Rushaid*, 28 N.Y.3d at 327 (documents showing that bank executed a dozen wire transfers through one correspondent account, and evidence of similar transfers through other accounts, sufficient to satisfy transaction-of-business prong); *Licci III*, 20 N.Y.3d at 339 (evidence that bank executed "dozens" of transfers through a correspondent account satisfies transaction-of-business prong). Certainly, as in *Gucci III*, at least the four Banks that have demonstrably used their New York-based correspondent accounts to facilitate U.S. dollar wire transfers abroad for Judgment Debtors "cannot credibly compare [themselves] to a passive recipient of a few one-off wire transfers that by pure happenstance were routed through a domestic correspondent bank account." *Gucci III*, 135 F. Supp. 3d at 95.

Third, the Assignee has shown that at least three of the Banks – BOCOM, ABC, and BOC – have not only maintained New York-based correspondent accounts, but have also specifically served as "acquiring" banks for Judgment Debtors and have used settlement accounts with New York banks to facilitate that service. "Acquiring banks . . . contract with merchants to purchase transactions effected with [credit cards] and serve as the intermediary between the network and the merchants accepting [credit card] payments." *Paycom Billing*

*Services, Inc. v. MasterCard Int'l., Inc.*, 467 F.3d 283, 286 (2d Cir. 2006).  The function of an

acquiring bank has been summarized as follows:

> A customer will initiate the process when he or she purchases a
> product from the merchant with a credit card.  Once the credit card
> information is . . . entered on a website, the merchant terminal
> transmits an authorization request to the merchant's acquiring
> bank. . . .  The acquiring bank sends the credit card request through
> an electronic network to the cardholder's issuing bank.  Based on
> the cardholder's credit limit or other factors, the issuing bank will
> send a message back through the network to the acquiring bank,
> [which] forwards it back to the merchant, which states that the
> merchant should either approve or decline the transaction.  If
> approved, the merchant will complete the transaction and the
> acquiring bank will credit the merchant's account with the
> appropriate amount of funds.

*Gucci America, Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 238 (S.D.N.Y. 2010).

The Assignee has provided evidence that BOCOM and BOC serve as acquiring banks for

processing Visa and MasterCard transactions, and that ABC serves as an acquiring bank for

processing Visa transactions.  (*See* Weigel Decl. ¶ 252 and Ex. 245 (copy of list of credit card

transactions produced by Visa, dated Nov. 26, 2013, indicating that, in May 2013, ABC acted as

an acquiring bank for processing two Visa transactions totaling approximately $150 on behalf of

certain Judgment Debtors, and indicating that, from June through September 2013, BOCOM

acted as an acquiring bank for processing 15 Visa transactions totaling over $1,200 on behalf of

multiple Judgment Debtors); *id*. ¶ 254 and Ex. 247 (copy of list of credit card transactions

produced by Visa, dated Oct. 21, 2017, indicating that BOCOM acted as an acquiring bank for

six Visa transactions totaling more than $350 on behalf of certain Judgment Debtors);

Supplemental Declaration of Alexandra Grossbaum, Esq., ("Grosssbaum") [in Support of the

Assignee's Motion to Compel Production of Documents], dated May 25, 2018 ("Grossbaum

Supp. Decl.") (Dkt. 125) ¶ 2 and Ex. 9 (copy of list of credit card transactions produced by

MasterCard, dated May 8, 2018, indicating that BOCOM acted as an acquiring bank for

processing more than 1,500 domestic MasterCard transactions totaling over $175,000 on behalf

of a Judgment Debtor, and indicating that BOC acted as an acquiring bank for processing more

than 140 domestic MasterCard transactions totaling over $30,000 on behalf of a Judgment

Debtor); *id.* ¶ 3 and Ex. 10 (copy of list of credit card transactions produced by MasterCard,

dated May 8, 2018, indicating that BOCOM acted as an acquiring bank for processing more than

1,500 foreign MasterCard transactions totaling over $160,000 on behalf of a Judgment Debtor,

and indicating that BOC acted as an acquiring bank for processing more than 400 foreign

MasterCard transactions totaling over $40,000 on behalf of a Judgment Debtor); *id.* ¶ 9 and

Ex. 16 (copy of list of credit card transactions produced by Visa, dated May 21, 2018, indicating

that BOCOM acted as an acquiring bank for processing more than 1,400 domestic Visa

transactions totaling over $1.2 million on behalf of certain Judgment Debtors; that ABC acted as

an acquiring bank for processing more than 450 domestic Visa transactions totaling over $32,000

on behalf of a Judgment Debtor; and that BOC acted as an acquiring bank for processing more

than 1,600 domestic Visa transactions totaling over $1.3 million on behalf of certain Judgment

Debtors).)[10]

     In order to process these domestic credit card transactions abroad, the acquiring banks

maintain New York-based "settlement accounts that receive payments for credit onto the

---

[10] The Banks claim that the transactions put forward by the Assignee do not "show[] a
connection with the Judgment Debtors." (Banks Reply Mem., at 16.) This Court has made a
limited attempted to cross-check the names of the Judgment Debtors appended to the Judgment,
with those identified in the transactions listed in the Supplemental Grossbaum Declaration, and,
in the lengthy lists, has found at least some matches. Further, this Court notes that Grossbaum
has declared under penalty of perjury that her statements regarding the Judgment Debtors' use of
the Banks to effectuate the transfer of funds are true and correct. (*See* Grossbaum Supp. Decl.)
Under the circumstances, this Court accepts that an adequate connection has been shown.

merchants."  (*See id.* ¶ 10 and Ex. 17 (letter to Bruce S. Kaplan, Esq., from Visa, dated May 21,

2018, identifying a BOCOM settlement account at Bank of New York-Mellon, used as an

intermediary account to process international Visa transactions; identifying an ABC settlement

account at JP Morgan Chase Bank in New York, used as an intermediary account to process

international Visa transactions; and identifying a BOC settlement account at JP Morgan Chase

Bank in New York, used as an intermediary to process international Visa transactions); *see also*

*id.* ¶ 11 and Ex. 18 (printout of Federal Reserve webpage, accessed May 21, 2018, identifying

ABC's settlement account "for ABC transactions identified by Visa" as an account at JP Morgan

Chase Bank in New York); *id.* ¶ 14 and Ex. 21 (printout of Federal Reserve webpage, accessed

May 21, 2018, identifying BOCOM's settlement account "for BOCOM transactions identified by

Visa" as an account at The Bank of New York-Mellon in New York).)

As the Banks themselves have described it, New York-based settlement accounts

function analogously to the way in which correspondent accounts function for the purpose of

U.S. dollar wire transfers.  (*See* Banks Reply Mem., at 17 n.16 (explaining with reference to

BOCOM's settlement account at JP Morgan New York that "[p]ayments associated with all

credit card transactions for which the bank serves as an acquirer . . . are credited and debited to

[the settlement] account" and that, "thereafter, the bank will issue corresponding credits and

debits to merchant accounts in China").)  Further, the Assignee has shown that ABC, BOCOM

and BOC have repeatedly and deliberately used their New York-based settlement accounts to

process international credit card transactions on behalf of their customers, including some of the

Judgment Debtors in this action.  Although courts in this Circuit have not specifically addressed,

post *Daimler*, whether the repeated use of a settlement account with a New York bank may

satisfy the transaction-of-business prong of the New York long-arm statute, the analysis should

be essentially the same as the analysis regarding correspondent accounts, logically leading to the same affirmative answer.

Indeed, the use by ABC, BOCOM, and BOC of settlement accounts more closely resembles BOC's repeated use of correspondent accounts in *Gucci III* (where such use was found to be sufficient to establish specific jurisdiction), than it resembles the services at issue in the two cases on which the Banks rely for the proposition that acquiring-bank activities alone are not sufficient for jurisdiction.  *See Project Honey Pot v. John Does*, No. 1:11CV15 (LMB) (JFA), 2012 WL 1854184, at *7 (E.D. Va. May 21, 2012) (foreign acquiring banks not subject to specific jurisdiction where they "merely provide[d] credit card processing services to foreign-based merchants, who . . . ultimately reach[ed] customers in Virginia" (cited in Banks Reply Mem., at 17)); *Fin. Inst. Track Litig. v. Heartland Bank*, No. H-10-171, 2011 WL 1232352, at *13 (S.D. Tex. Mar. 31, 2011) (no specific jurisdiction over Missouri-based acquiring bank where the bank's only connection to Texas was based on a contract the bank had with a New Jersey-based processing entity that housed a processing center in Texas (cited in Banks Reply Mem., at 17)).  Neither bank in those cases had deliberately acted in the forum state to establish settlement accounts, which the bank then used to facilitate international credit card transactions, as ABC, BOCOM, and BOC have reportedly done here.  Further, as the Assignee contends here that the acquiring banks' "credit card processing systems . . . actually allowed for the purchase of counterfeit products in New York," a finding that these banks transacted business within the state is more than appropriate.  *See Gucci America, Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d at 245.

