**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NIKE, INC and CONVERSE, INC., | Case No. 13 Civ. 8012 (CM) (DCF) |
| Plaintiffs, | |
| v. | **ORAL ARGUMENT REQUESTED** |
| Maria WU et al. | |
| Defendants. | |

**OBJECTION OF NONPARTY BANKS TO MAGISTRATE
JUDGE FREEMAN'S SEPTEMBER 11, 2018 ORDER DENYING
<u>NONPARTY BANKS' MOTION TO QUASH SUBPOENAS</u>**

David G. Hille
Paul B. Carberry
Jacqueline L. Chung
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email:  dhille@whitecase.com
          pcarberry@whitecase.com
          jacqueline.chung@whitecase.com

*Attorneys for Bank of China, Bank of
Communications, China Construction Bank,
China Merchants Bank, Industrial &
Commercial Bank of China Limited*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................................... 1

STATEMENT OF FACTS ................................................................................................................ 3

LEGAL STANDARDS ..................................................................................................................... 4

ARGUMENT ................................................................................................................................... 5

  I. THE MAGISTRATE JUDGE FAILED TO PROPERLY CONSIDER KEY FACTORS
     SUPPORTING DISCOVERY UNDER THE HAGUE CONVENTION ........................................... 5

     A. The Hague Convention Is a Viable Alternative for Discovery .................................. 6

     B. The Magistrate Judge Underestimates the Hardship of Compliance with the Subpoenas ........ 8

     C. The Magistrate Judge Erred in Finding That China's Interests in Were Not Paramount ........ 10

     D. The Magistrate Judge Erred in Finding That the Subpoena Requests Were Sufficiently
       Specific ..................................................................................................................... 11

  II. THE MAGISTRATE JUDGE INCORRECTLY CONCLUDED THAT THERE WAS A BASIS
     TO ASSERT SPECIFIC PERSONAL JURISDICTION OVER THE NONPARTY BANKS ........ 12

     A. The Establishment and Maintenance of Correspondent Accounts in New York Does Not
       Give Rise to Specific Jurisdiction ............................................................................. 13

     B. BOC AND BOCOM's Acquiring Bank Activities Do Not Give Rise to Specific
       Jurisdiction ............................................................................................................... 18

     C. The Advertising of Banking Services in New York and China Does Not Give Rise to
       Specific Jurisdiction. ................................................................................................. 21

     D. The Bank's Real Estate Holdings in New York Are Irrelevant ............................... 22

     E. The Exercise of Personal Jurisdiction Here Would Not Be Reasonable .................. 22

       1. Substantive Social Policies Countenance Against the Exercise of Specific Jurisdiction . 23

       2. Other "Reasonableness" Factors Also Counter Against the Exercise of Specific
         Jurisdiction ......................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Amigo Foods Corp. v Marine Midland Bank-New York, 39 N.Y. 2d 391 (N.Y. 1976) ..................................................................................................14, 16

Amigo Foods Corp. v. Midland Bank-New York, 402 N.Y.S.2d 406 (1st Dep't 1978) ...............................................................................................15, 16

Animal Sci. Prods. v. Hebei Welcome Pharm. Co., 138 S. Ct. 1865 (2018)..................................9

Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985)..........................................................13

CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd. P'ship, 2013 WL 2661037 (S.D.N.Y. June 12, 2013)........................................................................8, 9, 12

Chevron Corp. v. Donziger, 296 F.R.D. 168 (S.D.N.Y. 2013)........................................................12

Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158 (2d Cir. 2010)....................................22

Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736 (S.D.N.Y. 2005) .......................14

Dilworth v. Goldberg, 2014 WL 3798631 (S.D.N.Y. Aug. 1, 2014) ...............................................5

EEOC v. Sterling Jewelers, Inc., 2011 WL 5282622 (W.D.N.Y. Nov. 2, 2011) ............................5

Gucci Am., Inc. v. Li, 135 F. Supp. 3d 87 (S.D.N.Y. 2015) .........................................................6, 17

Gucci Am, Inc. v. Weixing Li, 2011 WL 6156936 (S.D.N.Y. Aug. 23, 2011)................................5

Gucci Am., Inc. v. Weixing Li, 2012 WL 5992142 (S.D.N.Y. Nov. 15, 2012).............................6

Gucci America, Inc. v. Frontline Processing Corp., 721 F. Supp. 2d 228 (S.D.N.Y 2010) ....................................................................................................20, 21

Gucci America v. Bank of China, 768 F.3d 122 (2d Cir. 2014)......................................................13

Hau Yin To v. HSBC Holdings, PLC, 700 Fed. Appx. 66 (2d. Cir. 2017) ....................................18

In re Terrorist Attacks on Sept. 11, 2011, 295 F.Supp.3d 416 (S.D.N.Y. Mar. 28, 2018) .........................................................................................................15

Leibovitch v. Islamic Republic of Iran, 188 F. Supp. 3d 734 (N.D. Ill. 2016), aff'd 852 F.3d 687 (7th Cir. 2017) ..............................................................................24

Licci v. Lebanese Canadian Bank, 20 N.Y.3d 327 (2012) ..........................................................17

ii

Licci v. Lebanese Canadian Bank, 732 F.3d 161 (2d Cir. 2013).......................................16

Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50 (2d Cir. 2012)..............................13

Linde v. Arab Bank, PLC, 262 F.R.D. 143 (E.D.N.Y. 2009)...........................................8

NLRB v. Frazier, 966 F.2d 812 (3d Cir. 1992)..................................................................4

PD Cargo, CA v. Lacteos CDS, 2015 NY Slip Op 32291(U) (NY Supt. Ct. Dec. 4, 2015).............................................................................................................................15

Rushaid v. Pictet & Cie, 28 N.Y.3d 316 (2016) ..............................................................18

Shipping Corp. of India v. Jaldhi Overseas PTE Ltd., 585 F.3d 58 (2d Cir. 2009).......24

Tamam v. Fransabank SAL, 677 F. Supp. 2d 720 (S.D.N.Y. 2010) ...............................14

Tiffany (NJ) LLC v. Qi Andrew, 276 F.R.D. 143 (S.D.N.Y. 2011).............................8, 10

United States v. Davidson, 175 Fed. Appx. 399 (2d Cir. 2006) ......................................14

Walden v. Fiore, 134 S. Ct. 1115 (2014) .........................................................................15

Waldman v. PLO, 835 F.3d 317 (2d Cir. 2016) ...............................................................15

Williams v. Beemiller, Inc., 527 F.3d 259 ..........................................................................4

## STATUTES AND RULES

28 U.S.C. § 636...................................................................................................................5

28 U.S.C. § 636(b)(1)(C)....................................................................................................4

Am. Law .............................................................................................................................6

Fed. R. Civ. P. 72(a) ..........................................................................................................5

Fed. R. Civ. P. 72(b)(3).......................................................................................................4

Lanham Act........................................................................................................................25

N.Y. C.P.L.R. § 302 ..........................................................................................................14

N.Y. C.P.L.R. § 302(a)(1)..................................................................................................13

N.Y. C.P.L.R. § 302(a)(3)(ii).............................................................................................21

The Nonparty Banks[1] submit this Objection to Magistrate Judge Freeman's September 11, 2018 Memorandum and Order pursuant to Federal Rule of Civil Procedure 72. The Banks respectfully request that this Court set aside Magistrate Judge Freeman's order directing compliance with subpoenas issued by Plaintiff-Assignee, Next Investments, LLC ("Assignee").

