**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/19/2018

---------------------------------------------------------------x

NIKE, INC. AND CONVERSE INC.,

                Plaintiffs,

    -against-                              13 Civ. 8012 (CM)

Maria WU d/b/a
WWW.SHOECAPSXYZ.COM, et al.,

                Defendants.

---------------------------------------------------------------x

## ORDER DENYING NONPARTY BANKS' OBJECTIONS AND AFFIRMING ORDER OF THE MAGISTRATE JUDGE DENYING MOTION TO QUASH AND GRANTING CROSS-MOTION TO COMPEL

McMahon, C.J.:

    Apparel and footwear companies NIKE, Inc. and Converse, Inc. sued over six hundred online retailers for selling products that infringed their trademarks. After the defendants predictably failed to appear, NIKE and Converse won a default judgment for $1.8 billion, which they assigned to an investment firm. The investment firm sought to enforce the judgment by, among other things, subpoenaing six nonparty Chinese banks for account information related to the defendants. The banks moved to quash the subpoenas, and the investment firm moved to compel. The Magistrate Judge, who was supervising post-judgment discovery, denied the banks' motion, finding that the court had jurisdiction over the nonparty banks and that the Hague Evidence Convention did not offer any a viable alternative to discovery. This Court now affirms that order.

1

I.      **Factual Background and Procedural History**

Plaintiffs NIKE, Inc. and Converse Inc. ("Plaintiffs") brought an action for trademark infringement against several hundred online retailers, the majority of them located in China.  On August 20, 2015, this Court entered a default judgment in favor of Plaintiffs (the "Judgment"). (Dkt. No. 49.)  Plaintiffs subsequently assigned their interest in the Judgment to Next Investments, LLC (the "Assignee"), (Dkt. No. 50), who moved to enforce the Judgment by, in part, issuing subpoenas to six nonparty Chinese banks[1] relating to the online retailer defendants' assets (the "Subpoenas").  (*See, e.g.*, Decl. of Jacqueline L. Chung, dated Feb. 14, 2018, Dkt. No. 72 Ex. 11.)  The Banks moved to quash the Subpoenas, and the Assignee cross-moved to compel production pursuant to the Subpoenas.  (Dkt. No. 70.)

On September 11, 2018, Magistrate Judge Debra Freeman entered a memorandum opinion and order denying the Banks' motion to quash the Subpoenas and granting Assignee's cross-motion to compel the production of documents pursuant to the Subpoenas. *Nike, Inc. v. Wu*, No. 13-cv-8012, 2018 WL 4907596, at *2 (S.D.N.Y. Sept. 11, 2018).  The Banks were ordered to produce documents in response to the Subpoenas by November 12, 2018.  (Dkt. Nos. 149, 150.)

On October 10, 2018, the Banks filed two sets of objections to the Magistrate Judge's order, one from ABC and another from the other five banks.  (Dkt. No. 156 ("Banks Obj.") and Dkt. No. 163 ("ABC Obj.") (collectively, the "Objections").)  ABC wrote "separately to highlight factual issues that pertained specifically to ABC as opposed to the [o]ther banks,"

---

[1]      Agricultural Bank of China ("ABC"), Bank of China ("BOC"), Bank of Communications ("BOCOM"), China Construction Bank ("CCB"), China Merchants Bank ("CMB"), and Industrial and Commercial Bank of China ("ICBC") (collectively, the "Banks").

including allegedly *de minimis* contacts with the forum state.  (ABC Obj. at 3 n.2.)  However, ABC joined the objection of the other five banks "in its entirety."  (*Id.* at 2 n.1.)

That same day, the Banks also submitted a letter asking the Court to stay the discovery deadline pending a resolution of the Objections.  (Dkt. No. 154 at 2.)  After allowing the Assignee to respond, this Court agreed with the Banks that a stay of the discovery deadline pending a resolution of the Objections avoided unduly prejudicing the Banks and, accordingly, granted their request to stay discovery.  (Dkt. No. 168.)

The Assignee filed a combined opposition to the Objections.  (Dkt. No. 169 ("Next Opp.").)

Ruling on the Banks' Objections, this Court now finds that the Magistrate Judge's order was neither clearly erroneous nor contrary to law and **AFFIRMS** the order.  This Court also hereby lifts the discovery stay entered on October 15, 2018 (Dkt. No. 168), and **ORDERS** that the Banks have twenty-eight (28) calendar days from the date of this order to comply with the Subpoenas.  The deadline for compliance is hereby set as Monday, December 17, 2018.

Finally, this Court will simultaneously enter an order referring any subsequent discovery disputes to the Magistrate Judge.

## II.    Legal Standard

Upon objection to a magistrate judge's order on a non-dispositive matter, the district court may modify or set aside any portion of the order which it finds to be clearly erroneous or contrary to law.  Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A).  The district court does not conduct a *de novo* review of a non-dispositive order; rather, it applies a deferential standard under which the moving party must show that the magistrate judge order is "clearly erroneous or

contrary to law." Fed. R. Civ. P. 72(a); see *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990). However, a magistrate judge's recommendation on a dispositive action must be reviewed by the district court *de novo* in the face of an objection. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1).

The Banks urge this Court to review the Magistrate Judge's order *de novo* because the "effect of the ruling is dispositive on the Banks." (Banks Obj. at 4; *see also* ABC Obj. at 8–9.) In response, the Assignee argues that the motion is non-dispositive as to the underlying cause of action and should therefore be reviewed under Rule 72(a)'s "clearly erroneous or contrary to law" standard. (Next Opp. at 9.)

The list of dispositive motions at 28 U.S.C. § 636(b)(1)(A) is not exhaustive. *Williams v. Beemiller, Inc.*, 527 F.3d 259, 265 (2d Cir. 2008). However, the Second Circuit has ruled that motions to compel or quash subpoenas are properly classified as non-dispositive, even when the subpoena seeks information from a nonparty. "A motion to quash a subpoena in an action seeking relief other than production of the subpoenaed information is not normally a dispositive motion." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 116 (2d Cir. 2010); *see also JPMorgan Chase Bank, N.A. v. Reifler*, No. 11-cv-4016, 2016 WL 10570981, at *2 (S.D.N.Y. July 14, 2016) (motion to quash subpoena of bank records on privacy grounds during judgment enforcement proceedings was non-dispositive); *Peterson v. Katonah Lewisboro Sch. Dist.*, No. 13-cv-51, 2014 WL 3891253, at *1 (S.D.N.Y. June 27, 2014) (motion to compel nonparty subpoenas was non-dispositive); *Allen v. Devine*, No. 09-cv-668, 2011 WL 505007, at *2 (E.D.N.Y. Feb. 9, 2011) (same).

