UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
: 
NIKE, INC. and CONVERSE INC., :
:
                Plaintiffs, :
:
    -against- :  No. 13 Civ. 8012 (CM)(DCF)
:
MARIA WU d/b/a :
WWW.SHOECAPSXYZ.COM, et al., :
:
            Judgment Debtors. :
:
---------------------------------------------------------x

**MEMORANDUM OF LAW (1) IN OPPOSITION TO THE MOVING BANKS' MOTION FOR REIMBURSEMENT AND (2) IN SUPPORT OF NEXT INVESTMENTS, LLC'S CROSS-MOTION AND MOTION TO HOLD THE BANKS IN CONTEMPT AND FOR A TURNOVER ORDER**

GIBSON, DUNN & CRUTCHER LLP
Robert Weigel
Howard S. Hogan
Lauren M.L. Nagin
Alexandra L. Grossbaum
200 Park Avenue
New York, NY  10166-0193
Telephone:  212.351.4000

Attorneys for Plaintiff NEXT
INVESTMENTS, LLC

# TABLE OF CONTENTS

Page

HISTORY OF THE BANKS' INVOLVEMENT IN THE CASE ................................................. 4

    **A.**    The Banks Were on Notice of This Court's Orders.............................................. 4

    **B.**    The Court—Over the Banks' Objections—Granted a Default Judgment. ............ 7

    **C.**    This Court Entered Into A Final Order Holding Judgment Debtors in
        Contempt of Court and Freezing Judgment Debtors' Assets................................ 8

    **D.**    Next Served Subpoenas on the Banks and This Court Ordered the Banks
        to Comply.......................................................................................................... 9

    **E.**    The Banks Failed to Timely Comply with the Subpoenas. ............................... 11

    **F.**    The Banks Filed a Motion for Reimbursement Despite Their Continued
        Non Compliance with the Subpoenas. ............................................................... 12

    **G.**    Analysis of the Banks' Productions Evidences Non-Compliance with the
        Subpoenas and this Court's Orders.................................................................... 12

ARGUMENT ............................................................................................................................ 16

    **A.**    The Court's Orders Are Enforceable Against the Banks.................................... 16

        **1.**    The Banks Are Bound by the Court's Orders......................................... 16

        **2.**    This Court Has Personal Jurisdiction Over the Banks............................ 19

        **3.**    The Asset Freeze Provisions Are Enforceable Against the Banks. ......... 20

        **4.**    Enforcing the Asset Freeze Provisions Comports with Principles of
            International Comity. .............................................................................. 22

    **B.**    The Banks Should Be Held in Contempt of Court. ........................................... 26

        **1.**    The Court Clearly and Unambiguously Required the Banks to
            Comply with the Subpoenas and This Court's Asset Freeze
            Provisions............................................................................................... 27

        **2.**    There Is Clear and Convincing Proof that the Banks Did Not
            Comply with the Subpoenas or the Asset Freeze Provisions.................. 29

            a.    Because the Banks Failed to Comply with the Subpoenas
                and Produce All Responsive Documents, the Court Should

# TABLE OF CONTENTS
### (continued)

Page

                Apply a Presumption that the Banks Violated the Asset Freeze Provisions. ........................................................ 29

         b.     Each Bank Has Violated This Court's Asset Freeze Provisions............................................................... 33

                (i)     ABC Violated the Asset Freeze Provisions. ................... 35

                (ii)    BOC Violated the Asset Freeze Provisions. ................... 37

                (iii)   BOCOM Violated the Asset Freeze Provisions.............. 38

                (iv)   CCB Violated the Asset Freeze Provisions. ................... 39

                (v)    CMB Violated The Asset Freeze Provisions. ................. 40

                (vi)   ICBC Violated the Asset Freeze Provisions. .................. 41

        3.     The Banks Did Not Display Reasonable Diligence. ............................... 42

   C.     The Court Should Award Next Compensatory Contempt Damages. .................. 44

   D.     The Moving Banks Are Not Entitled to Reimbursement...................................... 49

        1.     The Equities of This Case Demand the Moving Banks Bear Their Own Costs. ............................................................... 51

        2.     The Moving Banks' Fees, Costs and Expenses Are Not Reasonable. .............................................................. 53

   E.     Next Is Entitled to Attorney's Fees & Costs........................................................ 56

   F.     The Banks Must Turnover Judgment Debtors' Assets. ....................................... 59

CONCLUSION........................................................................................................................ 60

# TABLE OF AUTHORITIES

Page

## Cases

*In re Aggrenox Antitrust Litig.*,
 2017 WL 4679228 (D. Conn. Oct. 18, 2017) ...................................................49, 53

*In re American Corp.*,
 184 F.R.D. 234 (S.D.N.Y. 1998) .....................................................................50, 55

*Apotex, Inc. v. UCB, Inc.*,
 2015 WL 11622480 (S.D. Fla. Dec. 4, 2015) .......................................................54

*Arista Records, LLC v. Tkach*,
 122 F. Supp. 3d 32 (S.D.N.Y. 2015)..............................................................18, 19

*Ashley Homes of Long Island, Inc. v. Arico*,
 2009 WL 10709108 (E.D.N.Y. July 31, 2009).......................................................27

*Bulkmatic Transp. Co. v. Pappas*,
 2001 WL 504839 (S.D.N.Y. May 11, 2001) .........................................................57

*Chambers v. NASCO, Inc.*,
 501 U.S. 32 (1991)...............................................................................................30

*Chevron Corp. v. Donzginer*,
 296 F.R.D. 168 (S.D.N.Y. 2013) ..........................................................................32

*Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*,
 2008 WL 3852046 (S.D.N.Y. Aug. 13, 2008).................................................57, 58

*CSX Transportation, Inc. v. Emjay Envtl. Recycling, LTD.*,
 2016 WL 755630 (E.D.N.Y. Feb. 25, 2016).........................................................59

*Dow Chemical Co. v. Reinhard*,
 2008 WL 1968302 (S.D.N.Y. Apr. 29, 2008)..................................................50, 51

*Drywall Tapers & Pointers of Greater N.Y., Local 1974 of I.B.P.A.T. AFL-CIO v.
 Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n*,
 889 F.2d 389 (2d Cir. 1989).................................................................................27

*Eli Lilly & Co. v. Gottstein*,
 617 F.3d 186 (2d Cir. 2010)......................................................................17, 19, 20

*Eros Entm't, Inc. v. Melody Spot, L.L.C.*,
 2005 WL 4655385 (E.D.N.Y. Oct. 11, 2005).........................................................46

# TABLE OF AUTHORITIES
### (continued)

Page

*In Re Exxon Valdez*,
    142 F.R.D. 380 (D.D.C. 1998) ........................................................................ 50

*Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*,
    642 F. Supp. 2d 276 (S.D.N.Y. 2009) ........................................................... 57

*First Nat'l City Bank of N.Y. v. IRS*,
    271 F.2d 616 (2d Cir. 1959) ........................................................................... 26

*Freund v. Weinstein*,
    2010 WL 11627327 (E.D.N.Y. Oct. 1, 2010) ............................................... 31

*G & E Real Estate, Inc. v. Avison Young-Washington, D.C., LLC*,
    317 F.R.D. 313 (D.D.C. 2016) ....................................................................... 53

*Gucci Am., Inc. v. Weixing Li*,
    135 F. Supp. 3d 87 (S.D.N.Y. 2015) ....................................................... 19, 24

*Gucci Am., Inc. v. Weixing Li*,
    2011 WL 6156936 (S.D.N.Y. Aug. 23, 2011) ......................................... 23, 24

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014) ........................................... 17, 20, 22, 23, 55

*Hotel 71 Mezz Lender LLC v. Falor*,
    14 N.Y.3d 303 (2010) ..................................................................................... 21

*Huber v. Arck Credit Co., LLC*,
    2016 WL 482955 (S.D.N.Y. Feb. 5, 2016) ................................................... 42

*Jacobs v. Citibank, N.A.*,
    318 F. App'x 3 (2d Cir. 2008) ....................................................................... 58

*Jones v. Niagara Frontier Transp. Auth.*,
    836 F.2d 731 (2d Cir. 1987) ........................................................................... 45

*Kahn v. General Motors Corp.*,
    1992 WL 208286 (S.D.N.Y. Aug. 14, 1992) ........................................... 50, 56

*King v. Allied Vision, Ltd.*,
    65 F.3d 1051 (2d Cir. 1995) ........................................................................... 27

*Koehler v. Bank of Bermuda Ltd.*,
    12 N.Y.3d 533 (2009) ............................................................................... 21, 59

# TABLE OF AUTHORITIES
(continued)

Page

*Leser v. U.S. Bank Nat. Ass'n*,
    2011 WL 1004708 (E.D.N.Y. Mar. 18, 2011) ........................................................27

*Leser v. U.S. Bank Nat. Ass'n*,
    2012 WL 580489 (E.D.N.Y. Feb. 21, 2012) ...........................................................57

*Levin v. Timber Holdings Corp.*,
    277 F.3d 243 (2d Cir. 2002) ...................................................................................29

*Licci ex rel Licci v. Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012) .....................................................................................19

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ...................................................................................24

*Linde v. Arab Bank, PLC*,
    706 F.3d 92 (2d Cir. 2013) .....................................................................................24

*Linder v. Calero-Portocarrero*,
    180 F.R.D. 168 (D.D.C. 1998) ...............................................................................50

*Lofton v. Verizon Wireless (VAW) LLC*,
    308 F.R.D. 276 (N.D. Cal. 2015) ...........................................................................31

*Manhattan Industries, Inc. v. Swweater Bee by Banff, Ltd.*,
    885 F.2d 1 (2d Cir. 1989) .......................................................................................45

*McCarthy v. Wachovia Bank, N.A.*,
    759 F. Supp. 2d 275 (E.D.N.Y. 2011) ....................................................................21

*Motorola Credit Corp. v. Standard Chartered Bank*,
    24 N.Y.3d 149 (2014) .............................................................................................21

*N. Face Apparel Corp. v. Fujian Sharing Imp. & Exp. LTD. Co.*,
    2011 WL 12908845 (S.D.N.Y. June 24, 2011) ......................................................19

*N. Mariana Islands v. Millard*,
    845 F. Supp. 2d 579 (S.D.N.Y. 2012) ....................................................................59

*New York State Nat. Org. for Women v. Terry*,
    952 F. Supp. 1033 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 86 (2d Cir. 1998) ..........56, 58

*NML Capital, Ltd. v. Republic of Argentina*,
    2012 WL 5895786 (S.D.N.Y. Nov. 21, 2012), *aff'd*, 727 F.3d 230 (2d Cir.
    2013) .......................................................................................................................17

**TABLE OF AUTHORITIES**
(continued)

Page

*PaineWebber Inc. v. Acstar Ins. Co.*,
  211 F.R.D. 247 (S.D.N.Y. 2002) ........................................................................26

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Tech., Inc.*,
  369 F.3d 645 (2d Cir. 2004)........................................................................27, 45

*Pereira v. Felzenberg*,
  1997 WL 698186 (S.D.N.Y. Nov. 7, 1997)........................................................31

*Prescient Acquisition Grp., Inc. v. MJ Publishing Trust*,
  2006 WL 2996645 (S.D.N.Y. Oct. 13, 2006) ....................................................54

*Regal Knitwear Co. v. National Labor Relations Board*,
  324 U.S. 9 (1945)................................................................................................17

*Reilly v. Natwest Markets Group Inc.*,
  181 F.3d 253 (2d Cir. 1999)...............................................................................31

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
  306 F.3d 99 (2d Cir. 2002)..................................................................................31

*S.E.C. v. Homa*,
  2004 WL 1093492 (N.D. Ill. May 13, 2004) ......................................................43

*Sands Harbor Marina Corp. v. Wells Fargo Insurance*,
  2018 WL 1701944 (E.D.N.Y. Mar. 31, 2018).............................................50, 55

*Sec. & Exch. Comm'n v. Charles Plohn & Co.*,
  433 F.2d 376 (2d Cir. 1970)................................................................................22

*Shamis v. Ambassafor Factors Corp.*,
  34 F. Supp. 2d 879 ..............................................................................................31

*In re Sledziejowski*,
  533 B.R. 408 (Bankr. S.D.N.Y. 2015) ................................................................17

*South Cent. Bell Tel. Co. v. Constant, Inc.*,
  304 F. Supp. 732 (D. La. 1969) ..........................................................................19

*Sprint Nextel Corp. v. Ace Wholesale, Inc.*,
  2014 WL 4308355 (S.D.N.Y. Aug. 26, 2014).....................................................57

*Summit Bank v. Taylor*,
  1997 WL 811526 (S.D.N.Y. Nov. 12, 1997).......................................................57

# TABLE OF AUTHORITIES
(continued)

Page

*Tiffany (NJ) LLC v. Forbse,*
  2012 WL 1918866 (S.D.N.Y. May 23, 2012) *aff'd on this point, Tiffany (NJ)*
  *LLC, Tiffany & Co. v. China Merchants Bank*, 589 F. App'x 550 (2d Cir.
  2014) ................................................................................................................20, 55

*U.S. v. McGraw-Hill Companies, Inc.,*
  302 F.R.D. 532,536 (C.D. Cal. 2014) ..............................................52, 53, 54, 55

*U2 Home Entm't, Inc. v. Wei Ping Yuan,*
  245 F. App'x 28 (2d Cir. 2007) ......................................................................45, 46, 49

*United States v. First Nat'l City Bank,*
  379 U.S. 378 (1965) ........................................................................................20

*United States v. United Mine Workers of Am.,*
  330 U.S. 258 (1947) ........................................................................................22

*Upjohn Co. v. Medtron Labs., Inc.,*
  2005 WL 3078232 (S.D.N.Y. Nov. 16, 2005) ...............................................58

*US Bank N.A. v. PHL Variable Insurance Co.,*
  2012 WL 5395249 (S.D.N.Y. Nov. 2, 2012) ..................................................50, 56

*Vuitton & Fils, S.A. v. Carousel Handbags,*
  592 F.2d 126 (2d Cir. 1979)............................................................................26, 45

*Waffenschmidt v. MacKay,*
  763 F.2d 711 (5th Cir. 1985) ..........................................................................20

*Wultz v. Bank of China Ltd.,*
  910 F. Supp. 2d 548 (S.D.N.Y. 2012)............................................................25

*Yash Raj Films (USA), Inc. v. Bobby Music Co. & Sporting Goods,*
  2006 WL 2792756 (E.D.N.Y. Sept. 27, 2006) ...............................................46

*Zino Davidoff SA v. CVS Corp.,*
  2008 WL 1775410 (S.D.N.Y. Apr. 17, 2008)..................................................42

**Statutes**

15 U.S.C. §1117(c)(1)..................................................................................................47

**Rules**

Fed. R. Civ. P. 45(d)(2)(B)(ii) ...................................................................................49

**TABLE OF AUTHORITIES**
(continued)

Page

Fed. R. Civ. P. 65(d)(2)(c) ...................................................................................................17

Fed. R. Civ. P. 71 ...............................................................................................................26

N.Y. C.P.L.R. § 302(a)(1) ..................................................................................................19

N.Y. C.P.L.R. § 5222 ..........................................................................................................21

N.Y. C.P.L.R. § 5225(b) .....................................................................................................59

N.Y. C.P.L.R. § 5227 ..........................................................................................................59

**Treatises**

149 A.L.R. Fed. 589 (1998) ...............................................................................................30

Restatement (Third) of Foreign Relations Law § 403(2) ..........................................23, 24

# TABLE OF ABBREVIATIONS

| Term | Defined |
|---|---|
| ABC | Agricultural Bank of China |
| BOC | Bank of China |
| BOCOM | Bank of Communications |
| CCB | China Construction Bank |
| CMB | China Merchants Bank |
| ICBC | Industrial and Commercial Bank of China |
| Moving Banks | BOC, BOCOM, CCB, CMB, and ICBC |
| Banks | ABC, BOC, BOCOM, CCB, CMB, ICBC |
| Plaintiffs | Nike, Inc. and Converse Inc. |
| Next | Next Investments, LLC |
| The Moving Banks' Motion | Moving Banks' Memorandum of Law in Support of Motion for Reimbursement of Attorneys' Fees, Costs and Other Expenses (ECF No. 195) |
| Judgment Debtors | the counterfeiters subject to the Judgment and the additional counterfeiters identified in connection with the Final Order, both defined below, as well as the counterfeiters' associates. |
| TRO | Temporary Restraining Order (ECF No. 3) |
| PI Order | Preliminary Injunction (ECF No. 14) |
| Supplemental Order | ECF No. 19 |
| Second Supplemental Order | ECF No. 24 |
| Third Supplemental Order | ECF No. 27 |
| Judgment | ECF No. 49 |
| Final Order | ECF No. 62 |
| Court's Orders or Orders | ECF Nos. 3, 14, 19, 24, 27, 49, 62 |
| Subpoenas | Next's November 30, 2017 subpoenas to the Banks |
| PayPal | PayPal, Inc. |
| November 19, 2018 Order | this Court's November 19, 2018 order (ECF No. 174) |
| Nagin Decl. | Declaration of Lauren Nagin, dated July 19, 2019 |
| Clarke Decl. | Third Declaration of Donald Clarke, dated July 19, 2019 |
| Perles Decl. | Declaration of Sara Perles, dated July 19, 2019 |
| Lee Decl. | Declaration of Nicole Lee, dated July 19, 2019 |
| AP Decl. | Declaration of Edward Boyle of AlixPartners, dated July 19, 2019 |
| Asset Freeze Provisions | all of the asset restraint provisions in the Court's Orders.  *See* ECF No. 3 ¶ 3, ECF No. 14 ¶ 4, ECF No. 19 ¶ 11, ECF No. 24 ¶ 10, ECF No. 27 ¶ 10, ECF No. 49 ¶¶ 10-11, ECF No. 62 ¶ 4. |
| Injunctive Provisions | all of the Court's injunctive provisions prohibiting further violation of the Lanham Act.  *See* ECF No. 3 ¶¶ 2, 7, 25(b), ECF No. 14 ¶ 16, ECF No. 19 at 6, ECF No. 24 at 6–7, ECF No. 27 at 7, ECF No. 49 ¶ 2, ECF No. 62 ¶ 13. |

