THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIKE, INC and CONVERSE, INC.,<br>Plaintiffs,<br><br>v.<br><br>Maria WU et al.<br>Defendants. | Case No. 13 Civ. 8012 (CM) (DCF)<br><br>**ORAL ARGUMENT REQUESTED** |

### MEMORANDUM OF LAW OF NONPARTY BANKS IN OPPOSITION TO ASSIGNEE'S CROSS-MOTION TO HOLD THE BANKS IN CONTEMPT AND FOR A TURNOVER ORDER, AND IN FURTHER SUPPORT OF THE <u>NONPARTY BANKS' MOTION FOR REIMBURSEMENT</u>

WHITE & CASE LLP

Glenn M. Kurtz
David G. Hille
Jacqueline Chung
Dominique Forrest
Laura A. Grai

1221 Avenue of the Americas
New York, NY  10020-1095
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
gkurtz@whitecase.com
dhille@whitecase.com
jacqueline.chung@whitecase.com
dominique.forrest@whitecase.com
laura.grai@whitecase.com

QUINN EMANUEL URQUHART &
SULLIVAN LLP

Michael B. Carlinsky
Carey R. Ramos
Samuel Williamson
Cory D. Struble
Neil T. Phillips

51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
micharlcarlinsky@quinnemanuel.com
careyramos@quinnemanuel.com
samwilliamson@quinnemanuel.com
corystruble@quinnemanuel.com
neilphillips@quinnemanuel.com

*Attorneys for Bank of China, Bank of Communications, China Construction Bank, China Merchants Bank, Industrial and Commercial Bank of China Limited*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS ...................................................................................6

    A.    The Banks objected to the Pre-Judgment Orders. ..................................6

    B.    The Banks objected to the asset restraints in the Default Judgment, and the Court ruled that their objections were not ripe. ......................................8

    C.    Assignee obtains entry of the Final Order after an *ex parte* application. .............10

    D.    The Banks moved to modify the Final Order, and the Court declined to decide the issue based on Assignee's representation that it was not seeking to enforce the Final Order against the Banks. ........................................11

I.    THERE IS NO CONTEMPT OF THE FREEZE ORDERS ............................12

    A.    The Freeze Orders do not bind the Chinese Branches under the separate entity rule and therefore the Chinese Branches cannot be found in contempt. ............................................................................................12

        1.    The separate entity rule bars the judicial restraint of assets held in a bank's foreign branch. ............................................................12

        2.    Embracing Assignees' motion would upend well-settled norms with severe consequences for American banks. .........................16

    B.    The Freeze Orders are invalid because Assignee seeks statutory damages. ..........18

    C.    There is no contempt of any restraints based on Rule 69 because Assignee has failed to comply with the CPLR's judgment execution provisions. ...............21

    D.    The Freeze Orders do not clearly and unambiguously apply to the Banks. .........22

    E.    Applying the Freeze Orders retroactively would violate due process. .................26

    F.    Laches bars a finding of contempt. ....................................................29

    G.    Judicial estoppel bars Assignee's contempt claim. ..............................30

    H.    Principles of international comity also require denial of the motion. ....................31

II.    THERE IS NO CONTEMPT OF THE DISCOVERY ORDER .......................37

III.    ASSIGNEE'S CLAIM FOR $150 MILLION IN CONTEMPT "DAMAGES" FAILS .....................................................................................................43

    A.    Assignee has no standing to seek contempt damages based on "continuing infringement;" only Nike can pursue those claims. ...............................43

    B.    Assignee has no proof of causation as to alleged violations of its purported trademark rights. ............................................................................48

    C.    Assignee's statutory damages calculation is dubious and unreliable. ...................51

    D.    Assignee's claim for $32 million in compensatory damages is fatally

flawed..................................................................................................................55

IV.    ASSIGNEE MUST REIMBURSE THE BANKS............................................................57

CONCLUSION......................................................................................................................60

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Abreu v. Bank of Am. Corp.*,
   525 F. Supp. 2d 381 (S.D.N.Y. 2007) ......................................................................... 24

*In re Adelphia Recovery Tr.*,
   634 F.3d 678 (2d Cir. 2011) ...................................................................................... 30

*In re Agape Litig.*,
   681 F. Supp. 2d 352 (E.D.N.Y. 2010) ..................................................................... 24

*Alemite Mfg. Corp. v. Staff*,
   42 F.2d 832 (2d Cir. 1930) ...................................................................................... 24

*Allstar Mktg. Grp., LLC v. 158*,
   2019 WL 3936879 (S.D.N.Y. Aug. 20, 2019) ................................................. 19, 25

*Alzheimer's Disease & Related Disorders Ass'n v. Alzheimer's Found. of Am., Inc.*,
   307 F. Supp. 3d 260 (S.D.N.Y. 2018) ..................................................................... 49

*Andre Matenciot, Inc. v. David & Dash, Inc.*,
   442 F. Supp. 1199 (S.D.N.Y. 1976) ....................................................................... 49

*Aris Isotoner Inc. v. Berkshire Fashions, Inc.*,
   924 F.2d 465 (2d Cir. 1991) ..................................................................................... 29

*Baez v. Delta Airlines, Inc.*,
   2013 WL 5272935 (S.D.N.Y. Sept. 18, 2013) ....................................................... 42

*Baltazar v. Houslanger & Assocs., PLLC*,
   2018 WL 3941943 (E.D.N.Y. Aug. 16, 2018) ................................................. 14, 16

*Bigio v. Coca-Cola Co.*,
   675 F.3d 163 (2d Cir. 2012) ..................................................................................... 24

*Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*,
   869 F.2d 34 (2d Cir. 1989) ...................................................................................... 14

*CBF Industria De Gusa S/A v. AMCI, Holdings, Inc.*,
   2019 WL 3334503 (S.D.N.Y. July 25, 2019) ......................................................... 60

*Charles v. City of New York*,
   2015 WL 756886 (S.D.N.Y. Feb. 20, 2015) ........................................................... 42

*Court of Appeals in Motorola Credit Corp. v. Standard Chartered Bank*,
   21 N.E.3d 223 (N.Y. 2014) ............................................................................. passim

*Crown Die & Tool Co. v. Nye Tool & Machine Works,*
    261 U.S. 24 (1923) ................................................................. 46

*Daimler v. AG Bauman,*
    571 U.S. 117 (2014) ............................................................ 7, 35

*Deere & Co. v. MTD Holdings Inc.,*
    2004 WL 324890 (S.D.N.Y. Feb. 19, 2004) ....................... 29

*Doctor's Assocs. v. Reinert & Duree, P.C.,*
    191 F.3d 297 (2d Cir. 1999) ............................................... 24

*Emmendorfer v. Crader Tire & Retread Serv., Inc.,*
    670 S.W.2d 548 (Mo. Ct. App. 1984) ................................. 47

*Fed. Treasury Enter. Sojuplodoimport v. SPI Spirits Ltd.,*
    726 F.3d 62 (2d Cir. 2013) ................................................. 45

*Fils S. A. v. Carousel Handbags,*
    592 F.2d 126 (2d Cir. 1979) ............................................... 56

*In re First Am. Corp.,*
    184 F.R.D. 234 (S.D.N.Y. 1998) .................................... 59, 60

*Fonar Corp. v. Deccaid Services, Inc.,*
    983 F.2d 427 (2d Cir. 1993) ............................................... 23

*Funnekotter v. Republic of Zimb.,*
    2011 WL 5517860 (S.D.N.Y. Nov. 10, 2011) ................... 41

*Gjini v. U.S.,*
    2019 WL 498350 (S.D.N.Y. Feb. 8, 2019) ......................... 51

*Grand v. Schwarz,*
    2018 WL 4026735 (S.D.N.Y. Aug. 23, 2018) .................... 49

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999) ...................................................... 18, 19

*Gucci Am. Inc. v. Bank of China,*
    768 F.3d 122 (2d Cir. 2014) ......................................... passim

*Gucci Am., Inc. v. MyReplicaHandbag.com,*
    2008 WL 512789 (S.D.N.Y. Feb. 26, 2008) ....................... 35

*Gucci Am., Inc. v. Weixing Li,*
    135 F. Supp. 3d 87 (S.D.N.Y. 2015) .................................. 34

*Gucci Am., Inc. v. Weixing Li,*

2012 WL 5992142 (S.D.N.Y. Nov. 15, 2012) ........................................................................ 41

*Gucci Am., Inc. v. Weixing Li*,
2015 WL 7758872 (S.D.N.Y. Nov. 30, 2015) ........................................................ 37, 41, 48

*Gucci Am., Inc., v. Bagsmerchant, LLC*,
2012 WL 4468192 (S.D.N.Y. Sept. 27, 2012) ........................................................................ 35

*Heritage of Pride, Inc. v. Matinee NYC Inc.*,
2014 WL 3703871 (S.D.N.Y. Jul. 23, 2014) ................................................................... 37, 39

*Heyman v. Kline*,
444 F.2d 65 (2d Cir. 1971) .................................................................................................... 23

*In re Initial Pub. Offering Sec. Litig.*,
174 F. Supp. 2d 61 (S.D.N.Y. 2001) ...................................................................................... 33

*Int'l Soc'y for Krishna Consciousness of Western PA, Inc. v. Stadium Auth.*,
479 F. Supp. 792 (W.D. Pa. 1979) ........................................................................................ 46

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
327 F. Supp. 3d 606 (S.D.N.Y. 2018) .................................................................................... 25

*Kahn v. GMC*,
1992 WL 208286 (S.D.N.Y. Aug. 14, 1992) ......................................................................... 60

*Kelly-Brown v. Winfrey*,
717 F.3d 295 (2d Cir. 2013) .................................................................................................. 44

*Klipsch Group, Inc. v. Big Box Store Ltd.*,
2012 WL 4901407 (S.D.N.Y. Oct. 11, 2012) ........................................................................ 19

*Klipsch Group, Inc. v. Big Box Store Ltd.*,
2012 WL 5265727 (S.D.N.Y. Oct. 24, 2012) ........................................................................ 48

*Koehler v. Bank of Bermuda Ltd.*,
911 N.E.2d 825 (N.Y. 2009) ................................................................................................. 16

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt. Inc.*,
628 F. Supp. 2d 312 (E.D.N.Y. 2009) ................................................................................... 50

*Koopmann v. Robert Bosch LLC*,
2018 U.S. Dist. LEXIS 88332 (S.D.N.Y. May 25, 2018) ...................................................... 57

*Leadsinger, Inc. v. Cole*,
2006 WL 2266312 (S.D.N.Y. Aug. 4, 2006) ................................................................... 44, 49

*Lexmark International, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ............................................................................................................... 45

v

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
    2018 WL 1512055 (S.D.N.Y.  Mar. 12, 2018) ...................................................... 43

*Lurzer GMBH v. American Showcase, Inc.*,
    75 F. Supp. 2d 98 (S.D.N.Y. 1998) ........................................................................ 48

*U.S. v. McGraw-Hill Cos. Inc.*,
    302 F.R.D. 532 (C.D. Cal. 2014) ........................................................................... 58

*Motorola Credit Corp. v. Standard Chartered Bank ("Motorola II")*,
    771 F.3d 160 (2d Cir. 2014) ................................................................................... 14

*Motorola Credit Corp. v. Uzan*,
    388 F.3d 39 (2d Cir. 2004) ..................................................................................... 27

*Motorola Credit Corp. v. Uzan*,
    73 F. Supp. 3d 397 (S.D.N.Y. 2014) ...................................................................... 14

*Motorola Credit Corp. v. Uzan*,
    978 F. Supp. 2d 205 (S.D.N.Y. 2013) .............................................................. 13, 25

*Musah v. Houslanger & Assocs., PLLC*,
    2012 WL 5835293 (S.D.N.Y. Nov. 16, 2012) ....................................................... 22

*In re Namenda Direct Purchaser Antitrust Litig.*,
    2017 WL 3822883 (S.D.N.Y. Aug. 30, 2017) ....................................................... 58

*Nat'l Licensing Ass'n, LLC. v. Inland Joseph Fruit Co.*,
    361 F. Supp. 2d 1244 (E.D. Wash. 2004) .............................................................. 46

*Tiffany (NJ) LLC v. China Merchs. Bank*,
    589 F. App'x 550 (2d Cir. 2014) .............................................................................. 7

*Tiffany (NJ) LLC v. Dong*,
    2013 WL 4046380 (S.D.N.Y. Aug. 9, 2013) ......................................................... 35

*Tiffany (NJ) LLC v. Forbse*,
    2012 WL 1918866 (S.D.N.Y. May 23, 2012) ........................................................ 35

*Tiffany (NJ) LLC v. Qi Andrew*,
    2015 WL 3701602 (S.D.N.Y. June 15, 2015) ............................................. 19, 20, 35

*NML Capital, Ltd. v. Republic of Arg.*,
    727 F.3d 230 (2d Cir. 2013) ................................................................................... 27

*Nutritech Sols., Ltd. v. Matrix Nutrition, LLC*,
    2007 WL 1424337 (D. Ariz. May 11, 2007) .......................................................... 46

*ONE11 Imports Inc. v. NuOp LLC*,

2016 WL 7338422 (S.D.N.Y. Dec. 19, 2016) .................................................. 23, 24

*United States v. Paccione*,
    975 F. Supp. 537 (S.D.N.Y. 1997) ........................................................ 44

*Paradigm Biodevices, Inc. v. Centinel Spine, Inc.*,
    2013 WL 1915330 (S.D.N.Y. May 9, 2013) .......................................... 56

*Perfect 10 v. Visa International Services Ass'n*,
    494 F.3d 788 (9th Cir. 2007) ................................................................ 44

*Peterson v. Islamic Republic of Iran*,
    876 F.3d 63 (2d Cir. 2017) .................................................................... 15

*Reebok Int'l Ltd. v. McLaughlin*,
    49 F.3d 1387 (9th Cir. 1995) ................................................................ 34

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
    306 F.3d 99 (2d Cir. 2002) .................................................................... 42

*RJR Nabisco, Inc. v. European Cmty.*,
    136 S. Ct. 2090 (2016) .......................................................................... 35

*RooR Int'l BV v. Saleem*,
    2019 WL 4127282 (E.D. Tex. Aug. 12, 2019) ...................................... 47

*Samsun Logix Corp. v. Bank of China*,
    929 N.Y.S.2d 202 (N.Y. Sup. Ct. May 12, 2011) .................................. 17

*Sanders v. Air Line Pilots Assoc., Int'l*,
    473 F.2d 244 (2d Cir. 1972) .................................................................. 25

*Shaheen Sports, Inc. v. Asia Ins. Co.*,
    2012 WL 919664 (S.D.N.Y. Mar. 14, 2012) ........................................ 17

*Shamis v. Ambassador Factors Corp.*,
    34 F. Supp. 2d 879 (S.D.N.Y. 1999) .................................................... 42

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*,
    482 U.S. 522 (1987) .............................................................................. 31

*In re Subpoena to Loeb & Loeb LLP*,
    2019 WL 2428704 (S.D.N.Y. Jun. 11, 2019) ........................................ 60

*Tire Eng'g and Dist. L.L.C. v. Bank of China, Ltd.*,
    740 F.3d 108 (2d Cir. 2014) ............................................................ 13, 17

*Toray Int'l Am. Inc. v. Nakayama*,
    2014 WL 12543817 (S.D.N.Y. Apr. 29, 2014) ...................................... 19

*Union of Orthodox Jewish Congregations of Am. v. Am. Food & Bev. Inc.*,
    704 F. Supp. 2d 288 (S.D.N.Y. 2010) ...................................................... 54

*U.S. v. United Mine Workers of Am.*,
    330 U.S. 258 (1947) ................................................................................ 56

*Weston Capital Advisors, Inc. v. PT Bank Mutiara, Tbk*,
    738 Fed. Appx. 19 (2d Cir. 2018) ........................................................... 23

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000) ..................................................................... 30

*WowWee Grp. Ltd v. Meirly*,
    2019 WL 1375470 (S.D.N.Y. Mar. 27, 2019) ........................................ 19

*Zino Davidoff SA v. CVS Corp.*,
    (S.D.N.Y. Apr. 17, 2008) ........................................................................ 37

### Rules / Statutes

15 U.S.C. § 1114(1) .......................................................................................... 44

15 U.S.C. § 1116(a) .............................................................................. 6, 8, 10

15 U.S.C. § 1117(c)(1) ........................................................................... 21, 54

Fed. R. Civ. P. 26 .............................................................................................. 52

Fed. R. Civ. P. 45(d)(2) .................................................................................... 58

Fed. R. Civ. P. 65 ....................................................................................... 3, 13, 18

Fed. R. Civ. P. 69 ........................................................... 10, 13, 18, 19, 21, 22

Fed. R. Civ. P. 69(a)(1) .................................................................................... 22

Fed. R. Evid. 702 .............................................................................................. 52

Local Rule 83.6(b) ............................................................................................ 43

N.Y. Civ. Prac. L. & R. § 5018(b) ................................................................... 22

N.Y. Civ. Prac. L. & R. § 5019(c) ................................................................... 22

N.Y. Civ. Prac. L. & R. § 5104 ....................................................................... 22

N.Y. Civ. Prac. L. & R. § 5222 ............................................................... 10, 13

N.Y. Civ. Prac. L. & R. § 5222(b) ................................................................... 22

N.Y. Gen. Oblig. Law § 13-103...................................................................................................... 47

## **Other Authorities**

Ray Worthy Campbell & Ellen Claar Campbell, *Clash of Systems: Discovery in U.S. Litigation Involving Chinese Defendants*, 4 Peking U. Transnat'l L. Rev. 129 (2016)........... 36

Restatement (Third) of Foreign Relations Law ......................................................................... 31

## Table of Abbreviations

| Term | Definition |
|---|---|
| **The Parties** | |
| Assignee | Next Investments LLC |
| Tenor Capital | Tenor Capital Management, the parent company of Assignee |
| Plaintiffs or Nike | Nike, Inc. and Converse, Inc. |
| Nike Trademarks | The Nike and Converse-owned trademarks asserted in the Complaint and First Amended Complaint |
| Banks | Collectively, the defined terms BOC, BOCOM, CCB, CMB, ICBC |
| ABC | Agricultural Bank of China |
| BOC | Bank of China |
| BOCOM | Bank of Communications |
| CCB | China Construction Bank |
| CMB | China Merchants Bank |
| ICBC | Industrial and Commercial Bank of China |
| Chinese Branches | The branches of the Banks located in China |
| Judgment Debtors | The defendants identified in the Complaint and First Amended Complaint and orders defined as the Pre-Judgment Orders, the Default Judgment, and the Final Order |
| **Motions** | |
| Contempt Motion | Assignee's Cross-Motion to Hold the Banks in Contempt and for a Turnover Order (ECF 205) |
| Br. | Assignee's memorandum of law in support of the Contempt Motion (ECF 209) |
| Reimbursement Motion | The Banks' Motion for Reimbursement of Attorneys' Fees, Costs, and Other Expenses Reasonably Incurred in Responding to Subpoenas from Plaintiff-Assignee Next Investments (ECF 195) |

| Term | Definition |
|---|---|
| Discovery Motion | Assignee's Cross-Motion to Compel Production of Documents from the Banks (ECF 127) |
| **Orders** | |
| Freeze Orders | Collectively, the defined terms Pre-Judgment Orders, Default Judgment, Final Order |
| Pre-Judgment Orders | Collectively, the defined terms TRO, PI Order, and Supplemental Orders |
| TRO | The temporary restraining order (ECF 3) |
| PI Order | The order granting a preliminary injunction (ECF 14) |
| Default Judgment | The default judgment (ECF 49) |
| Final Order | The Court's order holding the Judgment Debtors in contempt of the Default Judgment (ECF 62) |
| Supplemental Orders | The First Supplemental Order (ECF 19), the Second Supplemental Order (ECF 24), and the Third Supplemental Order (ECF 27) |
| Discovery Order | Order Denying Nonparty Banks' Objections and Affirming Order of the Magistrate Judge Denying Motion to Quash and Granting Cross-Motion to Compel (ECF 174) |

## INTRODUCTION

Assignee's Contempt Motion is a cynical attempt by a special purpose vehicle created by a litigation finance firm to exploit a money judgment it purchased to reap a windfall recovery from nonparty banks against which it has asserted no claim—because no viable claim exists. The Contempt Motion asks this Court to ignore well-established principles of law and hold the Banks liable for their customers' debts for no other reason than they provided what Assignee concedes were routine banking services to customers who are subject of a default judgment.

