UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————————————x

NIKE, INC. and CONVERSE, INC.,

        Plaintiffs,

    -against-                           No. 13 Civ. 8012 (CM)

Maria WU et al.,

        Defendants.
——————————————————————————————x

**ORDER DENYING NONPARTY BANKS MOTION FOR REIMBURSEMENT, DENYING ASSIGNEE'S MOTION TO HOLD BANKS IN CONTEMPT AND FOR A TURNOVER ORDER, AND DENYING WITHOUT PREDJUDICE NONPARTY BANKS CONDITIONAL MOTION FOR DISCOVERY AND AN EVIDENTIARY HEARING REGARDING ASSIGNEE'S DAMAGES CLAIM**

McMahon, C.J.:

       This is an action to recover damages from 636 counterfeiters located in the People's Republic of China, who sold fake Nike and Converse products in violation of the Lanham Act. Between November 2013 and August 2015, Plaintiffs Nike, Inc. ("Nike") and Converse Inc. ("Converse") moved for, and my predecessor, Judge Scheindlin, granted, a temporary restraining order (Dkt. No. 3; the "TRO"), four preliminary injunctions (Dkt. Nos. 14 (the "PI Order"), 19, 24, 27 (collectively, the "PI Orders")), and a default judgment finding the Defendants liable for trademark infringement (Dkt. No 49). None of the Defendants, now Judgment Debtors, ever appeared.

       Each of those orders included restraints on Defendants' assets, "whether the Defendants' Assets are located in the United States or abroad." (*See, e.g.*, TRO ¶ 11.) However, Plaintiffs never sought to enforce the orders against the financial institutions (or any other entities) that might have access to or control over the Judgment Debtors' assets.

On January 31, 2017, Plaintiffs assigned their rights in the Default Judgment, valued at over $1.8 billion (Dkt. No. 49 at 8), to Next Investments, LLC ("Next" or "Assignee"), an investment vehicle owned by litigation finance firm Tenor Capital (Dkt. No. 50).

That was just the beginning.

On November 30, 2017, after obtaining another order holding the still-absent Judgment Debtors in contempt of the Default Judgment (Dkt. No. 62; the "Final Order"), Assignee issued third-party subpoenas to six banks with branches in this district – Agricultural Bank of China ("ABC"), Bank of China ("BOC"), Bank of Communications ("BOCOM"), China Construction Bank ("CCM"), China Merchants Bank ("CMB"), and Industrial and Commercial Bank of China ("ICBC") (each a "Bank" or "Nonparty Bank;" collectively, the "Banks" or "Nonparty Banks") – each of which was headquartered in China, and each of which, or so Assignee believed, maintained accounts associated with the Judgment Debtors. (*See* Dkt. Nos. 72, 72-11.)

After the Banks responded to the subpoenas, the current collection of disputes and pending motions arose.

On June 20, 2019, the Banks, with the exception of ABC (hereinafter, the "Moving Banks") moved for $1.22 million in attorneys' fees, costs, and other expenses incurred while complying with Assignee's subpoenas. (Dkt. No. 194; the "Reimbursement Motion" or "RM.") A month later, in addition to opposing the Reimbursement Motion, Assignee moved this Court to find the Nonparty Banks in contempt of the asset restraints, as well as this Court's discovery orders. (Dkt. No. 205; the "Contempt Motion" or "CM.") The Contempt Motion seeks over $150 million in damages, as well as a turnover order for the remaining funds in the Judgment Debtors' accounts that the Banks neglected to freeze. In response, the Nonparty Banks filed a Conditional Motion for Discovery and an Evidentiary Hearing Regarding Assignee's Damages

Claim, in the event that this Court found the Banks in contempt. (Dkt. No. 249; the "Conditional Motion.")

The Reimbursement M otion is denied because, as set out in greater detail below, the Banks compliance efforts were unreasonably expensive, inefficient, and cumbersome. The Contempt Motion is denied because it seeks to hold the Banks liable for violating orders that never bound them. The Conditional motion is denied as moot.

## BACKGROUND

The Default Judgment established that the Judgment Debtors "willfully infringed various valuable, federally protected [Nike and Converse] trademarks in connection with the sale, offering for sale, and distribution" of products similar to those offered by Nike and Converse. (Dkt. No. 28; Am. Compl. ¶ 22.) As the merits of the claims are no longer at issue, this Court need only review and discuss the procedural history of the Banks' involvement in the case to understand each side's positions and settle their pending motions.

### A. Plaintiffs Inform the Banks of the Pre-Judgment Orders and Request Banks' Compliance.

On November 14, 2013, Judge Scheindlin entered the TRO, which provided that:

in accordance with Rule 65 of the Federal Rules of Civil Procedure, 15 U.S.C. § 1116(a), and this Court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief, Defendants, their officers, directors, agents representatives, successors or assigns, and all persons acting in concert or in participation with any of them, including any third parties receiving actual notice of this Order . . . are temporarily restrained and enjoined from transferring, withdrawing or disposing of any money or other assets of Defendants, or otherwise paying or transferring money or other assets into or out of any accounts held by, associated with, or utilized by Defendants, regardless of whether such money or assets are held in the U.S. or abroad.

(TRO ¶ 11.) The PI Order, executed on December 3, 2013, contained identical language.

(PI Order ¶ 4.) The PI Order also directed third party financial service providers, including banks, to "within ten (10) days of receiving actual notice of this Order . . . provide to Plaintiffs'

counsel all documents and records [relating the Judgment Debtors' assets] in their possession, custody or control, whether located in the U.S. or abroad . . . ." (*Id.* ¶ 9.)

Plaintiffs served actual notice of the TRO and the PI Order on each of the Banks' New York branches on or before December 5, 2013, along with documents obtained in third-party discovery from Visa, Inc. and PayPal Holdings Inc. linking each of the Judgment Debtors to their respective Nonparty Bank. (*See, e.g.*, Dkt. No. 211 ("Nagin Decl."), Exs. 1, 5-8, 10-11, 13-15.) Plaintiffs highlighted the asset restraints and the discovery deadline, and instructed each Bank to take "all steps necessary to comply with the Preliminary Injunction." (*See, e.g.*, Nagin Decl. Ex. 15, at 2.) Although the Orders listed hundreds of email addresses and infringing websites, they only included two bank account numbers. (*See, e.g.*, TRO ¶ 12.)

The Banks objected in a December 16, 2013 letter. Writing on behalf of ABC, BOCOM, CMB, CCB, and ICBC, Dwight A. Healy of White & Case LLP asserted that the discovery provisions in both Orders were unenforceable to the extent that they called for the "production of information with respect to accounts at branches of the Banks in other jurisdictions," and "production of information prohibited by the banking, commercial and/or criminal laws of such jurisdictions, and should not be given effect under principles of comity." (Nagin. Decl. Ex. 17, at 2.) He said that the Plaintiffs should "seek information from China via the Hague convention." (*Id.*)

The December 16 letter also addressed the asset restraints, advising Plaintiffs that "the Banks dispute the availability of such relief in this action." (*Id.*) Healy listed three reasons why this Court could not enforce a cross-border asset freeze, against "assets or accounts, if any, that may be held at branches of the Banks outside New York." (*Id.*) First, the Court could not exercise jurisdiction over nonparties located abroad; second, asset restraints served on New York

bank branches have no effect on foreign branches under the common law separate entity rule; and, finally, principles of international comity forbid courts from enforcing "orders that require international banks to act in violation of the law of a foreign jurisdiction." (*Id.* at 3.)

Writing separately on December 23, 2013, BOC added that an asset freeze was unenforceable in a trademark case seeking statutory damages like this one, regardless of the location of the assets, because "federal courts have 'no authority' to restrain assets" in cases seeking purely monetary damages. (Nagin Decl. Ex. 20, at 3 (quoting *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999).) BOC also cited the separate entity rule, notifying Plaintiffs that "any order of attachment in this case would not extend to assets held at a foreign branch of a non-party bank." (*Id.*)

### B. The Plaintiffs and the Banks Await Guidance from the Second Circuit.

The Banks did not produce any documents in response to the Plaintiffs numerous requests in 2013 and 2014. Nor did the Plaintiffs file a motion to compel compliance with the Court's Orders. Instead, the two sides agreed to put their dispute on hold until the Second Circuit ruled on two pending appeals in the *Tiffany* and *Gucci* cases, two other trademark infringement suits in which certain of the Chinese Banks were challenging the enforceability of discovery orders and prejudgment asset freezes overseas in the wake of the Supreme Court's decision narrowing the scope of general jurisdiction in *Daimler AG v. Bauman*, 571 U.S. 117 (2014). (*See* Nagin Ex. 24 at 1; Ex. 25 at 2-3; Exs. 27-28, 30); *Tiffany (NJ) LLC v. China Merchs. Bank*, 589 F. App'x 550 (2d Cir. 2014) ("*Tiffany*"), *Gucci Am. Inc. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014) ("*Gucci*"). Both appeals arose when the nonparty Banks failed to comply with discovery orders and injunctions in actions naming Bank customers as defendants.

In September 2014, the Second Circuit handed down the *Gucci* and *Tiffany* decisions, vacating an asset restraint and a civil contempt order entered in *Gucci* against BOC on the

ground that the district court had improperly analyzed personal jurisdiction to compel the Bank's compliance with its orders, *Gucci* , 768 F.3d at 145, and applying the same rationale to vacate asset restraints and discovery orders entered against BOC, CMB, and ICBC in *Tiffany*. *Tiffany*, 589 F. App'x at 553-54. The court concluded that, following *Daimler AG v. Bauman*, 571 U.S. 117 (2014), "the district court may not properly exercise general personal jurisdiction over the Bank[s]" merely based on "branch offices in the forum." *Gucci*, 768 F.3d at 133. Accordingly, the Second Circuit remanded *Tiffany* and *Gucci* for the respective district courts to consider whether the Banks were subject to specific personal jurisdiction, "and (if so) whether [the district courts] should exercise such jurisdiction, properly applying principles of comity." *Id.* at 126.

In the meantime, Plaintiffs continued to review information obtained from Visa and PayPal, submitting evidence to Judge Scheindlin of newly identified websites and Nonparty Bank accounts associated with the Judgment Debtors' infringing conduct. These efforts resulted in three supplemental PI Orders, which expanded the scope of the original injunction to cover additional individuals, websites, email addresses, and accounts. (Dkt. Nos. 19, 24, 27.) Plaintiffs notified the Banks of these developments, while the Banks maintained their position that they were "under no obligation to freeze or turn over documents concerning accounts located in China." (Nagin. Decl. ¶ 33, at 1.)

### C. Plaintiffs Obtain the Default Judgment.

Plaintiffs moved for a default judgment on June 29, 2015. (Dkt. No. 37.) The proposed judgment attached to their motion included two asset restraints: the first provided that "all Defendants' Assets that have been previously identified or that were otherwise required to be restrained in compliance with this Court's Orders [shall] continue to be restrained regardless of whether the Defendants' Assets are located in the United States or abroad" (Dkt. No. 37-1 ¶ 9); the second applied to "any other of Defendants' assets that Plaintiffs identify in the future and/or

that have not yet been frozen shall be subject to the asset restraint provisions set forth herein, regardless of whether the Defendants' Assets are located in the United States or abroad." (*Id.* ¶ 10.)

While not entitled to formally oppose the motion (given their status as nonparties), the Banks sent a letter to the Court on July 17, 2015, which outlined their objections to Plaintiffs' proposal. (*See* Dkt. No. 41.) The Banks maintained that the proposed asset freeze provisions could not be applied to the Banks because: (1) Plaintiffs had thus far failed to establish grounds for this Court's exercise of specific jurisdiction over the Banks as required by *Gucci* and *Tiffany*; (2) New York's "separate entity" rule "do[es] not require a garnishee bank to restrain a judgment debtor's assets held in foreign branches;" and (3) "principles of comity would preclude the Court from requiring the Banks to freeze accounts in China as China's banking laws prohibit the Banks from freezing customer accounts pursuant to a foreign court order." (*Id.* at 1, 3.)

In a July 24, 2015 letter, Plaintiffs assured the Court that there was no need to address the Banks' objections, because "the proposed default judgment is not an order against the Banks, and the Court needs jurisdiction over only the counterfeiter defendants to enter it." (Dkt. No. 42, at 3.) The letter also encouraged the Court to defer the comity analysis, noting that, "If the Court later needs to compel the Banks . . . the Court can then evaluate whether personal jurisdiction exists over the Banks and whether any comity issues exist for the Court to consider." (*Id.*)

Judge Scheindlin requested supplemental briefing on the separate entity rule, to help her decide whether and to what extent she had the power to bind the Chinese branches. (Dkt. No. 45.) Once again, Plaintiffs assured the Court, "Plaintiffs do not seek to enforce any order against the Banks . . . Plaintiffs request relief only against Defendants." (Dkt. No. 46 at 2.) Acknowledging that the Default Judgment did not require the Banks to ever "have any

involvement" in the case, Plaintiffs characterized the Banks' objections as a "request for an improper advisory opinion." (*Id.* at 3.)