As a final point on the question of whether the Banks transact business in the forum, this Court finds that all of the Banks have made statements promoting their settlement services, and

18

their service (provided through correspondent accounts) of providing U.S. dollar wire transfers to and from China for customers like the Judgment Debtors in this action.  (*See* Weigel Decl. ¶ 241 and Ex. 234 (printout of BOC webpage announcement, accessed Feb. 18, 2018, stating "the People's Bank of China issued an announcement authorizing the Bank of China New York Branch as the clearing house for all Renminbi business in the United States"); *id.* ¶ 122 and Ex. 116 (printout of ICBC webpage announcement, accessed Jan. 11, 2018, stating "ICBC has taken all necessary steps to set up a US dollar Clearing Center in New York . . . bringing robust increases in USD clearing volume"); *id.* ¶ 20 and Ex. 18 (printout of ABC webpage announcement, accessed Feb. 21, 2018, stating "[t]he online success of U.S. dollar clearing business is of great significance for ABC . . . it enhances our ability to provide integrated services to customers"); *id.* ¶ 49 and Ex. 46 (printout of BOCOM webpage, accessed Feb. 22, 2018, describing "Specialty Services" to include "Cross-border RMB Clearing Services" including "U.S. Dollar Clearing Service"); *id.* ¶ 98 and Ex. 93 (printout of CCB "Products and Services" webpage, accessed Feb. 21, 2018, stating "CCB provides real-time settlement services for USD payments via . . . CHIPS, Fedwire or via book transfer"); *id.* ¶ 74 and Ex. 70 (printout of CMB "Advantages of the Branch" webpage, accessed Feb. 25, 2018, stating "[t]he New York Branch provides domestic and foreign customers with RMB, USD and other currencies' [sic] deposits and loan services, as well as collection, payment and settlement services").)

No single factor concerning the first prong of CPLR § 302(a)(1) is dispositive, as "what facts constitute 'purposeful availment' is an objective inquiry[] [that] always requires a court to closely examine the [entity's] contacts for their quality."  *Licci III*, 20 N.Y.3d at 338.  Given all of the Banks' physical bank branches in New York, their use of New York-based correspondent

accounts and/or settlement accounts, and their advertisement of their services in the forum, this

Court finds that the Assignee has adequately shown that all of the Banks have transacted

business in the state, under N.Y. C.P.L.R. § 302(a)(1).  *See Gucci III*, 135 F. Supp. 3d at 94

(concluding that BOC's physical presence in the state, its use of correspondent accounts in New

York, and its promotion of its New York business satisfied the first prong of the New York long-

arm statute).

### ii.     Whether the Requested Discovery Arises
### Out of the Business Transactions at Issue

The second prong of the New York statutory analysis, which focuses on whether the

claim arises from the business transaction at issue, "limits the broader 'transaction-of-business'

prong to confer jurisdiction only over those claims in some way arguably connected to the

transaction."  *Licci III*, 20 N.Y.3d at 340.  For a claim to arise from a business transaction, the

New York Court of Appeals requires that "there . . . be an articulable nexus or substantial

relationship between the business transaction and the claim asserted."  *Id*. (internal quotation

marks and citations omitted).  As noted above, in the context of discovery requests made to a

foreign nonparty, this prong "focus[es] on the connection between the nonparty's contacts with

the forum and the discovery order at issue."  *Gucci II*, 768 F.3d at 141-42; *see also Gucci III*,

135 F. Supp. 3d at 94.  This inquiry does not require a causal relationship between the business

transaction and legal claim asserted, only that "the latter is not completely unmoored from the

former."  *Licci III*, 20 N.Y.3d at 339; *see also Gucci III*, 135 F. Supp. at 93-94.  In situations

where the required articulable nexus or substantial relationship is lacking, the New York Court

of Appeals "ha[s] characterized the claim as too attenuated from the transaction, or merely

coincidental."  *Licci III*, 20 N.Y.3d at 340 (internal quotation marks and citation omitted).

This Court finds unpersuasive the Banks' argument that the required nexus should not be found here because none of the Judgment Debtors' accounts are "maintained" in New York and because none of the Banks' New York operations purportedly "have any relationship to the underlying action or the subject matter of the discovery requests issued by the Assignee." (Banks Mem., at 10.)  Rather, it is the Banks' repeated use of New York-based correspondent and/or settlement accounts that satisfies the requirement that there be an "articulable nexus" between the nonparties' contacts with the forum and the discovery order at issue.  *Licci III*, 20 N.Y.3d at 339.

The Subpoenas seek documents relating to Judgment Debtors' accounts with the Banks and relating to the transactions that the Banks made on behalf of Judgment Debtors, specifically the movement of U.S. dollars through New York-based correspondent or settlement accounts and into the accounts of Judgment Debtors in China.  (*See* Chung Decl., Ex. 11 (copy of representative subpoena); *see also* Banks Reply Mem., at 6-7 (outlining the process by which funds are transferred through correspondent accounts); *see id*., at 17 n.16 (outlining the similar process by which funds are transferred through settlement accounts).)  The Assignee submits that BOC, CCB, CMB, and ICBC, through their New York-based correspondent accounts, "collectively facilitated *at least* 600 wire transfers" from purchasers using U.S. dollars to Chinese counterfeiters as a "crucial component[] of the counterfeiters' operations."  (*See* Assignee Mem., at 12-13 (emphasis in original).)[11]  The Assignee further submits that ABC, BOCOM, and BOC, in using New York-based settlement accounts in furtherance of their role as

---

[11] Although the Assignee includes BOCOM in the group of banks that have facilitated these "at least 600" transfers, this Court acknowledges, as noted above (*see supra*, at n.9), that the Assignee has only demonstrated that BOCOM facilitated one wire transfer through a New York-based correspondent account on behalf of a Judgment Debtor.

acquiring banks, "have processed more than 7,000 credit card transactions, totaling more than $3 million, on behalf of Judgment Debtors."  (Assignee Reply Mem., at 8-9.)  As the Subpoenas "seek information about those very transfers, as well as Defendants' relationship with [the Banks]," there is a clear nexus between the Banks' New York business activity and the Subpoenas.  *Gucci III*, 135 F. Supp. 3d at 94.

In *Gucci III*, "nearly a dozen" transfers, as well as BOC's physical presence and advertising of services in New York, were considered "even more substantial, deliberate, and recurring than that of the foreign bank in the *Licci* cases," and were enough to satisfy the second prong of the Section 302(a)(1) analysis.  *Id.*  In light of the fact that the Banks here have facilitated hundreds, not dozens, of transfers and settlements of credit card transactions, and have the same physical presence and perform similar advertising of services in New York as were described in *Gucci III*, this Court finds that there is a New York statutory basis for specific personal jurisdiction over the Banks.

### 3.  Constitutional Due Process

Having concluded that there is a New York statutory basis for specific personal jurisdiction over the Banks, this Court next considers "whether personal jurisdiction comports with the Due Process Clause of the United States Constitution," *Chloé*, 616 F.3d at 164; *see also Licci IV* at 168-69, and concludes that it does.  To comply with constitutional due process, a court may only exercise specific personal jurisdiction over a non-domiciliary where the non-domiciliary has "'certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Goodyear*, 564 U.S. at 923 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  In making this determination, courts typically employ a two-step analysis:  first, evaluating the quality and the

nature of the non-domiciliary's contacts with the forum state, and second, considering whether, in light of several factors discussed below, the assertion of personal jurisdiction would comport with fair play and substantial justice.  *Licci IV*, 732 F.3d at 170 (2d Cir. 2013).

a.   <u>**Minimum Contacts**</u>

Determining whether sufficient minimum contacts exist is itself a two-part inquiry.  First, a court determines whether the nonparty has "purposefully availed" itself of the forum by "deliberately direct[ing] its conduct at the forum."  *Gucci III*, 135 F. Supp. 3d at 97.  Second, the court considers whether the matter at issue (in this case, the Assignee's effort to compel compliance with the Subpoenas, as an aid to enforcing the Judgment) arose out of, or is sufficiently related to, the nonparty's in-forum conduct.  *See id.*

Here, as in *Gucci III*, the Banks' "in-forum conduct is deliberate and recurring, not 'random, isolated, or fortuitous,'" such that this Court may conclude that the Banks have purposefully availed themselves of the forum.  *Id.* (quoting *Licci IV*, 732 F.3d at 171).  Four of the six Banks – BOC, CCB, CMB, and ICBC – used correspondent accounts with New York banks to facilitate hundreds of transactions on behalf of the Judgment Debtors.  (Assignee Mem., at 12-13.)  The remaining two banks – ABC and BOCOM (as well as BOC) – utilized New York-based settlement accounts to act as acquiring banks, and processed thousands of credit card transactions on behalf of the Judgment Debtors.  (Assignee Reply Mem., at 8-9.)  This alone would be sufficient to establish that the Banks have sufficient minimum contacts with the forum, as "the selection and repeated use of New York's banking system . . . constitutes 'purposeful availment of the privilege of doing business in New York.'"  *Gucci III*, 135 F. Supp. 3d at 97 (quoting *Licci IV*, 732 F.3d at 171).