## PRELIMINARY STATEMENT[2]

At present, five banks in China are stuck in an impossible position: either they must comply with the Magistrate Judge's order directing them to produce customer account information pursuant to civil subpoenas and thereby violate China's bank secrecy laws, or they must obey their regulators and China's banking laws by withholding this information in violation of this Court's order. The only way for the Banks to avoid the dire consequences at either end of this dilemma is for the Court to order discovery under the Hague Convention. Such an approach would allow the Banks—third parties here who are willing to, indeed *want to*, cooperate—to produce the information requested by Assignee in a manner that complies with Chinese law.

The Magistrate Judge, however, has rejected discovery via the Hague Convention. This decision comes notwithstanding the fact that the Banks have offered to assist with any Hague Convention application Assignee submits to China's Ministry of Justice, to request expedited treatment of the application, and to collect responsive documents while the application is being

---

[1] Bank of China ("BOC"), Bank of Communications ("BOCOM"), China Construction Bank ("CCB"), China Merchants Bank ("CMB"), and Industrial and Commercial Bank of China Limited ("ICBC"), nonparties to this action (collectively, the "Banks").
[2] This Objection uses the following abbreviations: Agricultural Bank of China ("ABC"), the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters (the "Hague Convention"); the 636 counterfeiter-defendants ("Judgement Debtors"); the Magistrate Judge's September 11, 2018 Memorandum and Order ("Opinion" or "Op."); the Banks' Motion to Quash Subpoenas and to Modify the Final Order, ECF No. 70 (the "Banks' Motion"); the Banks' Reply in Support of Motion to Quash Subpoenas and to Modify the Final Order and Opposition to Assignee's Cross-Motion to Compel, ECF No. 110 (the "Banks' Reply"); and the December 2017 subpoenas served on the New York branches of the Banks (the "Subpoenas").

processed so as to expedite providing the information Assignee seeks.  Additionally, the Chinese Ministry of Justice has written to this Court to request resolution of this matter through the Hague Convention and has offered to assist in this matter.  In light of these offers of cooperation, it was error for the Magistrate Judge to order compliance with the Subpoenas without first giving the Banks an opportunity to produce the requested information under the Hague Convention.

The Banks respectfully submit that the Magistrate Judge's order should be modified or set aside.  The Magistrate Judge failed to properly consider several key factors in her comity analysis, including the particularly high likelihood that a Hague Convention application will be granted and that the Banks will produce responsive documents.  The Magistrate Judge undervalued China's strong national interest in ensuring that its banks comply with Chinese banking law by protecting confidential information and producing such information only at the direction of a competent organ of the Chinese government.  The Magistrate Judge underestimated the hardship that compliance with the Subpoenas will have on the Banks.  The Magistrate Judge also disregarded the Banks' concerns that notwithstanding their willingness to help, the Subpoenas in their current form are overbroad and require modification.

Additionally, the Magistrate Judge rested her decision to enforce the Subpoenas on the fundamentally incorrect conclusion the Banks are subject to personal jurisdiction here.  The Magistrate Judge found, in error, that the Banks are subject to specific jurisdiction as a result of their routine maintenance of correspondent and settlement accounts at financial institutions in New York.  Moreover, the Magistrate Judge ignored the substantive policy considerations counseling that such a broad view of specific personal jurisdiction over foreign financial institutions to permit the discovery of documents and information located outside the United States would not comport with traditional notions of fair play and substantial justice.

2

The Banks have no interest in helping the Judgment Debtors evade their obligations.  The Banks have already stated that they are allies in the fight against counterfeiting (and have taken significant steps to help combat counterfeiting in China) and are willing to assist Assignee in this regard.  The Banks' sole request is that they be allowed to provide the requested information in a manner that complies with Chinese law.  The Banks respectfully ask this Court to intervene and grant the Banks' request to produce responsive documents under the Hague Convention.

## STATEMENT OF FACTS

On August 20, 2015, Nike and Converse obtained a $1.8 billion default judgment against the Judgment Debtors in connection with a trademark infringement action in which the Judgment Debtors were alleged to have sold counterfeit goods online.  Nike and Converse assigned their rights in the default judgment to Assignee on January 31, 2017.  ECF No. 50.

In late 2017, more than two years after the entry of the default judgment, Assignee issued subpoenas to the Banks demanding the discovery of bank accounts purportedly held by more than 600 Judgment Debtors.  ECF Nos. 72-11 to 72-14.  The Banks voluntarily searched their New York branches for information relating to these accounts.  The New York branches notified Assignee that they had no documents and no records of wire transfers relating to the accounts, and directed Assignee to seek information located in branches outside of the United States via a Hague Convention request.  ECF No. 72-9.  In response to Assignee's continued insistence on compliance with the Subpoenas, the Banks filed formal objections and responses and moved to quash the Subpoenas.  ECF Nos. 70, 72-26 to 72-30.  Assignee opposed the Banks' Motion and filed its Cross-Motion to Compel.  ECF No. 82.

During oral argument on June 20, 2018, the Magistrate Judge asked whether the Banks would voluntarily restrain relevant accounts during the pendency of any Hague Convention

proceedings or take other steps to mitigate the impact of any delay.  ECF No. 128 at 74:7-15.  On August 14, 2018, the Banks wrote to the Court and explained that the proposed restraints would be inconsistent with Chinese law, but also offered to cooperate with any Hague Convention application.  ECF No. 130.  On August 27, 2018, Assignee responded, rejecting the Banks' offer of cooperation.  ECF No. 132.  On August 31, 2018, the Banks wrote to the Court, reiterating their offer of assistance and stressing the need for cooperation by both sides.  ECF No. 133.  On September 7, 2018, Assignee again rebuffed the Banks' offer of cooperation.[3]  ECF No. 134.

On September 11, 2018, Magistrate Judge Freeman issued the Opinion, denying the Banks' Motion and deeming it withdrawn without prejudice to the extent it sought to modify the October 20, 2017 Order, and granting Assignee's cross-motion to compel.  ECF No. 150.

## LEGAL STANDARDS

The Magistrate Judge's decision should be reviewed *de novo* as the effect of the ruling is dispositive on the Banks.  Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(C).  "Once the court grants or quashes the [Subpoenas]" it will have "determine[d] with finality the duties of the parties."  NLRB v. Frazier, 966 F.2d 812, 817 (3d Cir. 1992).  Because "the question of whether or not to enforce the [Subpoenas] is the only matter before the court," *de novo* review is appropriate.  Id. at 818; see also Williams v. Beemiller, Inc., 527 F.3d 259, 265-66 (noting that

---

[3] Assignee has not always rejected the Hague Convention as a pathway for discovery in this action.  Appearing before Judge Scheindlin in 2014, Assignee acknowledged that all discovery regarding defendants was in China and that it would therefore seek discovery via the Hague Convention:

> Mr. Weigel: Actually, the first thing we're going to do is do a Hague Convention request to get whatever information we can get.
> The Court: What countries?
> Mr. Weigel: China. It's all in China.
> The Court: All China.
> Mr. Weigel: I think we're just going to do it in China, your Honor.

See ECF No. 25 at 5:2-9.  To the Banks' knowledge, no such Hague application was filed.

"the list [of dispositive matters under 28 U.S.C. § 636] is non-exhaustive" and holding that defendants were entitled to *de novo* review of a matter not specifically enumerated as dispositive); EEOC v. Sterling Jewelers, Inc., 2011 WL 5282622, at *1, n.2 (W.D.N.Y. Nov. 2, 2011) ("Because the Magistrate's order [regarding enforcement of a subpoena] would dispose of the entire matter at issue in this case . . . the order is more properly treated as a Report and Recommendation, subject to de novo review.").