The cases cited by the Banks are distinguishable, as the very causes of actions in those cases sought relief in the form of the production of the subpoenaed information. For example, in

*NLRB v. Frazier*, the Third Circuit held that a proceeding to enforce a subpoena *ad testificandum* brought pursuant to a specific provision of the National Labor Relations Act, 29 U.S.C. § 161, was a separate proceeding.  966 F.2d 812, 817 (3d Cir. 1992).  Accordingly, the Third Circuit found that when the magistrate judge denied the National Labor Relations Board's motion to enforce the subpoena, the district judge should have reviewed that order *de novo*.  *Id.*  As that case acknowledged, "While a motion to enforce a subpoena arising in a civil action would be a routine matter which a magistrate judge could dispose of as a non-dispositive motion, the Board's enforcement proceeding was not part of a larger case before the court."  *Id.*  The other case cited by the Banks likewise involves a separate civil action to enforce an administrative subpoena.  *EEOC v. Sterling Jewelers Inc.*, No. 11-mc-28, 2011 WL 5282622, at *1 (W.D.N.Y. Nov. 2, 2011).  In that case, the magistrate judge elected *sua sponte* to treat the EEOC's administrative subpoena as dispositive and to style his opinion as a report and recommendation. *Id.* at *1 n.2.

This Court therefore reviews the Magistrate Judge's order under the "clearly erroneous or contrary to law" standard under Rule 72(a).  An order is "clearly erroneous" when the entire evidence leaves the district court "with the definite and firm conviction that a mistake has been committed."  *FDIC v. Providence Coll.*, 115 F.3d 136, 140 (2d Cir. 1997) (quoting *United States v. U.S. Gypsum Co.*, 333. U.S. 364, 395 (1948); *see also LaVigna v. State Farm. Mut. Auto. Ins. Co.*, 736 F. Supp. 2d 504, 509–10 (N.D.N.Y. 2010) (district court will generally defer to magistrate judge and overrule only if discretion is clearly abused).  An order is "contrary to law" when it "fails to apply or misapplies relevant statutes, case law or rules of procedure." *Thompson v. Keane*, No. 95-cv-2442, 1996 WL 229887, at *1 (S.D.N.Y. May 6, 1996).  A

magistrate judge's resolution of discovery disputes deserves substantial deference. *Thompson*, 1996 WL 229887, at *1.

Finally, courts in this circuit generally follow the rule that a district court reviewing an appeal of a non-dispositive motion from a magistrate judge may not look beyond the factual record presented to the magistrate judge. *See, e.g., Thai Lao Lignite (Thai.) Co. v. Laos*, 924 F. Supp. 2d 508, 511 (S.D.N.Y. 2013) ("Rule 72(a) precludes the district court from considering factual evidence that was not presented to the magistrate judge."). *Thai Lao Lignite* relied on a Third Circuit case, *Haines v. Liggett Group*, which reviewed the legislative history of the Federal Magistrates Act to conclude that, "[b]y statute, the district court was not allocated the competence to do more than perform the clearly erroneous review function" for non-dispositive motions. 975 F.2d 81, 93 (3d Cir. 1992). In addition, courts in this circuit "generally do not entertain new legal arguments not presented to the magistrate judge." *Anderson v. Phoenix Beverage Inc.*, No. 12-cv-1055, 2015 WL 737102, at *3 (E.D.N.Y. Feb. 20, 2015) (collecting cases).

## III.    Discussion

The Banks object to two aspects of the Magistrate Judge's order. All six Banks argue first that the Magistrate Judge failed to give proper consideration to key facts that would support quashing the subpoenas in favor of proceeding with discovery under the Hague Evidence Convention, as a matter of comity. ABC writes separately to argue that the Subpoenas in this case are akin to so-called *Bank of Nova Scotia* subpoenas, the use of which is disfavored by the U.S. Department of Justice in the international criminal context (which, of course, this case is

not). Because the magistrate court's findings on this issue were not clearly erroneous, the Objections are denied.

The Banks also argue that the Magistrate Judge wrongly concluded that New York law provided for the exercise of personal jurisdiction over the Banks based on their maintenance and use of correspondent and settlement accounts at New York banks. Separately, ABC objects to the finding of personal jurisdiction on the basis that its contacts with New York were insufficient. Since the Magistrate Judge's findings on these issues are neither clearly erroneous nor contrary to law, this objection is also denied.

## A.    Personal Jurisdiction

"A district court must have personal jurisdiction over a nonparty to compel it to comply with a Rule 45 subpoena." *Gucci Am., Inc. v. Li*, 135 F. Supp. 3d 87, 93 (S.D.N.Y. 2015) ("*Gucci III*"). Exercise of personal jurisdiction requires proper service, which is not contested here, as well as statutory authorization and comportment with the Due Process Clause. *Id.*

As is relevant to this case, New York's long-arm statute provides for personal jurisdiction over a person not domiciled in the state "[a]s to a cause of action arising from . . . transact[ing] any business within this state." N.Y. C.P.L.R. § 302(a)(1). Corresponding to its statutory language, New York's statute has two requirements: that the party "(1) transacted business within the state; and (2) the claim asserted arises from that business activity." *Licci by Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 209 (2d Cir. 2016) ("*Licci V*"). The Second Circuit has observed favorably that "[a]t least one circuit has translated this test to nonparty discovery requests by focusing on the connection between the nonparty's contacts with the forum and the discovery order at issue." *Gucci Am., Inc. v. Li*, 768 F.3d 122, 141 (2d Cir. 2014) ("*Gucci 2d Cir.*") (citing *Application to Enforce Admin. Subpoenas Duces Tecum of the S.E.C. v.*

*Knowles*, 87 F.3d 413, 418 (10th Cir. 1996)).  Under New York law, the connection between the in-state activity and the subject of the subpoena must be "an articulable nexus or substantial relationship," but a causal relationship is not required.  *Gucci III*, 135 F. Supp. 3d at 93.

The Due Process Clause requires that the nonparty have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)).  This Court agrees with the Banks that "the two-part inquiry under N.Y. C.P.L.R. § 302(a)(1) and the minimum contacts analysis under the Due Process Clause are largely identical."  (Banks Obj. at 13 n.14.)

The Banks' briefs are addressed to discrete findings and conclusions within the Magistrate Judge's order, each of which is considered below.

### 1.        Correspondent Accounts

The Banks argue that it was contrary to law for the Magistrate Judge to find that their establishment and maintenance of correspondent accounts at New York banks could give rise to specific jurisdiction under N.Y. C.P.L.R. § 302(a)(1).  (Banks Obj. at 13.)  Notably, the Banks— with the exception of ABC—do not contend that even if, as a matter of law, correspondent accounts can suffice to create the requisite nexus, the Magistrate Judge's factual findings about the quality and quantity of correspondent accounts was clearly erroneous.  Therefore, this Court addresses only the Banks' "contrary to law" argument.

In the Banks' view, a non-domiciliary bank cannot be subject to specific personal jurisdiction in New York unless it *directs* the particular transactions at issue through the New York banks at which it maintains its correspondent accounts.  (*Id.*)  The Banks acknowledge that this finding would require the Court to disagree with the outcome in *Gucci III*, in which Judge Sullivan found that the district court had specific personal jurisdiction over a nonparty bank for

purposes of a Rule 45 subpoena under circumstances very similar to the instant case. (*Id.* at 17.) In the Banks' view, the exercise of personal jurisdiction in *Gucci III* was inappropriate because there was "no indication" that the bank in that case "engaged in affirmative conduct to initiate wire payments or that it knowingly assisted in any illegal scheme through the use of its correspondent accounts." (*Id.*)

This Court agrees with the Assignee that the Magistrate Judge's reliance on the Banks' use of correspondent accounts to find specific personal jurisdiction was neither clearly erroneous nor contrary to law. In spite of the Banks' arguments, New York's long-arm statute clearly does not require, as a condition precedent to personal jurisdiction, that foreign banks direct the payment of funds into their correspondent accounts.