The Judgment Debtors are counterfeiters selling fake Nike and Converse products through thousands of different websites.  Over the course of this action, this Court has issued seven orders shutting down over 2,200 websites and freezing all of the counterfeiters' assets. These Orders, issued on November 14, 2013, December 3, 2013, January 23, 2014, May 23, 2014, December 3, 2014, August 20, 2015, October 10, 2017 and October 20, 2017 enjoined Judgment Debtors from "manufacturing, distributing, delivering, shipping, importing, exporting, advertising, marketing, promoting, selling or offering for sale Counterfeit Products . . . ."  ECF No. 49 ¶ 2; *see also* ECF Nos. 3, 14, 19, 24, 27, 59 & 62.  The Orders also expressly prohibited the Judgment Debtors "and all persons acting in concert or participation with any of them, *including any third parties receiving actual notice of this Order*" from "transferring, withdrawing, or disposing of any money or other assets into or out of any accounts held by, associated with, or utilized by [Judgment Debtors], regardless of *whether such money or assets are held in the U.S. or abroad*."  ECF No. 3 ¶ 11 (emphasis added); *see also* ECF Nos. 14, 19, 24, 27, 59 & 62.  The Orders were served on the Banks.  The Court had to issue multiple Orders because the Court's Orders were ignored by both the Judgment Debtors and the Banks.  Despite the plain language of the Orders, the Judgment Debtors continued to sell their illegal wares through numerous websites that were created to replace the ones the Court shut down.  And the Banks enabled the Judgment Debtors' illegal operations by allowing the Judgment Debtors to continue banking as usual without the slightest regard for this Court's specific Orders.

The Banks' own documents uncontrovertibly establish that while the Banks were in possession of the Court's Orders freezing specific accounts and enjoining the counterfeiters' continued operations, the Banks acted in active concert with Judgment Debtors to allow them to continue to conduct ordinary banking transactions as part of their counterfeiting operations.  In

direct contempt of this Court's Orders the Banks collectively allowed more than 35,000

transactions—totaling more than $69 million—to be transferred in and out of Judgment Debtors'

accounts.  These ordinary banking transactions were essential to Judgment Debtors' ability to

continue to open and operate websites.

Under Federal Rule of Civil Procedure 65(d)(2), the Banks, by operating in concert with

Judgment Debtors to violate this Court's Orders, are liable in civil contempt for the damage they

have caused Next.  The Banks' refusal to comply with this Court's Orders allowed the Judgment

Debtors to continue to operate over 800 websites selling counterfeit Nike products after the dates

on which the Banks were on notice that the accounts of the Judgment Debtors were enjoined (the

"New Websites").  The New Websites were able to openly sell counterfeit Nike products

because the Banks permitted Judgment Debtors to continue banking.  With the Banks'

assistance, the counterfeiters' operations remained uninterrupted.  Nothing under Chinse law

required the Banks to violate the Court's Orders by continuing to do business with known

counterfeiters—indeed BOCOM represented to this Court that it could and eventually did cease

all financial transactions with the counterfeiters in a manner consistent with Chinese law.  The

problem is that the Banks waited until their contempt was about to be revealed—in 2018, after

Magistrate Judge Freeman had ordered the Banks to produce documents—to do what they

should have done in 2013.  In the interim, Judgment Debtors continued their illegal business as

usual and moved tens of millions of dollars through the Banks.  Accordingly, Plaintiffs were

forced to repeatedly seek additional relief from this Court.

The Judgment Debtors violated the Lanham Act and this Court's Orders by selling goods

bearing numerous Nike trademarks through over 800 New Websites.  Next has directly

connected Judgment Debtors' accounts to these New Websites by tracking shared identifying information—such as email addresses—used both by the accounts and the New Websites.

Furthermore, even at this late date, we still do not know the full scope of the Judgment Debtors' operations because the Banks have not complied with this Court's December 17, 2018 deadline to produce all documents concerning the Judgment Debtors' accounts. The Moving Banks have admitted in writing that they still have not produced all of the required documents. The Banks' productions in response to this Court's orders remain riddled with holes that have frustrated Next's efforts to identify all of the counterfeiters and to locate and recover their assets in order to satisfy the Judgment. It is implausible that the Banks, who are six of the largest banks in China, do not maintain extensive and complete records for all of their customers and do not have sophisticated infrastructure in place locate such records. And yet, in contempt of this Court's order to comply with the Subpoenas, the Banks' still have not produced complete transaction records for all Judgment Debtor accounts, among other glaring deficiencies that make it impossible to determine exactly how many additional transactions the Banks allowed Judgment Debtors to conduct in contempt of the Court's Orders. Logic would dictate, and this Court can presume, that these missing documents are at least as damaging to the Banks' position as the documents that were produced.

The damage caused by the Banks' known contempt is tangible and real. *First*, the Banks' complete disregard for the Asset Freeze Provisions resulted in Judgment Debtors transferring at least $32,690,603 out of their accounts—money that should have been frozen. *Second*, the Banks' refusal to honor this Court's Orders stopping all transactions in or out of the Judgment Debtors' accounts allowed Judgment Debtors to conduct banking as usual, facilitating the operation of over 800 New Websites selling counterfeit products in direct violation of both the

Court's Orders and the Lanham Act.  While the full scope of the damage caused by the continued operation of these massive counterfeiting operations is difficult to ascertain, Congress has expressly authorized statutory damages for violations of the Lanham Act, and courts in this circuit have endorsed the use of statutory damages as a measure of compensatory contempt damages.  This Court used statutory damages to calculate the amount of the Judgment.  *See* ECF No. 49.  Next respectfully requests that the harm caused by the Banks' contemptuous decision to continue doing business with the counterfeiters be measured using the Lanham Act's statutory measure of $200,000 "per counterfeit mark per type of goods" infringed in each network, totaling $118,000,000.

Next's damages calculation is a conservative estimate of the damage the Banks have caused to Next.  First, Next's expert grouped the 811 New Websites into just nine counterfeiting networks and treats each network as a single entity.  Next only seeks statutory damages for the first time each Nike trademark appears on a distinct type of good on any New Website across an entire network as opposed to seeking statutory damages for each New Website.  Second, the Banks' failure to produce complete account records for every Judgment Debtor makes it impossible to know just how much money, beyond the over $32,000,000 already known, the Banks permitted Judgment Debtors to drain out of their accounts.  As a direct result of the Banks' contempt of this Court's Orders, Next has suffered, at minimum, $150,690,603 in damage.  Next respectfully requests the Banks be ordered to pay Next this sum as well as to turnover all remaining funds in Judgment Debtors' accounts for a total of $150,730,325.64.

## HISTORY OF THE BANKS' INVOLVEMENT IN THE CASE

### A.     The Banks Were on Notice of This Court's Orders.

This Court entered a TRO on November 14, 2013, restraining Judgment Debtors *and* "all persons acting in concert or in participation with any of them, *including any third parties*

*receiving actual notice of this Order*" from, *inter alia*, infringing the Plaintiffs' trademarks by selling counterfeit products and freezing all of Judgment Debtors' assets, whether in the U.S. or abroad.  ECF No. 3 at 6–11 (emphasis added); ECF No. 14 at 7–10.  In accordance with Federal Rule of Civil Procedure 65(d), the Court made clear that all the Banks and all other "third parties who act in active concert or participation with [Judgment Debtors] . . . *shall be bound* by the terms of this Order and are *prohibited from assisting in any violation of this Order*" including the "transfer, withdrawal or disposal of any money or other asset by [Judgment Debtors]" or "sale or distribution of Counterfeit Products by [Judgment Debtors]."  ECF No. 3 ¶ 25 (emphasis added).

Plaintiffs sent notice of the TRO to all of the Banks, "put[ting the Banks] on notice that the Order directs a freeze of all money held or controlled by [Judgment Debtors]," including a list of names and specific bank accounts.  *See, e.g.*, Nagin Decl. Exs. 1–9.  The Banks were also notified that the TRO directed third parties, including the Banks, to comply with expedited discovery provisions and to produce all documents related to Judgment Debtors' accounts.  *Id*. On December 3, 2013, this Court entered the PI Order, which contained terms nearly identical to those of the TRO, *see* ECF No. 14.  The Banks were informed that the PI Order "continued the asset restraint imposed by the temporary restraining order." *See* Nagin Decl. Exs. 10–15.

The Banks never asked the Court to modify the PI Order.  But the Banks did not produce a single document from China.  Subsequently, Plaintiff responded to the Banks and made clear that the Banks' "[f]ailure to abide by the [C]ourt's Order will put the Banks at risk of being held in contempt in accordance with the Federal Rules of Civil Procedure" and firmly reiterated the Banks' obligations to comply with the Asset Freeze Provisions.  *Id.* Exs. 19, 23.

In response to the expedited discovery provisions in the TRO and PI Order, Plaintiffs received documents from PayPal identifying nearly 200 PayPal accounts belonging to Judgment

Debtors.  *See* ECF No. 18.  Through PayPal's documents, Plaintiffs were able to identify additional names, email addresses, and bank accounts associated with Judgment Debtors.  ECF No. 28 ¶ 4.  Based on these records, Plaintiffs sent the Banks notice of additional accounts that Judgment Debtors were using as repositories for the funds in their PayPal accounts and indicated that these accounts were also subject to the terms of the PI Order.  *See* Nagin Decl. Ex. 22 (providing ABC, BOCOM, CCB, CMB, and ICBC a list of Judgment Debtor accounts); *id.* Ex. 23 (providing BOC with a list of 77 additional Judgment Debtors accounts at BOC).

In the year following entry of the PI Order, Plaintiffs' investigators continued to monitor Judgment Debtors' online presence and discovered that Judgment Debtors had registered and/or activated more than 768 new infringing websites in violation of the TRO and PI Order.  *See* ECF No. 23.  Plaintiffs notified the Banks of these additional accounts.  *See id.* Exs. 22–25.  On January 23, 2014, May 23, 2014, and December 3, 2014, this Court signed a Supplemental Order, a Second Supplemental Order, and a Third Supplemental Order respectively, which enjoined and incorporated the true names of additional Judgment Debtors, additional Judgment Debtors' accounts at the Banks, and the more than 768 newly detected infringing websites.  *See* ECF Nos. 19, 24, 27.  The Banks were provided notice of the Supplemental Orders.  *See* Nagin Decl. Ex. 27 (providing notice of Supplemental Order to BOC); *id.* Ex. 28 (providing notice of Supplemental Order to ABC, BOCOM, CMB, CCB, ICBC); *id.* Ex. 35 (providing notice of Second Supplemental Order to BOC); *id.* Ex. 37 (providing notice of Third Supplemental Order to BOC); *id.* Ex. 38 (providing notice of Third Supplemental Order to ICBC); *id.* Ex. 85 (providing notice of the Third Supplemental Order to CMB).  During this time, Plaintiffs informed the Banks that they were subject to the Court's Asset Freeze Provisions.  *See, e.g.*, Nagin Decl. Exs. 31, 32.  The Banks did not seek to modify any of the Supplemental Orders.

**B.      The Court—Over the Banks' Objections—Granted a Default Judgment.**

On June 29, 2015, Plaintiffs moved this Court for a default judgment against Judgment

Debtors.  *See* ECF Nos. 37–40.  On July 17, 2015, the Banks submitted a letter in opposition to

the Judgment "insofar as the proposed judgment contain[ed] a federal asset-freezing injunction

that would purport to require the Banks to restrain customer accounts located outside the United

States."  ECF No. 41; *see also* Nagin Decl. Ex. 39.

On August 20, 2015, over the objections of the Banks, Judge Scheindlin granted

Plaintiffs' Judgment, including the global asset freeze provisions.  Judge Scheindlin rejected the

Banks' "objections to the asset freeze provisions of the Proposed Default Judgment" finding that

the "Court needs only 'personal jurisdiction over the defendants, not the Bank[s]'" in order to

issue the global asset freeze.  ECF No. 48 at 3.  The Court specifically stated that "the Proposed

Default Judgment *would order the Banks to comply with an asset freeze*."  *Id.* at 3 (emphasis

added).  The Banks all received notice of the Judgment.  *See* Nagin Decl. Ex. 40.

The Judgment restrained all of Judgment Debtors' assets and put the Banks on notice that

that Judgment Debtors' assets and "[Judgment Debtors'] [a]ssets that Plaintiffs identify in the

future and/or that have not yet been frozen shall be subject to the asset restraint provisions . . .

*regardless of whether the [Judgment Debtors'] [a]ssets are located in the United States or

abroad*," including the Bank accounts listed in Exhibit 3.   ECF No. 49 ¶¶ 10–11, Ex. 3.

(emphasis added).  The Judgment also permanently enjoined the Judgment Debtors "and all

persons acting in concert or in participation with any of them" from violating the Lanham Act by

continuing to infringe on Plaintiffs' trademarks and from "assisting, aiding or abetting any other

person or business entity in engaging in or performing any of the activities" prohibited by the

Judgment.  *See* ECF No. 49 ¶¶ 2(a); 2(j).  Plaintiffs' request for an accounting of profits was

granted and the Court awarded statutory damages totaling more than one billion dollars as a proxy for equitable relief against Judgment Debtors. *See id.* ¶ 8, Ex. 2.

Finally, the Judgment reserved Plaintiffs' ability to seek appropriate relief from this Court to (a) enforce the Judgment or any outstanding obligations to comply with the discovery provisions of this Court's prior Orders; (b) find any of Judgment Debtors' Asset Holders in contempt of this Court's Orders or the Judgment; or (c) reopen the matter in the event necessary to pursue sanctions for any violation of the Judgment. *Id.* ¶ 13. The Banks did not appeal.

**C.    This Court Entered Into A Final Order Holding Judgment Debtors in Contempt of Court and Freezing Judgment Debtors' Assets.**

In early 2017, Next discovered that the Judgment Debtors were continuing to operate over 550 websites in blatant violation of this Court's Judgment.[1] Next applied for an order to show cause why Judgment Debtors should not be held in contempt of court and requesting that newly identified Judgment Debtors—including any new names, email addresses, websites, and bank accounts—be made subject to the terms of the Judgment. ECF No. 59. The Banks did not oppose, and on October 20, 2017, this Court issued a Final Order granting Next's application, putting the Banks on notice that the newly identified Judgment Debtors also are "restrained and enjoined from transferring, withdrawing or disposing of any money or other assets into or out of [their] accounts." ECF No. 62 ¶ 4. Shortly thereafter, Next served notice of the Final Order on BOC, BOCOM, CCB, and ICBC. *See* Nagin Decl. Exs. 42–45.

---

[1] Once again, Next received documents from PayPal identifying PayPal accounts belonging to Judgment Debtors. Through PayPal's documents, Next was able to identify additional names, email addresses, and bank accounts associated with Judgment Debtors. *See* Nagin Decl. Ex. 41.

**D.      Next Served Subpoenas on the Banks and This Court Ordered the Banks to Comply.**

On November 30, 2017, having once again failed to comply with the expedited discovery provisions in the Court's Orders, Next served Subpoenas on the Banks requesting information related to Judgment Debtors' accounts and operations.  Nagin Decl. Exs. 46–51.  The Banks served responses and objections to the Subpoenas and refused to produce any documents located outside of their New York branches, despite the plain language of the Final Order and the Subpoenas.  *See* ECF No. 84, Exs. 3, 32, 48, 82, 102, 127, 128.  The Banks moved to quash the Subpoenas, *see* ECF Nos. 70–78, and Next opposed and filed a cross-motion to compel the production of documents, *see* ECF Nos. 82–87.  This Court referred the motions to Magistrate Judge Freeman, ECF No. 116, who received additional briefing, *see* ECF Nos. 110–115, Nos. 124–127, and heard oral argument from the Banks and Next, ECF No. 128.

At oral argument Magistrate Judge Freeman asked the Banks if there was a "willingness voluntarily to make sure that assets are frozen"  Nagin Decl. Ex. 83 at 74–75.  The Banks refused to answer the Court, saying "[t]his is extremely difficult" and they were "not in a position to answer that standing here" but that they would "see if something like that is possible."  *Id.* However, after two months, the Banks simply stated that they could not restrain Judgment Debtors' accounts, *see* ECF No. 130; *see also* ECF No. 133, effectively admitting that they had not frozen any of Judgment Debtors' assets despite the valid and un-appealed Asset Freeze Provisions entered by this Court, *see* ECF Nos. 132, 134.