Assignee has no interest in pursuing counterfeiters or stopping infringement.  Although it insists on keeping its Asset Purchase Agreement with Nike secret,[1] it appears from the Assignment it filed with the Court that it has only purchased a monetary judgment and not the trademarks or associated goodwill that gave Nike standing to bring this case and obtain a default judgment in the first place.  Assignee has also taken no steps to enforce that Default Judgment against Defendants' assets in China.  Nor has it sought to stop U.S. banks from executing funds transfers or credit card payments from U.S. consumers to Defendants.  Assignee has never even sought an order compelling the Banks to comply with the Freeze Orders even though the Banks repeatedly made their objections to those orders known to Assignee, Nike and the Court—thus putting off any adjudication of whether those orders applied to the Banks.

For years, Assignee and its predecessors have been on notice that the Banks believed the Freeze Orders did *not* bind them as a matter of U.S. law, that they were contrary to Chinese law, and that accordingly the Banks could not comply with them.  Instead of seeking an order compelling compliance, Assignee actively frustrated the Banks' attempts to seek this Court's

---

[1] By letter dated October 10, 2019, the Banks requested that the Court order Assignee to disclose the Asset Purchase Agreement.  ECF 222.  The Court ordered Assignee to submit it for *in camera* review.  ECF 225.  The Banks continue to believe the terms of that agreement are highly relevant to Assignee's motion and renew their request that Assignee be required to disclose it.

confirmation that the Banks were not bound.  Only now does Assignee ask this Court to sanction the Banks for their purported violation of the asset restraints—not to stop any alleged infringement, but to score a windfall return on their investment in a debt by targeting the deep pockets of nonparty banks.

On that calculated basis, Assignee invites this Court to take a "sentence first-verdict afterwards" approach borrowed from the pages of "Alice in Wonderland" by finding the Banks retroactively in "contempt" of Freeze Orders that neither Nike nor Assignee ever sought to enforce and awarding Assignee $150 million in "compensatory damages" as sanctions for trumped-up charges of "contempt."  This Court should decline that invitation not just because it ignores fundamental principles of law and due process, but because it ignores basic tenets of comity that protect the sovereign interests of nations in regulating economic affairs within their own borders.  A U.S. court's order sanctioning a Chinese bank for complying with Chinese banking laws would invite reciprocal orders by Chinese courts—directed at ***U.S. account holders*** of ***U.S. banks*** with branch offices in China—seeking to vindicate interests of equal or greater concern to China than the interests of the United States in enabling a litigation funder to win a bet on a dubious investment in a debt.

Assignee's Contempt Motion fails for many reasons, including:

***The Separate Entity Rule renders the Freeze Orders inapplicable to the Chinese Branches***.  This is open-and-shut.  For nearly a century, a fundamental legal principle of New York's banking system is that a Freeze Order does not apply to foreign bank branches, even if jurisdiction can be asserted over one of their domestic branches.  This rule has been affirmed in recent decisions of the New York Court of Appeals and Second Circuit.  Assignee essentially ignores this rule.  The relief sought by Assignee would upend the separate entity rule and nullify the reasonable expectations of both domestic and foreign banks subject to its protection.

***The Freeze Orders are invalid because Assignee seeks statutory damages.***  The Lanham Act requires an election of remedies.  A plaintiff can choose either an equitable accounting of profits or the legal remedy of statutory damages, but not both.  Plaintiffs have chosen the latter, although they have attempted to "hedge" both just as their counsel did in a prior case.  That attempt was rejected and should be rejected here for the same reasons.  Because what plaintiffs have sought all along are statutory damages, the equitable relief of prejudgment and post-judgment asset restraints under Federal Rule of Civil Procedure 65, which they invoke in this motion, were never available to them.  Accordingly, the Freeze Orders are invalid to the extent that they are grounded on Rule 65—and there can be no contempt.

***Assignee cannot invoke Rule 69 relief.***  Assignee failed to comply with multiple state law requirements for enforcing a judgment, which Rule 69 makes mandatory.

***The Freeze Orders do not clearly and unambiguously apply to the Banks.***  On more than one occasion, the Court stated that the Freeze Orders upon which Assignee now relies were directed to the defendants and ***not*** the Banks.  Though the Orders purport to bind those acting in "active concert or participation" with the counterfeiters, that is an aiding and abetting standard, requiring intent.  There has never been a finding of aiding and abetting, or any proof to support such a finding, with respect to the Banks.  Moreover, the Freeze Orders do not clearly and unambiguously identify which accounts to freeze.  Absent this clarity, there can be no contempt.

***Retroactive application of the Freeze Orders violates due process***.  As mentioned above, Assignee thwarted the Banks' attempts to seek the Court's adjudication of whether they were bound by the Freeze Orders.  And the Court repeatedly observed that the Banks were not bound.  Due process precludes a finding of contempt under these circumstances.

***Laches and judicial estoppel bars a finding of contempt***.  Assignee chose to sit on its purported rights even though it and its predecessor Nike knew that the Banks objected to the

Freeze Orders.  It now calculates $150 million in damages based on new alleged infringements—the majority of which post-date the entry of the Default Judgment in this action—claiming that the Banks caused them during the passage of time in which Assignee could have sought, but chose not to seek, to compel the Banks' compliance.  Having been on notice of the Bank's position, and having prejudiced the Banks with its delay by running up its damages claim in the interim, Assignee is equitably estopped from asserting contempt.  Similarly, judicial estoppel bars Assignee from claiming the Banks are in contempt, since it previously took the position that it was not enforcing the Freeze Orders against the Banks, a position on which the Court relied.

   ***Principles of international comity require denial of the Contempt Motion.***  The comity inquiry required by the Contempt Motion is separate from that conducted on the Discovery Motion and is evaluated under a different set of factors.  An order requiring a Chinese bank to restrain assets in its Chinese branches would be an affront to principles of international comity and set dangerous precedents that could imperil American banks with branches in China.

   ***The Banks complied with the Subpoenas.***  Although all that is required of a third party is "substantial compliance," the Banks went to extreme measures to comply with Assignee's immensely burdensome Subpoenas.  Contrary to Assignee's baseless claim, the Banks could not simply push a button to obtain the information sought in the Subpoenas, which included sweeping demands for all information tied to hundreds of identifiers, including common Chinese names, email addresses, and websites.  The Banks expended tens of thousands of hours and deployed every available resource to obtain this information, taking substantial time away from their normal business operations.  This involved the work of literally hundreds of employees, many of whom worked day and night digging through hard-copy records in warehouses located throughout mainland China.  The documents Assignee says are missing do not exist or cannot be found, as the Banks have confirmed.  In any event, Assignee has not come close to showing that

an alleged violation of the Discovery Order justifies holding the Banks' liable for damages allegedly caused by the Judgment Debtors.

   ***Assignee's claim for $118 million in statutory Lanham Act damages is baseless and unprecedented***.  Assignee claims the Banks damaged it by causing continued counterfeiting. But Assignee does not own any Nike Trademarks and thus is not entitled to "compensatory" sanctions that are tied to alleged infringement of these marks.  Basic principles of trademark law preclude Assignee from seeking damages for this simple reason.  This lack of standing is fatal to Assignee's statutory damages request, especially given that some 90% of the infringements comprising Assignee's damages claim were not identified until after the entry of the Default Judgment and the assignment of that judgment.  Moreover, Assignee fails to show causation. There is simply no proof that the Banks were the cause of the alleged expansion and continuation of the counterfeiting networks of which Assignee claims the Banks are members.  On the contrary, Assignee admits that the Banks merely allowed "ordinary banking transactions."  Br. 1. Without any genuine connection between the Banks and the alleged counterfeiting activity, Assignee is forced to rely upon  dubious and unreliable testimony of a recent college graduate with a political science degree who has no qualification to offer expert opinions, conceals a "secret methodology" from the Banks and the Court, and makes unfounded, unexplained assumptions that render her report inadmissible on its face.

   ***Assignee's $32 million compensatory damages claim is fatally flawed.***   Assignee's other damages expert, Mr. Boyle, also uses a flawed methodology.  Had the Banks complied with the Freeze Orders, they would have frozen not more than $630,000 at the time that the restraints were purportedly put in place.   The collective balance in these accounts has diminished in value by approximately $550,000.   That diminution in value is all that Assignee would be entitled to (if anything) as compensatory sanctions, not the $32 million Assignee seeks.

Finally, the Banks' Reimbursement Motion should be granted in full and Assignee should be directed to reimburse the Banks for the extraordinary efforts undertaken to comply with unduly complex and burdensome document Subpoenas that were apparently designed to set-up the instant Contempt Motion. The Banks established their basis for reimbursement in the Reimbursement Motion, and Assignee does not offer any justification to depart from the application of Rule 45's mandatory reimbursement requirement.

## STATEMENT OF FACTS

### A.   The Banks objected to the Pre-Judgment Orders.

Plaintiffs served the Banks' New York branches with notice of the TRO and PI Order, both entered in late fall 2013. Nagin Exs. 1, 5-8, 10-11, 13-15. The orders both provided that:

> in accordance with Rule 65 of the Federal Rules of Civil Procedure, 15 U.S.C. § 1116(a), and this Court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief, Defendants, their officers, directors, agents, representatives, successors or assigns, and all persons acting in concert or in participation with any of them, including any third parties receiving actual notice of this Order by personal service or otherwise, are restrained and enjoined from transferring, withdrawing or disposing of any money or other assets of Defendants, or otherwise paying or transferring money or other assets into or out of any accounts held by, associated with, or utilized by Defendants, regardless of whether such money or assets are held in the U.S. or abroad.

ECF 3 ¶ 11; ECF. 14 ¶ 4. On December 16, 2013, the Banks objected to the enforceability of the restraint provisions against their non-U.S. branches, noting "[n]either the Court's inherent equitable power nor Section 1116(a) of the Lanham Act authorize such relief" and that "[e]ven if there were authority to issue a pre-judgment asset restraint . . . such restraint cannot properly extend to assets or accounts" held outside New York under the separate entity rule and principles of international comity. Nagin Ex. 17 at 2; *see also* Nagin Ex. 20.

Plaintiffs served a supplemental order on the Banks' New York branches in January 2014. Nagin Exs. 27-28. Thereafter, the Banks reiterated to Plaintiffs that there was "no basis

for the asset restraint to apply extraterritorially at branches of non-party Banks." Nagin Ex. 30 at

3; *see also* Nagin Ex. 29. A few months later, the Banks again maintained that they were "under

no obligation to freeze . . . accounts located in China." Nagin Ex. 33*; see also* Nagin Ex. 34.

Plaintiffs served certain New York branches with the Second Supplemental Order on June 4,

2014 and the Third Supplemental Order on December 4, 2014. Nagin Exs. 35, 37-38.[2]

Although Assignee asserts that the Banks should have, at the outset, asked the Court to

modify the asset restraint provisions in the pre-judgment orders, *see* Br. 5-6, Assignee ignores

that both parties acknowledged that the pending appeals in the *Tiffany* and *Gucci* cases, which

considered similar issues, would have a direct impact on the present litigation. *See* Nagin Ex. 24

at 1; Ex. 25 at 2-3; Exs. 27-28, 30; *Tiffany (NJ) LLC v. China Merchs. Bank*, 589 F. App'x 550

(2d Cir. 2014), *Gucci Am. Inc. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014). Accordingly,

motion practice was deferred until the Second Circuit issued decisions in those cases.

It did so in September 2014. In the *Gucci* case, the Second Circuit vacated district court

orders enforcing global pre-judgment asset restraints and discovery orders against BOC. *Gucci*,

768 F.3d at 145. In *Tiffany*, the Second Circuit similarly vacated orders requiring BOC, CMB,

and ICBC to comply with discovery orders compelling global discovery. 589 F. App'x at 553-

54. In both cases, the Second Circuit held that in light of *Daimler v. AG Bauman*, 571 U.S. 117

(2014), the mere presence of a New York branch was not sufficient to confer general jurisdiction

over the Chinese banks. The Second Circuit remanded both cases (1) to consider whether there

was specific personal jurisdiction over the banks to enforce the asset restraints and the subpoenas

and (2) to consider issues of comity. *Tiffany*, 589 F. App'x at 553; *see Gucci*, 768 F.3d at 126.

---

[2]  Assignee does not include proof of delivering the Second Supplemental Order to BOCOM,
CCB, CMB, and ICBC. The Banks have searched their records and were unable to locate proof
of service of this Order. Assignee's submission also does not include proof of delivering the
Third Supplemental Order to BOCOM, CCB, and CMB.

### B.     The Banks objected to the asset restraints in the Default Judgment, and the Court ruled that their objections were not ripe.

Plaintiffs moved for a default judgment on June 29, 2015.  ECF 37.  The proposed default judgment included an asset restraint provision that purported to continue the enforcement of prior asset restraints entered in the action, providing that:

> [I]n accordance with Rule 65 of the Federal Rules of Civil Procedure, 15 U.S.C. § 1116(a), Article 52 of the New York State's Civil Practice Law and Rules, and this Court's inherent equitable power to issue remedies ancillary to its authority to provide final relief, all Defendants' Assets that have been previously identified as frozen or that were otherwise required to be restrained in compliance with this Court's orders, continue to be restrained regardless of whether the Defendants' Assets are located in the United States or abroad . . . .

ECF 49 ¶ 10.  The proposed default judgment further purported to restrain judgment debtor assets that were not yet identified or were not yet frozen, providing that:

> [I]n accordance with Rule 65 of the Federal Rules of Civil Procedure, 15 U.S.C. § 1116(a), Article 52 of New York State's Civil Practice Law and Rules and this Court's inherent equitable power to issue remedies ancillary to its authority to provide final relief, any other of Defendants' Assets that Plaintiffs identify in the future and/or that have not yet been frozen shall be subject to the asset restraint provisions set forth herein, regardless of whether the Defendants' Assets are located in the United States or abroad.

ECF 49 ¶ 11.  Shortly thereafter, the Banks wrote to the Court, objecting to the proposed default judgment's asset freeze provisions.  The Banks argued that the asset restraint provisions should be modified to clarify that they were not enforceable against the Banks, given that (1) under the separate entity rule, restraining orders  "do not require a garnishee bank to restrain a judgment debtor's assets held in foreign branches ," (2) in light of *Tiffany* and *Gucci* there was no basis for general jurisdiction over the Banks and plaintiffs had not established any basis for specific jurisdiction, and (3) "principles of comity would preclude the Court from requiring the Banks to freeze accounts in China as China's banking laws prohibit the Banks from freezing customer accounts pursuant to a foreign court order."  ECF 41 at 1, 3; *see also* ECF 43.