The Court entered the Default Judgment on August 20, 2015 and granted the Plaintiffs' request for an accounting of profits. (Dkt. No. 49.) Judge Scheindlin acknowledged that "a precise calculation [was] impossible," given the Defendants' failure to appear or participate in discovery, and thus awarded statutory damages under 15 U.S.C. § 1117(c) in excess of one billion dollars. (*Id.* ¶ 8.)

The order accompanying the Default Judgment made clear that the Court had neither sustained nor overruled the Banks' objections to the asset restraints. *Nike, Inc. v. Wu, et al.*, No. 13-cv-8012, 2015 WL 9450795 (S.D.N.Y. Aug. 20, 2015) (Dkt. No. 48; hereinafter "*Nike I*" or the "Default Judgment Order"). Judge Scheindlin expressly ruled that "none of [the Banks' objections] are ripe given the proposed Default judgment is directed entirely at defendants and seeks no enforcement against the non-party Banks." *Id.* at *1. With respect to each objection, the Court held that (1) the Bank's personal jurisdiction objection was "irrelevant because at this state, the Court needs only 'personal jurisdiction over the defendants, not the Bank[s]," *id.* at *1 & n.7 (quoting *Gucci*, 768 F.3d at 129); (2) "because this judgment is not directed against the Banks, it would be premature for the Court to undertake a hypothetical comity analysis;" and (3) the separate entity rule was inapposite "where no enforcement proceeding against any objecting bank has been initiated." *Id.* at *1-2.

Applying *Gucci*, Judge Scheindlin reasoned that "Although the Proposed Default Judgment would order the Banks to comply with an asset freeze" in the event the Judgment Debtors did not comply, the jurisdictional and comity analyses were not required until the Plaintiffs sought an "order compelling the [Banks] to comply with [the] asset freeze injunction."

(*Id.* at *1 & n.8 (citing *Gucci*, 768 F.3d at 138).)  Plaintiffs made no such request, so the Court conducted no such analysis and issued no such order.

Plaintiffs served copies of the Default Judgment on each of the Banks.  (Nagin Decl. Ex. 40.)

### D.    Assignee Obtains the Final Order *ex Parte*.

Nike and Converse assigned the judgment to Next on January 31, 2017.  (Dkt. No. 50.)

Nine months later, in October 2017, Assignee moved for an order to show cause, *ex parte* and under seal, as to why the Judgment Debtors should not be held in contempt of court for failure to satisfy the judgment.  (Dkt. No. 59.)  At the same time, Assignee sought to amend the Default Judgment to subject hundreds of new allegedly infringing websites and associated bank accounts to the restraints applied to the previously identified websites and accounts.  (*Id.*)  The *ex parte* motion did not seek an order finding the Banks in contempt, nor did it seek an order compelling the Banks to comply with the Court's previous asset restraints.

This Court, now presiding after Judge Scheindlin's retirement, entered the Final Order on October 20, 2017, finding the Judgment Debtors in contempt of court and applying the Default Judgment to the newly identified websites and accounts.  (Dkt. No. 62.)  Much like the TRO and the four PI Orders before it, the Final Order provided that:

> in accordance with Rule 65 of the Federal Rules of Civil Procedure, New York Civil Practice Law and Rules § 5222, 15 U.S.C. § 1116(a) and paragraph 13 of the Judgment, Judgment Debtors, their officers, directors, agents, representatives, successors or assigns, and all persons acting in concert or in participation with any of them, including Judgment Debtors' Aliases and any third parties, including third party financial service providers, receiving actual notice of this Order by personal service or otherwise, are restrained and enjoined from transferring, withdrawing, or disposing of any money or other assets into or out of any accounts held by, associated with, or utilized by the Judgment Debtors . . . regardless of whether such money or assets are held in the U.S. or abroad.

(*Id.* ¶ 4.)  The Final Order also gave the Judgment Debtors and "affected third part[ies]" the opportunity to "appear and move for dissolution or modification of the provisions of [the] order."

(*Id.* ¶ 5.)  Assignee served notice of the Final Order on BOC, BOCOM, CCB, and ICBC.  (*See* Nagin Decl. ¶ 42-45.)

### E.  Assignee Issues Subpoenas and Denies that the Final Order Binds the Banks.

In November and December of 2017, Assignee sent subpoenas to each Bank, pursuant to Federal Rule of Civil Procedure 45, requesting documents and information located in both the foreign and domestic branches of each Bank related to the 636 Judgment Debtors.  (*See, e.g.*, Dkt. Nos. 72-11 to 72-14.)  Each subpoena requested all documents associated with hundreds of accounts identified in the Default Judgment and Final Order, as well as "any other accounts" held in the name of any of the 636 Judgment Debtors, including any accounts linked to any of the Judgment Debtors' 2,361 infringing websites and aliases, and any accounts linked to any of the Judgment Debtors' 778 e-mail addresses.  (Dkt. No. 199, Chung Declaration ("Chung Decl."), Exs. J-N.)  The subpoenas defined each "Bank" to include its credit card subsidiaries.  (*See, e.g.*, Dkt. No. 72-11.)

The Banks complied with the subpoenas with respect to their New York branches, but again noted their position that they were not "legally obligated to produce documents or information relating to bank accounts maintained outside of New York."  (Dkt. No. 72-9, Jan. 8, 2018 letter from J. Chung, at 2.)

On February 14, 2017, the Banks (with the exception of BOC) moved this Court to quash the subpoenas and modify the Final Order insofar as either purported to apply outside of New York state.  (Dkt. No. 70.)  In support of their motion, the Banks presented the same three arguments raised with Judge Scheindlin prior to the entry of the Default Judgment: (1) the Court had yet to find personal jurisdiction over the Banks' Chinese branches, (2) the separate entity rule barred enforcement of this Court's orders against those branches, and, (3) even if

jurisdiction were proper, principles of international comity weighed against issuing a discovery order in conflict with Chinese law.

Assignee opposed the Banks' motion to quash and cross-moved to compel production pursuant to the subpoenas. Arguing that the Banks were "attempt[ing] to re-litigate an issue previously decided against them," – even though Judge Scheindlin never ruled on personal jurisdiction or the separate entity rule, or conducted a comity analysis, and had not made any rulings vis-à-vis the Bank-related discovery – Assignee once again assured the Court that "The Final Order, same as the Judgment, is directed entirely at Judgment Debtors and seeks no enforcement against the Banks." (Dkt. No. 87 at 8-9.) For that reason, Assignee again claimed that "the Banks' arguments [are] premature." (*Id.* at 9.)

### F. The Court Compels the Banks to Respond to the Subpoenas.

On referral from this Court, Magistrate Judge Freeman issued an order denying the Banks' motion to quash Assignee's subpoenas, withdrawing without prejudice the Banks' motion to modify the freeze provisions of the Final Order, and granting Assignee's motion to compel the Banks to respond to the subpoenas. *Nike, Inc. v. Wu, et al.*, 349 F. Supp. 3d 310 (S.D.N.Y. 2018) (Dkt. No. 150; "*Nike II*").

The magistrate's order was the first ruling in this case to reach the merits of this Court's exercise of personal jurisdiction over the Banks. Following *Gucci*, Judge Freeman declined to find general jurisdiction, but reasoned that each Bank's having "facilitated hundreds, not dozens, of transfers and settlements of credit card transactions," *id.* at 329, through correspondent and settlement accounts in their New York branches was sufficient to find specific personal jurisdiction "for purposes of a Rule 45 subpoena," *id.* at 322.

Because the Banks and Assignee had agreed at oral argument before Judge Freeman that the "separate entity" rule was irrelevant to the discovery motions, *Nike II* did not address the

issue.  In fact, Judge Freeman's order categorically states that it does not bind the Banks "to impose an asset restraint held in foreign branches or to turn over a customer's foreign-held assets." *Id.* at 332 n.12.  Judge Freeman's conclusion was justified by Assignee's representation that "it is not yet seeking to enforce the asset restraint provision of the [Final Order] against the Banks." *Id.* at 344.

The opinion in *Nike II* did reach the comity question and rejected the Banks' argument that complying with Assignee's subpoenas would require the Banks to violate Chinese law, thus offending principles of international comity.  While assessing the most important comity factor, the balancing of national interests, Judge Freeman emphasized that "foreign statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence, even though the act of production may violate that statute." *Id.* at 339 (internal citations and alterations omitted) *see also Societe Nationale Industrielle Aeropostale v. U.S. Dist. Court*, 482 U.S. 522, 544 n.29 (1987).

The Banks filed two sets of objections to *Nike II*, one from ABC and another from the other five Banks.  (Dkt. Nos. 156, 163.)  Although they did not concede that the subpoenas applied extraterritorially, the Banks submitted declarations revealing that they had applied "certain internal control measures" to each Judgment Debtor account identified in Assignee's subpoenas following *Nike II*.  (Dkt. No. 157 ¶ 5; *see also* Dkt. Nos. 158, 159, 160, 161.) BOCOM had even "terminated financial services" to certain of the accounts.  (Dkt. No. 161 ¶ 5.)

On November 19, 2018, reviewing the decision in *Nike II* under the "clearly erroneous or contrary to law" standard, this Court affirmed Judge Freeman's rulings. *Nike, Inc. v. Wu, et al.*, 346 F. Supp. 3d 346 (S.D.N.Y. 2018) (Dkt. No. 174, the "Discovery Order" or "*Nike III*"; together with *Nike II*, the "Discovery Orders").

The Discovery Order affirmed *Nike II*'s jurisdictional finding, ruling that the "hundreds of occasions" upon which the Banks used New York-based correspondent and settlement accounts to service the Judgment Debtors' China-based accounts were "sufficient to support the exercise of personal jurisdiction over the Banks for purposes of the Subpoenas." *Nike III*, 349 F. Supp. 3d at 357. This Court found that, under New York law, each Bank's use of those accounts "constitute[d] purposeful availment of the privilege of conducting business in New York." *Id.* at 358. Overruling one of ABC's jurisdictional objections to *Nike II*, this Court noted that "the key question is whether the transactions, which took place through ABC's New York-based settlement account, are related to the [subpoenas], which seeks information related to the assets of the Judgment Debtors." *Id.* at 359. The Discovery Order concluded that the New York-based transactions on behalf of Judgment Debtors necessarily related to assets collectible under the Default Judgment. Likewise, this Court found that requiring the banks to respond to the subpoenas was consistent with fair play and substantial justice, rejecting the Banks' claim that compelling cross-border compliance would be "disastrous for the New York banking industry." *Id.* at 361-62 (quoting Dkt. 156 at 23).

As for the comity analysis, *Nike III* echoed Judge Freeman's reasoning, noting that "China's bank secrecy laws are not a 'get out of jail free' card." *Nike III*, 349 F. Supp. 3d at 364. This Court assessed the comity considerations using the standard for "exercising its discretion to enter a discovery order that may violate foreign law." (*Id.* at 25.) As established by the Second Circuit in *Linde v. Arab Bank, PLC*, 706 F.3d 92 (2d Cir. 2013), a district court considering a cross-border discovery request applies a balancing test set out in Section 442(1)(c) of the Restatement (Third) of Foreign Relations Law, entitled "Requests for Disclosure: Law of the United States":

Section 442 provides that, in determining whether to issue a production order for information located abroad, courts should consider [1] "the importance to the investigation or litigation of the documents or other information requested; [2] the degree of specificity of the request; [3] whether the information originated in the United States; [4] the availability of alternative means of securing the information; and [5] the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." Restatement § 442(1)(c). Cases from our Circuit counsel that, when deciding whether to impose sanctions, a district court should also examine the [6] hardship of the party facing conflicting legal obligations and [7] whether that party has demonstrated good faith in addressing its discovery obligations.

*Id.* at 109-10. These factors are similar to, but not the same as, Section 403 of the Restatement, entitled "Limitations on Jurisdiction to Proscribe," which a court would have to consider before "ordering a nonparty foreign bank to freeze assets abroad in apparent contravention of foreign law." *Nike II*, 349 F. Supp. 3d at 335 n. 13 (quoting *Gucci*, 768 F.3d at 139).

The Banks specifically objected to Judge Freeman's treatment of the second, fourth, fifth, and sixth Section 442 factors. *Nike III* overruled all four objections.

First, the Court rejected Assignee's contention that the subpoenas requests were too vague and overly burdensome, given the Banks' demonstrated internal control measures over individual accounts. *Nike III*, 349 F. Supp. 3d at 365.