In addition, as discussed above, all of the Banks own real property in New York, and have actively solicited business in the forum.  (*See* Discussion, *supra*, at Section I(B)(2); *see also, e.g.*, Weigel Decl. ¶ 122 and Ex. 116 (printout of ICBC webpage announcement, accessed Jan. 11, 2018, stating that "ICBC has taken all necessary steps to set up a US dollar Clearing Center in New York[,] . . . bringing robust increases in USD clearing volume").)  The Second Circuit has also noted, with regard to the minimum-contacts prong of the constitutional analysis, "that it would be 'rare' and 'unusual' for a court to find that an entity's conduct satisfied § 302(a)(1), 'yet, in connection with the same transaction of business,' that the entity did not have sufficient minimum contacts with New York or that the exercise of personal jurisdiction would be otherwise unreasonable."  *Gucci III*, 135 F. Supp. 3d at 97 (citing *Licci IV*, 732 F.3d at 170).

In an attempt to distinguish this case from *Gucci III*, the Banks make a number of arguments.  With respect to their use of correspondent accounts, for example, the Banks argue that they are "passive actors" that merely maintain those New York-based accounts, and that they "themselves do not transfer funds, nor . . . direct the transfer of funds to their customer accounts overseas."  (Banks Reply Mem., at 7.)  In support of this argument, the Banks draw attention to the "highly automated" process of correspondent banking, noting that any "affirmative action" takes place either in the New York correspondent banks (into whose accounts the transferor's banks credit funds) or in the Banks' foreign branches (at which the Banks credit the accounts of the transferees, *i.e.*, the Judgment Debtors).  (*Id.*, at 6-7.)  The Banks thus contend that correspondent bank transactions constitute "limited activity [that] cannot form the basis for finding that the Banks have engaged in purposeful conduct in New York."  (*Id.*, at 8.)  Addressing the same arguments in *Gucci III*, however, under strikingly similar

circumstances, Judge Sullivan found ample support for the conclusion that the foreign bank

involved in that case (BOC) had purposefully availed itself of doing business in New York. *See*

*Gucci III*, 135 F. Supp. 3d at 94-96.

    While the Banks are correct in stating that "the 'mere maintenance' of correspondent

accounts in New York cannot be a basis for specific jurisdiction" (Banks Reply Mem., at 8

(citing *Amigo Foods Corp. v. Marine Midland Bank, N.Y.*, 39 N.Y.2d 391, 396)), both the New

York Court of Appeals in *Licci III* and Judge Sullivan in *Gucci III* recognized that the repeated

use of correspondent accounts based in New York, set up for the purpose of facilitating wire

transfers abroad, is not "mere maintenance" of a correspondent account for purposes for the

jurisdictional analysis, *see Licci III*, 20 N.Y.3d at 339 ("[C]omplaints alleging a foreign bank's

repeated use of a correspondent account in New York on behalf of a client . . . show purposeful

availment of New York's . . . banking system"); *Gucci III*, 135 F. Supp. 3d at 95 ("[T]here can

be no real dispute that BOC frequently and deliberately *used* its New York correspondent

account with Chase to effectuate wire transfers for its U.S. clients, including, critically,

Defendants in this action." (emphasis in original)).  Neither court held that the "automated"

nature of the crediting activity was relevant to whether there was a "use" of a correspondent

account; rather, the relevant "use" was the bank's establishment and promotion of New York-

based correspondent accounts *for the very purpose* of providing the service of U.S.-dollar wire

transfers for the benefit of its customers.  *Gucci III*, 135 F. Supp. 3d at 95 ("BOC did not simply

'maintain' a correspondent account with Chase in New York. . . .  To the contrary, BOC

encouraged its clients to rely on its relationships with Chase so that they could effectuate

frequent wire transfers from the United States to China" (citing *Licci III*, 20 N.Y.3d at 340)).

Notably, it was this same service that, as shown by the Assignee, several of the Banks provided

to Judgment Debtors on numerous occasions.  Thus, the Banks' argument that they should be found to be nothing more than "passive actors" is without merit.

In addition, the Banks argue that they have not engaged in purposeful conduct in New York because the crediting activity for relevant correspondent-account transactions occurred in China.  (*See* Banks Reply Mem., at 5-6, 8.)  The Banks make analogous arguments regarding settlement-account transactions for the acquiring banks, claiming that, "[t]o the extent [they] provide[] acquiring bank services, either directly or indirectly, to merchants on the MasterCard and Visa networks, such services are limited to the domestic territory of China exclusively." (Declaration of Shang Zhen, dated Apr. 27, 2018 ("Shang Decl.") (Dkt. 114) ¶ 8 (ABC); Supplemental Declaration of Junjie Shi, dated Apr. 27, 2018 ("Junjie Decl.") (Dkt. 113) ¶ 8 (BOCOM).)  These arguments are also unavailing.

First, as noted above, the relevant "use" and purposeful conduct is the non-U.S. bank's establishment of a New York correspondent account for the purpose of providing a U.S. dollar wire service to its customers, not any particular book entries that may be made in China or in a New York when funds are transferred.  Second, the Second Circuit has squarely rejected the argument that out-of-state effects of purposeful availment in the forum undermine personal jurisdiction.  *See Licci IV*, 732 F.3d at 173 ("So long as this in-forum activity sufficiently reflects the defendant's 'purposeful availment' of the privilege of carrying on its activities here, minimum contacts are established, even if the effects of the defendant's entire course of conduct are felt elsewhere." (citing *Chloé*, 616 F.3d at 172)).  Third, the physical location of the bank records in China, at separate branches, does not bar enforcement of the subpoena where personal jurisdiction over the legal entity is obtained.  *See Gucci III*, 135 F. Supp. 3d at 96 (""[W]here the remedy sought is . . . a subpoena, the separate entity rule has not barred enforcement;' rather,

'only personal jurisdiction over the legal entity, the bank and its branches, is necessary.'" (quoting *CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd.*, No. 12cv08087 (SN), 2013 WL 2661037, at *17 (S.D.N.Y. June 12, 2013))); *see also United States v. First Nat'l City Bank*, 379 U.S. 378, 384 (1965); *Eitzen Bulk A/S v. Bank of India*, 827 F. Supp. 2d 234, 239-41 (S.D.N.Y. 2011).[12]  In sum, this Court finds that the Banks, largely through their use of New York-based settlement and correspondent accounts, have purposefully availed themselves of the forum.

As for the second step of the minimum-contacts inquiry (*i.e.*, whether the Subpoenas are sufficiently related to the Banks' in-forum conduct), where, as here, a subpoenaed nonparty has substantial contacts with the forum, "it is sufficient that those contacts be a 'but for' cause of the plaintiff[s'] injury, rather than the 'proximate cause' of the injury."  *Gucci III*, 135 F. Supp. 3d at 98-99.  In this case, it is evident that Judgment Debtors would not have been able to enjoy the profits made through their exploitation of Plaintiffs' trademarks, "but for" the Banks' use of New York correspondent and settlement accounts.  Further, the Subpoenas, which seek discovery related to transactions routed through these New York accounts, are themselves connected to the Banks' contacts with the forum.  *See Licci IV*, 732 F.3d at 169-70.  Thus, as in *Gucci III*, because the Subpoenas "are premised on the fact that Defendants' proceeds from the sale of counterfeit goods were transferred through [the Banks' accounts] in New York," this Court may readily conclude that there is a sufficient nexus between the Banks' activities in the forum and the Subpoenas, and that this nexus is not undermined by the fact that relevant book entries and other requested records are likely located in China.  *Gucci III*, 135. F. Supp. 3d at 98-99.

---

[12] This Court notes that, in oral argument, the Banks themselves suggested that New York's "separate entity rule" should not factor into the question of whether a subpoena may be enforced internationally, but rather should be considered on the separate question of whether a nonparty bank can be required to impose an asset restraint on accounts held in foreign branches or to turn over a customer's foreign-held assets.  (*See* Discussion *infra*, at Section II.)

Accordingly, this Court finds that the Banks have the sufficient minimum contacts with the forum to satisfy the first prong of the due process analysis.