Even if this Court were to find that *de novo* review should not apply, it should nonetheless set the Magistrate Judge's decision aside under the "clearly erroneous" or "contrary to law" standard of Fed. R. Civ. P. 72(a). A finding is "clearly erroneous" if the Court "is left with the definite and firm conviction that a mistake has been committed, and is contrary to law if it fails to apply to or misapplies relevant statutes, case law, or rules of procedure." Dilworth v. Goldberg, 2014 WL 3798631, at *13 (S.D.N.Y. Aug. 1, 2014) (internal quotation marks omitted). The Banks respectfully submit that the Magistrate Judge made several material errors in her decision, including misapplications of law and fact, that have resulted in erroneous determinations as to comity and specific jurisdiction.

## ARGUMENT

### I.   THE MAGISTRATE JUDGE FAILED TO PROPERLY CONSIDER KEY FACTORS SUPPORTING DISCOVERY UNDER THE HAGUE CONVENTION

Principles of international comity should compel this Court to set aside the Magistrate Judge's Order. The Magistrate Judge's comity analysis adopted the conclusions in Gucci Am, Inc. v. Weixing Li, 2011 WL 6156936 (S.D.N.Y. Aug. 23, 2011) ("Gucci I"), in which Judge Sullivan held on jurisdictional and comity grounds that Bank of China should be required to produce documents pursuant to a subpoena. But more than seven years have passed since Judge

Sullivan issued that decision.[4]  China's receptivity to discovery under the Hague Convention has significantly improved during that period.  Here, the Chinese government—through the Ministry of Justice—has written directly to this Court in an effort to resolve this matter in a mutually agreeable manner via the Hague Convention, ECF Nos. 111-11 and 111-12, and the Banks have offered their cooperation as well.  A proper comity analysis must account for all circumstances which show that the Hague is a viable alternative to enforcement of the Subpoenas.[5]

## A.      The Hague Convention Is a Viable Alternative for Discovery

The Banks have made clear throughout this action that they are willing to cooperate on a Hague Convention request.[6]  The Magistrate Judge's conclusion that "historical precedent" brings into question the adequacy and timeliness of Hague productions, Op. at 38, ignored that the level of assistance offered by the Banks here is without precedent.  The Banks have offered to take concrete, proactive steps to facilitate a Hague Convention request, and have pledged to:

- "coordinate expeditiously with Next to arrive at an appropriate set of requests to include in a Hague Convention application";

- "liaise with their Chinese regulators and the ICB-MOJ [the International Cooperation Bureau at China's Ministry of Justice] prior to the filing, and during the pendency of the Hague Convention application process to address any questions or concerns that the regulators and/or ICB-MOJ may have regarding the default judgment and Next's discovery requests"; and

- "begin the process of searching for and collecting responsive documents to facilitate

_____

[4] In subsequent Gucci decisions, Judge Sullivan largely declined to revisit his comity analysis. See Gucci Am., Inc. v. Weixing Li, 2012 WL 5992142 (S.D.N.Y. Nov. 15, 2012) (containing no comity analysis); Gucci Am., Inc. v. Li, 135 F. Supp. 3d 87, 101-04 (S.D.N.Y. 2015) ("Gucci III") (engaging in a partial comity analysis of two of the seven comity factors).

[5] In conducting a comity analysis on a motion to compel, Second Circuit courts consider seven factors, four of which are particularly relevant here: 1) the availability of a viable alternative means—e.g., the Hague Convention—for securing the information; 2) the fact that complying with the Subpoenas will impose substantial hardship on the Banks; 3) the fact that China's national interests here considerably outweigh those of the United States; and 4) the tremendous overbreadth of the document requests.  Each of these factors weighs in favor of the Banks.  See Restatement (Third) of Foreign Relations Law § 442 (Am. Law. Inst. 1987).

[6] See ECF No. 72-9; see also Banks' Reply at 1 ("Indeed, the *Banks are ready and willing to provide information in response to a Hague Convention request*.") (emphasis in original).

the prompt production of such documents once the Hague Convention request has been approved, thus, eliminating any unnecessary delay in Next's receipt of responsive documents."

See ECF No. 130 at 2.  The Magistrate Judge gave no weight to these offers, concluding that the outcome here will be no different from prior cases where Hague Convention requests were only partially executed.  Op. at 37-38.  This is a critical error given that the Banks are not aware of *any* other case where non-U.S. third parties provided the assistance the Banks offer here.

Moreover, it is not only the Banks that are prepared to facilitate a timely Hague Convention request.  China's Ministry of Justice—the governmental entity authorized to receive and respond to discovery requests under the Hague Convention—has written to this Court to confirm that it will "execute a [Hague Convention request] according to the . . . Convention and Chinese laws" and will "take [a Hague Convention request] seriously and offer necessary legal assistance."  See ECF Nos. 111-11 and 111-12.  Moreover, the ICB-MOJ has notified the Banks that it is monitoring this action and has requested that the Banks keep it apprised of ways it may assist in resolving this matter.  See ECF No. 130 at 2 n.2.  Both the Banks and the relevant Chinese authorities thus continue to display a consistent willingness to cooperate with Assignee on a Hague Convention request, commitments that underscore the viability of the Hague Convention as an alternative, and by no means less efficient, method of obtaining discovery.

Magistrate Judge Freeman's reference to "historical precedents" regarding the Hague Convention, Op. at 38, also ignores the fact that the speed with which China processes Hague Convention requests has *increased* in recent years, to the point where China's processing rates surpass those of the United States.  See ECF Nos. 73 at ¶ 48, 115 at ¶ 34.[7]  In short, considering

---

[7] Rather than relying on these more relevant statistics, the Magistrate Judge instead cites a May 2015 report from the United States Economic and Security Review Commission that contains out-of-date and unsupported assertions regarding China's approach to the Hague Convention.

China's increasing efficiency in processing Hague Convention requests, the Banks' offers of cooperation, and the Chinese Ministry of Justice's commitment to responding to a Hague Convention request, it is clear that the present dispute can be resolved through the Hague Convention.   Moreover, given that the Hague Convention provides an alternative to U.S. discovery that avoids the conflicts with Chinese law that would arise if the Banks were forced to comply with the Subpoenas, there is no reason not to utilize it.  See CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd. P'ship, 2013 WL 2661037, at *10-13 (S.D.N.Y. June 12, 2013) ("If the information sought can be easily obtained elsewhere, there is little or no reason to require a party to violate foreign law"); Linde v. Arab Bank, PLC, 262 F.R.D. 143, 150 (E.D.N.Y. 2009) (refusing to compel production from nonparty bank where requesting party had "alternative means" to obtain "account and transactional evidence").

### B.   The Magistrate Judge Underestimates the Hardship of Compliance with the Subpoenas

That the Banks would suffer substantial hardship as a result of forced compliance with the Subpoenas is another comity factor weighing squarely in their favor.  There is no dispute that the Banks—financial institutions incorporated and headquartered in China—are subject to Chinese banking laws prohibiting the disclosure of customer account information absent authorization from a Chinese court or expressly authorized Chinese governmental entity.  See ECF No. 73 at ¶¶ 27-37.  Magistrate Judge Freeman's conclusion that "[a]t most . . . this factor weighs only slightly in the Banks' favor," Op. at 41, is clearly erroneous since it underestimated

_____

Op. at 37.  For example, the report relies heavily on a November 9, 2010 blog post by Dan Harris, which contains unsupported assertions about China's view of the Hague Convention. Likewise, the report quotes long-deleted language from the State Department's website.  See Tiffany (NJ) LLC v. Qi Andrew, 276 F.R.D. 143, 153 (S.D.N.Y. 2011).  The Magistrate Judge's reliance on these outdated assumptions regarding China's approach to the Hague Convention is clearly erroneous where those assumptions prove nothing about the current matter, particularly when China's Ministry of Justice has expressly affirmed its commitment to the use of the Hague Convention procedures in this very case.

the burden placed on the Banks by asking them to affirmatively break the laws of their home country.  Courts in this district have recognized the heavy weight of this burden, noting that "[u]nder the principles of international comity, a New York court should not encroach upon another nation's sovereignty by requiring citizens to take actions within their home country that would contravene that country's laws."  See CE Int'l Res. Holdings, 2013 WL 2661037, at *18.