In her order, the Magistrate Judge found that "[i]n determining whether the use of a correspondent account by a foreign bank is sufficiently purposeful to constitute a transaction of business within the state, . . . . the relevant distinction is between 'unintended and unapproved use of a correspondent bank account, where the non-domiciliary bank is a passive and unilateral recipient' and 'repeated, deliberate use that is approved by the foreign bank on behalf and for the benefit of a customer.'" *Nike*, 2018 WL 4907596, at *6 (quoting *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 326–27 (2016)).

Indeed, as the New York Court of Appeals has recognized:

> In the banking context, the requisite inquiry under CPLR 302(a)(1)'s first prong may be complicated by the nature of inter-bank activity, especially given the widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States. As a result, determining in an individual case whether a foreign bank's maintenance and use of a correspondent account is purposeful or coincidental may often prove . . . difficult[.] Nonetheless, complaints alleging a foreign bank's repeated use of a correspondent account in New York on

> behalf of a client—in effect, a "course of dealing"—show
> purposeful availment of New York's dependable and transparent
> banking system, the dollar as a stable and fungible currency, and the
> predictable jurisdictional and commercial law of New York and the
> United States.[2]

*Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327, 338–39, (2012) ("*Licci III*") (internal

citations omitted). The Court of Appeals later expanded upon this test in *Rushaid*, finding that

the *Licci III* court had "not reason[ed] . . . that personal jurisdiction arising from the use of a

correspondent bank account in New York must also be accompanied by additional activities in

the state." *Rushaid*, 28 N.Y.3d at 325. Instead, it found, the *Licci III* court had "concluded that

the repeated use by LCB [the nondomiciliary bank] of the correspondent account showed a

transaction of business where LCB deliberately used a New York account again and again and

presumably LCB used this New York account because it was cheaper and easier for LCB than

other options." *Id.* at 326 (internal quotations omitted). "Thus, even though LCB could have

routed the dollar transactions on behalf of [its customer] elsewhere, the fact that LCB used a

New York account dozens of times indicates desirability and a lack of coincidence." *Id.* (internal

quotations omitted). The Court of Appeals distilled the test as follows: "the quantity and quality

of a foreign bank's contacts with the correspondent bank must demonstrate more than banking

by happenstance." *Id.* at 327.

The *Rushaid* court applied the law from *Licci III* to hold that a New York court had

personal jurisdiction over a Swiss bank based on its use of a correspondent account in New York

because the Swiss bank: (1) had marketed business relations with New York on its website; (2)

had credited the funds held in the New York correspondent account to its client in Switzerland;

---

[2]      (*Accord.* Decl. of Robert Almanas, dated Apr. 27, 2018 ("Almanas Decl."), Dkt. No. 112 ¶ 34 ("Many large global financial banks . . . still use correspondent banking services provided by U.S. financial institutions in New York to access financial services offered by correspondent banks and the economies of scale achieved by correspondent banks clearing and settling of USD transactions.").)

and (3) had engaged in twelve of these transactions on behalf of the same client, eventually totaling millions of dollars. *Id.* at 325–26.  Responding to the Swiss bank's arguments that it had not *directed* the particular wire transfers at issue, the *Rushaid* court stated, "Our cases do not require that the foreign bank itself direct the deposits, only that the bank affirmatively act on them." *Id.* at 328 (describing how, in *Licci III*, the bank's customer—and not the bank itself—directed the transfers through the bank's correspondent account in New York).

　*Gucci III*, which was decided before *Rushaid*, is also persuasive.  In *Gucci III*, Judge Sullivan correctly understood the Court of Appeals' holding in *Licci III* as not limiting the exercise of personal jurisdiction to cases in which the banks made illegal payments "knowingly" or "in complicity" with counterfeiters that utilized their banking services.  135 F. Supp. 3d at 95. Instead, it was sufficient that the foreign bank "encouraged its clients to rely on its relationships with Chase so that they could effectuate frequent wire transfers from the United States to China, which is exactly what Defendants did." *Id.*

　New York law is clear:  a bank need not "direct" that a customer use its correspondent account in order to be subject to personal jurisdiction in New York, as long as the establishment and maintenance of the account evinces a purposeful availment of New York as a place for conducting business.  Accordingly, the Magistrate Judge found that "four Banks . . . ha[d] demonstrably used their New York-based correspondent accounts to facilitate U.S. dollar wire transfers abroad for Judgment Debtors," and that these Banks had collectively done so on hundreds of occasions to the tune of millions of dollars. *Nike*, 2018 WL 4907596, at *6–7. Thus, it was not contrary to law for the Magistrate Judge to conclude that the Banks' establishment and maintenance of correspondent accounts was sufficient to support the exercise of personal jurisdiction over the Banks for purposes of the Subpoenas.  Nor was it error for the

Magistrate Judge to rely on *Gucci III*, which applied the test from *Licci III* to very similar facts to find that the exercise of personal jurisdiction was appropriate.

### 2. Settlement Accounts

The Banks next argue that the Magistrate Judge erred by considering BOC and BOCOM's acquiring bank activities as a basis for specific jurisdiction. (Banks Obj. at 18.) The Banks argue that: (i) the acquiring bank services offered by BOC and BOCOM were limited to merchants in China; (ii) the establishment and maintenance of settlement accounts in New York does not constitute "purposeful availment" for purposes of personal jurisdiction; and (iii) reliance on *Gucci America, Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228 (S.D.N.Y. 2010) ("*Frontline*"), was improper because, unlike in that case, the Banks did not target their services towards counterfeiters. (*Id.* at 18–21.)

ABC joins these arguments and argues that, in addition:  (1) prior to entry of the Judgment, its transactions through settlement accounts in New York on behalf of the Judgment Debtors were *de minimis*; and, (2) subsequent to the Judgment, the transactions that took place through settlement accounts were neither relevant to the Subpoenas nor conducted on behalf of a Judgment Debtor. (ABC Obj. at 7.)

Briefly, an acquiring bank contracts with a merchant to process purchases by its customers that take place through a payment card network (*e.g.*, Visa or MasterCard). *Nike*, 2018 WL 4907596, at *7; (*see also* Almanas Decl. ¶ 21 ("an acquiring bank is the merchant's 'gateway' into the Visa or MasterCard interchange network")). The customers' banks, called "issuing banks," must regularly clear and settle these transactions with the acquiring bank. The interbank clearing and settlement process is conducted through the payment card network, which acts as a clearinghouse, and is facilitated through the use of "settlement accounts" at the issuing and acquiring banks.