On September 11, 2018, Magistrate Judge Freeman granted Next's motion to compel and denied the Banks' motion to quash.  ECF No. 135.[2]  Magistrate Judge Freeman issued a well-

---

[2]  Magistrate Judge Freeman issued an Amended Memorandum and Order on September 25, 2018 to correct for a typographical error.  Next will cite to the September 25, 2018 Order (ECF No. 150) when referring to Magistrate Judge Freeman's decision.

reasoned and thorough order finding that the Banks were subject to specific personal jurisdiction in New York because each Bank transacted business through its New York-based correspondent or settlement accounts on behalf of Judgment Debtors.  *See* ECF No. 150 at 12–31.  Magistrate Judge Freeman also found that international comity weighed in favor of compelling the Banks to produce documents.  *See id*. at 31–43.  The Banks objected to Magistrate Judge Freeman's decision and additional briefing by both Next and the Banks followed.  *See* ECF Nos. 156–164, 169–173.  In support of their objection, BOC, BOCOM, CCB, CMB and ICBC each submitted declarations in which they represented to this Court that they had finally taken "certain internal control measures . . . to address the problems relating to counterfeiting identified by Assignee" and that such measures were "consistent with Chinese law."  ECF No. 157 ¶ 5; *see also* ECF Nos. 158–161.  Among the measures the Banks claimed to have implemented that were "consistent with Chinese law" was BOCOM's assertion that it had "terminated financial services" to Judgment Debtors.  ECF No. 161 ¶ 5.  However, BOCOM did not give a date when it allegedly terminated services to Judgment Debtors.

On November 19, 2018, this Court affirmed Magistrate Judge Freeman's order and ordered the Banks to produce all documents responsive to the Subpoenas "by Monday, December 17, 2018."  ECF No. 174 at 3, 33.  Furthermore, on December 4, 2018, this Court denied ABC's motion for reconsideration.  *See* ECF Nos. 176–78.  On December 10, 2018 the Banks sought to delay, seeking this Court's approval of a convoluted delivery mechanism whereby they would first deliver documents to the Chinese Ministry of Justice, who would then transmit them to the U.S. Department of Justice, who would then transmit them to this Court, who would then finally transmit the documents to Next.  ECF No. 179; *see also* ECF No. 182.  On December 12 and 13, 2018, Magistrate Judge Freeman denied the request, ordering that the

Banks could deliver the subpoenaed documents "by any reasonable means" but *must* abide by the deadline set by Judge McMahon.  ECF no. 181; *see also* ECF No. 183.

**E.      The Banks Failed to Timely Comply with the Subpoenas.**

Next did not receive any documents from the Banks until Monday, December 24, 2018. Nagin Decl. Exs. 52, 53.  Even then, the Banks confirmed that their productions were not complete—in fact stating the delivery was an "initial production," *see* Nagin Decl. Ex. 54—and that supplemental productions were delayed due to "document transmission issues," *see* ECF No. 179 at 1; *see also* ECF No. 182; Nagin Decl. Ex. 54.  Over the course of January 2019, Next received three additional document productions from the Banks.  *See* Nagin Decl. Exs. 55–58.

In early February 2019, the Banks represented that they had "no further supplemental productions to make in response to the subpoenas."  Nagin Decl. Ex. 60; *see also id.* Exs. 61 (indicating that "ABC does not plan to make any additional productions in response to Next's November 30, 2017 subpoena").  The Banks took the position that they believed "that they have complied with the November 30, 2017 subpoena requests."  Nagin Decl. Ex. 62; *see also id.* Ex. 63 (indicating that ABC took the "position that it has complied with the subpoena").  Following the Banks' claims of full compliance, Next repeatedly notified the Banks of numerous deficiencies in their productions.  *See* Nagin Decl. Exs. 64, 65, 67, 70, 73.  The Banks did not dispute that the types of documents Next identified were in fact missing from their productions and provided no explanation for these gaps.  *See id.* Exs. 66, 68, 79, 81.  BOC, BOCOM, CCB, CMB and ICBC took *over two months* to respond to the issues raised by Next and, as discussed in more detail below, continued to provide no explanation for certain deficiencies in the Banks' productions.  *Id.* Ex. 84.  Further, CCB and ICBC admitted that they had failed to produce certain documents and that they would be providing supplemental productions to arrive more

than six months past this Court's deadline for production.  *Id*.  ABC also has not produced any additional documents to address the deficiencies in its production.[3]

**F.      The Banks Filed a Motion for Reimbursement Despite Their Continued Non Compliance with the Subpoenas.**

On June 20, 2019—the same day they belatedly responded to Next's inquiries regarding deficiencies in their productions—the Moving Banks filed a motion seeking an order from this Court for reimbursement of attorney's fees, costs and other expenses supposedly incurred in responding to the Subpoenas totaling a surprising $1.22 million.  ECF Nos. 194–201.  The Moving Banks' Memorandum of Law in support of their Motion admits that the Moving Banks did not comply with the Court's December 17, 2018 deadline.  ECF No. 195 at 4 n.3.

**G.      Analysis of the Banks' Productions Evidences Non-Compliance with the Subpoenas and this Court's Orders.**

While it is impossible for Next to determine the full extent to which responsive documents exist that the Banks failed to produce, Next has identified numerous ways in which the Banks failed to produce responsive documents that must be within the Banks' custody and control.  *See* AP Decl. ¶¶ 19–26.  At a bare minimum, the Banks have failed to produce any transaction documents for 53 known bank and merchant accounts.  In addition, the Banks have failed to provide an explanation for certain deficiencies in the Banks productions.  For example:

---

[3] Following notification from Next that much of its production was illegible due to the format in which documents were produced, ABC agreed to reproduce many of the documents in its production.  Nagin Decl. Exs. 65, 66, 69.  Next received this reproduction on March 28, 2019; however, the format of the production continued to prevent Next from reviewing the documents and ABC failed to reproduce several documents it had agreed to reproduce.  *Id*. Exs. 74–78.  ABC subsequently agreed to produce the documents a third time.  *Id*. Ex. 80.  Next finally received this reproduction on May 15, 2019 following significant delays caused by ABC's continued insistence on first delivering the documents to the Chinese Ministry of Justice.  *Id*. Ex. 82.  ABC has not, however, produced any additional new documents since its representation of compliance on February 12, 2019.  AP Decl. ¶ 15.  Furthermore, while Next similarly notified the other Banks of issues with the format of their productions, the Banks have not offered to reproduce any documents.  *See* Nagin Decl. Ex. 64 at n.1.

*BOC.*   While Next alerted BOC to over 20 accounts for which it did not receive any transaction documents, s*ee* Nagin Decl. Exs. 64, 73, BOC did not address six of these accounts and provided no explanation for their failure to produce documents.  *See id.* Ex. 84.[4]  This failure is particularly glaring as Next has evidence of wire transfers into several of these accounts.  *See* ECF No. 84. Exs. 162, 176, 178, 199, 203; AP Decl. ¶ 24.

*CCB.*   In response to Next informing CCB that they too did not produce transaction documents for certain accounts, *see* Nagin Decl. Exs. 64, 73, CCB simply stated that the Bank "has searched and has not found transaction documents related to th[ese] account[s]," *Id.* Ex. 84. This claim is not credible as these account numbers were identified in documents produced by PayPal, indicating that Judgment Debtors themselves identified these accounts for use.

*ICBC.*   ICBC was notified that it did not produce any documents related to the account ending in 4010.  *See* Nagin Decl. Ex. 64.  However, ICBC ignored Next's inquiry into this account and has not provided any updated information.

*CMB.*   CMB has still not produced any documents for the account ending in 8400 and claims they cannot locate any responsive documents.  *See* Nagin Decl. Ex. 68.  However, PayPal transaction records evidence wire transfers into Judgment Debtor's account.  *Id.* Ex. 98.

*BOCOM.*   BOCOM's explanation as to why it has not produced transaction records for *any* of the 18 merchant accounts at BOCOM is unacceptable.  In its June 20, 2019 letter, BOCOM for the first time claimed that they have not produced transaction data as it is "not in its possession, custody, or control of this information."  Nagin Decl. Ex. 84.  But in a sworn

---

[4]  The following accounts were set forth in Next's letters dated February 26, 2019, Nagin Decl. Ex. 64, and April 5, 2019, *id.* Ex. 73, but did not appear in the lists in the Moving Banks' June 20, 2019 letter, *id.* Ex. 84: BOC accounts ending in 5384, 6441, 2947, 6299, 4490, and 0287.  For the BOC account ending in 0358, BOC claimed to produce a single transaction document, *see id.* Ex. 84, Attach. 1 at 5, yet Next has reviewed that document and is unable to confirm that it relates to either the old or new account number at BOC.

declaration previously submitted to this Court, BOCOM admitted that "[u]pon receipt of the [S]ubpoenas, BOCOM . . . identified transaction information pertaining to fourteen of the eighteen merchants identified in attachment B of the [S]ubpoena."  ECF No. 161 ¶ 5.  Further, BOCOM has made "lump sum settlements" to a third-party entity regarding the settlement of these merchant accounts.  Nagin Decl. Ex. 84 at 4.  No such records were produced.  As an acquiring bank processing credit cards, BOCOM is "responsible for all acts and omissions of a Payment Facilitator and of any Submerchant," including the Judgment Debtors merchants here, Nagin Decl. Ex. 86 at 133, and has the ability to request the relevant transaction documents from third parties.  As is evident in BOCOM's response, BOCOM has "identified transaction information" but has chosen not to produce it.

*ABC.*  ABC did not produce transaction documents for three known merchant accounts and only produced incomplete transaction data for www.alvababy.com.  *See* AP Decl. ¶ 23. While ABC's own documents show that an additional merchant account www.usajumpman.com remained open after the date it should have been frozen, ABC has not provided transaction documents for this account.  *See* AP Decl. ¶¶ 65, 68–70.

The blatant deficiencies in the Banks' productions are widespread and without any explanation, let alone a legitimate one.  They have failed to produce a privilege log.  They have failed to produce any emails.  In fact, the Banks have failed to produce any communications with or about Judgment Debtors.  Despite being explicitly apprised of these significant deficiencies, no additional documents were forthcoming.

The Banks also failed to produce any documents regarding the internal control measures that the Banks attested to the Court that they implemented "to address the problems relating to counterfeiting identified by Assignee."  *See*, *e.g.*, ECF No. 157 ¶ 5.  Documentation of these

14

alleged internal control measures is unequivocally responsive to the Subpoenas, yet the Banks did not produce any documents evidencing that they in fact stopped providing financial services to Judgment Debtors, designated Judgment Debtors' accounts for heightened risk, put the accounts on the Banks' internal watch lists, added the accounts to a real-time monitoring list or generated reports of suspicious cases for further examination.  *See* ECF Nos. 157–161.  For example, BOC attested that it would stop Judgment Debtors from establishing new customer relationships at the Banks and that it could intercept cross-border transactions into Judgment Debtors' accounts, *see* ECF No. 157 ¶ 5(b), yet, there is not a single document in BOC's production indicating that BOC in fact implemented these measures.

Moreover, the Banks also concede that they have possession of but have not produced entire categories of documents responsive to the Subpoenas—including Suspicious Activity Reports, Currency Transaction Reports and credit reports—and claim that to do so would violate Chinese law.  *See* Nagin Decl. Exs. 57, 60, 68.  However, the Banks' obligation to produce documents in response to Next's Subpoenas has already been briefed, litigated and decided against them twice—once in front of Magistrate Judge Freeman and again in this Court.  The Banks cannot now again rely on their assertions of Chinese law to refuse to comply.

Most importantly, the limited documents produced make clear that the Banks did not comply with the Asset Freeze Provisions.  The Banks were provided explicit notice of 176 Judgment Debtor accounts and 39 merchant accounts that were subject to the Asset Freeze Provisions.  *See* Nagin Decl. Exs. 40, 42–45.  The Banks also were provided with all known Judgment Debtor names.  *See id.*  The Banks have made clear that they were capable of identifying Judgment Debtors' accounts based on this information.  *See* ECF No. 195 at 11 n.8 (indicating that the Banks confirmed that they were not inadvertently producing information

relating to individuals who were not Judgment Debtors).  Yet, for at least five years after

receiving notice of this Court's Orders, the Banks permitted transactions in the counterfeiters'

accounts:

- In 17 separate accounts of which the Banks were specifically provided notice of the account number or merchant name, BOC, ICBC, CCB, and ABC permitted Judgment Debtors to conduct business as usual, allowing *11,348* post-freeze transactions, totaling $10,697,712.60, after the date the account was ordered to be frozen by this Court.  AP Decl. ¶ 32.
- In 93 accounts related to 47 separate Judgment Debtors, where the Banks received notice of Judgment Debtor's name and later produced documents related to that name, ABC, BOC, CCB, CMB, and ICBC permitted Judgment Debtors to conduct business as usual, allowing *26,685* post-freeze transactions, totaling over $58,769,137.67, after the relevant Bank received notice of the Court's Orders freezing Judgment Debtor assets.  AP Decl. ¶¶ 52–62, 67.

The Banks continued to do business with the Judgment Debtors long after the Banks were

on notice that their customers were counterfeiters engaged in illicit activity.  The Banks' conduct

allowed the counterfeiters to evade this Courts' Order and continue their illegal operations for

years after this Court ordered them shut down.  Next has determined that the 110 accounts in

which the Banks permitted Judgment Debtors to conduct these post-freeze transactions—or

where the Banks' failure to produce documents merit a presumption of post-freeze transactions

in those accounts—were used by over 800 New Websites that are part of nine networks of

counterfeiters operating in active violation of this Court's Orders.  *See* Perles Decl ¶¶ 26, 27, 35.

## ARGUMENT

**A.      The Court's Orders Are Enforceable Against the Banks.**

### 1.      The Banks Are Bound by the Court's Orders.

The Court has made it expressly clear that the Banks—who received notice of the Court's

Orders—were prohibited from acting in concert or participation with Judgment Debtors to

violate the Court's Orders.  Federal Rule of Civil Procedure 65(d)(2) provides that an injunction

binds not only the parties to the action, but also binds "other persons who are in active concert or

16

participation with" the enjoined parties—so long as they have notice of the injunction.  Fed. R.

Civ. P. 65(d)(2)(c); *see also In re Sledziejowski*, 533 B.R. 408, 423 (Bankr. S.D.N.Y. 2015)

(Federal Rule of Civil Procedure 65(d)(2)(C) "codifies the common-law principle that non-

parties to a proceeding may also be bound by an injunction, and held in contempt for violations

thereof, where such non-part[y] . . . aids and abets the party named in the order in its

noncompliance").  The Court's inherent power to bind third parties, such as the Banks, is

essential to the Court's ability to enforce its own orders.  *See Eli Lilly & Co. v. Gottstein*, 617

F.3d 186, 196 (2d Cir. 2010) (holding that an injunction against a third party was a "perfectly

appropriate device").  This is especially important so that the Judgment Debtors "may not nullify

a decree by carrying out prohibited acts through aiders and abettors, although they were not

parties to the original proceeding."  *Regal Knitwear Co. v. National Labor Relations Board*, 324

U.S. 9, 14 (1945); *see also Eli Lilly*, 617 F.3d at 195.

Once the Court issued the "asset freeze order enjoining [Judgment Debtors] over whom it

ha[d] jurisdiction, that injunction automatically forb[ade] [the Banks]—who are not directly

enjoined but who act in active concert or participation with an enjoined party—from assisting in

its violation."  *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 130 (2d Cir. 2014) ("*Gucci 2d.

Cir.*") (internal quotation marks omitted); *see also NML Capital, Ltd. v. Republic of Argentina*,

2012 WL 5895786, at *5 (S.D.N.Y. Nov. 21, 2012), *aff'd*, 727 F.3d 230 (2d Cir. 2013) (finding

the Court's injunctions cover third parties who are "in active concert or participation with

[Defendant] in processing the payments" (internal quotation marks omitted)).  The Court's

Orders enjoined Judgment Debtors and the Banks from "transferring, withdrawing or disposing

of any money or other assets into or out of any accounts held by, associated with, or utilized by

Defendants, regardless of whether such money or assets are held in the U.S. or abroad,"  ECF

No. 3 ¶ 11; *see also* ECF No. 14 ¶ 4; ECF No. 19 at 6; ECF No. 24 at 6–7; ECF No. 27 at 7; ECF No. 62 ¶ 4, and put the Banks on notice that "all Defendants' Assets that have been previously identified as frozen or that were otherwise required to be restrained in compliance with this Court's Orders, continue to be restrained regardless of whether the Defendants' Assets are located in the United States or abroad . . . ."  ECF No. 49 ¶ 10; *see also id*. ¶ 11.