In response, Plaintiffs maintained that "***the proposed default judgment is not an order against the Banks***, and the Court needs jurisdiction over only the counterfeiter defendants to enter it."[3]  ECF 42 at 3.  Judge Scheindlin requested that the parties submit supplemental briefing on the separate entity rule.  ECF 45.  In their supplemental briefing, Plaintiffs again reiterated that "Plaintiffs seek an order against Defendants enjoining them from disposing of assets this Court froze" and that "***Plaintiffs do not seek to enforce any order against the Banks***. . . Plaintiffs request relief ***only against Defendants***."  ECF 46 at 1-2. The Court entered the Default Judgment in favor of Plaintiffs on August 20, 2015.  ECF 49.  Judge Scheindlin acknowledged the Banks' arguments regarding personal jurisdiction, comity, and the separate entity rule but held the Banks' objections were "not ripe given that ***the Proposed Default Judgment is directed entirely at defendants*** and seeks no enforcement against the non-party Banks."  ECF 48 at 2.[4] Specifically, Judge Scheindlin held that (1) the Banks' personal jurisdiction arguments were "irrelevant because at this stage, the Court needs only 'personal jurisdiction over the defendants, not the Bank[s],'" citing *Gucci*, 768 F.3d at 129; (2) the Banks' comity arguments were not yet appropriate because "[i]t is of course possible that defendants will comply with the Court's order and make plaintiffs whole – in which case ***the Banks would never be required to take any action with respect to the asset freeze***";[5] and (3) arguments regarding the separate entity rule had no effect on the Court's ability to issue a default judgment because the separate entity rule did

---

[3]  All emphasis is added unless stated otherwise, and all citations are omitted.

[4]  In a blatant misrepresentation of Judge Scheindlin's order, Assignee asserts that the Court "rejected the Banks' argument for modification of the Judgment and found that the Judgment, in fact 'order[ed] the Banks to comply with [the] asset freeze.'"  Br. 29.  It is evident from the decision that she made no such ruling, and Assignee's misrepresentation of the order by quoting language out of context goes far beyond inadvertent mischaracterization.

[5]  The Court also stated that "[i]f Plaintiffs do eventually seek to compel the Banks to freeze" assets overseas, "a comity analysis may then become appropriate."  ECF 48 at 3.

not extend to "the issuance of a default judgment where no enforcement proceeding against any objecting Bank has been initiated."  *See* ECF 48 at 2-4.

Notwithstanding these clear statements from Judge Scheindlin, upon which the Banks reasonably relied, Assignee's present position is that the Banks were bound by the asset restraints not only at the time of the entry of the Default Judgment, but also two years prior upon the entry of the TRO and PI Order.  Br. 16-19.

### C.    Assignee obtains entry of the Final Order after an *ex parte* application.

Nearly a year and a half after it obtained the Default Judgment, Nike assigned the Default Judgment to Assignee.  ECF 50 (Assignment dated Jan. 31, 2017).  Some ten months later, in October 2017, Assignee applied, pursuant to Rule 69, *ex parte* for an order to show cause as to why ***Judgment Debtors*** should not be held in contempt of court and requested that newly identified counterfeiters and hundreds of new allegedly infringing websites never identified before by Plaintiffs be made subject to the terms of the Default Judgment.  ECF 59.  This Court entered the Final Order on October 20, 2017.  ECF 62. The Final Order includes an asset restraint provision providing that:

> in accordance with Rule 65 of the Federal Rules of Civil Procedure, New York Civil Practice Law and Rules § 5222, 15 U.S.C. § 1116(a) and paragraph 13 of the Judgment, Judgment Debtors, their officers, directors, agents, representatives, successors or assigns, and all persons acting in concert or in participation with any of them, including Judgment Debtors' Aliases and any third parties, including third party financial service providers, receiving actual notice of this Order by personal service or otherwise, are restrained and enjoined from transferring, withdrawing, or disposing of any money or other assets into or out of any accounts held by, associated with, or utilized by the Judgment Debtors . . . regardless of whether such money or assets are held in the U.S. or abroad.

ECF 62 ¶ 4.  The Final Order also states that:

> upon (2) business days' written notice to the Court and Next's counsel, any Judgment Debtor or affected third party may, upon proper showing, appear and move for dissolution or modification of the provisions of this order.

ECF 62 ¶ 5.  Assignee's assertion that "[t]he Banks did not oppose" this order, to which it

contends the Banks are now subject, Br. 8, is disingenuous.  For one thing, the Banks had no

notice of Assignee's *ex parte* application and therefore no opportunity to oppose it.  The Banks

received notice of the Final Order only after it was entered on the public docket.  In addition,

Judge Scheindlin had already ruled that the prior orders that contained similar language were

"directed entirely at the defendants."  ECF 48 at 2.  In any event, as discussed *infra*, the Banks

did seek modification of the asset restraint provision after they received notice of the Final

Order.

> **D.     The Banks moved to modify the Final Order, and the Court declined to decide the issue based on Assignee's representation that it was not seeking to enforce the Final Order against the Banks.**

In late 2017, Assignee sent the Subpoenas to the Banks' New York branches, demanding

discovery concerning bank accounts purportedly held by 636 Judgment Debtors.  ECF 72-11 to

72-14.  The Banks' New York branches searched for information relating to the accounts

identified in the Subpoenas, notified Assignee that they had no documents and no records of wire

transfers relating to the accounts, and directed Assignee to seek information located in non-U.S.

branches via a Hague Convention request.  ECF 72-9 at 2.  In response to Assignee's continued

insistence that it was entitled to discovery outside the U.S., the Banks filed formal objections and

responses and moved to quash the Subpoenas.  ECF 70, 72-26 to 72-30.

In that same submission, the Banks also moved to modify the global asset restraint

provisions in the Final Order.  ECF 70.  The Banks argued that, to the extent these asset

restraints purported to reach the assets held in the Banks' foreign branches, they were prohibited

by the separate entity rule, the absence of personal jurisdiction over the banks, and principles of

international comity.  *See* ECF 71 at 17-18; ECF 110 at 24-26.  In its response, Assignee

maintained that "[t]he Final Order, same as the Judgment, ***is directed entirely at Judgment***

*Debtors and seeks no enforcement against the Banks*." ECF 87 at 9. As such, Assignee asserted, "*the situation is no different than when Judge Scheindlin previously held that the Banks' arguments were premature*." *Id.*

The parties appeared before Magistrate Judge Freeman for oral argument on June 20, 2018. ECF 128. Magistrate Judge Freeman asked counsel for Assignee to confirm that "you're not seeking to [enforce the restraining order against the banks] now." ECF 128 at 49:10. Assignee's counsel confirmed that "*[w]e don't have any motion to enforce the restraining notice at the banks . . .*" ECF 128 at 50:2-3. Magistrate Judge Freeman then issued an order denying the Banks' motion to quash and ruling that the motion to modify the asset restraint provisions in the Final Order was deemed withdrawn without prejudice. ECF 135. Magistrate Judge Freeman made clear that her decision regarding the asset restraint provisions was based on Assignee's explicit representation "*that it is not yet seeking to enforce the assert-restraint provision of the 10/20/17 Order against the Banks . . . .*" *Id.* at 50.

## LEGAL DISCUSSION

I.   **THERE IS NO CONTEMPT OF THE FREEZE ORDERS**

   A.   **The Freeze Orders do not bind the Chinese Branches under the separate entity rule and therefore the Chinese Branches cannot be found in contempt.**

   1.   **The separate entity rule bars the judicial restraint of assets held in a bank's foreign branch.**

There can be no contempt by the Banks because, under the separate entity rule, their Chinese Branches are not bound by the Freeze Orders and the Freeze Orders cannot restrain assets held in the Chinese Branches. The separate entity rule is a "firmly established principle of New York law" and was affirmed by the Court of Appeals in *Motorola Credit Corp. v. Standard Chartered Bank*, 21 N.E.3d 223, 227 (N.Y. 2014). Under this rule, an asset restraint "served on a New York branch . . . *will have no impact on assets in other branches*." *See id.* at 226. That

is because, "even when a bank garnishee with a New York branch is subject to personal jurisdiction, its other branches are to be treated as separate entities for certain purposes, particularly with respect to" prejudgment and post-judgment asset restraints. *See id.* at 226.  The rule is "a long-standing common-law doctrine" and "functions as a limiting principle in the context of international banking." *Id.* at 228.  **From the outset**, the Banks repeatedly informed Plaintiffs that the separate entity rule rendered the Freeze Orders inapplicable to the Chinese Branches.  *See* Nagin Exs. 17, 30; ECF 41, 43, 71, 110.

 *Motorola* is squarely on point.  There, a federal district court entered a default judgment against Turkish defendants and subsequently ordered asset restraints pursuant to FRCP 65 and 69, as well as CPLR 5222, "restraining the [defendants] and anyone with notice of the order from selling, assigning or transferring their property." *Motoral*a, 21 N.E.3d at 225.  The plaintiff, Motorola, attempted to enforce the restraint by serving the New York branch of a nonparty bank headquartered in the United Kingdom that "had no connection to . . . the underlying litigation." *Id.*  The foreign bank found no judgment debtor assets in its New York branch, though there were assets overseas. *Id.*  The federal district court held that the separate entity rule precluded enforcement of the asset restraint on the foreign branches. *Motorola Credit Corp. v. Uzan*, 978 F. Supp. 2d 205, 210-13 (S.D.N.Y. 2013).  On appeal, the Second Circuit certified questions to the New York Court of Appeals regarding the continued viability of the separate entity rule. *Tire Eng'g and Dist. L.L.C. v. Bank of China, Ltd.*, 740 F.3d 108, 117-118 (2d Cir. 2014).

 The Court of Appeals concluded that the separate entity rule precluded the enforcement of the asset restraints against branches located outside of New York. *Motorola*, 21 N.E.3d at 230.  In so ruling, the court recognized the continuing viability of the doctrine, which it observed had been "a part of the common law of New York for nearly a century" that "[c]ourts have repeatedly used" to prevent "restraint of assets situated in foreign branch accounts based solely

on the service of a foreign bank's New York branch."  *Id.* at 229.

This rule is just as firmly established in federal courts.  After the decision in *Motorola*, the Second Circuit and this Court followed suit, holding that the post-judgment asset restraints were not enforceable against non-U.S. branches of a foreign bank.  *See Motorola Credit Corp. v. Standard Chartered Bank ("Motorola II")*, 771 F.3d 160, 161 (2d Cir. 2014) ("the district court correctly concluded that the separate entity rule precludes the restraint of assets held in Standard Chartered Bank's foreign branches."); *Motorola Credit Corp. v. Uzan*, 73 F. Supp. 3d 397, 401 (S.D.N.Y. 2014) ("[T]he reasoning of the foregoing decisions of the New York Court of Appeals and the Second Circuit [in *Motorola v. Standard Bank*] clearly governs all similarly situated banks").  Courts in other districts in New York have applied the rule as well.  *See e.g., Baltazar v. Houslanger & Assocs., PLLC*, 2018 WL 3941943, at *11 (E.D.N.Y. Aug. 16, 2018).

Assignee addresses *Motorola* only in a single footnote.  Br. 21, n.7.  Assignee says *Motorola* is "irrelevant" because the Court here found "specific personal jurisdiction over the Banks" in the Discovery Order.  *Id.*  Initially, as a factual matter, that is incorrect, since the Court found it had specific jurisdiction only for "***purposes of the Subpoenas***."  ECF 174 at 11. Although Assignee argues, citing the Second Circuit's decision in *Gucci*, that the Banks' alleged violation of the Freeze Orders creates an "independent" basis for exerting specific jurisdiction over them, Br. 20, that is incorrect.  Nothing in *Gucci* allows the horse to be placed before the cart in this manner.  In *Gucci*, the Second Circuit acknowledged that, "in the context of asset freeze injunctions, ***other circuits*** have permitted the exercise of specific jurisdiction over domestic nonparties who, with knowledge of an injunction, intentionally aided in its violation." *Gucci*, 768 F.3d at 137.  The Second Circuit stated, however, that it had never "resolved this issue in the context of asset freezes" and further indicated disagreement with such a conferral of jurisdiction.  *Id*. at 137 n.17 (citing *Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d

34, 40 (2d Cir. 1989)).   The Second Circuit also observed that no *foreign* nonparty has ever

been subjected to the jurisdiction of a U.S. court on the grounds that it has violated an asset

freeze injunction.  *Gucci*, 768 F.3d at 137 ("We have found no case, however, applying such an

analysis in the context of a *foreign* nonparty with only limited contacts in the forum.") (emphasis

in original).  And even if the Second Circuit did apply such a standard for the conferral of

specific jurisdiction over non-parties, the Banks would not meet that standard here because

Assignee has not shown that the Banks "intentionally aided" in the violation of the Freeze

Orders.  *Id.*, 768 F.3d at 137; *see infra* at 24-25 & n.12.  Assignee itself concedes that the Banks

have merely engaged in "ordinary banking transactions," Br. at 1, which hardly rises to the level

of conduct that is required for an intentional violation.

But more critically, the jurisdictional finding does not render the separate entity rule

"irrelevant" or somehow override its application.  *Motorola* specifically concluded that the

separate entity rule "provides that *even when a bank garnishee with a New York branch is*

*subject to personal jurisdiction*, its other branches are to be treated as separate entities" for

purposes of asset restraints.  21 N.E.3d at 226.[6]  Accordingly, the Court of Appeals in *Motorola*

applied the separate entity rule to preclude the enforcement of an asset restraint on the foreign

bank's non-U.S. branches *even though that foreign bank was subject to personal jurisdiction in*

*New York*.  *Id.* at 227 n.4; *see also Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 94 n.22 (2d

Cir. 2017) (noting in the context of enforcement proceedings that, even where personal

jurisdiction exists, "barriers [to exercising it] might include the 'separate entity' doctrine").

---

[6] Assignee also misstates the opinion in *Motorola* by claiming that the "narrow question" before
the court was the application of the separate entity rule to assets in foreign branch accounts
"when jurisdiction over the bank is 'based *solely* on the service on a foreign bank's New York
branch.'"  Br. 21, n. 7.  That is not what *Motorola* says.  The court in *Motorola* stated that "[t]he
narrow question before us is whether the rule prevents the restraint of assets held in foreign
branch accounts."  *Motorola*, 21 N.E.3d at 226, n.2.

15

Finally, perhaps realizing that its personal jurisdiction arguments do not overcome the separate entity rule, Assignee leans on an irrelevant line of authority to claim that all it needs is jurisdiction over the Judgment Debtors to garnish "out-of-state property" held by Chinese Branches. *See* Br. 21.[7] It claims *Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d 825, 831 (N.Y. 2009), means that, if jurisdiction is present over defendants, it is proper to order them to turn over out-of-state property. *See* Br. 21. The Court of Appeals expressly rejected this argument in *Motorola*, finding that "we did not analyze, much less overrule, the separate entity doctrine in *Koehler*" and "therefore reject[ed] [the] view that *Koehler* decided the issue before us." *See* 21 N.E.3d at 228 ("[n]otably absent from our decision in *Koehler* was any discussion of the separate entity rule" and *Koehler* "had no occasion to examine the [separate entity] doctrine" at all). And Assignee's other cases, Br. 20-22, all pre-*Motorola*, "fail to take into account case law rendered after *Koehler* which undermines [Assignee's] position," and "*Koehler* d[oes] not extinguish the separate entity rule." *See Baltazar*, 2018 WL 3941943 at *10-11. *Koehler* presents no reason to depart from the application of that rule here.

### 2.   Embracing Assignees' motion would upend well-settled norms with severe consequences for American banks.

Assignee asks this Court to upend well-settled international order for its own gain. The Court's decision would reverberate globally with severe consequences for American businesses operating abroad, including American banks with branches in China. The separate entity rule is

---

[7]   Assignee's request for a turnover, Br. at 59-60, fails for the same reasons the asset restraints fail—both the separate entity rule and comity bar turnover of assets in China. *Motorola* expressly held that the separate entity rule is applicable to turnover orders, even where there is jurisdiction. 21 N.E.3d at 226. With respect to comity, the turnover of assets at bank accounts in China pursuant to a U.S. (or any non-Chinese court order) is prohibited under Chinese law. *See* Oct. 30, 2019 Declaration of Justice Wang Yun ("Wang Decl.") ¶¶ 13-18. 26-33; Oct. 30, 2019 Declaration of Jacques deLisle ("deLisle Decl.") ¶¶ 18-29. A comity analysis is therefore required, and principles of comity weigh against enforcing measures that would require the Banks to violate the law of their home country. *See id.* at 229-30; *infra* at Section I(H).

a cornerstone of the international banking industry in New York.  The *Motorola* court stressed that "foreign banks have reasonably relied on [the rule] over the years when deciding whether to open branches and conduct business in New York."  *Id.* at 226, 229 (international banks have "considered the doctrine's benefits when deciding to open branches in New York," which has shaped "New York's status as the preeminent commercial and financial nerve center of the world"); *Tire Eng'g*, 740 F.3d at 116 (stating that "the separate entity rule . . . reflects policy choices over time and . . . the banking industry in New York and abroad may have acquiesced in or relied on its principles.").  Assignee cannot override decades of precedent that has been relied upon by countless international banks simply because it would prefer to avoid the inconvenience of enforcing its judgment in China.

The rule also finds its rationale in protecting "banks from being 'subject . . . to competing claims' and the possibility of double liability."  *Motorola*, 21 N.E.3d at 227.  The concern about competing claims is not hypothetical, as certain of the Banks have already been the targets of lawsuits in China regarding Judgment Debtor accounts.  *See* Oct. 30 Declaration of Zhu Lei ("Zhu Decl.") ¶27 and Exs. 3. 4.  This sort of double liability is precisely what the separate entity rule is designed to avoid.  *See, e.g.*, *Shaheen Sports, Inc. v. Asia Ins. Co.*, 2012 WL 919664, at *8 (S.D.N.Y. Mar. 14, 2012) ("from its inception [the rule] was designed to target the concerns of banks susceptible to such multiple claims, first across branches, and more recently across borders."); *Samsun Logix Corp. v. Bank of China*, 929 N.Y.S.2d 202, 202 (N.Y. Sup. Ct. May 12, 2011) (rule intended to avoid "contradictory turnover orders . . . 'would potentially violate local laws' and subject the Banks to double liability").