Second, the Court agreed with Judge Freeman that seeking the information from the Banks through Hague Convention protocols was not an adequate "alternative means" of discovery, citing the Banks' representation that they would exploit the Hague Convention procedures to "narrow the scope of the currently overbroad subpoenas." *Id.* at 366.

Third, the Court found the United States had a greater national interest at stake in enforcing its trademark laws, as compared to China's interest in its bank secrecy laws, given that the Banks' only support for their argument was a "form letter" from the Chinese Ministry of

Justice ("MOJ") that failed to "discuss the nature or importance" of the Chinese law in question. *Id.* at 367.

Finally, the Court found that the Judge Freeman's ruling on the hardship to the Banks was not contrary to law, since, irrespective of any applicable Chinese statutes, "the Second Circuit has clearly said that bank secrecy laws are not a bar to discovery orders." *Id.* at 368 (citing *Linde*, 706 F.3d at 114).

The Discovery Order directed the Banks to comply with the Subpoenas within 28 days, *i.e.*, by December 17, 2018. (Dkt. 174 at 33.)

### G. The Banks Respond to the Subpoenas.

Nonetheless, the Banks maintained their position that complying with this Court's orders could violate Chinese law if the Banks proceeded without prior authorization of a "competent organ" of the Chinese government. Therefore, following the Discovery Orders, the Banks asked for permission from Judge Freeman to coordinate with the MOJ to approve the production and transmit the documents to the United States. (Dkt. No. 179.) The Banks planned to collect and review the documents, then transmit them to the MOJ; the MOJ would then send the production to the U.S. Department of Justice ("DOJ"), which would transmit the documents to this Court. Judge Freeman approved on December 12, 2018, noting that her ruling did not modify the production deadlines set in the Discovery Order. (Dkt. No. 181.)

Only then did the Banks begin to comply with the Discovery Order.

In their Reimbursement Motion, the Moving Banks highlight several onerous aspects of the document collection process. For example, all of the potentially responsive documents had to be collected from China, including hard copies records located at dozens of the Banks' respective branches scattered across the country. (*See* Dkt. Nos. 196, 197, 198, 201, Declarations of Bank Employees.) Where applicable, the Banks also searched the records of

numerous subsidiaries where the Judgment Debtors might have held accounts.  This included searching each Bank and subsidiary for all documents associated with "any deposits or accounts of the names listed in Attachment F" to each subpoena, a schedule that identified certain of the Judgment Debtors only by a single name. (*See, e.g.*, Chung. Decl. Ex. J, ln 130 ("Linda"); ln 131 ("Linda K"); ln 249 ("Huik"); ln 253 ("Sophie"); ln 260 ("Sophie"); ln 436 ("Karry"); ln 494 ("Dana").)  Assignee also identified many of the Judgment Debtors using Romanized Chinese characters (known as "pinyin") not searchable on the Banks' computer systems.  (*See, e.g.*, Nagin. Decl. Ex. 66 at 2.)

Before releasing the collection to their outside counsel, White and Case LLP, Bank employees reviewed every document to ensure that the transmission complied with MOJ protocol and other regulations governing bank activity.  The Moving Banks estimate that complying with the subpoenas generated $439,000 of internal costs, equal to the hourly wages of the employees enlisted to perform the collection multiplied by the total number of hours, plus other expenses. (Dkt. No. 195, Memorandum of Law in Support of Reimbursement Motion ("RM Br.") at 6.)

On top of that, local counsel advised the Moving Banks that the Cybersecurity Law of the People's Republic of China required them to store, process, and analyze all data within China before transmitting the documents to the MOJ.  (Chung Decl. ¶¶ 9-12.)  So White & Case flew attorneys to Beijing to conduct document review and production, while other members of its team worked with the Office of International Judicial Assistance at DOJ on the production plan. (*Id.* ¶ 14.)  White & Case also contracted with a production vendor, Alvarez & Marsal, to assist with production logistics, the tune of $95,484.00.  (RM Br. at 6.)  White & Case estimates its

total costs (including certain relocation expenses but excluding the fees of Alvarez & Marsal) to be $687,537.51. (*Id.*)[1]

The Banks eventually produced 7,390 documents between December 14, 2018 and January 16, 2019, informing Assignee that production was substantially complete on February 11, 2019 – nearly two months after the deadline in the Discovery Order. (*See* Nagin Decl. Ex. 62.)

### H. Post-Production Disputes Preview the Pending Motions.

That was not the end of it. On February 19, 2019, the Moving Banks sent Assignee a letter requesting "$1.18 million in reimbursement from Next for the substantial time and resources that they and their counsel have expended" to comply with the subpoenas. (Dkt. No. 233, Chung Supplemental Decl., Ex. 5.)

In response, Assignee not only disputed the Banks' entitlement to their fees and expenses, it argued that they had failed to comply with the subpoenas and were presently in violation of the Discovery Orders. In a letter sent to the Moving Banks on April 5, 2019, Assignee identified a number of production deficiencies, including:

- ICBC's failure to produce more than one document for the Judgment Debtor account ending 3240, including no documents identifying the name of the account holder, (Chung Decl. Ex. V. at 2);

- CMB's failure to produce a single document related to the Judgment Debtor account ending 3347, even though Plaintiffs had obtained documents from Citibank indicating a wire transfer from Citibank to the CMB account on April 10, 2014, (*id.*);

- BOC's failure to provide information linking accounts they claimed to be Judgment Debtors' accounts to particular Judgment Debtors listed in the subpoena (*id.*) ;

---

[1]   White & Case's fees do not include any attorney time billed prior to November 29, 2018 (Chung Decl. ¶ 20(c)), or any "hours billed for travel time to and from Beijing." (RM Br. at 10.)

- BOC's failure to produce documents relating to the Judgment Debtors' merchant accounts, maintained by BOC's credit card subsidiary, (*id.* at 3);

- The Banks' failure to produce any account transaction details corresponding to transaction information Assignee had independently obtained from Visa and Mastercard, (*id.* at 3);

- The Banks' failure to produce any Suspicious Activity Reports, Currency Transactions Reports, credit reports, and other communications on the basis of privilege, without providing privilege log. (*id.* at 4.)

Assignee also noted that the production revealed that certain accounts belonging to Judgment Debtors had remained open after the Banks were notified of the Default Judgment. (Chung Decl. Ex. V. at 5.) According to Assignee, "It is of little import that the Court has not yet ruled on whether the Asset Freeze Provisions apply against the Banks . . . . The Banks had notice of the Court's orders . . . and were bound by them under Federal Rule of Civil Procedure 65(d)(2)." (*Id.*)

As for the Banks' reimbursement request, Assignee argued that the Bank's continued contempt – for failing to comply with the subpoenas, for violating the December 17, 2018 Discovery Order deadline, and for violating the asset freeze provisions contained in the Default Judgment and the Court's injunction orders – entitled "Next, not the Banks . . . to fees and costs." (*Id.* at 5.)

**I.     The Pending Motions**

Two months after the Banks received Assignee's grievance letter, motion practice began.

The Moving Banks filed the Reimbursement Motion on June 20, 2019, seeking costs and expenses incurred by White & Case, Alvarez & Marshal, and the Banks' in-house teams, citing the provision of the Federal Rules of Civil Procedure that protects third party subpoena respondents "from significant expense resulting from compliance." FED. R. CIV. P. 45(d)(2)(B(ii). The Banks argue that an award of $1.22 million is justified by the fact that such

expenses were reasonable and necessary in order to both comply with the Court's orders and avoid violating numerous Chinese laws. Moreover, the Banks argue, Assignee is in better position to bear the costs associated with subpoena compliance as an investment vehicle of a multi-billion dollar litigation finance firm. (*See* Dkt. No. 195, at 2.)

In response to the Reimbursement Motion, Assignee cross moved for an order (1) holding the Banks in contempt for violating the asset restraints and the Discovery Orders, and (2) directing the Banks to turnover Judgment Debtors' assets. According to the Assignee, all seven of the orders containing asset restraints applied to the Banks as soon as Assignee served them, and the Banks' failure to comply constituted "active concert and participation" with the Judgment Debtors' defiance of this Court's judgment, making the Banks liable for contempt under Federal Rule of Civil Procedure 65(d)(2).

Accordingly, Assignee seeks an estimated $150,730,325.64 in damages, equivalent to the statutory damages available under the Lanham Act for the Judgment Debtors' post-TRO infringement of Plaintiffs' trademarks (Dkt. No. 209, Memorandum of Law in Support of the Contempt Motion ("CM Br."), at 4), plus the value of the funds that the Judgment Debtors transferred out of their accounts since the TRO, due to the Banks' "complete disregard for the Asset Freeze Provisions." (CM Br. at 3.)

Assignee is careful to note that its total damages calculation is "a conservative estimate of the damage the Banks have caused to Next." (*Id.*) That is because Assignee further claims that the Banks are in contempt of the Discovery order in light of the production deficiencies outlined in Assignee's April 5, 2019 letter, and that secondary contempt obscures the full breath of the Judgment Debtors' post-TRO misconduct. Assignee ask this Court to "presume . . . these

missing documents are at least as damaging to the Banks' position as the documents that were produced," and requests an adverse inference to that effect. (*Id.* at 3.)

Finally, concurrent with their opposition to the Contempt Motion, the Banks made the Conditional Motion, which seeks discovery and an evidentiary hearing allowing the Banks "to preserve their due process rights to gather evidence and be fully heard" on the question of Assignee's compensatory damages calculation, in the event the Court grants the Contempt Motion. (Dkt. No. 249, 250.)  Specifically, the Banks wish to depose the experts that submitted reports in support of the Contempt Motion.  They also seek an order directing Assignee to disclose the Asset Purchase Agreement underlying Assignee's claim that it has an interest in Nike's and Converse's trademarks.[2]

---

[2]    Assignee submitted the Asset Purchase Agreement for *in camera* review in response to the Conditional Motion. (*See* Dkt. No. 226.)

**DISCUSSION**

I.    **THE REIMBURSMENT MOTION IS DENIED.**

    A.    **Legal Standard for Awarding Third-Party Discovery Costs and Expenses**

Under the Federal Rules of Civil Procedure, litigants issuing subpoenas "must take reasonable steps to avoid imposing undue burden or expense" on nonparties. FED. R. CIV. P. 45(d)(1). Likewise, a court ordering a nonparty to comply with a subpoena "must protect [the nonparty] . . . from significant expense resulting from compliance." FED. R. CIV. P. 45(d)(2)(B)(ii). However, the responding party's right to such protection "does not mean that the requesting party necessarily must bear the entire cost of compliance." *In re Honeywell Intern., Inc. Sec. Litig.*, 203 F.R.D. 293, 302-3 (S.D.N.Y. 2003).

First, "only reasonable expenses are compensable" under Rule 45. *Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Or., Inc.*, No. 9-cv-3855, 2018 WL 1701944, at *4 (E.D.N.Y. Mar. 31, 2018) (quoting *G&E Real Est. v. Avison Young-Wash., D.C., LLC*, 317 F.R.D. 313, 316 (D.D.C. 2016)). "The determination of . . . reasonableness is committed to the sound discretion of the trial court," (*id.*), and the non-party bears the burden of demonstrating that its costs and expenses were reasonable. *In re Aggrenox Antitrust Litig.*, No. 14-md-2516, 2017 WL 4679228, at *2 (D. Conn. Oct. 18, 2017) (citations omitted).

Second, even if the respondent's fees and expenses are reasonable under the circumstances, courts frequently consider three factors to determine whether cost-shifting is equitable: "whether the nonparty actually has an interest in the outcome of the case, whether the nonparty can more readily bear the costs than the requesting party and whether the litigation is of public importance." *Honeywell*, 203 F.R.D. at 303 (citations omitted). Other equitable consideration may be relevant as well; for example, a nonparty may be required to bear some or

21

all of its expenses on the basis of "the [non-party's] degree of good faith" in responding to the subpoena. *Aggrenox*, 2017 WL 4679228, at *11 (citations omitted).

**B.**    **The Moving Banks Fail to Demonstrate that Their Costs and Expenses Are Reasonable.**

The Moving Banks produced 7,390 documents, which contained over 20,510 pages of information, and now seek $1.22 million for their trouble.  (RM Br. at 4-5.)  A careful review of the record does not justify the Moving Banks' $59-per-page request.