### b.      Fair Play and Substantial Justice

Once minimum contacts have been established, the objecting nonparty may nonetheless attempt to show that exercising personal jurisdiction would not comport with notions of fair play and substantial justice, by presenting "'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Gucci III*, 135 F. Supp. at 96 (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002)). Courts generally consider five factors in evaluating reasonableness:  (1) the burden that the exercise of jurisdiction will impose on the foreign nonparty; (2) the interests of the forum state in adjudicating the case; (3) the petitioner's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *Chloé*, 616 F.3d at 173; *see also Bank Brussels Lambert*, 305 F.3d at 129.  Where, as here, the entity potentially subject to personal jurisdiction is a foreign one, "courts consider the international judicial system's interest in efficiency and the shared interests of the nations in advancing substantive policies." *Gucci III*, 135 F. Supp. 3d at 99 (citing *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 115 (1987)).  In this instance, the Banks have failed to meet their burden to demonstrate that exercising jurisdiction over them would be unreasonable.

### i.      Burden Imposed on the Banks

With regard to the first factor, the Banks argue that "a global discovery order . . . would be overwhelmingly burdensome," largely because the Banks' branches outside of New York,

"particularly in China," would have to exert "significant effort" to comply.  (Banks Mem., at 14.)
In addressing this factor in their memorandum, the Banks refer to both the burden of complying
with the Subpoenas and the burden of complying with the global asset-restraint provision of the
10/20/17 Order, without giving any specific explanation as to why producing the requested
documents would itself be "overwhelmingly burdensome."  (*See id*.)  Absent any particularized
showing as to the basis of their claim of burden, the Banks have not persuasively argued that
they would suffer significant hardship if simply required to produce the documents requested by
the Subpoenas.

The Banks also argue, in connection with this factor, that complying with the Subpoenas
would force them to violate Chinese law *(id*., at 14-15), though the court in *Gucci III* heard a
virtually identical argument from BOC, and found such an argument to be more appropriately
considered in a separate comity analysis.  *Gucci III*, 135 F. Supp. 3d at 99 ("Although BOC asks
the Court to consider the fact that granting Gucci's motion would force BOC to violate Chinese
law, BOC cites to no other courts that have considered such arguments in the context of
assessing the reasonableness of an exercise of personal jurisdiction, as opposed to a separate and
subsequent comity analysis, and the Court declines to be the first." (internal citations omitted)).
In evaluating this factor, "courts tend to focus their inquiry on the logistical difficulties facing a
foreign entity forced to litigate in a given forum, such as the distance the entity would have to
travel and the entity's unfamiliarity with the forum."  *Id*., at 100.  Here, as in *Gucci III*, such
burdens are either "minimal or non-existent," as all of the Banks have physical branches in the
forum, and can be "no stranger to litigation in it [as they are] already represented by able New
York counsel."  *Id*.

### ii.      Interests of the Forum

Though the Assignee does not appear to be incorporated in New York (*see* Assignee Mem., at 18) – a fact that lessens the forum's interest in adjudicating the dispute – the Assignee still points out the forum's interests in eliminating or reducing counterfeiting within its borders, in protecting intellectual property rights by enforcing the Lanham Act, and in ensuring that third parties comply with discovery obligations so as to foster an efficient and effective judicial process.  (*Id.*)  These interests weigh in favor of a finding of personal jurisdiction.  *See Gucci III*, 135 F. Supp. 3d at 100.

### iii.      Assignee's Interests and Efficient Adjudication of Controversy

The Assignee also argues that it has a strong interest in securing the Banks' compliance with the Subpoenas because the Subpoenas are the "most fruitful avenue for discovering the identity of additional infringers and . . . it is unlikely that [it] will be able to recover absent the Banks' compliance with the Subpoenas."  (Assignee Mem., at 18.)  Indeed, as discussed in the context of this Court's comity analysis below (*see* Discussion, *infra*, at Section I(C)(4)), the Hague Convention – which the Banks urge the Court to require the Assignee to utilize as an alternative to the Subpoenas – has not proven to afford parties a viable mechanism through which they may secure full discovery from nonparties in China.  The limitations of the Hague Convention suggest that requiring its use, in this case, would not further the international judicial system's interest in ensuring that a significant judgment against trademark infringers is satisfied.  Rather, it appears that permitting the Assignee to proceed with the Subpoenas would "provide the fastest and most practical means" of advancing this matter.  *Gucci III*, 135 F. Supp. 3d at 100.

### iv. <u>Substantive Social Policy</u>

Finally, in balancing the substantive social policies at issue, this Court notes that the underlying claims in this case charged a large number of defendants with counterfeiting famous trademarks.  (*See* First Amended Complaint, dated Dec. 2, 2014 ("Am. Compl.") (Dkt. 28).)  As a matter of social policy, such significant violations of the Lanham Act should have consequences, and the Judgment Debtors should not be permitted to avoid the Judgment entered against them.  While the Banks point out that the Assignee is not, itself, the trademark holder (*see* Banks Mem., at 1 n.1 & 15), the mere fact that Plaintiffs assigned their rights to the Judgment does not render its enforcement of lesser significance.  Although the Banks have raised certain conflicting legal interests arising from Chinese banking law (interests that are properly addressed as part of the comity analysis (*see infra*)), this Court finds that, overall, this factor either weighs in the Assignee's favor or, at a minimum, in the face of competing policy interests, is neutral.

As at least four of the five factors weigh in favor of the Assignee, this Court finds that exercising personal jurisdiction over the Banks would comport with notions of fair play and substantial justice, and would not violate constitutional due process.

### C. <u>International Comity Analysis</u>

The Banks assert that complying with the Subpoenas will necessarily cause them to violate Chinese banking laws, which, according to the Banks, "prohibit the disclosure of customer account information and the restraint of customer accounts absent authorization from the appropriate Chinese authorities."  (Banks Mem., at 19.)  The Banks' view, as supported by a Declaration submitted by their expert, Guo – a Professor of Law and Vice Dean at Peking University Law School in the People's Republic of China – is that they are permitted by

applicable regulations to disclose or restrain accounts only at the request of a "competent organ" of the Chinese government, such as a Chinese judicial authority or another expressly authorized Chinese governmental entity. (*Id.*, at 14-15 (citing Guo Decl. ¶ 15-21).) The Banks therefore argue that the Subpoenas, as issued under the authority of a foreign court, place them in an "impossible position arising from mutually inconsistent legal obligations," requiring them to choose between non-compliance with this Court's orders on the one hand, and violating Chinese banking laws on the other. (*Id.*, at 15.)

As the Second Circuit recognized in *Gucci II*, even where personal jurisdiction over a foreign non-domiciliary is established, a court should not uphold an international subpoena in possible contravention of foreign law, without first performing a comity analysis pursuant to Section 442 of the Restatement (Third) of Foreign Relations Law.[13] *Id.*, at 141. "'[T]he concept of international comity' requires a 'particularized analysis of the respective interests of the foreign nation and the requesting nation.'" *Linde v. Arab Bank, PLC*, 706 F.3d 92, 111 (2d Cir. 2013) (quoting *Societe Nationale Industrielle Aerospatiale*, 482 U.S. 543-44)). The Second Circuit has clarified that this analysis requires a court to weigh "all of the relevant interests of all of the nations affected by the court's decision." *Id.*

The relevant factors to consider in this context are:

> (1) the importance to the investigation or litigation of the
> documents or other information requested; (2) the degree of

---

[13] Section 442(1)(c) of the Restatement, entitled "Requests for Disclosure:  Law of the United States," governs the comity analysis when the underlying exercise of jurisdiction concerns an international subpoena for the production of documents "in contravention of the laws of a foreign country." *Gucci II*, 768 F.3d at 139-40 (citing *Gucci Am., Inc. v. Curveal Fashion*, No. 09cv08458, 2010 WL 808639, at *2 (S.D.N.Y. Mar. 8, 2010)). This provision describes factors for a court to weigh that are similar to, but not the same as, Section 403 of the Restatement, entitled "Limitations on Jurisdiction to Prescribe," which should be considered when the underlying exercise of jurisdiction concerns "ordering a nonparty foreign bank to freeze assets abroad in apparent contravention of foreign law." *Gucci II*, 768 F.3d at 139.

> specificity of the request; (3)  whether the information originated
> in the United States; (4)  the availability of alternative means of
> securing the information; (5)  the extent to which noncompliance
> with the request would undermine important interests of the United
> States, or compliance with the request would undermine the
> important interests of the state where the information is located;
> (6)  the hardship of compliance on the party . . . from whom
> discovery is sought; and (7)  the good faith of the party resisting
> discovery.

*Royal Park Investments SA/NV v. HSBC Bank USA, N.A.*, No. 14cv8175 (LGS), 2018 WL
745994, at *2 (S.D.N.Y. Feb. 6, 2018) (citing *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409,
419-20 (S.D.N.Y. 2016)); *see also Gucci II*, 768 F.3d at 139-40 (endorsing the same analysis);
*CE Int'l*, 2013 WL 2661037, at *8 (performing the same analysis); *Tiffany (NJ) LLC v. Qi
Andrew*, 276 F.R.D. 143, 151 (S.D.N.Y. 2011) (same).  This Court will analyze each factor in
turn.