The Magistrate Judge essentially disregarded this hardship and concluded that the Banks are unlikely to face serious repercussions for complying with the Subpoenas.  Op. at 41.  This ignores the fact that the Chinese government itself has weighed in on this matter, stating in letters to this Court that the Banks "must abide by *the Law of Commercial Banks of the People's Republic of China* and other relative domestic laws."  See ECF Nos. 111-11 and 111-12.[8]  That the Banks and the Chinese government have articulated that compliance with the Subpoenas would violate Chinese laws should be more than sufficient to demonstrate hardship under a comity analysis.  In fact, the law in this district—unaddressed in the Opinion—holds that nonparties are not required to demonstrate proof of actual sanctions.  See CE Int'l Res. Holdings, 2013 WL 2661037, *15 ("The requirement that an entity resisting disclosure must provide specific instances of enforcement is relaxed, however, where that entity is a non-party to the

---

[8] The Supreme Court's recent decision in Animal Science Products does not undercut the Chinese Ministry of Justice's submissions or change the comity analysis here.  In that case, the Supreme Court held that federal courts, when considering a foreign government's official statement on the meaning of its domestic laws, are "not bound to accord conclusive effect to the foreign government's statements."  Animal Sci. Prods. v. Hebei Welcome Pharm. Co., 138 S. Ct. 1865, 1869 (2018).  The Supreme Court also held that "a government's expressed view of its own law is entitled to substantial but not conclusive weight," id. at 1875, and indeed that is all that the Banks argue here.  The Banks have never argued, nor do they argue now, that statements from China's Ministry of Justice are the only factors to be considered in this Court's evaluation of Chinese law.  Rather, consistent with the Animal Science decision, the Banks have also asked the Court to consider statutes and regulations regarding bank secrecy in China, expert reports on Chinese law, and declarations from the Banks that explain their understanding of Chinese law.  Consideration of all of these resources must lead to the conclusion that the Banks face a real risk of violating China's banking laws should they comply with the Subpoenas.

action."); <u>Tiffany (NJ) LLC</u>, 276 F.R.D. at 158 (holding that banks' "status as non-parties weighs against compelling production of documents in violation of Chinese law" and that banks "need not prove that they will certainly be punished if forced to comply with plaintiffs' subpoenas. . ."). It is particularly unreasonable to force the Banks to openly flout China's customer privacy laws when the Hague Convention would enable Assignee to obtain the information it seeks without inflicting unnecessary hardship on the Banks.

### C.   The Magistrate Judge Erred in Finding That China's Interests in Were Not Paramount

Despite stating that "this Court . . . accepts that China has an important national interest in ensuring compliance with its laws," Op. at n.14, the Magistrate Judge nonetheless erroneously concluded that China's interests in upholding its bank secrecy laws were subordinate to U.S. interests. As the Magistrate Judge acknowledged, "the Chinese Ministry of Justice has directly informed the Court that China's bank secrecy laws would be violated by the Banks' disclosure of documents pursuant to the Subpoenas." Op. at 39.[9] The Ministry of Justice's letter to the Court reinforces the significance of China's interest in the integrity of its banking laws. Nonetheless, under the Order, five of China's largest banks are essentially being told by a U.S. Court that they must violate Chinese law, a clear affront to China and its institutions.

Moreover, although the United States has an interest in enforcing intellectual property

---

[9] The Magistrate Judge's statement that "in its letter to the Court, the Chinese Ministry does not discuss the nature of the underlying banking or customer interests served by the bank secrecy laws, but rather only summarizes the procedural requirements of those laws," is misplaced. Op. at 39. The very fact that the Ministry of Justice made a submission demonstrates the importance afforded its banking laws by the Chinese government. Moreover, in past submissions to the Second Circuit, the Chinese authorities have clearly articulated "the nature of the underlying banking or customer interests served by the bank secrecy laws." <u>See</u>, <u>e.g.</u>, ECF No. 73-21 (Letter from the China Banking Regulatory Commission and the People's Bank of China stating that China's "bank secrecy laws, like those of the United States, serve the important national interest of supporting stable growth in the banking sector. A key aspect of the stable growth is ensuring depositor and other customer confidence in the banking systems and, in particular, that Chinese banks will view the confidentiality of private client information as sacrosanct").

("IP") rights (which the Magistrate Judge acknowledges), China shares this interest as well—as do the Banks. See ECF No. 133, at 1 ("The Banks abhor counterfeiting as a matter of principle, and are willing to assist in the fight against it."). Over the past decade, China has significantly reformed its IP regime by increasing statutory penalties for IP offenses, establishing IP courts across the country, and strengthening enforcement efforts.[10] In fact, these efforts have had a positive impact on counterfeiting in the footwear industry, with New Balance and Converse (a Nike subsidiary) both recently winning victories in Chinese IP courts against domestic Chinese litigants.[11] Moreover, the Banks have taken independent measures—consistent with Chinese law—to combat the counterfeiting at issue here by blacklisting certain Judgment Debtors and prohibiting them from receiving additional services.[12] Both China and the Banks are committed to respecting IP rights while also maintaining the integrity of China's banking laws. The only way to achieve these objectives in this particular discovery dispute is via the Hague Convention.

### D. The Magistrate Judge Erred in Finding That the Subpoena Requests Were Sufficiently Specific

The Magistrate Judge's statement that the Subpoenas are "sufficiently specific," Op. at 34-35, was erroneous. The Subpoenas are overly broad in numerous ways. The Subpoenas

---

[10] See S. Thiruchelvam, How China became a leader in intellectual property, RACONTEUR (Oct. 10 2018), https://www.raconteur.net/risk-management/how-china-became-leader-intellectual-property (China has demonstrated "serious resolve to enforce an effective IP rights regime," by increasing IP damages five-fold); Office of the U.S. Trade Representative, 2014 Report to Congress on China's WTO Compliance, 8-10 (Dec. 2014) (since acceding to the WTO, "China has undertaken a wide-ranging revision of its framework of [IP] laws and regulations" and that "rights holders report increased enforcement efforts by Chinese government authorities").

[11] Thiruchelvam, supra n.10 ("In a landmark 2017 ruling … three Chinese shoemakers were ordered to pay New Balance … for copying the sneaker brand's logo"); Lusha Zhang et al., China uncovers almost 1,600 U.S.-related intellectual property infringements this year, REUTERS (Nov. 8, 2017), https://www.reuters.com/article/us-china-u-s-intellectual-property/china-uncovers-almost-1600-u-s-related-intellectual-property-infringements-this-year-idUSKBN1D90A0 (in September 2017, China reported "a recently resolved case involving sales of counterfeit Converse brand shoes valued at more than 1 million yuan").