Contrary to the Banks' assertions, the Magistrate Judge did not base her finding of personal jurisdiction on the Banks' "acquiring bank activities," which undisputedly take place entirely within China.  Instead, based on the Banks' own descriptions, the Magistrate Judge reasoned that "New York-based settlement accounts function analogously to the way in which correspondent accounts function for the purpose of wire transfers." *Nike*, 2018 WL 4907596, at *8.  Thus, the Magistrate Judge found that although courts in this circuit had not specifically addressed whether the use of such accounts could ever establish personal jurisdiction, the analysis "should be essentially the same." *Id.*  This was not error.

Indeed, this Court agrees with the Assignee that applying New York's decisional law on correspondent accounts to the settlement accounts at issue in this case was a "reasonable extension of the law." (*See* Next Opp. at 20.)  The Banks protest that, "[i]mportantly, no authority in this district, or in any other jurisdiction, holds that an acquiring bank may be subject to personal jurisdiction solely due to the presence of a settlement account in that forum[,] and the Magistrate Judge's unprecedented conclusion on this matter is contrary to law and should be set aside." (Banks Obj. at 20.)  This is a bit of a red herring.  Although the Banks would have me believe otherwise, "correspondent accounts" and "settlement accounts" do not appear to be entirely distinct creatures:  both are essentially checking accounts for other banks, and both are used to support interbank transactions, particularly those involving multiple currencies.  The Assignee, for example, produced evidence demonstrating that the Banks' relevant "settlement accounts" were no more than intermediary accounts that the Banks had established at various New York banks. *Nike*, 2018 WL 4907596, at *8.  Indeed, I suspect that a correspondent account at a New York bank could well serve as a foreign bank's "settlement account" for a payment card network.

As a result, it was not contrary to law for the Magistrate Judge to reason from first principles and find that the exercise of personal jurisdiction was appropriate. When evaluating personal jurisdiction based on correspondent accounts, the New York Court of Appeals has said that the key question is whether a bank's establishment and maintenance of correspondent accounts constitutes purposeful availment of the privilege of conducting business in New York. Here, the Banks themselves admitted that they "maintain [settlement] accounts in New York to facilitate more efficient settlement processes with other banks, whose settlement accounts are also in New York." (Banks Obj. at 20.) This indicates purposeful availment.

The Court of Appeals has also said that the quantity and quality of transactions through bank accounts can support a finding of personal jurisdiction. Here, the Magistrate Judge relied on evidence introduced by the Assignee that three of the Banks—ABC, BOCOM, and BOC—had "repeatedly and deliberately used their New York-based settlement accounts to process international credit card transactions on behalf of their customers, including some of the Judgment Debtors in this action." *Nike*, 2018 WL 4907596, at *8. In light of this evidence, her conclusion that the Banks had purposefully availed themselves of the privilege of conducting business here is anything but clear error.

In addition, if "more efficient settlement processes with *other banks, whose settlement accounts are also in New York*," (Banks Obj. at 20) (emphasis added), refers to issuing banks based in New York, the Chinese Banks' establishment of settlement accounts in New York would almost certainly facilitate "the purchase of counterfeit products" in either New York," *Nike*, 2018 WL 4907596, at *8, or in China by persons with New York bank-issued credit cards (*e.g.*, tourists, expats, or exchange students). That just strengthens an already adequate demonstration of personal jurisdiction.

14

It was also not error for the Magistrate Judge to rely on *Frontline* for the proposition that directing business into the state supports the "transacting business" portion of New York's long-arm statute. The Banks attempt to distinguish that case by pointing out that, here, the Plaintiffs did not plead a tort or trademark infringement claim against the Banks. (Banks Obj. at 20–21.) However, the fact that the bank in *Frontline* "direct[ed] business into the state" was not relevant to that court's long-arm statutory jurisdiction analysis, which was based on tortious acts that took place in the state. *Frontline*, 721 F. Supp. 2d at 241. Instead, the *Frontline* court considered the fact that the defendants' conduct had "actually allowed for the purchase of counterfeit products in the New York market" as part of the "minimum contacts" prong of its constitutional analysis. *Id.* at 245. The Banks themselves have characterized the minimum contacts analysis under the Due Process Clause as "largely identical" to the statutory analysis under N.Y. C.P.L.R. § 302(a)(1). (*Id.* at 13 n.14.) Therefore, the Magistrate Judge's reliance on *Frontline* was not contrary to law.

As to ABC's separate concerns: the Magistrate Judge did not err in finding specific personal jurisdiction over ABC based on the fact that it "repeatedly and deliberately" used a Visa settlement account at JPMorgan Chase Bank to process 458 transactions for one of the Judgment Debtors—"ALI*WWW.ALVABABY.COM"—between January and June of 2016. *Nike*, 2018 WL 4907596, at *8; (*see also* Suppl. Decl. of Alexandra Grossbaum, dated May 25, 2018, Dkt. No. 125 ("Suppl. Grossbaum Decl.") Ex. 16).[3] ABC argues that these "sales cannot provide a jurisdictional hook" for the Subpoenas "because the money generated by those sales would be entirely unrelated to the funds that Next is seeking to collect under the Judgment." (ABC Obj. at

---

[3]     Because the Court concludes that these transactions are sufficient, this opinion does not address whether the Magistrate Judge erred in considering the two 2013 transactions, initiated by Plaintiffs, as part of the personal jurisdiction analysis. (*See* ABC Obj. at 16–17.)

12.)  However, the key question is whether the transactions, which took place through ABC's

New York-based settlement account, are related to the discovery order, which seeks information

related to the assets of the Judgment Debtors.  (*See, e.g.*, Decl. of Jacqueline L. Chung, dated

Feb. 14, 2018, Dkt. No. 72 Ex. 11 at 3.)  They unquestionably do.  ABC's argument that "ABC's

settlement account in New York is merely an incidental consequence of fulfilling a foreign

contract with Visa in Singapore," such that it does not constitute purposeful availment, (ABC

Obj. at 16), is also unavailing.  ABC points the Court to its 2009 Client Service and Trademark

License Agreement with Visa Worldwide, attached as one of the Assignee's exhibits, which

contains no mention of settlement accounts, let alone a requirement that ABC establish one in

New York.  (Suppl. Grossbaum Decl. Ex. 14.)

     ABC also argues that (1) "www.alvababy.com," a website, is not a Judgment Debtor and,

(2) in the alternative, even if the merchant name on the 2013 transactions,

"WWW.ALVABABY.COM BEIJING," is a Judgment Debtor, this merchant is not necessarily

the same as the merchant listed on the 2016 transactions, "ALI*WWW.ALVABABY.COM."

(ABC Obj. at 12–13.)  Because the 2016 transactions provide the strongest jurisdictional hook,

and because it is not clear that the 2016 transactions relate to a Judgment Debtor, ABC argues

that there is no personal jurisdiction.  (*Id.*)

     But, the Assignee is correct that "www.alvababy.com" refers, not to an infringing

website, but instead to the name of one of the Judgment Debtors, "WWW.ALVABABY.COM

BEIJING," which has a registered website "www.nfljerseywebsite.com," through which

infringing activities occurred.  In the Court's final order, dated October 20, 2017, "Judgment

Debtors" are defined as "all Defendants set forth in the Exhibits to the [August 20, 2015]

Judgment."  (Dkt. No. 62 at 1.)  Exhibit 1 to the Judgment lists "WWW.ALVABABY.COM

BEIJING" as the name of the Judgment Debtor operating at the domain www.nfljerseywebsite.com. (Dkt. No. 37 Ex. 1 (row 1273).)