The Banks did not honor this Court's Orders despite the clear dictates of Federal Rule 65(d).  *See, e.g.*, ECF No. 48 at 3 (finding the Judgment specifically "order[ed] the Banks to comply with [the] asset freeze"); ECF No. 62 ¶ 4 (providing that the Banks are "restrained and enjoined from transferring, withdrawing or disposing of any [of Judgment Debtors'] money or other assets . . . regardless of whether such money or assets are held in the U.S. or abroad"). Establishing that the Banks aided and abetted Judgment Debtors in violating this Court's Orders merely requires "show[ing] that the non-party had actual knowledge of the judicial decree and violated it, and that the challenged action was taken for the benefit of, or to assist, a party subject to the decree."  *Arista Records, LLC v. Tkach*, 122 F. Supp. 3d 32, 36 (S.D.N.Y. 2015).  Despite being on notice of the Court's Orders the Banks knowingly continued to do business with Judgment Debtors—allowing Judgment Debtors to continue their counterfeiting operations— thereby aiding Judgment Debtors in violating the Court's Orders.  The Banks continued to service the Judgment Debtors' accounts, sometimes for years, despite knowledge that this Court had determined that the specific accounts and individuals were engaged in illegal counterfeiting. Moreover, the motivation of the Banks is irrelevant to the analysis of whether they aided and abetted the violation of this Court's orders.  *Arista Records*, *LLC*, 122 F. Supp. 3d at 36 (noting that it is irrelevant whether the Banks were "motivated by a desire to help [Judgment Debtors] violate the injunction" or simply believed they did not have to comply this U.S. Court's orders).

"[A] Court's inquiry into the fact of aiding and abetting is 'directed to the actuality of concert or participation, without regard to the motives that prompt the concert or participation.'" *Id.* (quoting *Eli Lilly*, 617 F.3d at 193).  There can be no dispute that the Banks acted in active concert and participation with Judgment Debtors.[5]

### 2.      This Court Has Personal Jurisdiction Over the Banks.

This Court found that the Banks' purposeful and repeated use of New York-based correspondent and settlement accounts to process thousands of transactions and transfer funds to Judgment Debtors' accounts in China satisfies the requirements of New York's long-arm statute, which allows for the exercise of personal jurisdiction if (1) the Banks transacted any business within the state, satisfying the "purposeful availment" prong and (2) the cause of action arises from the Banks' business transactions, satisfying the "nexus" prong.  ECF No. 174; *see also Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 93 (S.D.N.Y. 2015) ("*Gucci II*") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012) ("*Licci II*")); N.Y. C.P.L.R. § 302(a)(1).  The Banks' role was a crucial component of the Judgment Debtors' operations, which sold counterfeit products to U.S. consumers, enabling the counterfeiters to move the proceeds of their counterfeiting activities in the U.S. to their bank accounts in China.  Many of the post-freeze transactions that Next has identified were conducted in U.S. dollars.  AP Decl. ¶¶ 33, 61, 62.

---

[5] *See also N. Face Apparel Corp. v. Fujian Sharing Imp. & Exp. LTD. Co.*, 2011 WL 12908845, at *2 (S.D.N.Y. June 24, 2011) ("Public Interest Registry, for example, cannot continue to make the connections that enable customers attracted to defendants' websites to access those websites."); *South Cent. Bell Tel. Co. v. Constant, Inc.*, 304 F. Supp. 732, 736 (D. La. 1969) ("As soon as South Central Bell was apprised of the fact that the subscriber, Constant, was, by use of South Central Bell's equipment, violating the injunction imposed by this Court, it had a duty not to act in any way in concert with Constant to effectuate or perpetuate the violation. South Central Bell had the means to prevent its equipment from being used to violate the injunction, and its failure to do so would, at the very least, have amounted to a passive participation in the violation.").

The Banks' violation of the Asset Freeze Provisions also provides an independent ground for the exercise specific personal jurisdiction over the Banks.  *See, e.g.*, *Gucci 2d. Cir.*, 768 F.3d at 137 (collecting cases exercising specific personal jurisdiction over nonparties for failure to comply with courts' orders); *Eli Lilly*, 617 F.3d at 195–96 (permitting district court to exercise specific personal jurisdiction over a nonparty who violated a protective order).  The Banks' contemptuous conduct was "'designed to have purpose and effect in the forum'" and "the [Court's] authority to force compliance 'is necessary to the proper enforcement and supervision of a court's injunctive authority and offends no precept of due process.'"  *Gucci 2d. Cir.*, 768 F.3d at 137 (quoting *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985)).

Moreover, this Court's exercise of personal jurisdiction over the Banks to enforce the Asset Freeze Provisions comports with due process.  This Court has already evaluated the five relevant factors and determined that exercising personal jurisdiction over the Banks is reasonable.  *See* ECF No. 174 at 20–24; *see also* ECF No. 150 at 22–31.  Certain of these factors weigh even more heavily in favor of exercising personal jurisdiction here.  Both the forum state's interest and Next's interest are heightened now, faced with the Banks' contempt and a higher risk of an inability to enforce this Court's Judgment.  Further, the interstate judicial system's interest in the most efficient resolution tips entirely in favor of the exercise of jurisdiction here, as there are no alternate paths by which Next can seek a remedy for the Banks' contempt.

### 3. The Asset Freeze Provisions Are Enforceable Against the Banks.

"Given that the Court has personal jurisdiction over both defendants and the Banks, the Court's authority to restrain defendants' assets that are controlled by the Banks extends to wherever those assets may be located."  *Tiffany (NJ) LLC v. Forbse*, 2012 WL 1918866, at *12 (S.D.N.Y. May 23, 2012) *aff'd on this point*, *Tiffany (NJ) LLC, Tiffany & Co. v. China Merchants Bank*, 589 F. App'x 550, 552 (2d Cir. 2014); *see also United States v. First Nat'l City*

20

*Bank*, 379 U.S. 378, 384 (1965) ("Once personal jurisdiction of a party is obtained [a district court] has authority to order it to 'freeze' property under its control, whether the property be within or without the United States.").  Under New York law, it is beyond dispute that once a court has personal jurisdiction over a garnishee such as the Banks, a court's order freezing a judgment debtor's assets is equally enforceable against the garnishee.  In *Koehler v. Bank of Bermuda Limited*, the court found that a "New York court with personal jurisdiction over a defendant may order him to turn over out-of-state property *regardless of whether the defendant is a judgment debtor or a garnishee*."  *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 541 (2009) (emphasis added); *see also Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 312 (2010) ("[A] court with personal jurisdiction over a nondomiciliary present in New York has jurisdiction over that individual's tangible or intangible property, even if the situs of the property is outside New York.").  While *Koehler* involved a turnover motion, its holding applies equally to an order to restrain assets because "a restraining order is a less intrusive remedy than a turnover order."  *McCarthy v. Wachovia Bank, N.A.*, 759 F. Supp. 2d 275 n.4 (E.D.N.Y. 2011). "It follows, therefore, that if New York courts have the authority to order garnishees to turn over out-of-state property belonging to a judgment debtor, they have similar authority to order such garnishees to merely restrain out-of-state property."[6] *Id*; *see* N.Y. C.P.L.R. § 5222; ECF No. 43 at 2.  Accordingly, *Koehler* firmly established this Court may order the Banks to restrain or turnover a judgment debtor's assets anywhere in the world so long as it has personal jurisdiction over the Banks.  *Koehler*, 12 N.Y.3d at 536.[7]  Of course, even if the Banks believed that the asset

---

[6]  As discussed *infra*, the Court also has authority to order the Banks to turnover Judgment Debtors' funds.

[7]  *Motorola Credit Corp. v. Standard Chartered Bank*, 24 N.Y.3d 149 (2014) is inapposite and the separate entity rule is irrelevant to enforcement of the Asset Freeze Provisions against the Banks.  In *Motorola*, the Court of Appeals considered the "narrow question" of whether the separate entity rule precludes a judgment creditor from obtaining "postjudgment restraint of assets situated in foreign branch accounts" when jurisdiction over the bank is "based *solely* on the service of a foreign bank's New York branch."  24 N.Y.3d at 162 & n.2 (emphasis added). The case is irrelevant here because the Court has specific personal jurisdiction over the Banks.

freeze was improvidently granted, the Banks were nonetheless obliged to honor the injunction. *See Sec. & Exch. Comm'n v. Charles Plohn & Co.*, 433 F.2d 376, 379 (2d Cir. 1970) ("It is axiomatic that a court order must be obeyed, even assuming its invalidity, until it is properly set aside.") (internal quotation marks omitted); *United States v. United Mine Workers of Am.*, 330 U.S. 258, 293 (1947) ("[A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings.").

### 4.     Enforcing the Asset Freeze Provisions Comports with Principles of International Comity.

Chinese law did not require the Banks—after they were on notice that the accounts at issue were connected to the Judgment Debtors' counterfeiting operations and were restrained by the Court's Orders as a result—to either keep the Judgment Debtors' accounts open or to allow Judgment Debtors to continue to use their accounts. *See* Clarke Decl. ¶¶ 10(a), 11–13. The Banks themselves have made clear that they had the ability to "terminate[] financial services" to customers who engage in illegal activity "in a manner consistent with Chinese law." ECF No. 161 ¶¶ 4, 5; *see also* Clarke Decl. ¶¶ 10, 14–19, 27–38; ECF Nos. 157–161. There is no conflict with Chinese law necessitating a comity analysis before enforcing its Orders against the Banks.

Where a conflict might exist, the Second Circuit has indicated that a comity analysis drawing upon Section 403 of the Restatement (Third) of Foreign Relations Law may be appropriate in connection with this Court's enforcement of its Asset Freeze Provisions against the Banks. *Gucci 2d. Cir.*, 768 F.3d at 140. Section 403(2) provides eight non-exclusive factors to evaluate in determining whether enforcement of the Asset Freeze Provisions is reasonable. These eight factors "are similar to, but not the same as" the factors this Court already has analyzed pursuant to § 442 of the Restatement (Third) of Foreign Relations Law in determining that principles of comity weighed in favor of ordering the Banks to comply with the Subpoenas.

*See* ECF No. 150 at 32, n.13; *see also Gucci 2d. Cir.*, 768 F.3d at 140.  Analysis of the § 403 factors similarly indicates that principles of international comity weigh in favor of enforcement of the Asset Freeze Provisions against the Banks.

Sections 403(2)(a) and (b) each require analysis of the connection between the Banks and New York.  This Court has already found that the Banks regularly transacted business in New York through their New York-based correspondent and settlement accounts—accounts that were used to facilitate the transfer of millions of dollars of Judgment Debtors' illicit proceeds to the exact accounts at issue in China.  *See* ECF No. 85-2 (summarizing over $3.6 million of wire transfers into Judgment Debtors' accounts); *see also* ECF No. 150 at 12–13 (finding Next demonstrated that the Banks "actually used New York-based correspondent accounts to facilitate numerous wire transfers" totaling $3.6 million and "serve[d] as acquiring banks for processing Visa and MasterCard transactions" totaling over $3 million).  The Judgment Debtors' use of their accounts at the Banks is directly linked to their sale of counterfeit products on the New Websites, which advertised and sold the counterfeit products to consumers in New York in violation of a Judgment held in New York.  *See, e.g.*, ECF Nos. 6–9, 10; *see also* Clarke Decl. ¶¶ 49–50.

The character of the activity being regulated and its importance to New York, as well as to the international economic system, also weigh in favor of enforcement of the Asset Freeze Provisions.  *See* Restatement § 403(2)(c), (e); *see also* Clarke Decl. ¶ 51.  "[I]t need hardly be stated that the United States itself has a powerful interest in enforcing the acts of Congress, especially those, such as the Lanham Act, that are designed to protect intellectual property rights and prevent consumer confusion."  *Gucci Am., Inc. v. Weixing Li*, 2011 WL 6156936, at *10 (S.D.N.Y. Aug. 23, 2011); *see also* Nagin Decl. Exs. 71, 72; ECF No. 84, Exs. 25–53. Magistrate Judge Freeman already has noted the "greater national interest of the United States in

enforcing its judgments against counterfeiters."  ECF 150 at 42.  This Court's ability to enforce its Orders is crucial to the maintenance of New York and the United States as a secure place to transact business.  *See Gucci II*, 135 F. Supp. 3d at 100 ("New York as the forum state has a manifest interest in providing effective means of redress for its residents" and "has a strong interest in litigants' compliance . . . to ensure an efficient and effective juridical process") (internal citations omitted); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 174 (2d Cir. 2013) (New York has an interest in "monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism, money laundering, or other nefarious ends"); Restatement § 403(2)(c), (f).  "[T]he Banks' choice to do business in the state of New York and avail themselves of the myriad benefits that come with establishing a presence in the United States' premier financial system also limit the force of the Banks' arguments here regarding China's national interest . . . For having made such a determination and reaped the rewards that flow therefrom, the Banks can hardly hide behind Chinese [] laws as a shield against the requirements faced by other Untied States-based financial institutions"  ECF No. 150 at 39–40 (citing *Gucci Am., Inc. v. Weixing Li*, 2011 WL 6156936, at *10) (internal alterations omitted).

Finally, the remaining factors (which concern the Banks' expectations that might be hurt, the extent to which China may have an interest in the regulating activity, and the likelihood of conflict with China's laws) weigh in favor of enforcement.  *See* Restatement §§ 403(2)(d), (g), (h); *see also* Clarke Decl. ¶¶ 52–54.  China's interest in enforcing its laws regulating the freezing of bank accounts should not deprive this Court of the power to order a party subject to its jurisdiction to comply with its injunction.  This Court already has found that China's laws cannot be "a 'get out of jail free card.'"  ECF No. 174 at 24 (citing *Linde v. Arab Bank, PLC*, 706 F.3d

92, 114 (2d Cir. 2013)). There is no Chinese law requiring the Banks to continue to do business with customers once they are aware that their customers are engaged in illegal activity.  Indeed, in this action the Banks have produced various agreements with Judgment Debtors which explicitly provide that the Banks can terminate service in the event of bad acts.  *See* Clarke Decl. ¶¶ 10(b), 14–16.  Moreover, the Banks have attested—to this Court—that they can take internal control measures to stop doing business with counterfeiters.  ECF Nos. 157–161.  For example, BOC has indicated that it can prohibit cross-border transactions, *see* ECF No. 157 ¶ 5, CCB placed Judgment Debtors on a "black-list" whereby Judgment Debtors could not open new accounts or request additional financial services, such as credit card or loan services, ECF No. 158 ¶ 5, and BOCOM terminated financial services to fourteen Judgment Debtor merchants, *see* ECF No. 161 ¶ 5.  *See also* Clarke Decl. ¶¶ 10(d), 27–38.  This suggests that any claim of a Chinese interest in conflict with this Court's Orders is simply pretext and that China also has an interest in prohibiting bad actors from continuing to utilize its banking system.  Accordingly, any claim by the Banks that they would have been harmed if they had complied with the Asset Freeze Provisions is unfounded and without evidentiary support.  The Banks have never produced evidence of an instance where a bank has been sanctioned in a material way for complying with a U.S. Court order.  *See* Clarke Decl. ¶¶ 10(e), 39–43, 53–54.  Magistrate Judge Freeman already has observed that, "'[t]o date, the evidence remains strong . . .  that meaningful sanctions by the Chinese government against [Chinese banks] are highly doubtful' due, in part, to the state ownership of the Banks."  ECF No. 150 at 41 (citing *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 554 (S.D.N.Y. 2012)); *see also* Clarke Decl. ¶¶ 10(e), 44–46.  Moreover, the law is clear that "[i]f the Bank[s] cannot, as it were, serve two masters and comply with the lawful requirements both of the United States and [China], perhaps [they] should surrender to

25

one sovereign or the other the privileges received therefrom." *First Nat'l City Bank of N.Y. v. IRS*, 271 F.2d 616, 620 (2d Cir. 1959).

**B.      The Banks Should Be Held in Contempt of Court.**

The Banks have acted in contempt of Court by failing to comply with the Subpoenas and by acting in active concert and participation with the Judgment Debtors to allow them to conduct more than 36,000 transactions, totaling more than $69,000,000 in violation of this Court's Orders.  Shockingly, the Banks have not even tried to deny their noncompliance with the Asset Freeze Provisions and have explicitly rejected the Court's efforts to obtain assurances of compliance.  *See* ECF Nos. 130, 133.  The Banks' complete failure to abide by the Court's Orders allowed Judgment Debtors to expand their counterfeiting enterprise, operating an astonishing 811 New Websites in violation of this Court's Orders.  *See* Perles Decl. ¶¶ 26, 27, 35.

This Court has the power—under Federal Rules of Civil Procedure 45(g) and 65(d)(2)— to hold the Banks in contempt both for failure to comply with this Court's November 19, 2018 Order compelling production and the Court's freezing Orders.  *See PaineWebber Inc. v. Acstar Ins. Co.*, 211 F.R.D. 247, 249 (S.D.N.Y. 2002) (the court has "the power under [Rule 45(g)] to impose contempt simply on the basis of failure to comply with a subpoena")*; Vuitton & Fils, S.A. v. Carousel Handbags*, 592 F.2d 126, 129–30 (2d Cir. 1979) (under Federal Rule of Civil Procedure 65(d)(2) a Court may hold a nonparty in contempt for failure to comply with an injunction if the nonparty has knowledge of the order and acted in concert with the defendant).[8]

---

[8]  Under Federal Rule of Civil Procedure 70(e) a court also may "hold [a] disobedient party in contempt" of court for failing to abide by a judgment. *See also* Fed. R. Civ. P. 71 ("[w]hen an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party").