Similarly, the rule is designed to avoid "the 'intolerable burden' that would otherwise be placed on banks to monitor and ascertain the status of bank accounts in numerous other branches" and "the practical constraints and costs associated with conducting a worldwide search

for a judgment debtor's assets." *Motorola*, 21 N.E.3d at 227, 229.  That burden is real here,

given that Assignee is seeking the enforcement of a global asset restraint, and the Banks' New

York branches, on which the asset restraints were served, do not have access to bank account

records outside New York.  *See* ECF 75 ¶¶ 7-13; ECF 76 ¶¶ 7-13; ECF 77 ¶¶ 7-13; ECF 78 ¶¶ 7-

13; ECF 109 ¶¶ 4-7.[8]  Finally, the separate entity rule "serves to avoid conflicts among

competing legal systems" and therefore "promotes international comity."  *Motorola*, 21 N.E.3d

at 229.  As discussed below, *see infra* Section I(H), there is a clear conflict of law, given that the

compliance with asset restraints issued by a non-Chinese court would violate Chinese law.

### B.    The Freeze Orders are invalid because Assignee seeks statutory damages.

Assignee's attempt to have this Court enforce the Freeze Orders under Federal Rule of

Civil Procedure 65 should be rejected.  Courts are without power to restrain assets under Rule 65

where the remedy sought is legal, rather than equitable.  The statutory damages that Assignee

seeks are, and always have been, plainly a legal remedy; therefore, a court cannot issue a Rule 65

injunction to restrain assets on that basis.  Assignee's enforcement remedies are limited to an

***execution*** on the money judgment under Rule 69.  As discussed below, Assignee's attempt to

dress its statutory damages claim in the garb of equity has already been rejected by another court,

in a case where Assignee's counsel tried a similar maneuver that the court rejected as "illusory."

It is well settled that courts lack power to order an asset freeze when the remedy sought is

a legal remedy, *i.e.*, for money damages.  *See Grupo Mexicano de Desarrollo S.A. v. Alliance

Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (a district court "had no authority to issue a

preliminary injunction preventing [a party] from disposing of their assets pending adjudication of

---

[8]   Indeed, there is no centralized method for locating customer accounts that may be located
anywhere in the world.  Each of the Banks has thousands of branches, meaning that any search
for Judgment Debtor assets is necessarily time-consuming and expensive. ECF 75 ¶ 2; ECF 76 ¶
2;  ECF 77 ¶ 2; ECF 108 ¶ 2; Y. Zhou Decl. ¶ 3.

Case 1:13-cv-08012-CM-DCF   Document 248   Filed 10/30/19   Page 31 of 73

[a] contract claim for money damages"); *Toray Int'l Am. Inc. v. Nakayama*, 2014 WL 12543817, at *2 (S.D.N.Y. Apr. 29, 2014) ("district courts lack the authority to issue a preliminary injunction preventing a defendant from transferring assets pending adjudication of an action seeking monetary damages"). It is equally settled that statutory damages under the Lanham Act are a remedy at law, not one at equity. *Klipsch Group, Inc. v. Big Box Store Ltd.*, 2012 WL 4901407, at *2-3 (S.D.N.Y. Oct. 11, 2012) (collecting cases); *see also WowWee Grp. Ltd v. Meirly*, 2019 WL 1375470, at *11 (S.D.N.Y. Mar. 27, 2019); *Tiffany (NJ) LLC v. Qi Andrew*, 2015 WL 3701602, at *11 (S.D.N.Y. June 15, 2015).

Accordingly, where a plaintiff seeks monetary statutory damages under the Lanham Act, the asset restraint injunction procedures under Rule 65 are not available in the pre- or -post judgment context.[9] Assignee's counsel knows this; in a prior case it pursued against defaulting counterfeiters, *Tiffany*, 2015 WL 3701602, the court rejected the same tactic Assignee attempts here, finding "a postjudgment asset freeze is not appropriate" where statutory damages are sought. *Id.* at *11. The court reasoned that it was without authority to include asset freeze provisions in a default judgment. *Id.* (citing *Grupo Mexicano*, *supra*). It noted that while equitable remedies, such as an accounting of profits, warrant a Rule 65 injunction because they seek "a return of lost profits," a claim for statutory damages merely seeks money damages, a legal remedy, and therefore cannot be the basis to invoke Rule 65's equitable remedies. *See id.*

---

[9] Nor can an asset freeze be justified on the basis that it "ensure[s] the availability of the requested final relief." *Tiffany*, 2015 WL 3701602, at *12. A Rule 65 injunction is not "an appropriate vehicle for the postjudgment restraint;" instead, "plaintiff's ordinary recourse upon securing a money judgment is to look to postjudgment remedies provided by" Rule 69 "and state law." *Id*; *see also Allstar Mktg. Grp., LLC v. 158*, 2019 WL 3936879, at *2 (S.D.N.Y. Aug. 20, 2019) (holding that "the language of Rule 69 is mandatory. If Plaintiff wishes to enforce its monetary judgment, it *must* do so in accordance with the procedures set forth by New York law") (emphasis in original); *Tiffany*, 2015 WL 3701602, at *11, 12, n.9 (finding "no basis" to maintain a post-judgment freeze and declining to "adopt a reading of a … Rule 65 that would seemingly subsume the post-judgment remedies provided by Rule 69 and state law.").

at *11.  Accordingly, the default judgment that Assignee's counsel proposed was inappropriate and "the postjudgment asset freeze provisions must be stricken."  *Id.*

The court in *Tiffany* also rejected the same sleight-of-hand Assignee attempts here—namely, an attempt to plead statutory damages as a so-called "proxy" for an accounting of profits.  ECF 49 ¶ 8.  The "proxy" theory fails because the Lanham Act requires an election of remedies.  The court concluded that "Tiffany's failure to elect between statutory damages and profits renders the Proposed Default Judgment defective."  *Tiffany*, 2015 WL 3701602 at *23-24.

From the beginning, Plaintiffs have alleged that this was "an action for preliminary and permanent injunctive relief and ***damages***."  ECF 1 ¶ 1; *see also id.* at 60 (requesting that the Court "[d]irect Defendants to account to Plaintiffs for their profits" or "award Plaintiffs statutory damages"); ECF 28 ¶ 1 and 65.  Plaintiffs' statements throughout this action likewise show they never realistically expected to receive any kind of equitable accounting, but rather sought money damages.  At a status conference before Judge Sheindlin in May 2014, counsel explained his "plan" to the Court, stating, "I assume [the Judgment Debtors] will all default; we will move for a default judgment; and then your Honor will grant it."  ECF 25 at 5:11-13.

That the plan all along was to obtain a default judgment shows that an equitable accounting of profits was never Assignee's intention.  As counsel for Assignee explained in *Tiffany*, "'an accounting would require . . . that the bad actor would show you all his books and records and show you the profits that he made and turn those profits over'" and that "'[m]y defendants are not going to do that'."  2015 WL 3701602, at *11.  Counsel for Assignee went on to note that "we all sort of know that they're not going to give us the records that we actually need to figure out how much they actually sold and how much they actually owe us."  *Id.* at *8.  Asked by Judge Failla how he could continue to seek both an equitable accounting and statutory damages in light of those circumstances, counsel for Assignee conceded that he had been

"'artful, coy and careful'" in requesting both kinds of relief.  *Id.*

Judge Failla saw through this charade and stated in a ruling on Tiffany's motion for default judgment that Tiffany "acknowledges that an accounting of profits simply will not occur" and that "there is a basis to conclude that Tiffany ***is seeking something other than 'what they ask for'*** [*i.e.*, an equitable accounting]*."  Id.* at *11.  Judge Failla further held that "the Lanham Act does not permit a plaintiff to hedge in this manner between recovery of profits under Section 1117(a) and statutory damages under Section 1117(c)" and concluded that "Tiffany's failure to elect between statutory damages and profits renders the Proposed Default Judgment defective." *Id.* at *8.  She therefore struck the Rule 65 injunction from the proposed default judgment.  *Id.* at *13.  While Assignee may believe its "proxy" theory in this case is also "artful, coy, and careful," in fact it is just invalid.  Just as in *Tiffany*, Assignee has not genuinely sought an accounting of profits from the Judgment Debtors, and this renders any basis for a pre-or post-judgment asset restraint under Rule 65 invalid.[10]

### C.    There is no contempt of any restraints based on Rule 69 because Assignee has failed to comply with the CPLR's judgment execution provisions.

To the extent Assignee relies on Rule 69 as a basis for contempt, ECF 49 ¶¶ 10-11, ECF 62 ¶ 4, Assignee is also foreclosed from doing so on procedural grounds under New York law. Rule 69 requires compliance with state law execution procedures and Assignee has failed the most basic of them—it never recorded the Default Judgment or the Assignment with the New York County Clerk.  Rule 69 provides that its procedures for execution "***must*** accord with the procedure of the state where the court is located."  Fed. R. Civ. Pro. 69(a)(1).  Pursuant to CPLR

---

[10] To the extent Assignee also invokes 15 U.S.C. § 1116(a) as a basis for the asset restraints, this argument is likewise unavailing.  By its own terms, 15 U.S.C. § 1116(a) provides that courts "shall have power to grant injunctions, according to the ***principles of equity.***"  This provision is thus yet another equitable remedy and does not apply here.

§ 5018(b), prior to enforcement, Plaintiffs were required to file a transcript of the Default

Judgment with the County Clerk.  Further, under CPLR § 5019(c), where there is a "[c]hange in

judgment creditor," an assignee of a judgment rendered in "a court other than the supreme,

county, or a family court" must file "a copy of the instrument on which authority is based,

acknowledged in form required to entitle a deed to be record" with the County Clerk where the

judgment was filed.  The Banks have confirmed that neither the Default Judgment nor the

Assignment are docketed with the County Clerk.  *See* Oct. 30, 2019 Decl. of Neil T. Phillips.

Assignee's failure to comply with this procedure also invalidates the Final Order, which

Assignee sought by invoking Rule 69 and CPLR § 5222(b).  *See* Oct. 30 Declaration of

Jacqueline Chung ("Chung Decl.") Ex. 8 (ex parte motion) at 18.  Assignee never had standing

to invoke this enforcement procedure.  Accordingly, until Assignee records the Default Judgment

and Assignment in the County Clerk's office, it lacks standing to invoke this Court's procedures

for enforcing any of the Freeze Orders and therefore cannot pursue any purported violations that

occurred during the time in which it failed to comply with state law procedure.  *See Musah v.

Houslanger & Assocs., PLLC*, 2012 WL 5835293, at *3 n.2 (S.D.N.Y. Nov. 16, 2012) (failure

does not invalidate assignment but does ***not*** "permit the assignee to invoke the court's process to

assist in collecting on the judgment").

Assignee also failed to comply with CPLR § 5104.  That provision makes the service of a

"certified copy of the judgment or order" a necessary prerequisite to enforcing "[a]ny

interlocutory or final judgment or order" through contempt proceedings.  Assignee has offered

no proof that it ever served the Banks with certified copies of any of the orders it invokes in the

Contempt Motion.  Accordingly, its Contempt Motion must be denied.

### D.    The Freeze Orders do not clearly and unambiguously apply to the Banks.

The Banks cannot be held in contempt because the Freeze Orders do not clearly and

unambiguously apply to them.  It is axiomatic that a party cannot be held in contempt of an order

unless the order is "clear and unambiguous."  *See Weston Capital Advisors, Inc. v. PT Bank

Mutiara, Tbk,* 738 Fed. Appx. 19, 21-22 (2d Cir. 2018); *see also, e.g., Fonar Corp. v. Deccaid

Services, Inc.,* 983 F.2d 427, 429-430 (2d Cir. 1993) ("The judicial contempt power is a potent

weapon.  When it is founded upon a decree too vague to be understood, it can be a deadly

one.  An unclear order provides insufficient notice to justify a sanction as harsh as contempt.").

Further, "Rule 65(d) does not grant a court power so broad 'as to make punishable the conduct of

persons who act independently and whose rights have not been adjudged according to law.'"

*ONE11 Imports Inc. v. NuOp LLC*, 2016 WL 7338422, at *2 (S.D.N.Y. Dec. 19, 2016) (quoting

*Heyman v. Kline*, 444 F.2d 65, 66-67 (2d Cir. 1971)).

Throughout this case, the Court adopted asset restraint orders crafted by Nike or Assignee

that were unopposed by the Defendants, who never appeared.  Assignee now seeks to take

advantage of those orders by enforcing their terms against the nonparty Banks.  But the Court

has repeatedly recognized that the asset restraints do ***not*** bind the Banks.  As Magistrate Judge

Freeman observed when the Banks objected to the asset restraint provisions in the Default

Judgment, "the language contained in the [Default] Judgment . . . was directed only at

Defendants."  ECF 135 at 50; *see also* ECF 49 (Default Judgment).  This is consistent with Judge

Scheindlin's earlier conclusion that the "Proposed Default Judgment is directed entirely at

defendants and seeks no enforcement against the non-party Banks."  ECF 48 at 2.  That two

federal judges described the Default Judgment as applying ***only*** to defendants should be

dispositive of whether the asset restraints clearly bound the Banks as well.

The TRO, PI Order, and Final Order[11] purport to enjoin "all persons acting in concert or in participation with any of [the Defendants (or Judgment Debtors)] . . . *and* any third parties, including third party financial service providers, receiving actual Notice of this order by personal service or otherwise . . . ."  ECF 62 ¶ 4.  But under Rule 65(d)(2), a third party can only be bound by an injunction if it receives actual notice *and* is acting in concert or participation with the defendant.[12]  Thus, if the Freeze Orders here purport to bind the Banks solely because their New York branches received *notice* of the orders, that is inconsistent with Rule 65(d)(2) which also requires acting in concert or participation.  There has never been a showing that the Banks acted in concert or participation with the Judgment Debtors in counterfeiting activities.  Indeed, as courts in this district have noted, "it would unduly stretch the language of the Court's Order to

---

[11]  The three Supplemental Orders, which purport to enjoin "all persons acting in concert or in participation with [the Judgment Debtors], including any third parties receiving actual notice of this Order" are similarly unclear and can also reasonably be read as referring only to individuals who were actively engaged in counterfeiting with the Judgment Debtors, which would not apply to the Banks.  ECF 19, Ex. 1 ¶ 4; ECF 24, Ex. 1 ¶ 4; ECF 27 at 7.

[12]  The "active concert and participation" requirement under Rule 65(d) is akin to aiding and abetting in common law.  *See Doctor's Assocs. v. Reinert & Duree, P.C.*, 191 F.3d 297, 302-303 (2d Cir. 1999) ("Rule 65(d) is designed to codify the common-law doctrine 'that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.'"); *ONE11 Imps. Inc.*, 2016 WL 7338422, at *1 ("the nonparty 'must either abet the defendant, or must be legally identified with him.'") (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930)).  Aiding and abetting requires proof of an underlying violation, knowledge of the violation, and "substantial assistance" to further the underlying violation.  *See, e.g.*, *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012).  Courts have held that the provision of routine banking services to a tortfeasor does not constitute "substantial assistance" and therefore does not support an aiding and abetting claim.  *See Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 390 (S.D.N.Y. 2007) ("[T]he mere fact that participants in a fraudulent scheme use accounts at a bank to perpetrate it, without more, does not in and of itself rise to the level of substantial assistance."); *In re Agape Litig.*, 681 F. Supp. 2d 352, 365 (E.D.N.Y. 2010) ("The case law is clear that opening accounts and approving transfers, even where there is a suspicion of fraudulent activity, does not amount to substantial assistance.").  That same conclusion is warranted with respect to the Banks here, who Assignee admits have not engaged in any conduct beyond providing ordinary banking services to the Judgment Debtors, and who, accordingly, are not "aiders and abettors" or nonparties in "active concert and participation" with the Judgment Debtors.

find that continuing to engage in routine banking transactions can be turned into 'active concert or participation with [the enjoined parties]' simply through 'notice of [the Court's] order [of asset freeze]." *Motorola Credit Corp.*, 978 F. Supp. 2d at 214; *see also Allstar Mktg. Grp., LLC v. 158*, 2019 WL 3936879, *3 (S.D.N.Y. Aug. 20, 2019) ("The Court cannot conclude that a third-party who merely holds the Defaulting Defendants' assets—which may be wholly unrelated to the counterfeiting at issue in this case—is by definition 'in active concert or participation' with the Defaulting Defendants"); *John Wiley & Sons, Inc. v. Book Dog Books*, LLC, 327 F. Supp. 3d 606, 638 (S.D.N.Y. 2018) ("Courts in this Circuit have found 'active concert' … where an enjoined party is ***substantially intertwined*** with a non-party . . . .").

Furthermore, nothing in the Freeze Orders makes clear that they should apply to the Chinese Branches.  Assignee relies on the fact that the orders bind the Judgment Debtors' assets "regardless of whether [such money or assets] are located in the United States or abroad."  Br. 7. However, that language appears to be directed to the Judgment Debtors, who were and could be barred from transferring assets that were located outside the U.S.  It could even be construed to apply to the New York branches of the Banks (the only branches that were served with notice of the orders) to the extent they held assets outside of the U.S.  Nothing in this language makes it clear, however, that the asset restraints apply to the Banks' branches in China.

Finally, the Freeze Orders have never clearly and unambiguously identified which accounts to freeze and have instead placed the burden on the Banks to "figure it out."  However, "[t]he party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden."  *Sanders v. Air Line Pilots Assoc., Int'l*, 473 F.2d 244, 247 (2d Cir. 1972). Assignee now provides the Court with a comprehensive list of account numbers, merchant names, and Judgment Debtors and the dates on which their associated accounts purportedly should have been frozen and asserts that the Banks should have known all along exactly which

accounts to freeze.  *See* July 19, 2019 Decl. of Edward Boyle, ECF 212 ("Boyle Decl."), Exs. 1-3.  But Assignee *never* provided that information to the Banks in such a comprehensive and organized manner.  To the contrary, the notices provided to the Banks contained tens if not hundreds of pages of confusing and piecemeal information that no third party could reasonably be expected to decipher.  *See* Oct. 30, 2019 Declaration of Zeng Li ("Zeng Decl.") ¶¶ 9-11, 20; Oct. 30, 2019 Declaration of Junjie Shi ("Shi Decl.") ¶¶ 10-12; Zhu Decl. ¶¶ 6, 8-10; Oct. 30, 2019 Declaration of Zhou Yanhua ("Y. Zhou Decl.") ¶¶ 7-8, 13; Oct. 30, 2019 Declaration of Zhou Bo ("B. Zhou Decl.") ¶¶ 8, 16.  In short, the Freeze Orders—which identify thousands of names, email addresses, and websites and intersperse this information throughout multiple documents—have never been "clear and unambiguous," nor could the Banks have implemented them *on the very day they were issued*, as Assignee's damages calculation charts suggest.  *See* Boyle Decl. Exs. 1-3.