1.    The Banks' Compliance Efforts Were Inefficient and Duplicative.

To begin with, the Motion and accompanying declarations do not justify the enormous number of hours each Banks' employees spent collecting and reviewing documents before passing them off to White & Case.  For example, from November 15 to December 28, 2018, one CCB Headquarters Deputy Chief Manager spent 448 hours – more than eleven 40-hour work weeks in a six-week time period – just "Reviewing [and] auditing gathered documents." (Dkt. No. 197-1, Lei Decl. Ex. A at 14.)  This expenditure of labor might be reasonable on its facts, were the Deputy Chief Manager not one of over 150 CCB employees who billed time to subpoena compliance efforts that produced fewer than 2,000 documents.  (*See id.*)[3]

CCB was not an outlier.  More than 80 BOC employees billed time to "reading" or "reviewing" the subpoena itself.  (*See* Dkt. No. 201, Li Decl. Ex. A.)  And 470 employees of ICBC spent over 6,800 hours to produce 409 documents – close to 17 hours per document.  (*See* Dkt. 198, Zhou Decl.)

Although the Banks do not offer (and I cannot fathom) the business justification for a financial institution's not maintaining centralized records, I appreciate that some of the

---

[3]    There are other dubious aspects of CCB's accounting.  For instance, 63 employees billed exactly 100 hours to subpoena compliance.  (Dkt. No. 197-1, Lei Decl. Ex. A.)  The odds are low.

documents requested by the subpoenas were scattered across various bank branches, and that collecting hard copy documents is never the easiest task. Perhaps recognizing the shortcomings of the record submitted with the Reimbursement Motion, the Moving Banks submitted four additional declarations with their brief opposing the contempt motion. (*See* Dkt. No. 248, Banks' Response in Opposition to the Contempt Motion ("CM Opp. BR.") at 57-60; Dkt. Nos. 239, 242, 244, 245.) But those sworn statements do not explain why it took so many people so many hours to produce so little. Indeed, it is still a mystery to this Court how many documents were actually collected prior to the Banks' internal review.

The billing records suggest that the Moving Banks are asking this Court "to pass along expenses for work that was unnecessary or that could have been done less expensively" to Assignee. *Kahn v. Gen. Motors Corp.*, No. 88-cv-2982, 1992 WL 208286, at *2 (S.D.N.Y. Aug. 14, 1992). That is not reasonable, and that is not allowed under Rule 45.

          2.        The Banks' Efforts Ignored Assignee's Most Burdensome Requests.

The declarations show that many of the searches which initially caused the Banks to complain of "undue burden" were not performed at all. For example, ICBC only "conducted electronic searches using information in the ICBC Subpoena *that could support searches* in the various databases available to ICBC." (Dkt. No. 244, Zhou Decl. ¶ 7 (emphasis added).) Because it was "impractical," ICBC did not conduct searches using the 778 email addresses or the 2,361 allegedly infringing websites listed in the subpoenas. (*Id.* ¶ 8.) Likewise, BOC did not search its databases using the 636 Judgment Debtor names listed in each subpoena. (Dkt. No. 239, Li Decl. ¶ 11.) And CCB did not search its account database for any of the email addresses, websites, or names provided by Assignee. (Dkt. No. 245, Lei Decl. ¶¶ 8-10.)

What is more, none of the Moving Banks' that submitted supplemental declarations attempted to search for email communications between Bank employees and any of the

Judgment Debtors. (Dkt. No. 239, Li Decl. ¶¶ 35-37; Dkt. No. 242, Y. Zhou Decl. ¶20; Dkt. No. 244, Zhou Decl. ¶ 24; Dkt. No. 245, Lei Decl. ¶¶ 22-24.) Negotiating search terms, identifying email custodians, and weeding out non-responsive emails are some of the most time-consuming stages of 21st-century document discovery. *Cf. Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 320 (S.D.N.Y. 2003). The Banks skipped them all.

That is not to say that the Moving Banks violated the Discovery Order or should be held in contempt for failing to conduct searches for every item listed in Assignee's voluminous subpoena attachments. (*See* section II.C, *infra.*) Rather, it shows that the Moving Banks did not run some of the most cumbersome searches demanded by the subpoenas due to technical limitations (*e.g.*, BOC and CCB did not try to figure out who "Linda" and "Linda K" referred to). As nonparties, the Moving Banks were not necessarily required to turn over every rock, restore every backup tape, or interview every employee that may have been in contact with one of the Judgment Debtors over the past decade to avoid a finding of contempt. *Cf.*, *US Bank Nat. Ass'n v. PHL Variable Ins. Co.*, No. 12-cv-6811, 2012 WL 5395249, at *4 (S.D.N.Y. Nov. 5, 2012) ("Rule 45 directs courts to minimize the burden on non-parties."). But the Banks' failure to address each of Assignee's requests undercuts their claim that compliance actually necessitated thousands of hours of employee time, and only makes it more difficult for this Court to understand why the Moving Banks' compliance was so costly.

3.     The Banks' Convoluted Production Process was Unnecessary.

The Banks further argue that their costs were reasonable in light of the herculean efforts necessary to produce documents in compliance with China's cybersecurity and banking laws. (RM Br. at 11.) White & Case "devise[d] a document production process" whereby the Banks produced documents to the MOJ, which produced them to the DOJ, which produced them to Assignee – although nothing in the Cybersecurity Law requires either government agency to act

as a courier on the Banks' behalf. (*See* Chung Decl. ¶¶ 9, 14.)  Then, each Bank reviewed thousands of potentially responsive documents pursuant to "significant internal review processes" – despite the fact that White & Case rereviewed the documents before sending them to MOJ.  (*Id.* ¶ 15; RM at 11.)

Although that process sounds reasonable and diligent, nothing in the voluminous record convinces me that every step in the Banks' "multi-step document transmission process" was actually required by Chinese law.  (*Id.*)  The Banks are not entitled to create obstacles, such as adopting an absurdly cautious interpretation of Chinese law, and then collect a fee for overcoming them.

All that the Chinese Cybersecurity Law directed the Banks to do was conduct a "security assessment" before producing customer information "to overseas parties."  (*See* Dkt. No. 251, deLisle Decl. Ex. B-43, Cybersecurity Law, Art. 37.)  According to the Moving Banks' Chinese law expert, Professor Jacques deLisle – whose opinion the Banks only offered to justify their reimbursement request after Assignee accused them of being in contempt of court – that language required the Banks to submit the production "to a national security evaluation by state authorities" prior to transmission.  (*Id.* ¶ 95.)

The text of the Cybersecurity Law, combined with Mr. Delisle's opinion, may justify the Moving Banks' costs associated with MOJ's review of the production before the Banks sent the documents to Assignee – assuming the Banks compensated MOJ for its time.  But that is all they reasonably justify.  The Moving Banks may not charge double (or triple) for unnecessary security assessments, although that approach would explain why the Moving Banks do not say whether their own employees, their outside counsel, or the MOJ was responsible for the "security

assessment" required by the Cybersecurity Law, nor do any of the Banks' supporting declarations and exhibits say what that assessment entailed.

The Moving Banks' papers also fail to explain who redacted sensitive information from many of the documents submitted with the pending motions (*see, e.g.*, Dkt. No. 206, Lee Decl. Ex. 8; Dkt. No. 246, Yun Decl. Ex. B-14), and whether those redactions were made pursuant to the Cybersecurity Law or the confidentiality provisions in this Court's Protective Order (Dkt. No. 188 ¶ 4). It is therefore impossible for me to tell which of these rounds of document review, document redaction, and document transmission were purportedly mandated by the Cybersecurity Law – and which were superfluous.

Finally, Mr. deLisle's declaration refutes Assignee's claim that, "the Banks' would not have been able to respond to the Subpoenas" without following their particular production plan. (RM Br. at 11.) According the Moving Banks' own expert, the production process was nothing more than "an understandable and promising approach, *not prohibited by Chinese law* . . . [that] has the virtue of providing the banks with the approval *or at least acquiescence* of an authoritative Chinese institution." (deLisle Decl. ¶ 96.) There is a wide gulf between a course of action that is "not prohibited" versus one that is "necessary." Mr. deLisle's analysis explains how MOJ review is consistent with Chinese law and policy, but it does not describe the sort of "legal impediment" to a third party's subpoena compliance – such as a binding confidentiality agreements and injunctions – which, if lifted by the third party, entitles them to their fees. *In re First Am. Corp.*, 184 F.R.D. 234, 240 (S.D.N.Y. 1998).

The record reveals a number of costly additional steps in the production process that the Banks undertook at their own discretion. Because costs resulting from "decisions by and on behalf of the non-party" that do not flow directly from a Rule 45 subpoena are not recoverable,

*Sands Harbor Marina*, 2018 1701844, at *7, the Moving Banks have not provided this Court with grounds to conclude that their costs and expenses incurred responding to the Subpoenas were reasonable under the circumstances, or compensable under Federal Rule of Civil Procedure 45.

### C.     The Equities Weight Against Cost-Shifting.

The Banks could still obtain reimbursement for a reasonable subset of their requested costs and expenses if the equities demanded it.  *See, e.g.*, *Dow Chem. Co. v. Reinhard*, No. M8-85 (HB), 2008 WL 1968302, at *2 (S.D.N.Y. Apr. 29, 2008).  However, the equities do not favor cost-shifting in this case.

The first equitable factor to consider when determining whether cost-shifting is warranted is whether the nonparty has an interest in the case.  *Honeywell*, 203 F.R.D. at 303.  Nonparties may have an interest where they were involved in the underlying conduct giving rise to the litigation.  For example, in *Dow Chemical*, my late colleague, Judge Harold Baer, found that a third-party law firm was not a "quintessential, innocent, disinterested bystander" to the underlying litigation because it had provided legal advice to the plaintiff's counterparty in the failed merger that was the subject matter of the case.  2008 WL 1968302, at *1 (internal citations and quotation marks omitted); *see also First Am.*, 184 F.R.D. at 242 (requiring accounting firm that had advised defendant and been named in related litigation to bear its own costs).  Although cited by Assignee, that line of cases is inapposite here: there is no allegation that the Banks were involved with, or even aware of, the Judgment Debtors' infringing conduct prior to the litigation.  Therefore, this factor favors the Banks.

Second, the Banks are in better position to bear the purported $1.22 million cost of compliance.  Each of the Banks is a large financial institution with billions of dollars in revenues and trillions of dollars in assets.  (*See* Nagin Decl. Exs. 87-92.)  One court in this district denied

a nearly identical reimbursement request – in the range of $1.06 to $1.29 million – from a law firm reporting $300 million in gross revenues, noting that the firm had produced "no persuasive evidence that the compliance costs are out of line with what would be typical for a nonparty witness in complex commercial litigation." *Chevron v. Donzinger*, No. 11-cv-0691, 2013 WL 1087236, at *33 (S.D.N.Y. Mar. 15, 2013); *see also In re World Trade Center Disaster Site Litig.*, No. 21-MC-100, 2010 WL 3582921, at *2 (S.D.N.Y. Sept. 14, 2010) (nonparty receiving $300 million in federal grants was "equipped to shoulder [discovery] costs"); *Sun Cap. Partners, Inc. v. Twin City Fire Ins. Co.*, No. 12-cv-81397, 2016 WL 1658765, at *8 (S.D. Fla. Apr. 26, 2016) (equities did not support awarding costs to "a large corporation with significant assets"). So too here: when compared to each Bank's annual revenue and total assets, $1.22 million is not an undue burden that favors cost-shifting. This factor favors Assignee.

The third factor is the public interest. It is well established that this factor favors cost-shifting where "litigation involves a purely private dispute." *US Bank*, 2012 WL 5395249, at *4. However, courts in this Circuit routinely grant motions for injunctive relief in trademark cases on the grounds that claims brought under the Lanham Act implicate a "strong interest in preventing public confusion." *Juicy Couture, Inc. v. Bella Intern. Ltd.*, 930 F. Supp. 2d 489, 505 (S.D.N.Y. 2013) (quoting *ProFitness Phys. Therapy Ctr. V. Pro–Fit Orth. & Sports Phys. Therapy P.C.*, 314 F. 3d 62, 68 (2d Cir. 2002)). Here, the public has an interest in the underlying Judgment Debtors' conduct, which weighs against cost-shifting; but, the public's interest in a third party's subpoena compliance is substantially less than its interest in enjoining actual infringement, which suggests that the Banks should pay their own costs. Accordingly, this factor narrowly favors Assignee.

Further equitable considerations weigh in favor of denying the Reimbursement Motion. This case involves a pattern of counterfeiting that continued for years after the Banks received the TRO and the PI Order. It continued after Judge Scheindlin entered the Default Judgment in 2015. And it continued after this Court entered the Final Order holding the Judgment Debtors in contempt and enjoining any "third party financial service providers" from aiding the Judgment Debtors' infringing conduct. (Dkt. No. 62 ¶ 4.) With each of those orders, Plaintiffs and Assignee updated the list of enjoined persons, account numbers, websites, and email addresses, and provided prompt notice to each of the Banks. (*See* CM Br. at 1.)