### 1.    Importance of Documents to the Litigation

As previously noted, the Assignee apparently served substantively similar Rule 45
Subpoenas on each of the Banks, seeking production of documents related to the Judgment
Debtors' accounts.  (Assignee Mem., at 20; Chung Decl. ¶ 13, Ex. 11.)  The Assignee contends
that this discovery is "crucial to establishing the true identities of the Judgment Debtors and the
location of Judgment Debtors' profits from their counterfeiting operation in order to satisfy the
Judgment."  (Assignee Mem., at 20.)

In *Gucci I*, where the issue of enforcement of an international subpoena arose in the
context of pretrial discovery, the court noted that this factor "clearly" weighed in favor of the
plaintiff, as the information sought by way of the subpoena was highly relevant to both its
identification of additional infringers and its computation of damages.  *See Gucci I*, 2011 WL
6156936, at *6 (noting, *inter alia*, that "information related to Defendants' bank accounts is

likely to provide the most effective measure of the revenues generated by Defendants in contravention of United States trademark laws").[14]   In this case, in contrast, the discovery sought is relevant not to proving damages, but rather to the Assignee's efforts to secure satisfaction of a judgment.   Regardless, this factor weighs in favor of the Assignee, as locating the Judgment Debtors' assets is plainly of critical importance to the Assignee's ability to obtain a recovery under the Judgment.

### 2.   Degree of Specificity of the Requests

The Subpoenas' discovery requests are targeted to documents relating to the Judgment Debtors' accounts at the Banks.   These requests were also modeled on, and closely resemble, requests that have been found to be "sufficiently specific and discrete [for this factor] to weigh in favor of [the Assignee]."   *Gucci I*, 2011 WL 6156936, at *6.   The Banks argue that the requests are not sufficiently "specific" or "narrowly tailored" because they seek "global discovery" of the Judgment Debtors' account information.   (Banks Mem., at 20.)   The analysis with regard to this factor, however, does not turn on whether a bank may have to search multiple branches (including in a foreign location) for the information, but rather whether the information sought is "'limited to specific accounts' related to the petitioner's claims."   *Gucci I*, 2011 WL 6156936, at *6 (quoting *Milliken & Co. v. Bank of China*, 758 F.Supp.2d 238, 247 (S.D.N.Y.2010)).   As the Subpoenas seek documents only about the Judgment Debtors' accounts, and as the Assignee has

---

[14] As noted above (*see supra*, at n.5), while the Second Circuit vacated the district court's decision in *Gucci I*, the vacatur was based on the district court's finding of general jurisdiction over BOC, rather than its comity analysis, *see Gucci II*, 768 F.3d at 141 ("discern[ing] no abuse of discretion in [the District Court's comity] analysis and conclud[ing] that BOC's arguments to the contrary [were] without merit," but vacating the District Court's order for lack of general jurisdiction, because a court "must have personal jurisdiction over a nonparty in order to compel it to comply with a valid discovery request"); *see also* Assignee Reply Mem., at 13. Accordingly, the comity analysis contained in *Gucci I* may still be instructive in this case.

produced evidence that such accounts exist and that the Banks have facilitated the transfer of funds into those accounts, this Court finds that the Subpoenas are sufficiently specific, and that this factor therefore weighs in favor of the Assignee.

### 3.      Whether Information Originated Outside of the United States

"[T]here is no genuine dispute that at least some of the documents to which the present comity analysis applies originated in China." *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 556 (S.D.N.Y. 2012) (finding that this factor weighed against the plaintiff).  In fact, in this instance, it seems that the bulk of the material sought may have originated in, and is likely maintained in, China.  (*See* Assignee Mem., at 21 (asserting only that "certain wire transfer information responsive to the Subpoenas originated in New York"); Banks Mem., at 21 (stating that the Banks "have confirmed that none of the accounts identified by [the] Assignee as those relating to the Judgment Debtors are located in their New York branches").)  "Where the information at issue originated and remains located outside of the United States, this factor weighs against the requesting party." *Gucci I*, 2011 WL 6156936, at *6.  Thus, this factor weighs in favor of the Banks.

### 4.      Alternative Methods of Securing Information

"If the information sought can easily be obtained elsewhere, there is little or no reason to require a party to violate foreign law. . . .  Conversely, if the information cannot be easily obtained through alternative means, this factor is said to counterbalance the previous factor – the location of the documents and information – and weighs in favor of disclosure." *Gucci I*, 2011 WL 6156936, at *7 (internal quotation marks and citations omitted).  Both the Banks and the Assignee set forth arguments and evidence in support of their respective positions on this factor.

As BOC has argued in a number of other cases, *see, e.g.*, *id.*, the Banks argue that "Hague Convention [requests to China] provide[] a practical and effective alternative to U.S. discovery mechanisms here, and avoid[] the conflicts with Chinese law that would arise if the Banks were forced to comply with the Subpoenas."  (Banks Mem., at 22; *see also Wultz*, 910 F. Supp. 2d at 557 ("BOC argued that the Hague Convention would provide a perfectly adequate means of securing the information requested without forcing the Bank to violate Chinese law" (internal quotation marks and citations omitted)).)  The Banks' expert, Guo, opines that "[t]here is every reason to expect that Chinese courts . . . will respond to a Hague Convention request issued by a U.S. court," given China's "rapid development" and overhaul of its "judicial and regulatory systems to become in line with international conventions."  (Guo Decl. ¶ 51.)

In opposition, the Assignee argues that the Banks are "simply incorrect that a Hague Convention request would provide a reliable alternative," and points to other cases in which such Hague Convention requests to China "introduced significant delay into the process."  (Assignee Mem., at 22; *see Wultz*, 910 F. Supp. 2d at 558 (finding, based on standards previously applied by the Chinese Ministry of Justice in responding to Hague Convention requests, that "it is likely that documents relevant to plaintiffs' claims . . . will be denied," and that, "[i]n such a scenario, the Hague Convention would definitively not represent a reasonable alternative means for plaintiffs to obtain discovery")).)  The Assignee has also proffered the views of its own expert, Clarke, a Professor of Law at the George Washington University School of Law and consultant in the field of Chinese Law, who has opined that the "Hague Convention is not a viable alternative method of obtaining information" from Chinese banks.  (Clarke Decl., at Section III.)

In support of this opinion, Clarke discusses a number of cases in which the plaintiffs were unsuccessful in securing needed discovery from China through the Hague Convention (*see*

Clarke Decl. ¶¶ 57-60), and cites to the following conclusion from a May 2015 staff research

report issued by the United States Economic and Security Review Commission:

> Although the Hague Service and Evidence Conventions provide
> the legal framework for serving papers and obtaining evidence in
> legal disputes between U.S.- and China-based entities, China's
> interpretation of its obligations under these conventions differs
> from that of the United States and has resulted in many service of
> process and discovery requests being denied or significantly
> delayed. As such, pursuing legal recourse through the Hague
> Conventions is not a viable course of action for many U.S.
> plaintiffs.

(Clarke Decl. ¶ 55.)

Moreover, although the Banks argue that, in the past, Hague Convention requests to

China have been honored, neither of the two cases they cite to support this argument – *Tiffany*

*(NJ) LLC v. QI Andrew*, No. 10cv9471 (KPF), 2015 WL 3701602 (S.D.N.Y. June 15, 2015)

(herein "*QI Andrew*"), and *Tiffany (NJ) LLC v. Forbse*, No. 11cv4976 (NRB), 2012 WL

1918866 (S.D.N.Y. May 23, 2012) (herein, "*Forbse*") (both cited in Banks Mem., at 23) –

actually resulted in full disclosure of the information sought.  Rather, as the Assignee points out

(*see* Assignee Mem., at 22; *see also* Clarke Decl. ¶¶ 58-59), in both of those cases, the Chinese

Ministry of Justice only "*partly executed*" the Hague Convention requests that the Ministry

"deem[ed to] conform to the provisions of the [Hague] Convention," *QI Andrew*, 2015 WL

3701602, at *1 n.1 (emphasis added); Clarke Decl. ¶ 58 (noting that the Chinese Ministry of

Justice stated that it only "partly executed" the Hague Convention request in *Forbse*).  The fact

that, after the partial production was made, certain plaintiffs "did not challenge the sufficiency of

the production" (Guo Decl. ¶ 50), does not indicate that the Hague Convention process was

efficacious for the parties seeking discovery.  Indeed, even the Banks have made clear in this

case, through their recent letters to this Court, that they do not expect or intend the Hague

Convention process to result in a full response to the Subpoenas; rather, if a Hague Convention request were made, they would plan to use that request as means to "narrow the scope of the currently overbroad subpoenas."  (8/14/2018 Hille Letter, at 2 ("[T]he Banks will coordinate expeditiously with Next to arrive at an appropriate set of requests to include in a Hague Convention application").)