[12] See Zeng Decl. (BOC) ¶¶ 5-6; Zhou Decl. (CMB) ¶¶ 4-6; Zhou Decl. (ICBC) ¶¶ 4-6; Fu Decl. (CCB) ¶¶ 4-6; BOCOM Decl.

identify 636 Judgment Debtors, but Assignee offers no proof that all but a handful of these 636 individuals utilized services at the Banks.  ECF No. 72-14 (Attachment F).  Moreover, the 636 Judgment Debtor names are often either extremely common Chinese names or partial names (to give but a few examples: "SandyC," "Linda," "Motao," and "Huik"), making it impossible for the Banks to identify the correct account holder and increasing the risk that the Banks will disclose customer information relating to a non-Judgment Debtor.  Id.  The Subpoenas also require the Banks to search for customer account information relating to 778 email addresses and 2361 websites, once again without demonstrating that these email addresses or websites are connected to specific account holders at the Banks.  Id. (Attachments E and G).  In short, the Subpoenas as currently drafted are so broad that the Banks would not even know where to begin.[13]  Courts confronted with similarly broad subpoenas have found that this factor mitigates against compelling compliance.  See CE Int'l Res. Holdings, 2013 WL 2661037, at *9-10 (noting that "[s]pecificity in subpoena requests is favored in this District" and finding discovery requests overbroad where they related to accounts that could not be "readily identified"); Chevron Corp. v. Donziger, 296 F.R.D. 168, 205 (S.D.N.Y. 2013) ("Generalized searches for information, the disclosure of which is prohibited under foreign law, are discouraged.  Where document requests are overbroad . . . this factor will counsel against production.").

## II.   THE MAGISTRATE JUDGE INCORRECTLY CONCLUDED THAT THERE WAS A BASIS TO ASSERT SPECIFIC PERSONAL JURISDICTION OVER THE NONPARTY BANKS

The Magistrate Judge erred in finding that the Banks are subject to specific jurisdiction because of the New York contacts alleged by Assignee.  Under the New York long arm statute

---

[13] The Magistrate Judge misconstrues the Banks' intention to "narrow[] the scope of the currently overbroad subpoena," as an indication that "the Banks . . . do not expect or intend the Hague Convention process to result in a full response to the Subpoenas."  Op. at 37-38 (citing ECF 130).  The Banks only meant to highlight that Assignee must cooperate by working with the Banks to frame the requests so that it would be *possible* for the Banks to comply.

and the "minimum contacts" test, the Court must find that the Banks have "transacted business" in the forum *and* that there is a relationship between this conduct and the cause of action.[14]   None of the alleged in-forum contacts upon which the Magistrate Judge relies satisfy both of these requirements.   The Banks' routine maintenance of correspondent and settlement accounts does not demonstrate purposeful or deliberate in-forum conduct that would constitute a "transaction of business" in New York.   And the Banks' other alleged contacts—their advertising of New York branch services and New York real estate holdings—are irrelevant because Assignee's cause of action does not "arise" from these in-forum contacts and Assignee does not seek discovery regarding such contacts.   A finding of jurisdiction on the basis of only one prong of the specific jurisdiction test would be an end-run around the two-part analysis, and is therefore improper.

A.   **The Establishment and Maintenance of Correspondent Accounts in New York Does Not Give Rise to Specific Jurisdiction**

The Magistrate Judge relied on records submitted by Assignee showing that four of the Banks' correspondent accounts in New York received wire transfers directed to certain Judgment Debtor accounts in China.[15]   The Banks did not direct these wire payments into their correspondent accounts; rather, third party banks initiated these transfers on behalf of their

---

[14] To establish specific jurisdiction over a non-domiciliary under New York's long-arm statute, the Court must find that the non-domiciliary (1) transacted business within the state; and (2) the claim asserted arises from the business activity.   N.Y. C.P.L.R. § 302(a)(1).   Under constitutional due process standards, the Court must find that the non-domiciliary's contacts with the forum satisfy "minimum contacts", meaning that (1) the party at issue has "purposefully availed" itself of the forum by "deliberately direct[ing] its conduct in the forum" and (2) the in-forum conduct arises out of, or is sufficiently related, to the cause of action.   Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75 (1985).   In the context of non-party discovery, the in-forum conduct must relate to the subject matter of the discovery request.   Gucci America v. Bank of China, 768 F.3d 122, 141-42 (2d Cir. 2014).   Thus, the two-part inquiry under N.Y. C.P.L.R. §302(a)(1) and the minimum contacts analysis are largely identical.   Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 61 n.11 (2d Cir. 2012) ("Licci II").   Under due process, the court must also consider whether exercise of personal jurisdiction would be reasonable.   Id. at 59-60.

[15] The Court did not include BOCOM in this analysis, noting that Assignee had submitted evidence of only one wire payment routed through BOCOM's correspondent account in New York.   Op. at 12 n.8.

customers and deposited these funds into the Banks' correspondent accounts, with instructions to credit the Judgment Debtors' accounts in China.  Based on these facts, there was no basis for the Magistrate Judge to conclude that the Banks "transacted business in New York" or "purposely directed" their activities in New York in the manner required for specific jurisdiction to attach.

It is axiomatic that the "mere maintenance" of a correspondent account in New York is insufficient to serve as a basis to exercise specific jurisdiction over a foreign bank. [16]  Tamam v. Fransabank SAL, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010) ("[C]ourts in this district have routinely held that merely maintaining a New York correspondent bank account is insufficient to subject a foreign bank to personal jurisdiction" (citing cases)); Amigo Foods Corp. v Marine Midland Bank-New York, 39 N.Y. 2d 391, 396 (N.Y. 1976) ("Standing by itself, a correspondent bank relationship . . . may not form the basis for long-arm jurisdiction."); Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 762 (S.D.N.Y. 2005) (holding that foreign bank's mere maintenance of New York correspondent account through which it transferred funds did not give rise to personal jurisdiction under N.Y. C.P.L.R. § 302).  These cases make it clear that simply opening a correspondent account in the forum (as thousands of foreign banks have done in New York) and maintaining it in the ordinary course of business— that is, allowing it to exist as a conduit for systematic and automated transfers of funds in and out of the forum—cannot be a basis for exercising specific jurisdiction over a foreign bank.

Moreover, the mere fact that a *third party* may choose to transmit funds through a foreign bank's correspondent accounts—as is the case here—does not create a basis for personal

---

[16] "Correspondent banking is an integral part of the domestic and international banking systems. Without correspondent banking, in fact, it would often be impossible for banks to provide comprehensive nationwide and international banking services—among them, the vital capability to transfer money by wire with amazing speed and accuracy across international boundaries." United States v. Davidson, 175 Fed. Appx. 399, 401 n.2 (2d Cir. 2006).

jurisdiction over the foreign bank.  In <u>Amigo Foods Corp.</u> v. <u>Midland Bank-New York</u>, 402 N.Y.S.2d 406 (1st Dep't 1978), the Appellate Division held that a Maine bank with a "long-standing correspondent bank relationship" with a New York bank was not subject to personal jurisdiction where a third party bank had "unilaterally" chosen to deposit funds into the New York correspondent account.  <u>Id.</u> at 408.  The Maine bank was not subject to personal jurisdiction because it had been "passively and unilaterally been made the recipient of funds." <u>Id.</u>  Time and again, courts have relied on this premise to find that the mere receipt of funds through a correspondent account does not create a basis for jurisdiction.  <u>In re Terrorist Attacks on Sept. 11, 2011</u>, 295 F.Supp.3d 416, 427 (S.D.N.Y. Mar. 28, 2018) (no specific jurisdiction against non-U.S. bank where allegations were "only that *third parties* used the [non-U.S. bank] to transfer money to Al Qaeda); <u>PD Cargo, CA</u> v. <u>Lacteos CDS</u>, 2015 NY Slip Op 32291(U), *7 (NY Supt. Ct. Dec. 4, 2015) (no jurisdiction where funds "transfer[ed] [were] not even at the direction of [the bank]"); <u>see also</u> <u>Waldman</u> v. <u>PLO</u>, 835 F.3d 317, 335 (2d Cir. 2016) ("the relationship between the defendant and the forum 'must arise out of contacts that the defendant *himself* creates with the forum.'") (quoting <u>Walden</u> v. <u>Fiore</u>, 134 S. Ct. 1115, 1122 (2014)).