Second, the Magistrate Judge did not clearly err in relying on a sample cross-check and the sworn declaration of one of the Assignee's lawyers, Alexandra Grossbaum, to find that an adequate connection had been shown between the Judgment Debtors and the Banks. *Nike*, 2018 WL 4907596, at *7 n.10. Although the names of the merchants in Exhibit 1 to the Judgment and in the records produced by Visa are slightly different, it was not error to assume that Visa had produced records that were responsive to the Assignee's March 5, 2018 subpoena. (*See* Suppl. Grossbaum Decl. Ex. 17.) The Assignee allegedly supplied the Merchant IDs to Visa for purposes of its search, from which Visa returned the relevant transaction information, including the 458 transactions that occurred in 2016. (Dkt. No. 146 at 1.)

### 3.    Advertising

The Magistrate Judge found, as part of both the statutory and constitutional personal jurisdiction analysis, that "all of the Banks have made statements promoting their settlement services, and their service (provided through correspondent accounts) of providing U.S. dollar wire transfers to and from China for customers like the Judgment Debtors in this action." *Nike*, 2018 WL 4907596, at *8. The Banks argue that this was error, because "the marketing materials cited by the Magistrate Judge do not advertise the wire transfer services that the Judgement Debtors [*sic*] utilized, but rather, promote services of the Banks' New York branches, which are not involved in the present dispute." (Banks Obj. at 21.)

As a preliminary matter, the Banks concede that BOC-New York branch "produced certain U.S. dollar wire transfer records associated with the Judgment Debtors." (*Id.* at 22 n.26.) Therefore, I do not consider BOC for purposes of this analysis, because its branch *was* involved in the present dispute.

17

It is true that the Banks maintain branches in New York and that, apart from BOC, the Assignee has shown no connection between the present dispute and these branches.  It is also true that some of the sources cited by the Magistrate Judge focus on branch banking services rather than, for example, the ability to wire money from the U.S. to China through correspondent banking or the global reach of its acquiring bank services.  For example, ABC's webpage discusses the dollar clearing business of its New York branch, and even says that this business will "reduce dependence on correspondent path to enhance the creation of business value." (Decl. of Robert L. Weigel, dated March 16, 2018, Dkt. No. 84 ("Weigel Decl.") Ex. 18.)  It does not mention anything about supporting cross-border payment card transactions, the only jurisdictional link to the Judgment Debtors.  (*Id.*)  Similarly, the spare BOCOM webpage advertises USD clearing services as part of the "Specialty Services" offered by its New York branch but does not say anything about payment cards.  (Weigel Decl. Ex. 46.)  Certain Banks' pages do relate to their in-state, suit-specific activities.  For example, the CMB webpage states that the bank "[m]aintain[s] long-term and close cooperative relationship with domestic institutions."  (Weigel Decl. Ex. 70.)  CCB's page, too, says that "[c]ontinuously increasing correspondent banks enables a good book transfer rate."  (Weigel Decl. Ex. 93.)  ICBC's states that "[t]he correspondent banking relationships maintained with the peers in 21 countries/regions lays a solid customer base for the Branch to achieve continual growth in USD clearing services." (Weigel Decl. Ex. 116.)

Because the webpages of CMB, CCB, and ICBC advertise the broader network of relationships with New York institutions that support the Banks' dollar clearing business—*i.e.*, the correspondent banking services that are the subject of the Subpoenas—it was proper to find specific jurisdiction arising out of this in-state activity.

However, for ABC and BOCOM, it was error to find that advertising their branch banking (and, to a very limited extent, dollar-clearing) activity was connected to the information requested in the Subpoenas. Personal jurisdiction was not asserted over ABC and BOCOM on the basis of its correspondent accounts; instead, it was based on its settlement accounts. (*See* ABC Obj. at 18.) The exhibits cited by the Magistrate Judge do not mention the reach of either Bank's acquiring banking services or the ability to reach payment card customers in the U.S.

Nonetheless, I find that this error was ultimately harmless, as these exhibits were only a small portion of the Magistrate Judge's personal jurisdiction analysis, the bulk of which was grounded in the Banks' establishment and repeated use of correspondent and/or settlement accounts in New York. *See Nike*, 2018 WL 4907596, at *9 ("No single factor concerning the first prong of CPLR § 302(a)(1) is dispositive.").

### 4.     Real Estate Holdings

The Banks make a similar argument that the Banks' real estate holdings have "no relationship to the underlying dispute" because the real estate holdings "primarily relate to the Banks' New York branch operations." (Banks Obj. at 22.) Branch banking is not always connected to correspondent banking. A head office may elect to use its branch for correspondent banking, but it may also elect to use third-party banks. Ultimately, it is a business decision. Likewise, the Court is not aware of—and the parties have not briefed—the connection between branch banking and interbank settlement of payment card transactions, even where the issuing bank and branch bank are in the same country. Therefore, it was error to consider the Banks' branch banking activities as a basis for personal jurisdiction (with the exception of BOC).

Again, however, this error of elision was harmless. The Magistrate Judge did not ground her personal jurisdiction analysis in the Banks' real estate holdings; "[r]ather, it is the Banks' repeated use of New York-based correspondent and/or settlement accounts that satisfies the

19

requirement that there be an 'articulable nexus' between the nonparties' contacts with the forum and the discovery order at issue." *Nike*, 2018 WL 4907596, at *9 (quoting *Licci III*, 20 N.Y.3d at 339).

### 5.    "Fair Play and Substantial Justice"

Finally, the Banks argue that the Magistrate Judge clearly erred in determining that the exercise of personal jurisdiction for purposes of the subpoenas would comport with "fair play and substantial justice." (*See* Banks Obj. at 22.)  This is sometimes called the "reasonableness" prong.

Courts evaluate five factors to determine if this prong of the Due Process analysis is satisfied:  "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).

Principally, the Banks take issue with the fifth factor, arguing that the Magistrate Judge failed to consider that her decision would be "disastrous for the New York banking industry." (Banks Obj. at 23.)  For this proposition, they cite *Shipping Corporation of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir. 2009).  *Shipping Corporation of India* was a maritime case that overturned a controversial Second Circuit decision, *Winter Storm Shipping Ltd. v. TPI*, which had held that electronic fund transfers (EFTs) that passed through intermediary banks in the Southern District of New York could be subject to Rule B attachment in admiralty.  310 F.3d 263, 278 (2d Cir. 2002).  In *Shipping Corporation of India*, the Second Circuit acknowledged that "[t]he unforeseen consequences of *Winter Storm* have been significant."  585 F.3d at 62.  In

particular, *amici curiae* had informed the court that, in the prior year, maritime attachment suits constituted 33% of all lawsuits filed in the Southern District, and New York banks had been forced to hire additional staff to cope with the increased volume of EFT-related writs. *Id.* Permitting the attachment of EFTs at intermediary banks had also "introduced uncertainty into the international funds transfer process." *Id.* (internal quotation omitted).