To hold the Banks in contempt of court, this Court must find:  (1) the issuance of a clear

and unambiguous court order; (2) clear and convincing proof of noncompliance with said order;

and (3) lack of reasonable diligence in attempting to accomplish what was ordered.  *King v.

Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995).  It need not be established that a party's

violation was willful in order to hold a party in contempt.  *Paramedics Electromedicina

Comercial, Ltda v. GE Med. Sys. Info. Tech., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004).

### 1.    The Court Clearly and Unambiguously Required the Banks to Comply with the Subpoenas and This Court's Asset Freeze Provisions.

A clear and unambiguous order is one that leaves "no doubt in the minds of those to

whom it was addressed," *Drywall Tapers & Pointers of Greater N.Y., Local 1974 of I.B.P.A.T.

AFL-CIO v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n*, 889 F.2d 389, 395

(2d Cir. 1989), and "apprise[s] those within its scope of the conduct that is being proscribed,"

*Leser v. U.S. Bank Nat. Ass'n*, 2011 WL 1004708, at *8 (E.D.N.Y. Mar. 18, 2011).  On

September 11, 2018, Magistrate Judge Freeman denied the Banks' motion to quash, granted

Next's motion to compel, and required the Banks to "produce *all* documents requested in the

Subpoenas within 45 days of the date of this Order."  ECF No. 150 at 51 (emphasis added); *see

also* ECF No. 135 at 51.  On November 19, 2018, this Court affirmed Magistrate Judge

Freeman's order and stated that "the Banks have . . . [until] December 17, 2018, to comply with

the Subpoenas."  ECF No. 174 at 3, 33.[9]  The Court's orders compelling production are clear and

unambiguous, leaving "no doubt in the minds of" the Banks that they were to *fully* respond to

Next's Subpoenas by the December 17, 2018 deadline.  *Drywall Tapers*, 889 F.2d at 395; *see

Ashley Homes of Long Island, Inc. v. Arico*, 2009 WL 10709108, at *2 (E.D.N.Y. July 31, 2009)

---

[9]   On December 12, 2018, Magistrate Judge Freeman—in declining to bless the Banks' delivery mechanism—
emphasized that "nothing herein shall be construed as modifying the production deadline."  ECF No. 181.

(finding an order clear and unambiguous because it "clearly stated that [the nonparties] must

comply with the subpoena by July 24"); *Leser*, 2011 WL 1004708, at *9 (same).

       Similarly, the Court's Asset Freeze Provisions unambiguously required the Banks to stop

all transactions in and out of Judgment Debtors' accounts.  In accordance with Federal Rule of

Civil Procedure 65(d)(2), the TRO, PI Order, and Supplemental Orders clearly prohibited the

Judgment Debtors, "and all persons acting in concert or participation with any of them, *including*

*any third parties receiving actual notice of this Order* by personal service or otherwise" from

"transferring, withdrawing or disposing of any money or other assets into or out of any accounts

held by, associated with, or utilized by [Judgment Debtors], regardless of *whether such money or*

*assets are held in the U.S. or abroad*."  ECF No. 3 ¶ 11 (emphasis added); *see also* ECF No. 14 ¶

4; ECF No. 19 ¶ 11; ECF No. 24 ¶ 10; ECF No. 27 ¶ 10.  The Judgment and Final Order likewise

ordered that "all Defendants' Assets that have been previously identified as frozen or that were

otherwise required to be restrained in compliance with this Court's Orders, continue to be

restrained *regardless of whether the Defendants' Assets are located in the United States or*

*abroad* "  ECF No. 49 ¶ 10 (emphasis added); *see also* ECF No. 62 ¶ 4 (restraining "third party

financial service providers").

       The Banks received notice of the Court's Orders which specifically referenced the

Judgment Debtors and the known accounts held at their Banks.  *See* Nagin Decl. Exs. 1–15, 22–

23, 27–28, 35, 37–38, 40, 42–45, 85.  The Banks did not seek to oppose or amend any of the

Orders entered prior to the Judgment.  The Banks never asked this Court for clarification of its

Asset Freeze Provisions nor did they claim that an inability to identify Judgment Debtors'

accounts prevented compliance.  Years after the Court issued the TRO and PI Order, all six

Banks opposed the entry of the Judgment arguing that the Court could not impose a worldwide

freezing order.  *See* ECF Nos. 41, 43, 47.  They lost.  *See* ECF Nos. 48, 49.  Judge Scheindlin

rejected the Banks' argument for modification of the Judgment and found that the Judgment, in

fact, "order[ed] the Banks to comply with [the] asset freeze."  *See* ECF No. 48 at 3.  The Banks

did not appeal the entry of the Judgment.  Put simply, the Banks were on notice of this Court's

Orders freezing Judgment Debtors accounts.  They just ignored them.

> **2.      There Is Clear and Convincing Proof that the Banks Did Not Comply with
> the Subpoenas or the Asset Freeze Provisions.**

"In the context of civil contempt," the "clear and convincing" element "requires a

quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred."

*Levin v. Timber Holdings Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (quotations omitted).  As set

forth below, the evidence is clear that *each* of the Banks failed to comply with this Court's

November 19, 2018 Order and also failed to comply with the Asset Freeze Provisions, instead

allowing the Judgment Debtors to continue with their ordinary banking transactions.

> **a.      Because the Banks Failed to Comply with the Subpoenas and Produce
> All Responsive Documents, the Court Should Apply a Presumption
> that the Banks Violated the Asset Freeze Provisions.**

The Banks' failures to comply with the Subpoenas should not inure to their benefit.  Even

though the Banks received the Subpoenas nearly a year before this Court's November 19, 2018

Order was entered and had plenty of time to collect the documents in a timely fashion, the Banks

ignored this Court's December 17, 2018 deadline.  Even more so, the Banks did not produce

transaction documents for 53 bank and merchant accounts.  AP Decl. ¶¶ 21, 23.  It is also evident

that even when the Banks produced some documents related to a Judgment Debtor account, they

frequently did not produce complete account records as required by the Subpoenas.  *Id.* ¶¶ 19–

20, 22, 24–26.  In addition, the Banks produced no communications or emails with or about any

of the Judgment Debtors.  *Id.* ¶ 25.  And, although five of the Banks attested before this Court

that they introduced certain safeguards relating to the Judgment Debtors' accounts, the Banks did not produce any documents relating to those supposed "internal control measures."

The Banks are withholding responsive documents and sanctions are appropriate.  Next has obtained literally hundreds of wire transfer records from third-party correspondent banks and thousands of transaction records from credit card companies conclusively proving that there were thousands of transactions into Judgment Debtors' accounts.  ECF No 85-2 (summarizing wire transfer records at Banks); ECF No. 125 ¶¶ 2, 3, 9.  Many of the transactions occurred in the Judgment Debtor accounts for which the Banks did not produce any transaction data.  *See, e.g.*, AP Decl. ¶¶ 21, 23.  And, with specific regard to BOCOM, BOCOM attested in a declaration submitted to this Court that it had "identified transaction information pertaining to fourteen of the eighteen merchants identified" in Next's Subpoena, yet has not produced a single transaction document regarding these merchants.  ECF No. 161 ¶ 5; AP Decl. ¶ 23.

This Court, pursuant to its inherent powers, can infer from the Banks' deliberate refusal to produce transaction documents for 53 accounts that these documents contain information unfavorable to the Banks, specifically showing that the Banks did not abide by the Court's Asset Freeze Provisions.  AP Decl ¶ 21.  This presumption is supported by the fact that the accounts for which the Banks failed to produce any transaction documents have been conclusively linked to hundreds of Judgment Debtors' New Websites—websites that continued to sell fake Nike products in violation of this Court's Orders.  It is reasonable to assume that the Banks continued to process transactions for those websites—just as they did for the accounts where the Banks did produce transaction data.  Courts are vested with the inherent power to "fashion an appropriate sanction for [third party] conduct which abuses the judicial process."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991) (internal quotations and citations omitted*); see also* 149 A.L.R. Fed.

589 (1998) ("The federal district court has the power to impose sanctions on non–parties for abuse of discovery.").[10]  This inherent power can be used to issue an adverse presumption for a nonparties' failure to produce evidence.  *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).[11]  Applying this presumption requires that the party seeking the inference show: (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had a culpable state of mind; and (3) that the missing evidence is relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.  *Id*.  This standard applies equally to nonparties, and all three requirements are met here.  *See, e.g.*, *Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 285 (N.D. Cal. 2015) (sanctioning a nonparty as "the court's inherent authority to sanction includes not only the authority to sanction a party, but also the authority to sanction the conduct of a nonparty who participates in abusive litigation practices, or whose actions or omissions cause the parties to incur additional expenses").

*First*, the Banks control the documents sought in the Subpoenas, and had an obligation to timely produce everything called for pursuant to the Court's November 19, 2018 Order.  The

---

[10]  The Second Circuit has repeatedly affirmed a court's inherent power to impose sanctions in the discovery context, holding that where "the nature of the alleged breach of a discovery obligation is the non-production of evidence, a District Court has broad discretion in fashioning an appropriate sanction." *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (superseded on other grounds); *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses.").

[11]  Several courts in this district have used their inherent powers to sanction nonparties for misconduct in discovery disputes including for bad faith noncompliance with a discovery order and destruction of evidence. *See, e.g.*, *Shamis v. Ambassafor Factors Corp.*, 34 F. Supp. 2d 879, 888–90 (S.D.N.Y. 1999) ("[T]his Court possesses an inherent power to sanction litigants for abusive litigation practices that are taken in bad faith" including drawing "an adverse inference" against nonparties); *Pereira v. Felzenberg*, 1997 WL 698186, at *6 (S.D.N.Y. Nov. 7, 1997) (sanctioning nonparties for bad faith noncompliance with discovery orders where nonparties behavior would otherwise "slip between the provisions of the Federal Rules"); *see also Freund v. Weinstein*, 2010 WL 11627327, at *2 (E.D.N.Y. Oct. 1, 2010) (ordering nonparties to pay monetary sanctions for failing to produce documents pursuant to a court order, per Rule 45 and the court's inherent powers).

Banks knew that the Judgment Debtors' records were at issue in this litigation from November 2013.  *See* Nagin Decl. Exs. 1–9.

*Second*, the Banks' culpable state of mind is beyond dispute.  "Where, as here, a [contemnor] actively seeks legal impediments to justify its non-[compliance], selectively determines when it will produce documents and when it will not, and continues to assert objections to discovery that have long been rejected, that party has willfully and culpably failed to produce evidence and an adverse inference . . .  is warranted."  *Chevron Corp. v. Donzgiger*, 296 F.R.D. 168, 222 (S.D.N.Y. 2013).  The Banks did not produce any documents by the Court ordered deadline—despite being on notice of the Court's Orders—which included expedited discovery provisions—since 2013, having received the Subpoenas to locate responsive documents over a year prior, and having been ordered to produce the documents months earlier by Magistrate Judge Freeman.  The Banks first produced some documents a week late and subsequent productions dribbled in over the next month.  *See* Nagin Decl. Exs. 52, 54, 55, 57. At least two of the Banks acknowledge that they still have not produced all responsive documents in their possession.  *See id.* 84.  The Court ordered that the Banks comply with the Subpoenas despite their claims that Chinese law allowed them to conceal information and the Banks failed to appeal.  *See* ECF Nos 150, 174.  Yet the Banks still refuse to comply and rely on Chinese law as an excuse for not producing Suspicious Activity Reports, Currency Transaction Reports and credit reports.  *See* Nagin Decl. Exs. 57, 60.  Each of the Banks failed to produce documents even after Next informed them of deficiencies in their productions relating to documents that must exist.[12]  *Id.* Exs. 64–65, 67, 70, 73–74.  As discussed above, the Banks'

---

[12]   CCB and ICBC state that additional Know Your Customer and Account Opening/Closing documents will be produced for certain accounts.  *See* Nagin Decl. Ex. 84.  As of the date of the filing, a month after the Moving Banks' letter, they still have yet to produce these documents.  Nonetheless, this supplemental production does not come close to curing the severe deficiencies in the Banks' productions.

culpable state of mind is particularly obvious from their failure to produce documents reflecting thousands of credit card transactions, all of which the Banks were aware of as they were cited in Next's briefing in support of its motion to compel.

*Third*, this Court has already acknowledged that the documents sought by the Subpoenas are essential "as locating the Judgment Debtors' assets is plainly of critical importance to [Next's] ability to obtain a recovery under the Judgment." ECF No. 150 at 34. Without these documents, Next is unable to determine the full scope of Judgment Debtors' enterprise, including identifying additional counterfeiters, tracing their assets and calculating their profits.

Accordingly, Next respectfully requests that this Court apply a presumption that for the 53 accounts for which the Banks failed to produce transaction documents and which Next conclusively tied to counterfeiting activity, that the withheld documents would evidence post-freeze transactions in violation of the Court's Asset Freeze Provisions that are equal to or greater than the 36,000 post freeze transactions which are reflected in the documents the Banks have produced.

### b.    Each Bank Has Violated This Court's Asset Freeze Provisions.

The documents produced to date by the Banks establish that ABC, BOC, CCB, CMB and ICBC collectively violated the Asset Freeze Provisions at least 36,000 times—all individual acts of contempt—totaling more than $69,000,000. *See* AP Decl. ¶¶ 29–63, 66–67. Those transactions are detailed in the documents the Banks did produce. Of course, the Banks still have not produced transaction documents for 53 accounts. *Id*. ¶¶ 21, 23. As to the accounts for which the Banks have failed to produce transaction records, Next respectfully requests that this Court presume that the documents the Banks continue to conceal contain evidence of additional contemptuous transactions.

The Banks' failure to freeze Judgment Debtors' accounts and their refusal to cease doing business with Judgment Debtors allowed the counterfeiters to expand their counterfeiting scheme in violation of this Court's Orders. As detailed in the Declaration of Sara Perles, the evidence establishes that the accounts that the Banks allowed Judgment Debtors to freely use are connected with 811 New Websites. *See* Perles Decl. ¶¶ 26, 27, 35. Ms. Perles made these connections by tracing Judgment Debtors' identifying information associated with their accounts to a network of interconnected websites. *See* Perles Decl. ¶¶ 12–20.

By analyzing images of Nike trademarks on the products offered for sale on the New Websites, Ms. Perles determined that the Judgment Debtors' operation of the New Websites infringed on 34 different Nike trademarks on 46 different types of goods in nine different networks. Perles Decl. ¶¶ 21–25, 28–30. In accordance with the Court's Orders, the Banks, at the very least, should have stopped doing business with Judgment Debtors once they were on notice that their customers were counterfeiters who were enjoined from conducting any transactions in or out of their accounts. Instead, the Banks allowed Judgment Debtors to continue routine banking. As set forth in detail in the Declarations of Edward Boyle, a Director of AlixPartners, a prominent accounting firm, and Sara Perles, a digital investigation specialist, the Banks each allowed the Judgment Debtors to engage in numerous transactions after receiving notice that such transactions were explicitly enjoined, allowing hundreds of websites to operate. *See* AP Decl. ¶¶ 29–63, 66–67, Perles Decl. ¶¶ 26, 27, 35, 36–468.

Each Bank has violated this Court's Orders and should be held in contempt. In order to avoid burdening the Court, Next has set forth below representative examples to illuminate the Banks' flagrant disregard of this Court's Orders. Even alone, these example prove that the Banks violated this Court's Orders.

34

**(i)      ABC Violated the Asset Freeze Provisions.**

While the full extent of ABC's contemptuous post-freeze conduct is impossible to

ascertain as ABC produced a mere 29 documents, the few documents ABC did produce

conclusively establish ABC's contempt.  Account statements related to Judgment Debtor Guo

Jian Cong—whose name appeared in both the Second Supplemental Order and the Judgment—

evidence over $9,500,000 dollars of post-freeze transactions, continuing through at least

December 2018.  *See* AP Decl. ¶ 67, Ex. 107.  The Second Supplemental Order identifies

Judgment Debtor Cong and finds that he is associated with the website www.hiphoplinda.org

which sold counterfeit Nike products.  *See* ECF No. 24-1 at 51; ECF No. 49, Ex. 1 at 12.  As set

forth in the Declaration of Sara Perles, the evidence establishes that hophoplinda.org is

connected to 168 New Websites selling fake Nike products. *See* Perles Decl. ¶¶ 39–45.  At the

very latest, ABC received notice of this website and Cong's name when it received notice of the

Judgment back in 2015.  Nagin Decl. Ex. 40.  The email address 770314722@qq.com, which is

identified in the Judgment as associated with Judgment Debtor Guo Jian Cong also appears in a

document ABC produced in connection with Judgment Debtor Cong's account.  AP Decl. Ex.

106.  As such, ABC knew that this Court's Orders froze Judgment Debtor's Cong's accounts—

having at least two different ways (name and email address) to identify Judgment Debtor Cong—

yet ABC allowed this Judgment Debtor to conduct nearly 3,400 transactions after the date of the

Judgment.  *See* AP Decl. ¶ 67.