### E.    Applying the Freeze Orders retroactively would violate due process.

The Banks cannot be liable for contempt sanctions on this record.  They repeatedly sought clarification as to whether they were bound—as was their right—and Assignee frustrated those attempts every step of the way.  As a result, there was never an adjudication that the Banks were required to comply with the Freeze Orders, much less that they even applied to them given their ambiguity and the applicability of the separate entity rule.  As the Second Circuit has held, "fundamental notions of due process" require that "nonparties must be accorded 'an opportunity to be heard and participate in . . . litigation' that could give rise to a judgment against them." *Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 62 (2d Cir. 2004).  Thus, "when questions arise as to who is bound by an injunction though operation of Rule 65, district courts will not 'withhold a clarification in the light of a concrete situation'" and  "[t]here [can] be no adjudication of liability against a [non-party] without affording it a full opportunity at a hearing, after adequate notice, to

present evidence." *NML Capital, Ltd. v. Republic of Arg.*, 727 F.3d 230, 243 (2d Cir. 2013).

Because the Court has repeatedly held that the asset restraints were directed only to the defendants, that the issue of the enforceability against the Banks was unripe, and because Plaintiffs have repeatedly maintained they are not seeking to enforce the Freeze Orders against the Banks, it would be contrary to fundamental due process to conclude that the Banks can now be found in contempt of restraints that they have never had the opportunity to contest.

In 2015, the Banks wrote to the Court three times, objecting to Nike's proposed Default Judgment. ECF 41, 43, 47. In response, Nike explicitly and repeatedly represented that the Default Judgment "[wa]s ***not an order against the Banks***" and conceded that the Court had neither established whether personal jurisdiction existed over the Banks nor conducted a comity analysis. *See* ECF 42 at 3; *see also* ECF 46 at 1 ("Plaintiffs seek an order against ***Defendants*** enjoining them from disposing of assets this Court froze . . . .") (emphasis in original); *id.* at 2 ("Plaintiffs ***do not seek to enforce*** any order ***against the Banks***. . . . Plaintiffs request relief ***only against Defendants***."). Following these submissions, Judge Scheindlin held that the Banks' arguments regarding personal jurisdiction, comity, and the separate entity rule were not ripe "given that the Proposed Default Judgment is ***directed entirely at defendants and seeks no enforcement against the non-party Banks***." ECF 48 at 2.[13] In 2018, the Banks moved for modification of the Final Order, reiterating their objections. ECF 71, 110. Magistrate Judge

---

[13]   Assignee misstates this ruling, falsely claiming that Judge Scheindlin "found that the Judgement . . . 'order[ed] the Banks to comply with [the] asset freeze.'" Br. 29; *see also id.* at 7. Judge Scheindlin actually noted that while "the Proposed Default Judgment would order the Banks to comply with an asset freeze, because this judgment is not directed against the Banks, it would be premature for the Court to undertake a hypothetical comity analysis at this time." ECF 48 at 3. In fact, Judge Scheindlin reiterated several more times that the Default Judgment was not directed at the Banks. *See id.* ("***If*** plaintiffs do ***eventually*** seek to compel the Banks to freeze . . . defendants' overseas assets . . . ."); *id.* at 4 ("no enforcement proceeding against any objecting Bank has been initiated").

Freeman again held that enforceability against the Banks was premature.  ECF 135 at 50-51.

The Court reached its conclusion based on Assignee's express representations that it was not yet

seeking to enforce the asset restraints against the Banks.  *See id.* at 50 (noting that "[t]he

Assignee has made plain that it is not yet seeking to enforce the asset-restraint provision of the

10/20/17 Order against the Banks").  Magistrate Judge Freeman agreed with Judge Scheindlin's

assessment that the Default Judgment "***was directed only at Defendants***" and noted that she

"***suspect[ed] that the Assignee . . . is well aware of*** *" that fact*.  *See id.*

In light of the Court's repeated statements that the Freeze Orders do ***not*** bind the Banks,

and in light of the Banks' repeatedly frustrated attempts to seek clarity, it would be extremely

prejudicial for the Banks now to be held in contempt, some four years after they initially sought

clarification as to whether they were bound.  Assignee founds the basis for its damages claim on

the notion that, by not complying with the Freeze Orders, the Banks facilitated the continuation

of the Judgment Debtors' counterfeiting, further escalating the damages Assignee seeks to

collect.  Due process cannot countenance a situation in which a party frustrates attempts to

clarify the outer bounds of a freeze order over a period of years, only to turn around and claim

"gotcha" and saddle the Banks with damages that purportedly accrued during years of

uncertainty.  That result would be manifestly unjust.

Moreover, as discussed *supra* and *infra*, a party in this situation cannot be held to be

bound to an asset restraint until a court decides that (1) the separate entity rule does not apply to

preclude the extraterritorial enforcement of asset restraints served on the New York branches; (2)

the Banks are subject to personal jurisdiction for purposes of the asset restraint; and (3)

principles of international comity do not preclude enforcement of the asset restraints.  *See supra*

at 7 and *infra* at 31 (citing *Gucci, Tiffany*).  Because the Court—at Assignee's own insistence—

never decided these questions, the Freeze Orders cannot apply retroactively even if the Court

were now to decide the questions in Assignee's favor.  Assignee could have moved to compel

the Banks' compliance or, at the very least, confirmed that it sought to enforce the orders against

the Banks.  It did not.  Instead, it set a trap, which it is trying to spring with this motion.

### F.      Laches bars a finding of contempt.

The Second Circuit has held that laches is a ground to deny a motion for contempt.  *See*

*Aris Isotoner Inc. v. Berkshire Fashions, Inc.*, 924 F.2d 465, 466-67 (2d Cir. 1991) (approving

"application of the normal rules regarding laches" and remanding for consideration of whether

the plaintiff's "delay in coming to court" was a bar to a finding of contempt).[14]  Assignee,

through its own actions and the actions of its predecessor Nike, has sat on its purported rights for

four years—almost twice the amount of time that the Second Circuit found made "the laches

defense to be a strong one" against a contempt motion.  *See id.*   This delay was to its benefit and

to the prejudice of the Banks because it allowed Assignee to run up its statutory damages claim

as new alleged counterfeiters and hundreds of purportedly infringing websites sprouted up, only

so Assignee could turn around and try to stick the Banks with a $150 million bill under its novel

theory of sanctions.  And Assignee did indeed run up the damages here, where some 90% of its

identified infringements consist of those identified only after the Default Judgment.  Oct. 30,

2019 Declaration of Philip Green ("Green Decl.") ¶¶ 38, 57 & Ex. E.

There is no justification for Plaintiffs' failure to seek to compel the Chinese Branches'

compliance with the Freeze Orders four years ago, when the Banks put them on notice that they

believed the Freeze Orders did not bind the Chinese Branches.  Assignee says that "[o]f course,

even if the Banks believed that the asset freeze was improvidently granted, the Banks were

nonetheless obliged to honor the injunction."  Br. 21-22.  That is entirely beside the point.

---

[14]  Though laches is an equitable defense, it may be invoked to bar both legal and equitable relief.
*See, e.g., Deere & Co. v. MTD Holdings Inc.*, 2004 WL 324890, at *18 (S.D.N.Y. Feb. 19, 2004).

Plaintiffs were on notice that the Banks did not intend to comply.  Assignee should not now be

heard to claim that the Banks caused $150 million worth of damages in new counterfeiting

activity when Plaintiffs were on notice that the Banks did not believe that they were required to

comply with the Freeze Orders and Assignee did nothing to compel that compliance.  In fact, as

discussed above, starting as early as four years ago, plaintiffs took affirmative steps to actively

frustrate the Banks' attempts to clarify whether they were bound.  *See supra* at 6-11, 26-28.

Under these circumstances, it would be inequitable to hold the Banks in contempt.

      **G.**    **Judicial estoppel bars Assignee's contempt claim.**

Because Assignee's motion is directly contrary to its prior representation that Assignee

does not seek to enforce the Freeze Orders against the Banks, judicial estoppel bars Assignee

from claiming the Banks have violated the Freeze Orders.  That doctrine prevents "a party who

plays fast and loose with the courts from gaining unfair advantage."  *Wight v. BankAmerica

Corp.*, 219 F.3d 79, 89 (2d Cir. 2000).  It is designed to ensure courts can "render their decisions

based on faithful representations by counsel."  *In re Adelphia Recovery Tr.*, 634 F.3d 678, 697

(2d Cir. 2011).  Judicial estoppel applies where "(1) a party's later position is clearly inconsistent

with its earlier position; (2) the party's former position has been adopted in some way by the

court in the earlier proceeding; and (3) the party asserting the two positions would derive an

unfair advantage against the party seeking estoppel."  *Id.* at 695-96.

When the Banks objected to the enforcement of the Default Judgment's asset restraints

against it, Plaintiffs stated that they "seek an order against ***Defendants*** enjoining them from

disposing of assets this Court froze," ECF 46 at 1 (emphasis in original) and that they "***do not

seek to enforce any order against the Banks***." *Id.* at 2.  The Court then adopted this position,

finding that the Banks' objections were "[not] ripe given that the Proposed Default Judgment is

directed entirely at defendants and seeks no enforcement against the non-party Banks."  ECF 48

at 2.  Assignee now seeks to do the exact opposite, and as discussed regarding laches, above, it does so at the Banks' prejudice, having run up its damages claim during the time it says the Banks should have been complying with the Freeze Orders, even though Assignee itself made clear it was not seeking to enforce them against the Banks.  And Assignee's prior position allowed it to deprive the Banks of any clarity from this Court as to whether the Banks were bound by the Freeze Orders.  Certainly, had Assignee been candid about its intentions, the Court would have looked at the Banks' objections to the asset restraints in a different light.  Under these circumstances, judicial estoppel bars it from now claiming the Banks are in contempt.

### H.    Principles of international comity also require denial of the motion.

The Contempt Motion must be denied because enforcement of the restraints would violate principles of international comity.  These principles, described as "the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interests of other sovereign states," require a "particularized analysis of the respective interests of the foreign nation and the requesting nation."  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 543-44 & n.27 (1987).

The Court must conduct a comity analysis under Section 403 of the Restatement (Third) of Foreign Relations Law ***before*** ordering the foreign nonparty Banks to freeze assets located abroad in contravention of their domestic law.  *See* ECF 135 at 32, n.12; Br. 22; *see also, e.g.*, *Tiffany*, 589 Fed. App'x at 553 (recognizing that a section 403 comity analysis is necessary "***before*** a district court may enforce an asset freeze injunction extraterritorially against a third-party foreign bank in a way that would cause the bank to violate its own domestic law"); *Gucci*, 768 F.3d at 139 (similar).  It is undisputed that such an analysis has never been undertaken in this case.  This accordingly provides an independent basis for denying Assignee's Contempt Motion, which seeks once again to hold the Banks in contempt of Freeze Orders even though they have

not yet been evaluated by this Court in accordance with principles of international comity.  *See id.* ("In such circumstances, where the Bank objected to application of the Asset Freeze Injunction to it, specifically citing an apparent conflict with the requirements of Chinese banking law, comity principles required the district court to consider the Bank's legal obligations pursuant to foreign law before compelling it to comply with the Asset Freeze Injunction.").

A conflict exists between enforcement of the Freeze Orders against the Banks and Chinese law, which prohibits banks from restraining customer accounts absent a formal direction from a "competent organ" of the Chinese government.  *See* Financial Institution Assistance Regulations (ECF 73-5) at 1 (asset freezes must be "according to the relevant laws and the demand of the competent organ for freeze"); deLisle Decl. ¶¶28-29; Wang Decl. ¶¶ 8, 14.[15] "Competent organs" of the Chinese government include the People's Court and a number of other Chinese governmental authorities, but not foreign courts or entities.  Wang Decl. ¶ 15. Accordingly, a Chinese commercial bank that unilaterally decides to comply with a U.S. court-ordered asset freeze would be in violation of Chinese law.

These prohibitions are not toothless, as Assignee suggests.  The Chinese government enforces them.  As described in the declaration of Justice Wang, a number of Chinese banks have been subject to administrative sanctions for failing to comply.  Wang Decl. ¶¶ 10, 27, 29.  And the number of administrative decisions on this issue is greater than the single case that Assignee's expert, Donald Clarke, addresses.  *See* ECF 207 ("Clarke Decl.") ¶ 42.  Bank customers have also sued Chinese commercial banks for improperly freezing or deducting funds

---

[15] Assignee's claim that "Chinese law did not require the Banks . . . to either keep the Judgment Debtors' accounts open or to allow Judgment Debtors to continue to use their accounts" is incorrect.  Br. 22.  Assignee ignores that it is asking the Court to enforce asset restraints on bank accounts located in China, and to turn over funds located in bank accounts in China.  Such measures would violate Chinese law.

from customer accounts—again, in more instances than Professor Clarke addresses in his declaration. Indeed, at least some of the Banks in this action are presently facing litigation in China as a result of certain internal control measures that they have undertaken with respect to the Judgment Debtor accounts.  Wang Decl. ¶¶ 22, 23.  For example, Chinese courts have already ruled against CCB and CMB, finding that branches of these banks had violated China's Commercial Banks Law and Contract Law in restricting the ability of certain Judgment Debtors to withdraw or transfer funds out of their accounts, and ***ordering these branches to lift the restrictions***.  Wang Decl. ¶¶ 22-24; deLisle Decl. at ¶¶ 43-52.  The conflict here is real, and the Banks have been placed in an untenable position because compliance with the Freeze Orders would subject them to the risk of sanctions and further legal action in China.[16]

Because there is a conflict with Chinese law and Court orders, the Court must consider the interests of international comity.  Restatement § 403 sets forth eight factors to be evaluated. Importantly, and as Magistrate Judge Freeman expressly noted, these factors are "not the same as" the Restatement § 442 factors this Court previously considered.  ECF 135 at 32, n.12; *see Gucci*, 768 F.3d at 140 ("And while the factors in §§ 403 and 442 of the Restatement partially overlap, subsections 403(2)(a), (c), (d), (e), (g), and (h), in particular, are not fully reflected in § 442.").  Asset restraints—and particularly ***extraterritorial*** asset restraints—have a significant impact on banking and warrant a separate analysis.  These eight factors weigh in favor of the

---

[16] The Banks also object to Professor Clarke's extensive legal arguments in his declaration regarding the weighing and application of the Section 403 comity factors.  *See* Clarke Decl. ¶¶ 47-54.  While Professor Clarke is purportedly an expert on Chinese law, the Banks respectfully submit that it is not Professor Clarke's role to conduct a comity analysis as required under U.S. law, and that portion of his declaration should be stricken as supplanting the Court's role in conducting that analysis.  *See In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) ("The rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle.'") (citations omitted).

Banks and against the enforcement of the asset restraints against *Chinese* banks, *Chinese* account holders, and *Chinese* assets in contravention of *Chinese* banking law and sovereignty.

Factors (a) and (b), relating to "the link of the activity to the territory of the regulating state," and "the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated," clearly favor the Banks.  Assignee asks a U.S. court to restrain hundreds of accounts—*all*  located in China in banks subject to *Chinese* law and regulated by *Chinese* banking authorities.  Assignee's counsel has acknowledged that the relevant information in this case, including the information regarding the accounts Assignee seeks to restrain, is "all in China."  *See* ECF 25 at 5:2-7. Moreover, the Banks are not "the person[s] principally responsible" for the underlying activity here; the Judgment Debtors are, and there is no dispute that they, too, are located in China.

Factors (c) and (e)—"the importance of regulation to the regulating state" and "the importance of the regulation to the international political, legal, or economic system"—also support the Banks, and Assignee's attempts to spin these factors in its favor are disingenuous. Assignee invokes the U.S. policy of enforcing intellectual property rights.  Br. 23.  But Assignee's motion does not seek to enforce intellectual property rights; it seeks to enforce a monetary judgment acquired by a litigation finance firm seeking a return on its investment. Assignee does not own the Nike and Converse trademarks, thus undermining any attempt to obtain statutory damages based on the alleged infringement of these marks.  This case is now about using a baseless theory of contempt to extract sanctions (or a lucrative settlement) from the Banks, which has long been the *modus operandi* for counsel for Assignee.  Assignee's counsel has brought a string of cases over the past decade that all start as counterfeiting cases against absent defendants and invariably end up as actions targeting the Banks, notwithstanding their nonparty status.  *See Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87 (S.D.N.Y. 2015); *Tiffany*,

2015 WL 3701602; *Tiffany (NJ) LLC v. Dong*, 2013 WL 4046380 (S.D.N.Y. Aug. 9, 2013);

*Gucci Am., Inc., v. Bagsmerchant, LLC*,  2012 WL 4468192 (S.D.N.Y. Sept. 27, 2012); *Tiffany*

*(NJ) LLC v. Forbse*, 2012 WL 1918866 (S.D.N.Y. May 23, 2012); *Gucci Am., Inc. v.*

*MyReplicaHandbag.com*, 2008 WL 512789 (S.D.N.Y. Feb. 26, 2008).[17]   Under these

circumstances, the alleged goal of protecting intellectual property rights is not a legitimate basis

to require the Banks to act in a manner that conflicts with Chinese law.