Despite having the ability to monitor (and, at least in BOCOM's case, freeze) the Judgment Debtors' accounts, the Moving Banks chose to do nothing for nearly four years, other than repeatedly claim that this Court had no authority to enforce its judgments or Assignee's subpoenas against the Chinese branches. Only after Judge Freeman ruled against them in the Subpoena Order did the Moving Banks actually deploy their internal control measures against the Judgment Debtors' accounts. (Dkt. Nos. 157, 158, 159, 160, 161.) Had the Moving Banks used the tools at their disposal earlier – including tracking the Judgment Debtors' accounts, limiting their ability to open new accounts, and, in some cases, intercepting their cross-border transactions (Dkt. No. 157 ¶5) – there would have been fewer accounts to search, fewer transactions responsive to the subpoenas, and fewer documents to collect. Instead, the Moving Banks declined to take proactive measures that would have limited the burdens imposed by the subpoenas.

The Banks had every right to resist complying with the Court's orders and the Assignee's subpoenas. Indeed, the Second Circuit's decisions in *Gucci* and *Tiffany* demonstrate that Chinese bank branches had substantial grounds to object to this Court's orders. But the Banks

29

also knew that the number of documents responsive to Assignee's subpoenas would grow as long as the Judgment Debtors' continued to freely use their accounts. By standing on their legal arguments, while doing nothing to address the ongoing misconduct of the Judgment Debtors, the Banks acted as if there was no chance that they would lose the jurisdictional argument. That attitude was especially cavalier in light of Judge Sullivan's decision on remand to exercise jurisdiction over BOC in *Gucci*, 135 F. Supp. 3d 87, 104 (S.D.N.Y. 2015) ("*Gucci II*") – two years before Assignee served subpoenas in this case.

Even if the Banks did not violate any of this Court's orders by refusing to freeze the Judgment Debtors' accounts, their inaction allowed the number of relevant transactions (and documents) to multiply for five years after the TRO, including one year after the Banks received the subpoenas. On top of that, the Banks missed the production deadline in the Discovery Order, at least in part due to their insistence on following an unnecessary and convoluted document delivery process.[4]

By seeking reimbursement, the Moving Banks hope to collect windfall fees generated by their own refusal to cooperate in a timely fashion, as well as their refusal to mitigate the costs of subpoena compliance   In doing so, they forget what one district court observed when denying cost-shifting to a third party that had taken over a year to comply with a subpoena, only doing so after three court orders: the Second Circuit does not reward "scorched earth tactics" and "hardball litigation strategy." *Aggrenox*, 2017 WL 4679228, at *11 (alterations and internal quotation marks omitted).

---

[4]    Indeed, Assignee informed this Court on January 14, 2020 that the Banks were still producing documents responsive to the subpoenas, but had yet to satisfy all of Assignee's requests. (Dkt. No. 267.) That too suggests that reimbursement is inappropriate in this instance.

The equities do not favor an award of costs and expenses to the Moving Banks. The Reimbursement Motion is **DENIED.**

## II.      THE CONTEMPT MOTION IS DENIED.

As the judgment creditor, Assignee argues that the service of the TRO, the PI Orders, the Default Judgment, and the Final Order on the Banks' New York branches was sufficient to require the Chinese Banks to freeze the funds of the Judgments Debtors held in their branches in China Chinese – and, critically, that each of those orders applied, not just to the Debtors, but to the Banks as well. There is no dispute that the Banks did not immediately comply with those orders. Assignee therefore asks this Court to find the Banks in contempt for failing to freeze the funds, as well as for failure to comply with the Court's discovery orders. Assignee claims $150 million in damages.

The Banks argue, *inter alia*, that the Contempt Motion must be denied, because: (i) the asset restraints never clearly and unambiguously applied to the Banks; (ii) none of the asset restraints could have bound the Chinese branches under New York's "separate entity" rule, (iii) it would violate fundamental principles of due process to retroactively apply the asset freeze provisions against the Banks; and (vi) the Banks have substantially complied with the Discovery Order, thus, there are no discovery-related grounds for finding them in contempt. (Dkt. Nos. 243, 248.)[5] Notably, the Banks do not argue that this Court lacks personal jurisdiction, as they did for purposes of discovery; that issue was settled by two prior orders of this Court.

Assignee fails to establish that any of the asset restraints were or are enforceable against the Banks' Chinese Branches. No judge of this Court ever concluded that the asset restraints

---

[5]    The Banks filed two briefs opposing the Contempt Motion, one for all six Banks (Dkt. No 248) and another only for ABC (Dkt. No. 243). As discussed in this order, the arguments raised in the two briefs are substantially similar.

were binding on the Banks, and Assignee never moved to compel those branches to comply with the restraints. Yet now, Assignee claims that the Banks have been violating this Court's orders since 2013, and are responsible for statutory damages arising from every act of infringement by the Judgment Debtors since. That is inside-out. The Contempt Motion is denied.

## A.    Legal Standard

A contempt order is a "potent weapon to which courts should not resort where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (internal quotation marks and citations omitted). For a contempt order to issue, the movant must establish "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Weston Cap. Advisors, Inc. v. PT Bank Mutiara, Tbk*, 738 F. App'x 19, 21–22 (2d Cir. 2018) (citing *King*, 65 F.3d at 1058.) An order is "clear and unambiguous" when it leaves "no uncertainty in the minds of those to whom it is addressed," *Hess v. N.J. Transit Rail Operations, Inc.,* 846 F.2d 114, 116 (2d Cir.1988), who "must be able to ascertain from the four corners of the order precisely what acts are forbidden," *see Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n,* 889 F.2d 389, 395 (2d Cir.1989), *cert. denied,* 494 U.S. 1030 (1990).

## B.    The Banks are Not in Contempt of the Asset Restraints.

Assignee claims that the Moving Banks "collectively violated the Asset Freeze Provisions 36,000 times – all individual acts of contempt – totaling $69,000,000." (CM Br. at 33.) To arrive at that figure, Assignee added up the value of every transaction that occurred in each enjoined account beginning the day that the accounts were purportedly added to the list of enjoined websites. (Dkt. No. 212, Declaration of Edward Boyle ("Boyle Decl.") ¶¶ 29-63, 66-67.)

These calculations assume that as soon as the Banks' New York branches received notice of the Court's orders, the Banks' Chinese branches were bound by the asset restraints therein. However, neither the law governing cross-border injunctions nor the record supports that premise. And instantaneous compliance is a draconian standard to apply to nonparties.

The Banks are not in contempt of the asset restraints for the following reasons.

1.     The Asset Restraints Are Not Clear and Unambiguous.

Prior to entering the Default Judgment, this Court entered five asset restraints freezing the Judgment Debtors' assets, and purporting to bind "any third parties acting in concert or participation with any of them . . . including third party financial service providers, receiving actual Notice of this order by personal service or otherwise . . . ." (TRO ¶ 11; PI Order ¶ 4; *see also* Dkt. No. 19 Ex. 1 ¶ 4; Dkt. No. 24 Ex. 1 ¶ 4; Dkt. No. 27 Ex. 1 ¶ 4.) This Court's Final Order used the same language. (Dkt. No. 62 ¶ 4.)

Reading these orders together, and considering that the third party Banks had no input into the language therein, this Court cannot conclude that the Orders clearly and unambiguously bound the Banks. The injunctions contain "no language within [their] four corners" that prohibited the Chinese branches from continuing to service their customers' accounts. *U.S. v. O'Rourke*, 943 F.2d 180. 189 (2d Cir. 1991). Accordingly, the Banks cannot be found in contempt of the asset restraints.

a)     *The asset restraints do not clearly and unambiguously apply to the Chinese Branches.*

Since first receiving the TRO and the PI Order, the Banks have had good reason to dispute the applicability of the asset restraint provisions to their Chinese Branches. The discovery provision of the PI Order identified BOC (and no other Bank) as a "Third Party Financial Service Provider" required to comply with Plaintiffs requests. The asset restraint

provision, in contrast, did not identify any "third parties acting in concert and participation" with the Judgment Debtors to whom those restraints applied. (PI Order ¶¶ 8, 9.)

The Banks made it clear to Plaintiffs in December 2013 that they did not consider themselves bound by the orders, setting out several objections to any future attempt to enforce the orders in mainland China, including lack of personal jurisdiction, New York's "separate entity" rule, and principles of international comity. (Nagin. Decl. Exs. 17, 20.) Although the Plaintiffs obviously considered those objections meritless, they never moved the Court to compel enforcement of the asset restraints against the Chinese Branches. That contemporaneous record further supports the conclusion that the asset restraints were not "specific and definite enough to apprise those within [their] scope of the conduct that is being proscribed." *In re Baldwin-United Corp.*, 770 F.2d 328, 339 (2d Cir. 1985).

Moreover, an injunction is not "clear and unambiguous" if two sides disagree about its geographic scope, and the Court does not settle the dispute. Any later ruling based on such an injunction "must construe any possible ambiguity" in the text of the order against the party who "drew the order, chose the language, and presented it to the judge for approval." *A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, 87 F. Supp. 2d 281, 291 (S.D.N.Y. 2000). In *Versace*, the defendant argued in opposition to a contempt motion that an order enjoining future trademark infringement, applied only within the territorial boundaries of the United States. *Id.* Although both sides briefed the issue, the court did not amend its order to "definitively adopt either side's argument." *Id.* On that record, my former colleague, Judge Leisure, found that the *Versace* order did not apply extraterritorially and denied the contempt motion. *Id.* at 292.

*Versace* forecloses any argument by Assignee that the asset restraints applied to the Banks, because the Banks and the Plaintiffs treated the asset restraints as though they did not

apply to the Chinese Branches, and this Court never decided the issue. (*See, e.g.*, *Nike I* at *1-2.)

Indeed, Plaintiffs specifically advised judge Scheindlin in 2015 that the Default Judgment –

which contained the same asset restraint language as the prior injunctions – "is not an order

against the Banks." (Dkt. No. 42, at 3.) If anything, Plaintiffs' past representations prove the

opposite of Assignee's current position: the orders clearly and unambiguously did not bind the

Banks.

When Plaintiffs forfeited their chance to get a clear and plain statement of the scope of

the asset restraints, they also compromised Assignee's ability to use those restraints later as a

basis for the Contempt Motion.

> b) *None of this Court's orders adequately identified the accounts that*
> *the Banks were required to freeze.*

Assignee claims it is entitled to contempt damages beginning the same day each of this

Court's orders were issued, based on neatly compiled exhibits submitted alongside the Contempt

Motion listing the enjoined accounts, websites, and email addresses. (*See* Boyle Decl., Exs. 1- 3.)

But those exhibits were not attached to the orders signed by this Court, and they were not served

on the Banks prior to the Contempt Motion.

Nor did the Court's original orders, which the Plaintiffs drafted, identify each account

subject to the asset restraints – thereby failing to provide the Banks with notice of "precisely

what acts are forbidden." *Sanders v. Air Line Pilots Assoc., Int'l*, 473 F.2d 244, 247 (2d Cir.

1972). Assignee claims damages relating to transactions in dozens of accounts that it claims

were frozen by the TRO on November 14, 2013. (*See, e.g.*, *Id.* ¶ 32 & Ex. 1.) For example,

Assignee's forensic analysis traces 1,331 unlawful transactions to the ICBC account ending -

5541 by adding up every transaction that occurred between November 14, 2013 – the date of the

TRO, which identified -5541 as one of the Judgment Debtors' accounts – and the date of the last

transaction in the account – October 19, 2018.  (*Id.* ¶ 32.) But Plaintiffs only included two account numbers in the TRO signed by Judge Scheindlin, and neither was the ICBC account in question.  (Dkt. No. 3 ¶ 12.)  So Assignee has no basis to say, as it does in the Contempt Motion, that the Plaintiffs gave the Banks adequate notice of the accounts enjoined at the time they served the TRO.  This Court cannot and will not order retroactive application of orders that plainly did not contain information necessary to ensure enforcement.

The same goes for the post-TRO asset restraints.  Assignee suddenly seeks contempt damages for the Banks failure to comply with this Court's orders.  Yet, by not identifying all of the purportedly restrained accounts in the text of their proposed injunctions, Plaintiffs and Assignee did not give the Banks the notice and specificity needed to ensure compliance.  *See Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000).  I will not award contempt damages relating to all the accounts now identified in the Boyle Declaration based on these incomplete injunctive language used by Plaintiffs – not least because "it is impossible for an appellate tribunal to know precisely what it is reviewing" when a lower court finds contempt based on an ambiguous order. *Fonar Corp. v. Deccaid Servs., Inc.*, 983 F.3d 427, 430 (2d Cir. 1993).

Because the TRO, the PI Orders, and the Final Order do not clearly and unambiguously identify the accounts to be restrained, the Banks cannot be found to be in contempt of those orders.[6]

---

[6] The Default Judgment, drafted by Plaintiffs, is vague and ambiguous for the same reason, as it purports to freeze "other of Defendants' Assets that Plaintiffs identify in the future." (Dkt. No. 49 ¶ 11.)  In other words, the Default Judgment refers to accounts-to-be-named-later.  On its face, that language does not identify any accounts within the four corners of the injunction.