The Assignee was not required to proceed by way of the Hague Convention in the first instance, before utilizing other available means of discovery.  *See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 541-46 (1987) (declining to adopt a rule requiring American litigants to use Hague Convention procedures as a first resort before initiating discovery pursuant to the Federal Rules of Civil Procedure).  As found in *Gucci*, this Court finds that, "as a general matter, the outcome of a request [to the Chinese Ministry of Justice] pursuant to the [Hague] Convention is by no means certain, and [that] making the request will undeniably result in delays of unknown, and perhaps considerable, duration." *Gucci I*, 2011 WL 6156936, at *8.  Based on historical precedent regarding the timeline and adequacy of productions made pursuant to Hague Convention requests to China, the Assignee has the better argument as to the viability of this alternative means for obtaining the information sought.  Accordingly, this factor weighs in the Assignee's favor and counterbalances the previous factor.

### 5.   Balance of National Interests

The balancing of national interests "is the most important [factor], as it directly addresses the relations between sovereign nations."  *Wultz*, 910 F. Supp. 2d at 558.  In examining this factor, courts engage in a "particularized analysis of the respective interests of the foreign nation and the requesting nation."  *Gucci I*, 2011 WL 6156936, at *9.

Certainly, every nation has a significant national interest in ensuring that its citizens abide by its laws, and, in this case, the Chinese Ministry of Justice has directly informed the Court that China's bank secrecy laws would be violated by the Banks' disclosure of documents pursuant to the Subpoenas.  (*See* Chinese Ministry of Justice Letter.)  This Court observes, though, that, in its letter to the Court, the Chinese Ministry does not discuss the nature of the underlying banking or customer interests served by the bank secrecy laws, but rather only summarizes the procedural requirements of those laws.  (*See generally id.*)  In particular, according to the Ministry, pursuant to "the Law of Commercial Banks of the People's Republic of China" and other relevant foreign laws, "[a]ny bank records or other evidence possessed by the[] [B]anks to be used by any individual or entity for the purpose of any law suit can only be collected by the Chinese Competent Authority through legal procedures."  (*Id.*, at 1.)  As previously discussed, the Banks themselves contend that if they are forced to "disclose or restrain accounts at the behest of a foreign court – and without authorization from the Chinese governmental authorities – they will violate Chinese bank secrecy laws and be subject to civil fines, civil liability, administrative penalties, and criminal penalties."  (Bank Mem., at 15 (citing Guo Decl. ¶¶ 27-37).)

Even accepting that China has an important interest in enforcing its laws, "'[i]t is well settled that [foreign] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence, even though the act of production may violate that statute.'"  *Royal Park Investments SA/NV*, 2018 WL 745994, at *2 (quoting *Societe National Industrielle Aerospatiale*, at 544 n.29).  Further, the Banks' choice to do business in the state of New York and "avail[] [themselves] of the myriad benefits that come with establishing a presence in the United States' premier financial center" also limit the force of the Banks' arguments here regarding China's national interest.  *Gucci I*, 2011 WL 6156936, at *10.  For

39

"[h]aving made such a determination, and reaped the rewards that flow therefrom, the Bank[s] can hardly hide behind Chinese bank secrecy laws as a shield against the requirements faced by other United States-based financial institutions." *Id.*

In addition, the United States has a "powerful interest in enforcing the acts of Congress, especially those, such as the Lanham Act, that are designed to protect intellectual property rights and prevent consumer confusion." *Gucci I*, 2011 WL 6156936, at *11. This interest extends well beyond this nation's "generalized interest in fully and fairly adjudicating matters before its courts," which, without more, might not be sufficient to tip the balance in its favor. *See CE Int'l*, 2013 WL 2661037, at *14 (finding that Singapore had a superior national interest in enforcing its bank secrecy laws, in a discovery dispute arising from a commercial litigation, where the articulated U.S. interest was limited to the general enforcement of U.S. judgments (quotations omitted)). Although the interest of the United States in enforcing a party's trademark rights – here, against hundreds of counterfeiters – may be somewhat weaker where an assignee, rather than the trademark holder itself, is seeking discovery, the United States still has a compelling interest in enforcing federal judgments issued against counterfeiters. On balance, this Court finds that this factor weighs in favor of the Assignee.[15]

---

[15] During oral argument, counsel for the Banks argued that this Court should discount Judge Sullivan's conclusion, in *Gucci I*, that China had only a limited national interest in a similar matter, as Judge Sullivan reached that conclusion without the benefit of direct input from the Chinese government. (*See* 6/25/18 Tr., at 17-19; *see also Gucci I*, 768 F. Supp. 3d at *10 (noting that "the Chinese government ha[d] not voiced any objections to disclosure").) According to the Banks, the fact that the Chinese Ministry of Justice has now stated China's position in this case should "dramatically change[] the calculus in the comity analysis." (6/25/18 Tr. at 17). Far from ignoring China's national interest in his comity analysis, however, Judge Sullivan recognized in *Gucci I* that "China undoubtedly ha[d] an interest in enforcing its bank secrecy laws." *Gucci I*, 768 F. Supp. 3d at *10. Moreover, in *Gucci III*, Judge Sullivan directly incorporated into his comity analysis the Chinese government's "views as to the application of Chinese bank secrecy laws to disclosures of customer information outside of China" – views which, by then, had been communicated to the court via a letter from the Chinese

###### 6.     Hardship of Compliance

As noted above, the Banks contend that ordering them to comply with the Subpoenas would "subject the Banks and their employees to civil and criminal liability" in China.  (Banks Mem., at 23-24 (citing Guo Decl. ¶¶ 27-37).)  As has been observed by other courts in this district, however, "[t]o date, the evidence remains strong for the conclusion reached in the *Forbse* case that meaningful sanctions by the Chinese government against [Chinese banks] are 'highly doubtful.'"  *Wultz*, 910 F. Supp. 2d at 554.  The Banks "are closely tied to the Chinese state and are in many respects quasi-governmental entities" (Clarke Decl. ¶ 20), and Clarke states that, in his expert opinion, it is unlikely that the Banks or their employees would face serious repercussions if ordered to comply with the Subpoenas (*see id*. ¶¶ 37-39).  Further, the cases cited by Guo, some of which were previously analyzed in *Gucci I* and found not to support the Banks' position, "are plainly inapposite to the facts of the case at bar[,] . . . [as] the Bank[s] ha[ve] cited no specific instance in which a Chinese financial institution was punished for complying with a foreign court order directing the production of documents."  *Gucci I*, 2011 WL 6156936, at *11.  At most, therefore, this factor weighs only slightly in the Banks' favor, and, more likely, it is neutral.

###### 7.     Good Faith of Party Resisting Discovery

With regard to this factor, the Assignee asserts that the Banks have acted in bad faith by failing to comply with the Subpoenas in this case, when they knew that BOC had been ordered to comply with a subpoena under similar circumstances in *Gucci III*.  (Assignee Mem., at 25.)  The Assignee further argues that the Banks have provided no justification for their failure to produce

_____

banking authorities.  *Gucci III*, F. Supp. 3d at 92.  In any event, as discussed above, this Court has considered the views expressed in the Chinese Ministry's letter, and accepts that China has an important national interest in ensuring compliance with its laws.

documents related to New York correspondent accounts, asserting that such production would

not have "raise[d] the same comity concerns." (*Id*.)  In contrast, the Banks point to their

voluntary search of records in their New York branches for responsive information, their active

participation in this case, and the supposedly "narrowly focused" relief they seek (*i.e.*, to limit

the scope of the Assignee's requests, and not to evade discovery, but rather to require the

Assignee to proceed by way of the Hague Convention) as evidence of their good faith.  (Banks

Mem., at 25; *see also id*., at 3.)  Based on the current record, this Court cannot find that the

Banks have acted in bad faith in resisting the Subpoenas and filing their motion.  Therefore, this

factor weighs in favor of the Banks.

Considering the totality of the circumstances, though, this Court finds that, overall, the

balance of interests in the comity analysis weigh in favor of granting the Assignee's motion to

compel production of documents from the Banks.  To be sure, there are factors that weigh

slightly or moderately in favor of the Banks, including the location of relevant documents

abroad, a lack of demonstrated bad faith by the Banks, and the potential (although doubtful) legal

repercussions that the Banks may face for violating Chinese law.  These factors, however, are

outweighed by others that weigh more strongly in favor of the Assignee, including the obvious

importance of the requested documents to enforcing the Judgment; the lack of a proven, viable

alternative means by which those documents may be secured without substantial delay and

imposed limitations; the specific focus of the document requests; and, on the whole, the greater

national interest of the United States in enforcing its judgments against counterfeiters.  Given the

balance of the comity considerations, and this Court's earlier finding that an exercise of specific

personal jurisdiction over the Banks would satisfy the requirements of both the New York long-

arm statute and constitutional due process, the Banks' motion to quash the Subpoenas is denied,

and the Assignee's cross-motion to compel compliance is granted.