The Magistrate Judge's findings as to the Banks do not establish that they engaged in any activities beyond the mere maintenance of a correspondent account.  That fact is evident in the language of the Opinion, which focuses on the Banks' "facilitation" of the transfer of funds through their correspondent accounts:

- "[T]he Banks have been shown by the Assignee to *maintain* multiple correspondent accounts with New York Banks . . . which are used *to facilitate* international wire transfers on behalf of the Banks' customers."  Op. at 12 (emphasis added).
- "Assignee has specifically shown that at least four of the Banks – BOC, CCB, CMB, and ICBC – have actually used New York-based correspondent accounts *to facilitate* numerous wire transfers on behalf of the Judgment Debtors."  <u>Id.</u> (emphasis added).

- The Assignee submits that BOC, CCB, CMB, and ICBC, through their New York-based correspondent accounts, "collectively *facilitated* at least 600 wire transfers" from purchasers . . . ."  Op. at 21 (emphasis added).
- Four of the six Banks – BOC, CCB, CMB, and ICBC – used correspondent accounts with New York banks *to facilitate* hundreds of transactions on behalf of the Judgment Debtors.  Op. at 23 (emphasis added).

These descriptions of the Banks' passive conduct only make the deficiencies in the Magistrate Judge's Opinion more clear.  The "facilitation" of wire payments simply involves opening New York correspondent accounts for general business purposes and receiving wire payments into these accounts (at the direction of others).  Prevailing authority dictates that such routine conduct does not give rise to specific jurisdiction.  See Amigo Foods Corp., 39 N.Y. 2d at 396; Amigo Foods Corp., 402 N.Y.S. 2d at 408.  The Banks cannot fairly be said to have "used" their correspondent accounts since all they did was receive payments directed by others.  Assignee has alleged no affirmative conduct by the Banks in the forum regarding these wire payments (other than the opening and maintenance of a correspondent account) and adduced no proof that the Banks engaged in any conduct beyond the "mere maintenance" of a correspondent account.

The Licci cases cited in the Opinion do not support a different outcome.  In Licci IV, the Second Circuit held that a foreign bank, Lebanese Canadian Bank ("LCB"), was subject to specific jurisdiction based on its "repeated use" of a correspondent account in New York to execute payments to a Hizbollah affiliate in knowing furtherance of a terrorist scheme.  Licci v. Lebanese Canadian Bank, 732 F.3d 161, 166 (2d Cir. 2013) ("Licci IV") (noting plaintiffs' allegation that "LCB *executed* wire transfers using its correspondent account in New York" for a terrorist organization) (emphasis added); see also id. (stating that LCB "*carried out* wire transfers . . . to assist and advance Hizbollah's goal of using terrorism to destroy the State of

16

Israel") (quotations omitted) (emphasis added).[17]  In *that* context—where the foreign bank was alleged to have affirmatively "carried out" wire transfers to support a terrorist scheme—the Court stated that "complaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client . . . show purposeful availment of New York's dependable and transparent banking system."  Licci v. Lebanese Canadian Bank, 20 N.Y.3d 327, 339 (2012) ("Licci III").  The foreign bank's active "use" of the correspondent account in Licci was markedly different from the Banks' "use" of their correspondent accounts here, where the only action (or lack thereof) was the passive receipt of funds into the account.  Licci must be understood in this context.  Otherwise, the Court risks upending decades of authority finding that the routine operation of correspondent accounts does not give rise to specific jurisdiction.[18]

That very mistake was made in Gucci Am., Inc. v. Weixing Li, 135 F. Supp. 3d 87 (S.D.N.Y. 2015) ("Gucci III"), a decision the Magistrate Judge relied upon heavily.  In Gucci III, Judge Sullivan found that Bank of China "repeatedly" used its New York correspondent account at JPMorgan Chase to effectuate wire payments to defendants' accounts in China, even though wire payment records indicated only that Bank of China's correspondent account received these payments at the direction of another party.  Id. at 95.  There was no indication that Bank of China engaged in affirmative conduct to initiate wire payments or that it knowingly assisted in any illegal scheme through the use of its correspondent accounts, such as was present in Licci.  Gucci III failed to distinguish between a non-U.S. bank's deliberate use of correspondent accounts to

---

[17] See also ECF No. 111-3 (Licci First. Am. Compl.) at ¶¶ 55, 56, 141, 143, 169, 179, 180, 189, 190, 203 (alleging that LCB "carried out" or "executed" wire transfers on behalf of Hizbollah).

[18] The Second Circuit cautioned in Licci IV that it was not overruling longstanding precedent that a foreign bank's mere maintenance of correspondent accounts do not give rise to personal jurisdiction.  Licci IV at 171. ("[W]e by no means suggest that a foreign defendant's mere maintenance of a correspondent account in the United States is sufficient to support…personal jurisdiction…in connection with any controversy.").  Licci IV therefore expressly stated an intention to carve out routine correspondent banking services from its jurisdictional findings.

make payments in support of an illegal enterprise (as was the case in <u>Licci</u>), and the routine receipt of wire payments into a non-U.S. banks' correspondent account at the direction of another party.  No other court in this district has followed the <u>Gucci III</u> opinion,[19] and it would be clearly erroneous for this Court to do so.

### B.  BOC AND BOCOM's Acquiring Bank Activities Do Not Give Rise to Specific Jurisdiction[20]

The Magistrate Judge also incorrectly held that BOC and BOCOM should be subject to specific jurisdiction because they provided acquiring bank services (to process Visa and MasterCard credit card payments) to certain Judgment Debtors.  This finding disregards the undisputed evidence that BOC and BOCOM provided these acquiring bank services *only to customers in China*.  Although the Magistrate Judge relied on the fact that these banks maintain settlement accounts in New York, the presence of these settlement accounts alone (a requirement for banks providing Visa or MasterCard services) does not establish a basis for specific

---

[19] In <u>Hau Yin To</u> v. <u>HSBC Holdings, PLC,</u> 700 Fed. Appx. 66, 67 (2d. Cir. 2017), the Second Circuit affirmed the dismissal of claims asserted against a non-U.S. bank, HSBC, on personal jurisdiction grounds because plaintiffs' allegations regarding bank's use of correspondent accounts in New York did not constitute "the kind of intentional and repeated use of correspondent accounts that amounts to a transaction of business."  The district court found no basis for personal jurisdiction because "the passage of money through the U.S. bank accounts were merely incidental and not specifically directed by any of the HSBC entities to facilitate the Ponzi scheme."  <u>Hau Yin To</u> v. HSBC Holdings, PLC, 2017 WL 816136, at *7 n.6 (S.D.N.Y. Mar. 1, 2017).  The district court distinguished that case from <u>Rushaid</u> v. <u>Pictet & Cie</u>, 28 N.Y.3d 316 (2016), in which the New York Court of Appeals held that a Swiss bank was subject to specific jurisdiction because it had knowingly orchestrated the receipt of laundered funds into its New York correspondent account.  <u>Rushaid</u>, 28 N.Y. 3d at 327-28.  The district court held that <u>Rushaid</u> did not apply because there, "the defendants [including the Swiss bank] orchestrated the money laundering and . . . the New York account was integral to the scheme." <u>Hau Yin To</u>, 2017 WL 816136, at *9 n.6.  That is the same distinction that the Court should draw here (and which the Magistrate Judge failed to draw, given her reliance on <u>Rushaid</u>), because the Banks did not orchestrate the wire payments that passed through their correspondent accounts as part of the counterfeiting scheme.