The Magistrate Judge did not clearly err, however, in failing to give this slippery slope argument much weight. First, the Banks' argument is purely speculative. The New York Court of Appeals announced the rule in *Licci III* in 2012. The Banks have failed to demonstrate how this rule has been "disastrous" for the banking industry in the intervening six years, except that they have submitted, along with their objections, a complete version of *The Bank Directory: Worldwide Correspondents* (2018). (*See* Decl. of Jacqueline L. Chung, dated Oct. 10, 2018, Dkt. No. 164 ¶ 6.) This impressive-looking volume, which clocks in in at just over 1500 pages, the Banks maintain, is "necessary [in order] for the Court to have a complete understanding of the number of non-U.S. banks maintaining correspondent accounts in New York in order to assess the reasonableness of exercising personal jurisdiction over non-U.S. banks that maintain such accounts in New York." (*Id.* ¶ 5.) As the saying goes, "if the law and the facts are against you, pound the table"—here, apparently, by dropping a 5-lb. book on it.

The Banks also inflate the policy implications of the Magistrate Judge's order by misconstruing its reasoning. According to the Banks, "[u]nder the standards for specific jurisdiction adopted by the Magistrate Judge, a plaintiff would simply be required to a wire payment [*sic*] connected with a particular defendant or judgment debtor was routed through one of the[] 9122" correspondent accounts that foreign banks maintain in New York. (Banks Obj. at 24 n.28.) As discussed in preceding sections, this is an incorrect statement of the rule. In fact,

the parade of horribles imagined by the Banks is precisely the fact pattern from *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 46 N.Y.2d 855, 856 (1979), a case in which the Court of Appeals determined that the routing of a single transaction through a New York correspondent account held by a Maine-based bank was not enough to confer personal jurisdiction. This finding was later affirmed by the Court of Appeals in *Licci III*, which used *Amigo Foods* to demarcate when the exercise of personal jurisdiction based on the maintenance of correspondent accounts was appropriate. *Licci III*, 20 N.Y.3d at 338–39.

In the instant case, by contrast, the Magistrate Judge made detailed findings that the Banks' use of correspondent accounts to support hundreds of transactions for millions of dollars in the aggregate was "repeated [and] deliberate" rather than "unintended and unapproved." *Nike*, 2018 WL 4907596, at *6.

 The Banks also argue that it was clear error to evaluate the burden to the Banks in the portion of the opinion that discusses comity, rather than as part of the personal jurisdiction analysis. (Banks Obj. at 24.) According to the Banks, their burden consists of being "forc[ed] to violate the laws of their home country." (*Id.*)

However, the Due Process burden analysis relates to the burden of "submitting to jurisdiction in New York." *Gucci III*, 135 F. Supp. 3d at 99. Bank secrecy laws have nothing to do with this factor, which requires the court to consider, among other things, whether the party is familiar with the forum or would need to travel a long distance in order to participate in the litigation. *Id.* at 99–100.

*Leibovitch v. Islamic Republic of Iran*, cited by the Banks, does not stand for the proposition that violation of bank secrecy laws is properly considered as part of the "burden" framework; instead, the *Leibovitch* court appeared to weigh this as part of the "interests of other

22

sovereigns" factor.  188 F. Supp. 3d 374, 755 (N.D. Ill. 2016), *aff'd*, 852 F.3d 687 (7th Cir.

2017).  Here, the Magistrate Judge adequately weighed the Chinese bank secrecy laws as part of

her comity analysis.  Like the *Gucci III* court, the Magistrate Judge declined to consider violation

of bank secrecy laws as part of the Due Process reasonableness framework; this was not clear

error.

      The Banks' other argument also fail.  (Banks Obj. at 25.)  The Magistrate Judge was self-

evidently not required to consider China's bank secrecy laws in analyzing *the Assignee's* "interest

in obtaining convenient and effective relief."  This factor has nothing to do with defendants'—or,

in this case, nonparty Banks'—interests.  In fact, repeated stonewalling by a party may contribute

to the court's finding that the exercise of personal jurisdiction is the only way for the plaintiff to

obtain any effective relief for a clear violation of its rights.  *See, e.g., Mario Valente Collezioni,*

*Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 174 F. Supp. 2d 170, 176 (S.D.N.Y. 2001).

      Finally, contrary to what the Banks state in their papers, the Magistrate Judge did in fact

"explain why the forum's interests in combating counterfeiting and enforcing the Lanham Act

justify the expenditure of judicial resources." (Banks Obj. at 25)  In fact, she balanced this factor

against the burden claimed by the Banks.  If the Banks failed to brief this issue adequately below,

focusing only on the breadth of the Subpoenas and the violation of bank secrecy laws, and

neglecting to include facts such as the location of key documents, actors, and assets, they cannot

now claim that Judge Freeman committed clear error.  The Magistrate Judge properly found that

"the Banks ha[d] failed to meet their burden to demonstrate that exercising jurisdiction over them

would be unreasonable." *Nike*, 2018 WL 4907596, at *12.

For the aforementioned reasons, the Magistrate Judge's determination that the Banks were subject to personal jurisdiction in the Southern District of New York was neither clearly erroneous nor contrary to law.

### B.     Comity and the Hague Convention

The Banks do not dispute that "even where personal jurisdiction over a foreign non-domiciliary is established, a court should not uphold an international subpoena in possible contravention of foreign law, without first performing a comity analysis pursuant to Section 442 of the Restatement (Third) of Foreign Relations Law." *Nike*, 2018 WL 4907596, at *14. However, they argue that "it was error for the Magistrate Judge to order compliance with the Subpoenas without first giving the Banks an opportunity to produce the requested information under the Hague Convention." (Banks Obj. at 2.)  The Banks claim this puts them in an "impossible position," and that the Magistrate Judge's order creates "dire consequences at either end of this dilemma." (*Id.* at 1.)

At the outset, this Court notes that the U.S. Supreme Court has "decline[d] to hold as a blanket matter that comity requires resort to Hague Evidence Convention procedures without prior scrutiny in each case of the particular facts, sovereign interests, and likelihood that resort to those procedures will prove effective." *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for Southern Dist. of Iowa*, 482 U.S. 522, 544 (1987).

This Court also notes that China's bank secrecy laws are not a "get out of jail free" card. *See Linde v. Arab Bank, PLC*, 706 F.3d 92, 114 (2d Cir. 2013) (collecting cases in which discovery orders issued despite foreign bank secrecy laws).  "The Supreme Court long ago recognized the difficulties faced by parties for whom compliance with a U.S. discovery order would violate foreign law." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 109 (2d Cir. 2013) (citing

*Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357

U.S. 197, 211 (1958)). "Operation of foreign law 'do[es] not deprive an American court of the

power to order a party subject to its jurisdiction to produce evidence even though the act of

production may violate that [law].'" *Linde*, 706 F.3d at 109 (citing *Aérospatiale*, 482 U.S. at 544

n.29; *Rogers*, 357 U.S. at 204–06). Ultimately, "the District Court possesses wide discretion to

proceed in whatever manner it deems most effective." *Id.*

      When exercising its discretion to enter a discovery order that may violate foreign law, a

district court follows the balancing test set out in *Linde*:

> Section 442 [of the Restatement (Third) of Foreign Relations Law
> of the United States] provides that, in determining whether to issue
> a production order for information located abroad, courts should
> consider [1] "the importance to the investigation or litigation of the
> documents or other information requested; [2] the degree of
> specificity of the request; [3] whether the information originated in
> the United States; [4] the availability of alternative means of
> securing the information; and [5] the extent to which noncompliance
> with the request would undermine important interests of the United
> States, or compliance with the request would undermine important
> interests of the state where the information is located." Restatement
> § 442(1)(c). Cases from our Circuit counsel that, when deciding
> whether to impose sanctions, a district court should also examine the
> [6] hardship of the party facing conflicting legal obligations and [7]
> whether that party has demonstrated good faith in addressing its
> discovery obligations.