The documents produced by ABC also reveal that ABC permitted Judgment Debtor

www.alvababy.com to initiate more than 1,000 transactions after ABC received notice that this

account specifically appeared in the TRO.  *See* AP Decl. ¶¶ 32, 35, 65; ECF No. 3 at 27, row

362; Nagin Decl. Ex. 4.  The merchant www.alvababy.com was the merchant name displayed on

the private investigators' credit card statement after purchasing a pair of counterfeit Nike shoes

35

from www.nfljerseywebsite.com back in 2013.  ECF No. 6-9.  ABC was on notice that its records relating to www.alvababy.com were at issue no later than November 2013 when ABC received the TRO calling for their production.  Nagin Decl. Ex. 4.  Nevertheless, after the Court's November 19, 2018 order compelling production, ABC only produced records of transactions in www.albavavy.com's account for a *single six-month period* in 2016—even though alvababy was in operation at least as early as May 22, 2013.  *See* ECF No. 6-9, Ex. G; AP Decl. Ex. ¶ 35.  While ABC's failure to produce records from 2014 and 2015 make it impossible to know the full scope of ABC's contempt, the records that ABC did produce show that in 2016 ABC allowed www.alvababy.com to process more than 1,000 sales through its merchant account—transactions that were expressly prohibited by both the TRO and the PI Order.  Each of the more than 1,000 transfers made in 2016—as well as each of the transfers that took place in 2014 and 2015, that ABC's failure to produce records has concealed—is a known act of contempt by ABC.

The documents ABC produced related to additional Judgment Debtors similarly indicate that each maintained open accounts after the date each became subject to the asset freeze.  AP Decl. ¶¶ 67, 68, 71.  For example, the website www.bestbuynike.com was listed in the TRO, notice of which was provided to ABC on November 26, 2013.  *See* Nagin Decl. Ex. 4.  A second website www.usajumpman.com is associated with www.bestbuynike.com as evidenced by ABC's own document.  Lee Decl. Ex. 53.  The email address ptcsn@163.com is listed in the TRO as associated with www.bestbuynike.com and in the Second Supplemental Order as associated with www.usajumpman.com.  *See* ECF No. 3 at 23, row 232; ECF No. 24-1 at 47.  Both websites also were listed as being connected to each other in the Judgment, of which ABC received notice.  *See* Nagin Decl. Ex. 40 at 22, rows 264, 292.  Accordingly, ABC should have

frozen and ceased doing business with the account www.bestbuynike.com and all associated accounts, including www.usajumpman.com as of the time it received notice of the TRO. Additionally, ABC should have automatically been on notice of its customers' counterfeit activity based on names of merchant accounts alone—which contain two of Nike's trademarks. Despite this, ABC's documents indicate that the account for www.usajumpman.com remained open until at least November 2, 2018.  AP Decl. ¶ 71.  The full extent of ABC's contempt cannot be determined as ABC did not produce transaction records for either www.usajumpman.com or www.bestbuynike.com.

**(ii)      BOC Violated the Asset Freeze Provisions.**

BOC permitted at least 1563 transactions, totaling over $4,600,000 in and out of Judgment Debtor Chen Wei Fang's account after the date on which BOC was on notice that this Judgment Debtor's account should have been frozen.  AP Decl. ¶¶ 59–60, Exs. 68–69, 103; Nagin Decl. Ex. 37.  BOC received notice of Judgment Debtor Fang's name in connection with the Third Supplemental Order on December 4, 2014.  Nagin Decl. Ex. 37.  This account is associated with the email address 274024654@qq.com, which is associated with the website bestfanjersey.com, which BOC received notice of in the Second Supplemental Order.  Nagin Decl. Ex. 35.  The documents produced by BOC evidence post-freeze transactions from late September 2015 through late September 2018, years after Judgment Debtor Fang's assets were frozen.  AP Decl. ¶ 59, Ex. 103.  This allowed Judgment Debtor Fang to continue to operate his counterfeiting empire.  Ms. Perles determined that Judgment Debtor Fang is a member of a network responsible for operating 552 New Websites selling counterfeit Nike products, after the date this Judgment Debtor was enjoined by this Court's Orders. *See* Perles Decl. ¶¶ 122–127.

37

(iii)     **BOCOM Violated the Asset Freeze Provisions.**

BOCOM did not produce transaction records for any of the 17 known Judgment Debtor

merchant accounts at BOCOM.[13]  AP Decl. ¶¶ 21, 23, Ex. 4.  Accordingly, Next respectfully

requests a presumption that there was post-freeze activity in these accounts.  Next is able to tie

the BOCOM accounts to 642 New Websites.  *See* Perles Decl. ¶¶ 207–266.  The documents that

BOCOM did produce establish that these accounts remained open after BOCOM received notice

of this Court's Orders freezing those accounts but BOCOM's failure to fully comply with the

Subpoenas has prevented Next from determining the full extent of the post-freeze activity in

these Judgment Debtor accounts.

There is no question, however, that BOCOM continued to do business with Judgment

Debtors in violation of this Court's Orders.  For example, the documents produced by BOCOM

reveal that while BOCOM received notice of the Judgment Debtor name Lin Jian (in both

English and Chinese) in the Supplemental Order, and also again in the Judgment, *see* Nagin

Decl. Exs. 28, 40, BOCOM did not enjoin Judgment Debtor Jian's account as required to by this

Court's Orders.  In response to Next's Subpoenas, BOCOM only produced a single document

relating to Judgment Debtor Jian's account, which reflected Judgment Debtor Jian as the account

holder of the merchant account QINGHUIGONGMAO.  *See* Lee Decl. Ex. 51.  In addition,

BOCOM's own document also shows that Judgment Debtor Jian was also selling shoes via the

website www.7shoesmall.com.  *Id*.  Unsurprisingly, the evidence proves that BOCOM did not

shut down Judgment Debtor Jian's account in 2014, but rather allowed Judgment Debtor Jian to

---

[13]  In their June 20. 2019 letter, BOCOM belatedly claims that their failure to produce transaction documents
should be excused because they allegedly use a third party who maintains these transaction records. *See* Nagin
Decl. Ex. 84.  This is unacceptable.  BOCOM did not raise this issue before Magistrate Judge Freeman or this
Court in connection with its motion to quash.  And, this Court's November 19, 2018 Order made clear that
BOCOM must produce all responsive transaction documents.  In addition, as discussed *supra*, BOCOM had the
ability to obtain these documents yet chose not to.

continue to operate.  Judgment Debtor Jian's name is included in the Supplemental Order dated

January 23, 2014 and BOCOM knew from its own records that QINGHUIGONGMAO was a

merchant account belonging to Judgment Debtor Jian.  Yet, when Next's investigator

successfully purchased a counterfeit Nike good from Judgement Debtor Jian's website,

2016retros.com in 2017, the merchant name QINGHUIGONGMAO appeared as the seller on the

investigator's Mastercard statement.  Documents produced by Mastercard revealed that BOCOM

was the acquiring bank.  *See* ECF No. 125 ¶¶ 2, 3.  Had BOCOM abided by this Court's

Supplemental Order and enjoined Judgment Debtor Jian's account, Jian would not have been

able to use his merchant account QINGHUIGONGMAO to continue to process the sale of

counterfeit goods, including its sale of a counterfeit product to Next's investigator in 2017.  In

naked contempt of this Court's Orders, Judgment Debtor Jian continued to utilize BOCOM's

acquiring bank services to further its counterfeiting operation and BOCOM knowingly

participated in Jian's violations of the Court's Orders.  Judgment Debtor Jian's account and the

website 2016retros.com are part of a network of counterfeiters responsible for operating 552

New Websites selling fake Nike product in contempt of Court.  *See* Perles Decl. ¶¶ 257–266.

### (iv)    CCB Violated the Asset Freeze Provisions.

In just one account, CCB permitted almost *$37,000,000* in transactions *after* the date

CCB was notified that all of Judgment Debtor Hu Xiu Feng's accounts should have been frozen

pursuant to the TRO, which plainly stated that Judgment Debtor Feng's other CCB account

ending in 1229 was enjoined.  *See* AP Decl. ¶¶ 55–56; Nagin Decl. Ex. 6.  Judgment Debtor

Feng's name also appeared in the Supplemental Order.  *See* ECF No. 19, Ex. 3 at 1.  Despite this

Court's clear Orders, CCB permitted Judgment Debtor Feng to engage in at least 634 post-freeze

transactions.  *See* AP Decl. ¶55, Exs. 53–56.  Using the email addresses associated with

Judgment Debtor Feng's PayPal account as listed in Exhibit 3 to the Supplemental Order, *see*

ECF No. 19, Ex. 3 at 1, Ms. Perles was able to connect Judgment Debtor Feng's accounts to a larger network of counterfeiters, which are responsible for operating 552 New Websites selling counterfeit Nike products.  Perles Decl. ¶¶ 302–313.

(v)    <b>CMB Violated The Asset Freeze Provisions.</b>

CMB permitted at least 115 transactions totaling over $2,600,000 dollars in Judgment Debtor Huang Xiu Zhu's account after CMB was on notice that this Judgment Debtor's account was frozen in connection with the Court's Supplemental Order.  AP Decl. ¶¶ 55, 57.  CMB received notice of Judgment Debtor's name and another specific account number associated with Judgment Debtor Zhu (CCB account ending in 7441) on January 8, 2014.  *See* Nagin Decl. Ex. 22, Ex. C.  Judgment Debtor Zhu's name and corresponding account number appeared in the Supplemental Order, *see* ECF No. 19, Ex. 3 at 4, and CMB received notice after the Court entered into the Supplemental Order, *see* ECF No. 28.  Ms. Perles determined that Judgment Debtor Zhu is a member of a network of counterfeiters responsible for operating 552 New Websites selling counterfeit Nike products, after the date this Judgment Debtor was enjoined by this Court's Orders. *See* Perles Decl. ¶¶ 425–431.

In addition, CMB has admitted that it did not produce any transaction documents for the account ending in 8400.  AP Decl. ¶ 21, Ex. 4.  On November 27, 2013 in connection with the TRO, CMB received notice that this account had been frozen and that documents connected to this account were relevant and should be produced.  *See* Nagin Decl. Ex. 7.  This account subsequently appeared in the Supplemental Order, *see* ECF No. 19, Ex. 3 at 1.  CMB received notice of the Supplemental Order shortly after it was signed by this Court.  Nagin Decl. Ex. 28.  From the Supplemental Order, CMB should have known that the Judgment Debtor associated with this account was involved in counterfeiting of Nike products as that Judgment Debtor is listed as using numerous email address infringing on the Nike name, including

40

bestbuynike@yahoo.com, ineednikeshoes@hotmail.com, usajumpman@yahoo.com, and

nikeonlineservice@gmail.com.  ECF No. 19, Ex. 3 at 1.  CMB was on notice of Judgment

Debtor's use of the Nike name as early as December 5, 2013, when it received notice of the

underlying PayPal documents where this information was sourced.  *See* Nagin Decl. Ex. 14. This

Judgment Debtor's account was identified by PayPal, *see id.*, and PayPal produced transaction

records evidencing over 20 transactions into this account, *see id.* Ex. 98.  Despite the fact that

PayPal's records showed transactions into the account, CMB has withheld the records of the

account's transactions.  This fact makes the presumption that CMB permitted post-freeze

transactions in contempt of Court compelling.  Ms. Perles was able to connect Judgment

Debtor's account ending in 8400 to a network infringing on 23 Nike trademarks selling unique

goods, totaling $4,200,000.  Perles Decl. ¶¶ 432-438.

<b>(vi)     ICBC Violated the Asset Freeze Provisions.</b>

ICBC allowed Judgment Debtor associated with the ICBC account ending in 1178 to

engage in at least 1,766 transactions, totaling over $200,000 after the date on which ICBC was

on notice that this account was frozen by this Court's Order.  *See* AP Decl. ¶¶ 32, 47.  In direct

contempt of this Court's Orders, ICBC did not freeze Judgment Debtor's account ending in 1178

and continued to do business with the Judgment Debtor.  ICBC was notified the account ending

1178 was specifically restrained in the TRO on November 14, 2013, *see* Nagin Decl. Ex. 8.

Instead of freezing the account, ICBC allowed Judgment Debtor to continue to use this account

to effectuate nearly 1,800 transactions and Judgment Debtor's counterfeiting network grew.  AP

Decl. ¶ 47.  Ms. Perles used Judgment Debtor's email address jenneyzhenlin@gmail.com, which

is directly associated with this ICBC bank account as evidenced in documents produced by

PayPal, s*ee* Nagin Decl. Ex. 8 at 67, to connect this ICBC account to 119 New Websites.  Perles

Decl. ¶ 441–447.  The email address jenneyzhenlin@gmail.com is associated with many

41

websites in the TRO including the website kdshoescheap.com.  ECF No. 3 at 25, row 317; *see generally id.* at 24–25.  The New Websites connected to Judgment Debtors' email address jenneyzhenlin@gmail.com are listed in the Supplemental Order, the Second Supplemental Order, the Third Supplemental Order and the Judgment.  *See* ECF No., 19, Ex. 3; ECF No. 24, Ex. 3; ECF No. 27, Ex. 3; ECF No. 49; *see* also Perles Decl. ¶¶ 441–447.  ICBC continued to permit this Judgment Debtor to transact business in its account through at least November 20, 2017— nearly three years after ICBC was on notice that the account was enjoined.  *See* AP Decl. ¶¶ 32, 47; Nagin Decl. Ex. 8.  Ms. Perles determined that this account is a member of a network of counterfeiters responsible for operating at least 119 New Websites selling counterfeit Nike products.  Perles Decl. ¶ 447.

### 3.     The Banks Did Not Display Reasonable Diligence.

The Banks did not display reasonable diligence in complying with the Court's November 19, 2018 Order to produce all documents responsive to the Subpoenas nor did they display reasonable diligence in complying with the Court's Asset Freeze Provisions.  Due diligence "at the very least, requires a party to develop reasonably effective methods of compliance." *Zino Davidoff SA v. CVS Corp.*, 2008 WL 1775410, at *8 (S.D.N.Y. Apr. 17, 2008).  Yet the Banks clearly did little to ensure their compliance with the Court's November 19, 2018 Order despite having confirmed that they have the ability to identify and produce documents related to Judgment Debtors' in this action.  *See* ECF No. 195 n.8.  Rather, the documents the Banks "produced are only a fraction of what was presumably responsive to" Next's Subpoenas, *Huber v. Arck Credit Co., LLC*, 2016 WL 482955, at *3 (S.D.N.Y. Feb. 5, 2016), and cannot be the totality of documents that the Banks maintain in the normal course of business for their customers.  AP Decl. ¶¶ 19–25.  The Banks simply cannot assert that no other documents exist, as Next has uncontroverted evidence from PayPal, correspondent banks and credit card

companies of additional transactions.[14]  *See* AP Decl. ¶¶ 20(c)–(d), 24; *see also* ECF No. 84, Exs. 33, 49–62, 93–95, 104–108, 129–219 (wire transfer records into accounts at Banks); *see also* ECF No. 85-2 (summarizing wire transfer records); ECF No. 125 ¶¶ 2, 3, 9.

The repeated and significant post-freeze transactions—which occurred for years after the Banks received notice of the Asset Freeze Provisions in 2013—further illustrate the Banks complete disregard for the Court's Orders.  Whether the Banks allowed Judgment Debtors to move funds "knowing full well that they were likely the target of the court's freeze order, or because of extreme negligence never even bothered to make an initial determination as to whether or not the funds were frozen by the court's order" is irrelevant as "either one [of the two possibilities] would put [the Banks] in civil contempt."  *S.E.C. v. Homa*, 2004 WL 1093492, at *7 (N.D. Ill. May 13, 2004).  The Banks' conduct illustrates, however, that they never had any intention of complying with the Asset Freeze Provisions.  The Banks opposed the Asset Freeze Provisions at every turn and have never claimed that they were attempting to comply—in fact the Banks effectively admitted that they had not frozen the Judgment Debtors' accounts in open court in 2018.  *See, e.g.*, Nagin Decl. Exs. 17, 20, 24, 30, 34; ECF Nos. 41, 43, 47 (opposing asset freeze provisions in Judgment); ECF Nos. 67, 70 (seeking modification of asset freeze in Final Order); Nagin Decl. Ex. 83; ECF Nos. 130, 133 (refusing to agree to restrain customer accounts pending decision and effectively admitting noncompliance).  This choice to ignore the Court's Orders is shocking since, if they had acted diligently, the Banks could have, by their own description, "terminated financial services" to Judgment Debtors without violating any Chinese

---

[14]  If the Banks do not have these additional records, it is then clear that the Banks were not reasonably diligent in preserving documents related to Judgment Debtors.  The Banks have been on notice since November 2013 that they were required to preserve all documents related to Judgment Debtors' accounts.  The TRO, along with all of the Court's subsequent Orders, contained explicit expedited discovery provisions, requesting the very documents the Banks should have produced.  At the very latest, the Banks knew that they should have preserved all documents related to Judgment Debtors as of November 30, 2017 when they were served with the Subpoenas.  The failure to preserve and produce these documents flies in the face of any claim of diligence.

law.  *See, e.g.*, ECF No. 161 at ¶ 5; ECF No. 160 ¶ 5.  There is no Chinese law that requires the Banks to continue to do business with criminals.  Clarke Decl. ¶¶ 10(a), 14–38.  The Banks' own documents reveal that they entered into various contracts with Judgment Debtors under which the Banks have the right to freeze accounts and stop doing business with Judgment Debtors in the event of wrongful activity.  *See* Clarke Decl. ¶¶ 10(b), 14–16; Lee Decl. Exs. 14–24.  The Banks, however, made no effort to comply with this Court's Orders prohibiting transactions in to or out of the Judgment Debtors' accounts until 2018—five years after they first were on notice of the Asset Freeze Provisions.