Factor (d), "the existence of justified expectations that might be protected or hurt by the

regulation," also favors the Banks because they (along with other banks with established New

York branches) "have reasonably relied on [the separate entity rule] over the years when

deciding whether to open branches and conduct business" here.  *Motorola*, 21 N.E.3d at 226.  As

stated earlier, one of the key justifications for the rule is to prevent conflicts with foreign law

arising from the extraterritorial enforcement of U.S. asset restraints.  *See supra* Section I.A.1.

Factors (f), (g), and (h)—which consider "the extent to which the regulation is consistent

with the traditions of the international system," "the extent to which another state may have an

interest in regulating the activity," and "the likelihood of conflict with regulation by another

state"—also clearly favor the Banks.  Post-*Daimler*, courts have sought to ensure that the U.S.

does not overreach regarding the extraterritorial application of jurisdiction and U.S. law, an

approach that is consistent with how other sovereign nations limit the application of their own

laws.  *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016) ("It is a basic

---

[17]   Assignee further stresses that Magistrate Judge Freeman "already has noted the 'greater
national interest of the United States in enforcing its judgments *against counterfeiters*.'"  Br. 23-
24 (quoting ECF 150 at 42).  The Banks are not counterfeiters.  Moreover, Assignee does not
explain why it has targeted *only* the Banks, rather than the Judgment Debtors, the providers of
the websites the Judgment Debtors use, or any number of providers of financial services to the
Judgment Debtors based in the U.S. (e.g., PayPal, Visa, or Mastercard).  If Assignee were
serious about combatting counterfeiting, these entities would be subject to litigation as well.

premise of our legal system that, in general, United States law … does not rule the world."). China also has a strong interest in applying its own banking laws to bank accounts in China, which would be directly contravened were the asset restraints held to apply to the Banks' Chinese branches.  deLisle Decl. ¶¶ 30, 33-34; *see* Wang Decl. ¶¶ 13-18.  Courts have recognized that they "cannot arrogate to the federal courts the power to control the banking systems of other countries within their own territory."  *Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1395 (9th Cir. 1995).  Indeed, it would be a complete affront to the traditions of the international banking system to find that an asset restraint order issued here may be enforced in China, just as U.S. banks would not expect their New York branches to be bound by orders of the Chinese courts restraining assets in the U.S.  *See* Wang Decl. ¶¶ 18, 38-41; deLisle Decl. ¶¶ 72.

U.S.-China relations, moreover, are informed by the long history of foreign interference in China's internal affairs going back to the 19th century, and enforcement of the asset restraints goes well beyond the mere violation of Chinese black-letter law.  "From the Chinese perspective, foreign court systems imposing demands on Chinese [entities] that need to be carried out on Chinese soil constitute an affront to Chinese sovereignty."  Ray Worthy Campbell & Ellen Claar Campbell, *Clash of Systems: Discovery in U.S. Litigation Involving Chinese Defendants*, 4 Peking U. Transnat'l L. Rev. 129, 131 (2016).  "A history of foreign powers operating their own judicial systems against Chinese citizens on Chinese soil, in derogation of Chinese laws and Chinese processes, makes extraterritoriality a sensitive issue."  *Id*. at 148;  deLisle Decl. at ¶ 33.

Considered together, these factors weigh in the Banks' favor and should compel the Court to conclude that this is not an instance where it should override a conflict with foreign laws to impose asset restraints extraterritorially.  *See Reebok*, 49 F.3d at 1392 (noting that the analysis regarding jurisdiction to enforce an asset restraint "begins to crumble when a district

court seeks to reach out across the Atlantic in an attempt to impose conflicting duties on another country's nationals within its own borders").  Indeed, as far as the Banks are aware, **no** federal court has ever enforced an asset restraint against a foreign bank's non-U.S. branches—most likely given the potential for serious conflicts with foreign law, as is the case here.  *Hawkins v. i-TV Digitális Távközlési zrt.*, 935 F.3d 211, 228-232 (4th Cir. 2019) (declining "invitation to become the first" due, in part, to "serious comity concerns") (citing *Gucci Am.*, 768 F.3d at 137).

## II.    <u>THERE IS NO CONTEMPT OF THE DISCOVERY ORDER</u>

While "***substantial compliance***" is what the law requires of a nonparty responding to a document production subpoena, the Banks here went well beyond that to respond to the Subpoenas and comply with the order of this Court.  In view of these efforts, there can be no finding of contempt.  *See Heritage of Pride, Inc. v. Matinee NYC Inc*., 2014 WL 3703871, at *1 (S.D.N.Y. Jul. 23, 2014) ("[S]ubstantial compliance will defeat a motion for contempt . . . .").  Substantial compliance does not require "performance approximating perfection," but rather only the development of "reasonably effective methods of compliance."  *Zino Davidoff SA v. CVS Corp.*, 2008 WL 1775410, at *5, 8 (S.D.N.Y. Apr. 17, 2008).  And contempt is a "potent weapon" that should not be used "where there is fair ground of doubt" as to the wrongfulness of the alleged noncompliance.  *See id.* at *5.  Accordingly, Assignee bears the burden of showing with clear and convincing evidence that the Banks have "not diligently attempted to comply in a reasonable manner" with the court's order.  *See Gucci Am., Inc. v. Weixing Li*, 2015 WL 7758872, at *1 (S.D.N.Y. Nov. 30, 2015).  Assignee does not satisfy its burden.

Assignee cannot ignore the extraordinary burdens it put the Banks to; they are highly relevant because the difficulty of compliance shapes what constitutes "reasonable" efforts to comply.   The Subpoenas here are of epic proportions; they include hundreds of websites, email addresses, and common Chinese names (equivalent to "John Smith") and leave it to the Banks to

"figure it out."  *See* ECF 211-66–211-92..  The Banks nevertheless attempted to locate every piece of information demanded in the Subpoenas.  *See* generally Y. Zhou Decl.; Zhu Decl.; Zeng Decl.; Shi Decl.; B. Zhou Decl.  When responsive information was located, it was produced, with the exception of information for which Chinese law prohibits disclosure (see *infra* at 40-41).  *See id*.  This includes records relating to more than 100 accounts specifically identified in the Subpoenas, *see* Y. Zhou Decl. ¶ 5; Zhu Decl. ¶ 6; Zeng Decl.  ¶ 7; Shi Decl. ¶ 6; B. Zhou Decl. ¶ 7, and documents and information relating to ***hundreds*** of additional accounts also maintained by the Judgment Debtors that are not identified in the Subpoenas.[18]  Chung Decl. ¶¶ 11, 14 & Ex. 4.  All told, the Banks produced over 7,300 documents comprising over 20,500 pages.  *See* ECF 195 at 4.  And even after their initial productions, the Banks continued to work with Assignee in good faith to follow up on additional inquiries about the production and made supplemental productions.

The collection process, moreover, was a massive undertaking—hardly a "push button" process as Assignee would have the Court believe.  There was no centralized method for obtaining the account information demanded in the Subpoenas.  *See* Y. Zhou Decl. ¶ 3; Zhu Decl. ¶¶ 3–4; Zeng Decl.  ¶¶ 3–5; Shi Decl. ¶ 3; B. Zhou Decl. ¶¶ 3–5.  Rather, it was a painstaking process that required searching for documents and information both electronically and manually relating to hundreds of customer accounts located in dozens of individual bank branches and data archive centers located across China.  *See* Y. Zhou Decl. ¶¶ 9–15;  Zhu Decl. ¶¶ 10–17; Zeng Decl.  ¶¶ 12–23; Shi Decl. ¶¶ 4–15; B. Zhou Decl. ¶¶ 9–19.  It required the work of literally hundreds of bank personnel—many of whom were required to work overtime—to

---

[18] As the Second Circuit has held, however, there cannot be contempt as to any bank accounts that were not specifically identified within the four corners of the subpoena.  *See Gucci*, 768 F.3d at 142-144 (reversing contempt order where subpoena called for bank accounts in an "open ended" fashion that requested accounts "including but not limited to" specific account numbers).

search for and collect responsive documents so that they could be produced by the Court's deadline. *See id.*; *see also* ECF 196-1; 197-1; 198-1; 201-1. Many of these documents were stored in hard-copy format—sorted only by branch and date—and required bank employees to dig manually through bound volumes of records hunting for individual transaction records stored in multiple locations throughout China. *See* Y. Zhou Decl. ¶¶ 9–15; Zhu Decl. ¶¶ 10–17 ; Zeng Decl. ¶¶ 12–23 ; B. Zhou Decl. ¶¶ 9–19. When the Banks completed this massive collection effort, which took tens of thousands of hours, the process then required that the documents be transmitted via the Chinese Ministry of Justice and the U.S. Department of Justice in order to mitigate the risk of violating Chinese law, to which the Banks were still bound. deLisle Decl. at ¶¶ 89-97; ]Wang Decl. ¶¶ 38-41. This record of compliance simply cannot support the imposition of contempt sanctions.

If anything, the record shows that Assignee has targeted the Banks for purported deficiencies in their production not to further their judgment enforcement efforts against the counterfeiters, but rather to set up contempt proceedings against the Banks. *See Heritage*, 2014 WL 3703871, at *1 ("Frankly, if anyone has behaved badly here, it is Plaintiff, which seems to have engaged in 'gotcha' tactics that were designed to set up a contempt application—which happens to be a style of litigation that this Court finds offensive."). And as described elsewhere in this brief, Assignee's counsel is no stranger to this "gotcha" tactic, which has nothing to do with the substance of the Banks' production and everything to do with finding a way to reap a windfall recovery from the Banks. *See, e.g., supra* n. 18 (citing *Gucci*, 768 F.3d at 142-44, in which the Second Circuit reversed a contempt finding as to BOC in connection with a vague and ambiguous subpoena Assignee's counsel served); *see also supra* at 34-35.

Assignee faults the Banks for failing to produce information that either does not exist or could not be located after diligent effort. That is not a basis for contempt. The various

categories of allegedly "missing" information sought by the Subpoenas are discussed in turn.

      ***Transaction and account records***.  The Banks searched for the account and related transaction information demanded using the numerous identifiers contained in the Subpoenas and produced the relevant information that they were able to locate after a diligent search.  Y. Zhou Decl. ¶¶ 4–15;  Zhu Decl. ¶¶ 5–17; Zeng Decl.  ¶¶ 6–23; Shi Decl. ¶¶ 4–15; B. Zhou Decl. ¶¶ 7–19.  Assignee's assertion that numerous records tied to these accounts, *see* Boyle Decl. ¶¶19–23, are absent from the Banks' production is unfounded, as explained in the Banks' declarations submitted herewith and during the course of the parties' correspondence on these issues.  Y. Zhou Decl. ¶¶ 16–20;  Zhu Decl. ¶¶ 18–23; Zeng Decl.  ¶¶ 24–37; Shi Decl. ¶¶ 4–15; B. Zhou Decl. ¶¶ 20–24; Chung Decl. ¶¶ 16, 17 & Exs. 6, 7.

      ***Emails with Judgment Debtors.***  Most consumers in the U.S. do not email their banks regarding basic debit card accounts, and it is no different in China.  As the Banks have each explained at length, it is simply implausible that anyone at the Banks communicated with the Judgement Debtors over email with respect to specific transactions, and the burden associated with even attempting to locate any such records across thousands of bank employees using common accountholder names would be tremendous.  *See* Y. Zhou Decl. ¶ 20;  Zhu Decl. ¶¶ 21–23; Zeng Decl.  ¶¶ 35–37; Shi Decl. ¶ 11; B. Zhou Decl. ¶ 24.  In addition, any internal emails also would not involve transactions regarding individual bank accounts, which would have been reflected in the produced documents relating to each subject account.  *See id*.  Any email correspondence regarding compliance with the subpoenas is not responsive to the subpoenas and in any event is privileged.  Chung Decl. ¶ 16 & Ex. 6.

      ***Suspicious Activity Reports, Currency Transaction Reports, and Credit Reports.***  Each of these reports is barred from production by specific provisions of Chinese law beyond those relating to customer records generally, as the Banks have made clear in their correspondence

with Assignee.  Chung Decl. ¶¶ 13, 14 & Exs. 3, 4; *see* deLisle Decl. ¶¶ 82-88.  These records, which relate to anti-money laundering enforcement regulations, also could not be produced under U.S. law.  *See* 31 USC § 5318(g)(2); 31 CFR 1020.320(e).  In any event, the Banks have produced other records that document the underlying transaction information contained in these reports.  Chung Decl. ¶ 14 & Ex. 4.  Assignee thus cannot point to any discernable prejudice that it suffered as a result of not receiving the reports.

Given that Assignee's assertions regarding alleged "deficiencies" are invalid, its request for an "adverse inference" that alleged missing documents would show the Banks violated the Freeze Orders, Br. 30-33, is unfounded.  It would be equally unfounded even if there were not "substantial compliance" with the subpoenas, for an adverse inference is simply not available to Assignee in the present procedural posture.  Assignee's counsel knows this having made the same request against non-party BOC in *Gucci v. Weixing Li*, and Judge Sullivan rejected it.[19] An adverse inference is a Rule 37 sanction, and that rule governs the discovery conduct of ***parties*** to an action, not nonparties such as the Banks; accordingly, an adverse inference sanction is not available.  *See Gucci Am., Inc. v. Weixing Li*, 2012 WL 5992142, at *6 n.3 (S.D.N.Y. Nov. 15, 2012) ("[T]he sanctions provisions of Federal Rule of Civil Procedure 37 do not apply to non-parties"); *Funnekotter v. Republic of Zimb.*, 2011 WL 5517860, at *3 (S.D.N.Y. Nov. 10, 2011) ("[E]ven where a non-party is subject to a court-ordered deposition or subpoena, and fails to comply, the only remedies available are those for contempt, not adverse findings against the

---

[19] *Gucci v. Weixing Li*, ECF 178 at 10:10-19 (S.D.N.Y. Dec. 2, 2015) (Counsel argued that the Court "is entitled to draw an inference . . . as part of the Court's inherent power . . . that these documents, if they were produced, would be harmful to their case."  In response, Judge Sullivan highlighted that "it is not really their case at this point. . . . They are a third party."); *see id.*, 2015 WL 7758872, at *3 (S.D.N.Y. Nov. 30, 2015) ("Plaintiffs do not cite a single case where a non-party has been ordered to pay the damages attributable to the defendants' conduct in the underlying action as compensatory contempt sanctions.").

non-party."). Nor does Assignee cure this infirmity by appealing to the Court's "inherent powers," Br. 30-31, for Assignee cites no law in support for its unprecedented request.[20]

Even were the Court to break with precedent and so-exercise its inherent powers, Assignee fails to prove the requisite bad faith. Such inferences are available "*only* upon a particularized showing of bad faith, which requires both clear evidence that the challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of the [district] court." *Charles v. City of New York*, 2015 WL 756886, at *3 (S.D.N.Y. Feb. 20, 2015). The only record evidence supports the Banks; their extensive efforts to comply with the Subpoenas demonstrates their good faith. *See* Y. Zhou Decl. ¶¶ 4–15; Zhu Decl. ¶¶ 5–17; Zeng Decl. ¶¶ 6–23; Shi Decl. ¶¶ 4–15; B. Zhou Decl. ¶¶ 7–19. In addition, as the Banks explained to Assignee, if the productions do not contain transaction documents for a specified account, the Banks have confirmed that they have conducted extensive searches for these documents and either (1) could not find any evidence of the existence of the account, or (2) could not find any transaction documents related to that account. *See id*. Assignee "is not entitled to an adverse inference based on [the] nonproduction of nonexistent evidence." *See Baez v. Delta Airlines, Inc.*, 2013 WL 5272935, at *10-12 (S.D.N.Y. Sept. 18, 2013) (declining to issue adverse inference where plaintiff did not prove the existence of the evidence). The Banks furthermore have a legitimate basis to withhold any remaining documents that Assignee claims to be missing from the productions, which are prohibited from disclosure under Chinese law. *See supra* at 40-41.

---

[20] Assignee misleadingly describes cases. It says the Second Circuit endorsed adverse inferences as to nonparties. Br. 31. Not so; that case involved named parties to a litigation. *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). It commits the same error in claiming courts in this district have endorsed such sanctions against nonparties. Br. 31, n. 11 (citing *Shamis v. Ambassador Factors Corp.*, 34 F. Supp. 2d 879 (S.D.N.Y. 1999)).

Finally, an adverse inference is a severe sanction and is grossly disproportionate to the facts of this case.  Courts must "impose the least harsh sanction that can provide an adequate remedy."  *Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at *8 (S.D.N.Y. Mar. 12, 2018).  An adverse inference is wholly inappropriate.

## III.  <u>ASSIGNEE'S CLAIM FOR $150 MILLION IN CONTEMPT "DAMAGES" FAILS</u>

Given the clear absence of contempt, the Court need not even consider Assignee's $150 million contempt "damages" claim.  Should the Court even entertain the damages claims, the Banks are entitled to discovery and an evidentiary hearing pursuant to Local Rule 83.6(b) and principles of due process, as set forth in Assignee's pending Conditional Motion for Discovery and an Evidentiary Hearing Regarding Assignee's Damages Claim, filed concurrently herewith. Even without discovery, the damages claims fail on their face, for the reasons set forth below.

### A.  **Assignee has no standing to seek contempt damages based on "continuing infringement;" only Nike can pursue those claims.**

Assignee asks this Court to find that the Banks "damaged" Assignee by allowing counterfeiting of ***Nike's*** Trademarks to continue.  Bedrock principles of trademark law render this "damages" claim illegitimate.  Assignee is without standing to pursue compensatory damages for violations of Nike's trademark rights.  Assignee is merely a purchaser of a money judgment; it has no rights to pursue damages for violations of rights in which it has no interest.