*The asset restraints do not clearly and unambiguously apply to the Banks.*

Nor do this Court's asset restraints expressly identify the Banks by name as enjoined parties.  Assignee argues that this Court may enforce the restraints against the Banks because: (1) under Rule 65(d)(2), the restraints bind to all those who receive actual notice of the restraints and are "in active concert or participation" with the Judgment Debtors; and (2) the Banks "acted in active concert with Judgement Debtors [by] allow[ing] them to continue to conduct ordinary banking transactions as part of their counterfeiting operations."  (CM Br. at 1.)

Rule 65 does not stretch that far.  Rather, the rule "is designed to codify the common-law doctrine 'that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.'"  *Doctor's Assocs. v. Reinert & Duree, P.C.*, 191 F.3d 297, 302-3 (2d Cir. 1999).  The "active concert or participation" language represents "an exception to the general principal that a court cannot make a decree which will bind any one but a party."  *Id.* at 302 (internal quotation marks omitted).  For that reason, courts seeking to hold a nonparty liable for contempt on an "active concert" standard require clear and convincing proof of coordination between the enjoined party and the nonparty.

One court recently listed examples of "active concert or participation" recognized in this Circuit:

> "cases where an enjoined party is substantially intertwined with a non-party, including the shared occupation of office space, payment of employee expenses between the non-party and enjoined party, considerable control by the enjoined party over the non-party's operations, and other substantial interconnections . . . ."

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 638 (S.D.N.Y. 2018) (quoting *In re Sledziejowski*, 533 B.R. 408, 424 (Bankr. S.D.N.Y. 2015). None of those scenarios describes the relationship between the Banks and the Judgment Debtors. It is thus not clear and unambiguous to this Court – and therefore could not have been clear and unambiguous to the

Banks – that a Rule 65 order binding those in "active concert and participation" with an enjoined defendant extends to that defendant's bank.

Courts in this district have repeatedly rejected the argument that a bank is "in active concert and participation" when it provides routine banking activities to an enjoined party. In *Motorola Credit Corp. v. Uzan*, 978 F. Supp. 2d 205, 210-13 (S.D.N.Y. 2013), the court rejected the same interpretation of Rule 65(d)(2) now forwarded by Assignee, opining that "it would unduly stretch the language of the Court's Order to find that continuing to engage in routine banking transactions can be turned into 'active concert or participation with [the enjoined parties]' simply through 'notice of [the Court's] order [of asset freeze]." *Id.* at 210-213. The same reasoning carried the day in *Allstar Mktg. Grp., LLC v. 158*, No. 18-cv-4101, 2019 WL 3936879 (S.D.N.Y. Aug. 20, 2019), when the court could not "conclude that a third-party who merely holds the Defaulting Defendants' assets – which may be wholly unrelated to the counterfeiting at issue in this case – is by definition 'in active concert or participation' with the Defaulting Defendants." *Id.* at *3. Those cases suggest that "active concert or participation" is something more than account management in the ordinary course, which is what the Banks stand accused of in the Contempt Motion.

For that reason, the Second Circuit's holding in *Gucci* that a district court "need not have personal jurisdiction over nonparties to issue a preliminary injunction requiring a party before it to refrain from moving assets" is no help to Assignee. (Dkt. No. 264, Reply Memorandum of Law in further Support of the Contempt Motion ("CM Reply"), at 9 (quoting *Gucci*, 768 F.3d at 129-30).) The court in *Gucci* specifically said that any such injunction only "restrain[s] the conduct of nonparties" to the extent those nonparties act "in active concert or participation with an enjoined party" – directly quoting the same standard that courts have refused to apply to a

nonparty bank's maintenance of an enjoined party's account. *Id.* Assignee's reliance on *Gucci* to support a finding of contempt begs the question; it presumes that the banks are in "active concert or participation" without pointing to any conduct that courts in this Circuit have recognized as "active concert or participation."

Furthermore, Assignee does not cite a single case in which the court made a finding of contempt against a bank acting in the ordinary course based on an "active concert or participation" theory – let alone a foreign branch of a bank that was only personally served at its New York location. (*See* CM Reply at 9.)

In *Arista Records, LLV v. Tkach*, 122 F. Supp. 3d 32 (S.D.N.Y. 2015), Judge Nathan clarified that an existing preliminary injunction applied to an internet service provider that had aided and abetted trademark infringement by "improv[ing] the performance" of the enjoined party's infringing websites after the provider received actual notice of the order. *Id.* at 36. She made no finding of contempt.

In *Pittman v. Aswasn Restaurant Group, LLC*, No. 11-cv-2259, 2012 WL 505920 (S.D. Cal. Feb. 14, 2012), a court in the Central District of California granted an unopposed motion to compel compliance with a TRO – not a contempt motion – against a bank branch located within its jurisdiction.

Finally, in *Reliance Insurance Company v. Mast Construction Company*, 84 F.3d 372 (10th Cir. 1996), the Tenth Circuit reversed a district court's denial of a contempt motion against a bank located within its jurisdiction where the lower court had applied an incorrect "alter ego, collusion, or identity of interest" test to assess the bank's "active concert or participation" with an enjoined party. *Id.* at 377. Remanding the matter for further proceedings, the court noted that, while the bank could be held in contempt if employees had extended credit to the enjoined party

four days after receiving actual notice of the order, plaintiff would nonetheless face "significant hurdles" before it could prevail on its contempt motion. *Id.*

Each of these three cases equates "active concert and participation" with "aiding and abetting," *Arista*, 122 F. Supp. 3d at 35; *Pittman*, 2012 WL 505920, at *1; *Reliance*, 84 F.3d at 377. However, this Court can only find that the Banks aided and abetted if Assignee musters proof that the Banks "provided substantial assistance to advance the [underlying tort's] commission." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 172 (2d Cir. 2012). The Contempt Motion does not address that requirement.

Assignee argues that the Banks are bound under the "active concert and participation" language in the Orders because the Judgment Debtors enjoyed "continued access to their accounts. (CM Reply at 9.) But the mere fact of account access is not enough for this Court to conclude that the Banks provided substantial assistance to further the Judgment Debtors' infringement schemes (even if Assignee had satisfied the other elements of aiding and abetting). *See Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 390 (S.D.N.Y. 2007) ("'[T]he mere fact that participants in a fraudulent scheme use accounts at a bank to perpetrate it, without more, does not in and of itself rise to the level of substantial assistance.'").

Because the Contempt Motion offers no proof showing that the Banks aided and abetted the Judgment Debtors' unlawful activity, the asset restraints did not clearly and unambiguously apply to the Banks as entities "in active concert or participation" with the Judgment Debtors, and therefore, the Banks cannot be found in contempt of the asset restraints.

   2. <u>The Default Judgment is Not Enforceable Against the Chinese Branches.</u>

The Default Judgment Order clearly and unmistakably states that, "this judgment is not directed against the banks" and that "no enforcement proceeding . . . has been initiated [against the Chinese branches]." *Nike I*, at *1-2. That was an understatement. Not only was there no

enforcement proceeding against the Chinese Branches in this Court at the time of the Default

Judgment, no enforcement proceeding would have been possible, because the restraints in the

Default Judgment are unenforceable against the Chinese branches. Therefore, this Court cannot

find the Banks in contempt of the Default Judgment.

> a)      *The "separate entity" rule bars postjudgment restraints of assets*
> *held in foreign bank branches.*

For the duration of their involvement in this case, the Banks have raised three excuses for

their noncompliance with this Court's orders: lack of personal jurisdiction, the "separate entity"

rule, and comity concerns.  This Court addressed the personal jurisdiction and comity arguments

in the Discovery Orders, concluding that, at least for purposes of discovery, the Banks were

subject to this Court's jurisdiction, and that compliance with Assignee's requests would not

offend principles of international comity.  Those orders were consistent with the Second

Circuit's rulings regarding discovery and prejudgment asset restraints in *Gucci* and *Tiffany*, as

well as the lower court rulings on remand in those cases.  *See, e.g.*, *Gucci II*.

However, no court has ever considered the Banks' third argument – that the separate

entity rule bars enforcement of postjudgment asset restraints and turnover orders against the

Chinese branches.  When entering a default judgment in *Tiffany (NJ) LLC v. Qi Andrew, et al.*,

No. 10-civ-9471, 2015 WL 3701602 (S.D.N.Y. June 15, 2015) ("*Tiffany II*"), my colleague,

Judge Failla, specifically declined to address the "separate entity" rule until the nonparty banks

in that case were "summoned to answer for assisting in a violation of a district court's

injunction."  *Id.* at *13 (quoting *NML Cap., Ltd. V. Rep. of Argentina*, 727 F.3d 230, 243 (2d Cir.

2013)).

This Court faces that scenario now. Once again, the Banks argue that the asset restraints, including those in the Default Judgment, cannot bind the Chinese Branches, because, under New York law:

> The separate entity rule . . . provides that even when a bank garnishee with a New York Branch is subject to personal jurisdiction, its other branches are to be treated as separate entities for certain purposes, particularly with respect to . . . article 52 postjudgment restraining notices and turnover orders . . . . In other words, a restraining notice served on a New York branch will be effective for assets held in accounts at that branch but will have no impact on assets in other branches.

*Motorola Credit Corp. v. Standard Chartered Bank*, 24 N.Y.3d 149, 158-59 (2014) ("*Motorola*") (internal citations omitted).

*Motorola* is squarely on point. There, a federal district court entered a default judgment against Turkish defendants, which included asset restraints pursuant to FRCP 65 and 69, as well as CPLR 5222, enjoining "the [defendants] and anyone with notice of the order from selling, assigning or transferring their property." *Motorola*, 24 N.Y.3d at 157. The plaintiff, Motorola, attempted to enforce the restraints by serving the New York branch of a nonparty bank headquartered in the United Kingdom that "had no connection to . . . the underlying litigation." *Id.* The bank found no judgment debtor assets in its New York branch, though there were assets overseas. *Id.* The district court held that the "separate entity" rule precluded enforcement of the asset restraint on the foreign branches. *Motorola Credit Corp. v. Uzan*, 978 F. Supp. 2d 205, 210-13 (S.D.N.Y. 2013).

On appeal, the Second Circuit certified questions to the New York Court of Appeals regarding the continued viability of the "separate entity" rule. *See Tire Eng'g and Dist. L.L.C. v. Bank of China, Ltd.*, 740 F.3d 108, 117-118 (2d Cir. 2014). The New York Court of Appeals affirmed that the rule precluded the enforcement of the asset restraints against branches located outside of New York. *Motorola*, 24 N.Y.3d at 163. After the decision in *Motorola*, the Second

Circuit and the lower court held that the postjudgment asset restraints were not enforceable against non-U.S. branches of a foreign bank. *See Motorola Credit Corp. v. Standard Chartered Bank*, 771 F.3d 160, 161 (2d Cir. 2014) ("the district court correctly concluded that the separate entity rule precludes the restraint of assets held in Standard Chartered Bank's foreign branches.");[7] *Motorola Credit Corp. v. Uzan*, 73 F. Supp. 3d 397, 401 (S.D.N.Y. 2014) (same). Courts in other districts in New York have applied the rule as well.  *See e.g., Baltazar v. Houslanger & Assocs., PLLC*, No. 16-civ-4982, 2018 WL 3941943, at *11 (E.D.N.Y. Aug. 16, 2018); *John Wiley*, 2009 WL 3003242, at *3 (listing cases citing the "separate entity" rule).

Assignee contends that the "separate entity" rule is irrelevant in this case, because the rule only shields assets in foreign bank branches where jurisdiction over the bank is "based *solely* on the service of a foreign bank's New York branch" (CM Br. at 21 n.7 (emphasis in original) (quoting *Motorola*, 24 N.Y.3d at 162).)  According to Assignee, because this Court found specific personal jurisdiction over the Banks in the Discovery Orders, and because service plus the discovery orders is more than service alone, the separate entity rule does not apply to the postjudgment asset restraints in this case.

That argument is a trifecta: wrong on the facts, contrary to law, and unworkable as a matter of public policy.

First of all, Assignee's claim that this Court has already exercised personal jurisdiction over the Banks for the purposes of attachment finds no support the record.  Assignee says that the Discovery Orders affirmatively establish this Court's ability to ignore the "separate entity" rule and enforce the postjudgment restraints against the Chinese Branches.  (CM Br. at 19-20.)

---

[7] *Motorola II* was not the first Second Circuit decision to recognize the "separate entity" rule.  In *Allied Maritime, Inc. v. Descatrade SA*, 620 F. 3d 70 (2d Cir. 2010), the court relied on the separate entity rule to hold that it lacked jurisdiction over a bank account in France based on "the mere fact that a bank may have a branch within New York." *Id.* at 74 (quoting *John Wiley*, 2009 WL 3003242, at *3).