## II.   THE BANKS' MOTION TO MODIFY THE COURT'S 10/20/17 ORDER

Relying on *Motorola Credit Corp. v. Standard Chartered Bank*, 24 N.Y.3d 149, 156

(2014) (answering in the affirmative a question certified by the Second Circuit as to whether

New York's "'separate entity rule' prevents a judgment creditor from ordering a garnishee bank

operating branches in New York to restrain a judgment debtor's assets held in foreign branches

of the bank"),[16] and *Motorola Credit Corp. v. Standard Chartered Bank*, 771 F.3d 160 (2d Cir.

2014) (instructing district court to vacate restraining order on defendants' assets in foreign banks,

in light of answer to certified question), the Banks also argue in their motion that the Court

should modify the 10/20/17 Order, to the extent the Order requires the Banks to restrain the

Judgment Debtors' assets on a global basis.  (*See* Banks Mem., at 4 n.4 and 17-18; Banks Reply

Mem., at 24.)  For the reasons discussed below, however, this Court understands that the Banks

have voluntarily withdrawn their request for a modification of the 10/20/17 Order at this time,

without prejudice to renew the request at a later date, should the Assignee take affirmative steps

in the future to enforce the asset restraint.

### A.   The Asset-Restraint Provisions of the Judgment, and the Procedural History of Those Provisions

Prior to Judge Scheindlin's entry of the Judgment against Defendants in this case, the

Banks wrote to the Court, requesting that the Court decline to include in the Judgment certain

---

[16] As explained by the New York Court of Appeals in *Motorola*, "[t]he separate entity rule, as it has been employed by lower New York Courts and federal courts applying New York law, provides that even when a bank garnishee with a New York branch is subject to personal jurisdiction, its other branches are to be treated as separate entities for certain purposes, particularly with respect to CPLR article 72 prejudgment attachments and article 52 postjudgment restraining notices and turnover orders."  24 N.Y.3d 149, 158 (citations omitted).

language that had been proposed by Plaintiffs that, according to the Banks, "would purport to require the Banks to restrain customer accounts located outside the United States." (Letter to the Court from Andrew Rhys Davies, Esq., and Paul B. Carberry, Esq., dated July 17, 2015 (Dkt. 41), at 1.) Plaintiffs responded to the Banks' letter by arguing, *inter alia*, that, as the proposed default judgment was "not an order against the Banks, . . . the Court need[ed] jurisdiction only over the counterfeiter defendants to enter it." (Letter to the Court from Robert L Weigel, Esq., dated July 24, 2015 (Dkt. 42), at 3.) In reply, the Banks acknowledged that Plaintiffs' proposed language, as written, would directly enjoin only Defendants, but argued that Plaintiffs did "not deny . . . that [their] true purpose in seeking such an injunction [was] to coerce the Banks into restraining customer accounts overseas, by allowing [Plaintiffs] to threaten the Banks with contempt proceedings if they fail[ed] to prevent the accountholders from withdrawing their funds abroad." (Letter to the Court from Andrew Rhys Davies, Esq., and Paul B. Carberry, Esq., dated Aug. 4, 2015 (Dkt. 43), at 1.)

On August 7, 2015 (Dkt. 45), Judge Scheindlin requested that both Plaintiffs and the Banks file supplemental submissions, addressing the effect of the New York Court of Appeals' decision in *Motorola* on a potential order requiring the Banks to freeze accounts located outside the United States. Both Plaintiffs and the Banks duly made the requested supplemental submissions, with Plaintiffs arguing that "*Motorola* and the separate entity rule . . . simply [did] not apply at this stage of proceedings where the Plaintiffs [did] not seek to enforce any order against the Banks" (Plaintiffs' Memorandum of Law in Further Support of Motion for Default Judgment, dated  Aug. 14, 2015 (Dkt. 46), at 2), and the Banks, for their part, contending that Plaintiffs should not be permitted to "end-run New York's carefully calibrated post-judgment enforcement regime, including the policy-based geographical limitations that are inherent in that

regime, *i.e.*, the separate entity rule, by seeking a post-judgment federal asset-freezing injunction of extraterritorial scope" (Supplemental Submission of Non-Parties [Banks] Pursuant to the Court's Order Dated August 7, 2015, dated Aug 14, 2015 (Dkt. 47), at 4).

By Order dated August 20, 2017, Judge Scheindlin overruled the Banks' objections to the language that had been proposed by Plaintiffs, finding that "none [of those objections were] ripe given that the Proposed Default Judgment [was] directed entirely at defendants and [sought] no enforcement against the non-party Banks."  (Order, dated Aug. 20, 2015 (Dkt. 48), at 2.)  With respect to the applicability of *Motorola*, Judge Scheindlin specifically concluded:

> *Motorola* . . . has no effect on the Court's ability to grant the Proposed Default Judgment.  Addressing a 'narrow question' that arose after plaintiffs sought to enforce a restraining order against a non-party bank, *Motorola* held that New York's 'separate entity rule precludes a judgment creditor from ordering a garnishee bank operating branches in New York to restrain a debtor's assets held in foreign branches of the bank.'  Nothing in *Motorola* supports extending its holding to the issuance of a default judgment where no enforcement proceeding against any objecting Bank has been initiated.

(*Id.*, at 4 (citations omitted).)  Judge Scheindlin then proceeded to enter the Judgment with the challenged language, which ordered, in relevant part:

> 10.   That, in accordance with Rule 65 of the Federal Rules of Civil Procedure, 15 U.S.C. § 1116(a), Article 52 of New York State's Civil Practice Law and Rules, and this Court's inherent equitable power to issue remedies ancillary to its authority to provide final relief, all Defendants' Assets that have been previously identified as frozen or that were otherwise required to be restrained in compliance with this Court's Orders, continue to be restrained regardless of whether the Defendants' Assets are located in the United States or abroad . . .
>
> 11.   That in accordance with Rule 65 of the Federal Rules of Civil Procedure, 15 U.S.C. § 1116(a), Article 52 of New York State's Civil Practice Law and Rules, and this Court's inherent equitable power to issue remedies ancillary to its

> authority to provide final relief, any other of Defendants'
> Assets that Plaintiffs identify in the future and/or that have
> not yet been frozen shall be subject to the asset restraint
> provisions set forth herein, regardless of whether the
> Defendants' Assets are located in the United States or
> abroad[.]

(Judgment ¶¶ 10, 11.)

## B.   The Relevant Provisions of the 10/20/17 Order

On October 20, 2017, after Plaintiffs assigned their rights in the Judgment to the

Assignee, the Assignee made the Court aware that Defendants had failed to comply with the

Judgment's injunctive provisions, and requested the entry of an order holding Defendants in

contempt of court.  Before entering the contempt order proposed by the Assignee,

Judge McMahon inquired at a hearing (attended only by counsel for the Assignee) as to what

counsel expected would happen, "as a practical matter," if the requested order were issued.

(Transcript proceedings held on Oct. 20, 2017 (Dkt. 65), at 3.)  Counsel responded that the

order, if issued, would serve as a "predicate" to an anticipated turnover proceeding.  (*Id.*)

Judge McMahon then proceeded to sign the 10/20/17 Order, in the form proposed by the

Assignee, which, as relevant to the disputes now before the Court, included the following

provision:

> 4.      IT IS . . . ORDERED that in accordance with Rule 65 of
> the Federal Rules of Civil Procedure, New York Civil
> Practice Law and Rules § 5222, 15 U.S.C. § 1116(a), and
> paragraph 13 of the Judgment [which permitted
> applications to enforce the Judgment], Judgment Debtors,
> their officers, directors, agents, representatives, successor
> or assigns, and all persons acting in concert or in
> participation with any of them, including . . . any third
> parties, including third party financial service providers,
> receiving actual notice of this Order by personal service or
> otherwise, are restrained and enjoined from transferring,
> withdrawing or disposing of any money or other assets into
> or out of any accounts held by, associated with, or utilized

46

> by Judgment Debtors . . ., regardless of whether such
> money or assets are held in the U.S. or abroad.[17]

(*Id.* ¶ 4.)  The Order further provided that, "[u]pon (2) business days' written notice to the Court

and [the Assignee's] counsel, any Judgment Debtor or affected third party may, upon proper

showing, appear and move for dissolution or modification of the provisions of this order."  (*Id.*

¶ 5.)