[20] BOC and BOCOM incorporate ABC's objections on this issue, to the extent relevant to all three banks.  In particular, ABC's arguments as to Assignee's improper use of "manufactured contacts" (i.e., purchases of counterfeit goods initiated by private investigators) applies equally to BOC and BOCOM as well.  ABC Objection at II.B; <u>see also</u> ECF Nos. 7-10.

jurisdiction.  Accordingly, the Magistrate Judge's findings should be set aside.[21]

First, as the Banks explained in their briefing, the acquiring bank services provided by BOC and BOCOM are limited to China.  Banks' Reply at 16; ECF No. 108 at ¶ 20; ECF No. 113 at ¶¶ 5-11.  The MasterCard and Visa licensing agreements entered into by these banks are limited in scope to China.  ECF No. 86-1 at MC000011; ECF Nos. 125-4 at 1; 125-7 at 1.  The records of credit card transactions purportedly connected to the Judgment Debtors all indicate that the acquiring country for these transactions (*i.e.*, where acquiring bank services were actually performed) was China.  ECF Nos. 125-1; 125-2; 125-8.  The Magistrate Judge disregarded the fact that the locus of all of the Banks' acquiring bank activities was in China when she found that jurisdiction should attach.

Second, the Magistrate Judge makes the critical error of finding that the Banks have satisfied the "purposeful availment" requirement as to specific jurisdiction by "establishing" and "maintaining" settlement accounts in New York to "facilitate international credit card transactions."  Op. at 17-18.  Settlement accounts are omnibus bank accounts that issuing and acquiring banks maintain to ensure that all credit card transactions can be "settled"—that is, to allow payments to an acquiring bank to be credited and payments by an issuing bank to be

---

[21] Certain factual conclusions underpinning the Magistrate Judge's jurisdictional findings as to BOC and BOCOM are also in error.  See Op. at 15-16.  For example, the Magistrate Judge attributes $184,000 worth of acquiring bank transactions to BOC that relate to BOC Credit Card (International) Limited, even though BOC has clarified this is a separate legal entity.  See id. (citing ECF Nos. 125-1, 125-2, and 125-8); Banks' Reply at 15 n.14; ECF No. 108 at ¶ 21; ECF No. 111-6.  Additionally, there appear to be no identifiable Judgment Debtors corresponding to certain transactions for which BOCOM is alleged to have served as an acquiring bank (e.g., the transactions attributed to BOCOM in ECF No. 84-245).  Given that enforcing the Subpoenas would require the Banks to violate Chinese law, the Banks respectfully submit that any finding as to personal jurisdiction cannot be based on incorrect—or incomplete—factual conclusions regarding the Banks' connection to the Judgment Debtors.  Additionally, the Banks should not be required to produce documents and information relating to transactions for which there is no demonstrable connection to the Judgment Debtors.

debited.  Maintenance of a settlement account is an essential requirement for all issuing and acquiring banks in the Visa and MasterCard networks, and banks in these networks generally maintain these accounts in New York to facilitate more efficient settlement processes with other banks, whose settlement accounts are also in New York.  ECF No. 112 at ¶¶ 34, 69-70, 73.[22] Settlement itself is a passive process that involves the automated crediting and debiting of funds in and out of the settlement account.[23]  Similar to correspondent banks, no affirmative conduct within the forum is required to "maintain" a settlement account or to "facilitate" transactions to and from these accounts, and the Magistrate Judge's description of the banks' "deliberate use" of these accounts should be understood in that context.  Importantly, no authority in this district,[24] or in any other jurisdiction, holds that an acquiring bank may be subject to personal jurisdiction solely due to the presence of a settlement account in that forum and the Magistrate Judge's unprecedented conclusion on this matter is contrary to law and should be set aside.

Finally, the Magistrate Judge erred in concluding, on the basis of Gucci America, Inc. v. Frontline Processing Corp., 721 F. Supp. 2d 228 (S.D.N.Y 2010), that BOC and BOCOM should be subject to specific jurisdiction because their "'credit card processing systems . . . actually allowed for the purchase of counterfeit products in New York.'"  Op. at 18 (quoting Frontline, 721 F. Supp. 2d at 245).  In Frontline, the Court found a basis for specific jurisdiction over two

---

[22] See Ann Kjos, The Merchant-Acquiring Side of the Payment Card Industry: Structure, Operations, and Challenges 2-8, FEDERAL RESERVE BANK OF PHILADELPHIA (Oct. 2007) https://philadelphiafed.org/-/media/consumer-finance-institute/payment-cards-center/publications/discussion-papers/2007/D2007OctoberMerchantAcquiring.pdf

[23] See Susan Herbst-Murphy, Clearing and Settlement of Interbank Card Transactions: A MasterCard Tutorial for Federal Reserve Payment Analysts 1, 8, 12, 14, FEDERAL RESERVE BANK OF PHILADELPHIA (Oct. 2013) https://www.philadelphiafed.org/-/media/consumer-finance-institute/payment-cards-center/publications/discussion-papers/2013/D-2013-October-Clearing-Settlement.pdf

[24] The Magistrate Judge concedes that "courts in this Circuit have not specifically addressed, post Daimler, whether the repeated use of a settlement account with a New York bank may satisfy the transaction-of-business prong of the New York long-arm statute."  Op. at 17.

acquiring banks that were *targeting their services toward counterfeiters*.  721 F. Supp. 2d at 239 (noting that the acquiring banks offered higher discounts for processing credit card transactions for merchants of counterfeit goods).   The Court found that plaintiff had pled a plausible contributory trademark infringement claim against the banks, thus satisfying *another* prong of the New York long arm statute that permits jurisdiction to attach "for a tortious act committed outside the state that causes injury within the state."   Id. at 241 (citing N.Y. C.P.L.R. § 302(a)(3)(ii)).   Assignee has not pled contributory trademark infringement claims against BOC and BOCOM.   Nor is there a basis to do so where the Banks have not engaged in the kind of targeted conduct at issue in Frontline.   Accordingly, that case is inapplicable.

### C.   The Advertising of Banking Services in New York and China Does Not Give Rise to Specific Jurisdiction.

The Magistrate Judge also found, on the basis of marketing materials submitted by Assignee, that "the Banks have made statements promoting their settlement services, and their service (provided through correspondent accounts) of providing U.S. dollars wire transfers to and from China *for customers like the Judgment Debtors*."   Op. at 18-19 (emphasis added).   This finding was in error because the marketing materials cited by the Magistrate Judge *do not advertise the wire transfer services that the Judgement Debtors utilized*, but rather, promote services of the Banks' New York branches, which are not involved in the present dispute.   See Op. at 19.[25]   The Banks' correspondent banking relationships, which the Magistrate Judge relied

---

[25] The opinion cites Weigel Ex. 234 (press release stating that *Bank of China New York Branch* has been approved as "the clearing house for all Renminbi business in the United States"); Weigel Ex. 116 ("*ICBC New York Branch* clears over $1 trillion dollars"); Weigel Ex. 18 ("*Agricultural Bank of China New York Branch* successfully launched and performed the on-line operations of dollar clearing business"); Weigel Ex. 46 ("*The New York Branch* offers Cross-border RMB Clearing Services, including U.S. Dollar Clearing Services"); Weigel Ex. 46 ("*The New York Branch* offers Cross-border RMB Clearing Services, including U.S. Dollar Clearing Services"); Weigel Ex. 93 (China Construction Bank New York Branch website advertising its US dollar clearing services); Weigel Ex. 70 (China Merchants Bank New York Branch webpage

upon here, are managed by their head offices in China, and not by their New York branches, which have no involvement in the transactions and no access to information regarding them. Banks' Reply at 5; ECF No. 112 at ¶¶ 34, 47, 49; ECF No. 109 at ¶ 6; ECF No. 128 at 60:5-61:12.   The New York branches have searched their records and confirmed that they have no account documents or wire transfer records associated with the Judgment Debtors.[26]  See supra at 3.  The advertised New York branch services are therefore irrelevant to the specific jurisdiction analysis because they do not relate to the cause of action or to Assignee's discovery requests.