706 F.3d at 109–10; *see also Laydon v. Mizuho Bank, Ltd.*, 183 F.Supp.3d 409, 420 (S.D.N.Y.

2016) (numbering factors).

      The Banks take issue with the Magistrate Judge's findings of fact with respect to the

second, fourth, fifth, and sixth factors. These are addressed in turn.

### 1.    Second Factor: Degree of Specificity of the Request

      The Magistrate Judge did not clearly err in finding that the Subpoenas were sufficiently

specific based on her finding that they were modeled after subpoenas found to be sufficiently

specific in the *Gucci* case. *Nike*, 2018 WL 4907596, at \*15 (citing *Gucci Am., Inc. v. Li*, No. 10-cv-4974, 2011 WL 6156936, at \*6 (S.D.N.Y. Aug. 23, 2011) ("*Gucci I*")).  In that case, as in the case at bar, the plaintiffs had connected the counterfeiting activities with certain accounts located at the subpoenaed banks. *Gucci I*, 2011 WL 6156936, at \*6; (*compare* Next Obj. at 34 (describing the Assignee's investigation of Judgment Debtor accounts at the Banks)).

The Banks also claim that the Magistrate Judge erred by failing to consider certain hardships associated with the breadth of the requests.  (Banks Obj. at 11–12.)  They argue that the Assignee had tied only "a handful" of the Judgment Debtors to the Banks; that it is "impossible for the Banks to identify the correct account holder" because many of the Judgment Debtor names are "extremely common Chinese names or partial names;" and that the requests for customer account information based on e-mail addresses and websites are "so broad that the Banks would not even know where to begin."  (*Id.*)  At the same time, however, representatives of the Banks have submitted declarations to this Court describing the internal control measures they have taken with respect to the Judgment Debtors identified in Attachment B to the subpoenas.  (*See, e.g.*, Dkt. No. 157 ¶ 5; Dkt. No. 158 ¶ 5; Dkt. No. 159 ¶ 5; Dkt. No. 160 ¶ 5; Dkt. No. 161 ¶ 5–6.)  These internal control measures include designating certain Judgment Debtor accounts for heightened risk, putting them on the Banks' internal "watch lists," adding them to the Banks' real-time monitoring lists, *etc.*  This rather undermines the Banks' contention that the breadth of the request should weigh against a finding of comity.

The Magistrate Judge did not clearly err in determining that the Subpoenas were sufficiently specific and that this weighed in favor of granting the Assignee's motion to compel.

## 2.    Fourth Factor:  Alternative Means of Securing the Information

Similarly, the Magistrate Judge did not err in disagreeing with the Banks that "given . . .
the Hague Convention provides an alternative to U.S. discovery that avoids the conflicts with
Chinese law that would arise if the Banks were forced to comply with the Subpoenas, there is no
reason not to utilize it." (Banks Obj. at 8.)  Indeed, there are several.  The Magistrate Judge
made specific findings of fact that, "Based on historical precedent regarding the timeline and
adequacy of productions made pursuant to Hague Convention requests to China, the Assignee
has the better argument." *Nike*, 2018 WL 4907596, at *16.  The Magistrate Judge carefully
examined expert declarations and supporting exhibits submitted by both parties, as well as recent
case law, to support her conclusion that proceeding under the Hague Convention would result in
substantially delayed and less than fulsome discovery. *Id.* at 14–16.  In particular, the Assignee
submitted evidence that, in similar cases in which the Hague Convention procedures were used,
banks that were the subject of these requests produced only partial discovery. *Id.* at 16 (citing
Decl. of Donald Clarke, dated March 16, 2018, Dkt. No. 83 at ¶¶ 58–59.)

Contrary to the Bank's Objections, moreover, the Magistrate Judge did not "ignore[] that
the level of assistance offered by the Banks here is without precedent." (Banks Obj. at 6.)
Instead, she simply found that argument unpersuasive. *Nike*, 2018 WL 4907596, at *16.  The
Magistrate Judge found that, far from cooperating, the Banks had represented in a letter to the
Court that they "they would plan to use that request as means to 'narrow the scope of the
currently overbroad subpoenas.'" *Id.* (quoting Letter from David Hille, Dkt. No. 130 at 2).

The Banks also wrongly imply that the Magistrate Judge gave "no weight" to the Banks'
evidence that China's Ministry of Justice ("MOJ") had evinced a greater willingness to comply
with discovery orders.  This evidence was, and remains, thin.  For example, the Banks stress that

China's Ministry of Justice "has written to this Court to confirm that it will 'execute a [Hague Convention request] according to the . . . Convention and Chinese law" and will "take [a Hague Convention request] seriously and offer necessary legal assistance." (Banks Obj. at 7 (quoting Decl. of Jacqueline L. Chung, dated Apr. 27, 2018, Dkt. No. 111 at Ex. 11 ("MOJ Ltr.").)  For the Banks, this demonstrates that "the relevant Chinese authorities . . . continue to display a consistent willingness to cooperate with Assignee on a Hague Convention request." (Banks Obj. at 7.)

This Court is not convinced that this letter demonstrates that the Magistrate Judge clearly erred in her comity analysis.  First, the Chinese version is addressed to "中国农业银行," *i.e.*, ABC, not to the Court, and it simply confirms that the Chinese office will write a letter to the Office of International Judicial Assistance, U.S. Department of Justice, copying Chief Judge Colleen McMahon, to express their aforementioned legal position.  (MOJ Ltr. at 1–2 ("我中心拟以民商事司法协助中方中央机关名义致函美国司法部国际事务办公室并抄送美国纽约南区法院首席法官 Colleen McMahon，表明上述法律立场。").)  This is hardly evidence of a sea change in the MOJ's willingness to cooperate with a Hague Convention request.  Nor is it evidence of the MOJ's interest in supporting the expeditious production of relevant materials in this particular case.  Indeed, it appears to be a form letter.  The Magistrate Judge did not "ignore" this evidence, and she did not clearly err in affording it little weight.

The Banks also point to their own (unprecedented) willingness to cooperate in these discovery requests.  (Banks Obj. at 6–7.)  However, as the Assignee has accurately stated, "it is the MOJ, not the Banks, that executes Hague Convention requests, and 'historical precedent' indicates that any requests submitted to the MOJ will be only 'partly executed.'" (Next Opp. at 29.)