There is simply no excuse for the Banks' failure to stop doing business with Judgment Debtors once they knew Judgment Debtors were engaged in illegal activity and were enjoined.  Documents produced by ABC, BOCOM and BOC specifically reference the word "Nike" giving the Banks even more reason to know that their customers were engaged in counterfeiting activity.  *See* Lee Decl. Ex. 25; *see also id.* Exs. 26–53.  For example BOC produced records of wire transfers into Judgment Debtors' accounts for "PAYMENT FOR 3 PAIRS OF NIKE SHOES" and "NIKE FREE RUN+2 MEN SHOES ALL BLAACK (QTY 2) SIZE 45."  Lee Decl. Exs. 31, 34.  The Banks received notice on numerous occasions that Judgment Debtors were serial counterfeiters and that the Banks should stop allowing Judgment Debtors to benefit from their banking services.  The Banks simply chose to continue to do business with criminals.

## C.    The Court Should Award Next Compensatory Contempt Damages.

Next has been damaged as a result of the Banks' contempt.  The Banks allowed Judgment Debtors to continue to operate their extensive illegal counterfeiting networks in contempt of this Court's Orders by permitting Judgment Debtors to conduct business as usual—collectively permitting at least 36,000 transactions, totaling more than $69,000,000 after the Banks were aware of this Court's Orders freezing Judgment Debtors' accounts.  As a result, the Banks

allowed Judgment Debtors to continue their illegal operations and more than $32,000,000—

money to which Next is entitled—slip away.  *See* AP Decl. ¶ 75.  And by allowing these

counterfeiters to continue business as usual, the Banks allowed the sale of counterfeit Nike

products to continue on 811 New Websites.  *See* Perles Decl. ¶¶ 26, 27, 35.

Next respectfully requests that the Court order the Banks to compensate Next for the

$32,690,603 they allowed Judgment Debtors to transfer out of their accounts as a measure of loss

for the Banks' failure to comply with the Court's Asset Freeze Provisions.  *See* ECF No. 49; AP

Decl. ¶ 75.  Had the Banks abided by the Asset Freeze Provisions, Next would have been able to

recover these sums pursuant to a turnover order to satisfy its Judgment.  Because of the Banks'

contempt, Judgment Debtors ferreted away this money—and likely more—causing damage to

Next.  The Banks should be ordered to compensate Next for these sums.  Respectively, ABC

permitted Judgment Debtors to withdraw $4,936,813, BOC permitted Judgment Debtors to

withdraw $2,450,326, CCB permitted Judgment Debtors to withdraw $23,292,374, CMB

permitted Judgment Debtors to withdraw $1,332,389, and ICBC permitted Judgment Debtors to

withdraw $678,701.  AP Decl. ¶ 75.

Next also respectfully requests that this Court award statutory damages totaling

$118,000,000 based on the illegal use of Nike trademarks on numerous types of goods across the

nine counterfeiting networks that continued to operate in violation of this Court's Orders due to

the Banks' willingness to continue business as usual.

Severe sanctions are "clearly warranted."  *Jones v. Niagara Frontier Transp. Auth.*, 836

F.2d 731, 735 (2d Cir. 1987).  Next has established herein that it has "suffered harm because of

[the Banks'] violation of the terms of [the Court's Orders]" and therefore "compensatory

damages are appropriate."  *Vuitton et Fils S.A.*, 592 F.2d at 130.  While Next must show "some

proof of loss," the sanction imposed by this Court need only "correspond at least to some degree with the amount of damages." *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Ingo. Techs., Inc.*, 369 F.3d 645, 658 (2d Cir. 2004); *see also U2 Home Entm't, Inc. v. Wei Ping Yuan*, 245 F. App'x 28, 30 (2d Cir. 2007) (stating that compensatory damages require only some proof of loss). "When awarded as a means of compensation, however, a civil contempt fine is not always dependent on a demonstration of 'actual pecuniary loss.'" *Manhattan Industries, Inc. v. Swweater Bee by Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir. 1989) (citation omitted).

In addition to the damage caused by the Banks permitting the Judgment Debtors to drain their accounts, Next suffered additional loss due to the Banks' failure to cease doing business with Judgment Debtors.  The Court's Orders not only provided for an asset freeze but also forbade Judgment Debtors and those acting in concert with them from continuing to violate the Lanham Act.  *See, e.g.*, ECF No. 49.  This Circuit has endorsed the use of statutory damages as a "prox[y] for actual damage, where the actual damages" caused by contemptuous conduct are "difficult to determine."  *See, e.g.*, *Yash Raj Films (USA), Inc. v. Bobby Music Co. & Sporting Goods*, 2006 WL 2792756, at *11–12 (E.D.N.Y. Sept. 27, 2006) (finding that fines calculated using statutory damages were appropriate because the defendants violated the preliminary injunction, without analysis of proof of injury).  Statutory damages are a particularly appropriate measure of the Banks' contempt in continuing to transact business with Judgment Debtors as "there is no way to assess actual pecuniary loss or even [Judgment Debtors]' profits" *Eros Entm't, Inc. v. Melody Spot, L.L.C.*, 2005 WL 4655385, at *7 (E.D.N.Y. Oct. 11, 2005). Statutory damages are useful where "defendants' failure to participate adequately in discovery made it very difficult for the district court to calculate the appropriate fine." *U2 Home Entm't*, 245 F. App'x at 30.

Next has computed a statutory damages calculation to determine the injury Next has suffered as a result of the Banks' contempt of this Court's Orders.[15]  To do so, Ms. Perles identified 811 New Websites that were connected to Judgment Debtors' accounts in which Next identified post-freeze transactions or is a requesting a presumption of post-freeze activity.  All of the New Websites appeared as an enjoined website in one of the Court's Orders after the date on which the Banks were on notice that the relevant Judgment Debtor's account should have been frozen.  *See* Perles Decl. ¶¶ 13–19.  The New Websites included in the computations were all determined by this Court to have been selling counterfeit Nike products and were operational after the Banks had notice of the Court's Order freezing the accounts.  *Id*.  The Banks' contempt allowed these websites to continue to sell their illegal wares—in some cases for years after this Court ordered transactions in the counterfeiters' accounts to cease.  Ms. Perles was able to connect Judgment Debtor's accounts to the New Websites by using shared identifiers such as email addresses.  *Id.* ¶¶ 18–19.

Ms. Perles also developed two models (the "Models") which, used together, identify different Nike trademarks on different types of goods from images of saved web archive files of Judgment Debtors' websites, thereby computing damages "per counterfeit mark per type of goods."  15 U.S.C. § 1117(c)(1); *see* Perles Decl. ¶¶ 21–25.  Ms. Perles was able to precisely identify all distinct instances of infringement on Judgment Debtors' New Websites.[16]  Perles Decl. ¶¶ 21–25, 29–30.  Ms. Perles then determined the number of products bearing infringing trademarks that the Banks' contempt allowed the Judgment Debtors to continue to sell.  Based on

---

[15] Since compensatory damages may not be used as a "purely punitive" measure, Next's calculation of damages is based upon the $200,000 per counterfeit mark per type of good sold, as set forth in Section 1117(c)(1), and not the $1 million per counterfeit mark per type of good sold calculation which was used in connection with the Judgment, which has a punitive component.  *See U2 Home Entm't,* 245 Fed. App'x at 30.

[16] Ms. Perles manually reviewed each individual infringement and classification to ensure complete accuracy. Perles Decl. ¶ 29.  Images taken from those websites showing the use of Nike's trademarks by each contemptuous network are attached as Exhibits 6–14 to Ms. Perles' Declaration.

the interconnected nature of Judgment Debtors' websites, many accounts are linked to the same

New Websites.  Perles Decl. ¶¶ 20, 31.  Ms. Perles determined the 811 New Websites are a part

of nine counterfeiting networks.  This damages calculation takes these networks into account and

only seeks statutory damages for the first time each Nike trademark appears on a distinct type of

good on any website across a network.  This methodology conservatively calculates the damage

caused by the Banks—it does not count a trademark on a product more than once in each

counterfeiting network even though the same mark might be used on the same product on

multiple websites within each network.[17]

The evidence establishes the following damages calculation:

| Network | Infringements Per Type of Good | Total New Websites | Damages Calculation | Banks with Accounts Utilized by Network |
|---|---|---|---|---|
| 1. | 208 | 552 | $41,600,000 | ABC, BOC, BOCOM, CCB, CMB, ICBC |
| 2. | 61 | 25 | $12,200,000 | CCB |
| 3. | 23 | 2 | $4,600,000 | ABC, BOC, CMB |
| 4. | 97 | 119 | $19,400,000 | BOC, ICBC |
| 5. | 24 | 2 | $4,800,000 | BOCOM |
| 6. | 17 | 4 | $3,400,000 | BOCOM |
| 7. | 4 | 6 | $800,000 | BOC, CCB, ICBC |
| 8. | 142 | 84 | $28,400,000 | BOCOM |
| 9. | 14 | 17 | $2,800,000 | ABC |
|  |  |  |  |  |
| **TOTAL** |  |  | **$118,000,000**[18] |  |

The Banks are jointly and severally liable for the damage for each counterfeiting network

of which they are a member.  The list of individual accounts and the network they are a member

---

[17]  Next has also limited its calculation to the websites that have been incorporated into this action through the Final Order.  However, our investigator has evidence that certain of these counterfeiting operations are ongoing and therefore the Banks' inaction is still causing Next damage. This damages calculation does not include a value for that additional damage and Next reserves its right to seek additional relief should the Banks' contempt continue.

[18]  A complete breakdown of the damages calculation is set forth in Perles Decl. ¶¶ 35, 36, Ex. 15.

of is fully set forth in the declaration of Ms. Perles.  The damage caused by each of the Banks'

liability based on network membership is as follows:

| Bank | ABC | BOC | BOCOM | CCB | CMB | ICBC |
|------|-----|-----|-------|-----|-----|------|
| Network | 1, 3, 9 | 1, 3 | 1, 5, 6, 8 | 1, 2, 7 | 1, 3 | 1, 4, 7 |
| Total Damage | $49 million | $46.2 million | $78.2 million | $54.6 million | $46.2 million | $61.8 million |

Because the Banks have refused to produce complete account records for all Judgment

Debtors, Next has at best a pinhole view of Judgment Debtors' profits and counterfeiting

operations, making it impossible to adequately trace Judgment Debtors' illicit profits and

identify additional counterfeiters.  Even more so, the failure to produce complete account records

for the Judgment Debtors has allowed the Banks to conceal the full extent of the Banks'

contempt of the Court's Asset Freeze Provisions.  Accordingly, the damages calculation set forth

herein is a conservative proxy for the damages caused by the Banks' contempt as the Banks'

"failure to participate adequately in discovery . . . should hardly inure to their benefit."  *U2*

*Home Entm't*, 245 F. App'x at 30.

**D.      The Moving Banks Are Not Entitled to Reimbursement.**

The Moving Banks' motion for reimbursement of excessive fees, costs, and expenses in

connection with their purported compliance with the Subpoenas is nonsense, especially in light

of the Banks' contempt.  It is incomprehensible that the Moving Banks would seek relief from

this Court while admitting to Next that they still—six months after this Court's December 19,

2018 deadline —had not fully complied with the Subpoenas.  Nagin Decl. Ex. 84.  The Moving

Banks admit that certain documents are still to be produced and continue to provide inadequate

explanation for their continued failure to produce others.  *Id.*; *see In re Aggrenox Antitrust Litig.*,

2017 WL 4679228, at *11 (D. Conn. Oct. 18, 2017) (only shifting partial costs because the third

party had not shown "good faith," was "notably intransigent and dilatory in its response to the

subpoena," and has "repeatedly exaggerated its costs").  Such reimbursement is not contemplated

by Federal Rule of Civil Procedure 45, which protects a nonparty from significant expense

*resulting from compliance* with a court order compelling the production of documents.  Fed. R.

Civ. P. 45(d)(2)(B)(ii) (emphasis added).[19]  The Moving Banks have not complied.

The Moving Banks are not automatically entitled to reimbursement for their questionable

efforts to comply with the Subpoenas.  *See Dow Chemical Co. v. Reinhard*, 2008 WL 1968302,

at *1 (S.D.N.Y. Apr. 29, 2008) ("[C]osts on behalf of non-parties is not necessarily automatic . . .

."). The word "protect" in Rule 45 does not mean "that the requesting party foot the nonparty's

bill of compliance." *In re First American Corp.*, 184 F.R.D. 234, 240 (S.D.N.Y. 1998); *see also

id.* at 241 ("Protection from significant expense does not mean that the requesting party

necessarily must bear the entire cost of compliance." (quoting *Linder v. Calero-Portocarrero*,

180 F.R.D. 168, 177 (D.D.C. 1998))).  The Moving Banks' are not "entitle[d] to pass along

expenses for work that was unnecessary or that could have been done less expensively." *Kahn v.

General Motors Corp.*, 1992 WL 208286, at *2 (S.D.N.Y. Aug. 14, 1992).  Had the Banks

complied with this Court's Orders prohibiting transactions in Judgment Debtors' accounts

starting in 2013, there would have been *far fewer* transactions and many fewer documents to

search and produce.

It is settled law that "a nonparty can be required to bear some *or all* of its expenses where

the equities of a particular case demand in." *See, e.g.*, *In re First American Corp.*, 184 F.R.D. at

241 (quoting *In Re Exxon Valdez*, 142 F.R.D. 380, 383 (D.D.C. 1998)).  The equities here

demand it.  A determination of whether cost shifting is appropriate requires analysis of (1)

whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can

---

[19]  Notably, this Court elected not to order reimbursement to the Banks in compelling them to produce
documents—despite the Moving Banks' request in their motion to quash the Subpoenas.

more readily bear the costs; and (3) whether the litigation is of public importance.  *US Bank N.A. v. PHL Variable Insurance Co.*, 2012 WL 5395249, at *4 (S.D.N.Y. Nov. 2, 2012).  Each of the three factors weighs against shifting the Moving Banks' fees, costs and expenses to Next.  Furthermore, reimbursement is appropriate only when a third party's costs are reasonable.  *See Sands Harbor Marina Corp. v. Wells Fargo Insurance*, 2018 WL 1701944, at * 4 (E.D.N.Y. Mar. 31, 2018) (holding "only reasonable expenses are compensable under Rule 45" (internal quotation marks omitted)).  The Moving Banks' alleged expenses are not.

      **1.**      **The Equities of This Case Demand the Moving Banks Bear Their Own Costs.**

The Moving Banks are not "disinterested nonparties."  ECF No. 195 at 15.  The Moving Banks are hardly the "quintessential, innocent, disinterested bystander the rule aims to protect."  *Dow Chemical Co*, 2008 WL 1968302, at *2 (S.D.N.Y. Apr. 29, 2008) (internal quotation marks omitted).  Rather, the Moving Banks have been involved in this action and put on notice of their potential liability from the very start—they were all served with notice of the TRO and PI Order and they have known from the very start that they had exposure for failing to honor this Court's Orders.  *See, e.g.*, ECF No. 3 ¶¶ 11–12, 17–18, 25; ECF No. 14 ¶¶ 1(j), 4, 16.  The Moving Banks appeared voluntarily before this Court in this action over four years ago to oppose the entry of the Judgment containing the global asset restraint.  ECF No. 41; *see also* Nagin Decl. Ex. 39.  They lost.  *See* ECF Nos. 48, 49.  The Moving Banks once again sought to modify the Asset Freeze Provisions when they brought their motion to quash the Subpoenas.  *See* ECF No. 71.  These voluntary appearances before this Court belie any claim of disinterest and illustrate the Moving Banks' interest in preventing the discovery of their own contempt.

The Moving Banks are substantially involved in the underlying conduct at issue in this action as their continued provision of banking services permitted Judgment Debtors to continue to their counterfeiting operations in contempt of this Court's Orders.  Moreover, they were fully

aware that Next sought to enforce the Asset Freeze Provisions.  *See Dow Chemical*, 2008 WL 1968302, at * 2 (finding nonparty to be interested where they "should have reasonably anticipated being drawn into subsequent litigation").  During oral argument before this Court, Next made clear that one of the purposes of the Subpoenas was to determine if the Banks were acting in concert with Judgment Debtors to violate this Court's Orders.  *See* Nagin Decl. Ex. 83 at 36:2–36:6 ("I'm assuming the banks have complied with the court order and not allowed the counterfeiters to touch their money.  If they have, well, we'll find that out.  *That's part of what we're looking for*." (emphasis added)).  Next has indeed found that out.  The Moving Banks are not innocent nonparties simply providing information—they are central to the counterfeiting operation this action was commenced to address and which was enjoined by this Court.  There is no reason to treat them otherwise.[20]

Second, the Moving Banks are better able to bear the cost of compliance with the Subpoenas.  While expenses associated with responding to a subpoena might be "significant . . . to a small family-run business" they can be "insignificant to a global financial institution."  *U.S. v. McGraw-Hill Companies, Inc.*, 302 F.R.D. 532,536 (C.D. Cal. 2014).  The Banks are among China's largest Banks and are at least partially state-owned.  ECF No. 83 ¶¶ 20–37; ECF No. 124 ¶¶ 15–16; Clarke Decl. ¶¶ 44–46.  The Moving Banks all recently reported profits in the range of tens of billions of *dollars*, with total assets in the trillions of dollars.  *See* Nagin Decl. Exs. 87–92.  Meanwhile, this Court's Judgment remains unsatisfied and Next's recovery has been blocked by the Banks' contempt, weighing against Next's ability to bear these costs.[21]

---

[20]  Notably, ABC and other third parties who have complied with expedited discovery provisions and subpoenas either have not requested reimbursement or have requested only minimal reimbursement for costs.