Bizarrely, Assignee does nothing to conceal that its theory of "contempt damages" is a claim for statutory damages under the Lanham Act premised on the factual assertion that "the Banks enabled the Judgment Debtors" to "continue[] to sell their illegal wares."  Br. 1; *see also id.* at 2 (Banks "allowed the Judgment Debtors to continue to operate over 800 [New Websites] selling counterfeit Nike products"); *id.* ("With the Banks' assistance, the counterfeiters' operation remained uninterrupted"); *id.* ("These ordinary banking transactions were essential …

to open and operate websites"); *see also id.* at 26. Assignee further charges, "[t]he Judgment

Debtors violated the Lanham Act." Br. 2. Without any proof, they claim the Banks are

"member[s]" of the judgment debtors' "counterfeiting networks." Br. 48; *see also id.* at 49.

Assignee further claims it "***suffered … $150,690,603 in damage***" from the alleged

continued infringements. Br. 4; *id.* at 48 ("the damage caused by the Banks"). That is ludicrous.

Assignee has no trademarks at issue here and therefore has not suffered any harm from the

alleged continuation of counterfeiting by the Judgment Debtors that the Banks purportedly

facilitated. Without a cognizable injury, Assignee is not entitled to compensatory contempt

sanctions. *See U.S.* v. *Paccione*, 975 F. Supp. 537, 544 (S.D.N.Y. 1997) ("Compensatory

sanctions should reimburse an injured party for its actual damages and may not be imposed

absent some proof of actual loss."); *Leadsinger, Inc. v. Cole*, 2006 WL 2266312, *15-17

(S.D.N.Y. Aug. 4, 2006) (for compensatory sanctions, "actual damages must be established by

competent evidence" not " mere speculation or conjecture").

Long-established, fundamental principles of trademark law forbid this attempt to collect

damages based on violations of trademark rights in which Assignee has no interest:

*First*, the Lanham Act itself codifies the principle that only the registrant of the trademark

has standing to pursue claims for trademark infringement.[21] 15 U.S.C. § 1114(1); *see Fed.*

---

[21] Assignee's attempt to execute an end run around these limitations was already rejected by one circuit court. In *Perfect 10 v. Visa International Services Ass'n*, 494 F.3d 788, 807 (9th Cir. 2007), the plaintiff sued various credit card companies because they continued to process payments to the websites that allegedly infringed on the plaintiff's trademark after they were notified of the alleged infringement. The Ninth Circuit held that the credit card companies could not be jointly liable with the website operators because "the credit card payment network . . . is not the instrument used to infringe [Plaintiff's] trademarks; that infringement occurs without any involvement of Defendants and their payment systems." *Id.*; *see also Kelly-Brown v. Winfrey*, 717 F.3d 295, 314 (2d Cir. 2013) (rejecting contributory liability claim where plaintiff "allege[d] only that the corporate sponsors provided sponsorship for" an infringing event). The Banks respectfully incorporate by reference ABC's arguments regarding Assignee's failure to prove the

*Treasury Enter. Sojuplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 72-79 (2d Cir. 2013) ("*Stoli*")
("registrant" does not encompass any assignee who does not have an "ownership interest" in the
trademark that is transferred by a "duly executed" "instrument in writing" or, at the least, an
"exclusive license to use or enforce the [trademarks].").  Nor does Assignee have any standing to
pursue damages for contributory infringement, ostensibly its theory of damage.  *See id.* at 84.

*Second*, as to Lanham Act Section 43(a) claims, while they do extend beyond the
registrant to those harmed by the violation, they do not extend to someone in Assignee's
position.  The Supreme Court held in *Lexmark International, Inc. v. Static Control Components,
Inc.*, 572 U.S. 118, 133-34 (2014), that such claims require "economic or reputational injury
flowing ***directly from the deception wrought*** by the defendant's advertising; and that occurs
when deception of consumers causes them to withhold trade from the [claimant]."[22]  This
"generally bars suits for alleged harm that is 'too remote'" from the infringement, such as
Assignee's claimed harm as a purported derivative beneficiary of Nike's rights.  *See id.* ("That is
ordinarily the case if the harm is purely derivative").  The Supreme Court reasoned that, while "a
competitor who is forced out of business by a defendant's false advertising generally will be able
to sue for its losses, the same is not true of the competitor's landlord, its electric company, and
other commercial parties who suffer merely as a result of the competitor's 'inability to meet [its]
financial obligations.'"  *Id.*  Assignee is even less close to Nike than examples the Supreme
Court gave of parties who have an insufficient standing.

It is not even questionable whether Assignee could have rights to enforce Nike's
trademark rights; the answer is definitely "no."  "[A]s a general principle of trademark law, only

---

Banks are liable for infringement in their concurrently filed brief (ECF 243, Section IV(a)).

[22]   *Millennium Access Control Tech., Inc. v. On the Gate, LLC*, 2017 WL 10445800, at *12
(E.D.N.Y. Feb. 14, 2017) (applying *Lexmark* to Section 43(a)(1)(a) false designation of origin).

the owner of the trademark is entitled to sue for [] infringement."  6 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 32:3 (5th ed.).  This principle is so obvious that it is rarely litigated.  But the Supreme Court had occasion to rule in 1923 that the rights to sue for infringement of a patent could not be sold separate from the patent itself because they are exclusive to the patent owner.  *See Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 36-45 (1923) (finding an assignment of such claims invalid as a matter of law).

Relying on that precedent, a district court found that a trademark owner's subsidiary had no standing to pursue trademark claims even where it was purportedly assigned that right.  *See Int'l Soc'y for Krishna Consciousness of Western PA, Inc. v. Stadium Auth. of the City of Pittsburgh*, 479 F. Supp. 792 (W.D. Pa. 1979).  The court recognized the basic principle of trademark law that a trademark consists of a bundle of rights that cannot be split or assigned without the underlying goodwill: "It was obviously not the intention of the Legislature to permit several monopolies to be made out of one, and divided among different persons with the same limits."  *See id.* at 796.[23]   This is because "there are no rights in a trademark standing alone" and therefore "no rights can be transferred apart from the business with which the mark is associated."  *Nat'l Licensing Ass'n, LLC. v. Inland Joseph Fruit Co.*, 361 F. Supp. 2d 1244, 1255–57 (E.D. Wash. 2004); *see also* McCarthy § 18:2 ("A sale of a trademark apart from its goodwill is called an 'Assignment in Gross' and is invalid.  Goodwill and its symbolic trademark cannot be separated without damage, usually fatal damage, to both.").

The Assignment plainly confers no rights on Assignee to enforce (or seek damages for alleged violations of) Nike Trademark rights.  *See* ECF 50.  Even it did, Assignee has no

---

[23] Courts have honored the rationale of *Krishna*, and none have questioned it.  *See Nat'l Licensing Ass'n, LLC. v. Inland Joseph Fruit Co.*, 361 F. Supp. 2d 1244, 1255-57 (E.D. Wash. 2004); *Nutritech Sols., Ltd. v. Matrix Nutrition, LLC*, 2007 WL 1424337, at *4-5 (D. Ariz. May 11, 2007).

standing to pursue violations of the Court's injunction prohibiting further trademark violations. New York state law only allows the assignment of final judgments for a "sum of money;" it does not permit the sale of *injunctions*. N.Y. Gen. Oblig. Law § 13-103. That is unsurprising, since it is an age-old truism that while "one may purchase a cause of action at law and enforce all legal rights which go with it, … the right to appeal to the conscience of the court of equity cannot be bought or sold." *Emmendorfer v. Crader Tire & Retread Serv., Inc.*, 670 S.W.2d 548, 549–50 (Mo. Ct. App. 1984); *see also RooR Int'l BV v. Saleem*, 2019 WL 4127282, at *4 (E.D. Tex. Aug. 12, 2019), *R. & R. adopted,* 2019 WL 4081008, at *1 (E.D. Tex. Aug. 29, 2019) (there is no "standing to pursue an injunction" without standing to sue for infringement).

For these reasons, in addition to the claim for damages being void altogether because it is premised on a violation of the injunction prohibiting infringement, the Final Order itself is also invalid. The Final Order incorporated *infringements that were never alleged by Nike—the trademark owner—and only alleged by Assignee*. *See* Br. 8. As the Banks' expert, Mr. Green, demonstrates, the "new infringements" identified by Assignee constitutes some 90% of Assignee's statutory damages computation. Green Decl. ¶¶ 38, 57 and Ex. E.

To justify its reliance on statutory damages as a basis for compensatory contempt sanctions, Assignee again utters the word "proxy," *see supra* at 20, as if it is some magical spell that dispenses with the law. Br. 49. That is illusory because Assignee admits that the so-called proxy is "a proxy for *damages caused by the Bank*,"—*i.e.*, continued trademark infringement. *See id.* None of the cases it cites in support of its "proxy" theory have applied to third parties in the Banks' position. Every case Assignee cites in support of its statutory damages argument is directed toward *defendants*, not third parties. Br. at 45-46 (citing *Vuitton*, *Manhattan Indus*., *Yash Raj*, *Eros En'tmt*, and *U2 Home*). There is simply no precedent for Assignee's damages theory. Moreover, none of these cases concern a party in Assignee's position, *i.e.*, a judgment

purchaser with no right to assail infringements of a trademark it does not own.

This fact was recognized by the court in *Gucci America, Inc. v. Weixing Li*, a case Assignee's counsel brought where Gucci sought $12 million in compensatory sanctions against nonparty Bank of China.  The court denied Gucci's request, holding that it was "unwilling to treat non-party BOC as an alter ego responsible for the entirety of the statutory damages owed … by Defendants."  *Gucci,* 2015 WL 7758872, at * 3.  The Court should hold likewise here.

Assignee's trademark damages claim is problematic for another related reason—this Court has never found that the Banks were liable for trademark infringement.  Of course, before the Banks could be held responsible for trademark infringement, they are entitled to be served with a complaint, to make a motion to dismiss, to obtain party and third party discovery, to summary judgment motions and to a jury trial (among other things).  Assignee cannot be permitted to sidestep the entire Federal Rules of Civil Procedure by cramming a trademark case into a contempt motion against nonparties.  The Banks have ***never*** had the opportunity to litigate the merits of the trademark infringement case.  The Banks also never had the ability to challenge the motion to obtain the Final Order prior to its entry, which was filed *ex parte* and under seal. ECF 58-60.  It is inconceivable that the Banks could be responsible for $118 million in Lanham Act damages under those circumstances.  It would also violate the law of this District, which has recognized that "it is increasingly clear that claims for damages or profits under the Lanham Act must first be tried to a jury."  *Lurzer GMBH v. American Showcase, Inc.*, 75 F. Supp. 2d 98, 103-04 (S.D.N.Y. 1998); *see also Klipsch Group, Inc. v. Big Box Store Ltd.*, 2012 WL 5265727, at *6-7 (S.D.N.Y. Oct. 24, 2012) ("[T]he Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages . . . including the amount itself.").

   **B.    Assignee has no proof of causation as to alleged violations of its purported trademark rights.**

48

Assignee's statutory damages claim must also fail because Assignee has failed to establish causation.  A party seeking compensatory contempt sanctions "must demonstrate a causal connection between the contemnor's contemptuous behavior and the alleged damages." *Grand v. Schwarz*, 2018 WL 4026735, at *2 (S.D.N.Y. Aug. 23, 2018); *see also Leadsinger*, 2006 WL 2266312, at *17 (finding in a civil contempt proceeding that "Plaintiff is not entitled to compensatory damages without some evidence that defendant's contemptuous conduct **caused** plaintiff to suffer actual damages"); *In re Vill. Manor Health Care, Inc.*, 2016 WL 758687,  at*5 (D. Conn. Bankr. Feb. 25, 2016) ("[P]laintiff's recovery will be limited to those provable damages proximately resulting from contempt") (citing *Andre Matenciot, Inc. v. David & Dash, Inc.*, 442 F. Supp. 1199, 1211 (S.D.N.Y. 1976)).  Likewise, a claim for damages under the Lanham Act requires proof of "both actual damages and a causal link between defendant's violation and those damages."  *Alzheimer's Disease & Related Disorders Ass'n v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 303 (S.D.N.Y. 2018).

Here, there is a complete failure of proof.  Assignee has not proffered **any evidence** that the Banks caused the alleged counterfeiting network to expand and continue.  Assignee's so-called expert, a recent college graduate whose purported expertise is that she **knows how to use the Internet**, merely **assumes** that there is causation, presumably because Assignee's counsel asked her to make that assumption.  For her part in "tracing" the New Websites to the Banks, Ms. Perles does not establish any connection for many of those websites to any account at the Banks.  Green Decl. ¶¶39-42.

Causation is too attenuated here for other reasons as well.  Assignee has chosen to go after the Chinese Banks for its damages, but has not explained (nor could it) why the Banks should be targeted before a variety of other entities—including those based in New York—who are much closer to the counterfeiting in the chain of events than the Banks, including the website

service providers who host the webpages through which Judgment Debtors sell their products; PayPal, which "identif[ied] nearly 200 PayPal accounts belonging to Judgment Debtors," *see* Br. 5-6, and any number of other third party financial providers such as Visa or MasterCard.  *See* Green Decl. ¶¶ 28-30.  Nor has Assignee sought to enforce the judgment against the Judgment Debtors in the country of their domicile.  All of these entities are in front of the line of causation, *see id.*, and the Banks cannot be deemed the proximate cause.  On that score, Assignee's own admissions doom its motion.  Assignee admits that the Banks did nothing more than allow "ordinary banking transactions" and "banking as usual."  Br. 1.

Relatedly, damages cannot be awarded where Assignee cannot provide evidence about the percentage of damages for which the Banks are allegedly responsible.  *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt. Inc.*, 628 F. Supp. 2d 312, 326-27 (E.D.N.Y. 2009) (no anti-counterfeiting damages where plaintiffs targeted just three defendants out of many and plaintiffs "failed to present any evidence" about how defendant's conduct "compares to the scope of the infringing activity it claims to have uncovered").

Additionally, Ms. Perles fails to show that the infringing activity on these 811 New Websites ***would not have occurred*** if the Banks had restrained the Judgment Debtor accounts. Perles has not shown the Banks' conduct (or lack thereof) was instrumental or even relevant to the infringing activity on the New Websites.  *See generally* ECF 208 ("Perles Decl.").  And there is no way to establish that the counterfeiters' infringing activity on the 811 New Websites would have come to a complete standstill if the Banks had complied with the asset restraint orders. Indeed, there would have been nothing to stop the counterfeiters from opening new accounts at other commercial banks in China or elsewhere to service their infringing websites and continuing to rely on other third parties (such as website hosts, PayPal, and credit card operators) to advance its counterfeiting operations.  Green Decl. ¶¶ 27-31.  This dooms Assignee's causation case.

### C.      Assignee's statutory damages calculation is dubious and unreliable.

Assignee's entire $118 million statutory damages calculation rests on the declaration of

Ms. Perles, who has a B.A. in political science and took an unnamed course on the Internet.  *See*

Perles Decl. ¶ 2 (purporting to offer expertise in "the creative leveraging of publicly available

information").  While reading this labyrinthine declaration is akin to an exercise in mental Tetris,

the Court should not mistake that for thoroughness.  *See* Green Decl. ¶¶26-67.  On its face, the

Perles Declaration is severely flawed and Ms. Perles is facially unqualified to offer reliable

analysis to this Court.  *See id.*

As a threshold matter, Ms. Perles is not a "witness [who] is qualified as an expert by

knowledge, skill, experience, training, or education who may testify in the form of an opinion."

Fed. R. Evid. 702; *see Gjini v. U.S.*, 2019 WL 498350, at *13 (S.D.N.Y. Feb. 8, 2019) ("The

Court must first address 'the threshold question of whether a witness is qualified as an expert by

knowledge, skill, experience, training, or education to render his or her opinions.'").  Ms. Perles

does not establish any of these things in her declaration.  *See generally* Perles Decl.  She does not

explain how her political science degree or her work as an analyst is at all relevant to the opinion

she provides regarding the tracing of Judgment Debtors' activity.  *See generally id*.  She

purportedly has "completed an extensive training course in the field of cyber security smart data

research," but provides no information about where she took this course, when she took this

course, and what sort of certificate or diploma (if any) she received.  *Id.* ¶ 4.  She claims to have

"experience with investigations regarding the digital footprint and use of social media by illicit

organizations which requires the same analytic and investigatory tools as required to identify

infringing websites," but does not detail what that experience was or explain how the use of

social media is at all akin to selling counterfeited products (if indeed it is).  *Id.* ¶ 5.  She does not

provide a C.V. with her submission.  On these bases alone her declaration should be rejected.

51

The Perles Declaration suffers from other serious flaws as well.  For starters, Ms. Perles improperly conceals her own  methodology and how she applied that methodology.  Her approach directly contravenes Rule 702, which allows an expert to offer opinion testimony only if the testimony "is the product of reliable principles and methods" that have been reliably applied.  Fed. R. Evid. 702(c)-(d).  Ms. Perles, instead, claims that she has dumbed-down any disclosure of her methodology to "prevent counterfeiters from obtaining key information that would allow them to escape detection and enforcement, as well as to protect [her] proprietary methodology."  Perles Decl. ¶ 11.  Noble as that may be, it is not a basis to conceal a methodology from the Banks and no such exemption to disclosure is cognizable under either Federal Rules of Evidence 702 or FRCP 26.  Clearly, the filing of such material under seal—***if truly warranted, and there is no evidence it is***—would be the proper measure to address such concerns.  Because Ms. Perles deprives the Court and the Banks of the basis for her methodology, the Perles Declaration must be stricken.  *See* Green Decl. ¶¶ 35-51; *Caruso v. Bon Secours Charity Health Sys.*, 2016 WL 8711396, at*6-7 (S.D.N.Y. Aug. 5, 2016) (holding that an expert's "opinions are unreliable because her report does not explain the methodology she used to reach her opinions" and that "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").  Furthermore, this is not an issue that can be remedied in Assignee's reply submission; it is too late.