But *Nike II* did just the opposite: Judge Freeman expressly declined to say "whether a nonparty ban can be required to impose an asset restraint held in foreign branches or to turn over a customer's foreign-held assets." *Nike II*, 349 F. Supp. 3d at 332 n.12. And *Nike III* was entirely silent on the matter.

Second, Assignee's understanding of the separate entity conflates the reach of turnover orders under New York law with the scope of this Court's authority to attach judgments to a judgment debtor's foreign accounts. In *Koehler v. Bank of Bermuda Ltd.*, 911 N.E. 2d 825 (N.Y. 2009), the New York Court of Appeals ruled that Section 5225 allows New York courts with personal jurisdiction over garnishee banks may use turnover orders to compel those banks to produce stock certificates located overseas in order to satisfy the obligations of a judgment debtor. *Id.* at 828.[8] A turnover order is a creature of state statute that permits a judgment creditor to commence a special proceeding naming the person in possession of the judgment debtor's personal property as a defendant, whether that person is the judgment debtor or a third party. CPLR § 5225. Assignee's argument that the postjudgment asset restraints are enforceable in spite of the separate entity rule relies exclusively on *Koehler*.[9]

---

[8] Another case cited in Assignee's Reply brief, *Peterson v. Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017), offered for the proposition that *Koehler* allows "a court sitting in New York with personal jurisdiction over a non-sovereign third party to recall to New York extraterritorial assets owned by a foreign sovereign," also arose in the context of a turnover petition. *Id.* at 73.

[9] Assignee cites several cases that do not involve postjudgment seizure of assets held by third parties. For example, in *Hotel 71 Mezz Lender LLC v. Falor*, 926 N.E.2d 1202 (2010) the New York Court of Appeals upheld a lower court's "authority to order prejudgment attaches of the property defendant . . . owned and/or controlled." *Id.* at 1208. That is entirely consistent with the Court's orders as to the Judgment Debtors, but has no bearing on the Banks' obligations in this case, or the applicability of the separate entity rule. *See also Abuhamda v. Abuhamda*, 236 A.D.2d 290, 290 (1st Dept. 1997) (prejudgment restraint of assets transferred from New York branch). This Court's opinion in *S.E.C. v. Heden* (cited at CM Br. at 16) is also irrelevant to cross-border asset seizures; it only stands for the principle that courts "may order equitable relief [such as an asset freeze] against a person who is not accused of wrongdoing in a securities enforcement action where that person (1) has received ill-gotten gains; and (2) does not have a legitimate claim to those funds." 51 F. Supp. 2d 296, 299 (S.D.N.Y. 1999). But there is no allegation that the Banks have reaped any such gains in this case.

Yet *Koehler* did not address the separate entity rule at all, because the defendant bank did not invoke its protection. That was wise strategy, because the separate entity rule did not apply in *Koehler* for three reasons not applicable here: the *Koehler* plaintiff sought stock certificates, not the contents of a foreign bank account; the *Koehler* plaintiff personally served a subsidiary of a foreign bank, Bank of Bermuda Limited ("BBL"), rather than a coequal branch of common parent entity; and, lastly, BBL consented to the Court's personal jurisdiction "as of the time that Koehler commenced the proceeding," effectively conceding that the certificates were within the court's reach. For that reason, the *Motorola* court rejected the argument that *Koehler* overruled the separate entity rule, and reiterated that judgment creditors only run up against the rule when attempting to enforce turnover order or asset restraints overseas against, "particularly in situations involving attempts to restrain assets held in a garnishee bank's foreign branches." *Motorola*, 24 N.Y.3d at 161.

Finally, Assignee's conception of the separate entity rule – whereby a finding of specific personal jurisdiction for discovery purposes operates as a hook to ensnare a bank's offshore assets – would ensure the very "undue disruption of routine banking practices . . . involv[ing] [nonparty] banks subject to foreign laws and practices" that the rule serves to prevent. *Motorola Credit Corp. v. Uzan*, 288 F. Supp. 2d 558, 561 (S.D.N.Y. 2003). It would also expose foreign bank branches competing claims – *i.e.* a withdrawal made locally versus a judgment attached from this jurisdiction – and, relatedly, "the possibility of double liability." *Motorola*, 24 N.Y.3d at 159. Without citation to any on-point authority, Assignee asks this Court to gut a rule "vital in the context of international banking," which encourages foreign financial institutions to "open branches and conduct business in New York." *Id.* at 158.

Even if the facts of this case do present some as-yet-unrecognized exception to this "firmly established principle of New York law," *Id.* at 160, it would be manifestly unfair to use contempt proceedings to resolve such an important issue of first impression, *see Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 292 (2d Cir. 2008). This Court will not upend years of precedent, recently reaffirmed by the New York Court of Appeals and ratified by the Second Circuit.

Because this Court cannot enforce the asset restraints in the Default judgment under the separate entity rule as stated in *Motorola*, it also cannot hold the Banks in contempt for their failure to abide by those provisions.

<blockquote>

*b)*     *The asset restraints in the Default Judgment are unenforceable under the Federal Rules.*

</blockquote>

Independently, the statutory damages award in the Default judgment rendered the postjudgment asset restraints unenforceable. (*See* Dkt. No. 49 ¶¶ 10, 11.)

Asset restraints are valid only as long as they are necessary to maintain "the status quo pending final determination" of an equitable claim. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 325 (1999). Once Plaintiffs received a legal remedy in the form of statutory damages, extinguishing their equitable claims, this Court lost the ability to impose postjudgment asset restraints. It is black letter law, supported by Supreme Court precedent, that courts may not impose asset restraints "for the purpose of preserving an award of statutory damages." *Klipsch Grp., Inc. v. Big Box Store Ltd.*, No. 12 Civ. 6283, 2012 WL 5265727, at *8 (S.D.N.Y. Oct. 24, 2012) (citing *Grupo Mexicano*, 527 U.S. at 333).

The court in *Tiffany II* reached the same conclusion. Upon awarding statutory damages for claims of trademark infringement, the court struck postjudgment asset freeze provisions from the text of plaintiff's proposed default judgment. *Tiffany II*, 2015 WL 3701602, at *11. Although the plaintiff had sought legal and equitable remedies in the alternative, the court

acknowledged that any equitable accounting of profits that depended on the cooperation of defaulting defendants was "illusory." *Id.* Judge Failla further held that "the Lanham Act does not permit a plaintiff to hedge in this manner between recovery of profits under Section 1117(a) and statutory damages under Section 1117(c)" and concluded that "Tiffany's failure to elect between statutory damages and profits renders the Proposed Default Judgment defective." *Id.* at *8. She therefore struck the Rule 65 injunction from the proposed default judgment. *Id.* at *13.

Here, Judge Scheindlin awarded statutory damages because she determined that an accounting of profits was impossible under the circumstances. (Dkt. No. 49 ¶ 8.) In doing so, she extinguished Plaintiffs' ability to enforce the postjudgment restraints included in the Default Judgment. As in *Tiffany II*, "the logic behind a prejudgment asset freeze" – to maintain the status quo pending adjudication – no longer applies now that Plaintiff's claims have been fully adjudicated. *Tiffany II*, 2015 WL 3701602, at *12.

It is true that Judge Scheindlin did not strike the asset restraint from Plaintiffs' proposed default judgment, as the Banks requested in their letter briefs (*see* Dkt. No. 41 at 4), and as Judge Failla did in *Tiffany II*. But the Default Judgment Order made clear that the judgment is "directed entirely at defendants," and stated that it was premature to determine whether judgment "would order the Banks to comply with an asset freeze." *Nike I*, at *1.[10]

By binding only the Judgment Debtors and not the Banks, the Default Judgment here is similar to the one in a related Tiffany trademark infringement case, *Tiffany (NJ) LLC v. Forbse*, No. 11-cv-4976, 2015 WL 5638060 (S.D.N.Y. Sept. 22, 2015) ("*Tiffany III*"), where Judge Buchwald found that a postjudgment asset restraint binding infringers was necessary to prevent

---

[10] Assignee frequently cites the "would order the banks to comply" language. However, many of these reference – including one that claims "the Judgment specifically 'order[ed] the Banks to comply with [the] asset freeze'" (CM Br. at 18 (quotation marks and alterations in original) – are flagrant distortions of the actual text of the order. They are as conspicuous as they are unappreciated.

them from hiding their assets prior to execution.  *Id.* at *4.  *Tiffany III* is consistent with *Grupo Mexicano*, in that it provides for postjudgment asset restraints only when there is reason to conclude that the judgment debtor is "seeking to evade enforcement of a . . . judgment," thus warranting further equitable remedies.  *Id.*  Judge Buchwald, like Judge Scheindlin, did not conclude that equitable remedies were necessary to constrain the conduct of third parties, and thus did not apply the judgment or the asset restraints to the Chinese branches of the nonparty banks that objected in that case.  *Id.* at *3–4.

Contrary to Assignee's claim, neither court's silence on this issue establishes that the Banks' Rule 65 argument "has already been rejected." (Dkt. No. 263, CM Reply Br. at 12.) Rather, the enforceability of the postjudgment asset restraints is just one of many issues raised in 2015 that this Court is deciding for the first time, in the context of the Contempt Motion.  By preserving these questions for a later date, Judge Scheindlin did not transform asset restraints that violate Rule 65 and Supreme Court precedent into enforceable orders.

Accordingly, the Banks cannot be bound by, nor found in contempt of, the postjudgment asset restraints in the Default Judgment.

3.     <u>Enforcing the Asset Restraints Retroactively Would Violate Due Process.</u>

In addition to these infirmities, the Contempt Motion clashes with fundamental notions of due process.

This Court cannot find the Banks in contempt of its orders "without affording [the Banks] a full opportunity at a hearing, after adequate notice, to present evidence."  *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 243 (2d Cir. 2013).  Such a hearing is necessary "before any finding of liability or sanction against a non-party" to settle legal questions relevant to the nonparty's potential liability.  *Id.*  That is, even if the Banks were bound by the orders, this Court would have to say so prior to (not concurrently with) making any finding of contempt.

As such, the Contempt Motion is premature, because it presumed answers to questions that this Court has never settled, and which it must settle in order to find the Banks in contempt, including: questions about the separate entity rule (just answered adversely to Next), and whether principles of international comity weigh against extraterritorial application of the asset restraints.

While the Discovery Orders addressed comity, Judge Freeman was careful to note that comity in the discovery context "is not the same as [the analysis] . . . which should be considered when the underlying exercise of jurisdiction concerns 'order a nonparty foreign bank to freeze assets abroad in apparent contravention of foreign law.'" (Discovery Order at 32 n.12 (quoting *Gucci*, 768 F.3d at 139).)  This Court has yet to say whether the comity factors favor enforcing the restraints against the Banks, which it must "before [it] may enforce an asset freeze injunction extraterritorially against a third-party foreign bank in a way that would cause the bank to violate its own domestic law." *Tiffany*, 589 Fed. Appx. at 553 (citing § 403 of the Restatement (Third) of Foreign Relations Law).

Irrespective of the merits, Assignee's failure to obtain an affirmative ruling on the comity question in the enforcement context dooms its underhanded Contempt Motion.  And it would be unreasonable to first decide that comity favored enforcement against the banks "on pain of contempt." *Chao*, 514 F.3d at 292.  As Judge Scheindlin made clear to Plaintiffs in *Nike I*, the appropriate time to analyze Comity under Section 403 would be when Assignee "seek[s] to compel the Banks to freeze those of defendants' overseas assets that are within their control." *Nike I*, at *1.  That day has yet to come.

I will not reward efforts by both Plaintiffs and Assignee to delay resolution of this issue and bolster their contempt arguments – these are the "gotcha" tactics that this Court will not tolerate.  *Cf. Heritage of Pride, Inc. v. Matinee NYC Inc.*, No. 14-civ-4165, 2014 WL 3703871,

at *1 (S.D.N.Y. July 23, 2014). If Assignee wishes to enforce the asset restraints against the Banks, it should brief the comity factors and give the Banks an opportunity to respond in connection with a motion to compel compliance.

Because applying the asset restraints to the Banks' activities prior to this Court's resolution of critical issues would violate due process, I cannot base a finding of contempt on any of the asset restraints.

### C.    The Banks Are Not in Contempt of the Discovery Orders.

I will not find the Banks in contempt of either of the Discovery Orders.

In the context of civil contempt, "clear and convincing evidence" denotes "a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (internal quotation marks omitted). The Court finds that Assignee has failed to establish by clear and convincing evidence that the Banks did not comply with the Court's discovery orders.