### C.   The Positions Now Taken Before This Court by the Banks and the Assignee, Regarding the Ripeness of the Banks' Current Objections to the Asset Restraint

On February 12, 2018, pursuant to paragraph 5 of the 10/20/17 Order (quoted above),

five of the Banks – all except BOC – gave notice to the Court and to counsel for the Assignee of

their intention to move for modification of that Order (Dkt. 67), and, two days later, those five

banks filed their motion to quash the Subpoenas and to modify the 10/20/17 Order "insofar as it

purports to apply extraterritorially" (Banks Mem., at 1).  In their motion (which this Court has

permitted BOC to join (*see* Discussion, *supra*, at Section I(A))), the Banks acknowledged that

Judge Scheindlin had previously found that their objections to any global asset restraint were not

ripe for resolution, but suggested that

> it would be proper for the Court to resolve these issues now
> because:  (1) through the [10/20/17] Order, the Assignee is seeking
> enforcement of the global asset restraint and discovery provisions
> against the Banks, and the [10/20/17] Order authorizes third parties
> affected by the order to move for modification or clarification of
> the order; and (2) the Subpoenas also implicate the same personal
> jurisdiction and comity concerns.

---

[17] The Order proceeded to list certain financial service providers expressly covered by this provision, including, but not limited to, three of the Banks that are the moving parties here – BOC, ICBC, and CCB.  (*See id.*)

(*Id.*, at 4 n.4.)  Substantively, the Banks reiterated their earlier argument that the New York

"separate entity rule," as discussed by the New York Court of Appeals in *Motorola*, prohibits a

global asset restraint.  (*Id.*, at 17.)

In response to the Banks' challenge to the asset-restraint provision of the 10/20/17 Order,

the Assignee took the position, in its brief, that the 10/20/17 Order, "same as the Judgment, is

directed entirely at Judgment Debtors and seeks no enforcement against the Banks."  (Assignee

Mem., at 9 (citing the paragraphs of the Judgment and the 10/20/17 Order quoted above).)  In

any event, the Assignee represented that it "is not currently seeking an order compelling the

Banks to turn over their proceeds, simply discovery into the assets that the Banks currently hold

for the Judgment Debtors."  (*Id.* (citation omitted).)  "As a result," the Assignee argued, "the

situation is no different than when Judge Scheindlin previously held that the Banks' arguments

were premature."  (*Id.*)

When this Court then held oral argument with respect to the Banks' motion to quash the

Subpoenas and to modify the 10/20/17 Order, this Court sought clarification from both the Banks

and the Assignee as to their views as to how the *Gucci* and *Motorola* decisions could be

reconciled.  (*See* 6/25/18 Tr., at 5.)  Counsel for the Banks explained his view that, while *Gucci*

"deal[s] primarily with a subpoena for documents and information," *Motorola* "is a case dealing

with a very specific situation of asset restraint."  (*Id.*, at 9.)  The Banks' counsel went on to say

that, in light of the Assignee's papers in response to the Banks' motion, the Banks had come to

understand that the Assignee was not actually seeking to enforce an asset restraint against the

Banks at this time, but rather was anticipating that "further steps would have to be taken" by the

Assignee "for that to come to pass."  (*Id.*, at 32-33.)  With that understanding, the Banks' counsel

stated that "we can probably address those issues [*i.e.*, regarding the asset restraint] down the

road." (*Id.*, at 33.)  This led this Court to ask, "Then you don't need that relief at this point[,] and then *Motorola* doesn't have an impact[?]" (*Id.*)  The Banks' counsel responded, "I believe the answer to both of those questions is yes, Your Honor." (*Id.*, at 34.)

This Court also heard oral argument from counsel for the Assignee, who confirmed that, although the Banks had "given [the Assignee] no comfort that they're actually honoring the injunction" (*id.*, at 74), the Assignee, nonetheless, did not "have any motion to enforce the restraining notice at the [B]anks because [the Assignee] ha[d] no information right now that the [B]anks have violated it." (*Id.*, at 50.)  The Assignee made clear that, should the subpoenaed information or other discovered evidence reveal such a violation, the matter would then be presented to the Court, in what this Court described as a likely "round two." (*Id.*)

Subsequent to the oral argument, the Banks and the Assignee made additional submissions to address an inquiry that this Court made to the Banks at the time of the argument. Specifically, after hearing the Assignee's argument that a Hague Convention request would engender substantial delay, this Court asked the Banks to inform it as to whether they would agree to restrain the Judgment Debtors' accounts voluntarily, during the pendency of any Hague Convention requests, so as to mitigate any prejudice to the Assignee that could result from the delay. (*Id.*, at 74-76.)  In their additional submission, the Banks indicated that they would not agree to an asset restraint.  (*See* letter to the Court from David G. Hille, Esq., dated Aug. 14, 2018 (Dkt. 130) (reiterating argument that "Chinese law prohibits the Banks from restraining customer accounts absent a formal direction from a 'competent organ' of the Chinese government to do so," and stating that "no such authorization has been granted at this time").)  In response, the Assignee noted that, in the Banks' submission, "the Banks c[a]me close to admitting that they have not frozen any of the counterfeiters' assets." (Letter to the

Court from Robert Weigel, Esq., dated Aug. 27, 2018 (Dkt. 132), at 1; *see also id.*, at 3 (stating

that "the Banks' letter makes clear that the Banks have not taken any action, and will not take

any action, to ensure that the counterfeiters' assets are, and will remain, frozen").)  Nonetheless,

the Assignee did not alter the position that it had taken at oral argument, *i.e.*, that it was not

seeking, at this time, to enforce the asset restraint as against the Banks, but rather was only

seeking to compel the Banks' compliance with the Subpoenas.  Indeed, the Assignee primarily

argued, in its additional submission, that the Banks' latest statements further demonstrated the

drawbacks in proceeding by way of the Hague Convention (*see generally id.*), and concluded its

submission by merely repeating its request that this Court compel the Banks to produce

documents in response to the Subpoenas (*id.*, at 3).[18]

In short, while this Court does not agree with the Assignee that there is essentially no

difference between the language contained in the Judgment (which was directed only at

Defendants) and that contained in the 10/20/17 Order (which was also expressly directed at third-

party financial service providers for the Judgment Debtors), and suspects that the Assignee –

whose counsel crafted the language of both – is well aware of the distinction, this is of little

moment at this juncture.  The Assignee has made plain that it is not yet seeking to enforce the

asset-restraint provision of the 10/20/17 Order against the Banks, and the Banks have confirmed

to this Court that, based on the Assignee's representations in this regard, this Court need not, at

this time, reach the issue of the propriety of that provision.  As this Court understands the current

situation, the Banks are now conceding that the matter is not ripe for the Court's consideration,[19]

---

[18] Two further letters submitted by the Banks and the Assignees on August 31 and
September 7, 2018, respectively (Dkts. 133, 134), largely rehash arguments already made to this
Court, and need not be separately discussed here.

[19] *See QI Andrew*, 2015 WL 3701602, at *13 (declining to address issues raised by
nonparty banks concerning a proposed post-judgment asset freeze order as premature where the

and are voluntarily withdrawing the portion of their motion that seeks modification of the

10/20/17 Order, without prejudice to renewal at such time as the Assignee may commence

enforcement proceedings against them.

Accordingly, to the extent the Banks' motion seeks modification of the asset-restraint

provision of the 10/20/17 Order, the motion is deemed withdrawn without prejudice.

## CONCLUSION

For all of the foregoing reasons, BOC's request for leave to join in the Banks' motion

(Dkt. 107) is granted; the Banks' motion to quash the Subpoenas and to modify the global asset-

restraint provision of the Court's 10/20/17 Order (Dkt. 70) is denied to the extent it seeks to

quash the Subpoenas and deemed withdrawn without prejudice to the extent it seeks to modify

the 10/20/17 Order; and the Assignee's cross-motion to compel compliance with the Subpoenas

(Dkt. 82) is granted.  Absent a stipulation between the Assignee and the Banks as to a time frame

for production, the Banks are directed to produce all documents requested in the Subpoenas

within 45 days of the date of this Order.[20]

Dated:  New York, New York
        September 25, 2018

                                            SO ORDERED

                                            _____
                                            DEBRA FREEMAN
                                            United States Magistrate Judge

---

plaintiff had not yet pursued appropriate post-judgment enforcement mechanisms); *see generally U.S. v. Broad. Music, Inc.*, 275 F.3d 168, 178 (2d Cir. 2001) ("An issue is ripe for judicial resolution only if it presents a real, substantial controversy, not a mere hypothetical question" (quotations omitted)).

[20] *See In re Namenda Direct Purchaser Antitrust Litig.*, No. 15cv7488C (MJCF), 2017 WL 4700367 (S.D.N.Y. Oct. 19, 2017) (ordering a non-party to produce documents responsive to a subpoena upon granting the plaintiffs' motion to compel); *Gucci III*, 135 F. Supp. at 105 (same).

<u>Copies to</u>:

All counsel (via ECF)