### D.   The Bank's Real Estate Holdings in New York Are Irrelevant

The Magistrate Judge's finding that the Banks should be subject to specific jurisdiction because they own real estate in New York should also be set aside because these connections have no relationship to the underlying dispute.  The Banks' real estate holdings in New York primarily relate to the Banks' New York branch operations, which have no connection to this dispute.  See ECF Nos. 84-4; 84-34; 84-64; 84-87; 84-109; 84-225.  The Magistrate Judge was therefore incorrect to consider these in-forum contacts as a basis for finding specific jurisdiction over the Banks.  See Op. at 12, 22, and 24.

### E.   The Exercise of Personal Jurisdiction Here Would Not Be Reasonable

The Banks also submit that it was clearly erroneous for the Magistrate Judge to conclude that the exercise of personal jurisdiction would be reasonable under due process standards.[27]  The

---

entitled "Advantages of the Branch").

[26] The only exception is BOC, New York branch, which identified and produced certain U.S. dollar wire transfer records associated with the Judgment Debtors.  ECF No. 109 at ¶ 10.

[27] To determine whether the exercise of jurisdiction would comport with "traditional notions of fair play and substantial justice," courts will generally consider (1) the burden that the exercise of jurisdiction will impose on the foreign nonparty; (2) the interests of the forum state in adjudicating the case; (3) the petitioners' interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164-65 (2d Cir. 2010).

Magistrate Judge's decision relies solely on the prior analysis of <u>Gucci III</u> and disregards important reasons raised by the Banks as to why the assertion of jurisdiction over non-U.S. banks would be decidedly unreasonable. Most importantly, the Magistrate Judge disregarded the Banks' argument that a decision to exercise specific jurisdiction on the basis of correspondent and settlement account transactions would negatively impact *all non-U.S. banks* maintaining such correspondent and settlement accounts in the United States, not just the Banks here.

## 1. Substantive Social Policies Countenance Against the Exercise of Specific Jurisdiction

The Banks argued extensively in their briefing (with further support from the expert declaration of Robert Almanas, ECF. No. 112 at ¶¶ 22-25) that subjecting non-U.S. banks to specific jurisdiction in any instance where wire payments received into their New York correspondent accounts (or settlement accounts) are connected with a pending litigation, would be disastrous for the New York banking industry. The Magistrate Judge failed to address this issue in her analysis of the reasonableness of jurisdiction.

Under the Magistrate Judge's view of specific jurisdiction as to correspondent accounts, it does not matter whether the non-U.S. bank initiated the payment or merely received it, or, given the highly-automated nature of correspondent banking, whether the bank even knew about it. All routine activities associated with maintaining a correspondent account would constitute the "transaction of business" or "purposeful availment" in New York. An opportunistic plaintiff would simply be required to show that there is "some" connection between the payment routed through the correspondent account in New York and the underlying cause of action.

This expansive view of personal jurisdiction is untenable not just for the Banks, but for the more than 3,500 non-U.S. banks who maintain upwards of over 9,000 correspondent accounts at U.S. financial institutions in New York and the scores of banks that, as a result of

their membership in the Visa and Mastercard networks, maintain settlement accounts in New York.  See Chung Decl. Ex. 1.[28]  This increased litigation risk would also harm the sector of the New York financial industry that provides these services to these financial institutions.  See Shipping Corp. of India v. Jaldhi Overseas PTE Ltd., 585 F.3d 58, 62 (2d Cir. 2009) ("Undermining the efficiency and certainty of fund transfers in New York could, if left uncorrected, discourage dollar-denominated transactions and damage New York's standing as an international financial center.").

### 2. Other "Reasonableness" Factors Also Counter Against the Exercise of Specific Jurisdiction

Burden.  The Magistrate Judge incorrectly declined to consider the burden imposed on the Banks in forcing them to violate the laws of their home country, finding it more appropriate to address this issue in its comity analysis.  Op. at 29.  Personal jurisdiction and comity are separate issues, and any proper evaluation of the burdens of jurisdiction should have included consideration of the fact that the Banks were being asked to disobey their regulators and violate Chinese law.  See Leibovitch v. Islamic Republic of Iran, 188 F. Supp. 3d 734, 755 (N.D. Ill. 2016), aff'd 852 F.3d 687 (7th Cir. 2017) (personal jurisdiction over subpoenaed non-U.S. banks would be burdensome because compliance with subpoenas would violate their national laws).[29]

---

[28] Notably, such an expansive view of specific jurisdiction has the potential to impact not just the Chinese banks (of which 110 banks maintain 340 correspondent accounts in New York), but also German banks (of which 447 banks maintain 833 correspondent accounts in New York); Austrian Banks (of which 89 banks maintain 329 correspondent accounts in New York); Italian banks (of which 89 banks maintain 219 correspondent accounts in New York); and Swiss banks (of which 160 banks maintain 306 correspondent accounts in New York), among other foreign banks maintaining a total of 9122 correspondent accounts in the forum.  See Chung Declaration ¶¶ 5-7 (discussing Worldwide Correspondents Directory).   Under the standards for specific jurisdiction adopted by the Magistrate Judge, a plaintiff would simply be required to a wire payment connected with a particular defendant or judgment debtor was routed through one of these 9122 New York correspondent accounts.

[29] The Magistrate Judge also incorrectly concluded that the Banks had failed to make any "particularized showing" as to burden, Op. at 29, even though the Banks argued in their briefing

Assignee's Interests and Judiciary's Interest in Efficient Adjudication of Controversy.
While Assignee may have an interest in obtaining discovery under the "fastest and most practical
means," Op. at 30, these interests do not justify a solution where the Banks would be required to
break the law in order satisfy another party's (and the Court's) desire for efficiency and
expediency.  The Banks offered a solution for efficient discovery that did not require them to
violate the law: a coordinated effort under the Hague Convention with significant cooperation by
the Banks.  ECF Nos. 130, 133.   That should be the approach adopted here.

Interests of the Forum.  The Magistrate Judge failed to explain why the forum's interests
in combating counterfeiting and enforcing the Lanham Act justify the expenditure of judicial
resources when the counterfeiters are in China, the Banks are headquartered in China, the
documents sought are in China, the assets with which to satisfy the judgment are presumably in
China, and Assignee could have brought this case initially in China or pursued enforcement of
the Judgment there.[30]  The Magistrate Judge also failed to consider the Court's interests in *not*
adjudicating this matter, given that the exercise of personal jurisdiction here would invite an
influx of litigation against non-U.S. banks with correspondent accounts and/or settlement
accounts in the forum.  Banks' Reply at 20-22; supra at 23-24.

## CONCLUSION

For the foregoing reasons, the Banks respectfully submit that Magistrate Judge Freeman's
order should be set aside to the extent that it orders the Banks to comply with the Subpoenas.

---

that compliance with the subpoenas would be overwhelmingly burdensome given their
overbroad nature.  Banks' Motion at 20-21 and n.15.  The Banks raise this argument again in
their objection to the Magistrate Judge's comity analysis and incorporate it here by reference.
[30] Assignee has previously acknowledged to the Court that the relevant discovery is "all in
China."  ECF No. 25 at 5:2-9.

Dated: October 10, 2018

_/s/ David G. Hille_
David G. Hille
Paul B. Carberry
Jacqueline L. Chung
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email:  dhille@whitcase.com
        pcarberry@whitecase.com
        jacqueline.chung@whitecase.com

_Attorneys for Bank of China, Bank of
Communications, China Construction Bank,
China Merchants Bank, Industrial and
Commercial Bank of China Limited_

26