Finally, the Banks argue that the Magistrate Judge "ignore[d] the fact that the speed with which China processes Hague Convention requests *has increased*" in recent years. (Banks Obj. at 7 (emphasis added).)  However, in support of this, the Banks cite to the Declaration of Guo Li, (dated Feb. 14, 2018, Dkt. No. 73), which the Magistrate Judge did, in fact, review as part of her findings. *Nike*, 2018 WL 4907596, at *16.  There was no error, let alone clear error, because the Guo Declaration is not persuasive.  Guo cites data from the 2012 Hague Convention questionnaire, which demonstrates nothing about an increased response rate on the part of China to Hague Convention requests and simply compares the percentage of received requests answered by China and the percentage of received requests answered by the U.S. in the year 2012. (Guo Decl. ¶ 48.)

The Magistrate Judge did not clearly err in determining that resort to the Hague Convention was unlikely to produce the requested materials within a reasonable timeframe and that this fact weighed in favor of the Assignee.

### 3.    Fifth Factor:  National Interests

The Magistrate Judge's analysis of competing national interests was also not clearly erroneous.  The Banks make much hay of the MOJ Letter:  "The very fact that the Ministry of Justice made a submission demonstrates the importance afforded its banking laws by the Chinese government." (Banks Obj. at 10.)  Again, however, the Magistrate Judge was not required to give that form letter substantial weight, particularly where she found that it did not discuss the nature or importance of the law it purported to enforce. *Nike*, 2018 WL 4907596, at *17.  The Magistrate Judge also did not err in affording comparatively greater weight to the U.S.'s interest in enforcing the Lanham Act. *Id.*  On appeal to this Court, the Banks make a confusing argument that the Magistrate Judge failed to appreciate China's national interest in enforcing

*American* intellectual property laws by not ordering discovery pursuant to the Hague Convention. (Banks Obj. at 11.) In support, they cite articles from Reuters and Raconteur[4] on China's great leap forward in IP reform. (*Id.*) However, this evidence may not be considered by this Court in the first instance and, in any event, is more properly directed at the fourth factor of the analysis—the viability of alternative discovery methods.

For the first time on review, ABC raises an additional argument that, in the criminal context, the U.S. Department of Justice "has placed special, important curbs on the ability of prosecutors to issue" subpoenas that would cause the subject to violate its country's laws. (ABC Obj. at 22.) Therefore, ABC argues, "[t]here is no legitimate reason why Next, a private litigant, should be permitted to issue such Subpoenas and circumvent the Hague Convention process when, if the U.S. Department of Justice sought to obtain the same foreign banking records, it almost certainly would not issue subpoenas and would instead elect to proceed through the [mutual legal assistance treaty] process out of respect for foreign law." (*Id.* at 23.)

The Assignee has pointed out that district courts "generally do not entertain new legal arguments not presented to the magistrate judge." (Next Opp. at 11 (quoting *Anderson*, 2015 WL 737102, at *3).) Regardless, ABC's argument fails because it compares apples to oranges. In the instant case, the Assignee does not wish to proceed under the Hague Convention, and the Magistrate Judge has determined that the interests of comity do not require it to do so. That the U.S. Department of Justice has adopted a different policy for purposes of its criminal cases is of no moment here. Moreover, as the Assignee has pointed out, the U.S. government submitted an

---

[4]    The Court has never heard of *Raconteur* but was surprised to find counsel for the Banks listed as a partner on its website. *About Us*, Raconteur, https://www.raconteur.net/about-us (last accessed Nov. 2, 2018) (scroll down to "Brands Who Work With Us"). The author of the *Raconteur* article also features it on her personal webpage as an *editorial*—not an article. http://sharonthiruchelvam.com/filter/Editorial/How-China-became-a-leader-in-intellectual-property-The-Times (last accessed Nov. 2, 2018).

amicus brief to the Second Circuit in *Gucci 2d Cir.* in favor of the plaintiffs' right to proceed

without resort to the Hague Convention.  (Next Opp. at 33 n.27.)  This implies that the

Department distinguishes between its own criminal cases and civil cases pursued by private

parties.

      The Magistrate Judge did not err in finding that this factor weighed in favor of the

Assignee.

      **4.     Sixth Factor:  Hardship to the Banks**

      The Magistrate Judge concluded that "to date, the evidence remains strong for the

conclusion . . .  that meaningful sanctions by the Chinese government against Chinese banks are

highly doubtful."  *Nike*, 2018 WL 4907596, at \*18 (quoting *Wultz v. Bank of China Ltd.*, 910 F.

Supp. 2d 548, 554 (2012).  The Banks do not challenge these factual findings but instead argue

that consideration of the likelihood of sanctions was contrary to law.  (Banks Obj. at 9.)

      According to the Banks, "a New York court should not encroach upon another nation's

sovereignty by requiring citizens to take actions within their home country that would contravene

that country's laws."  (*Id.* (citing *CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd. P'ship*, No.

12-cv-8087, 2013 WL 2661037, at \*18 (S.D.N.Y. June 12, 2013).)  While this is desirable as a

normative principle, the Second Circuit has clearly said that bank secrecy laws are not a bar to

discovery orders.  *Linde*, 706 F.3d at 114 (collecting cases).  On its own, that argument is

unavailing.  Their contention that the Magistrate Judge "essentially disregarded this hardship,"

(Banks Obj. at 9), is further belied by her repeated acknowledgment and treatment of this fact in

the opinion.  For example, "this Court has considered the views expressed in the Chinese

Ministry's letter, and accepts that China has an important national interest in ensuring

compliance with its laws."  *Nike*, 2018 WL 4907596, at \*17 n.15.

Second, the Banks argue that "the law in this district . . . holds that nonparties are not required to demonstrate proof of actual sanctions." (Banks Obj. at 9 (citing *CE Int'l Res.*, 2013 WL 2661037, at *15).) Therefore, they argue, the Magistrate Judge's finding was contrary to law. *CE International Resources* did not hold, however, that considering the likelihood of sanctions is always improper; instead, that case held that nonparties "must show that the possibility of civil and/or criminal punishment is more than speculative." *CE Intern. Res.*, 2013 WL 2661037, at *15. This the Banks failed to do, and the Magistrate Judge found that they had not cited a single case in which penalties had arisen from compliance with a U.S. court's discovery order. *Nike*, 2018 WL 4907596, at *18.

Therefore, the Magistrate Judge's finding that this factor did not weigh in favor of the Banks was neither clearly erroneous nor contrary to law.

IV.    **Conclusion**

For the reasons stated above, the order of the Magistrate Judge denying the Banks' motion to quash the Subpoenas and granting the Assignee's cross-motion to compel is **AFFIRMED**.

This Court also hereby lifts the discovery stay entered on October 15, 2018 (Dkt. No. 168), and **ORDERS** that the Banks have twenty-eight (28) calendar days from today, *i.e.*, by Monday, December 17, 2018, to comply with the Subpoenas.

Finally, this Court will simultaneously enter an order referring any subsequent discovery disputes relating to the Subpoenas to the Magistrate Judge.

Dated: November 19, 2018

_____
Chief Judge

BY ECF TO ALL PARTIES