[21]  Next has been more than willing to "bear the costs of its investment" spending significant time and money to compel the Banks to produce documents—which should have already been produced pursuant to his Court's Orders—as well as uncovering the vast extent of the Banks' contempt.  Next should not, however, be saddled with the Moving Banks' fees and costs, especially given the Moving Banks' role in preventing Next's recovery.

Third, as this Court has recognized, enforcement of the Lanham Act is of the utmost public importance. *See* ECF No. 174 at 23, 29; ECF No. 150 at 30, 31, 40; *see also* Nagin Decl. Exs. 71–72; ECF No. 84 Exs. 251–53. Furthermore, this Court's ability to enforce its Orders is also a U.S. interest already recognized in this action. *See* ECF No. 150 at 30, 40. The Banks' compliance with this Court's Orders is essential to shutting down Judgment Debtors' operations and preventing further violations of the Lanham Act. Without being able to access the banking system, Judgment Debtors will have no means to manufacture or sell their counterfeit products. Ensuring the Banks' compliance with this Court's Orders has the potential to have a real impact on counterfeiters' ability to infiltrate the U.S. markets and violate U.S. trademark laws. Accordingly, this factor weighs against reimbursing the Moving Banks.

## 2.    The Moving Banks' Fees, Costs and Expenses Are Not Reasonable.

Finally, the fees, costs and expenses for which the Moving Banks seek reimbursement are unreasonable for myriad reasons and are not compensable. "[O]ne thing is certain:  an unreasonably incurred expense is not an expense 'resulting from compliance.'" *McGraw-Hill*, 302 F.R.D. at 536. "[O]nly reasonable expenses are compensable. An unreasonable expense, even undertaken in some sense as a response to a subpoena, does not result from that subpoena. Instead, it results from whatever set of decisions by and on behalf of the nonparty led to those unreasonable expenses being incurred." *G & E Real Estate, Inc. v. Avison Young-Washington, D.C., LLC*, 317 F.R.D. 313, 316 (D.D.C. 2016). It is the Moving Banks' burden to prove that their fees, costs and expenses are reasonable and resulted from the Subpoenas and the Court's November 19, 2018 Order and it is within the sound discretion of this Court to determine reasonableness. *Id.* The Moving Banks have not come close to meeting their burden.

Requesting over $1.2 million dollars for producing less than 7,500 documents is absurd.[22] It is inconceivable that the Moving Banks were required to expend the time and resources they claim to have expended to comply with the Subpoenas.  For example, ICBC claims that it incurred $125,000 in expenses reflecting the time spent by over *470 bank personnel* totaling nearly *15,000 hours* collecting a mere 409 documents.  ECF No. 195 at 7; ECF No. 198-1. Similarly, CCB claims that bank personnel expended almost *11,000 hours* to produce 1,805 documents, *see* ECF No. 197-1, and BOC claims that bank personnel expended over *12,000 business hours* and *6,600 overtime hours* to produce 5,003 documents, *see* ECF No. 201-1.  It is implausible that large financial institutions such as the Moving Banks could not have collected responsive documents using electronic and automated methods much more efficiently.

Moreover, the Moving Banks' requests for reimbursement of $687,537.51 in attorney's fees and costs are patently unreasonable.  "Hiring outside counsel is appropriate when a nonparty wishes to resist a subpoena *duces tecum* for its own independent reasons, but that is not a sufficient reason to charge legal costs to the issuing party."  *Id.*  "[I]t is not appropriate to shift the full weight of th[ese] commercial bank[s'] choices to" Next.  *Prescient Acquisition Grp., Inc. v. MJ Publishing Trust*, 2006 WL 2996645, at *2 (S.D.N.Y. Oct. 13, 2006).  Further, while the Banks purport only to seek reimbursement for certain of their counsel's fees, the complete redaction of counsel's bills makes it impossible to confirm that their request for reimbursement

---

[22]  None of the cases the Moving Banks cite in support of their Motion comes even *close* to granting a million dollars in costs.  Unsurprisingly, the only cases the Moving Banks can find in support of such an absurd amount of fees and costs as well as its support that these costs should include document review vendors and transportation and lodging costs for attorneys are cases in which attorney's fees were awarded in connection with the settlement of a class action or a Rule 37 motion.  *See* ECF No. 195 at 14–15.  These cases are inapposite.  Rather, courts have found significantly lower costs unreasonable in the context of Rule 45 reimbursement.  *See, e.g.*, *In re Aggrenox Litig.*, 2017 WL 4679228, at *10 (D. Conn. Oct. 18, 2017) (finding that the requested $176,000 was "outrageously high" and that spending $105,585 to review 5,545 pages of documents was unreasonable).  Even where the nonparties have produced "tens of millions of pages"—which pales in comparison to the 20,732 pages the Moving Banks produced here—Courts have found that only "*some* portion of the production costs will shift."  *McGraw-Hill*, 302 F.R.D. at 536 (emphasis added).

has been appropriately limited.  *See* ECF No. 199 ¶ 17, ¶ 21 n.4; *cf. Apotex, Inc. v. UCB, Inc.*,

2015 WL 11622480, at * 2 (S.D. Fla. Dec. 4, 2015) (finding redacted White & Case bills to be

sufficient to determine if attorney's fees should be recovered since "[t]he nature of the services

can be determined despite the redactions").

The Banks also seek reimbursement for attorney's fees and costs associated with a

"document production process" that was not required under Chinese law for the Banks to comply

with the Subpoenas.  Clarke Decl. ¶ 58.  Similarly, White & Case's fees purportedly include

costs specific to a need to store, process and analyze the Banks' documents in China, including

the cost of hiring a production vendor located in China prior to production.  The Moving Banks

provide no real support, legal or otherwise, to show Chinse law necessitated these expenses in

connection with complying with the Subpoenas.  *See* Clarke Decl. ¶ 56.  *Cf. First American*, 184

F.R.D. at 240 (finding shifting $75,000 of the $210,990.76 of expenses incurred was reasonable

because the Second Circuit and Court were aware that the third party "could not have complied

with the Subpoena without first making the appropriate applications" to the foreign "courts to lift

th[e] [legal] impediments").  In fact, BOC has previously produced documents directly to

plaintiffs in the United States without using this mechanism.  *See Gucci 2d. Cir.*, 768 F.3d at

128; *see also Tiffany (NJ) LLC*, 2012 WL 1918866 at *3; Clarke Decl. ¶ 59.  The Moving Banks

incorrectly state that they "obtained permission" from this Court to use this delivery mechanism.

ECF No. 195 at 4, n.4.  While Magistrate Judge Freeman told the Banks that they could produce

documents "by any reasonable means," *see* ECF Nos. 181, 183, this Court has never opined on

the necessity of producing documents in this manner and made clear that compliance with the

Subpoenas was not conditioned on the involvement of the Chinese government, *see* ECF No.

174.  Accordingly, these types of services, which were provided "for the non-party's sole benefit

and peace of mind" are not reimbursable. *McGraw-Hill*, 302 F.R.D. at 536. "In other words, Rule 45 does not cut a blank check to non-parties—unnecessary or unduly expensive services do not 'result from compliance' and, therefore, do not count as 'expenses.'" *Id.*

The request for reimbursement of attorney's fees also includes time spent negotiating a protective order, which similarly was not necessary to compliance. *See Sands Harbor Marina*, 2018 WL 1701944, at * 7 (finding tasks "wholly unrelated to document production . . . cannot be said to have resulted from that subpoena"). In addition, the Banks' reimbursement request includes costs such as transportation, travel, airfare, visa applications, hotels, taxis and meals which were not necessary to compliance with the Subpoenas. The cases the Banks cite in support of reimbursement of these types of costs are inapposite as none of them arose in the context of third party reimbursement for responding to a subpoena. *See* ECF No. 195 at 14–15. Moreover, the Banks' own cases make clear that discretionary costs such as meals and couriers are not required by the Subpoenas and should not be passed on to Next. *Kahn*, 1992 WL 208286 at * 3 (costs including "meals" and "courier services" are "discretionary expenses, not shown to have been required" and "should not be passed on to the adverse party"). It also generally is *not* appropriate to shift the cost of *reviewing* documents. *See US Bank Nat. Ass'n v. PHL Variables Ins., Co.*, 2012 WL 5395249 at *4 ("Generally, it is not appropriate to shift such costs because the producing party has the exclusive ability to control the cost of reviewing the documents.")

In sum, the Banks have not met their burden of establishing that the fees, costs and expenses for which they seek reimbursement were reasonably incurred in connection with compliance with the Subpoenas and this Court should deny their request.

E.    **Next Is Entitled to Attorney's Fees & Costs.**

It is not the Moving Banks but Next that is entitled to attorney's fees and costs. "It is well settled in this Circuit that costs, including reasonable attorneys' fees, may be awarded to the

party who prosecutes a contempt motion as an appropriate compensatory sanction for contumacious behavior." *New York State Nat. Org. for Women v. Terry*, 952 F. Supp. 1033, 1043 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 86 (2d Cir. 1998).  The Banks should be ordered to pay Next's fees and costs incurred in uncovering the Banks' contemptuous violation of this Court's Orders, including the Asset Freeze Provisions, and bringing this motion.  *See, e.g.*, *Terry*, 952 F. Supp. at 1044 (S.D.N.Y. 1997) (awarding attorney's fees for prosecuting contempt motion against defendants and nonparties who violated injunction); *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 642 F. Supp. 2d 276, 298–300 (S.D.N.Y. 2009) (awarding attorney's fees where defendant was in contempt of consent injunction prohibiting sale of counterfeit products).  Furthermore, because the Banks failed to produce all documents in response to this Court's November 19, 2018 Order, Next respectfully requests that this Court also award Next's fees and costs in connection with its enforcement of the Subpoenas, including its motion to compel.  *See*, *e.g., Sprint Nextel Corp. v. Ace Wholesale, Inc.*, 2014 WL 4308355, at *1 (S.D.N.Y. Aug. 26, 2014) (ordering the nonparty to pay attorney's fees and costs, after finding the nonparty in contempt for failing to produce all responsive documents); *Summit Bank v. Taylor*, 1997 WL 811526, at *4 (S.D.N.Y. Nov. 12, 1997) (same); *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 2008 WL 3852046, at *2 (S.D.N.Y. Aug. 13, 2008) (same); *Leser v. U.S. Bank Nat. Ass'n*, 2012 WL 580489, at *1–2 (E.D.N.Y. Feb. 21, 2012) (ordering nonparty to compensate the movant for damages suffered beginning the day the subpoena was issued).  "Pursuant to Rule 45 of the Federal Rules of Civil Procedure, such a request may be granted if a nonparty is declared in contempt on the basis of its failure to comply with [the] subpoena." *Bulkmatic Transp. Co. v. Pappas*, 2001 WL 504839, at *3 (S.D.N.Y. May 11, 2001).

Once this Court holds the Banks in contempt, it can award fees and costs as a matter of course. *See Sprint Nextel*, 2014 WL 4308355, at *1 ("The Court has the power under this rule to impose contempt simply on the basis of failure to comply with a subpoena." (citation omitted)); *Summit Bank*, 1997 WL 811526, at *4 (awarding fees upon finding the nonparty was in contempt, without additional analysis). This is appropriate as the Banks have repeatedly defied this Court's Orders, with flagrant bad faith.[23] *See, e.g., Terry*, 952 F. Supp. at 1044 (awarding costs where nonparties repeatedly violated court orders despite receiving notice of the orders). After receiving the Court's Orders, the Banks should have frozen Judgment Debtors' assets and ceased doing business with the Judgment Debtors. The Banks also were required to produce documents regarding the accounts pursuant to the expedited discovery provisions in the Orders, Next's Subpoenas, and this Court's November 19, 2018 Order. Instead, the Banks continued to drag their feet in actually producing the documents—and are still not in compliance with the Subpoenas *over* six months after the deadline for production—demonstrating they never actually intended to comply in good faith with the Court's November 19, 2018 Order. *See Upjohn Co. v. Medtron Labs., Inc.*, 2005 WL 3078232, at *2 (S.D.N.Y. Nov. 16, 2005) (awarding attorney's fees where the contemnor "stalled the production" of responsive documents, which "had the effect of concealing these transfers and unnecessarily prolonging litigation"). The documents the Banks did produce are incriminating, conclusively proving the Banks ignored this Court's Orders. All of the conduct described herein constitutes a pattern of bad behavior, and Next has

---

[23] Moreover, even though willfulness or bad faith is not a required for obtaining attorney's fees in this Circuit, *see, e.g.*, *Jacobs v. Citibank, N.A.*, 318 F. App'x 3, 5 (2d Cir. 2008), it is clear that the Banks' conduct has been willful.

spent years trying to secure compliance with this Court's Orders.  Next is entitled to be made whole for prosecuting the Banks' misconduct.[24]

## F.      The Banks Must Turnover Judgment Debtors' Assets.

While it is shocking that there is only $39,721.64 dollars left in Judgment Debtors accounts, AP Decl. ¶¶ 72–74 especially given the fact that the Banks permitted Judgment Debtors to drain over $32,000,000 post-freeze, Next is entitled to an order requiring the Banks to turnover these remaining assets.  There is no dispute that the Banks are in possession of Judgment Debtors'—their customers—money.  *See generally* AP Decl.  Next is clearly entitled to these monies pursuant to the Judgment which held Judgment Debtors liable for over one billion dollars.  *See* ECF No. 49.  "Nearly every court in th[e] [Second] Circuit to consider the issue has held that parties can bring a motion under FRCP 69(a)" to obtain a turnover order pursuant to New York state procedure.  *N. Mariana Islands v. Millard*, 845 F. Supp. 2d 579, 581 (S.D.N.Y. 2012); *see also* N.Y. C.P.L.R. §§ 5225(b), 5227.[25]  As discussed in section A.2 *supra*, New York state law, incorporated by Federal Rule of Civil Procedure 69(a), is clear that, because this Court has personal jurisdiction over the Banks, the Court has the authority to order the Banks to "turnover out-of-state property regardless of whether [the Banks are] a judgment debtor or garnishee."  *Koehler*, 12 N.Y.3d at 541.  For the same reasons set forth in section A.4 *supra*, the principles of international comity weigh strongly in favor of ordering the Banks to turnover

---

[24]  Upon the Court's request, Next will submit an affidavit setting forth its actual costs and fees incurred in its efforts to compel the Banks' production of documents and in bringing this motion to hold the Banks in contempt of court.  *See Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 2008 WL 3852046, at *2 (S.D.N.Y. Aug. 13, 2008) (directing complaining party to submit proposed order setting forth "actual costs").

[25]  Section 5225(b) states that the court "shall require" a person "[1] in possession or custody of money . . . [2] in which the judgment debtor has an interest" to pay the money to the judgment creditor "where [3] it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee."  Section 5227 is "essentially interchangeable," *CSX Transportation, Inc. v. Emjay Envtl. Recycling, LTD.*, 2016 WL 755630, at *3 (E.D.N.Y. Feb. 25, 2016), and directs the court to issue a turnover order against any person who it is shown is or will become indebted to the judgment debtor, N.Y. C.P.L.R. § 5227.  Next easily meets this standard.

the $32,721.64 in funds remaining in Judgment Debtors' accounts.  The very purpose of §§

5225(b) and 5227 is to require turnover in situations like this, and obligate third parties, like the

Banks, to allow judgment creditors, such as Next, the ability to collect their lawful judgment.

## CONCLUSION

For the reasons set forth herein, Next respectfully requests that this Court hold the Banks

in contempt and order them to pay Next $150,690,603 in compensatory damages plus attorney's

fees and costs, and to turnover all of Judgment Debtors' assets held at the Banks, totaling at least

$39,721.64, for a total of $150,730,325.64 plus fees and costs.


Dated:   July 19, 2019
         New York, New York

                                        GIBSON, DUNN & CRUTCHER LLP


                                        By:   _s/ Robert L. Weigel_____
                                              Robert Weigel
                                              Howard S. Hogan
                                              Lauren M.L. Nagin
                                              Alexandra Leigh Grossbaum

                                        200 Park Avenue
                                        New York, NY  10166-0193
                                        Telephone:  212.351.4000
                                        RWeigel@gibsondunn.com

                                        Attorneys for Plaintiff NEXT INVESTMENTS,
                                        LLC