Even had Ms. Perles disclosed her secret methodology, such disclosure would likely have only been damning to Assignee.  For example, Ms. Perles makes the conclusory allegation that "[t]he 57 Post Freeze Accounts at the Banks are connected to 811 New Websites selling counterfeit Nike product that were active in violation of this Court's Orders in this action" and then proceeds to calculate statutory damages based on these 811 New Websites.  Perles Decl. ¶

13.   However, the only "connection" between the Banks and these New Websites that Ms. Perles

provides is that "Judgment Debtors used the same email addresses [associated with these 57

accounts] to continue to open up new websites after the date the Bank in question was on

notice."  *Id.* ¶ 14.  Ms. Perles provides no explanation as to how this tenuous link supports

liability on the part of the Banks since, even if these 57 accounts had been frozen, this would

have no effect on whether the Judgment Debtors could continue to use those email addresses to

open new websites; nor would it automatically result in any of the 811 New Websites identified

by Ms. Perles being shut down.  *See* Green Decl. ¶¶ 27-31, 34.

In addition to the alleged 57 post-freeze accounts, Ms. Perles also alleges statutory

damages against the Banks based on a number of the Judgement Debtors' purported involvement

with the 811 New Websites.  *See* Perles Decl. ¶ 16.  However, beyond asserting a supposed

"connection" via shared email address, Ms. Perles fails to identify any evidence linking these

New Websites to the Banks.  For example, many of the Perles exhibits list domain names that do

not have any corresponding Bank account identified.  *E.g.,* Perles Ex. 24 at Nos. 4-5, 10-11, 14,

45, 51-52, 54, 56, 58-69, 71-73, 75-78, 81, 83-84, 86-95, 99-110, 112-127, 129-131, 133-139,

141-169.  More critically, even though Ms. Perles provides allegedly related Bank accounts in

certain instances, she does not provide ***any*** evidence of actual transactions from these 811 New

Websites that were routed through ***any*** of the Banks.

Further, Ms. Perles includes a variety of exhibits that purport to show "the identification

of a distinct Nike trademark the first time it appears on a distinct type of good across an entire

Counterfeiting Network."  Perles Decl. ¶ 30 and Exs. 6-14.  Many of these screenshots have no

dates anywhere on them; others appear to have dates but are so illegible that identification of the

date is impossible. *See generally* Perles Exs. 6-14.[24]  Ms. Perles thus provides no evidence that these websites were actually in operation beyond when the Accounts should have been frozen.

Still further, Assignee improperly double- and triple-counts in its statutory damages calculation, and fails to meet its burden to show that its designation of product categories is appropriate.  The Lanham Act's statutory damages formula permits up to $200,000 for each counterfeit mark multiplied by each "type of good" sold.  *See* 15 U.S.C. § 1117(c)(1).  The more "type[s] of goods" that are claimed thus results in a higher quantum of damages.  Courts have acknowledged the danger for abuse by slicing the "type of goods" too thinly, holding that "[c]ommon sense cuts in favor of defining the phrase 'type of goods' to be the general product type as opposed to many sub-forms of that product."  *Union of Orthodox Jewish Congregations of Am. v. Am. Food & Bev. Inc.*, 704 F. Supp. 2d 288, 292 (S.D.N.Y. 2010) (infringement of Baskin Robbins' trademarks on "31 flavors of ice cream" does not equate to 31 types of goods).

Here, Ms. Perles purports to identify "46 different types of goods" for which "34 Nike trademarks" were infringed.  Perles Decl. ¶ 29.  Ms. Perles does not offer any opinion as to why her differentiation of the types of goods is appropriate, nor does Assignee offer any other evidence to substantiate this categorization of goods.  The following chart demonstrates how Assignee has created sub-types within sub-types of goods, counting shoes for each type of sport as a type of good, and then further divided by gender and/or age, rather than just counting the types of goods as "athletic shoes" or "sneakers."  *See* Perles Decl. ¶ 25 and *id.* Ex. 3; *see also* Green Decl. ¶¶49-51 (further detailing flaws in Perles' methodology).

| Type of Goods | Ms. Perles' Classification of 47 Types of Goods | | | |
|---|---|---|---|---|
| Shoes | Mens Basketball | Womens Basketball | Childs Basketball | Unisex Basketball |
|  | Mens Running | Womens Running | Childs Running | Unisex Running |

---

[24]   The Banks also object that these documents have not been properly authenticated.

| | Mens Cleats | Womens Cleats | Childs Cleats | |
| | Mens Lifestyle | Womens Lifestyle | Childs Lifestyle | |
| | Mens Sandals | Womens Sandals | Childs Sandals | |
| | Mens Sport | Womens Sport | Childs Sport | |
| | Mens Training | Womens Training | Childs Yoga | |
| | Mens Boots | Womens High Heel | | |
| **Apparel** | Mens Jerseys | Womens Jerseys | Childs Jerseys | Mens Tank Tops |
| | Mens T-shirts | Womens T-shirts | Childs T-shirts | Mens Socks |
| | Mens Sweatshirts | Womens Sweatshirts | Childs Sweatshirt | Mens Jackets |
| | Mens Pants | Mens Shorts | Child Shorts | |
| **Access-ories** | Mens Gloves | Mens Hats | Mens Wristband | Mens Shinguard |
| | Unisex Phonecase | Unisex Sunglasses | Unisex soccerball | |

Finally, as set forth more fully in the Banks' concurrently-filed Conditional Motion for Discovery and an Evidentiary Hearing Regarding Assignee's Damages Claim, the Banks, as third parties, have had no opportunity to examine Ms. Perles regarding her experience, qualifications, methodology, or opinions.[25]  In a normal litigation, after the appropriate fact-finding period, Ms. Perles's expert opinion would undoubtedly be the subject of a *Daubert* motion regarding both her qualifications and the secret methodology she employs.  If the Contempt Motion is not denied, as it should be, the Banks are entitled to discovery to test Ms. Perles' opinions, qualifications, and reliability.

### D.    Assignee's claim for $32 million in compensatory damages is fatally flawed.

Assignee seeks $32,690,603 in compensatory damages based on the amount of money the Banks purportedly allowed Judgment Debtors to transfer out of their accounts.  Br. 44-45.  This figure, presented in the Boyle Declaration (¶ 75), is invalid for a number of reasons.  Chief among them is that it wrongly assumes the Banks should have frozen the relevant accounts as

---

[25]  Ms. Perles's prior declaration, dated September 27, 2017, also went completely untested. ECF 208-1.  In fact, that declaration was initially filed under seal per this Court's order, but was never subsequently filed publicly until the instant motion, though the Court ordered otherwise, ECF 58.  Accordingly, no one—neither the Judgment Debtors nor the Banks—had an opportunity to challenge her initial findings, which were part of the basis for the Final Order.

early as 2013 but that Assignee should also be allowed to recover sums deposited into those accounts *after* that date. The amount of funds in the accounts as of the dates that Assignee claims the accounts should have been frozen was $623,078. *See* Oct. 30, 2019 Declaration of Keith Williamson ("Williamson Decl.") at ¶ 3.1.3. These accounts currently total $75,733, meaning that they have decreased in value by $547,345—far less than the $32 million Assignee now seeks. *Id.* ¶ 3.1.3.

The law is clear that an asset freeze is designed only to preserve the *status quo*. *See Tiffany*, 2015 WL 3701602, at *12 (S.D.N.Y. June 15, 2015) (purpose of an asset freeze "is the maintenance of the status quo pending adjudication of a claim."); *Paradigm Biodevices, Inc. v. Centinel Spine, Inc.*, 2013 WL 1915330, at *2 (S.D.N.Y. May 9, 2013) (asset freezes "preserve the *status quo* pending judgment"). Assignee's "compensatory" damages calculation, however, is not based on preserving the *status quo*, but rather on reaping a windfall. If, as Assignee argues, the asset restraints went into effect in 2013, its compensatory damages must be limited to no more than the $547,345 diminution in value of the Judgment Debtors' accounts from that date to the present. *See* Williamson Decl. ¶ 3.1.3. Anything further would allow Assignee to recover more than the amount of loss actually suffered, which the law does not permit. *See Vuitton et Fils S. A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979) (compensatory sanctions are intended to "restore the parties to the position they would have held had the injunction been obeyed."); *U.S. v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947) (compensatory sanctions "must of course be based upon evidence of complainant's actual loss").

Mr. Boyle's calculations are also incorrect for a number of other reasons. For example, they fail to account for the fact that certain money that Assignee claims was "withdrawn" from the accounts was actually transferred to Judgment Debtors' other accounts at the same bank, thus resulting in incorrect double counting. *See* Williamson Decl. ¶ 3.5.4. Mr. Boyle's analysis also

omits certain relevant transactions and contains calculation errors.  *See* Williamson Decl. at n.10

and ¶ 3.5.6(i).  For all these reasons, Mr. Boyle's analysis should be disregarded entirely.

## IV.   ASSIGNEE MUST REIMBURSE THE BANKS

The Banks demonstrated in the Reimbursement Motion that they are entitled to

reimbursement of the fees and costs expended to comply with the Subpoenas.  Assignee's

opposition, Br. 49-54, does nothing to show it should be excused from Rule 45's mandatory

reimbursement requirement.  The facts here cry out for reimbursement.  Assignee's Subpoenas

were a shambolic mess of hundreds of website names, email addresses, and a partial, incomplete

list of names, including a significant number of Chinese names equivalent to "John Smith."  ECF

72-11 to 72-14.  The Subpoenas were never designed to enable the Banks to piece it all together.

On the contrary, they were overbroad and far reaching, increasing their burden still, and called

for documents the Banks could not readily gather, with the normal level of effort required of a

reasonable subpoena, from dozens of branch offices across China whose data repositories are not

centrally organized. Zeng Decl. ¶¶ 6, 12-20; Shi Decl. ¶¶ 10-12; Zhu Decl. ¶¶ 6, 11-16; Y. Zhou

Decl. ¶¶ 3, 9-13; B. Zhou Decl. ¶¶ 7-16.

It should therefore not surprise Assignee that the Banks collectively diverted their

attention from normal bank business for at least 30,000 hours, divided across nearly 500 of their

employees, who had to decipher Assignee's complex and convoluted Subpoenas and pursue

myriad leads in search of responsive documents.  *See supra* at 37-39.  Many of these documents

were stored in hard-copy format and spread across numerous storage facilities and individual

bank branches, thus requiring a herculean effort that went far beyond that typically required or

undertaken by third parties.

Rule 45 mandates reimbursement.  Under Rule 45, nonparties should be "protect[ed]"

from "significant expense resulting from [subpoena] compliance."  Fed. R. Civ. P. 45(d)(2).  In

this district, Rule 45 "make[s] cost shifting **mandatory in all instances in which a non-party incurs significant expense from compliance with a subpoena.**"  *Koopmann v. Robert Bosch LLC*, 2018 U.S. Dist. LEXIS 88332, at *3 (S.D.N.Y. May 25, 2018). That should be the beginning and end of the matter.  Assignee seeks to avoid this through a distorted analysis of the equities.  As detailed below, all of the factors weigh in favor the Banks, namely "(1) whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can more readily bear the costs; and (3) whether the litigation is of public importance." *See In re Namenda Direct Purchaser Antitrust Litig.*, 2017 WL 3822883, at *10  (S.D.N.Y. Aug. 30, 2017).

First, the Banks are disinterested non-parties.  Assignee's claim that the Banks were "central to the counterfeiting" is unfounded.  As demonstrated *supra* Section III(B), Assignee has failed to prove causation.  Br.  52.  And as also demonstrated above, it has no standing to enforce trademarks it does not own.  *Supra* Section III(A).  Simply put, there has never been any finding, nor any claim, of trademark liability against the Banks.  ECF 28, 49.  The Banks cannot be considered "interested parties" simply because Assignee has reeled them into this action in an attempt to access deep pockets.  The situation that the Banks find themselves in now—subject to years of overbroad, burdensome discovery demands  but, as nonparties, unable to contest the scope of litigation and discovery—is one that courts have acknowledged merits an award of costs. [26]

Second, Assignee cannot show that the Banks can more readily bear the costs.  Nobody disputes that the Banks are profitable, and so is Assignee.  Assignee's parent, Tenor Capital, is a behemoth hedge fund with at least $1.67 billion in equity holdings and routinely spends tens of

---

[26]    *See U.S. v. McGraw-Hill Cos. Inc.*, 302 F.R.D. 532, 535 (C.D. Cal. 2014) (nonparties are "powerless to control the scope of litigation … and should not be forced to subsidize an unreasonable share of the costs of a litigation to which they are not a party.")

millions on litigation finance projects.  *See* ECF 195 at 16.  Assignee could easily pay the $1.22

million in compliance costs, particularly where it has purported to buy a judgment worth over a

billion dollars, ECF 49 at 8.  In fact, courts routinely award fees to large, non-party institutions.

*See Namenda*, 2017 WL 3822883, at *10  (S.D.N.Y. Aug. 30, 2017) (Lupin Pharmaceuticals);

*Prescient Acquisition Grp. V. MJ Publ'g Trust*, 2006 WL 2996645, at *3 (Bank of America); *In*

*re First Am. Corp.*, 184 F.R.D. 234, 245 (S.D.N.Y. 1998) (Price Waterhouse-UK).[27]

Third, Assignee's insistence that this case is about trademark issues of the "utmost public

importance" is misplaced.  Br. 53.  Assignee is the purchaser of a monetary judgment with no

standing to enforce Nike's Trademarks.  This case is now about a litigation funder seeking to

turn a profit on its investment by pursuing trumped-up damages against the Judgment Debtors'

banks.  Presumably recognizing it has no standing, Assignee also invokes "this Court's ability to

enforce its Orders."  Br. 53.  The Banks have never disputed that this is a legitimate

consideration, and indeed they have complied with this Court's order to produce documents.  *See*

*supra* Section II.  The Banks dispute only Assignee's contention that they be required to pay the

costs of such compliance when the equities dictate otherwise.

Finally, the Banks' requested fees and expenses are reasonable and have been

documented in great detail.  *See* ECF 196-199.  Assignee's argument, Br. 54, that it is

"implausible" that the Banks could not have used "electronic and automated methods" to collect

the requested documents "much more efficiently" is directly refuted by the detailed declarations

---

[27]   Assignee's argument that the Banks' must bear the costs of collection because of their efforts
to defend themselves in this litigation is not only absurd, it raises serious due process concerns.
Br. 51.  That the Banks "oppose[d] entry of the Judgment" and "sought to modify the Asset
Freeze Provisions" does nothing to demonstrate the "Banks' interest in preventing the discovery
of their own contempt," as Assignee now claims.  *Id*.  Assignee cites no authority supporting the
proposition that a non-party's efforts to defend its rights in a litigation somehow "belie any claim
of disinterest" for Rule 45 cost shifting purposes, let alone any facts to support such a claim here.

submitted in response to Assignee's cross-motion.  These efforts all took time and required a

high level of coordination across numerous Bank branches throughout China.

   The costs incurred by the Banks' counsel are also reasonable.[28]  Contra Assignee's claim,

courts in this district regularly shift the cost of document review and production.  *See In re*

*Subpoena to Loeb & Loeb LLP*, 2019 WL 2428704, at *5-6 (S.D.N.Y. Jun. 11, 2019); *Kahn v.*

*GMC*, 1992 WL 208286, at *2 (S.D.N.Y. Aug. 14, 1992).  Assignee also claims that the

negotiation of a protective order was unnecessary, but of course the Banks could not have

produced sensitive financial information without having a protective order in place.  *See CBF*

*Industria De Gusa S/A v. AMCI, Holdings, Inc.*, 2019 WL 3334503, at *13 (S.D.N.Y. July 25,

2019) (protective order warranted for bank account information).  As for the other costs, travel

and associated expenses *were* in fact necessary, as the document review had to be undertaken in

China to comply with Chinese law.  *See* ECF 199 ¶ 9; *see also* Wang Decl. ¶¶ 38-41; deLisle

Decl. ¶¶ 92-96.  These costs were all reasonable and required, and reimbursement is warranted.[29]

## CONCLUSION

   For the foregoing reasons, the Banks respectfully request that Assignee's Contempt

Motion be denied in full,  that their Reimbursement Motion be granted, and that this Court enter

an order requiring Assignee to reimburse the Banks $1.22 million in costs accordingly.

---

[28]  To the extent Assignee complains about the redaction of the Banks' legal bills, Br. 54, the Banks reiterate their prior offer to submit them for in camera review.  ECF 199 at n.1.

[29]   Assignee's complaints about the required transmission of documents through the MOJ and DOJ are also wrong.  This process was necessary in light of concerns about violating Chinese law.  Wang Decl. ¶¶ 38-41; deLisle Decl. ¶89-92; *see* Br. 55; *see In re First Am. Corp.*, 184 F.R.D. at 240 (awarding expenses under Rule 45 because non-party "could not have complied with the Subpoena without first making the appropriate applications" to the foreign "courts to lift th[e] [legal] impediments").

Dated: October 30, 2019

/s/ David G. Hille
WHITE & CASE LLP

Glenn M. Kurtz
David G. Hille
Jacqueline Chung
Dominique Forrest
Laura A. Grai

1221 Avenue of the Americas
New York, NY  10020-1095
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
gkurtz@whitecase.com
dhille@whitecase.com
jacqueline.chung@whitecase.com
dominique.forrest@whitecase.com
laura.grai@whitecase.com

/s/ Carey R. Ramos
QUINN EMANUEL URQUHART &
SULLIVAN LLP

Michael B. Carlinsky
Carey R. Ramos
Samuel Williamson
Cory D. Struble
Neil T. Phillips

51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
micharlcarlinsky@quinnemanuel.com
careyramos@quinnemanuel.com
samwilliamson@quinnemanuel.com
corystruble@quinnemanuel.com
neilphillips@quinnemanuel.com

*Attorneys for Bank of China, Bank of Communications, China Construction Bank, China Merchants Bank, Industrial and Commercial Bank of China Limited*

61