The Banks cannot be held in contempt as long as they made "diligent and energetic efforts to comply in a reasonable manner" with the Discovery Orders. *Chao*, 514 F.3d at 293. "Although the Second Circuit has not been squarely confronted with the question of what constitutes 'reasonable diligence,' it has noted that 'substantial compliance' is the appropriate standard in evaluating noncompliance in a contempt case." *Yurman Studio, Inc. v. Castaneda*, No. 07-cv-1241, 2009 WL 454275, at *2 (S.D.N.Y. Feb. 23, 2009) (quoting *Latino Officers Ass'n of the City of New York v. City of New York*, 519 F. Supp. 2d 438, 446 n.43 (S.D.N.Y. 2007). Therefore, reasonable diligence does not require that Banks to "exhaust all means available" to them, *Chao*, 514 F.3d at 293; indeed, demonstrably inadequate efforts may be sufficient to avoid contempt sanctions, provided they are the product of a nonparty's "reasonably effective methods of compliance," *Zino Davidoff SA v. CVS Corp.*, No. 06-cv-15332, 2008 WL

1775410, at *8 (S.D.N.Y. Apr. 17, 2008); *see also Coan v. Dunne*, 602 B.R. 429, 443 (D. Conn. 2019) ("Perfect compliance is not required to avoid a finding of contempt.") (internal quotation marks omitted).

In *Gucci America, Inc. v. Li*, No. 10-cv-4974, 2015 WL 7758872 (S.D.N.Y. Nov. 30, 2015) ("*Gucci III*"), which followed the Second Circuit's remand, the district court found BOC in contempt of an order compelling subpoena compliance where the bank "ha[d] made clear, in writing and in conferences before the Court, this it does not intend to comply," and "ha[d] made no effort to turn over the subpoenaed account documents." *Id.* at *2. Accordingly, Judge Sullivan had "little difficulty concluding that BOC's conduct satisfies the civil contempt standard." *Id.*

In this case, by contrast, the Banks searched numerous branches and databases for the information demanded in the subpoenas, even though some of the Debtor information was incomplete and unsearchable on the Banks' systems, and other records could only be found in hard copy format. The Banks ultimately produced over 7,000 documents, including records relating to more than 100 accounts specifically identified in the Subpoenas and documents and information relating to hundreds of additional accounts also maintained by the Judgment Debtors that are not identified in the Subpoenas. (*See* CM Opp. Br. at 38-39; *see also* Chung Decl. ¶¶ 11, 14 & Ex. 4.) Each of these steps evinces the Banks' efforts to substantially comply with this Court's Discovery Orders.

Nonetheless, Assignee maintains that "substantial compliance" means perfect (or near-perfect) compliance, arguing that the Banks must be held in contempt because Assignee has yet to receive every account record, email, and report related to the Judgment Debtors. (CM Br. at 29-30.) But it is by no means clear and convincing to this Court that the Banks are actually

withholding any relevant or nonduplicative information.  Assignee's only support for that claim is the opinion of its forensic accountant, Edward Boyle, who states that the Banks failed to produce every document that he expected to receive based on the subpoenas.  (*See* Boyle Decl. ¶¶ 19-26.)  But Mr. Boyle's experience with other Chinese bank records does not prove that such documents ever existed with respect to the Judgment Debtors' accounts, let alone that such documents are currently in the Banks' possession.

Indeed, the lengthy record of correspondence submitted in connection with the Contempt Motion demonstrates that the Banks have spent months responding to Assignee's concerns.  For example, Assignee sent a letter to the Banks listing 39 accounts for which it had yet to receive any records (*see* Nagin Decl. Ex. 64), to which the Banks responded with lists of documents associated with each account, and identified all those accounts for which they were unable to locate any responsive documents (*see* Chung Supp. Decl. ¶ 16 & Ex. 6).  That sort of diligent cooperation does not merit a contempt finding.

As for emails and other communications between Bank employees and the Judgment Debtors, the burden associated with locating any such records in the email accounts of thousands of Bank employees using common accountholder names would be tremendous. (*See* Y. Zhou Decl. ¶ 20; Zhu Decl. ¶¶ 21– 23; Zeng Decl. ¶¶ 35–37; Shi Decl. ¶ 11; B. Zhou Decl. ¶ 24.)  This case concerns more than 200 Bank accounts and nearly 800 unique Judgment Debtor email addresses, each of which would require a separate search.  There is no dispute that by failing to look, the Banks may have failed to collect communications between the Debtors and Bank employees – if any exist.  But the Contempt Motion fails to explain what relevant information those communications would reveal that is not otherwise contained in the account records Assignee has already received, or whether that information justifies the significant expense

necessary to collect it.  Under the circumstances, in the course of complying with third-party subpoenas that required them to scour paper files across dozens of  branches, it was reasonable for the Banks to forego email collection and review, both to minimize cost and expedite the production process.

I cannot say the same for the Banks' decision to withhold reports related to the Judgment Debtors' accounts.  The Banks' position is that the legal regimes applicable to banks in both China and the United States prohibit the dissemination of Suspicious Activity Reports, Currency Transaction Reports, and credit reports of individual Judgment Debtors.  (CM Opp. Br. at 40-41.)  This Court already rejected this argument with regard to Chinese law twice in this case, finding that principles of international comity do not allow the Banks to "hide behind Chinese Bank secrecy laws as shield" in order to shirk their discovery responsibilities.  *Nike II*, 349 F. Supp. 3d at 339; *see also Nike III*, 349 F. Supp. 3d at 368.  And while U.S. banking law does prohibit the disclosure of Suspicious Activity Reports, *see* 31 USC § 5318(g)(2); 31 CFR 1020.320(e), the Banks offer no grounds for withholding the other two types of reports.

However, those limited instances of noncompliance are slender reeds on which to rest the finding of contempt that Assignee demands.  *See Zino Davidoff*, No. 06-cv-15332, 2008 WL 1775410, at *13 (S.D.N.Y. Apr. 17, 2008) (listing cases permitting "some isolated instances of noncompliance").  Such a finding would be especially severe in light of the fact that the Banks have produced records containing the same transaction information that Assignee seeks form the unproduced reports.  (*See* CM Opp. Br. at 41 (citing Chung Decl. ¶ 14 & Ex. 4).)

Finally, Assignee fails to present any cogent argument in support of its request for an "adverse inference" that the alleged missing documents would show the Banks violated this Court's orders.  (CM Br. at 30-33.)  Even if the Banks were not in "substantial compliance" with

the subpoena, an adverse inference would be inappropriate in this case. Courts may only utilize a Rule 37 adverse inference to sanction the discovery misconduct of parties to an action, not nonparties such as the Banks; accordingly, an adverse inference sanction is not available. *See Gucci Am., Inc. v. Weixing Li*, 2012 WL 5992142, at *6 n.3 (S.D.N.Y. Nov. 15, 2012) ("[T]he sanctions provisions of Federal Rule of Civil Procedure 37 do not apply to non-parties"); *Funnekotter v. Republic of Zimb.*, 2011 WL 5517860, at *3 (S.D.N.Y. Nov. 10, 2011) ("[E]ven where a non-party is subject to a court-ordered deposition or subpoena, and fails to comply, the only remedies available are those for contempt, not adverse findings against the non-party.").

Nor may Assignee obtain an adverse inference by appealing to the Court's "inherent powers" to levy sanctions. (CM Br. at 30-31.) Because Assignee cites no law in support for its unprecedented request to enter an adverse inference against a nonparty, this Court must resort to first principles. It is black letter law that "inherent power" sanctions are available "only upon a particularized showing of bad faith, which requires both clear evidence that the challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of the [district] court." *Charles v. City of New York*, 2015 WL 756886, at *3 (S.D.N.Y. Feb. 20, 2015). The Banks considerable efforts to comply come nowhere near that very high bar. They have each conducted extensive searches for these documents and either (1) could not find any evidence of the existence of the account, or (2) could not find any transaction documents related to that account. Assignee "is not entitled to an adverse inference based on [the] nonproduction of nonexistent evidence." *See Baez v. Delta Airlines, Inc.*, 2013 WL 5272935, at *10-12 (S.D.N.Y. Sept. 18, 2013).

Assignee's motion to hold the Banks in contempt of the Discovery Orders is denied.

### D.  Contempt Sanctions

Because Assignee has failed to establish that a finding of civil contempt is merited, the Court finds that compensatory sanctions are inappropriate. *See, e.g., N.Y. State Nat'l Orf. For Women v. Terry,* 886 F.2d 1339, 1352 (2d Cir. 1989).  Likewise, because Assignee has failed to present clear and convincing evidence that the Banks' compliance efforts were not reasonably diligent, the Court finds that coercive contempt sanctions aimed at the Banks' future behavior are inappropriate.  *See Zino Davidoff*, 2008 WL 1775410, at *14; *see also Brown v. Kelly*, No. 05-civ-5442,  2007 WL 1573957, at *5 (S.D.N.Y. May 31, 2007) ("Punitive civil sanctions are not permitted ....").  Therefore, this Court need not reach the merits of Assignee's damages request.

### E.  Assignee's Fees and Costs Associated with the Contempt Motion

Finally, Assignee seeks to recover the attorney's fees and the costs incurred in bringing the instant motion. (CM Br. at 56-59.)  In the absence of willfully contumacious conduct or other conduct evincing the contemnor's bad faith, an award of fees and costs is inappropriate. *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd*, 885 F.2d 1, 8 (2d Cir. 1989) (internal quotation marks and citation omitted); *see also Weitzman v. Stein,* 98 F.3d 717, 719 (2d Cir.1996).  It should go without saying, then, that a party bringing an unsuccessful contempt motion cannot expect to recover the fees incurred in preparing such a motion. Therefore, the Court denies Assignee's motion for attorney's fees associated with the Contempt Motion.

## III.  THE MOTION FOR A TURNOVER ORDER IS DENIED.

Assignee also moves this Court to order the Banks to turn over the $39,721.64 currently in the Judgment Debtors' accounts at the Chinese branches.  (CM Br. at 59.)  This motion for attachment to the Debtors' remaining assets is governed by Federal Rule of Civil Procedure 69(a), which states in part that, "The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the

court is located, but a federal statute governs to the extent it applies." FED. R. CIV. P. 69(a).

However, a judgment creditor movant may not "skirt limitations on [their requested] relief under

New York law" when a turnover order is in federal court. *Uzan*, 978 F. Supp. 2d at 214.

Here, Assignee must clear both statutory and common law hurdles to obtain a turnover

order against the Banks. First, CPLR § 5225(b) provides that:

> Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff ... The court may permit the judgment debtor to intervene in the proceeding.

Courts in this Circuit do not require judgment creditors to file a new complaint in either state or

federal court to comply with CPLR § 5225, noting that "a special proceeding . . . has more in

common with motion practice than it does with a plenary action." *Northern Mariana Islands v.*

*Millard*, 845 F. Supp. 2d 579, 582 (S.D.N.Y. 2012) (internal quotation marks omitted).

Therefore, Assignee's motion for a turnover order complies with the CPLR and Rule 69.

There remains, however, the separate entity rule, which prevents this Court from issuing

a Rule 69 execution order for cross-border attachment of assets. (*See* Section II.B.2.a, *supra*.)

That is why, in *Allied Maritime*, the Second Circuit relied on the separate entity rule to affirm a

district court's ruling that it could not attach a judgment to assets held in a French bank branch.

*Allied Maritime,* 620 F.3d 70 at 74. Similarly, no court, state or federal, could enter the turnover

order Assignee seeks, because it would not "accord with the procedure of [New York] state."

FED. R. CIV. P. 69(a)(1). The writ of the Sheriff of New York County does not run to China.

Assignee is hardly the first judgment holder to encounter difficulty when attempting to collect from a foreign debtor.  It happens all the time, and to parties with considerably fewer resources.  Assignee may still attempt collect from the judgment debtors in the Chinese court system, or other courts with jurisdiction over them (if there are any).

The motion for a turnover order is denied.

## IV.     THE CONDITIONAL MOTION IS DENIED AS MOOT.

The Banks filed the Conditional Motion pursuant to Local Civil Rule 83.6(b) and principles of due process, requesting additional discovery and an evidentiary hearing regarding Assignee's claimed damages in the event this Court granted the Contempt Motion.  (*See* Dkt. Nos. 249-250.)  This Court having denied the Contempt Motion, the Conditional Motion is denied as moot.

**CONCLUSION**

The Reimbursement Motion is DENIED.

The Contempt Motion and the motion for a turnover order is DENIED.

The Conditional Motion is DENIED as moot, without prejudice.

The Clerk of Court is respectfully directed to close Dkt. Nos. 194, 205, and 249.  This constitutes the written decision and order of the Court.

Dated: January 17, 2020

_____
Chief Judge

BY ECF TO ALL PARTIES